# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT J. HANFLING, CHAPTER 11 ) <br> TRUSTEE FOR ATG, INC. AND ) <br> CATALYTICS LLC ) <br> ) <br> **Plaintiff,** ) <br> v. ) <br> ) <br> EPSTEIN BECKER & GREEN, P.C. ) <br> JOHN PRESTON, CHRISTOPHER NAGEL, ) <br> EUGENE BERMAN, ETHAN JACKS, ) <br> QUANTUM CATALYTICS LLC, ABC ) <br> CORPS 1 through 5 and JOHN DOES ) <br> 1 through 5, ) <br> ) <br> **Defendants.** ) | C.A. No. 05-10077-RGS |

## REQUEST FOR JUDICIAL NOTICE OF EXHIBITS
## ATTACHED TO DEFENDANTS RENEWED MOTION TO DISMISS

Defendants Quantum Catalytics, LLC, John Preston, and Christopher Nagle hereby respectfully request that the Court judicially notice Exhibits A through I referenced in, and attached to, their Modified Memorandum of Law in Support of Their Motion to Dismiss. The attached exhibits are publicly filed documents, or are otherwise expressly relied upon in the Complaint and, therefore, may properly be considered on a motion to dismiss. Alternative Energy, Inc. v. St. Paul Fire and Marine Insurance Co., 267 F.3d 30, 33-34 (1st Cir. 2001); Perry v. New England Bus. Serv., Inc., 347 F.3d 343, 345 (1st Cir. 2003); see also MGIC Indemnity Corp. v. Weisman, 803 F.2d 500, 524 (9th Cir. 1986); Neilson v. Union Bank of California, 290 F.Supp.2d 1101, 1112 n. 37 (C.D. Cal. 2003).

**Exhibit A:** Copy of Purchase Offer filed with the United States Bankruptcy Court for the District of Massachusetts, Case No. 97-21-386-CJK, dated November 6, 1998;

**Exhibit B:** Copy of Order Approving Sale Entered by the United States Bankruptcy Court for the District of Massachusetts, Case No. 97-21-386-CJK, on November 25, 1998;

**Exhibit C:** Copy of Letter Agreement dated December 1, 1998, referred to and relied upon in the Complaint;

**Exhibit D:** Copy of Adversary Proceeding filed on or about May 11, 2001 with the United States Bankruptcy Court for the District of Massachusetts, Case No. 97-21-386-CJK, entitled Stephen S. Gray, Chapter 11 Trustee v. Quantum Catalytics, LLC., Adversary Proceeding No. 01-1205-CJK;

**Exhibit E:** Copy of Trustees Motion to Approve Settlement of Adversary Proceeding filed on or about August 9, 2002 with the United States Bankruptcy Court for the District of Massachusetts, Case No. 97-21-386-CJK, entitled Stephen S. Gray, Chapter 11 Trustee v. Quantum Catalytics, LLC, Adversary Proceeding No. 01-1205-CJK;

**Exhibit F:** Copy of Notice of Removal filed on or about June 25, 2001 with the United States District Court for the Eastern District of Tennessee, Knoxville Division, Case No. 3:01-CV-322;

**Exhibit G:** Copy of Answer and Counterclaim filed on or about July 11, 2001 with the United States District Court for the Eastern District of Tennessee, Knoxville Division, Case No. 3:01-CV-322;

Exhibit H:    Copy of Response to Motion to Dismiss filed on or about September 6, 2001 with the United States District Court for the Eastern District of Tennessee, Knoxville Division, Case No. 3:01-CV-322; and

Exhibit I:    Copy of Memorandum and Order entered on or about January 29, 2002 by the United States District Court for the Eastern District of Tennessee, Knoxville Division, Case No. 3:01-CV-322.

Dated: June 2, 2005

Respectfully submitted,
**DEFENDANTS QUANTUM CATALYTICS LLC, JOHN PRESTON, and CHRISTOPHER NAGEL**
By their attorneys,


_/s/ Nancy E. Maroney_
Joseph S. Ayoub, Jr. (BBO #024900)
Nancy E. Maroney (BBO# 652324)
**NUTTER MCCLENNEN & FISH, LLP**
155 Seaport Boulevard
Boston, MA  02210
T. (617) 439-2000
F. (617) 310-9000


## CERTIFICATE OF SERVICE

    I hereby certify that a true copy of the above document was served by U.S. mail upon the attorney of record for each party who did not receive electronic service of this document.


_/s/ Nancy E. Maroney_
Nancy E. Maroney

Dated:  June 2, 2005


1433834.1

# EXHIBIT A

DOCKETED

*Molten Metal*

November 6, 1998

Stephen S. Gray, Trustee
c/c The Recovery Group
270 Congress Street
Boston, MA 02210

*ATG, Inc. and*
*Quantum Catalytics*

Re:     Acquisition of "Wet Waste Assets" and "CEP Business" of the Debtors

Dear Mr. Gray:

        The seller is a trustee for debtors (the "Seller") under Chapter 11 of the United States Bankruptcy Code (the "Code") in the United States Bankruptcy Court for the District of Massachusetts (Eastern District) (the "Court") Case No. 97-21-386-CJK (the "Chapter 11 Case"). This letter sets forth the binding terms under which ATG, Inc. (the "Wet Waste Assets Buyer") or its nominees offers to purchase, as more particularly set forth in Part I hereof, the Wet Waste Assets (as defined in Part I), and Quantum Catalytics, LLC (the "CEP Assets Buyer") or its nominees offers to purchase, as more particularly set forth in Part II hereof, the CEP Assets (as defined in Part II). This is a joint offer to purchase the specified assets of the Seller, and the closing of the purchase and sale of either the Wet Waste Assets or the CEP Assets is dependent on the purchase and sale of the other. The Wet Waste Assets Buyer and the CEP Assets Buyer are jointly referred to herein as the "Buyers" and each as a "Buyer". Each Buyer shall be severally, and not jointly, responsible for the obligations and payments relating to the respective asset sales each proposes herein and shall have no obligation, responsibility or liability with respect to the other Buyer's proposal. The combined consideration accruing to the Sellers with respect to this joint proposed includes:

        1.      A deposit via certified check from the Wet Water Assets Buyer in the amount of $1,050,000;

        2.      A certified check from the Wet Water Assets Buyer at Closing in the amount of $9,450,000;



Stephen S. Gray, Trustee
November 6, 1998
Page 2

    3.     Assumption of environmental liabilities by the CEP Assets Buyer relating to disposal of secondary waste and decontamination and decommissioning of Bear Creek Road and Fall River facilities; and

    4.     Future cash payments from the CEP Asset Buyer of 10% of CEP Business EBITDA for the three (3) years following closing for each such year that EBITDA exceeds $3,000,000.

    In formulating this joint proposal, it was necessary for the Buyers to address numerous issues regarding the interplay between the Wet Waste Business and the CEP Business, and with regarding cooperative activities and utilization of shared assets. The Buyers' success in resolving these issues, as set forth below, will optimize the CEP Business operations and significantly enhance the viability of the CEP Business and increases the probable magnitude of the CEP Business EBITDA, and the resulting future payments to the Sellers. The Buyers have reached a preliminary understanding as to many significant economic terms of their synergistic relationship. Among the significant issues which have been conceptually resolved are the following:

    1.     ATG will for the foreseeable future, continue to maintain central wet waste processing operations at the Bear Creek facility, and make sufficient capacity available at commercially favorable rates for the more efficient onsite processing of applicable CEP wastes.

    2.     ATG and CEP Assets Buyer have agreed to an effective means for the continued fulfillment of the existing contracts and lessening the risk of loss of business and feed continuity.

    3.     CEP Assets Buyer will maintain health physics at the Bear Creek facility for both parties under a pro rata allocation of the expenses between the parties.

    4.     ATG will provide quality assurance (QA) using its onsite personnel at the Bear Creek Facility for both parties under a pro rata allocation of the expenses between the parties.

    5.     ATG will pay caste fleet/transportation services to the CEP Business at ATG's best commercial rates.

    6.     ATG will pay fees to be determined by the parties for its use of the north end of the Bear Creek Road Facility, rental space, operation under the licenses, power and other services for its central Wet Waste operation.

Stephen S. Gray, Trustee
November 6, 1998
Page 3

The above practices will help maximize CEP's EBITDA which would result in enhancing the "10% EBITDA" payments to the Sellers. To the extent that the Wet Waste operations are sold to any entity that does not incorporate such operational practices with CEP operation, any such enhancement in CEP EBITDA payments would not result.

## PART I [WET WASTE ASSETS]

The following sets forth the binding terms under which ATG Inc., a California corporation ("ATG"), or an affiliate of ATG (the "Buyer") offers to purchase, as more particularly set forth below, substantially all of the assets of, together with contracts, licenses and permits associated with the Seller's so-called wet waste business based in Oak Ridge, Tennessee, with a facility in Columbia, South Carolina. The defined terms used in this Part I shall have the meanings set forth in this Part I.

For purposes of this offer, the term "Wet Waste Business" means the Seller's business which provides: (1) on-site and off-site services for the treatment of radioactive liquids, (2) dewatering and volume reduction (other than by thermal destruction) by the CEP process) of spent ion exchange resins, less than or equal to one Rem zeolites and activated carbon, (3) solidification of sludges and equipment for the volume reduction of sludges, (4) containers and shielded transportation, (5) the design and sale of treatment, dewatering and volume reduction equipment for installation at nuclear power plants, and similar business activities carried out by the Seller through the following product organizations: central wet waste processing (equipment but not the facility), advanced water processing, field services, cask rental and transport, containers, material and equipment sales, government and the Department of Energy work, and international work, provided, that the term "Wet Waste Business" shall not mean the Seller's business and related assets which consists of the volume reduction of radioactive ion exchange resins through thermal destruction by the CEP process conducted at its so-called CEP facility (the "CEP Business")and other assets of the Seller.

## SECTION 1. ASSETS AND CONTRACT RIGHTS SUBJECT TO OFFER

The Buyer submits this offer (the "Offer") to purchase all of the Seller's right, title and interest in and to the assets of (or used in connection with) the Wet Waste Business, including, but not limited to (a) those assets identified on the schedule attached hereto as Exhibit A, as well as related work in process, construction in progress, inventory, including, without limitation, those assets described in that Exhibit A; (b) all customer contracts which are a part of or are used in the "Wet Waste Business", including, but not limited to, those customer contracts identified in Exhibit B hereto and the contracts the Seller previously acquired from VECTRA and SEG,

Stephen S. Gray, Trustee
November 6, 1998
Page 4

which the Buyer elects to assume pursuant to Section 7 of this Offer, but excluding any of such contracts which relate to the CEP Business (as defined in Part II) (collectively, the "Subject Customer Agreements"); (c) all subcontracts or teaming agreements including, but not limited to, all executory contracts, used in the Wet Waste Business which the Buyer may elect to assume pursuant to Section 7 (collectively, "Subcontracts" and, together with the Subject Customer Agreements, the "Subject Agreements"); (d) all permits and licenses issued to the Seller primarily for use in the Wet Waste Business to the extent assignable under applicable law (the "Subject Permits"); (e) the Intellectual Assets (as defined below) used or useable in the Wet Waste Business (except those Intellectual Assets or useable in the provision of CEP Business and only incidentally used in the Wet Waste Business, as to which the Seller or the CEP Buyer shall issue as part of the Wet Waste Assets a perpetual, non-exclusive, assignable, royalty-free license to use the same on customary terms and protections to be used solely in connection with the Wet Waste Business); (f) all furniture, telephones, copiers, scanners, facsimile machines, printers, plotters, computers, monitors, modems, software and other office equipment that is used or useable in the normal conduct of the Wet Waste Business (provided that any of the foregoing that are used in the provision of CEP Business shall be shared by the Buyer and CEP Buyer as determined by mutual agreement of the Buyer and the CEP Buyer); (g) the accounts receivable generated by the Seller from the operation of the Wet Waste Business through the Closing Date (the "Subject Accounts Receivable"); (h) the Columbia, South Carolina facility operated by the Seller; (i) offers and proposals in progress; (j) business books and records, subject to the Seller retaining reasonable access, use and copying rights; (k) the Advanced Water Processing unit and technology; and (l) any radioactive, hazardous or mixed waste that the Seller has control over or possession of, title to, or disposal obligations for ("Waste Products"), as to which the Seller has not recognized revenues or Waste Products that are in the process lines and equipment included in the Wet Waste Assets ("Transferred Waste Products") (with all of the foregoing referred to collectively as the "Wet Waste Assets"). Relative to the Bear Creek Facility, the Buyer will rent building space from the CEP Assets Buyer in the north end of the building and the Buyer's liability will be limited to that portion of the north end of the building actually and solely used by the Buyer.

Expressly excluded from the Wet Waste Assets and the purchase and sale proposed hereunder are: (i) cash, cash equivalents, and marketable securities: (ii) any notes receivable or other receivables of the Seller (exclusive of the Subject Accounts Receivable); (iii) any and all trade names of the Seller and its parents and subsidiaries except those trademarks associated with the Wet Waste Business, and other entities under common control with the Seller; (iv) all Waste Products that are not Transferred Waste Products; and (v) the Seller's CEP facilities and those Assets used solely to provide CEP Services; (v) any other assets of the Seller; and (vii) any

Stephen S. Gray, Trustee
November 6, 1998
Page 5

tanks, piping, equipment and related building/yard space, whether or not located in the North building, that is used primarily for storing, handling, processing or transporting CEP materials.

Notwithstanding the foregoing, the Seller shall provide the Buyer with a non-exclusive royalty-free license agreement (in form and substance reasonably satisfactory to the Buyer) sufficient to permit the Buyer to operate under the "MMT of Tennessee" name for a period of up to 18 months after the Closing Date, and shall assign to the Buyer any rights it may have to use the "Vectra" or "SEG" tradenames.

Intellectual Assets - As used herein, the term "Intellectual Assets" shall mean patent applications, patents, designs, drawings, software, trademarks, topical reports, certificates of compliance, procedures, specifications, service marks, copyrights, quality assurance programs, process-control programs, customer approved tender status, sales lists, contract lists, project references, and proposals, as well as patent pending, ideas and applications, records, files, software, inventions and software licenses, and other such items commonly know as "intellectual property rights" and "intangible items" and all manuals and documentation related to any of the foregoing. To the extent that any Intellectual Assets which are exclusively transferred to the Buyer hereunder are also used in the Seller's business lines not sold to the Buyer, the Buyer shall grant to the Seller (subject to re-assignment by the Seller to buyers of other business lines) a non-exclusive, royalty-free license to use such Intellectual Assets which are exclusively transferred to the Buyer hereunder on customary terms and protections solely in connection with the operation of such other business lines.

## SECTION 2. TERMS OF PURCHASE

(a)     On the Closing Date, the Buyer shall purchase all of the Seller's right, title and interest in and to the Wet Waste Assets, free and clear of all lens encumbrances and interests, pursuant to Section 363(b) and (f) of the Code and, in connection therewith, the Seller shall assign the Subject Permits to the Buyer to the full extent permitted by law and the Buyer shall assume, and the Seller shall assign, the Subject Agreements to the Buyer (only those pursuant to Section 365 of the Code). The total price to be paid for the Wet Waste Assets is $10,500,000 (Ten Million Five Hundred Thousand Dollars) (the "Purchase Price"). The Purchase Price shall be allocated among the Wet Waste Assets in accordance with the Buyer's instruction and discretion. Subject to satisfaction of the Conditions Precedent set forth in Section 18 hereof, the Purchase Price is payable in cash or cash equivalent as follows:

Stephen S. Gray, Trustee
November 6, 1998
Page 6

    (i)    $1,050,000 to be paid simultaneously herewith to the Seller's Chapter 11 trustee (the "Trustee") as a Deposit (the "Deposit"); and

    (ii)    $9,450,000 to be paid within three (3) business days (the "Closing Date") after entry of the Sale Order (the date of such entry, the "Approval Date") at which time the Trustee shall convey to Buyer all of the Wet Waste Assets.

(b)    Through the Closing Date, the Deposit shall be held by the Trustee's counsel, Riemer & Braunstein, in an interest bearing client funds escrow account. The Deposit (and all interest earned thereon) shall be applied to the Purchase Price if the balance thereof is paid by the Buyer. The Purchase Price shall be disbursed by the Trustee pursuant to that certain Letter Agreement regarding the Use of Cash Collateral and New Commitment dated September 23, 1998 as approved by the Court on September 29, 1998; provided that the Deposit shall not be turned over to the Seller unless the Seller has issued the notices pursuant to subsection (d) below. The Deposit, together with all interest thereon, shall be returned to the Buyer within two (2) business days if the Seller defaults hereunder, or if the Seller's Trustee or the Court does not authorize the sale of the Wet Waste Assets to the Buyer. Notwithstanding anything herein to the contrary, the Deposit, together with all interest thereon, promptly shall be returned to the Buyer, or if the Sale Order has not been entered by November 18, 1998, or if any of the Conditions Precedent have not been satisfied on or before November 23, 1998 (the "Termination Date"), or if the Closing Date has not occurred prior to the Termination Date. The Deposit shall be forfeited to the Seller as the Seller and the Trustee's sole remedy at law or in equity, if the Buyer defaults hereunder as set in Section 4 of the Notice of Offer previously issued by the Seller.

(c)    The Seller is responsible for, and the Buyer shall not assume or otherwise be liable for, any debts, claims, liabilities or any other obligations of the Seller of any nature whatsoever, whether such debts, liabilities or obligations are known or unknown, liquidated or contingent, direct or indirect, including, but not limited to, any liens, attachments, environmental liabilities, trade debt, sale or transfer taxes relating to these transactions, accounts payable, warranty obligations, tax liabilities, claims of employees, pension liabilities or any expenses of administration of the Chapter 11 estate (collectively, the "Excluded Liabilities"). All Excluded Liabilities shall remain with the Seller's estate.

Stephen S. Gray, Trustee
November 6, 1998
Page 7

    (d)    The parties believe, based upon preliminary due diligence, that no approval of these transactions will be necessary under the Hart Scott Rodino Act ("HSRA"). However, if the Buyer reasonably concludes that HSRA approval is necessary, the Seller shall obtain such approval and the filing fee required for such approval shall be split equally (50% each) between the Seller and the Buyer.

    (e)    The Purchase Price shall be adjusted, on the Closing Date, as follows: (1) increased by an amount equal to 90% of the amount if any, by which the fair value of the current period collectible accounts receivable (net of offsets and contras) and current inventory and spare parts (the "Good Current Assets") on the Closing Date exceeds $2,653,000; or (2) decreased by an amount equal to 90% of the amount, if any, by which the fair value of the Good Current Assets on the Closing Date is less than $2,047,000.

    (f)    The sale of Assets hereunder shall be without representation or warranty of the Seller or the Trustee (including as to merchantability or fitness for use) except as to any that may be specifically set forth herein, and (except as specifically set forth herein) WHERE IS and AS IS.

## SECTION 3. COURT APPROVAL

The Trustee shall immediately file in the Chapter 11 Case a motion (the "Motion") seeking an Order of the Court in form reasonably acceptable to Seller and the Buyer (the "Sale Order") approving, pursuant to Sections 363(b) and (f) and 365 of the Code, the sale by the Seller of the Wet Waste Assets, free and clear of liens, encumbrances and interests. [The Sale Order shall, among other things, (i) determine that this Agreement was proposed by the Buyer in good faith, (ii) determine that the Buyer is a good faith purchaser under Section 363(m) of the Code, and (iii) permanently enjoins each and every holder of an Excluded Liability from commencing, continuing or otherwise pursuing or enforcing and remedy claim, or cause of action against the Buyer relative to such Excluded Liability.] Regarding the Wet Waste Assets, the Buyer is expressly accepting hereunder, the Buyer shall be responsible for fulfilling the requirements of Section 365(1)(A) (which pertain to the curing of defaults under the Subject Agreements), and 365(f)(2)(B) pertains to the providing of adequate assurance of future performance), of the Code; provided, however, that Buyer's obligation shall not exceed $50,000 in the aggregate. To the extent that the aggregate cure payments to be made pursuant to Code Section 365(1)(A) exceeds $50,000, the Seller agrees and acknowledges that the payment of such amounts shall be an obligation of the Seller and that Seller shall pay (immediately upon receipt of the Purchase Price, and regardless of any other claims asserted or that could be asserted in the

Stephen S. Gray, Trustee
November 6, 1998
Page 8

Chapter 11 Case) such amounts from the proceeds of the sale of the Wet Waste Business
pursuant to this Offer.

## SECTION 4. AFFIRMATIVE COVENANTS OF THE BUYER

As an express condition of the Seller's acceptance of this Offer, the Buyer hereby
covenants that, if the Wet Waste Assets are conveyed to the Buyer, then the Buyer shall enter
into a separate agreement or agreements with CEP Buyer with respect to Wet Waste services
required to support CEP Services. The Buyer further covenants to provide in conjunction with
the CEP Buyer quality assurance (QA) support on reasonable commercial terms consistent with
the current QA requirements for the facility insofar as it is used to provide CEP Services;
provided that Buyer shall not be liable for any claims, damages or losses arising out of or relating
to the operation of the Seller's QA Program.

## SECTION 5. EXCLUSION OF CERTAIN ASSETS

The Buyer shall have the right to exclude from this Offer such of the Acquired Assets,
including, but not limited to, executory contracts, as it elects in writing, on or before the
twentieth day after Closing (the "Exclusion Notice Date"), provided, however, that such election
shall not be made with respect to the real estate or facilities which are subject to the Assumed
Environmental Liabilities. In such event, the Buyer shall deliver that excluded property or
dispose of it as directed by the Trustee, provided however, that the cost for delivery and/or
disposal shall be the responsibility of the acquired Seller.

## SECTION 6. AFFIRMATIVE COVENANTS OF SELLER

As an express condition of this Offer by the Buyer, the Trustee hereby covenants that, if
the Buyer purchases the Wet Waste Assets:

    (a)    the Trustee shall reasonably assist the Buyer in the transfer of the Wet Waste
              Assets and the assumption of the Wet Waste Business, including the providing of
              reasonable access to all records, employees and staff;

    (b)    the Trustee shall cooperate with the Buyer in its efforts to facilitate timely
              transfers of the Subject Permits or other governmental approvals related to the
              continued use of the Wet Waste Assets; and

    (c)    to the extent permitted under the Code, the Seller will transfer to the

Stephen S. Gray, Trustee
November 6, 1998
Page 9

       Buyer or its Affiliate any non-competition agreements the Seller now has with
respect to the Wet Waste Business which are beneficial to the Wet Waste
Business the Buyer is acquiring from the Seller.

Notwithstanding the foregoing:

(d)     nothing herein contained shall be deemed to constitute a joint venture or
partnership between the Buyer and the Seller; and

(e)     the Seller undertakes to bind any legal successor with the same obligations as set
for hereunder.

## SECTION 7. COURT APPROVAL

     All obligations of the Seller under this Offer shall be subject to approval by the Court,
which approval the Trustee shall in good faith seek as expeditiously as possible.

## SECTION 8. SUBJECT AGREEMENTS PRIOR TO BUYER'S ACCEPTANCE

(a)     As to each Subject Agreement pending the Buyer's determination of whether or
not to accept and assume the Subject Agreement, the Seller and the Trustee agree
as follows:

(i)     The Trustee will notify each party to the Subject Agreement that (a) the
Buyer has purchased and is the owner of the Wet Waste Assets (including
the assets used in performing the Seller's obligations under the Subject
Agreement); (b) the Buyer has the right (but not the obligation) to assume
the Seller's interest in the Subject Agreement (subject to curing any
defaults under the Subject Agreement and providing adequate assurance of
future performance); (c) all payments after the date of such notice must be
sent to the Buyer except for portions thereof that are not related to work
performed by the Buyer after such date; (d) all information and records
regarding the Subject Agreement are to be made available to the Buyer; (e)
the Buyer will not be obligated to perform the Seller's obligations under
the Subject Agreement unless and until the Buyer has accepted and
assumed the Subject Agreement; and (f) the Buyer must determine

Stephen S. Gray, Trustee
November 6, 1998
Page 10

whether to accept or refuse the Subject Agreement by the end of the
Transition Period (as defined below);

(ii)    The Seller shall send the notices required in the preceding subsection (i)
immediately after the Approval Date, in a mutually acceptable form;

(iii)    The Seller will remain the contract party to the Subject Agreement until
the Buyer accepts the Subject Agreement. The Buyer will act as the
Seller's authorized agent to perform the Seller's obligations under the
Subject Agreements which become due during the Transition Period. The
Buyer will indemnify the Seller for any damage caused by the Buyer's
actions or inactions incurred in fulfilling its responsibilities as agent under
this Section 7;

(iv)    On the Closing Date, the Seller shall irrevocably assign to the Buyer all
rights to receive any and all payments under the Subject Agreements in
respect of work performed or to be performed by the Buyer after the
Closing Date. On or before the Approval Date, in accordance with
Subsection 3(d), the Seller shall notify the customers to make all such
payments to the Buyer. In the event the Seller receives any such
payments, these shall be deemed received in trusteeship for the Buyer and
shall be immediately transferred by the Seller to the Buyer;

(v)    The Buyer shall perform for the Seller under the Subject Agreement only
if the Buyer receives payment for its services and costs as the Seller's
agent under the Subject Agreement; if the Buyer does not receive
payment, the Buyer may immediately terminate its services as the Seller's
agent under the Subject Agreement. Further, the Buyer's obligation to
perform shall terminate upon the Buyer's notification to the Seller that the
Buyer elects not to accept assignment of that Subject Agreement;

(vi)    The Buyer shall have twenty (20) business days after the Closing Date
(the "Transition Period") in which to designate in writing which of the
Subject Agreements the Buyer will accept and assume;

(vii)    The Buyer shall provide the equipment it has acquired as part of the Wet
Waste Assets for its performance as the Seller's agent under the Subject
Agreement;

Stephen S. Gray, Trustee
November 6, 1998
Page 11

> (viii)   If, during the Transition Period, any of the Seller's current employees
> continue to work on the Subject Agreement before they are hired by the
> Buyer, then, as between the Buyer and the Seller, they shall be deemed
> independent contractors of the Buyer;
>
> (ix)   The Buyer may at any time after the delivery of written notice to the Seller
> at least five (5) business days in advance prior to its acceptance of the
> Subject Agreement refuse to continue to act as Seller's agent under the
> Subject Agreement and, if the Buyer has already commenced performance
> as the Seller's agent under the Subject Agreement, immediately terminate
> its services (and, in such event, and upon the Seller's request and
> prepayment, the Buyer shall enter into a sub-contract on customary terms
> and rates to perform the work necessary to complete such contract at the
> Seller's expense, if such work can be reasonably done under such contract
> without undue risk or expense to the Buyer or the Seller); and
>
> (x)   The Buyer shall not be obligated or liable for the Seller's performance
> under the Subject Agreement, except for the services it provides as the
> Seller's agent under the Subject Agreement during the period after the
> Closing Date until the Buyer's determination to accept or reject the
> Subject Agreement.

(b)   The Trustee and the Seller shall use their best efforts to assist the Buyer in the
assignment of Subject Agreements to the Buyer and in the separation of the
Subject Agreements which provide for services in addition to Wet Waste Services
other than CEP Business ("Dual Contracts"). Dual Contracts where such services
are offered as separate line items will be separated on that basis. Buyer and CEP
Buyer shall resolve as between themselves, and without any obligation on the part
of the Trustee, the separation of Subject Agreements which provide for both Wet
Waste Business and CEP Business.

(c)   Any payments received by the Buyer that are due to the Seller pursuant to the
above shall be forwarded to the Seller's account without undue delay. Any
payments received by the Seller or by the Trustee that are due to the Buyer shall
be forwarded to the Buyer without undue delay and regardless of any claims
asserted or that may be asserted in the Chapter 11 Case.

Stephen S. Gray, Trustee
November 6, 1998
Page 12

(d)    If the Buyer elects to refuse a Subject Agreement, the Trustee shall reject
and terminate such Subject Agreement to the extent it relates to the provision of
services for the Wet Waste Business as soon as practicable thereafter.

(e)    The Buyer and the Trustee recognize that, at the time of the Closing Date, all the
Dual Contracts may not be fully documented and resolved. Therefore, in addition
to the obligations prior to the Closing Date as described Section 7 (b) above, after
Closing, the Buyer and the Trustee shall continue to fully cooperate to assign or
otherwise transfer to Buyer the full scope of Wet Waste work under the Dual
Contracts outstanding at the time of the Closing Date.

(f)    The Buyer shall within twenty (20) business days after Closing notify the Trustee
which bids and proposals that it wants assigned to the Buyer, and to the extent
that said bid or proposal is assignable, the Trustee will cooperate with the Buyer
in its efforts to facilitate the transfer of said bids and/or proposals from the Seller
to the Buyer.

## SECTION 9. WET WASTE BUSINESS EMPLOYEES

By November 12, 1998, the Buyer shall submit to the Seller a list of the Seller's
employees, independent contractors, and consultants that are engaged primarily or exclusively in
the Wet Waste Business including staff involved in the administrative and other support
functions (the "Wet Waste Employees") that it desires to hire (the "Selected Employees"). At
Closing, the Seller shall release the Selected Employees from any non-compete agreements in
effect to allow the Buyer to employ such Selected Employees in the operation of the Wet Waste
Business and the Wet Waste Assets, and Buyer shall make offers of employment to the Selected
Employees contingent only upon the closing of the sale transaction contemplated hereby.

The Buyer agrees that for a period of one (1) year commencing as of the Closing Date it
shall not employ any Wet Waste Employee who is not a Selected Employee unless, in
connection therewith (i) the Buyer reimburses the Seller for such Employee's severance pay
actually said by the Seller, or (ii) Buyer obtains the Trustee's consent.

## SECTION 10. COLUMBIA, SOUTH CAROLINA FACILITY

The Columbia, South Carolina facility is designated as a Wet Waste Asset subject to this
Offer.

Stephen S. Gray, Trustee
November 6, 1998
Page 13

## SECTION 11. USE OF SELLER'S QUALITY ASSURANCE (QA) PROGRAM

The Seller shall cooperate with the Buyer in the transition of its QA Program to the Buyer, including, without limitation, the transfer of Certificates of Compliance on casks and high integrity containers and communications and meeting with customers to support a timely takeover by the Buyer.

## SECTION 12. REPRESENTATIONS AND WARRANTIES

The Buyer represents that it has made a due diligence investigation of the Wet Waste Assets, that the Buyer is relying solely on that due diligence investigation in making this Offer, and that the Buyer has not relied and is not relying on any representation or warranty of the Seller or any of its agents except those that are specifically set forth herein.

The Buyer represents and warrants to, and agrees with, the Seller as follows:

(a)     The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of California. The Buyer has full power and authority to carry on its business as and where now conducted and to own or lease and operate its properties at and where now owned, leased and operated by it, and is duly qualified to do business and is in good standing in every jurisdiction in which the property owned, leased or operated by it, or the nature of the business conducted by it, makes such qualification necessary.

(b)     The execution, delivery and consummation of this Offer by the Buyer has been authorized by the Directors of the Buyer in accordance with all applicable laws and the Buyer's Certificates of Incorporation, and at the Closing Date no further action will be necessary on the Buyer's part to make this Offer valid and binding and enforceable against the Buyer in accordance with its terms. The foregoing shall not diminish the rights of the Buyer stated herein to exclude certain Subject Agreements, proposals and bids. The execution, delivery and consummation of this Offer by the Buyer (i) is not contrary to the Buyer's Certificate of Incorporation or Bylaws, (ii) will not violate any order, law, rule or regulation known by the Buyer to be applicable to the Buyer; (iii) does not now and will not, with the passage of time, the giving of notice or otherwise, result in a violation or breach of or constitute a default under, any term of provision of any material indenture, mortgage, deed of trust, lease, instrument, order, judgment, decree, rule, regulation, law, contract, agreement or any other restriction to which the

Stephen S. Gray, Trustee
November 6, 1998
Page 14

Buyer is a party or to which the Buyer or any of its assets is subject or bound; and (iv) will not result in any acceleration or termination of any loan or security interest agreement to which the Buyer is a party or to which the Buyer or any of its assets is subject or bound.

(c) <u>Litigation</u>. There is no judicial or administrative action, proceeding or investigation pending, or to the Buyer's knowledge, threatened, that calls into question the validity of this Offer or any action taken or to be taken by the Buyer in connection herewith. There is no litigation, proceeding or investigation pending, or to the Buyer's knowledge, threatened, or any order, injunction or decree outstanding, against the Buyer that, if adversely determined would have a material adverse effect upon the Buyer's ability to perform its obligations under this Offer.

(d) <u>Financial Capacity</u>. The Buyer has the financial capacity to consummate all of the transactions contemplated by this Offer.

(e) <u>Compliance with Laws</u>. To the Buyer's knowledge, the Buyer has complied in all materials respects with all laws, regulations, rules and orders of any governmental department or agency or any other commission board, agency or instrumentality, federal, state, local or other requirements of law in connection with the operation of its business, and is not in material default under or in violation of any provision of any federal, state or local law, regulation, rule or order.

(f) <u>Approval</u>. The Buyer is not aware of any reason why it would be denied any necessary approval, consent, permit or other governmental authorization necessary to purchase and/or operate the Wet Waste Business and/or the Wet Waste Assets. Notwithstanding the Closing and the consummation of the transactions contemplated by this Offer, the representations, warranties and covenants of the Buyer contained in this Offer or any agreement, instrument, paper, or certificate executed and delivered by the Buyer in connection with the transactions contemplated hereby, will survive the Closing.

## SECTION 13. ACCESS TO SELLER'S FACILITY

The Seller agrees to make available to the Wet Assets Buyer and its attorneys, accountants, agent and advisors, prior to the Closing Date, such records, information and personnel as the Wet Assets Buyer may reasonably request. As a condition to the Seller's

Stephen S. Gray, Trustee
November 6, 1998
Page 15

granting to the Wet Assets Buyer and/or its agents physical access to the Seller's Wet Assets Business facilities, the Wet Assets Buyer shall provide the Seller proof of workers compensation or similar insurance as well as of such liability and other insurance as may be required by applicable regulatory or other law, in such amounts as the Seller may reasonably require.

## SECTION 14. EXPENSES

Each party shall bear its own costs and expenses (including attorney's fees) associated with this Offer and the performance thereof.

## SECTION 15. TAXES ASSOCIATED WITH THE SALE

Each party shall pay when due any taxes assessed under applicable law against such party relating to the transactions hereby.

## SECTION 16. SEVERABILITY

If (but only if) the Buyer elects, if any portion of this Offer is held invalid or unenforceable, any remaining portion shall continue in full force and effect and the invalid or unenforceable portion shall be replaced by a valid and enforceable portion reflecting the original intent of the parties as closely as possible. If a material aspect of this Offer is severed by the Court and, prior to Closing, either party determines that this Offer as modified (that is, without the severed portion) is deficient, it may terminate this Offer.

## SECTION 17. NOTICES

All notices required or permitted to be given pursuant to the terms of this Offer shall be sent by hand or private overnight delivery service of national reputation and also by facsimile transmission as follows:

|  |  |
|---|---|
| To the Seller | Stephen S. Gray, Trustee |
|  | c/o The Recovery Group |
|  | 270 Congress Street |
|  | Boston, MA 02210 |
|  | Telecopy: (617) 482-9804 |
|  |  |
| To the Buyer | ATG, Inc. |
|  | 47375 Fremont Boulevard |

Stephen S. Gray, Trustee
November 6, 1998
Page 16

                          Fremont, CA  94538
                          Attention:  Bill Hewitt
                          Telecopy:  (510) 651-3731

with a copy to

The Buyer's counsel:      Jarvis P. Kellogg
                          Epstein Becker & Green, P.C.
                          75 State Street
                          Boston, MA  02109
                          Telecopy:  (617) 341-4001

Copy to:                  Steve Guerrettaz
                          47375 Fremont Boulevard
                          Fremont, CA  94538
                          Telecopy:  (510) 651-3731

## SECTION 18. CHOICE OF LAW

Enforcement of this Offer and legal matters not governed by the Code shall be determined in accordance with the laws of the Commonwealth of Massachusetts, without reference to its choice of law doctrine. The Buyer consents to the jurisdiction of the Court as to any proceeding to enforce or interpret this Agreement.

## SECTION 19. HEADINGS

The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Offer.

## SECTION 20. BUYER'S CONDITIONS PRECEDENT

The obligation of the Buyer to consummate the transactions to be performed by it hereunder is subject to the satisfaction on or before the Closing of the following conditions precedent (the "Conditions Precedent"), any or all of which Buyer may elect to waive or not waive, extend or not extend in its absolute discretion:

(a)      Any representation and warranties made by the Seller hereunder shall be true and

Stephen S. Gray, Trustee
November 6, 1998
Page 17

correct in all material respects as of the Closing Date.

(b)     The Seller shall have performed and complied with any covenants made by it
hereunder in all material respects as of the Closing Date.

(c)     No action, suit, proceeding or regulatory determination shall be pending or
threatened wherein an unfavorable ruling would: (a) prevent consummation of any
of the transactions contemplated hereunder; (b) cause any of the transactions
contemplated hereunder to be rescinded following consummation; or (c) affect
adversely the right of Buyer to own or use the Assets.

(d)     The Court shall have entered the Sale Order, which Sale Order shall not have been
reversed, stayed, modified or amended in any material respect prior to the Closing
Date.

(e)     Any applicable waiting periods relating to the transfers contemplated hereby
under the HSRA shall have expired without extension or challenge to such
transactions, and any approvals required by such Act have been issued. However,
if the Buyer reasonably concludes that HSRA approval is necessary, the Seller
shall obtain such approval and the filing fee required for such approval shall be
split equally (50% each) between the Seller and the Buyer.

(f)     The CEP Business sale referred to Part II hereof shall have been closed.

(g)     The Seller shall have obtained any regulatory approvals, licenses and/or premises
which are necessary or appropriate for the Buyer to acquire and operate the
Columbia, South Carolina facility (the "SC Approvals"); provided, however, that
the Seller's failure to obtain such SC Approvals despite the Seller's and the
Trustee's and the Buyer's best efforts to do so shall not excuse the Buyer's
performance hereunder if and only if the Seller's own SC Approvals are
maintained in a manner sufficient to enable the Buyer/Seller to operate from such
facility on an interim basis after the Closing Date and the Buyer is permitted
access to such facility for 45 or more days after the Closing Date in order to
conduct an orderly transition of the operations conducted at such facility and the
Wet Waste Assets at such location to a replacement facility selected by the Buyer.
The Buyer will indemnify the Seller and the Trustee for any damage caused by the
Buyer's actions or inaction's incurred with respect to the Buyer's operations, use,

Stephen S. Gray, Trustee
November 6, 1998
Page 18

        and/or occupancy of the Columbia, South Carolina facility as provided for in this
subsection.

(h)     Buyer shall enter into definitive agreements with purchaser of Seller's CEP
Business in form, substance and scope satisfactory to Buyer, pursuant to which
among other things:

     (i)     CEP Buyer will have agreed the Buyer will supply all contracted IER
requiring thermal treatment to CEP Buyer for three yeas on mutually
agreeable terms, conditions and exceptions provided such IER is above
one (1) REM per hour requiring thermal treatment.

     (ii)    Buyer and CEP Buyer shall lease on mutually agreeable terms for the area
supporting Wet Waste operations in north end of CEP building in Oak
Ridge, Tennessee, and the Buyer may operate under the CEP Buyer
radioactive license; and;

     (iii)   Buyer and CEP Buyer will support each other on certain transitional
requirements such as sharing sales force and allowing continued cask
storage for IER at the Columbia South Carolina maintenance facility and
leasing of casks to support shipments and outside storage requirements.

(i)     The Wet Waste Business shall on the Closing Date be in no worse financial or
operating condition it was in on November 3, 1998. Adverse changes constituting
a breach of this condition shall include material diminution in customers or
revenues, material income, in costs or liabilities or losses of existing key
employees or experienced work force.

(j)     The Seller shall have continued to conduct the Wet Waste Business in the
ordinary course, consistent with past practice and in the same manner as it is
presently being conducted;

(k)    No material adverse change shall have accrued to the Wet Waste Business or the
Wet Waste Assets after November 3, 1998 or, if such change was not known to
John Preston, after the appointment of the Trustee;

Stephen S. Gray, Trustee
November 6, 1998
Page 19

(l)    The Wet Waste Buyer shall have entered into agreements to hire such of the Seller's Wet Waste Business employees as it deems, in its sole discretion, to be necessary or desirable to the continued operation of the Wet Waste Business;

(m)    The Wet Waste Buyer shall have procured insurance, including, without limitation, nuclear liability insurance, and environmental impairment insurance, satisfactory in form, substance and amount to the Buyer;

(n)    All pleadings, agreements and other documents related directly or indirectly to the sale anticipated herein shall be in form and substance satisfactory to the Wet Waste Buyer;

(o)    A closing date of November 23, 1998.

(p)    The Seller shall have delivered to the Buyer, in form reasonable acceptable to the Buyer, deeds, bills of sale, assignments or other instruments of transfer necessary and appropriate to transfer and vest in the Buyer the Wet Waste Assets.

## SECTION 21. SELLER'S CONDITIONS PRECEDENT

The obligation of the Seller to consummate the transactions to be performed by it hereunder is subject to the satisfaction of the following conditions precedent, any or all of which Seller may elect to waive or not waive in its absolute discretion.

(a)    Any representation and warranties made by the Buyer hereunder shall be true and correct in all material respects as of the Closing Date.

(b)    The Buyer shall have performed and complied with any covenants made by it hereunder in all material respects as of the Closing Date.

(c)    The Court shall have entered the Sale Order, which Sale Order shall not have been reversed stayed, modified or amended in any material respect prior to the Closing Date.

(d)    Any applicable waiting periods relating to the transfers contemplated hereby under the HSRA shall have expired without extension or challenge to such transactions, and any approvals required by such Act have been issued.

Stephen S. Gray, Trustee
November 6, 1998
Page 20

## SECTION 22. COUNTERPARTS

This Offer may be signed in any two (2) or more counterparts, all of which, taken together, shall be deemed to constitute the original Offer.

By its signature below, the Seller accepts this offer, subject to the terms and conditions set forth herein and to approval by the Court.

Stephen S. Gray, Trustee
November 6, 1998
Page 21

ATG, INC.

By: _~~~~~~~~~~~~~~~~~~
its duly authorized Officer

AGREED TO:

_____

Stephen S. Gray, Trustee

Stephen S. Gray, Trustee
November 6, 1998
Page 22

## PART II [CEP ASSETS]

The following sets forth the binding terms under which Quantum Catalytics, LLC (the "CEP Buyer") or its nominee offers to purchase, as more particularly set forth below, substantially all of the assets of, together with contracts, licenses and permits associated with the Seller's Catalytic Extraction Processing ("CEP") business conducted at the two facilities in Oak Ridge, Tennessee, (one, the "Bear Creek Road Facility", the second, the "Tech Center Facility") and one facility in Fall River, Massachusetts, and all of the Intellectual Assets (as defined below) hereinafter referred to as the "CEP Business". Capitalized terms used in this Part II shall have the meanings so defined in this Part II.

For purposes of this offer, the term "CEP Business" means all assets, properties and rights of every kind, character and description (other than property and rights specifically excluded in this Agreement) used or useful in or for the benefit of the CEP Business consistent with the Wet Waste Buyer's Offer plus the Intellectual Assets, including, without limitation, the following:

a.      All real estate, improvements, buildings, fixtures, tangible property and equipment located at the Bear Creek Road Facility;

b.      All rights in and to the existing $1.6 million Letter of Credit and the cash collateral posted in connection therewith for decontamination & decommissioning/closure costs and any other utility deposits relating to the Bear Creek Road Facility;

c.      All rights in and to the existing $91,000 Letter of Credit and the cash collateral posted in connection therewith for decontamination & decommissioning/closure costs relating to the Fall River facility.

d.      All IER contracts relating to the CEP Business;

e.      All licenses and permits relating to the CEP Business exclusively (licenses or permits relating to the Tech Center Facility);

f.      All of Debtors' rights and licenses to store radiological material for CEP processing at Hake and Duratek locations; and

Stephen S. Gray, Trustee
November 6, 1998
Page 23

    g.      Debtors' rights to enforce and obtain the benefits under existing GTS/Duratek non-compete, preferred vendor status and shared boundary radiological dose limit agreements; including, but not limited to, all of Debtors' rights under the Asset Purchase Agreement between Debtors and Westinghouse dated December 10, 1996.

    h.      All accounts receivable associated with the CEP Business.

    i.      All intellectual assets of the debtors except those used primarily in the "Wet Waste Business" and designated as such in Part I hereof. Intellectual Assets shall include without limitation, all patents; patent applications, patent disclosures, designs, drawings, formulas, processes, software, trade secrets, trademarks, tradenames, topical reports, specifications, service marks, copyrights, quality assurance programs, process control programs, sales lists, contract lists, project references, proposals, ideas, inventions and software or process licenses and all other proprietary information commonly known as "intellectual property rights", including, but not limited to, the specific intellectual assets set forth on the Intellectual Property schedule attached hereto ("Intellectual Assets");

    j.      All development equipment, analytical equipment, electrical switches, induction power supplies (including the power supplies for RPU(4), electrical power supply, computers, computer software, general intangibles, office equipment located or associated with the Tech Center Facility, and used or usable in connection with the CEP Business including, but not limited to, those assets listed in Schedule ___;

    k.      All office furniture, personal computers and telephone and network infrastructures located at the Tech Center Facility and used by or available to CEP Business personnel or used in the CEP Business, including, but not limited to, those items set forth on the Tech Center Asset schedule.

    l.      All assets located at the Debtors' Fall River, Massachusetts facility, including, but not limited to, the research and development equipment, supplies and other tangible property used in the conduct of research and development activities, including, but not limited to, the equipment and supplies set forth on the "Research and Development Equipment" schedule attached hereto, all permits and licenses associated with the Fall River facility, and all rights to occupy the Fall River facility to conduct research and development operations and conduct sales and marketing activities to support the CEP Business and related businesses.

Stephen S. Gray, Trustee
November 6, 1998
Page 24

   m.  Existing proposals, contracts and agreements, including, but not limited to, executory
        contracts and unexpired leases, entered into in connection with the CEP Business
        including, but not limited to the following:

        (i)        Crystal Systems
        (ii)       AFCEE
        (iii)     SNPE
        (iv)     US DoD BAA
        (v)       ThermuHex option
        (vi)     Ebara
        (vii)    NKK Nichemen

## SECTION 1. ASSETS AND CONTRACT RIGHTS SUBJECT TO OFFER

    . The CEP Buyer submits this Offer to Purchase all of the Seller's right, title and interest in
and to (a) the assets of (or used in connection with) the CEP Business, including, but not limited
to, those described above or identified on the schedules attached hereto, as well as related work
in process, construction in progress, inventory; (b) all customer contracts which are a part of or
are used in the CEP Business which Buyer may elect to assume pursuant to Section 7 of this
Offer, including, but not limited to, those customer contracts identified in the "Customer
Contracts" schedule attached hereto and the contracts the Seller previously acquired from
VECTRA and SEG (collectively the "Subject Agreements"); (c) all subcontracts or teaming
agreements used in the business related to the assets which Buyer may elect to assume pursuant
to Section 7; (d) all permits and licenses issued to the Seller primarily for use in the CEP
Business (the "Subject Permits"); (e) business books and records, subject to Seller's retaining
reasonable access, use and copying rights, (all collectively, the "Acquired Assets"); (f) the
Intellectual Assets (as defined below) used or useable in the CEP Business (except those
Intellectual Assets or useable in the provision of Wet Waste Business and only incidentally used
in the CEP Business, as to which the Seller or the Wet Waste Buyer shall issue as part of the
CEP Assets a perpetual, non-exclusive, assignable, royalty-free license to use the same on
customary terms and protections to be used solely in connection with the CEP Business); (g) all
furniture, telephones, copiers, scanners, facsimile machines, printers, plotters, computers,
monitors, modems, software and other office equipment that is used or useable in the normal
conduct of the CEP Business (provided that any of the foregoing that are used in the provision of
Wet Waste Business shall be shared by the Buyer and Wet Waste Buyer as determined by mutual
agreement of the Buyer and the Wet Waste Buyer).

Stephen S. Gray, Trustee
November 6, 1998
Page 25

Expressly excluded from the CEP Asset and the purchase and sale proposal hereunder are: (i) cash, cash equivalents, and marketable securities; (ii) any and all trade names of the Seller and its parents and subsidiaries, and other entities under common control with the Seller; (iii) the Seller's Wet Waste Assets defined in Part I hereof; and (iv) all commercial radioactive processing equipment at the Tech Center Facility.

To the extent that any Intellectual Assets are also used in Seller's business lines not sold to Buyer, Buyer shall grant to Seller (subject to re-assignment by Seller to buyers of other business lines) a non-exclusive, royalty-free license to use such Intellectual Assets on customary terms and protections solely in connection with the operation of such other business lines. Seller shall provide to Buyer a non-exclusive, royalty-free license in form and substance reasonably satisfactory to the Buyer, with respect to all Intellectual Assets primarily used in Seller's other business lines but also used or usable by Buyer in connection with the CEP Business.

## SECTION 2. TERMS OF PURCHASE

(a)    On the Closing Date, the Seller shall transfer to Buyer and Buyer shall acquire from Seller all of the Seller's right, title and interest in and to the Acquired Assets, free and clear of all liens encumbrances and interests, pursuant to Section 363(b) and (f) of the Code and, in connection therewith, the Seller shall assign the permits and licenses included in the Acquired Assets to the Buyer to the full extent permitted by law and Buyer shall assume buy and Seller shall assign and sell the Subject Agreements, which the Buyer has accepted, to the Buyer.

(b)    The Buyer shall assume and be responsible for the cost to dispose of secondary waste on site and costs of decontamination and decommissioning of the Bear Creek Road Facility and the Fall River Facility, if operations and the permits/licenses of either facility are terminated (the "Assumed Environmental Liabilities");

(c)    As additional consideration for the transfer of the CEP Assets, Buyer shall pay to Seller, on each of the next three anniversary dates of the Closing, (the first anniversary date shall be deemed to be that date which is ninety (90) days after the CEP Buyer's fiscal year end to occur after the Closing Date), an amount equal to 10% of EBITDA, of the CEP Business, determined in accordance with GAAP, in each of such years that the EBITDA exceeds $3,000,000.

Stephen S. Gray, Trustee
November 6, 1998
Page 26

(d)    Other than the Assumed Environmental Liability, and obligations arising after the
       Closing Date with respect to the Acquired Assets, the Seller is responsible for and
       the Buyer shall not assume or otherwise be liable for any debts, claims, liabilities
       or any other obligations of the Seller of any nature whatsoever, whether such
       debts, liabilities or obligations are known or unknown, liquidated or contingent,
       direct or indirect, including, but not limited to, any liens, attachments
       environmental liabilities, trade debt, sale or transfer taxes relating to these
       transactions, accounts payable, warranty obligations, tax liabilities, claims of
       employees, pension liabilities or any expenses of administration of the Chapter 11
       estate (collectively, "Liabilities").  All Liabilities shall remain with the Seller's
       estate.

(e)    Immediately after the Approval Date (as defined in Part I), the Seller shall issue
       notices to all of its employees, to all parties with which it holds Subject
       Agreements (as provided for in paragraph 10(a) below), and to all other relevant
       parties (e.g. licensing authorities) advising them of the sale of the Acquired Assets
       to Buyer. The notices shall be made in a form mutually agreed by Seller and
       Buyer.  Notices to the parties to the Subject Agreements shall include appropriate
       notice that such agreements will be assumed and assigned by the Seller to the
       Buyer.

(f)    The parties believe, based upon preliminary due diligence, that no approval of
       these transactions will be necessary under the Hart-Scott Rodino Act.

       The sale of Assets hereunder shall be without representation or warranty of the Seller or
Trustee (including as to merchantability or fitness for use) except as to any that may be
specifically set forth herein, and (except as specifically set forth herein) WHERE IS and AS IS.

## SECTION 3. COURT APPROVAL

       The Trustee shall immediately file in the Chapter 11 Case a motion (the "Motion")
seeking an Order of the Court in form reasonably acceptable to Seller and substantially in the
form attached hereto (the "Sale Order") approving, pursuant to Sections 363(b) and (f) and 365
of the Code, the sale by the Seller of the Acquired Assets, free and clear of liens, encumbrances
and interests, and the purchase and assumption by and assignment to the Buyer of the Subject
Agreements.  The Sale Order shall, among other things, (i) determine that this Agreement was
proposed by the Buyer in good faith, (ii) determine that the Buyer is a good faith purchaser under
section 363(m) of the Code, and (iii) permanently enjoins each and every holder of an Excluded

Stephen S. Gray, Trustee
November 6, 1998
Page 27

Liability from commencing, continuing or otherwise pursuing or enforcing and remedy claim, or cause of action against the Buyer relative to such Excluded Liability. Regarding the Acquired Assets the Buyer is expressly accepting hereunder, the Seller shall be responsible for fulfilling the requirements of Section 365(1)(A) (which pertain to the curing of defaults under the Subject Agreements), and 365(f)(2)(B) pertains to the providing of adequate assurance of future performance), of the Code. To the extent that aggregate cure payments are required to be made pursuant to Code Section 365(1)(A), the Seller agrees and acknowledges that the payment of such amounts shall be an obligation of the Seller and that Seller shall pay such amounts on or before the Closing Date.

## SECTION 4. AFFIRMATIVE COVENANTS OF SELLER

As an express condition of this Offer by the Buyer, the Trustee hereby covenants that, if the Buyer purchases the Assets:

(a)    · the Trustee shall reasonably assist the Buyer in the transfer of the Acquired Assets and the assumption of the CEP Business, including the providing of reasonable access to all records, employees and staff, and the Seller's offices and facilities;  .

(b)    the Trustee shall cooperate with the Buyer in its efforts to facilitate timely transfers of its Subject Permits or other governmental approvals related to the continued use of the Acquired Assets; and ·

(c)    to the extent permitted under the Bankruptcy Code, the Seller will transfer to the Buyer or its Affiliate any non-competition agreements the Seller now has related to the CEP.    Business which are beneficial to the CEP Business.

## SECTION 5. EXCLUSION OF CERTAIN ASSETS

The Buyer shall have the right to exclude from this Offer such of the Acquired Assets, including, but not limited to, executory contracts as it elects in writing, on or before the twentieth day after Closing (the "Exclusion Notice Date"), provided, however, that such election shall not · be made with respect to the real estate or facilities which are subject to the Assumed Environmental Liabilities. In such event, the Buyer shall deliver that excluded property or dispose of it as directed by the Trustee, provided however, that the cost for delivery and/or disposal shall be the responsibility of the acquired Seller.

Stephen S. Gray, Trustee
November 6, 1998
Page 28


## SECTION 6. COURT APPROVAL

All obligations of the Seller under this Offer shall be subject to approval by the Court, which approval the Trustee shall in good faith seek as expeditiously as possible.

## SECTION 7.  SUBJECT AGREEMENTS AND VENDOR SUBCONTRACTS PRIOR TO BUYER'S ACCEPTANCE

(a)     As to each Subject Agreement, pending the Buyer's determination of whether or not to accept and assume the Subject Agreement, the Seller and the Trustee agree as follows:

   (i)     The Trustee will notify each party to the Subject Agreement that (a) the Buyer has purchased and is the owner of the Acquired Assets (including the assets used in performing the Sellers obligations under the Subject Agreement); (b) the Buyer has the right (but not the obligation) to assume the Seller's interest in the Subject Agreement (subject to curing any defaults under the Subject Agreement and providing adequate assurance of future performance); (c) all payments after the date of the notice must be sent to the Buyer; (d) all information and records regarding the Subject Agreement are to be made available to the Buyer; (e) the Buyer will not be obligated to perform the Seller's obligations under the Subject Agreement unless and until the Buyer has accepted and assumed the Subject Agreement; and (f) the Buyer must determine whether to accept or refuse the Subject Agreement by the end of the Transition Period (defined below).

   (ii)     The Seller shall send the notices required in the preceding subsection (i) immediately after the Approval Date, in a mutually acceptable form;

   (iii)     The Seller will remain the contract party to the Subject Agreement until the Buyer accepts the Subject Agreement. The Buyer will act as the Seller's authorized agent to perform the Seller's obligations under the Subject Agreement which become due during the Transition Period. The Buyer will indemnify the Seller for any damage caused by the Buyer's actions or inactions incurred in fulfilling its responsibilities as agent under this Section 7;

Stephen S. Gray, Trustee
November 6, 1998
Page 29

(iv)    At the Closing Date, the Seller shall irrevocably assign to the Buyer (i) all
rights to receive any and all payments under the Subject Agreements in
respect of work performed by Seller prior to or to be performed by the
Buyer after the Closing Date, and (ii) all CEP Business receivables
established before the Closing Date. Upon the Approval Date, in
accordance with Subsection 3(d), the Seller shall notify the customers to
make all such payments to the Buyer. In the event the Seller receives any
such payments, these shall be deemed received and held in trust for benefit
of the Buyer and shall be immediately transferred to the Buyer;

(v)    The Buyer shall perform for the Seller under the Subject Agreement only
if the Buyer receives payment for its services and costs as the Sellers agent
under the Subject Agreement; if the Buyer does not receive payment, the
Buyer may immediately terminate its services as the Seller's agent under
the Subject Agreement. Further, Buyer's obligation to perform shall
terminate upon Buyer's notification to Seller that Buyer elects not to
accept assignment of that Subject Agreement;

(vi)    The Buyer shall have (20) business days after the Closing Date
("Transition Period") in which to designate in writing which of the Subject
Agreements and subcontracts the Buyer will accept and assume;

(vii)    The Buyer shall provide the equipment it has acquired as part of the CEP
Assets for its performance as the Seller's agent under the Subject
Agreement;

(viii)    If during the Transition Period any of the Seller's current employees, on
the selected employees list, continue to work on the Subject Agreement
before they are hired by the Buyer, then as between the Buyer and the
Seller, they shall be deemed independent contractors of the Buyer;

(ix)    The Buyer may at any time after the delivery of written notice to the
Seller, at least five (5) business days in advance prior to its acceptance of
the Subject Agreement, refuse the Subject Agreement and, if the Buyer
has already commenced performance as the Seller's agent under the
Subject Agreement, immediately terminate its services (and, in such
event, and upon Seller's request and prepayment, Buyer shall enter into a
sub-contract on customary terms and rates to perform the work necessary

Stephen S. Gray, Trustee
November 6, 1998
Page 30

> to complete such contract at Seller's expense, if such work can be
> reasonably done under such contract without undue risk or expense to
> Buyer or Seller); and

> (x)    The Buyer shall not be obligated or liable for the Seller's performance
>        under the Subject Agreement, except for the services it provides as the
>        Seller's agent under the Subject Agreement during the period after the
>        Closing Date until the Buyer's determination to accept or revise the
>        Subject Agreement.

(b)    The Trustee and the Seller shall use their best efforts to assist the Buyer in the
       assignment of contracts to the Buyer.

(c)    Any payments received by Seller or by the Trustee that are due to Buyer shall be
       forwarded to Buyer without undue delay and regardless of any claims asserted or
       that may be asserted in the Chapter 11 Case.

(d)    If the Buyer elects to refuse a Subject Agreement, the Trustee shall reject and
       terminate such Subject Agreement to the extent it relates to the provision of
       services of the CEP Business as soon as practicable thereafter.  Buyer and
       Trustee recognize that at the time of the Closing Date, all the Subject Agreements
       involving Wet Waste scope and CEP scope combined may not be fully resolved
       with those customers.  Therefore, in addition to the obligations prior to the
       Closing Date as described Section 7(b) above, after Closing, Buyer and Trustee
       shall continue to fully cooperate to assign or otherwise transfer to Buyer the full
       scope of CEP work under the Subject Agreements and any offers or bids
       outstanding at the time of the Closing Date.  The Trustee shall obtain agreement
       by Seller's successor for the Wet Waste business for such cooperation, which
       shall be a condition of sale of the CEP business, provided however, that Buyer
       shall cooperate and reasonably assist Seller's successor at the same time to allow
       Seller's successor by assignment or otherwise to obtain the Wet Waste scope of
       those contracts. In no event will Buyer have any responsibility for the Wet Waste
       scope of work or obligations related thereto.

(e)    The Buyer shall within twenty (20) business days after Closing notify the Trustee
       which bids and proposals that it wants assigned to the Buyer, and to the extent that
       said bid is assignable, the Trustee will cooperate with the Buyer in its efforts to
       facilitate the transfer of said bids from the Seller to the Buyer.

Stephen S. Gray, Trustee
November 6, 1998
Page 31

## SECTION 8. CEP BUSINESS EMPLOYEES

By November 12, 1998, the Buyer shall submit to the Seller a list of the Seller's employees, independent contractors, and consultants that are engaged primarily or exclusively in the CEP Business including staff involved in the administrative and other support functions (the "CEP Employees") that it desires to hire (the "Selected Employees"). At Closing, the Seller shall release the Selected Employees from any non-compete agreements in effect to allow the Buyer to employ such Selected Employees in the operation of the CEP Business and the CEP Assets, and the Buyer shall make offers of employment to the Selected Employees contingent only upon the closing of the sale transaction contemplated hereby.

The Buyer agrees that for a period of one (1) year commencing as of the Closing Date; it shall not employ any of Seller's employees who is not a Selected Employee unless, in connection therewith (i) the Buyer reimburses the Seller for such employee's severance pay actually said by Seller, or (ii) the Buyer obtains the Trustee's consent.

Stephen S. Gray, Trustee
November 6, 1998
Page 32

## SECTION 9. MAINTENANCE OF LICENSES, INSURANCE, REGULATORY FILINGS AND PERMITS

The Fall River Facility and the Bear Creek Road Facility are each designated as included in the Acquired Assets subject to this Offer. If Buyer's Offer is accepted, the Seller will maintain licenses, insurance, regulatory filings and permits that are necessary or appropriate for the operation of each facility, until the Closing Date, and thereafter until all required licenses and permits are transferred, at the Seller's expense before the Closing Date, and at the Buyer's expense after the Closing Date. However, Buyer shall indemnify, defend and hold harmless the Seller for any and all claims made against the Seller for any losses, damages or claims caused after the Closing Date on account of Buyer's use or acquisition of the facility and for Seller's reasonable and necessary costs of defending same.

## SECTION 10. TRANSITION FACILITY AND ADMINISTRATIVE SERVICES

The Trustee shall provide reasonable space in the Seller's Tech Center at 1000 Clearview Court, Oak Ridge, Tennessee, or other suitable location at no charge to Buyer, for Buyer to store the "Tech Center Assets" for up to 90 days following the Closing Date, to afford Buyer the requisite time to obtain approvals to remove such assets. Buyer will promptly apply for and diligently pursue such required approvals.

## SECTION 11. USE OF SELLER'S QUALITY ASSURANCE (QA) PROGRAM

The Seller's QA programs shall be one of the CEP Assets to be purchased in conjunction with the Wet Waste Buyer, along with the manuals and documents associated with that program the Seller shall cooperate with Buyer in this transition process.

## SECTION 12. PRE-CLOSING INFORMATION TO THE BUYER

As soon as possible, but in any event no more than three days from the submission of this Offer, the Trustee shall provide to the Buyer the following information solely to the extent such information is related to the CEP Business and has not been made available previously to Buyer:

    (a)    listings of all projects with on-going work being performed over the next three weeks and the associated personnel;

Stephen S. Gray, Trustee
November 6, 1998
Page 33

(b)    listings of all set-offs, contracts and the like as to all contracts to be assumed.
Listings are to include a short description of each contract, expiration date, and
value;

(c)    copies of agreements that the Seller has with employees;

(d)    copies of contracts that contain performance penalties, obligations to take
possession or title to waste; and

(e)    a list of all open bids and proposals with respect to the CEP Business setting fort
the status of each such bid and proposal and details regarding the same.

## SECTION 13. REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to, and agrees with, Seller as follows:

(a)    <u>Organization and Good Standing of Buyer</u>. Buyer is or will be a newly formed
corporation or limited liability company duly organized, validly existing and in
good standing under the laws of the State of Delaware. Buyer has full power and
authority to carry on the CEP Business as and where now conducted and to own
or lease and operate the Acquired Assets at and where now owned or leased and
operated by it, and is or will be duly qualified to do business in Massachusetts
and Tennessee.

(b)    <u>Authority of Buyer Consents</u>.  The execution, delivery and consummation of this
Offer by Buyer has been or will be authorized by the Directors of Buyer in
accordance with all applicable laws and Buyer's Certificates of Incorporation, and
at the Closing Date no further action will be necessary on Buyer's part to make
this Offer valid and binding and enforceable against Buyer in accordance with its
terms.   The execution, delivery and consummation of this Offer by Buyer (i) is
not or will not be contrary to the Buyer's Certificate of Incorporation or Bylaws;
(ii) will not violate any order law rule or regulation known by Buyer to be
applicable to Buyer; (iii) does not now and will not, with the passage of time, the
giving of notice or otherwise, result in a violation or breach of or constitute a
default under, any term of provision of any material indenture, mortgage, deed of
trust, lease, instrument order, judgment, decree, rule, regulation, law, contract,
agreement or any other restriction to which Buyer is a party or to which Buyer or
any of its assets is subject or bound; and (iv) will not result in any acceleration or

Stephen S. Gray, Trustee
November 6, 1998
Page 34

termination of any loan or security interest agreement to which Buyer is a party or
to which Buyer or any of its assets is subject or bound.

(c)　Litigation.  There is no judicial or administrative action, proceeding or
investigation pending or to Buyer's knowledge, threatened, that calls into question
the validity of this Offer or any action taken or to be taken by Buyer in connection
herewith.  There is no litigation, proceeding or investigation pending or, to
Buyer's knowledge, threatened, or any order, injunction or decree outstanding,
against Buyer that, if adversely determined, would have a material adverse effect
upon Buyer's ability to perform its obligations under this Offer.

(d)　Approval.  The Buyer is not aware of any reason why it would be denied any
necessary approval, consent, permit or other governmental authorization
necessary to purchase and/or operate the CEP Business and/or the Acquired
Assets.

(e)　Notwithstanding the Closing and the consummation of the transactions
contemplated by this Offer, the representations, warranties and covenants of the
Buyer contained in this Offer or any agreement, instrument, paper, or certificate
executed and delivered by the Buyer in connection with the transactions
contemplated hereby, will survive the Closing.

## SECTION 14. ACCESS TO SELLER'S FACILITY

Seller agrees to make available to the Buyer and its attorneys, accountants, agents and
advisors, prior to the Closing Date, such records, information and personnel as the Buyer may
reasonably request.  As a condition to the Seller's granting to the Buyer and/or its agents physical
access to the Seller's CEP Business facilities, the Buyer shall provide the Seller proof of workers
compensation or similar insurance as well as of such liability and other insurance as may be
required by applicable regulatory or other law, in such amounts as the Seller may reasonably
require.

Stephen S. Gray, Trustee
November 6, 1998
Page 35

## SECTION 15. EXPENSES

Each party shall bear its own costs and expenses (including attorney's fees) associated with this offer and the performance thereof.

## SECTION 16. TAXES ASSOCIATED WITH THE SALE

Each party shall pay when due any taxes assessed under applicable law against such party relating to these transactions.

## SECTION 17. SEVERABILITY

(If and only if) Buyer elects, if any portion of this offer is held invalid or unenforceable any remaining portion shall continue in full force and effect and the invalid or unenforceable portion shall be replaced by a valid and enforceable portion reflecting the original intent of the parties as closely as possible. If a material aspect of this Offer is severed by the Court and, prior to Closing, either party determines that the Offer as modified (that is, without the severed portion) is deficient, it may terminate the Offer.

## SECTION 18. NOTICES

All notices required or permitted to be given pursuant to the terms of this Offer shall be sent by hand or private overnight delivery service of national reputation and also by facsimile transmission as follows:

To Seller    Stephen S. Gray, Trustee
c/o The Recovery Group
270 Congress Street
Boston, MA 02210
Telecopy: (617) 482-9804

To Buyer    John T. Preston, Officer
9 Martins Cover Lane
Hingham, MA 02043
Telecopy: (781) 740-2056

Stephen S. Gray, Trustee
November 6, 1998
Page 36


with a copy to

      Buyers counsel:      Richard E. Mikels, Esq.
                                Mintz, Levin, Cohn, Ferris, Glovsky and
                                Popeo, P.C.
                                One Financial Center
                                Boston, MA  02111
                                Telephone:     617/542-6000
                                Telecopy:      617/542-2241

## SECTION 19. CHOICE OF LAW

    Enforcement of this Offer and legal matters not governed by the Code shall be determined in accordance with the laws of the Commonwealth of Massachusetts, without reference to its choice of law doctrine.   Buyer consents to the jurisdiction of the Court as to any proceeding to enforce or interpret this Agreement.

## SECTION 20. HEADINGS

    The section headings contained herein are for reference purposes only and shall not in any way affect the meaning or interpretation of this Offer.

## SECTION 21. COUNTERPARTS

    This Offer may be signed in any two (2) or more counterparts, all of which, taken together, shall be deemed to constitute the original Offer.

By its signature below, the Seller accepts this offer, subject to the terms and conditions set forth herein and to approval by the Court.

## SECTION 22. BUYER'S CONDITIONS PRECEDENT

    The obligation of the Buyer to consummate the transactions to be performed by it hereunder is subject to the satisfaction on or before the Closing of the following conditions precedent, any or all of which Buyer may elect to waive or not waive, extend or not extend, in its absolute discretion:

Stephen S. Gray, Trustee
November 6, 1998
Page 37

(a)    Any representation and warranties made by the Seller hereunder shall be true and
       correct in all material respects as of the Closing Date.

(b)    The Seller shall have performed and complied with any covenants made by it
       hereunder in all material respects as of the Closing Date.

(c)    No action, suit or proceeding shall be pending or threatened wherein an
       unfavorable ruling would (a) prevent consummation of any of the transactions
       contemplated hereunder; (b) cause any of the transactions contemplated hereunder
       to be rescinded following consummation; or (c) affect adversely the right of Buyer
       to own or use the Acquired Assets.

(d)    The Court shall have entered the Sale Order, which Sale Order shall not have been
       reversed, stayed, modified or amended in material respects prior to the Closing
       Date.

(e)    The CEP Business shall on the Closing Date be in no worse financial or operating
       condition it was in were on November 3, 1998. Adverse changes constituting a
       breach of this condition shall include material diminution in customers or
       revenues, material income, in costs or liabilities, or losses of existing key
       employees or experienced work force.

(f)    The Seller shall have continued to conduct the CEP Business in the ordinary
       course, consistent with past practice and in the same manner as it is presently
       being conducted;

(g)    No material adverse change shall have accrued to the CEP business or the CEP
       assets after November 3, 1998 or, if such change was not known to John T.
       Preston, after the appointment of the Trustee;

(h)    The Buyer shall have entered into agreements to hire such of the Seller's CEP
       Business employees as it deems, in its sole discretion, to be necessary or desirable
       to the continued operation of the CEP Business;

(i)    The Buyer shall have procured insurance, including, without limitation, nuclear
       liability insurance, and environmental impairment insurance, satisfactory in form,
       substance and amount to Buyer;

Stephen S. Gray, Trustee
November 6, 1998
Page 38

(j)    All pleadings, agreements and other documents related directly or indirectly to the sale anticipated herein shall be in form and substance satisfactory to the Buyer;

(k)    Buyer shall have entered into definitive agreements with purchaser of Seller's Wet Waste business in form, substance and scope satisfactory to Buyer, pursuant to which, among other things:

   (i)    Wet Waste purchaser will have agreed to exclusively supply all contracted IER to CEP Buyer for three years on mutually agreeable terms conditions and exceptions provided such IER is above one (1) REM per hour requiring thermal treatment;

   (ii)    Buyer and Wet Waste purchaser shall have entered into a lease on mutually agreeable terms supporting Wet Waste operations in north end of CEP building in Oak Ridge, Tennessee, and Wet Waste purchaser may operate under the CEP Buyer radioactive license; and

   (iii)    Buyer and Wet Waste purchaser will support each other on certain transitional requirements such as sharing sales force and allowing continued cask storage for IER at the Columbia, South Carolina facility and leasing of casks to support shipments and outside storage requirements.

(l)    The Closing Date shall occur on or before November 23, 1998.

(m)    The Wet Waste Asset sale referred to in Part I hereof shall have been closed.

(n)    The Seller shall have delivered to the Buyer, in form reasonable acceptable to the Buyer, deeds, bills of sale, assignments or other instruments of transfer necessary and appropriate to transfer and vest in the Buyer the CEP Assets.

(o)    In the event that this Agreement gets noticed as the new "stalking horse" agreement to acquire the CEP Assets, the Buyer and the Trustee shall have agreed upon bidding procedures, a break up fee for the Buyer, bid protection and other bankruptcy sale terms as the Buyer and the Trustee may agree upon, all subject to approval by the Bankruptcy Court.

Stephen S. Gray, Trustee
November 6, 1998
Page 39

## SECTION 23. SELLER'S CONDITIONS PRECEDENT

The obligation of the Seller to consummate the transactions to be performed by it hereunder is subject to the satisfaction of the following conditions precedent, any or all of which Seller may elect to waive or not waive in its absolute discretion.

(a)     Any representation and warranties made by the Buyer hereunder shall be true and correct in all material respects as of the Closing Date;

(b)     The Buyer shall have performed and complied with any covenants made by it hereunder in all material respects as of the Closing Date and the Second Closing Date;

(c)     The Court shall have entered the Sale Order, which Sale Order shall not have been reversed stayed, modified or amended in material respects prior to the Closing Date.

## SECTON 24.  CLOSING

The Closing Date shall occur on the later of three (3) business days after the entry of the Sale Order or the satisfaction of all conditions (as set forth in Section 22), subject to the Buyer's right to waive or extend such conditions in its discretion.

**Quantum Catalytics, LLC**

By: _John T Preston_

**Its Duly Authorized Member**

**AGREED TO:**

_____

Stephen S. Gray, Trustee

TRADOCS: 1145982.4 (_k8%04!.doc)

# EXHIBIT B



ENTERED ON DOCKET
11/25/98

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case Nos.    97-21385-CJK |
| MOLTEN METAL TECHNOLOGY, INC., | ) | through |
| MMT OF TENNESSEE, INC., | ) | 97-21389-CJK |
| MMT FEDERAL HOLDINGS, INC., | ) | jointly administered |
| M4 ENVIRONMENTAL | ) |  |
|    MANAGEMENT, INC., and | ) |  |
| M4 ENVIRONMENTAL, L.P., | ) |  |
|  | ) |  |
|               Debtors | ) | *November 25, 1998* |
|  | ) |  |

ORDER APPROVING SALE OF WET WASTE ASSETS
AND CEP ASSETS FREE AND CLEAR

Stephen S. Gray, the duly appointed chapter 11 trustee (the "Trustee") of all of the above-

referenced, jointly administered debtors (collectively, the "Debtors"), filed his Motion of

Chapter 11 Trustee for Authority (a) to Sell Wet Waste Assets and the CEP Assets of the Estates

Free and Clear of all Liens, Claims and Encumbrances and (b) to Conditionally Assume and

Assign Executory Contracts (the "Sale Motion") requesting authorization to sell substantially all

of the assets of the Debtors' so-called "wet waste" business (the "Wet Waste Assets") and the

catalytic extraction processing or "CEP" business (the "CEP Assets"), as such assets

(collectively, the "Assets") are described more particularly in that certain letter agreement dated

November 13, 1998, as further amended in open court and by sealed bid (the "ATG/QC Bid"),[1]

free and clear of all liens, claims, interests and encumbrances to ATG, Inc. (the "Wet Waste

564

Assets Buyer") and Quantum Catalytics, LLC (the "CEP Assets Buyer") and to conditionally

sell, assume and assign certain executory contracts. The ATG/QC Bid constitutes one bid by the

Wet Waste Assets Buyer for the Wet Waste Assets and one bid by the CEP Assets Buyer for the

CEP Assets, plus certain guarantees by the Wet Waste Assets Buyer on behalf of the CEP Assets

Buyer. The consideration being provided to the estate for the purchase of the Assets, in addition

to the assumption of various specifically designated liabilities (but no others), consists of, in

general, and without specification of all aspects of such consideration, $10,500,000 cash and a

$1,000,000 secured and/or guaranteed promissory note due in one year for the Wet Waste Assets

(the "Wet Waste Sale Proceeds") and $100,000 cash and a contingent obligation of 5% of

EBITDA for the CEP Business, not to be less than $800,000 per year for five years, which

obligation is secured as to the first payment of $800,000 and guaranteed as to the subsequent

$800,000 annual payments (the "CEP Sale Proceeds").

The Sale Motion requested this Court to authorize a sale of the Assets to the highest and

best bidder at a public, sealed-bid auction that was held on November 24, 1998 at 9:30 a.m.

before this Court (the "Sale Hearing"). The Court entered an order, dated November 13, 1998,

scheduling the Sale Hearing with respect to the sale of the Assets, prescribing the form and

manner of notice thereof and approving bidding procedures related to the sale and the assumption

and assignment of executory contracts and unexpired leases (the "Sale Procedures Order"). A

notice to creditors and parties in interest of the Sale Motion, the Sale Hearing date and the Sale

Procedures Order (the "Notice") in proper form was served upon all lien holders of record, those

creditors pursuant to the Court's Order Allowing Motion To Limit Notice, dated November 13,

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to them in the

1998, other parties in interest (including without limitation, the United States of America, the Commonwealth of Massachusetts, the State of South Carolina and the State of Tennessee as potential environmental claimants) and parties who requested notice.

NOW, THEREFORE, based upon all of the evidence, including evidence proffered or adduced at the Sale Hearing, memoranda, objections and representations and argument of counsel in connection with the Sale Hearing, and upon the entire record of the Sale Hearing and of the Debtors' chapter 11 cases, and after due deliberation thereon, and good cause appearing therefor,

IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any finding of fact shall later be determined to be a conclusion of law it shall be so deemed and vice versa.

B.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1134.

C.    Venue of this case in this district is proper pursuant to 28 U.S.C. § 1408(a) and venue of this proceeding is proper pursuant to 28 U.S.C. § 1409(a).

D.    Determination of the Sale Motion is a core proceeding under 28 U.S.C. §§ 157(b) (2) (A) and (N). The statutory predicates for the relief requested herein are §§105, 363 and 365

ATG/QC Bid.

of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. as amended (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 6006 and 9019; and MLBR 2002-1, 6004-1, and 9019-1.

E.    The Trustee has followed the procedures for notice of the Sale Motion and the Sale Hearing set forth in the Sale Procedures Order, which procedures were fair and reasonable to provide notice of the Sale Motion and the Sale Hearing to all creditors and other parties in interest and to provide interested bidders with notice of the Sale Motion and Sale Hearing and an opportunity to bid for the Assets.

F.    Proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Hearing and the sale has been provided under the circumstances in accordance with all applicable law, including without limitation, §102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9019, MLBR 2002-1, 6004-1 and 9019-1 and the Sale Procedures Order, and no other or further notice of the Sale Motion, the Sale Hearing, or of the entry of this Sale Order is required. The marketing efforts, advertising and solicitations conducted in connection with the sale were appropriate and reasonable to obtain the highest and best price for the Assets.

G.    A reasonable opportunity to bid, to object and to be heard regarding the relief requested in the Sale Motion has been afforded to all creditors, parties in interest and other entities, as provided in the Motion to Limit Notice, including but not limited to (a) all creditors of the Debtors, (b) all parties that claim interests in or liens upon the Assets, (c) all parties to the executory contracts to be assumed pursuant to the ATG/QC Bid, (d) all governmental authorities, including the Office of the Attorney General for the State of Tennessee, who have, or as a result of the sale of the Assets may have, claims, contingent or otherwise, against the Debtors or the

4

Debtors' estates, (e) all parties who have filed notices of appearance in this case, and (f) all parties who are or may be bidders for the Assets.

H.      The only bid filed by the bid deadline set forth in the Sale Procedures Order (the "Bid Deadline") was the combined bid of NUKEM Nuclear Technologies Corporation ("NUKEM") and GTS Duratek, Inc. ("GTSD"), which filed a bid (the "NUKEM/GTSD Bid") to purchase the Wet Waste Assets and certain of the CEP Assets for a cash payment, a Royalty Payment (as defined in the NUKEM/GTSD Bid) and the assumption of certain environmental liabilities of the Debtors.

I.      No other bids for the Assets were received by the Bid Deadline.

J.      NUKEM previously had submitted a bid (the "NUKEM Bid") for only the Wet Waste Assets for $10,500,000.

K.      At the Sale Hearing, the Trustee, the Official Committee of Unsecured Creditors (the "Creditors' Committee") and MMT Recovery LLC jointly recommended that the Court approve the sale of the Assets to the Wet Waste Assets Buyer and the CEP Assets Buyer and reject all other bids on the Assets, including the NUKEM Bid and the NUKEM/GTSD Bid.

L.      The Wet Waste Assets Buyer has provided the Trustee a cash deposit of $1,050,000 and together with the CEP Assets Buyer, has adequately demonstrated the financial wherewithal to close the transactions contemplated by the ATG/QC Bid. The consideration exchanged for the Assets constitutes "value" within the meaning of §363(m) of the Bankruptcy Code.

M.      The NUKEM/GTSD Bid does not exceed the value of the ATG/QC Bid. The NUKEM/GTSD Bid does not maximize the value of the Debtors' estates.

N.     The highest and best price for the Assets is represented by the ATG/QC Bid, as supplemented and amended, in open court and by the sealed bid submitted to the Trustee and attached hereto as Exhibit A, which amendments included without limitation:

(1)         that the Wet Waste Assets buyer has provided its list of Selected Employees pursuant to Section 9 (Part I) of the ATG/QC Bid;

(2)         that the CEP Assets Buyer has provided its list of Selected Employees pursuant to Section 7 (Part II) of the ATG/QC Bid;

(3)         that in the event that the Wet Waste Buyer or the CEP Assets Buyer takes an assignment of the Kepco contract, the deposit in the approximate amount of $140,000 shall remain property of the estate;

(4)         that the promissory note in the principal amount of $1,000,000 and the first guaranteed minimum annual payment of $800,000 calculated as a function of EBITDA in respect of the CEP Business (both as set forth in page 4 of Exhibit A) are to be secured by a standby letter of credit to be obtained by ATG, Inc.; and

(5)         that the Wet Waste Assets Buyer and the CEP Assets Buyer agree to pay all costs of cure, if any, associated with their respective Assumed Contracts.

O.     It is therefore in the best interest of the Debtors, their respective creditors, and their respective estates that the Court enter this order (the "Sale Order") authorizing and directing, under §§105, 363 and 365 of the Bankruptcy Code: (1) the Trustee to enter into and comply with the terms and conditions of the ATG/QC Bid; (2) the sale of the Wet Waste Assets

to the Wet Waste Assets Buyer or its nominee(s), free and clear, except as provided by the

ATG/QC Bid, of all liens, claims, interests and encumbrances (including all "interests" in such

assets within the meaning of §363(f) of the Bankruptcy Code), with all such liens, claims,

interests and encumbrances transferring to the Wet Waste Sale Proceeds with the same validity

and priority as the now have; (3) the sale of the CEP Assets to the CEP Assets Buyer or its

nominee(s), free and clear, except as provided by the ATG/QC Bid, of all liens, claims, interests

and encumbrances (including all "interests" in such assets within he meaning of §363(f) of the

Bankruptcy Code), with all such liens, claims, interests and encumbrances transferring to the

CEP Sale Proceeds with the same validity and priority as the now have; (4) the Trustee to sell,

assume and assign to the Wet Waste Assets Buyer, or its nominee(s), the executory contracts

described in Part I of the ATG/QC Bid (the "Wet Waste Assumed Contracts"); and (5) the

Trustee to sell, assume and assign to the CEP Assets Buyer, or its nominee(s), the executory

contracts described in Part II of the ATG/QC Bid (the "CEP Assumed Contracts").

P.        The approval of the ATG/QC Bid, and consummation of the sale of the Assets at

this time are in the best interests of each of the Debtors, their respective creditors, and their

respective estates. The Trustee has presented good and sufficient business justification for the

sale of the Assets pursuant to §363 of the Bankruptcy Code, rather than disposing of the Assets

pursuant to a liquidating plan of reorganization, and the assumption and assignment of the Wet

Waste Assumed Contracts and the CEP Assumed Contracts, in that, among other things:

      (1)        An expeditious sale of the Assets in accordance with the

      procedures followed by the Trustee will enable the estates to realize the

      highest possible price for the Assets and, in the absence of a prompt sale,

7

the Assets will continue to decline precipitously in value due to continued

operations in a chapter 11 case.

(2)    Claims against the Debtors' estates will be significantly reduced as

a result of the prompt consummation of a sale of the Assets and the

assumption of the Assumed Environmental Liabilities (as defined in the

ATG/QC Bid) and the concomitant assumption and assignment of the Wet

Waste Assumed Contracts and the CEP Assumed Contracts; and

(3)    A sale of the Assets out of the ordinary course of business and

outside of a plan is essential to ensure the continued, uninterrupted

processing of contaminated waste at, and/or the removal of contaminated

assets from, the sites to be sold.

Q.    The ATG/QC Bid represents the highest and best offer for the Assets, the

purchase price, the assumption of significant environmental liabilities, and other present and

future consideration is fair and reasonable, and constitutes fair consideration and reasonably

equivalent value under the Bankruptcy Code and applicable state law.

R.    As a condition to the purchase of the Assets by the Wet Waste Assets Buyer and

the CEP Assets Buyer, each buyer requires that their respective Assets be sold free and clear of

all liens, claims, interests and encumbrances (except those specifically assumed by such buyers

under the ATG/QC Bid), and that neither the Wet Waste Assets Buyer nor the CEP Assets Buyer

have any liability for any liabilities of the Debtors or the Debtors' estates (except those

specifically assumed by such buyers under the ATG/QC Bid). Neither the Wet Waste Assets

Buyer nor the CEP Assets Buyer would enter into and consummate the sale if such sale were not

free and clear of all liens, claims, interests and encumbrances of the Debtors or the Trustee, other

than as specifically provided in the ATG/QC Bid, or if the Wet Waste Assets Buyer or the CEP

Assets Buyer were or would be liable for liabilities of the Debtors or the Trustee, other than as

specifically assumed by such buyers under the ATG/QC Bid.

      S.     The sale, assumption and assignment to the Wet Waste Assets Buyer of the Wet

Waste Assumed Contracts, pursuant to §§ 363 and 365 of the Bankruptcy Code, is in the best

interest of each of the Debtors and its creditors and estate, and represents a prudent exercise of

the Trustee's business judgment. A procedure for determining the amount necessary to cure any

defaults under the Wet Waste Assumed Contracts has been established by order of this Court and

a bar date was set for November 9, 1998. The amounts so claimed by the non-Debtor parties,

subject to objections, if any, by the Wet Waste Buyer and the Trustee shall establish the cure

amount (the "Wet Waste Cure Amounts"). The Wet Waste Cure Amounts will be the maximum

amounts necessary to cure all defaults, in each Assumed Contract, if any, and to pay all actual or

pecuniary losses that have resulted from such defaults, if any, under the Wet Waste Assumed

Contracts. The Wet Waste Assets Buyer has provided adequate assurance of future performance

under the Wet Waste Assumed Contracts within the meaning of §§365(b)(1)(C) and (f)(2)(B) of

the Bankruptcy Code.

      T.     The sale, assumption and assignment to the CEP Assets Buyer of the CEP

Assumed Contract, pursuant to §§ 363 and 365 of the Bankruptcy Code, is in the best interest of

each of the Debtors and its creditors and estate, and represents a prudent exercise of the Trustee's

business judgment. A procedure to determine the amount necessary to cure any defaults under

the CEP Assumed Contracts has been established by order of this Court, and a bar date of

November 30, 1998 has been set. The amounts so claimed by the non-Debtor parties subject to

objections, if any, by the CEP Assets Buyer and the Trustee shall establish the cure amount (the

"CEP Cure Amounts"). The CEP Cure Amounts will be the maximum amounts necessary to

cure all defaults in each Assumed Contract, if any, and to pay all actual or pecuniary losses that

have resulted from such defaults, if any, under the CEP Assumed Contracts. The CEP Assets

Buyer has provided adequate assurance of future performance under the CEP Assumed Contracts

within the meaning of §§365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

      U.     The ATG/QC Bid has been proposed by each of the Wet Waste Assets Buyer and

the CEP Assets Buyer in good faith in accordance with the standards of applicable law and In re

Mark Bell Furniture Warehouse, Inc., 992 F.2d 7 (1st Cir. 1993); and Greylock Glen Corp. v.

Community Savings Bank, 656 F.2d 1(1st Cir. 1981). Neither the Wet Waste Assets Buyer nor

the CEP Assets Buyer is currently affiliated with any of the Debtors, although some of the key

principals of the CEP Assets Buyer were affiliated with the Debtors as directors and/or

employees. Each of the Wet Waste Assets Buyer and the CEP Assets Buyer is a good faith

purchaser under §363(m) of the Bankruptcy Code and, as such, is entitled to the protections

afforded thereby. No party has engaged in any conduct that would cause or permit the ATG/QC

Bid to be avoided under §363(n) of the Bankruptcy Code.

      V.     In the absence of a stay of this Sale Order, each of the Wet Waste Assets Buyer

and the CEP Assets Buyer will be acting in good faith within the meaning of §363(m) of the

Bankruptcy Code in consummating the transactions contemplated by the ATG/QC Bid, including

the assumption by the Trustee and assignment to the Wet Waste Assets Buyer and the CEP

Assets Buyer of the Wet Waste Assumed Contracts and the CEP Assumed Contracts, at any time after the entry of this Sale Order.

      W.      The sale and transfer of the Assets and the assignment of the Wet Waste Assumed Contracts and the CEP Assumed Contracts contemplated by the ATG/QC Bid (1) are or will be legal, valid and effective transfers of property of the Debtors' estates held by the Trustee to each of the Wet Waste Assets Buyer and the CEP Assets Buyer or their nominee(s) in the manner contemplated by the ATG/QC Bid, and (2) vest or will vest each of the Wet Waste Assets Buyer and the CEP Assets Buyer or their nominee(s) with all right, title and interest of the Trustee in and to the Assets and Assumed Contracts free and clear of all liens, claims, encumbrances and interests under §§363(f) and 105 of the Bankruptcy Code, other than as specifically provided in the ATG/QC Bid.

      X.      The State of Tennessee and the CEP Assets Buyer have agreed on a schedule for the removal of secondary waste from the Bear Creek Road Facility and have asked that the schedule be attached to this Sale Order; accordingly, the schedule is attached hereto as Exhibit B. Such secondary waste shall be removed in compliance with the applicable regulatory requirements of the State of Tennessee and other applicable laws.

      Y.      Each of the Wet Waste Assets Buyer and the CEP Assets Buyer will sustain irreparable damage and harm unless the injunctions specified in the ordering paragraphs below are entered. All the elements necessary for the imposition of these injunctions have been established.

      Z.      All of the provisions of this Sale Order are non-severable and mutually dependent.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.  The Sale Motion is approved as provided herein.

2.  All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, are overruled on the merits.

3.  The terms and conditions of the ATG/QC Bid are hereby approved in all respects. Pursuant to the provisions of §§105, 363 and 365 of the Bankruptcy Code, the Trustee is hereby authorized and directed to sell the Assets described in the ATG/QC Bid to the Wet Waste Assets Buyer and the CEP Assets Buyer, free and clear of all liens, claims, interests and encumbrances, except as provided in the ATG/QC Bid, and to sell, assume and assign the Wet Waste Assumed Contracts to the Wet Waste Assets Buyer and to sell, assume and assign the CEP Assumed Contracts to the CEP Assets Buyer.  No further consent, approval or order is required for such sale and assumption and assignment, except as specified in the ATG/QC Bid.

4.  By the issuance of this Order, the Trustee is authorized and directed to execute and deliver, and empowered and directed fully to perform under, consummate and implement, the ATG/QC Bid, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the ATG/QC Bid, and to take all further actions as may reasonably be requested by the Wet Waste Assets Buyer or the CEP Assets Buyer for the purpose of assigning, transferring, granting, conveying and conferring possession of any or all of the Assets, or as otherwise may be necessary or appropriate to the performance of the obligations as contemplated by the ATG/QC Bid, including but not limited to using its best efforts to maintain licenses, insurance, regulatory filings and permits as are necessary or appropriate for the

operation of any facilities that constitute components of the Assets and allowing the Wet Waste

Assets Buyer or the CEP Assets Buyer, as appropriate, under the laws of the State of Tennessee

or other applicable states, to operate under such licenses, insurance, regulatory filings and

permits as are necessary or appropriate as permitted under the laws of the State of Tennessee or

other applicable law for the operation of any such facilities, for a period not to exceed 60 days

from the Closing Date. as further provides in the ATG/QC Bid. The buyers shall indemnify,

defend and hold harmless the Trustee for any and all claims made against the Trustee for any

losses, damages or claims caused after the Closing Date on account of such buyer's use or

acquisition of the facility and for the Trustee's reasonable and necessary costs of defending same.

    5.    Nothing contained in this Sale Order shall in any way inhibit the State of

Tennessee or the State of South Carolina from enforcing compliance with any license, permit or

other regulatory authorization issued in connection with the Wet Waste Assets or the CEP

Assets.

    6.    Pursuant to §§105(a) and 363(f) of the Bankruptcy Code, the Assets shall be

transferred, as set forth in the ATG/QC Bid, to the Wet Waste Assets Buyer and the CEP Assets

Buyer upon the closing under the ATG/QC Bid (the "Closing") and, except as specifically

specified in the ATG/QC Bid, shall be, to the maximum extent permitted under the Bankruptcy

Code and other applicable law, free and clear of (a) all mortgages, security interests, conditional

sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances,

easements, restrictions or charges of any kind or nature, if any, including, but not limited to, any

restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of

ownership (the foregoing collectively referred to herein as "Liens") and (b) all debts arising in

any way in connection with any acts or omissions of the Trustee or any of the Debtors, claims (as

that term is defined in §101(5) of the Bankruptcy Code) against the Trustee or any of the Debtors

arising on or prior to the date of the closing of the sale under the ATG/QC Bid and obligations,

demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters

of or against the Debtors or any of their estates of any kind and nature, whether arising prior to,

or subsequent to the commencement of these cases, whether matured or unmatured, liquidated or

unliquidated, whether known or unknown, and whether imposed by agreement, understanding,

law, equity or otherwise, including without limitation, those of the kind specified in §§502(g),

502(h) and 502(i) of the Bankruptcy Code (the foregoing collectively referred to as "Claims"

herein). All such Liens and Claims (including, without limitation, Liens and Claims in respect of

any DIP financing) shall be released, terminated and discharged as to the Assets and shall attach

to the proceeds of the sale, with the Liens and Claims in the Wet Waste Assets (except those

assumed in the ATG/QC Bid) so attaching to the Wet Waste Sale Proceeds and with the Liens

and Claims in the CEP Assets (except those assumed in the ATG/QC Bid) so attaching to the

CEP Sale Proceeds, in each case in the order of their priority, with the same validity, force and

effect which they now have as against the respective Wet Waste Assets or the respective CEP

Assets as the case may be. The Wet Waste Sale Proceeds and the CEP Sale Proceeds shall be

held, administered and distributed as provided in the September 23, 1998 letter agreement among

the Trustee and MMT Recovery LLC (the "Overadvance Agreement") which was approved by

the Court's order entered October 13, 1998 entitled "Order Granting Second Motion of the

Chapter 11 Trustee to Approve Amendment to Post-Petition Financing Dated as of March 3,

1998."

7.    Without limiting the generality of paragraph 6 above, the sale of the Assets shall occur free and clear of any and all environmental claims resulting from any event whatsoever (including without limitation, a release of hazardous substance) which occurred prior to the Closing Date, including without limitation, claims arising from the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") or claims arising under other applicable law; provided, however, that nothing in this Sale Order shall release the CEP Assets Buyer from the Assumed Environmental Liabilities (as defined in the ATG/QC Bid) or from any state regulatory obligation of the CEP Assets Buyer for its ongoing operations, nor shall such environmental liability be limited as to a buyer that becomes the owner operator of a facility.

8.    Effective on the Closing, with the exception of any liabilities specifically assumed under the ATG/QC Bid, all persons and entities holding Liens or Claims of any kind and nature against any of the Debtors or with respect to the Assets are hereby barred and enjoined from asserting such Liens and Claims against the Assets or the Wet Waste Assets Buyer or the CEP Assets Buyer, their successors, designees, nominees or assigns, or their respective affiliates, shareholders, members, officers, directors or trustees.

9.    The Trustee is hereby authorized and directed in accordance with §§ 363 and 365 of the Bankruptcy Code to (a) sell, assume and assign to the Wet Waste Assets Buyer each of the Wet Waste Assumed Contracts and sell, assume and assign to the CEP Assets Buyer each of the CEP Assumed Contracts including, without limitation, the Debtor's right to enforce and obtain the benefits under the existing GTS/Duratek non-compete, preferred vendor status and shared boundary radiological dose limit agreements, in each case pursuant to the provisions of §§ 363

and 365 of the Bankruptcy Code, and free and clear of all Claims and Liens, and (b) execute and deliver to each of the Wet Waste Assets Buyer and the CEP Assets Buyer such documents or other instruments as may be necessary to assign and transfer the respective Assumed Contracts.

10.    All of the Assumed Contracts shall, upon assignment, be valid, binding and in full force and effect and enforceable in accordance with their terms, and, pursuant to §365(k) of the Bankruptcy Code, the Trustee shall be relieved from any further liability with respect to such contracts after such assignment, and each non-Debtor party to such contract shall be, and hereby is, barred and enjoined from asserting any prior default thereon or seeking to enforce or collect any amount, if any, in excess of the Wet Waste Cure Amounts or the CEP Cure Amounts against the Wet Waste Assets Buyer or the CEP Assets Buyer, as the case may be, or their nominees or, with respect to any subsequent default thereon, against the Trustee.

11.    Upon the Closing, all Liens or Claims against the Assets shall, without the necessity of further action on the part of any creditor, shall be deemed released and discharged from the Assets, including, without limitation, the Liens and Claims held or asserted by the following:

Restart Partners, L.P.
Restart Partners II, L.P.
Restart Partners III, L.P.
Restart Partners IV, L.P.
Restart Partners V, L.P.
Morgans Waterfall Income Partners
MWV Separate Account Alpha, LLC
Endowment Restart, LLC
IceSolv, Inc.
Cameron & Barkley Company
Fluor Daniel, Inc.
Tennessee Associates Electrical Company
JBM Incorporated
D.F. Shaffner Merchants and Industrial Contractors, Inc.

Advance Office
Caterpillar Financial Service Corp.
Copelco Capital, Inc.
Vanguard Finance
Anderson County
City of Oakridge
Canon Financial Services, Inc.
Scotsman Group, Inc.
Richland County Treasury
Citicorp Dealer Finance
CW Henderson Electric Company
D.L. Carroll Construction Company, Inc.
Design Security Controls, Inc.
Goldston Engineering
Gowan, Inc.
Eaton Financial Corp.
General Electric Capital Corp.
AT&T Capital Services, Inc.
Crellin Handling Equip.
Inter-tel Leasing, Inc.
BayBank
U.S. Trust
Alamo Concrete company
BankBoston
Bayless Technologies, Inc.
Brazos M&E, Inc.
Century Constructors & Engineers, Ltd.
Certified technical Services, Inc.
Grinell Fire Protection Systems, Inc.
H&H Overhead door Co., Inc.
Matagorda County Tax
Otis Elevator Company
Safety Steel Services, Inc.
Scott & Company
Vee Industrial Plastics
Canon Financial Services, Inc.
Scotsman Group
Yale Financial Services

In addition, the assets at the Tech Center which are part of the CEP Assets shall be sold

free and clear of any rights of any third-party and any claims which may be asserted by any

federal or state agency, bonding company or insurance company. Any and all such Liens and

17

Claims shall attach to the proceeds of the respective Assets in the order of priority they now have, with the same validity, force and effect as they now have against the respective Assets.

12.    On the Closing Date, the creditors of each of the Debtors are authorized and directed to execute such documents and take all other actions as may be necessary to document the release of their Liens on or Claims against the Assets, if any, as such Liens or Claims may have been recorded or may otherwise exist.

13.    This Sale Order (a) is and shall be effective as a determination that, effective as of the Closing Date and except as specially provided in the ATG/QC Bid, all Liens and Claims existing on the Assets before the Closing have been unconditionally released, discharged and terminated as a Lien or Claim against the Assets, and that the conveyance described in ordering paragraph 6 hereof has been effected, and (b) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

14.    Subject to applicable law, each and every federal, state and local governmental agency or department and title company hereby is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the ATG/QC Bid.

15.    If any person or entity that has filed financing statements or other documents or agreements evidencing Liens on or interests in the Assets shall not have delivered to the Trustee prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all Liens or other interests which the person or entity has with respect to the Assets, the Trustee is hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Assets.

16.    All entities who are presently, or on the Closing Date may be, in possession of some or all of the Assets are hereby directed to surrender possession of said Assets to the Wet Waste Assets Buyer with respect to the Wet Waste Assets and to the CEP Assets Buyer with respect to the CEP Assets.

17.    All entities are hereby enjoined, restrained and prohibited from interfering in any way with the removal by the CEP Assets Buyer of any of the Assets that are located at the Tech Center. Any of the Assets located at the Tech Center shall be transferred to the CEP Assets Buyer free and clear from all liens, claims, encumbrances and interests of any entity, including without limitation any insurance provider, bonding company or carrier.

18.    As of the Closing Date, all agreements of any kind whatsoever and all orders of this Court entered prior to the date hereof shall be deemed amended and/or modified to the extent required to permit the consummation of the transactions contemplated by the ATG/QC Bid and under the laws of the State of Tennessee or other applicable states.

19.    Except as otherwise expressly provided in the ATG/QC Bid or related instruments or as otherwise provided in this Sale Order, neither the Wet Waste Assets Buyer nor the CEP

Assets Buyer shall have any liability or responsibility for any liability or other obligation of the

Debtors' estates arising under or related to the Assets other than for the Purchase Price and those

liabilities specifically assumed and described in the ATG/QC Bid. Without limiting the effect of

the foregoing, the transfer of the Assets and the assignment of the Assumed Contracts do not and

will not subject the Wet Waste Assets Buyer or the CEP Assets Buyer to any liability for claims

against the Debtors' estates or the Assets by reason of such transfer under the laws of the United

States, any state, territory or possession thereof or the District of Columbia applicable to such

transactions. Neither the Wet Waste Assets Buyer nor the CEP Assets Buyer shall be deemed, as

a result of any action taken in connection with the ATG/QC Bid, to: (a) be the successor of the

Trustee or any of the Debtors; (b) have, de facto or otherwise, merged with or into any of the

Debtors; (c) be a mere continuation or substantial continuation of any of the Debtors or the

enterprise of any of the Debtors; (d) be responsible for any liability of the Trustee or any of the

Debtors or for payment of any benefit accruing to the Trustee or any of the Debtors, except as

specifically provided for in the ATG/QC Bid; or (e) be liable as a successor in interest to any

Debtor's estate or the Trustee by reason of any theory of law or equity, nor shall it have any

successor or transferee liability of any kind or character for any claims, liabilities, damages or

causes of action with regard to the Assets, including, without limitation, any employment-related

claims, products liability claims and environmental claims arising under CERCLA or other

applicable law, which arose or relate to the period prior to the Closing Date, except as provided

in the ATG/QC Bid with respect to the Assumed Environmental Liabilities (as defined the

ATG/QC Bid) or with respect to preexisting environmental liabilities, as the owner or operator of

a facility.

20.    This Court retains jurisdiction (a) to enforce and implement the terms and

provisions of the ATG/QC Bid, all amendments thereto, any waivers and consents thereunder,

and each of the agreements executed in connection therewith, (b) to compel delivery of the

Assets to the Wet Waste Assets Buyer and the CEP Assets Buyer, (c) to enforce the assumption

and assignment of the Assumed Contracts, (d) to resolve any disputes arising under or related to

the ATG/QC Bid, and (e) to interpret, implement and enforce the provisions of this Sale Order.

21.    Nothing contained in any plan of reorganization (or liquidation) confirmed in

these cases or the order of confirmation confirming any plan of reorganization (or liquidation),

nor any order dismissing any case or converting it to a Chapter 7 liquidation shall conflict with or

derogate from the provisions of the ATG/QC Bid, any document or instrument executed in

connection therewith, or the terms of this Sale Order.

22.    Each of the Wet Waste Assets Buyer and the CEP Assets Buyer is a purchaser of

the Assets in good faith as determined in accordance with applicable law, including without

limitation, In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7 (1st Cir. 1993) and is entitled to

all of the protections afforded by §363(m) of the Bankruptcy Code.

23.    In the absence of a stay of this Sale Order, if each of the Wet Waste Assets Buyer

and the CEP Assets Buyer elects to close under the ATG/QC Bid at any time after entry of this

Sale Order, then, with respect to the ATG/QC Bid, including the assumption and assignment of

the Wet Waste Assumed Contracts and the CEP Assumed Contracts approved and authorized

herein, each of the Wet Waste Assets Buyer and the CEP Assets Buyer shall be entitled to the

protections of §363(m) of the Bankruptcy Code if this Sale Order or an authorization contained

herein is reversed or modified on appeal.

24.    The terms and provisions of the ATG/QC Bid, as modified in open court and by the terms of the sealed bid submitted to the Trustee, together with the terms and provisions of this Sale Order, shall be binding in all respects upon, and shall inure to the benefit of, the Trustee, each of the Debtors' estates and their creditors, and each of the Wet Waste Assets Buyer and the CEP Assets Buyer, and their respective affiliates, successors and assigns, and any affected third parties including but not limited to all non-Debtor parties to the Wet Waste Assumed Contracts and the CEP Assumed Contracts to be assigned to the Wet Waste Assets Buyer and the CEP Assets Buyer, respectively, and persons asserting a claim against or interest in any Debtor's estate or any of the Assets, notwithstanding any subsequent appointment of any trustee for a Debtor under any chapter of the Bankruptcy Code, as to which trustee such terms and provisions likewise shall be binding in all respects.

25.    The failure specifically to include any particular provisions of the ATG/QC Bid or any of the documents, agreements or instruments executed in connection therewith in this Sale Order shall not diminish or impair the efficacy of such provision, document, agreement or instrument, it being the intent of the Court that the ATG/QC Bid and each such document, agreement or instrument be authorized and approved in its entirety.

26.    The ATG/QC Bid and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not material.

27.    Each of the Wet Waste Assets Buyer and the CEP Assets Buyer, as appropriate, is authorized to endorse in the name of the Trustee, and collect, any payments made by account

debtors in connection with accounts receivable associated with the Wet Waste Business and the CEP Business.

28.    The sale and purchase of the Assets is to be consummated as part of a Chapter 11 reorganization proceeding and in contemplation of the Trustee proposing a plan, if possible; therefore, under applicable bankruptcy law, including § 1146 of the Bankruptcy Code, transfer taxes and/or recording fees cannot be imposed on the sale of the Assets.

29.    On the later of a) Closing and b)the date the CEP Assets Buyer receives appropriate permits and licenses to operate the CEP Business in locations where such licenses and permits are required, all letters of credit (the "Letters of Credit") issued by BayBank n/k/a BankBoston, N.A. and U.S. Trust or any affiliate thereof (collectively, the "Banks") for the account of any of the Debtors shall be canceled.. Under no circumstances will the cash collateral that secures each Letter of Credit leave the Banks' possession and control until such Letter of Credit is canceled; but upon such cancellation the cash collateral shall be delivered to the CEP Assets Buyer forthwith.  The Banks' rights and liens in the cash collateral prior to such turnover shall remain in full force and effect notwithstanding anything to the contrary in this Order.

30.    To the extent that any of the Letters of Credit are drawn on prior to the Closing, the applicable issuing Bank shall be permitted to file a motion for relief from the automatic stay on an emergency basis to enable such Bank to exercise its rights under the documents relating to any such Letters of Credit and other applicable law.  The Trustee is hereby deemed to have assented to such a hearing on an emergency basis.

31.    At the Closing, the Trustee shall escrow for the benefit of the Banks $55,000 from the proceeds of the sale of the Assets or from other assets of the estate not being purchased by the

Wet Waste Buyer or the CEP Assets Buyer in order to pay, subject to objections as to reasonableness by parties in interest, the reasonable attorneys' fees, costs of collection and other fees owing to or incurred by the Banks in connection with the Letters of Credit. Such escrow arrangement shall be in form and substance satisfactory to the Banks.

32.    As provided by Bankruptcy Rule 7062, this Sale Order shall be effective and enforceable immediately upon entry.

**ENTERED** at Boston, Massachusetts this 25th day of November, 1998

*Carol J. Kenner*

Honorable Carol J. Kenner
United States Bankruptcy Judge

TRADOCS: 1147977.4 (_ls9041.doc)

24

fill in page 27

11/24/98
12:20 pm

DOCKETED

_1_

1. These changes are in addition to the changes noted on the record before the Court on November 24, 1998

2. Quantum Catalytics, LLC will be a 90% owned subsidiary of ATG, Inc. and 10% owned by John T. Preston

3. ~~Paragraphs 1, 3, 4, 5~~

4. Page 1 is amended by deleting paragraph 3 thereof in its entirety and substituting the following:

   "3. A promissory note from ATG's Wet Waste subsidiary in the principal amount of $1,000,000, payable 12 months from the closing of the acquisition. Payment will be guaranteed by ATG. The cash collateral in the amount of $216,000 securing the performance bond at the South Carolina facility will be paid to the Seller within sixty (60) days of the Closing."

5. Page 3 is amended by deleting the following language where it appears in subparagraph (h) thereof: "... together with the Letter of Credit in the amount of $288,000 and cash collateral posted as financial assurance related to such facility."

6. Page 3 and Page 4 are amended by deleting the following sentence where it appears therein in its entirety: "Relative to the Bear Creek Facility, the Buyer will rent building space from the CEP Assets Buyer in the north of the building and the Buyer's liability will be limited to that portion of the north end of the building actually and solely used by the Buyer."

$561

2

7. Page 5 is amended by deleting paragraph (b) where it appears therein in its entirety and substituting the following:

"(b) A promissory note from ATG's West Waste subsidiary in the principal amount of $1,000,000, payable 12 months from the closing of the acquisition. Payment will be guaranteed by ATG. The cash collateral in the amount of $216,000 securing the performance bond at the South Carolina facility will be paid to the Seller in full within sixty (60) days of the Closing."

8. Page 25, Section 2(d) and (e) shall be deleted in their entirety and substituting therefor:

"(c) As additional consideration for the transfer of the CEP Assets, Quantum Catalytics, LLC shall pay the Seller five percent (5%) of the EBITDA for the CEP Business (including the Fall River assets and the Intellectual Property Assets), for the first five years following closing. Such payments will be in a minimum amount of $800,000 per annum which minimum payments will be guaranteed by ATG."

"(d) In the event that within the five-year (5) period following the Closing Date, the CEP Assets Buyer sells substantially all of the CEP Business, the CEP Assets Buyer shall pay the Trustee an amount equal to five percent (5%) of EBITDA for the CEP Business (including the Fall River assets and the Intellectual Property Assets), after taking into account the sale of the CEP Business. The CEP Assets Buyer shall make such payment to the Trustee within 30 days of receipt by the CEP Assets Buyer all of

2

the proceed of such sale."

9. As additional consideration for the purchase of the CEP Assets, the CEP Assets Buyer shall pay an additional $100,000 on the Closing Date.

10. ATG will post an assurance bond in form and scope satisfactory to the State of Tennessee in the amount of approximately $4.6 million at the time of the release to ATG of the Cash collateral securing the existing $1.4 million to $4.6 million letters of credit, which will then be cancelled.

ATG, INC.

By _____
As authorized officer

4.

## Summary Page

1. The aggregate consideration paid is calculated as follows:

A. $10,500,000    cash

b. $100,000    cash

c. $296,000    letter of credit collateral (cash)

d. $1,000,000  12 month note. Guaranteed by ATG

e. $4,000,000    Minimum Guaranteed EBITDA *

$15,896,000    Guaranteed payments

2. $4.6 million assurance bond to State of Tennessee by ATG.

* 5% of CEP EBITDA. No cap on upside guaranteed downside by ATG.

# EXHIBIT C

O9  Exhi. B

IN ESCROW

December 1, 1998

Stephen S. Gray, Trustee
c/o The Recovery Group
270 Congress Street
Boston. MA 02210

Dear Mr. Gray:

Reference is made to an offer dated November 13, 1998, as amended and filed with the United States Bankruptcy Court for the District of Massachusetts (Eastern District) (the "Court") on November 24, 1998 (as amended, the "Bid") in jointly administered Case Nos. 97-21385CJK through 97-21389CJK (the "Chapter 11 Case") and to an Order of Sale entered by the Court on November 25, 1998 (the "Sale Order") approving the sale on the terms and conditions set forth in the Bid. Capitalized terms used in this letter agreement shall have the same meanings herein as in the Bid.

Pursuant to the Bid and the Order, the parties have agreed that:

1.    Purchase by ATG Nuclear.  ATG Nuclear Services L.L.C. ("ATG Nuclear") will purchase the Wet Waste Assets from the Trustee (including the assets and real estate located in South Carolina) at 12:01 a.m. on December 1, 1998 (the "First Closing") under a Bill of Sale and related closing documents in form and scope satisfactory to the parties executed and delivered by the Trustee. Notwithstanding

the foregoing, the accounts receivable generated from the Wet Waste Business outstanding as of the date hereof (the "Wet Waste Receivables") shall be held back from the Wet Waste Assets until the earlier to occur of: (i) the posting of the letter of credit as provided for in Section 4(c) hereof or (ii) the amount deposited in the Collateral Account (as defined below) equaling or exceeding $1,800,000.

2.    Purchase by ATG Catalytics.   ATG Catalytics L.L.C. ("ATG Catalytics") will purchase the CEP Assets (other than certain intellectual property belonging to QC and the Fall River assets, which are referred to herein as the "QC Assets") as of December 1, 1998 from the Trustee which shall be conveyed and delivered immediately upon the earlier of (i) December 4, 1998 or (ii) the issuance of an operating license by the State of Tennessee pursuant to which ATG Catalytics is empowered to operate the CEP Assets (the "Second Closing") under a Bill of Sale and related closing documents in form and scope satisfactory to the parties executed and delivered by the Trustee.   Notwithstanding the foregoing, the accounts receivable generated from the CEP Business outstanding as of the date hereof or arising on or after the date hereof through the Second Closing (the "CEP Accounts Receivable" and, together with the Wet Waste Receivables, the "Receivables") shall be held back from the CEP Assets until the earlier to occur of: (i) the posting of the letter of credit as provided for in Section 4(c) hereof or (ii) the amount deposited in the Collateral Account equaling or exceeding $1,800,000.

3.    Purchase by Quantum Catalytic.   Quantum Catalytic LLC ("QC") will purchase the QC Assets from the Trustee at the First Closing under a Bill of Sale and

related closing documents in form and scope satisfactory to the parties executed and delivered by the Trustee.

4.  <u>Consideration</u>. The consideration paid to the Trustee will be as follows:

a)  For the Wet Waste Assets, $10,500,000 paid in cash by ATG Nuclear at the First Closing ($1,050,000 of which was released at the First Closing from an escrow of previously deposited funds) together with its Promissory Note in the principal amount of $1,000,000, payable in full on the first anniversary of the closing (the "Promissory Note").

b)  For the CEP Assets, ATG Catalytics, its successors and/or assigns will make a payment of five percent (5%) of annual EBITDA arising from the ongoing operations of and/or generation of revenues from the CEP Business and/or the CEP Assets (including the sale of assets, except for an Extraordinary Sale (as defined below)) and QC, its successors and/or assigns will make a payment of five percent (5%) of annual EBITDA arising from the ongoing operations of and/or generation of revenues from the QC Business and/or the QC Assets, each such payment payable each calendar year commencing January 1, 1999 for a period of five years from the Closing (together the "EBITDA Payments"). The EBITDA Payments will be in the minimum amount of $800,000 per year for each year of the five-year period, and will be due 90 days following the end of each calendar year during such five-year period. The EBIDTA Payments shall be the joint and several obligation of each of ATG Catalytics and QC. In

3

the event of a sale or other disposition (excluding any merger, reorganization or other similar corporate transaction) of all or substantially all of the CEP Assets (other than the QC Assets) (an "Extraordinary Sale") at any time during such five-year period. ATG Catalytics shall make the payments required by Part II, Section 2(d) of the Bid.

c)  The Promissory Note and the EBITDA Payments will be guaranteed by ATG, Inc. ("ATG"), the parent of ATG Nuclear and ATG Catalytics, pursuant to the terms of a Guaranty executed simultaneously herewith. ATG's guaranty of payment of the Promissory Note and the first of the EBITDA Payments (in the amount of $800,000) (the "Guaranteed Payments") will be secured by a letter of credit in form, scope and substance satisfactory to the Trustee, with such letter of credit to be in place within thirty (30) days of the date hereof, provided, however, that until the letter of credit is issued, any proceeds collected from the Receivables shall be deposited in a segregated, interest-bearing account (the "Collateral Account") (subject to the provisions of Section 6(b) hereof). The principal balance of the Collateral Account shall not exceed $1,800,000, exclusive of accrued interest. In the event that the principal balance in the Collateral Account equals or exceeds $1,800,000, any additional proceeds collected from the Receivables shall be turned over to ATG. The Collateral Account shall secure the Guaranteed Payments. In the event that the letter of credit is not issued and to the extent there is a default under the Guaranty with respect to the Guaranteed Payments, the

4

Trustee shall apply the funds in the Collateral Account to satisfy the Guaranteed Payments. In the event that the Guaranteed Payments are paid in full, (i) if the letter of credit has been issued, it shall be terminated or (ii) if the letter of credit has not been issued, the funds in the Collateral Account shall be returned to ATG. The Trustee shall be entitled to withdraw up to $225,000 from the Collateral Account to pay Estate expenses incurred prior to the date hereof; provided, that the Trustee shall deposit in the Collateral Account an amount equal to the amounts so withdrawn (together with interest thereon at the rate of interest earned on the cash collateral referred to below) upon receipt of the proceeds of the cash collateral supporting the South Carolina letter of credit.

d) For the QC Assets, QC, its successors and/or assigns will pay (i) $100,000 in cash at the First Closing and (ii) its portion of the EBITDA Payments as set forth in Section 4(b) hereof. In the event of a sale or other disposition (excluding any merger, reorganization or other similar corporate transaction) of all or substantially all of the QC Assets at any time during the five-year period commencing on the Closing, QC shall make the payments required by Part II, Section 2(d) of the Bid.

e) Attached as Exhibit A hereto is a schedule setting forth the prepayments made to vendors prior to the First Closing for services to be rendered after the First Closing, which amount ATG has paid to the Trustee. In the event that the contracts set forth on Exhibit A hereto that are marked with an asterisk are terminated after the Second Closing and to the extent there

exists any balance outstanding with respect to the amounts prepaid under such contracts, the Trustee shall reimburse to ATG, or its nominee, such balance. Any other adjustments to the purchase price shall be made in accordance with Part I, Section 24 or Part II, Section 24 of the Bid, as the case may be.

f)    For the purposes contained herein as well as for purposes of the Bid, "EBITDA" shall be defined as earnings before interest, taxes, depreciation and amortization, as determined in accordance with GAAP (as defined below). In addition to the foregoing, for purposes of calculating the EBITDA payment, any bonuses and other extraordinary compensation payable to officers, directors or shareholders shall not be included in such calculation. "GAAP" means principles which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made, consistently applied.

5.    **Trustee's Title to Bear Creek Facility.** For the period from the First Closing to the Second Closing (the "Interim Period") the portion of the Wet Waste Assets and CEP Assets constituting the Bear Creek Facility and all operations thereof shall continue under the exclusive jurisdiction and control of the Trustee and there shall be no transfer of ownership or title with respect to such assets (including without limitation all such assets comprising real property) to any third party by the Trustee until the Second Closing.

6

6.   Operation of Bear Creek Facility During Interim Period.

a)   ATG Catalytics agrees that, during the Interim Period, ATG Catalytics shall bear the costs of the operations of the Bear Creek Facility, which the Trustee shall endeavor to operate in accordance with the budget attached to this letter agreement as Exhibit B (the "Budget"). The parties agree further that all accounts receivable generated or collected during the Interim Period in respect of the Bear Creek Facility shall be for the benefit of ATG Catalytics, except as provided in Section 4(c) hereof, it being the intention of the parties that ATG Catalytics shall bear the costs, and benefit from the revenues, of the Bear Creek Facility during the Interim Period as though it had been transferred from the Trustee to ATG Catalytics at the First Closing. The parties covenant and agree that solely with respect to the Bear Creek Facility the Trustee shall continue to operate such facility in the same manner and method as previously operated by the Trustee, including, without limitation, the continued employment of all employees associated with such facility to the extent not employed by ATG Nuclear or QC.

b)   During the Interim Period, the Trustee with the consent of its post-petition lender shall utilize the cash collateral of the post-petition lender to pay the operating costs of the Bear Creek Facility during the Interim Period (the "Operating Costs"). The Operating Costs shall be reimbursed by ATG on a daily basis. To the extent that the Operating Costs are not reimbursed on or before the expiration of five days after the Interim Period, the Trustee,

7

upon prior telephonic notice or telefax notice to ATG's counsel, may withdraw funds held in the Collateral Account for reimbursement to the Estate, and such withdrawal shall not effect the requirements of Section 4(c) hereof. Notwithstanding the foregoing, in the event that the post-petition lender does not consent to the use of its cash collateral to pay the Operating Costs, ATG agrees to establish an account for the benefit of the Trustee in an amount equal to the costs expected to be incurred for the operation of the Bear Creek Facility in accordance with the Budget (the "Operating Cost Account"). Such funds may be withdrawn by the Trustee to pay any and all operating costs of the Bear Creek Facility incurred during the Interim Period. To the extent that the actual costs of operation of the Bear Creek Facility during the Interim Period are less than the amount deposited in the Operating Cost Account, such excess funds shall be transferred to the Collateral Account, subject to the limitation provided in Section 4(c) above.

7. Attached hereto as Exhibit C is a schedule setting forth the Good Current Assets. Pursuant to such schedule, the parties acknowledge and agree that there is no adjustment to the purchase price pursuant to Part I, Section 2(e) of the Bid.

8. The parties hereby agree to cooperate with each other with respect to the transfer of utility accounts. To the extent there exists any deposits paid by the Bankruptcy Estates, such deposits shall be returned to the Trustee.

9. Post-Closing Issues

8

a) The parties agree to cooperate in undertaking the appropriate measures to have the letters of credit referenced in the Bid terminated, cancelled and returned. Upon the termination of such letters of credit and the receipt by the Trustee of the cash collateral securing such letters of credit, the Trustee shall remit to QC the sum of $91,000, and to ATG, or its nominee, the sum of $1,600,000 or such additional amount as the parties may agree, together with all interest thereon. It being understood that there is a dispute among the parties as to the amount to be remitted to ATG or its nominee pursuant to the preceding sentence. This issue shall be resolved by further negotiations among the parties or, if necessary, an order of the court. Any additional funds associated with such letters of credit shall be retained by the Trustee.

b) The cash in the approximate amount of $140,000 to secure the performance of the Kepco contract (Contract No. KH972NN800) shall be returned to the Trustee upon the performance of the obligations under such contract to the extent that such funds would be and are returned in accordance with the terms of such contract.

c) ATG has determined that the fair market value of the assets to be purchased pursuant to the Bid does not exceed the "size of the transaction" test under the HSRA.

9

d)    ATG Nuclear or QC, as the case may be, shall pay the salaries of the Selected Employees accrued from and after the First Closing.

e)    ATG Nuclear shall reimburse the Trustee for all expenses of the Trustee associated with licenses, insurance, regulatory filings and permits that are necessary or appropriate for ATG Nuclear's operation of the South Carolina Facility pursuant to Part I, Section 8 of the Bid and incurred after the First Closing.

f)    The Trustee shall pay the outstanding real estate taxes associated with the South Carolina property which accrued prior to the First Closing, which amount is approximately $6,200. With respect to the Bear Creek Facility, the Trustee shall pay the outstanding real estate taxes associated with such facility which accrued prior to the First Closing, unless the Trustee reasonably believes that the payment of such taxes would require a court order, in which case the Trustee shall use his best efforts to obtain such court order.

g)    The parties agree to coordinate their efforts and cooperate with each other regarding the termination of Wet Waste Employees and CEP Employees by the Trustee.

h)    The parties agree that the Exclusion Notice Date with respect to executory contracts referenced in Part II, Section 5 shall be extended to the date of the Second Closing.

10.    <u>Miscellaneous Provisions</u>

a)    <u>Bid</u>.  To the extent not explicitly modified by this letter agreement, the Bid shall remain in full force and effect.

b)    <u>Counterparts</u>.  This letter agreement may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document.

c)    <u>Captions and Section Headings</u>.  Captions and section headings are for convenience only, are not a part of this letter agreement and may not be used in construing the provisions of this letter agreement.

d)    <u>Waivers</u>.  Any failure by any of the parties to comply with any of the obligations, agreements or conditions set forth in this letter agreement may be waived by the other party or parties, but any such waiver will not be deemed a waiver of any other obligation, agreement or condition contained herein.

e)    <u>Expenses</u>.  Except as otherwise provided in this letter agreement, each party shall bear their own respective expenses, including, without limitation, accounting, consulting and legal fees incurred in connection

11

with the preparation and negotiation of, and transactions contemplated under, this letter agreement.

f)  <u>Assignment</u>.  Buyers and their nominees may not assign their rights or obligations under this letter agreement without the prior written consent of the Trustee, and any attempted assignment or delegation without such consent will be null and void.  In addition to any other rights that the Trustee may have hereunder, the Trustee shall have the right to assign his rights set forth in Section 4 of this letter agreement, including, without limitation, the EBITDA Payments.  This letter agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Nothing contained in this letter agreement is intended to convey upon any person or entity, other than the parties and their successors in interest and permitted assigns, any rights or remedies under or by reason of this letter agreement unless expressly stated.

g)  <u>Governing Laws</u>.  This letter agreement is to governed by and construed in accordance with the internal laws of the Commonwealth of Massachusetts.  The parties agree that any actions brought under this letter agreement by any of the parties shall be brought only in the Court, and the parties hereby submit to the jurisdiction of the Court; provided, however, that any action by a third party and/or successor or assignee of a party hereto may be brought in any other court of competent jurisdiction.

12

11.   <u>Further Assurances</u>.  The parties each agree to execute all such documents and take all such actions after the date hereof as any other party shall reasonably request in connection with carrying out and effectuating the intent and purpose hereof and all transactions and things contemplated by this letter agreement, including, without limitation, the execution and delivery of any and all confirmatory and other documents in addition to those to be delivered simultaneously with the execution hereof and all actions which may reasonably be necessary or desirable to complete the transactions contemplated hereby. Without limiting the foregoing, the parties expressly agree and acknowledge that ATG Nuclear, ATG Catalytics and/or QC (collectively, the "Buyers") shall make available at the reasonable request of the Trustee, within five (5) days written notice, any and all books and records requested by the Trustee, in his sole and complete discretion, including, but not limited to, any and all original documents. The Buyers further agree to use their best efforts to preserve the books and records until the closing of the respective Bankruptcy Estates.

[Remainder of Page Intentionally Left Blank]

13

Sincerely,

ATG, INC.

By: _____

ATG NUCLEAR SERVICES L.L.C.

By: _____

ATG CATALYTICS L.L.C.

By: _____

QUANTUM CATALYTIC LLC

By: _____

Accepted and agreed:

_____
Stephen S. Gray, as Trustee
and not individually

BO:12394.8

14

# EXHIBIT D

UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In Re:

MOLTEN METAL TECHNOLOGY, INC.,
MMT OF TENNESSEE INC.,
MMT FEDERAL HOLDINGS, INC.,
M4 ENVIRONMENTAL MANAGEMENT
INC. and M4 ENVIRONMENTAL L.P.,

Debtors

STEPHEN S. GRAY, CHAPTER 11
TRUSTEE,

Plaintiff

v.

QUANTUM CATALYTICS, LLC,

Defendant

Case Nos. 97-21385-CJK through
97-21389-CJK [Jointly Administered]

Chapter 11

Adversary Proceeding
No.



## COMPLAINT

### I. INTRODUCTION

The Plaintiff, Stephen S. Gray, Chapter 11 Trustee of Molten Metal Technology, Inc.,
MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc.
and M4 Environmental L.P. seeks in this action to enforce the terms of an Offer/Bid executed
and delivered by the Defendant, Quantum Catalytics, LLC, as amended by an Order of Sale
entered by the Bankruptcy Court, whereby Quantum Catalytics, LLC agreed to pay the Plaintiff
an annual minimum payment of $800,000.00 as consideration for the sale by the Plaintiff of
certain assets to Quantum Catalytics, LLC.

## II.  JURISDICTION AND PARTIES

1.    The Plaintiff, Stephen S. Gray, is the duly appointed and acting Chapter 11 Trustee for the Estates of Molten Metal Technology, Inc., MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc. and M4 Environmental L.P. and has a principal place of business at 270 Congress Street, Boston, Massachusetts.

2.    The Defendant, Quantum Catalytics, LLC ("QC"), is a Delaware limited liability company having a principal place of business at 9 Martins Cove Lane, Hingham, Massachusetts.

3.    This Court has jurisdiction over the parties to this action pursuant to 28 U.S.C. §§157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(N) and (O).

## III.  FACTS COMMON TO ALL COUNTS

4.    On December 3, 1997, Molten Metal Technology, Inc. ("Molten Metal") and its four principal subsidiaries (together with Molten Metal (the "Debtor")) filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.

5.    The Debtor was in the business of research and development of hazardous waste processing technologies, as well as design, construction and operation of waste processing facilities using such technologies.  The principal proprietary technology of the Debtor was "catalytic extraction processing" ("CEP"), whereby hazardous waste was placed in a bath of liquid metal kept at a temperature of several thousand degrees Fahrenheit with the CEP process causing the breakdown of many kinds of hazardous waste into harmless gasses, liquids and solids.

6.    On August 21, 1998, the Court entered an Order approving the request of certain secured creditors of the Debtor for the appointment of a Chapter 11 Trustee.  Subsequently, the office of the United States Trustee filed an Application seeking the appointment of the Plaintiff, Stephen S. Gray, as Chapter 11 Trustee (the "Trustee") and on August 24, 1998, the Court approved Mr. Gray's appointment.

7.    On November 13, 1998, QC executed and delivered to the Trustee an Offer/Bid (the "Offer") to purchase certain assets defined in the Offer and identified in the Offer as the

2

"CEP Assets" for the stated consideration as set forth therein, subject to Bankruptcy Court approval. A copy of the Offer is annexed hereto as Exhibit "A".

8.     By Order entered November 25, 1998 (the "Order"), the Bankruptcy Court (Kenner, J.) approved the sale of the CEP Assets by the Trustee to QC in accordance with the terms and conditions set forth in the Offer as amended and incorporated in the Order. A copy of the Order is annexed hereto as Exhibit "B".

9.     Pursuant to the Offer as amended and incorporated in the Order, the CEP Assets were sold by the Trustee to QC.

10.     Pursuant to the offer as amended and incorporated in the Order, as consideration for the purchase of the CEP Assets, QC was to pay to the Trustee "...five percent (5%) of the EBITDA for the CEP Business...for the first five years following closing (December 1, 1998). Such payments will be in a minimum amount of $800,000 per annum which minimum payments will be guaranteed by ATG."

## IV.  CAUSES OF ACTION

### COUNT I
### (v. QC for Breach of Offer)

11.     The Trustee hereby re-affirms, re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 10 hereof.

12.     QC has defaulted on its obligations to the Trustee under the terms and conditions of the Offer by failing to pay the annual payment due thereon on December 1, 2000, as agreed.

13.     QC has breached the Offer and owes the Trustee the minimum amount of $800,000.00, plus interest, costs and attorneys' fees.

### COUNT II

### (v. QC for an Accounting)

14.     The Trustee hereby re-affirms, re-alleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 13 hereof.

3

15. Pursuant to the Offer as amended and entered by the Order, QC agreed to pay the Trustee as consideration for the sale of the CEP Assets "...five percent (5%) of the EBITDA for the CEP Business (including the Fall River assets and the Intellectual Property Assets), for the first five years following closing...", with such payments being in the minimum amount of $800,000.00 per year.

16. Despite the Trustee's request for an accounting of the EBITDA for the years 1999 and 2000, QC has refused, and continues to refuse, to provide the Trustee with an accounting of the EBITDA for those years.

17. Under the terms and conditions of the Offer as amended and incorporated in the Order, QC has contractually agreed to provide an accounting to the Trustee of the EBITDA Payments for the years 1999 and 2000.

## V. PRAYERS FOR RELIEF

WHEREFORE, the Plaintiff, Stephen S. Gray, Chapter 11 Trustee, requests the following relief:

1. That Judgment enter in favor of the Plaintiff, Stephen S. Gray, Chapter 11 Trustee, against the Defendant, Quantum Catalytics, LLC, for the calendar year 2000, in the minimum sum of $800,000.00, plus interest, costs and attorneys' fees under Count I of the Complaint.

2. That Judgment enter in favor of the Plaintiff, Stephen S. Gray, Chapter 11 Trustee, against the Defendant, Quantum Catalytics LLC ordering the Defendant, Quantum Catalytics, LLC, to provide the Plaintiff with a full and accurate accounting for the EBITDA for the CEP Business (including the Fall River assets and the Intellectual Property Assets), for the years 1999 and 2000 under Count II of the Complaint.

4

3.    And for such other and ~~further~~ relief as this Court deems just and proper.

STEPHEN S. GRAY, CHAPTER 11
TRUSTEE

By his Attorneys,
RIEMER & BRAUNSTEIN LLP

Lawrence J. Crowley, Jr.
BBO NO. 107160
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000

Dated: _May 3_, 2001

LJC/mxl
616453

5

# EXHIBIT E

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In Re:

MOLTEN METAL TECHNOLOGY, INC.,
MMT OF TENNESSEE INC.,
MMT FEDERAL HOLDINGS, INC.,
M4 ENVIRONMENTAL MANAGEMENT
INC. and M4 ENVIRONMENTAL L.P.,

                                    Debtors

Case Nos. 97-21385-CJK through
97-21389-CJK [Jointly Administered]

Chapter 11

STEPHEN S. GRAY, CHAPTER 11
TRUSTEE,                 Plaintiff

v.

QUANTUM CATALYTICS, LLC,

                                    Defendant

Adversary Proceeding
No. 01-1205-CJK

## TRUSTEE'S MOTION TO APPROVE SETTLEMENT OF ADVERSARY PROCEEDING

Pursuant to Rule 9019(a), Bankruptcy Rules, the Plaintiff, Stephen S. Gray, the duly

appointed and acting Chapter 11 Trustee (the "Trustee") of the Debtor, Molten Metal

Technology, Inc. (the "Debtor"), hereby moves the Court to approve the full and complete

settlement of the above-entitled Adversary Proceeding (the "Adversary Proceeding") by way of

the approval of the Mutual Release and Agreement to Distribute Proceeds from Liquidation of

Tangible Assets (the "Settlement Agreement") filed currently herewith, and the execution of the

Agreement for Judgment annexed hereto.

In support hereof, the Trustee states as follows:

1.     On November 24, 1998, the Court approved a sale of the Debtor's Wet Waste and

Q-CEP Assets. Pursuant thereto at the closing on December 1, 1998, the Debtor's Q-CEP Assets

were sold to the Defendant, Quantum Catalytics, LLC ("Quantum"), and ATG Catalytics, LLC.

As part of the consideration for the sale and pursuant to the court-approved sealed bid, Quantum

and ATG Catalytics jointly and severally agreed to tender installment payments to the Trustee in

the minimum amount of $800,000.00 annually for a period of 5 years commencing December 1, 1999. The annual minimum installment payments could be further increased based on Quantum and ATG Catalytics, LLC's EBITDA revenues with respect to the Q-CEP business. ATG, Inc. guaranteed the minimum payment and is jointly and severally liable with Quantum and ATG Catalytics, LLC therefor.

2.    On or about December 1, 1999, the first annual $800,000.00 minimum installment payment was received by the Trustee.

3.    The second annual minimum installment payment due December 1, 2000 and payable no later than April 1, 2001 was not received by the Trustee.

4.    On or about April 10, 2001 the Trustee commenced the Adversary Proceeding against Quantum seeking the second annual $800,000.00 minimum installment payment due and owing as of April 1, 2001.[1]

5.    Quantum filed its Answer to the Trustee's Complaint in which it denied liability. Thereafter, Quantum and the Trustee engaged in discovery and have entered into negotiations to attempt to resolve the Adversary Proceeding.

6.    Pursuant to those negotiations, Quantum has acknowledged and agreed that it has no defenses to the Trustee's Complaint but claims that it has no funds or assets available to pay in full any Judgment which may enter in the Adversary Proceeding.

---

[1] The Trustee had also instituted an action in the State Court in Tennessee which was subsequently removed to the United States District Court for the District of Tennessee against ATG Catalytics LLC, and ATG Inc., the former as co-obligor and the latter as guarantor of the annual EBITA guaranteed installment payment under the sealed bid and Sale Order of the Bankruptcy Court (the "Tennessee Action"). In the Tennessee Action, ATG Catalytics LLC and ATG Inc. filed an Answer denying the obligations and asserting a Counterclaim against the Trustee seeking to impute alleged misrepresentations by the Debtors to the Trustee and for a recoupment of approximately $6,000,000.00 paid in connection with the acquisition of the Q-CEP assets. The Trustee in response filed a Motion to Dismiss the Counterclaim. Therefore, ATG, Inc. filed a petition for relief pursuant to Chapter 11 of the Bankruptcy Code. The Trustee timely filed two Proofs of Claim in the ATG bankruptcy case. A Chapter 11 Trustee has been appointed in the ATG proceedings.

7.     Pursuant to the terms and conditions of the Settlement Agreement, and in full and complete settlement of all claims asserted in the Adversary Proceeding, Quantum has agreed to pay to the Trustee the sum of $50,000.00 and has agreed to enter into an Agreement for Judgment for the full amount of its contractual obligations.

8.     The Trustee has reviewed all of the financial information provided by Quantum and has concluded that based upon the financial condition of Quantum, it does not appear that Quantum now has the ability to pay its obligations, nor will it in the future have the ability to pay its obligation inasmuch as Quantum has ceased its business operations and has liquidated all of its assets.[2]

9.     The Trustee believes that the proposed settlement is fair and reasonable and is in the best interest of the estate and its creditors because the settlement ensures a complete resolution of the claims set forth in the Adversary Proceeding with positive recovery for the estate without any further costs and expenses to the estate in the pursuit of those claims, which pursuit, given the perceived financial condition of Quantum, may result in no recovery whatsoever for the estate.

WHEREFORE, the Trustee requests that this Court:

1.     Approve the Mutual Release and Agreement to Distribute Proceeds from Liquidation of Tangible Assets and Agreement for Judgment between the Trustee and Quantum in full settlement of all claims asserted in the Adversary Proceeding; and,

---

[2]Specifically Quantum liquidated its tangible assets, which generated after costs of liquidation, approximately $63,000.00. However, Quantum has unpaid liabilities in connection with its business shut down costs, including contingent claim associated with the disassembly and decontamination of the equipment.

2.    For such other and further relief as is just and proper.

> STEPHEN S. GRAY , CHAPTER 11
> TRUSTEE OF MOLTEN METAL
> TECHNOLOGY, INC., MMT OF
> TENNESSEE INC., MMT FEDERAL
> HOLDINGS, INC.,
> M4 ENVIRONMENTAL MANAGEMENT
> INC. and M4 ENVIRONMENTAL L.P.,
>
> By his Attorneys,
>
> RIEMER & BRAUNSTEIN LLP

Dated: August  9 , 2002

Lawrence J. Crowley, Esquire
BBO No. 107160
Alan L. Braunstein, Esquire
BBO NO. 546042
Riemer & Braunstein LLP
Three Center Plaza
Boston, Massachusetts 02108
(617) 523-9000

671850.3

# EXHIBIT F



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

STEPHEN S. GRAY, CHAPTER 11 )
TRUSTEE FOR THE ESTATE OF )
DEBTORS MOLTEN METAL )
TECHNOLOGY, INC., MMT OF )
TENNESSEE, INC., MMT FEDERAL )
HOLDINGS, INC., M4 )
ENVIRONMENTAL )
MANAGEMENT, INC., AND M4 )
ENVIRONMENTAL, L.P., )
                          )
        Plaintiff, )
                           )
v. )     No.: 3:01-CV-388
                           )     Jarvis/Phillips
ATG CATALYTICS, LLC AND )
ATG, INC., )
       Defendants. )

## NOTICE OF REMOVAL

Defendants, ATG Catalytics, LLC ("ATG-C") and ATG, Inc. ("ATG")
(collectively the "Defendants") file this Notice of Removal hereby removing to this Court
an action brought against them and currently pending in the Chancery Court for Roane
County, Tennessee, bearing Docket No. 13998, and with respect thereto would show this
Court as follows:

### I.

The above-styled cause was commenced in the Chancery Court for Roane
County, Tennessee, Docket No. 13998, by virtue of a Complaint filed by the Plaintiff,
Stephen S. Gray, as Chapter 11 Trustee for the Estate of Debtors Molten Metal

LEWIS, KING, KRIEG
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

Technology, Inc., MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc., and M4 Environmental, L.P. ("Plaintiffs") on June 8, 2001 against the Defendants. This action stems from the Defendants' purchase of certain assets of the Estate of the Debtors. In the State Court action, the Plaintiff asserts that it is owed in excess of $800,000.00 by the Defendants. The Defendants were served a copy of the Complaint, Wednesday, June 13, 2001. A copy of the aforementioned Complaint is attached hereto as Exhibit A and made a part of this Notice by reference.

## II.

This action is one of a civil nature for damages claimed as a result of an alleged breach of the buy sell agreement between the parties, and this Court has jurisdiction of the Plaintiff's claims by virtue of 28 U.S.C.A. § 1332, in that there is a complete diversity of citizenship as between Plaintiffs and Defendants, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

## III.

The time period within which Defendants are required to file this Notice of Removal pursuant to 28 U.S.C.A. § 1446 has not yet expired. Since June 13, 2001, the date on which Defendants were served with the Summons and Complaint, there have been no other proceedings in this case in the Chancery Court of Roane County, Tennessee.

## IV.

Pursuant to 28 U.S.C.A. § 1446(a), Defendants file herewith a copy of all process, pleadings, and orders served upon all parties to this action.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

2

V.

The allegations of this Notice are true and correct, and the claims at issue are within the jurisdiction of the United States District Court for the Eastern District of Tennessee, and this cause of action is removable to the United States District for the Eastern District of Tennessee, at Knoxville.

VI.

Upon filing of this Notice of Removal, Defendants shall give written notice thereof Plaintiffs, and shall file this Notice of Removal with the Clerk of the chancery Court for Roane County, Tennessee, pursuant to 28 U.S.C.A. § 1446(d). A copy of this Notice of Removal to be served upon Plaintiffs and filed with the Clerk of the Chancery for Roane County, Tennessee, is attached hereto as Exhibit B.

Wherefore, Defendants file this Notice for the purpose of removing the Plaintiffs' State Court action pending in Roane County, Tennessee to the United States District Court for the Eastern District of Tennessee, at Knoxville.


David A. Draper, BPR #016067

LEWIS, KING, KRIEG & WALDROP, P.C.
One Centre Square
620 Market Street, Fifth Floor
P. O. Box 2425
Knoxville, Tennessee 37901
(865) 546-4646

Attorney for ATG Catalytics, LLC and ATG, Inc.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

3

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing **Notice of Removal** has been served upon the following persons by delivering same to their offices or mailing same to their offices.

H. Buckley Cole, Jr., Esq.
Carol M. Joiner, Esq.
Greenebaum Doll & McDonald PLCC
700 Two American Center
3102 West End Avenue
Nashville, TN  37203-1304

Shannon Conley, Clerk & Master
Roane County Chancery Court
P.O. Box 402
Kingston, TN  37763

This the 25th day of June 2001.

Doc. #1

# EXHIBIT G



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

STEPHEN S. GRAY, CHAPTER 11 )
TRUSTEE FOR THE ESTATE OF )
DEBTORS MOLTEN METAL )
TECHNOLOGY, INC., MMT OF )
TENNESSEE, INC., MMT FEDERAL )
HOLDINGS, INC., M4 )
ENVIRONMENTAL )
MANAGEMENT, INC., AND M4 )
ENVIRONMENTAL, L.P., )

    Plaintiff/Counter Defendant, )

                                     )

v.                             )

ATG CATALYTICS, LLC AND )
ATG, INC., )

    Defendants/Counter Plantiffs. )

No.: 3:01-CV-322
Jarvis/Phillips

## ANSWER AND COUNTER CLAIM

Comes now ATG Catalytics, LLC ("ATG-C") and ATG, Inc. ("ATG") (collectively, "ATG-C/ATG"), by and through counsel, and for their Answer to the Plaintiff's Complaint, state as follows:

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

ATG-C/ATG are due monetary set-offs that meet or exceed any and all amounts claimed, or to be claimed, by the Plaintiff.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

1

## THIRD AFFIRMATIVE DEFENSE

. The Plaintiff/Counter Defendant's claims are barred because of material misrepresentation and/or fraud in the inducement in connection with the underlying asset purchase transaction, as set forth in ATG-C/ATG Counterclaim.

For answer to the enumerated paragraphs of the Complaint, ATG-C/ATG state and aver as follows:

1.    ATG-C/ATG are without sufficient information to admit or deny the allegations of Paragraph 1 of the Complaint, and therefore deny same and demand strict proof where material to Plaintiff's clams.

2.    ATG-C/ATG admit the allegations of Paragraph 2 of the Complaint, except as to ATG's principal business address, which is 3400 Arden Road, Hayward California, 94545.

3.    ATG-C/ATG admit the allegations of Paragraph 3 of the Complaint, except as to ATG-C's principal business address, which is 3400 Arden Road, Hayward California, 94545.

4.    ATG-C/ATG make no response to Paragraph 4 of the Complaint, as this action has now been removed to the United States District Court, which maintains diversity jurisdiction of all claims herein.

5.    ATG-C/ATG is without sufficient information to admit or deny the averments of Paragraph 5 of the Complaint, but admit the existence of a bankruptcy involving the Debtors.

6.    ATG-C/ATG lacks sufficient information to admit or deny the various allegations in Paragraph 6 of the Complaint respecting the Debtors' past business

2

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

operations, and therefore deny same and demand strict proof of such allegations where material to Plaintiff's claims.

7.    In response to the allegations in Paragraph 7 of the Complaint, ATG-C/ATG state that the referenced bankruptcy court Order of appointment speaks for itself, and denies all allegations contrary to said Order.

8.    In response to the allegations of Paragraph 8 of the Complaint, ATG-C/ATG state that the referenced Offer speaks for itself, and deny all allegations of Paragraph 8 to the contrary.

9.    ATG-C/ATG deny the allegations of Paragraph 9 of the Complaint.

10.    ATG-C/ATG admit the allegations of Paragraph 10 of the Complaint, except as to Exhibit A, which document speaks for itself.

11.    In response to the allegations of Paragraph 11 of the Complaint, ATG-C/ATG state that the referenced bankruptcy court Order speaks for itself, and denies all contrary averments of Paragraph 11.

12.    In response to the allegations of Paragraph 12, ATG-C/ATG state the referenced "Purchase Documents", and all terms therein, speak for themselves, and AGT-C/ATG deny all averments to the contrary.

13.    In response to the allegations of Paragraph 13, ATG-C/ATG state that the referenced "Purchase Documents", and all terms therein, speak for themselves, and ATG-C/ATG deny all averments to the contrary.

14.    In response to the allegations of Paragraph 14, ATG-C/ATG state that the referenced guaranty document, and all terms therein, speaks for itself, and ATG-C/ATG deny all averments to the contrary.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

15.    Paragraph 15 of the Complaint requires no answer, and thus none is made.

16.    In response to the allegations of Paragraph 16 of the Complaint, ATG-C/ATG admit that they have not made certain payments to the Trustee, but deny that such payments are due and owing, and deny that they are in breach or default of any contractual obligations to the Trustee.

17.    ATG-C/ATG deny the allegations of Paragraph 17 of the Complaint.

18.    Paragraph 18 of the Complaint requires no answer, and thus none is made.

19.    In response to the allegations of Paragraph 19 of the Complaint, ATG-C/ATG admit that they have not made certain payments to the Trustee, but deny that such payments are due and owing, and deny that they are in breach or default of any contractual obligations to the Trustee.

20.    ATG-C/ATG deny the allegations of Paragraph 20 of the Complaint.

21.    ATG-C/ATG deny the allegations of Paragraph 21 of the Complaint.

22.    Paragraph 22 of the Complaint requires no answer, and thus none is made.

23.    In response to the allegations of Paragraph 23, ATG-C/ATG state that the referenced "Purchase Documents", and all terms therein, speak for themselves, and ATG-C/ATG deny all averments to the contrary.  Further, ATG-C/ATG admit that they have not made certain payments to the Trustee, but deny that such payments are due and owing, and deny that they are in breach or default of any contractual obligations to the Trustee.

24.    In response to the allegations of Paragraph 24, ATG-C/ATG state that the referenced "Purchase Documents", and all terms therein, speak for themselves, and AGT-C/ATG deny all averments to the contrary.

4

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

25.    ATG-C/ATG deny the allegations of Paragraph 25 of the Complaint.

26.    All allegations of the Complaint that are not specifically admitted herein are hereby denied.

AND NOW, having fully answered the Complaint against it, Defendants ATG-C/ATG pray that the Plaintiff's Complaint be dismissed, with prejudice, and for their costs and attorneys fees. In the alternative, ATG-C/ATG join issue with the Plaintiff, and submit all issues joined to the court for its determination herein.

## COUNTER CLAIM

COMES NOW, ATG Catalytics, LLC ("ATG-C") and ATG, Inc. ("AGT") (collectively ATG-C/ATG"), and for their Counterclaim against the Plaintiff/Counter Defendant, Trustee, Stephen S. Gray, alleges as follows:

1.    The Counter-plaintiff, ATG, is a California corporation, having its principal offices at 3400 Arden Road, Hayward, California, 94545. ATG is in the business of processing for disposal various hazardous wastes, including low-level radioactive wastes. ATG is the sole owner of ATG-C, and ATG acted as guarantor for ATG-C in connection with the asset purchase outlined herein. Further, ATG was an intended third party beneficiary of the ATG-C/Trustee contract of sale described in the original Complaint.

2.    The Counter-plaintiff, ATG-C, is a limited liability company, having its principal offices at 3400 Arden Road, Hayward, California, 94545. ATG-C is a wholly owned subsidiary of ATG, and is also in the business of processing for disposal various hazardous low-level radioactive wastes. ATG-C was the buyer and subsequent operator

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

of a radioactive waste processing facility and related equipment of the Debtors the outlined herein.

      3.      Trustee, Stephen S. Gray, is a citizen of the State of Massachusetts, was at all times material hereto a duly appointed Chapter 11 Trustee acting on behalf of and for the interests of the bankruptcy estate of debtors Molten Metal Technology, Inc., MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc., and M4 Environmental, L.P. (herein referred to as the "Debtors").

      4.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(3), because the matter in controversy s exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and the claims herein are between citizens of different states. Further, the Counter-plaintiffs claims are asserted against the Trustee, acting on behalf of the Debtors, pursuant to 28 U.S.C. 957.

### Facts

      5.      As set forth in the Complaint, and more particularly described within the documents exhibited to the Plaintiff's Complaint herein, ATG-C purchased certain assets of the Debtors pursuant to a post bankruptcy petition sales contract. Those assets, commonly referred to as the catalytic extraction processing assets ("CEP"assets"), comprised a physical plant and equipment known as the Bear Creek facility, located in Roane County, Tennessee. The Bear Creek operations were devoted to processing low-level radioactive wastes for disposal. As further alleged in the Complaint, ATG executed a Guaranty guaranteeing ATG-C's payment obligations in connection with ATG-C's purchase of the CEP assets.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

6

6.    As a part of the CEP assets sales transaction, and during the bid process, the Trustee, acting through representatives of the Debtors an/or agents of the Debtors, either failed to disclose material information or made false and misleading material representations regarding the CEP assets, all of which ATG-C and ATG relied upon to their detriment.  These false misrepresentations include, without limitation:

> a.) assertions that the CEP system was in conformance with Debtors' radioactive materials license, when it was not;
>
> b.) assertions that the CEP assets were suitable for use within the radioactive waste industry, when they were not;
>
> c.) assertions that the two reactors within the CEP system could be simultaneously operated, when they could not;
>
> d.) assertions that the CEP system was reliable and fully operational, when it was not.
>
> e.) assertions that there was a viable market for the processing services rendered by way of the CEP assets, when there was not.

As a result of the foregoing non-disclosures and/or misrepresentations, ATG-C purchased a highly unreliable and essentially non-functional waste processing system that required grossly excessive maintenance costs from the inception of ATG-C's possession and operation of the system, and the deficiencies in the CEP system also resulted in repeated shut downs of the system, all of which caused damage and loss to ATG-C and ATG.  These losses include, but are not limited to, ATG-C's costs associated with having to shut down the

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

7

waste processing system and install extensive amounts of shielding in order to adequately protect workers at Bear Creek from undue radiation exposure.

7.    After taking possession of the Bear Creek facility, ATG-C learned for the first time the radioactive wastes had migrated from the Bear Creek facility to adjacent property during the Debtors' operation of Bear Creek, and in order to maintain its licensure of the facility, ATG-C was required to conduct clean-up operations of the contaminated areas. ATG-C and ATG aver that the Debtors knew or should have known that the off-site contamination had occurred, and failed disclose its existence to Counter plaintiffs.

8.    Counter plaintiffs aver that the Debtors failure to disclose the existence of the off-site contamination constitutes a material misrepresentation by the Debtors upon which the Counter plaintiffs relied and which resulted in ATG-C making a higher bid for the CEP assets than it would have otherwise made. Further, pursuant to the sale agreement with the Trustee, neither ATG-C nor ATG assumed any liability for such off-site contamination. Counter plaintiffs are therefore entitled to recover all costs associated with the clean up from the Trustee.

### Count I
### Breach of Contract

1.    ATG-C/ATG realleges the allegations of Paragraphs 1 through 6, as if set forth fully herein.

2.    As set forth above, ATG-C/ATG avers that the various defects and deficiencies in the CEP assets and the off-site contamination, the existence of which was either not disclosed or falsely misrepresented, constitutes a breach of contract causing

8

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

direct damage and loss to ATG-C and its intended third-party beneficiary, ATG, and rendering the Plaintiff, as trustee for the Debtor's estate, liable to the ATG-C/ATG.

### Count II
Misrepresentation/Fraudulent Inducement

1.    ATG-C/ATG realleges the allegations of Paragraphs 1 through 8, as if set forth fully herein.

2.    ATG-C/ATG aver that that the Plaintiff, as trustee of the Debtors, and the Debtors, either knowingly or negligently misrepresented numerous material facts concerning the CEP assets, all of which ATG-C and ATG reasonably relied during the bidding and contracting process.  Such misrepresentations related to the essence of the purchase agreement, and have caused financial loss to ATG-C/ATG, for all of which the Trustee is liable to ATG-C/ATG.

3.    ATG-C/ATG further avers that certain of the misrepresentations regarding the functional capabilities of the CEP assets and non-disclosure of the off-site contamination were made for the purpose of inducing ATG-C's purchase of the CEP assets, rendering the Trustee liable to ATG-C/ATG.

WHEREFORE, ATG CATALYTICS, LLC AND ATG, INC., pray for the following relief:

A.    That the Trustee be served with this Counterclaim and be required to make answer to this Couterclaim as required by law; and

B.    For judgment against the Trustee, Stephen S. Gray, for compensatory damages in an amount consistent with the Counter-

9

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

plaintiffs' proof of damages as shown at trial, but in any event not

less than $6,000,000; and

C.    For such other relief as may be necessary and proper.


Gregory Q. Edwards
Senior Vice President
ATG, Inc.


David A. Draper, BPR #016067


LEWIS, KING, KRIEG & WALDROP, P.C.
One Centre Square
620 Market Street, Fifth Floor
P. O. Box 2425
Knoxville, Tennessee 37901
(865) 546-4646

Attorneys for Defendants/Counter Plaintiffs

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

10

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that a true and exact copy of this the foregoing document has been served upon all counsel of interest in this case, by delivering a true and exact copy to the offices of counsel of record shown at the addresses below or by placing a copy in the United States mail, first-class postage prepaid.

          H. Buckley Cole, Jr., Esq.
          Carol M. Joiner, Esq.
          Greenebaum Doll & McDonald PLCC
          700 Two American Center
          3102 West End Avenue
          Nashville, TN 37203-1304

This the 11th day of July, 2001.

David A. Draper, BPR #016067

Doc. #18

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

11

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

STEPHEN S. GRAY, CHAPTER 11 )
TRUSTEE FOR THE ESTATE OF )
DEBTORS MOLTEN METAL )
TECHNOLOGY, INC., MMT OF )
TENNESSEE, INC., MMT FEDERAL )        No.: 3:01-CV-322
HOLDINGS, INC., M4 )                  Jarvis/Phillips
ENVIRONMENTAL )
MANAGEMENT, INC., AND M4 )
ENVIRONMENTAL, L.P., )
)
        Plaintiff/Counter-Defendant, )
)
V. )
)
ATG CATALYTICS, LLC AND )
ATG, INC., )
)
        Defendants/Counter-Plaintiffs. )

## RESPONSE TO MOTION TO DISMISS

Defendants, through their undersigned counsel, submit the following response to Plaintiff's Motion to Dismiss. For the reasons set forth below, the Court should deny the Motion.

### I.    THE COURT SHOULD ALLOW DEFENDANTS TO OBTAIN BANKRUPTCY COURT PERMISSION TO FILE THEIR COUNTERCLAIM.

Plaintiff is not a Chapter 7 trustee. He is a Chapter 11 trustee carrying on the business of the Defendants, who are in bankruptcy. On its surface, 28 U.S.C. § 959 would seem to permit a Chapter 11 trustee to be sued with respect to his acts or transactions connected with the Debtors' property. However, as Plaintiff points out in his

LEWIS, KING, KRIEG
& WALDROP, P.C.
One Centre Square, 5th Floor
Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

Memorandum, there is case law setting forth a contrary, common law doctrine, at least in Chapter 7 cases. Defendants are willing to seek bankruptcy court approval for a suit against Plaintiff. If such permission is granted, it would only make sense to pursue the suit as a Counterclaim in this action, rather than as a separate suit that would cost the parties and the courts unnecessary additional time and resources. Rather than dismiss the Counterclaim only to have it refiled later, this Court should deny the Motion to Dismiss and allow Defendants to seek bankruptcy court approval for their suit against Plaintiff.

## II.    DEFENDANTS' COUNTERCLAIM IS NOT TIME BARRED.

Plaintiff argues that the Counterclaim is time barred because Defendants did not include most of the Counterclaim's allegations in their Proof of Claim filed in the bankruptcy court prior to the bankruptcy claim's bar date of May 12, 1999. However, as shown by the Affidavit of Michael McCauley, filed simultaneously herewith, Defendants were not aware of the facts that form the basis for most of their Counterclaim until well after the May 12, 1999 bar date. As set forth in Mr. McCauley's affidavit, the physical assets and technology comprising the property purchased by Defendant ATG Catalytics, LLC is complex within the hazardous waste disposal industry and it was only after ATG's completion of a very detailed and lengthy period of analysis of the Q-CEP waste processing system that the nature and extent of the problems with the system sold by the Debtors became known to ATG. The review process was not concluded until well after the May 12, 1999 bar date. Under the circumstances, Defendants' failure to assert those

LEWIS, KING, KRIEG,
& WALDROP, P.C.
re Square, 5th Floor
Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

2

claims in the bankruptcy court prior to the deadline constitutes excusable neglect, and Defendants should be permitted to assert their claims.

Rule 9006(b)(1) of the Federal Rules of Bankruptcy Procedure allows a court to permit the late filing of a proof of claim, on motion made after the expiration of the bar date, where the failure to file a timely claim is the result of "excusable neglect." In Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership, 507 U.S. 380, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993), a case involving the late filing of a proof of claim in a Chapter 11 case, the U.S. Supreme Court held that "excusable neglect" under Rule 9006(b)(1) "is not limited to situations where the failure to timely file is due to circumstances beyond the control of the filer." 507 U.S. at 391-392, 113 S. Ct. at 1496, 123 L. Ed. 2d at 86-87. Rather, it extends to situations involving carelessness or negligence. The key question is whether the neglect is "excusable." In Pioneer, the Court concluded that the determination of whether neglect is excusable "is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission", including "the danger of prejudice to the debtor, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." 507 U.S. at 395, 113 S. Ct. at 1498, 123 L. Ed. 2d at 89-90.

Here, Defendants acted in good faith and there would be no prejudice to the Debtors or undue impact on judicial proceedings by allowing Defendants to assert their claims against Plaintiff. This Court should deny the Motion to Dismiss in order to permit Defendants to seek bankruptcy court permission to file their claims with the

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

3

bankruptcy court beyond the deadline, or in the alternative, to amend their existing bankruptcy claim to include the additional grounds for relief discovered by Defendants after the bar date. If Defendants are permitted to assert their claims in the bankruptcy court, it would only make sense to permit those claims to be liquidated in this Court as part of these proceedings. Defendants respectfully request that the Court deny the Motion to Dismiss and permit Defendants to obtain a bankruptcy court ruling on the timeliness of their claim.

### III. THE COUNTERCLAIM SATISFIES RULE 9(b), BUT DEFENDANTS SHOULD BE PERMITTED TO AMEND THE COUNTERCLAIM IF NECESSARY.

Plaintiff asserts that the Counterclaim does not allege fraud or misrepresentation with sufficient particularity to satisfy Rule 9(b). Defendants submit that the Counterclaim does satisfy the Rule, but in the event that it does not, Defendants should be permitted to amend their Counterclaim to allege fraud and misrepresentation with sufficient particularity. It is well settled that it is an abuse of discretion to dismiss a complaint based on Rule 9(b) without giving the complainant a chance to amend its complaint to satisfy the Rule. See, e.g., Bank v. Pitt, 928 F.2d 1108, 1112-1113 (11th Cir. 1991); Schreiber Dist. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986); Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1986).

Plaintiff also asserts that Defendants cannot bring an action for fraud and misrepresentation because the sale contract between the parties contained a disclaimer of warranties and stated that the property was being sold "as is". However, this contract

LEWIS, KING, KRIEG,
& WALDROP, P.C.
ntre Square, 5th Floor
20 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

4

clause is simply irrelevant to Defendants' claims of fraud and misrepresentation. While

Section 2-316 of the Uniform Commercial Code does permit disclaimers of warranties,

such disclaimers, including the use of "as is" language, do not preclude a buyer from

making claims of misrepresentation or deceptive practices. Morris v. Mack's Used Cars,

824 S.W.2d 538, 539-540 (Tenn. 1992). As the court pointed out in Morris, Section 1-

103 of the UCC specifically states that the law of fraud and misrepresentation is

supplemental to the UCC and is not displaced by it:

> Unless displaced by the particular provisions of chapters 1-
> 9 of this title, the principles of law and equity, including the
> law merchant and the law relative to capacity to contract,
> principal and agent, estoppel, fraud, misrepresentation,
> duress, coercion, mistake, bankruptcy, or other validating
> or invalidating cause shall supplement its provisions.

Morris, 824 S.W.2d at 539, *citing* T.C.A. § 47-1-103.

Throughout the bankruptcy purchase transaction between the Debtors and

the Defendants, the Defendants relied upon information supplied by the Debtors with

respect to the historic operating characteristics of the Q-CEP system. The information

provided by the Debtors portrayed a fully functional radioactive waste disposal system.

As set forth in the Affidavit of Mr. McCauley, certain of the data provided by the Debtors

in this regard was grossly inaccurate, suggesting volumes of waste processing that were

never in fact attained during Mr. McCauley's operation of the system by the Debtors'

entities. This data constituted a key component of the information upon which the

Defendants here materially relied in deciding to purchase the Debtors' assets in

bankruptcy.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
On 'a Square, 5th Floor
Market Street
.O. Box 2425
Knoxville, Tennessee 37901

5

Plaintiff's Motion to Dismiss should be denied, or the Court should at least permit the Defendants to amend their Counterclaim to satisfy Rule 9(b) consistent with the terms of Mr. McCauley's Affidavit, and consistent with the evidence as further reduced during the discovery in this cause.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion to Dismiss their Counterclaim.

Respectfully submitted,

David A. Draper, BPR #016067

LEWIS, KING, KRIEG & WALDROP, P.C.
One Centre Square
620 Market Street, Fifth Floor
P. O. Box 2425
Knoxville, Tennessee 37901
(865) 546-4646

Attorneys for Defendants

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Square, 5th Floor
Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

6

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of this the foregoing document has been served upon all counsel of interest in this case, by delivering a true and exact copy to the offices of counsel of record shown at the addresses below or by placing a copy in the United States mail, first-class postage prepaid.

H. Buckley Cole, Jr., Esq.
Carol M. Joiner, Esq.
Greenebaum Doll & McDonald PLCC
700 Two American Center
3102 West End Avenue
Nashville, TN 37203-1304

This the _____ day of _____ 2001.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
[illegible] Square, 5th Floor
[illegible] Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

7

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

STEPHEN S. GRAY, CHAPTER 11            )
TRUSTEE FOR THE ESTATE OF              )
DEBTORS MOLTEN METAL                   )
TECHNOLOGY, INC., MMT OF               )
TENNESSEE, INC., MMT FEDERAL           )
HOLDINGS, INC., M4                     )
ENVIRONMENTAL MANAGEMENT,              )
INC., AND M4 ENVIRONMENTAL,            )
L.P.,                                  )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )            No.: 3:01-CV-322
                                       )            Jarvis/Phillips
ATG CATALYTICS, LLC AND ATG,           )
INC.,                                  )
                                       )
            Defendants.                )

## AFFIDAVIT OF MICHAEL McCAULEY

STATE OF TENNESSEE       )
                         ) S/S
COUNTY OF _Roane_        )

        Comes the Affiant, Michael McCauley, after having been duly sworn, and makes oath as

follows:

        1.      My name is Michael McCauley, I am over twenty-one (21) years of age, and I

have personal knowledge of the matters contained herein.

        2.      I am presently employed as Plant Manager for ATG, Inc., and I am responsible

for the daily operations of ATG, Inc.'s Bear Creek plant in Kingston, Tennessee, which plant

comprises the radioactive waste processing system and related facilities purchased by the

defendant, ATG Catalytics, LLC, along with Quantum Catalytics, LLC from the plaintiff

LEWIS, KING, KRIEG
DROP, P.C.
On       Square, 5th Floor
      Market Street
      P.O. Box 2425
Knoxville, Tennessee 37901

bankrupt entities commonly referred to as "Molten Metals" (the "Plant"). Prior to becoming employed by ATG, I was employed by Molten Metals as plant manager of the Plant, and I have worked at the Plant since its original construction in 1995. I have over 30 years of experience in the hazardous waste disposal industry, and I have a "hands–on" working knowledge of many of the technologies utilized in the hazardous waste disposal industry.

3.    The Plant began processing radioactive waste in December 1996, and since that time I have been continuously involved in all Plant operations.    During the period from December, 1996 until ATG's purchase and taking possession of the Plant in December, 1998, only low dose radioactive waste was processed through the Plant's main radioactive waste processing system, commonly known as the quantum catalytic extraction process, or "Q-CEP" system, and these operations consistently resulted in system breakdowns and malfunctions.

4.    Upon taking possession of the Bear Creek plant, ATG's chemical engineer, Don Gagel and I immediately set about the process of reviewing the existing operating procedures and characteristics of the Q-CEP system. The purpose of this review was to enable to ATG to begin operating the Q-CEP system so that the backlogged inventory of higher dose radioactive waste accumulated on-site could be processed and that waste inventory reduced, in part under the mandate of state regulators.

5.    Because of the complex nature of the technology utilized in the Q-CEP system, the review process was similarly complex and time consuming, involving months of trial and error analysis of the system. This process continued well into the 2000 calendar year, at which point, it became evident that the system could not be reliably operated. Based on my knowledge and experience at the Plant and with the Q-CEP system, I do not believe the nature and scope of Q-CEP system deficiencies became evident to ATG until at least late 1999 or early 2000.

6.    During the above described review process in the summer of 1999, I had occasion to review for the first time Q-CEP operating data supplied by Molten Metal for use by

LEWIS, KING, KRIEG,
WALDROP, P.C.
re Square, 5th Floor
J Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

2

ATG in developing an economic model of Q-CEP system. In part, the data purported to set forth the historic operating results of the Q-CEP system during its operation by Molten Metal. Upon reviewing this "data", I noticed that the operating figures provided were grossly inaccurate and totally inconsistent with similar Q-CEP system data I had previously collected and provided to the management of Molten Metal. Based on my knowledge and experience with the Q-CEP system, it is my opinion that this data inaccurately portrayed the actual operating characteristics of the Q-CEP system.

7.    During ATG's operation of the Q-CEP system to process higher dose radioactive waste in the summer and fall of 1999, it became evident that there was inadequate shielding within the Plant. As a result, ATG was required to install large quantities of additional shielding in the Plant. These efforts to increase shielding commenced in October 1999 and continued through March, 2000.

MICHAEL McCAULEY

Sworn to and subscribed
before me this 6th day
of September , 2001.

Notary Public

My Commission Expires: 5/28/03

Doc. #43

LEWIS, KING, KRIEG.
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

3



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

STEPHEN S. GRAY, CHAPTER 11 )
TRUSTEE FOR THE ESTATE OF )
DEBTORS MOLTEN METAL )
TECHNOLOGY, INC., MMT OF )
TENNESSEE, INC., MMT FEDERAL )
HOLDINGS, INC., M4 )
ENVIRONMENTAL )
MANAGEMENT, INC., AND M4 )
ENVIRONMENTAL, L.P., )
)
    Plaintiff/Counter Defendant, )
)
v. )
)
ATG CATALYTICS, LLC AND )
ATG, INC., )
)
    Defendants/Counter Plaintiffs. )

No.: 3:01-CV-322
Jarvis/Phillips

## ANSWER AND COUNTER CLAIM

Comes now ATG Catalytics, LLC ("ATG-C") and ATG, Inc. ("ATG") (collectively, "ATG-C/ATG"), by and through counsel, and for their Answer to the Plaintiff's Complaint, state as follows:

### FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

ATG-C/ATG are due monetary set-offs that meet or exceed any and all amounts claimed, or to be claimed, by the Plaintiff.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

-1-

3

## THIRD AFFIRMATIVE DEFENSE

. The Plaintiff/Counter Defendant's claims are barred because of material misrepresentation and/or fraud in the inducement in connection with the underlying asset purchase transaction, as set forth in ATG-C/ATG Counterclaim.

For answer to the enumerated paragraphs of the Complaint, ATG-C/ATG state and aver as follows:

1.      ATG-C/ATG are without sufficient information to admit or deny the allegations of Paragraph 1 of the Complaint, and therefore deny same and demand strict proof where material to Plaintiff's clams.

2.      ATG-C/ATG admit the allegations of Paragraph 2 of the Complaint, except as to ATG's principal business address, which is 3400 Arden Road, Hayward California, 94545.

3.      ATG-C/ATG admit the allegations of Paragraph 3 of the Complaint, except as to ATG-C's principal business address, which is 3400 Arden Road, Hayward California, 94545.

4.      ATG-C/ATG make no response to Paragraph 4 of the Complaint, as this action has now been removed to the United States District Court, which maintains diversity jurisdiction of all claims herein.

5.      ATG-C/ATG is without sufficient information to admit or deny the averments of Paragraph 5 of the Complaint, but admit the existence of a bankruptcy involving the Debtors.

6.      ATG-C/ATG lacks sufficient information to admit or deny the various allegations in Paragraph 6 of the Complaint respecting the Debtors' past business

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor.
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

operations, and therefore deny same and demand strict proof of such allegations where material to Plaintiff's claims.

7.    In response to the allegations in Paragraph 7 of the Complaint, ATG-C/ATG state that the referenced bankruptcy court Order of appointment speaks for itself, and denies all allegations contrary to said Order.

8.    In response to the allegations of Paragraph 8 of the Complaint, ATG-C/ATG state that the referenced Offer speaks for itself, and deny all allegations of Paragraph 8 to the contrary.

9.    ATG-C/ATG deny the allegations of Paragraph 9 of the Complaint.

10.    ATG-C/ATG admit the allegations of Paragraph 10 of the Complaint, except as to Exhibit A, which document speaks for itself.

11.    In response to the allegations of Paragraph 11 of the Complaint, ATG-C/ATG state that the referenced bankruptcy court Order speaks for itself, and denies all contrary averments of Paragraph 11.

12.    In response to the allegations of Paragraph 12, ATG-C/ATG state the referenced "Purchase Documents", and all terms therein, speak for themselves, and AGT-C/ATG deny all averments to the contrary.

13.    In response to the allegations of Paragraph 13, ATG-C/ATG state that the referenced "Purchase Documents", and all terms therein, speak for themselves, and ATG-C/ATG deny all averments to the contrary.

14.    In response to the allegations of Paragraph 14, ATG-C/ATG state that the referenced guaranty document, and all terms therein, speaks for itself, and ATG-C/ATG deny all averments to the contrary.

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

15.    Paragraph 15 of the Complaint requires no answer, and thus none is made.

16.    In response to the allegations of Paragraph 16 of the Complaint, ATG-C/ATG admit that they have not made certain payments to the Trustee, but deny that such payments are due and owing, and deny that they are in breach or default of any contractual obligations to the Trustee.

17.    ATG-C/ATG deny the allegations of Paragraph 17 of the Complaint.

18.    Paragraph 18 of the Complaint requires no answer, and thus none is made.

19.    In response to the allegations of Paragraph 19 of the Complaint, ATG-C/ATG admit that they have not made certain payments to the Trustee, but deny that such payments are due and owing, and deny that they are in breach or default of any contractual obligations to the Trustee.

20.    ATG-C/ATG deny the allegations of Paragraph 20 of the Complaint.

21.    ATG-C/ATG deny the allegations of Paragraph 21 of the Complaint.

22.    Paragraph 22 of the Complaint requires no answer, and thus none is made.

23.    In response to the allegations of Paragraph 23, ATG-C/ATG state that the referenced "Purchase Documents", and all terms therein, speak for themselves, and ATG-C/ATG deny all averments to the contrary.  Further, ATG-C/ATG admit that they have not made certain payments to the Trustee, but deny that such payments are due and owing, and deny that they are in breach or default of any contractual obligations to the Trustee.

24.    In response to the allegations of Paragraph 24, ATG-C/ATG state that the referenced "Purchase Documents", and all terms therein, speak for themselves, and AGT-C/ATG deny all averments to the contrary.

4

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

25.    ATG-C/ATG deny the allegations of Paragraph 25 of the Complaint.

26.    All allegations of the Complaint that are not specifically admitted herein are hereby denied.

AND NOW, having fully answered the Complaint against it, Defendants ATG-C/ATG pray that the Plaintiff's Complaint be dismissed, with prejudice, and for their costs and attorneys fees.  In the alternative, ATG-C/ATG join issue with the Plaintiff, and submit all issues joined to the court for its determination herein.

## COUNTER CLAIM

COMES NOW, ATG Catalytics, LLC ("ATG-C") and ATG, Inc. ("AGT") (collectively ATG-C/ATG"), and for their Counterclaim against the Plaintiff/Counter Defendant, Trustee, Stephen S. Gray, alleges as follows:

1.    The Counter-plaintiff, ATG, is a California corporation, having its principal offices at 3400 Arden Road, Hayward, California, 94545.  ATG is in the business of processing for disposal various hazardous wastes, including low-level radioactive wastes.  ATG is the sole owner of ATG-C, and ATG acted as guarantor for ATG-C in connection with the asset purchase outlined herein.  Further, ATG was an intended third party beneficiary of the ATG-C/Trustee contract of sale described in the original Complaint.

2.    The Counter-plaintiff, ATG-C, is a limited liability company, having its principal offices at 3400 Arden Road, Hayward, California, 94545.  ATG-C is a wholly owned subsidiary of ATG, and is also in the business of processing for disposal various hazardous low-level radioactive wastes.  ATG-C was the buyer and subsequent operator

5

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

of a radioactive waste processing facility and related equipment of the Debtors the outlined herein.

3.    Trustee, Stephen S. Gray, is a citizen of the State of Massachusetts, was at all times material hereto a duly appointed Chapter 11 Trustee acting on behalf of and for the interests of the bankruptcy estate of debtors Molten Metal Technology, Inc., MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc., and M4 Environmental, L.P. (herein referred to as the "Debtors").

4.    This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(3), because the matter in controversy s exceeds the sum of Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs, and the claims herein are between citizens of different states.  Further, the Counter-plaintiffs claims are asserted against the Trustee, acting on behalf of the Debtors, pursuant to 28 U.S.C. 957.

**Facts**

5.    As set forth in the Complaint, and more particularly described within the documents exhibited to the Plaintiff's Complaint herein, ATG-C purchased certain assets of the Debtors pursuant to a post bankruptcy petition sales contract.  Those assets, commonly referred to as the catalytic extraction processing assets ("CEP"assets"), comprised a physical plant and equipment known as the Bear Creek facility, located in Roane County, Tennessee.  The Bear Creek operations were devoted to processing low-level radioactive wastes for disposal.  As further alleged in the Complaint, ATG executed a Guaranty guaranteeing ATG-C's payment obligations in connection with ATG-C's purchase of the CEP assets.

6

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

6.      As a part of the CEP assets sales transaction, and during the bid process, the Trustee, acting through representatives of the Debtors an/or agents of the Debtors, either failed to disclose material information or made false and misleading material representations regarding the CEP assets, all of which ATG-C and ATG relied upon to their detriment.  These false misrepresentations include, without limitation:

a.) assertions that the CEP system was in conformance with Debtors' radioactive materials license, when it was not;

b.) assertions that the CEP assets were suitable for use within the radioactive waste industry, when they were not;

c.) assertions that the two reactors within the CEP system could be simultaneously operated, when they could not;

d.) assertions that the CEP system was reliable and fully operational, when it was not.

e.) assertions that there was a viable market for the processing services rendered by way of the CEP assets, when there was not.

As a result of the foregoing non-disclosures and/or misrepresentations, ATG-C purchased a highly unreliable and essentially non-functional waste processing system that required grossly excessive maintenance costs from the inception of ATG-C's possession and operation of the system, and the deficiencies in the CEP system also resulted in repeated shut downs of the system, all of which caused damage and loss to ATG-C and ATG.  These losses include, but are not limited to, ATG-C's costs associated with having to shut down the

7

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

waste processing system and install extensive amounts of shielding in order to

adequately protect workers at Bear Creek from undue radiation exposure.

7.    After taking possession of the Bear Creek facility, ATG-C learned for the

first time the radioactive wastes had migrated from the Bear Creek facility to adjacent

property during the Debtors' operation of Bear Creek, and in order to maintain its

licensure of the facility, ATG-C was required to conduct clean-up operations of the

contaminated areas. ATG-C and ATG aver that the Debtors knew or should have known

that the off-site contamination had occurred, and failed disclose its existence to Counter

plaintiffs.

8.    Counter plaintiffs aver that the Debtors failure to disclose the existence of

the off-site contamination constitutes a material misrepresentation by the Debtors upon

which the Counter plaintiffs relied and which resulted in ATG-C making a higher bid for

the CEP assets than it would have otherwise made. Further, pursuant to the sale

agreement with the Trustee, neither ATG-C nor ATG assumed any liability for such off-

site contamination. Counter plaintiffs are therefore entitled to recover all costs associated

with the clean up from the Trustee.

## Count I
### Breach of Contract

1.    ATG-C/ATG realleges the allegations of Paragraphs 1 through 6, as if set

forth fully herein.

2.    As set forth above, ATG-C/ATG avers that the various defects and

deficiencies in the CEP assets and the off-site contamination, the existence of which was

either not disclosed or falsely misrepresented, constitutes a breach of contract causing

8

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

direct damage and loss to ATG-C and its intended third-party beneficiary, ATG, and rendering the Plaintiff, as trustee for the Debtor's estate, liable to the ATG-C/ATG.

### Count II
### Misrepresentation/Fraudulent Inducement

1.     ATG-C/ATG realleges the allegations of Paragraphs 1 through 8, as if set forth fully herein.

2.     ATG-C/ATG aver that that the Plaintiff, as trustee of the Debtors, and the Debtors, either knowingly or negligently misrepresented numerous material facts concerning the CEP assets, all of which ATG-C and ATG reasonably relied during the bidding and contracting process.  Such misrepresentations related to the essence of the purchase agreement, and have caused financial loss to ATG-C/ATG, for all of which the Trustee is liable to ATG-C/ATG.

3.     ATG-C/ATG further avers that certain of the misrepresentations regarding the functional capabilities of the CEP assets and non-disclosure of the off-site contamination were made for the purpose of inducing ATG-C's purchase of the CEP assets, rendering the Trustee liable to ATG-C/ATG.

**WHEREFORE,** ATG CATALYTICS, LLC AND ATG, INC., pray for the following relief:

A.     That the Trustee be served with this Counterclaim and be required to make answer to this Couterclaim as required by law; and

B.     For judgment against the Trustee, Stephen S. Gray, for compensatory damages in an amount consistent with the Counter-

9

plaintiffs' proof of damages as shown at trial, but in any event not

less than $6,000,000; and

C.    For such other relief as may be necessary and proper.


Gregory G. Edwards
Senior Vice President
ATG, Inc.


David A. Draper, BPR #016067


LEWIS, KING, KRIEG & WALDROP, P.C.
One Centre Square
620 Market Street, Fifth Floor
P. O. Box 2425
Knoxville, Tennessee 37901
(865) 546-4646

**Attorneys for Defendants/Counter Plaintiffs**

10

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of this the foregoing document has been served upon all counsel of interest in this case, by delivering a true and exact copy to the offices of counsel of record shown at the addresses below or by placing a copy in the United States mail, first-class postage prepaid.

> H. Buckley Cole, Jr., Esq.
> Carol M. Joiner, Esq.
> Greenebaum Doll & McDonald PLCC
> 700 Two American Center
> 3102 West End Avenue
> Nashville, TN 37203-1304

This the 11th day of July, 2001.

David A. Draper, BPR #016067

Doc. #18

11

LEWIS, KING, KRIEG,
& WALDROP, P.C.
One Centre Square, 5th Floor
620 Market Street
P.O. Box 2425
Knoxville, Tennessee 37901

# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

FILED

STEPHEN S. GRAY, CHAPTER 11 )
TRUSTEE FOR THE ESTATE OF
DEBTORS MOLTEN METAL )
TECHNOLOGY, INC., MMT OF
TENNESSEE, INC., MMT FEDERAL )
HOLDINGS, INC., M4 ENVIRON- )
MENTAL MANAGEMENT, INC., )
AND M4 ENVIRONMENTAL,
L.P., )

    Plaintiff/Counter-Defendant )

        v. )        No. 3:01-cv-322

ATG CATALYTICS, LLC and )
ATG, INC., )

    Defendants/Counter-Plaintiffs )

## MEMORANDUM AND ORDER

Counter-Plaintiffs having failed to obtain leave of the Bankruptcy Court in which the debtors' case is pending to sue the trustee, counter-defendants' motion to dismiss the counterclaim [Court File #4] is hereby GRANTED. For the same reason, defendants' motion to amend its counterclaim [Court File #9] is also DENIED. However,

for good cause shown, defendants' motion to amend its answer to raise the affirmative defense of recoupment [Court File #9] is GRANTED.


ENTER:

James H. Jarvis,
UNITED STATES DISTRICT JUDGE