# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROBERT I. HANFLING, CHAPTER 11 TRUSTEE FOR ATG, INC. AND ATG CATALYTICS L.L.C., | |
| **Plaintiffs,** | C.A. No. 05-10077-RGS |
| vs. | |
| EPSTEIN BECKER & GREEN, P.C., JOHN PRESTON, CHRISTOPHER NAGEL, EUGENE BERMAN, ETHAN JACKS, QUANTUM CATALYTICS LLC, ABC CORPS 1 through 5 and JOHN DOES 1 through 5, | |
| **Defendants.** | **June 27, 2005** |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS QUANTUM CATALYTICS, LLC, JOHN PRESTON AND CHRISTOPHER NAGLE

The Plaintiffs, Robert I. Hanfling, Chapter 7[1] Trustee of ATG, Inc. ("ATG") and Robert I. Hanfling, Chapter 7 Trustee of ATG Catalytics, L.L.C. ("ATG Catalytics" and jointly with ATG, the "Plaintiffs"), by their attorneys, hereby submit this Memorandum in Opposition to the Motion to Dismiss Plaintiffs' Complaint (the "Complaint") and supporting memorandum (as modified) (the "Motion to Dismiss") filed by defendants Quantum Catalytics, LLC ("Quantum"), John Preston ("Preston") and Christopher Nagel ("Nagel", and together with

---

[1] At the time this case was commenced, ATG, Inc. and ATG Catalytics, L.L.C., a wholly owned subsidiary of ATG, Inc., were debtors under chapter 11 of the Bankruptcy Code. Robert I. Hanfling was the duly-appointed chapter 11 Trustee for ATG, Inc. and acted as chief executive officer of ATG Catalytics, L.L.C. and two other wholly-owned subsidiaries of ATG, Inc., each of which was a debtor-in-possession in separate chapter 11 proceedings. On April 27, 2004, the Bankruptcy Court entered an Order converting the bankruptcy cases of each of ATG, Inc. and ATG Catalytics, L.L.C. (and the other two wholly-owned subsidiaries, which are not relevant to he instant proceeding) to cases under chapter 7 of the Bankruptcy Code. In connection therewith, Robert I. Hanfling was appointed chapter 7 trustee of ATG, Inc. and ATG Catalytics, L.L.C.

Quantum and Preston, the "Quantum Defendants"), in the above captioned proceeding pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## COUNTER STATEMENT OF FACTS

The Quantum Defendants state a number of factual assertions in their Modified Memorandum of Law In Support of their Motion to Dismiss (the "Quantum Defendants' Memorandum"), that, whether relevant or not to the issues at hand, are simply not supported by, or are flatly contradicted by, the very records and documents submitted by the Quantum Defendants in support of their Motion to Dismiss. Rather than providing the Court with a comprehensive statement of the voluminous factual circumstances leading up the immediate litigation, the Plaintiffs will specifically address the factual assertions in the Quantum Defendants' Memorandum that are unsupported, misleading or false.

First, the Quantum Defendants attempt to distance themselves from MMT[2] and the systemic problems of the Q-CEP facility that existed at the time ATG negotiated the transaction to acquire the Q-CEP (as defined in ¶ 21 of the Complaint) assets from the MMT Trustee. The Quantum Defendants would have this Court believe that so much time had elapsed following their termination as officers and directors of MMT that they were not privy to any knowledge of Q-CEP operations before ATG negotiated and acquired the Q-CEP assets. Specifically, the Quantum Defendants state that "[a]s Plaintiff acknowledges, the Quantum Defendants resigned from MMT in advance of the MMT bankruptcy." *See* Quantum Defendants' Memorandum, p. 3. Therefore, the Quantum Defendants would have this Court believe that they had almost no connection with MMT for at least a year prior to the purchase of the Q-CEP assets by ATG Catalytics." *Id*. Plaintiffs, however, have made no such acknowledgement. The Quantum Defendants, misleadingly, base such assertion on paragraph 29 of the Complaint, which alleges only that "at a point in time to be discovered, the defendants Preston, Nagel, Berman and Jacks were terminated as officers and/or directors of MMT." *See* Complaint, ¶ 29. Furthermore, the Quantum Defendants later in their Memorandum again misleadingly cite ¶ 29 of the Complaint

---

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Quantum Defendants' Memorandum.

for their assertion that "[d]uring the summer of 1998, Messrs. Preston and Nagel resigned as officers and directors of MMT." Defendants' Memorandum, pp. 4-5; 14. Thus, the Quantum Defendants not only misrepresent the content of ¶ 29 of the Complaint, but also contradict themselves.[3]   MMT commenced its bankruptcy case on December 3, 1997. *See In re Molten Metals Technology, Inc.*, 289 B.R. 505 (Bankr. D. Mass. 2003). The MMT Trustee was appointed effective August 24, 1998. *Id.* It would appear then, that Quantum Defendants Preston and Nagel resigned from (or were terminated by) MMT <u>after</u> MMT filed bankruptcy, not prior to that event. It further appears that Quantum Defendants Preston and Nagel left MMT less than 4 months before ATG purchased the Q-CEP assets (and only about two months before submission of the ATG Catalytics and Quantum joint bid), not "at least a year" as the Quantum Defendants state. *See* Sale Order and Letter Agreement of December 1, 1998, which are Exhibits B and C in the Quantum Defendants' "Notice of Exhibits" filed concurrently with the Motion to Dismiss (authorizing ATG's acquisition of the Q-CEP assets on December 1, 1998).

Second, in an attempt to persuade the Court that the Quantum Defendants had an aligned interest with ATG (and therefore had no motive to commit fraud), the Quantum Defendants assert that Quantum received a 10% ownership interest in ATG Catalytics as part of the parties' agreement. <u>See</u> Quantum Defendants' Memorandum, p. 6. In support of this statement, the Quantum Defendants direct the Court to the Order Approving Sale and Exhibit A thereto. The Plaintiffs have reviewed the document cited by the Quantum Defendants and find no provisions within the Sale Order and Exhibit A thereto which supports the Quantum Defendants' statement.[4] Nor are the Plaintiffs aware of any other evidence, documentary or otherwise, that supports this statement.

The Quantum Defendants further assert that ATG Catalytics repurchased Quantum's 10% interest in ATG Catalytics in January of 2000 in exchange for release of an option held by ATG

---

[3] In light of, *inter alia*, the Quantum Defendants' blatant misrepresentations concerning the content of ¶ 29 of the Complaint, Plaintiffs respectfully submit that the Court should give increased scrutiny to all of the Quantum Defendants' factual and legal citations.

[4] Exhibit A to the Order does include language regarding allocation of the ownership of Quantum, but not ATG Catalytics. See Order Approving Sale, Exhibit A, item 2.

to purchase a 25% interest in Quantum. See Defendant's Memorandum, p. 6, fn. 3.  Again, the Quantum Defendants' assertion is wholly unsupported by evidence, documentary or otherwise. Even assuming, *arguendo,* that the Quantum Defendants' assertion is correct, the fact that ATG and Quantum ultimately agreed to a wash-out transaction only underscores that the consideration paid by Quantum to ATG for the 10% interest was illusory.   Furthermore, the Court should not indulge the Quantum Defendants' speculation that ATG's alleged purchase of the 10% interest back from Quantum in any way manifests ATG's satisfaction with the underlying transaction. The facts and circumstances under which ATG might have acquired Quantum's interest in ATG Catalytics are not clear and remains to be discovered.  No doubt, however, ATG could not have been satisfied with the performance of the Q-CEP assets and the Bear Creek Facility as the Quantum Defendants suggest. (See Defendant's Memorandum, p. 12, fn.6).  According to the affidavit of Michael McCauley, a former plant manager for ATG responsible for the daily operations of ATG's Bear Creek, Tennessee facilities (which included, *inter* alia, the Q-CEP facility), ATG concluded, after months of costly and fruitless trial and error, that the Q-CEP system could not be reliably operated. *See* Affidavit of Michael McCauley dated September 6, 2001 (the "McCauley Affidavit)[5], ¶¶ 4-5.  Furthermore, ATG's filings with the United States Securities and Exchange Commission evidence that ATG abandoned the Q-CEP system entirely in 2000, and recorded a resultant non-cash asset impairment charge of $14.1 million, plus other charges amounting to an additional $2.6 million, all associated with the failure of Q-CEP.  See Form 10-K for ATG, Inc., for Fiscal Year Ended December 31, 2000 (the "Form 10-K"), p. 52, "Asset Abandonment", a copy of which relevant portions are attached hereto as Exhibit "A".

The Quantum Defendants also state in their Memorandum that in December, 1998, when the ATG Catalytics-Quantum transaction occurred, that the revenue generated by the Q-CEP facility was running at an annual rate of approximately $17 million, whereas revenue generated by the assets purchased by Quantum Catalytics were approximately $0.4 million per year.  See Quantum Defendants' Memorandum, p. 6, fn. 4.  As with many other factual assertions in the

---

[5] A copy of the McCauley Affidavit is included within Exhibit H of the documents submitted by the Quantum Defendants along with, and in support of, the Motion to Dismiss.

Defendant's Memorandum, these assertions are entirely unsupported.  Furthermore, the Plaintiffs strongly question the veracity of any financial information or data regarding the Q-CEP facility that is based upon information recorded or generated prior to ATG's purchase of the Q-CEP assets, as it appears that MMT may have fraudulently booked contracts and recorded revenue for waste processing jobs that exceeded the actual true capabilities of the Q-CEP system[6].  Indeed, the MMT Trustee has charged that MMT management committed unlawful acts, including the falsification of accounting records and statements to the SEC, by falsely listing receivables from a subsidiary as income of MMT.[7]

## LAW AND ARGUMENT

**I.    APPLICABLE LEGAL STANDARDS.**

### A.    Standard under Fed. R. Civ. P. 12(b)(6)

In considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all material factual allegations in the complaint and indulge all reasonable inferences in the plaintiff's favor. *Calderon-Ortiz v. Laboy-Alvorado*, 300 F.3d 60, 62-3 (1st Cir. 2002); *S.E.C. v. SG Ltd.*, 265 F.3d 42, 46 (1st Cir. 2001); *Barrington Cove Ltd. Partnership v. Rhode Island Housing and Mort. Finance Corp.*, 246 F.3d 1, 4-5 (1st Cir. 2001).  Dismissal under Rule 12(b)(6) is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery.  *S.E.C. vs. SG Ltd.*, 265 F.3d at 46; *Blacksmith Investments, LLC v. Cives Steel Co., Inc.*, 228 F.R.D. 66, 71 (D. Mass. 2005).  Ordinarily, a court may not consider material beyond that found in the complaint itself when adjudicating a 12(b)(6) motion, unless the motion is converted into one for summary judgment.  *Alternative Energy v. St. Paul Fire & Marine Ins.*

---

[6] The McCauley Affidavit also states that there was a backlogged inventory of higher dose radioactive waste accumulated at the facility. McCauley Affidavit, p2, ¶2.  ATG's Form 10-K indicates that ATG incurred a charge of $1.2 million to process and dispose of secondary waste associated with the shutdown of the Q-CEP facility. Form 10-K, p.52.  The Plaintiffs believe that the backlogged waste and subsequent disposal expenses resulted from, in large part, waste that had been improperly delivered to the Q-CEP facility for processing under contracts booked by MMT prior to ATG's acquisition of the facility, and which waste could not have been properly treated and disposed of.

[7] See Memorandum of Decision, dated February 11, 2003, *In re Molten Metals Technology, Inc., et al.*, 289 B.R. 505, 507 (Bankr. D. Mass. 2003).

*Co.,* 267 F.3d 30, 33 (1st Cir. 2001).  A "narrow exception" exists "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson v. Page,* 987 F.2d 1, 3 (1st Cir.1993).

    **B.**    **Standard under Fed. R. Civ. P. 9(b)**

Rule 9(b) states that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Fed. R. Civ. P. 9(b).  What constitutes particularity for purposes of Rule 9(b) "necessarily differ[s] with the facts of each case…." *American Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 Fed. Appx. 662, 667 2004 WL 2297150 (5th Cir. (Tex.)).  Accordingly, courts generally have not articulated the requirements of Rule 9(b) in great detail. *Id.*  The primary purpose of Rule 9(b)'s particularity requirements is to "provide a defendant with fair notice of a plaintiff's claim …." *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997).

Moreover, Rule 9(b) is an exception to the liberal federal court pleading requirements embodied in Fed. R. Civ. P. 8(a) and, therefore, Rule 9(b)'s more stringent pleading requirements should not be extended to causes of action not specified therein. *Swierkiewicz v. Sorema N.A,* 534 U.S. 506, 513 (2002) ("This Court, however, has declined to extend [Rule 9(b)'s] exceptions to other contexts.");  *Leatherman v. Tarrant County,* 507 U.S. 163, 168 (1993) (indicating that the doctrine of *expressio unius est exclusio alterius* operates to prevent courts from expanding Rule 9(b)'s stringent pleading requirements to other causes of action);  *see also* Wright & Miller, Federal Practice and Procedure: Civil 2d § 1297 ("Since [Rule 9(b)] is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules, its scope of application should be construed narrowly and not extended to other legal theories or defenses.").  Accordingly, as discussed in greater detail below, the First Circuit has ruled that claims for negligent misrepresentation are not subject to the Rule 9(b) pleading standards. *See Massachusetts School of Law at Andover, Inc. v. American Bar Assoc.*, 142 F.3d 26, 41 (1st Cir. 1998).

## II.   PLAINTIFFS HAVE STATED CLAIMS UPON WHICH RELIEF CAN BE GRANTED.

### A.   The Complaint Pleads Counts II and III With Sufficient Particularity

1.   *Count II (Fraudulent Misrepresentation) Satisfies the Particularity Requirements of Rule 9(b).*

Plaintiffs respectfully submit that Count II of the Complaint meets the pleading requirements established by Federal Rule of Civil Procedure 9(b).  As stated above, the overall purpose of Rule 9(b) is to provide defendants with adequate notice of the plaintiff's claims. Here, there can be no dispute that the Complaint provides the Quantum Defendants with sufficient notice to enable the Quantum Defendants to prepare their answer and defenses in this case.  For instance, the Complaint alleges that the Q-CEP facility was highly flawed and unsafe to operate and, more specifically, that "a bi-product from operation of the [Q-CEP] was a chemical compound known as Dioxin, an extremely toxic and difficult to dispose chemical that typically results from burning chlorine-based chemical compounds with hydrocarbons." Complaint ¶ 23.  The Complaint further specifically alleges that the Quantum Defendant Nagel received a letter on behalf of Garnet Earl McConchie from the law firm of Dwyer & Collora on or about March 25, 1998 (the "McConchie Letter") and that such letter set forth at length the flaws in the Q-CEP technology and the malfeasance and misfeasance of, *inter alia,* the Quantum Defendant Nagel and other persons identified in the McConchie Letter. Complaint ¶ 26.  A copy of the McConchie Letter is attached hereto as Exhibit "B."  The Complaint further specifically alleges that the Quantum Defendants Nagel and Preston, and defendants Berman and Jacks, in their capacity as fellow officers and directors of MMT, and defendant Epstein Becker and Green, P.C. ("EBG"), in its capacity as counsel to MMT, had actual knowledge of the Q-CEP defects and hazards. Complaint ¶¶ 27, 52.

Notwithstanding each of the Quantum Defendants' knowledge of the deficiencies surrounding the Q-CEP system, the Complaint alleges that Quantum Defendants Nagel and Preston, and defendants Berman and Jacks, made representations to ATG and its representatives

during the course of negotiations and due diligence in late 1998 (i) regarding the efficacy of the

Q-CEP technology and (ii) that the Q-CEP technology was operational, safe, effective and had

significant value.  Complaint ¶¶ 33-35.  The Complaint further alleges that Quantum Defendants

Nagel and Preston, and defendants Berman and Jacks, failed to disclose such defects to ATG

notwithstanding their duty to do so.  *See* Complaint ¶¶ 27, 52-55.  The Complaint further alleges

that Quantum Defendants Nagel and Preston, and defendants Berman and Jacks, provided

materially false and misleading financial information to ATG during the course of negotiations

and due diligence in late 1998 concerning the value of the Q-CEP operations. Complaint ¶¶ 33,

34, 53.

The foregoing allegations, together with the other allegations set forth in the Complaint,

provide the Quantum Defendants with fair notice of the claims asserted by Plaintiffs and

sufficiently meet or exceed the pleading requirements of Rule 9(b).  The Quantum Defendants

claim that the Complaint does not identify who made the false statements to ATG.  That is

simply incorrect.  As stated above, the Complaint specifically alleges that the Quantum

Defendants Nagel and Preston, and defendants Berman and Jacks, made the false statements and

provided the false information.  Likewise, the Quantum Defendants' contention that the

Complaint fails to identify who relied on the statements or when such statements were made is

equally false.  As previously indicated, the Complaint alleges, specifically, that it was ATG and

ATG Catalytics who relied upon the false statements and that the false statements were made

during the course of the parties' negotiations and due diligence, which occurred during the latter

part of 1998, immediately preceding the parties joint bid to acquire certain of the MMT assets.

Even more outrageous is the Quantum Defendants' false assertion that the Complaint

fails to identify a single document suggesting that any of the Quantum Defendants knew that

their representations to ATG were false when made.  To the contrary, the Complaint (i) specifically identifies the McConchie Letter (annexed hereto as Exhibit "B"), which describes in great detail and with great clarity the flaws, defects and safety hazards associated with the Q-CEP technology, (ii) alleges that the McConchie Letter was received by Quantum Defendant Nagel on or about March 25, 1998, only months prior to the submission of the ATG and Quantum joint bid and (iii) alleges that each of the Quantum Defendants had knowledge of the McConchie Letter and the details set forth therein prior to approaching ATG for the purpose of inducing ATG to submit the joint bid.  These allegations fully comply with Rule 9(b) and provide the Quantum Defendants with adequate and fair notice of Plaintiffs' claims. Accordingly, the Quantum Defendants' assertions that Count II was not plead in accordance with Rule 9(b) is clearly not supported by the facts and must be rejected by the Court.

2.     *If the Court Finds that Count II Does Not Satisfy Rule 9(b)'s Standards, Justice Requires that the Court Grant Plaintiff Leave to Amend to Replead.*

In the event that the Court finds that Plaintiffs' claim for fraudulent misrepresentation as alleged in Count II of the Complaint does not satisfy the pleading requirement of Rule 9(b), it is well-settled that Plaintiffs should be granted leave to amend the Complaint, rather than dismissal of the Complaint.  *See, e.g., New England Data Servs., Inc. v. Becher*, 829 F.2d 286 (1st Cir. 1987) (holding that a dismissal should not be automatic once a court determines that Rule 9(b) was not satisfied); *Learning Express, Inc. v. Ray-Matt Enterprises, Inc.*, 74 F. Supp. 2d 79 (D. Mass. 1999); *Guilbeault v. R.J. Reynolds Tobacco Co.*, 84 F. Supp. 2d 263 (D.R.I. 2000) (granting leave to amend despite fact that it was plaintiff's second attempt at drafting viable complaint); *American Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 Fed. Appx. 662, 667 2004 WL 2297150 (5th Cir. (Tex.)) (noting that "district court held that plaintiffs' original

complaint did not plead fraud with the particularity required by Rule 9(b) but allowed plaintiffs 'leave to replead their claims against [defendant]' because it was 'mindful of the well-settled principle that dismissal should be avoided until the plaintiffs have been afforded an opportunity to file an amended complaint'"); Wright & Miller, Federal Practice and Procedure: Civil 3d § 1300.  Accordingly, should the Court be inclined to grant the Quantum Defendants' Motion to Dismiss on this ground, the Plaintiffs hereby request that the Court first grant Plaintiffs sufficient time to file an amended complaint and conduct discovery regarding the Quantum Defendants' misrepresentations.  To the extent that the Court finds that Count II does not satisfy 9(b), Plaintiffs respectfully submit that if they are allowed an opportunity to replead, they will be able to satisfy Rule 9(b).

> 3.  *Count III (Negligent Misrepresentation) Is Not Subject to Rule 9(b)'s Heightened Pleading Requirements.*

The Quantum Defendants assert in their Memorandum that "there is a split in this district as to whether 9(b) applies to negligent misrepresentation claims…."  Quantum Defendants' Memorandum, p. 8.  While that statement may have been accurate prior to 1998, it is no longer true in light of a 1998 decision rendered by the United States Court of Appeals for the First Circuit, a case which is conveniently omitted from any discussion in the Quantum Defendants' Memorandum.  *See Massachusetts School of Law at Andover, Inc. v. American Bar Assoc.*, 142 F.3d 26, 41 (1st Cir. 1998).  In *Massachusetts School of Law at Andover*, the First Circuit specifically held that Rule 9(b) does not apply to claims for negligent misrepresentation.  *Id.*; *see also Fruehauf Trailer Corp. v. Terex Corp.*, 250 B.R. 168, 197-98 (D. Del. 2000) (stating that the Rule 9(b) pleading requirement generally does not apply to state law claims for, *inter alia*, negligent misrepresentation and citing *Massachusetts School of Law at Andover, Inc. v.*

*American Bar Assoc.*, 142 F.3d 26, 41 (1st Cir. 1998) (and other cases) as authority for that proposition.).

Furthermore, as noted above, the United States Supreme Court has indicated that Rule 9(b)'s pleading requirements should not be extended to claims other than those specifically enumerated in that section, and that courts are indeed prohibited from expanding Rule 9(b)'s application to other causes of action.  *See Swierkiewicz v. Sorema N.A,* 534 U.S. 506, 513 (2002) ("This Court, however, has declined to extend [Rule 9(b)'s] exceptions to other contexts."); *Leatherman v. Tarrant County,* 507 U.S. 163, 168 (1993) (indicating that the doctrine of *expressio unius est exclusio alterius* operates to prevent courts from expanding Rule 9(b)'s stringent pleading requirements to other causes of action). *See also Lawson v. Affirmative Equities Co.*, L.P. , 341 F.Supp.2d 51, 67 (D. Mass 2002) (complaint asserting a cause of action specifically enumerated in Rule 9(b) need only satisfy the simple notice pleading requirements of Rule 8(a)).  In addition, several other courts that have addressed this issue have specifically ruled that Rule 9(b) does not apply to claims for negligent misrepresentation.  *See, e.g., Masso v. United Parcel Service of America, Inc.*, 884 F. Supp. 610, 615 (D. Mass. 1995); *City of Worcester v. HCA Management Company, Inc.*, 1994 WL 123629 at *1 (D. Mass. April 7, 1994); *American Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 Fed. Appx. 662, 667 2004 WL 2297150 (5th Cir. (Tex.)); *In re Cendant Corp. Securities Litigation*, 190 F.R.D. 331, 337 (D.N.J.1999); *Small v. Provident Life & Accident Ins. Co.*, 1998 WL 848112, *3 (E.D. Pa.1998);  *see also* Wright & Miller, Federal Practice and Procedure: Civil 2d § 1297 ("Since [Rule 9(b)] is a special pleading requirement and contrary to the general approach of simplified pleading adopted by the federal rules, its scope of application should be construed narrowly and not extended to other legal theories or defenses.")

Despite the Quantum Defendants' attempt to have this Court believe that Rule 9(b)'s application to negligent misrepresentation claims is unsettled, the foregoing cases make it abundantly clear that Rule 9(b) is <u>not</u> applicable to Plaintiffs' claim for negligent misrepresentation.  Accordingly, the more liberal pleading standard under Rule 8(a) governs Plaintiff's negligent misrepresentation claim and, insofar as the Quantum Defendants have not moved to dismiss under Rule 8(a) (or otherwise alleged that the Complaint does not satisfy Rule 8(a)), the Quantum Defendants Motion to Dismiss Count III of the Complaint must be denied.

      4.     *If the Court Finds that Count III Is Subject to Rule 9(b): (a) Count III Does Satisfy the Requirements of Rule 9(b) and (b) the Court Should Grant Plaintiff Leave to Amend to Replead In the Event the Court Finds that Count III Does Not Satisfy Rule 9(b)'s Standards.*

In the unlikely event that the Court were to disregard the legal authorities cited above and find that Plaintiffs' negligent misrepresentation claim is subject to Rule 9(b), Plaintiff respectfully submits that the Complaint satisfies the pleading requirement of Rule 9(b).  As detailed in Section II.A.1. above, the Complaint makes numerous specific allegations of the facts giving rise to the Plaintiffs' claims.  With respect to Count III specifically, the Complaint alleges (i) what the misrepresentation was (the failure to disclose the existence of known material defects with the Q-CEP system, including the numerous and specific defects and problems specified in the McConchie letter, to ATG and ATG Catalytics), (ii) who made such misrepresentation (each of the Quantum Defendants Nagel and Preston, and the defendants Berman, Jacks and EBG), (iii) when the representations were made (during the parties' negotiations and due diligence that took place in late 1998 in the months immediately preceding the submission of the Quantum and ATG Catalytics joint bid), (iv) that each of the Defendants had a duty to disclose the existence of the material defects and problems associated with the Q-CEP system to ATG  and ATG Catalytics, and (v) that ATG and ATG Catalytics relied on such

misrepresentations and suffered damages as a result. Such allegations meet the requirement of Rule 9(b) and provide the Quantum Defendants with fair and adequate notice of Plaintiffs' negligent misrepresentation claim asserted in Count III of the Complaint.

Should the Court, however, find that Rule 9(b) does apply to the negligent misrepresentation claim and that Count III does not satisfy Rule 9(b), as explained in Section II.A.2. above, it is settled principle that dismissal should be avoided until Plaintiffs have been afforded an opportunity to file an amended complaint. Accordingly, Plaintiffs request that they be granted leave to file an amended complaint and conduct discovery should the Court be inclined to grant the Motion to Dismiss Count III under Rule 9(b).

### B.    The Complaint Pleads All Essential Elements For Counts II and III

The Quantum Defendants assert that Counts II (fraud/ misrepresentation) and III (negligent misrepresentation) of the Complaint should be dismissed because the Plaintiffs have failed to plead essential elements for each cause of action. Their muddled argument does not appear to address any specific technical deficiency of the Complaint, but instead, attacks the quantum and quality of the factual basis for the Plaintiff's claims. The Quantum Defendants rely in large part on unsubstantiated facts outside the complaint or other documents that may not be considered by the Court. In essence, the Quantum Defendants are attempting to use a motion to dismiss to defeat the Plaintiffs' case on the merits. However, a motion to dismiss is not an occasion to prove or disprove facts in a complaint. *Greenier v. Pace, Local No. 1188*, 201 F. Supp.2d 172, 176 (D. Me. 2002). Rather, the relevant inquiry is whether the complaint has plead sufficient facts to provide the defendants with fair notice of what the plaintiff's claims and the grounds upon which it rests. *Id.*

Count II of the Complaint alleges fraud and misrepresentation. As discussed above, the allegations in the complaint fully comply with pleading standards imposed under Rule 9(b) and provide the Quantum Defendants with more than adequate notice of Plaintiffs' claims. See discussion, *infra*, at II(A)(1).

Count III of the complaint alleges Negligent Misrepresentation. This claim is not subject to the heightened pleading standard of Rule 9(b), but the more simplified pleading standard imposed under Federal Rule of Civil Procedure 8(a). Under Rule 8(a)(2), the complaint must contain "a short and plain statement of the claim showing that pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The plaintiff is not required to plead facts supporting each and every element of his prima facie case. *Greenier v. Pace, Local No. 1188*, 201 F. Supp. 2d 172, 176 (D. Maine 2002) (citing *Swierkiewics v. Sorema N.A.*, 534 U.S. 506 (2002)). The complaint need only plead facts to "give the defendant fair notice of what his claim is and the grounds upon which it rests." *Id*. Furthermore, Rule 8(e)(1) provides that no technical forms of pleading or motions are required. Fed. R. Civ. P. 8(e)(1). Rule 8(f) provides that all pleadings shall be construed as to do substantial justice. Fed. R. Civ. P. 8(f). A complaint that does not address itself to every element of every claim may nonetheless be adequate under Rule 8(a) if it provides the defendant with fair notice of the claim. *Greenier*, 201 F. Supp at 177.

The Complaint alleges more than sufficient facts to fairly apprise the Quantum Defendants of the bases for the Plaintiffs' claim for negligent misrepresentation. For example, it is readily apparent from the Complaint as a whole that the alleged misrepresentations were made in connection with a business transaction among the parties. The Complaint alleges that the Q-CEP system was flawed, including the flaws specifically identified in the McConchie Letter. Complaint, ¶¶ 23, 25-26. The Complaint specifically alleges that the defendants made certain representations to ATG regarding the efficacy of the Q-CEP system and failed to disclose other information to ATG in connection with ATG's decision to acquire the system from MMT. Complaint, ¶¶ 33, 34, 53, 60-63. The Complaint contains allegations from which it can be inferred that the Defendant failed to exercise reasonable care or competence in obtaining or

14

communicating the information, including specific allegations that the Defendants were aware of the problems with the Q-CEP system (Complaint, ¶¶ 25-26, 60-61) and allegations that the problems with the Q-CEP system were not generally known to the public and not known by ATG (Complaint ¶ 24, 61).   The Complaint contains allegations from which it can be reasonably inferred that ATG's reliance on the defendants' representations was in fact justified, including allegations that the Quantum Defendants were former officers and/or directors of MMT. Complaint, ¶ 9-10.  It can reasonably be inferred from the Complaint as a whole that ATG suffered pecuniary damages insofar as ATG acquired the Q-CEP without knowledge of the deficiencies. Complaint generally, and ¶ 41, 64.   The Complaint provides the Quantum Defendants with fair notice of the Plaintiffs' claims in Counts II and III and the grounds upon which the claims rest.

### III.     PLAINTIFFS' CLAIMS AGAINST THE QUANTUM DEFENDANTS ARE NOT BARRRED BY THE STATUTE OF LIMITATIONS.

As they have done throughout their Memorandum, with respect to the Quantum Defendants' assertion that Counts II and III are barred by the statute of limitations, the Quantum Defendants have again failed to disclose or otherwise address controlling legal authorities that are not convenient to their positions and, indeed, mandate denial of their Motion to Dismiss. Section 108(a) of Title 11 of the United States Code (as amended, the "Bankruptcy Code") extends the time within which a trustee or debtor-in-possession can file an action if the statute of limitations had not run when the bankruptcy case was commenced.  11 U.S.C. § 108(a)[8].

---

[8] Section 108(a) reads as follows:

   If applicable nonbankruptcy law, an order entered in a non-bankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case;  or (2) two years after the order for relief.

"Pursuant to section 108(a), a trustee has the longer of the original period or two years after an 'order for relief.'"[9] *Dimaio Family Pizza and Luncheonette, Inc. v. The Charter Oak Fire Ins. Co.*, 205 WL 174834, *1 (D. Mass. Jan. 25, 2005); *see also* 11 U.S.C. § 108(a)(2). That section 108(a) extends or tolls the statute of limitations for a bankruptcy trustee for two years where the statute of limitations has not expired at the time the case was commenced, is black-letter bankruptcy law. *See, e.g.*, *Mi-lor Corp. v. Gottsegen*, 233 B.R. 608, 613-14 (D. Mass. 1999) (Where three-year statute of limitations on corporations' breach of fiduciary duty and other tort claims against former director had not yet run on date that corporations filed for chapter 11 relief, limitations period was extended, pursuant to bankruptcy statute, until the later of date when statute would otherwise have expired or date two years after order for relief.). Nevertheless, the Quantum Defendants do not even mention section 108(a), let alone address its effect on the applicable statute of limitations in this action.

As stated in the Complaint, ATG commenced its voluntary bankruptcy case by filing a petition for relief under chapter 11 of the Bankruptcy Code on December 3, 2001 (the "ATG Petition Date") and, accordingly, an "order for relief" was entered on that date. Complaint ¶ 16. Thus, pursuant to section 108(a) of the Bankruptcy Code, Robert I. Hanfling, as the trustee for Plaintiffs, had until the later of the end of the original statute of limitations period or two years from the ATG Petition Date (*i.e.* December 3, 2003) to commence an action against the Quantum Defendants on behalf of ATG's estate. ATG Catalytics did not file its chapter 11 voluntary bankruptcy petition until June 12, 2002 (the "ATG Catalytics Petition Date"). Thus, pursuant to section 108(a) of the Bankruptcy Code, Robert I. Hanfling, as the trustee for Plaintiffs, had until the later of the end of the original statute of limitations period or two years from the ATG

---

11 U.S.C. § 108(a).

[9] The commencement of a case under the Bankruptcy Code constitutes an "order for relief." 11 U.S.C. § 301.

Catalytics Petition Date (*i.e.* June 12, 2004) to commence an action against the Quantum Defendants on behalf of ATG Catalytic's estate.  Here, Robert I. Hanfling commenced the present action by filing an adversary proceeding with the Bankruptcy Court on December 2, 2003.  Accordingly, pursuant to section 108(a) of the Bankruptcy Code, Plaintiffs actions were timely commenced as long as the applicable statute of limitations had not expired prior to the Plaintiffs' respective Petition Dates.

Even assuming that Plaintiffs' causes of action for fraudulent misrepresentation and negligent misrepresentation accrued in late 1998 or early 1999, as alleged by the Quantum Defendants in their Memorandum, and applying the applicable three-year statute of limitations for tort claims under Mass. Gen. Laws ch. 260, § 2A, such actions would be timely under section 108(a) of the Bankruptcy Code.   As a result, the Quantum Defendants' Motion to Dismiss on statute of limitations grounds must be dismissed.

Moreover, Plaintiffs' causes of action for fraudulent and negligent misrepresentation did not accrue until well after Plaintiffs acquired the Q-CEP assets in December 1998.  Rather, the causes of action could not have accrued, and did not accrue, until sometime in mid to late 2003 when the Plaintiffs learned from the MMT Trustee that the Quantum Defendants knew all along that there were extensive defects and problems with the Q-CEP technology, including the numerous deficiencies detailed in the McConchie Letter, and that the Quantum Defendants nevertheless failed to disclose such deficiencies to Plaintiffs.  *See, e.g., Mi-lor Corp. v. Gottsegen*, 233 B.R. 608, 612-14 (D. Mass. 1999)  ("'[T]he repudiation of trust and fraudulent concealment doctrines prevent the statute of limitations from running until knowledge is gained by those who have the power and responsibility to act on the corporation's behalf and who are not themselves involved in the wrongdoing that is the basis for the cause of action.'") (quoting

*Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 677 (1997). This so-called "discovery rule" requires "actual knowledge by the plaintiff and reject[s] the usual rule that the statute of limitations begins to run upon the occurrence of an event which should have put the plaintiff on notice of facts giving rise to the cause of action. *Id.*

Accordingly, the Quantum Defendants' assertion that Plaintiffs' claims are barred by the statute of limitations is utterly devoid of merit and, therefore, their Motion to Dismiss on such ground must be denied.

## CONCLUSION

For the forgoing reasons, the Court should deny the Quantum Defendants' Motion to Dismiss in its entirety and grant Plaintiffs such other and further relief as this Court deems just and proper.

Dated:   June 27, 2005

THE PLAINTIFFS,
By their attorneys,


By: /s/ David Himelfarb

GADSBY HANNAH LLP
William A. Zucker, BBO# 541240
wzucker@ghlaw.com
David Himelfarb, BBO# 649596
225 Franklin Street
Boston, MA 02110
(617) 345-7000

*Of Counsel*:
JACOBS PARTNERS LLC
Mark R. Jacobs
Leslie L. Lane
Robert M. Fleischer
Merritt View
383 Main Avenue
Norwalk, Connecticut 06851
Phone: (203) 846-6622
Fax: (203) 846-6621


## CERTIFICATION OF SERVICE

The undersigned hereby certifies that a copy of the foregoing PLAINTIFFs'

MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS OF DEFENDANTS

QUANTUM CATALYTICS, LLC, JOHN PRESTON AND CHRISTOPHER NAGLE was sent,

by first class mail, postage prepaid, on this 27th day of June, 2005, upon the following:

Paula M. Bagger, Esq.
Marjorie S. Cooke, Esq.
Nancy Maroney, Esq.
Cooke, Clancy & Gruenthal LLP
265 Franklin Street
Boston, MA 02110
*Fax: 617-428-6868*

Joseph S. Ayoub, Jr., Esq.
Nutter, McClennen & Fish LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210-2604
*Fax: 617-310-9771*

John P. Coyle, Esq.
John R. Stickman, Esq.
Duncan & Allen
1575 Eye Street NW, Suite 300
Washington, DC 20005
Phone: 202-289-8400
Fax: 202-289-8450

By: /s/ Robert M. Fleischer_____
Robert M. Fleischer, Esq.

20

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

[X] Annual Report pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934.
For the fiscal year ended December 31, 2000.

[_] Transition report pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934.
For the transition period from _____ to _____.

*Commission File Number 0-23781*

# ATG INC.
### (Exact name of registrant as specified in its charter)

```
       California                                94-2657762
State or other jurisdiction of                 (IRS Employer
Incorporation or organization)              Identification Number)
```

47375 Fremont Boulevard
Fremont, California 94538
(Address of principal executive offices)

(510) 490-3008
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, No par value**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for at least the past 90 days:

Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K (Paragraph 229.405 of this Chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

On April 2, 2001, there were issued and outstanding 17,014,746 shares of Common Stock. The aggregate market value of Common Stock held by non-affiliates of the Registrant on that date was approximately $14,611,808 based on the closing sale price of the Common Stock, as reported by the NASDAQ National Market.

### Documents Incorporated By Reference

None

1

**Item 1. Business**

**Forward-Looking Information**

Statements in this report concerning expectations for the future constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements are subject to a number of known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements of ATG or industry trends to differ materially from those expressed or implied by the forward-looking statements. These risks and uncertainties include, among others, those discussed in Item 1 of Part I under the heading "Factors Affecting Future Operating Results" and elsewhere in this report and those described from time to time in ATG's other filings with the Securities and Exchange Commission, press releases and other public communications.

**General**

ATG Inc. was incorporated in Texas in 1976 under the name Allied Nuclear, Inc., reincorporated in California in 1980 and changed its name to "ATG Inc." in 1987. ATG is a radioactive and hazardous waste management company that offers comprehensive treatment solutions for low-level radioactive waste and low-level mixed waste generated by the U.S. Department of Defense, the U.S. Department of Energy and commercial entities such as nuclear power plants, medical facilities and research institutions. Our thermal treatment technologies achieve substantial volume and mass reductions for treated waste streams while encapsulating the non-volatile waste remains in a glass matrix or metal matrix for final disposal. Both of these final waste forms offer greater intrinsic safety and environmental benefits at competitive prices than either incinerator ash or non-thermal waste processing techniques.

ATG operates through two primary business lines, the Fixed Facilities Group and the Field Engineering Group. The Fixed Facilities Group operates ATG's fixed facilities in Richland, Washington and Oak Ridge, Tennessee, which are used to process low-level radioactive waste and low-level mixed waste. The Fixed Facilities Group also performs nuclear related work at its customer sites which normally results in waste being sent to its fixed facilities for processing prior to disposal. ATG's fixed facilities operate under radioactive material licenses issued by the State of Washington for its Richland facilities and the State of Tennessee for its Oak Ridge facilities. Our radioactive materials licenses include reciprocity provisions that allow us to treat radioactive waste at customer sites in all fifty states. Our licenses and permits for our Richland, Washington facilities also include the most comprehensive mixed waste processing permit in the United States. Our mixed waste processing capabilities resulted in substantial mixed waste revenue starting in 2000 which is expected to continue in 2001 and is anticipated to help attract additional wastes to our processing facilities for low-level radioactive waste.

The Field Engineering Group performs a broad range of construction management projects and hazardous waste remediation projects at customer sites. Its primary customer base is private industry and the Department of Defense. It carries out both fixed price and time and materials contracts related to the clean-up of customer sites under the U.S. Comprehensive Environmental Response, Compensation and Liability Act of 1980, commonly referred to as CERCLA, and the U.S. Resources Conservation and Recovery Act of 1976, commonly referred to as RCRA, asbestos abatement projects, as well as various specialized construction management projects, such as the construction of levies.

In December 1998, ATG acquired assets and business lines from the former Molten Metal Technologies, Inc. The assets acquired from Molten Metal Technologies included substantially all of the operating assets, contracts, licenses and permits associated with the wet waste treatment and catalytic extraction processing for ion exchange resins used to clean various nuclear power plant waste streams. During the quarter ended June 30, 2000, ATG announced and completed a restructuring plan that was aimed primarily at improving cost efficiencies and waste treatment processes. During the quarter ended December 31, 2000, ATG completed a review of the Tennessee fixed facilities concerning the utilization of a modified Q-CEP thermal treatment system for the processing of specialty niche waste streams. Due to the prohibitive cost and the unknown prospect of success related to the proposed system modification, ATG formally abandoned the Q-CEP thermal treatment system.

We believe that we possess a number of competitive advantages which distinguish our company from other radioactive and hazardous waste management companies. These include:

. a very comprehensive range of services;

During the quarter ended June 30, 2000, the Company announced and completed a restructuring plan, which included a workforce reduction of approximately 110 employees at its Tennessee facilities. The plan was primarily aimed at improving cost efficiencies and waste treatment processes. The Company recorded a $500 maintenance supply inventory write-down and a restructuring charge of $1.9 million which included non cash charges of $800 for equipment taken out of service and abandoned.

Asset Abandonment

During the fourth quarter of 2000, the Company completed a review of the Tennessee fixed facilities concerning the utilization of a modified Q-CEP thermal treatment system for the processing of specialty niche waste streams. Due to the prohibitive cost and the unknown prospect of success related to the proposed system modification, the Company formally abandoned the Q-CEP thermal treatment system during the fourth quarter of 2000 and recorded a non cash asset impairment charge of $14.1 million. In addition, the Company recorded non cash charges regarding the $1.4 million write-down of goodwill from its acquisition of the Q-CEP assets, a $307 maintenance supply inventory write-down that was charged to cost of revenue, and an $828 write-down of other assets. Furthermore, a charge of $1.2 million was recorded for processing and disposal of secondary waste associated with the shutdown of the Q-CEP facility, of which $1.0 million remains accrued at December 31, 2000.

### 4. Accounts Receivable

|  | December 31, | |
|---|---|---|
|  | 2000 | 1999 |
| U.S. Government: |  |  |
| Amounts billed................................. | $ 3,987 | $ 2,867 |
| Amounts unbilled............................... | 8,193 | 7,314 |
| Total U.S. Government......................... | 12,180 | 10,181 |
| Commercial customers: |  |  |
| Amounts billed................................. | 6,078 | 10,847 |
| Amounts unbilled............................... | 3,825 | 4,982 |
| Total commercial.............................. | 9,903 | 15,829 |
| Total accounts receivable...................... | 22,083 | 26,010 |
| Less: allowances for doubtful accounts.............. | (3,417) | (1,522) |
|  | $18,666 | $24,488 |

Recoverable costs and accrued profit on progress completed but not billed on U.S. government contracts are based on estimates of reimbursable overhead and general and administrative expenses calculated in accordance with contractually determined methods of calculation. These amounts are subject to final determination by the U.S. federal government after the contracts have been completed. As such, the actual recoverable amounts on these contracts may differ from these estimates.

Included in the unbilled portion within the above amounts is $3,941 and $3,595, as of December 31, 2000 and 1999, respectively, related to claims for additional services rendered.



## Molten Metal Technology

Molten Metal Technology, Inc., 421 Currant Road, Fall River, MA 02720
Tel: (508) 324-6901    Fax: (508) 324-6401

**TO:**

| Name: | Date: |
|---|---|
| Dan Cohn, Cohn & Kelakos and John Graham, Aon Risk Services | March 30, 1998 3:06 PM |
| Company: | Fax No: |
| Cohn & Kelakos Aon Risk Services | (617) 951-0679 (617) 542-2597 |

**FROM:**

| Name: | Telephone: |
|---|---|
| Ethan E Jacks | (508) 324-6901 |

**CC:** Gene Berman, Gordon Bitter → MMT OFFICER

**REFERENCE:** Earl McConchie

**MESSAGE:** Attached please find a letter dated March 26, 1998 sent by counsel to Earl McConchie to Bill Haney, and Chris Nagel. Chris provided a copy to me.

I would like to set up a conference call in the next day or so to discuss this letter. I will have my assistant, Darry Pattinson arrange the call.

Ethan

This facsimile message is confidential. It may contain information which is privileged or subject to other confidentiality requirements and exemptions from disclosure under applicable law. It is intended solely for the use of the individual(s) named above. If you are not the intended recipient(s), or the person responsible to deliver it to the intended recipient(s), you are hereby advised that any dissemination, distribution or copying of this communication is prohibited. If you have received this facsimile message in error, please immediately notify the sender by telephone collect, and return the original message to the sender by US Mail. Postage in return facsimile transmission will be refunded.

Federal Reserve Plaza
600 Atlantic Avenue
Boston, Massachusetts 02210-2211
Telephone (617) 371-1000
Fax (617) 371-1037

■Dwyer & Collora, LLP

Nancy S. Shilepsky
(617) 371-1003

## CONFIDENTIAL – FOR SETTLEMENT PURPOSES ONLY

March 25, 1998

### BY CERTIFIED MAIL

Mr. William M. Haney, III            Mr. Christopher J. Nagel
61 Lincoln Road                      28 Highland Circle
Wayland, Massachusetts 01778         Wayland, Massachusetts 01778

Re:    Garnet Earl McConchie

Dear Messrs. Haney and Nagel:

This firm represents Garnet Earl McConchie, who was terminated from Molten Metal Technology, Inc. ("MMT") in September 1997. After reviewing the circumstances surrounding his recruitment to MMT from December 1995 through April 1996, we have advised Mr. McConchie that he has legal claims against both of you individually for misrepresentation. We are writing to inquire whether you wish to discuss a settlement of this matter before Mr. McConchie commences litigation against you.[1]

Section I of this letter sets out the facts as we understand them. Your liability is set out in Section II, and Mr. McConchie's damages -- which total approximately $2.572 million -- are set out in Section III. If you know of any additional facts that you believe are relevant, please inform us about them. This letter is sent without prejudice and is for settlement purposes only.

### I.    FACTUAL BACKGROUND

Prior to joining MMT, Mr. McConchie was a twenty-four year employee of Dow Chemical Company ("Dow"). He rose steadily through the ranks at Dow, becoming the Global Director of Chlorinated Waste, Hydrogen Chloride and Incineration Business in

---

[1] This letter should not be construed in any way as a demand upon MMT.

Thomas E. Dwyer, Jr.    William H. Kettlewell    David J. Burgess    Anthony D. Rizzotti    Michael B. Galvin
Michael A. Collora      Judy L. Newman          Maria R. Durant     David M. Osborne       Tracy S. Fitzpatrick
Nancy S. Shilepsky      David A. Bunis          Amy Baron-Evans     Ellen J. Zucker        Of Counsel

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 2

1992. Based in Texas, he reported to the Commercial Vice President of the Chemicals Business. As one of Dow's top 200 executives, he managed an operation with more than $1.5 billion in assets and over 500 employees at more than a dozen global facilities. In 1996, in addition to his total estimated compensation of $260,000 annually, he was eligible for Dow's generous executive benefit package, including retirement at age 50, paid life and medical insurance for life, and a matching 401(k) investment plan.

Around the time that Mr. McConchie assumed the position of Global Business Director, MMT targeted Dow as a potential development partner and customer for its Catalytic Extraction Process ("CEP"). From 1992 through 1995, MMT pursued these relationships with Dow. As a Dow representative, Mr. McConchie personally attended more than a half dozen meetings with MMT executives – including Mr. Haney and Mr. Nagel – during this period. These meetings were held at Dow facilities in Freeport, Texas, MMT facilities in Waltham and Fall River, Massachusetts, and other conference sites. During these meetings, Mr. Haney and Mr. Nagel repeatedly presented specific information that painted a glowing picture of MMT, the promise of its CEP technology, and potential markets.

As the Dow-MMT negotiations progressed, Mr. Haney and Mr. Nagel began to realize that Mr. McConchie had unique skills and experience that could be of great benefit to MMT. Beginning around 1995, Mr. Haney and Mr. Nagel launched a campaign to recruit Mr. McConchie to MMT. At first, Mr. Haney's overtures to Mr. McConchie were subtle and indirect, but over time they became increasingly serious and direct. On several occasions, these overtures were made in the presence of other Dow employees. Because Mr. McConchie was satisfied with his position, career prospects and compensation package at Dow, he consistently conveyed to Mr. Haney his lack of interest in joining MMT.

By the end of the 1995, Mr. Haney's recruitment efforts became so boldly direct and persistent that Mr. McConchie was induced to reconsider his lack of interest in employment at MMT. In December 1995, during a meeting with Dow executives at the Houstonian Hotel in Houston, Texas, Mr. Haney and Mr. Nagel presented information regarding the status of MMT's technology, stating that it was fully developed and ready for commercial implementation. At the lunch break, Mr. Haney approached Mr. McConchie and explicitly solicited him to join MMT. Mr. Haney's representations of enormous CEP markets, MMT's financial stability and growth, technology readiness, and promises of financial rewards and career growth were so upbeat that Mr. McConchie agreed to meet with him at a later time to discuss an employment proposal. However, Mr. McConchie believed it was extremely unlikely that these talks would lead to anything, and he warned Mr. Haney that he was very satisfied with his job at Dow and that MMT "would not be able to afford" him, or words to that effect.

FROM : GREENE & HOFFMAN          FAX NO. : 617 261 3555                    508 324 6901      P.04/12

MAR-30-1998  15:31          MOLTEN METAL TECHNOLOGY

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 3

On or about February 8, 1996, Mr. Haney and Mr. McConchie met again at the Houstonian Hotel to discuss specific employment opportunities at MMT. Mr. Haney made an intense pitch for Mr. McConchie to leave Dow for MMT. During meetings over the next two days totaling four hours in length, Mr. Haney explained MMT's business plan in detail, including the company's projections of high growth rates and huge potential markets. He showed Mr. McConchie information about MMT's commercialization schedules, customer base, organizational structure and financials. He also described the status of MMT's CEP technology at length, repeatedly stressing that the technology was completely developed and ready for commercialization. He specifically proposed that Mr. McConchie join MMT as Vice President of the Chemicals Business. While still skeptical about compensation, long-term job security, and family relocation issues, Mr. McConchie agreed to discuss the matter further with Mr. Haney at a later time.

Mr. Haney returned to Texas on or about February 27, 1996 to talk with Mr. McConchie about the terms of a job offer, including salary, stock, options, bonuses and career growth. A week later, Mr. Haney extended Mr. McConchie a formal offer. During the next two weeks, while Mr. McConchie considered the offer, Mr. Haney exerted a great deal of pressure on him to accept it. He repeatedly called him, both at work and at home -- sometimes several times a day. Mr. Haney also contacted employees at Dow to exert additional pressure on Mr. McConchie to accept the MMT job.

Based on the presentations and statements by Mr. Haney and Mr. Nagel, by early March 1996 Mr. McConchie was convinced that MMT's technology was fully developed, that commercial plants were already operating, that the markets for CEP were extremely large, and that MMT's finances were stable with high projected growth. However, Mr. McConchie continued to have reservations about his long-term job security at MMT, relocation costs and the high cost of living in Boston, and the effects of being separated from his daughter and her family. Mr. Haney was so determined to lure Mr. McConchie away from Dow that he responded to Mr. McConchie's concerns by agreeing to give Mr. McConchie a ten-year employment contract (with a guarantee of five years' severance if MMT terminated him), to increase his restricted stock grant by 10,000 shares (valued at $350,000) to cover housing differential costs, and to provide employment to Mr. McConchie's son-in-law, Clay Provence, so Mr. McConchie's family could remain together.[2]

After much reflection on the representations and promises made by Mr. Haney and Mr. Nagel, on March 29, 1996, Mr. McConchie finally accepted the MMT job offer. In doing so, he made significant personal and economic sacrifices, including giving up a secure, well-paying job at Dow and relocating his family 2,200 miles from Texas to Massachusetts. However, he was willing to accept these sacrifices for one reason: Mr.

---

[2] Mr. Provence was terminated by MMT in May 1997.

FROM : GREENE & HOFFMAN          FAX NO. : 91+ 2613558                        500 324 6901    P.05/10

MAR-30-1998  15:31          MOLTEN METAL TECHNOLOGY

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 4

Haney and Mr. Nagel had persuaded him that the CEP technology was fully developed and commercially proven, and that by joining MMT his family would benefit from even greater financial security. With this in mind, he began work at MMT on April 30, 1996.

Over the next few months, as Mr. McConchie became privy to the true situation at MMT, he began to realize that the representations made to him by Mr. Haney and Mr. Nagel about the company and the status of its CEP technology had been blatantly false and purposefully misleading. All of the misrepresentations were integral to his decision to join MMT. However, if Mr. McConchie had known the true facts about any *one* of these misrepresentations, he would have doubted the commercial value and viability of the CEP process and decided not to leave Dow. Some of these misrepresentations are discussed below.

**Dioxin Production**

- During meetings with Mr. McConchie in 1995, Mr. Nagel repeatedly stated that the CEP process did not provide the pathways for the formation of dioxins and furans and that dioxin and furan formation had not been detected. Mr. Haney made these same assurances during the December 1995 meeting and his private meetings with Mr. McConchie in February 1996. Mr. Haney also provided Mr. McConchie with written materials — including materials authored by Mr. Nagel — touting MMT's dioxin-free technology. This was significant to Mr. McConchie because dioxins and furans are extremely toxic compounds, and their production is highly regulated by the federal government. The claim that the CEP process did not produce dioxins and furans was important to Mr. McConchie because, if true, the process would have enjoyed a very strong economical and environmental advantage over alternative technologies offered by MMT's competitors.

- *In October 1996, Mr. McConchie learned that the CEP process was not dioxin-free. Instead, he discovered that the CEP process did in fact produce dioxins and furans in significant quantities. He also learned that MMT had performed analytical work in 1995 which showed conclusively that dioxins and furans were produced during the CEP process, including excessively high levels of dioxins and furans in the process's dust and products.*

**Commercial Operations at Q-CEP**

- Mr. Nagel stated during the December 1995 meeting attended by Mr. McConchie that the Quantum-CEP ("Q-CEP") facility in Oak Ridge, Tennessee was scheduled to be operational on radioactive waste that month. Mr. Haney and Mr. Nagel stated that the cost of the Q-CEP facility was $13 million. During Mr. Haney's private meetings with Mr. McConchie in February 1996, he reaffirmed that the Q-CEP facility had

FROM : GREENE & HOFFMAN          FAX NO. : 5168 213556                    508 324 6901   P.06/12
MAR-30-1998  15:31        MOLTEN METAL TECHNOLOGY

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 5

been operational on radioactive waste since December 1995. These claims about the facility's start-up and operation on radioactive waste and the cost of the facility were important to Mr. McConchie because, if true, they would have established the commercial viability of the CEP process.

• *When Mr. McConchie arrived at MMT, he learned that the Q-CEP facility was not operational. The facility did not begin commercial radioactive waste operation until December 1996, a full year later than the start-up date represented to Mr. McConchie. During the recruitment period, Mr. Haney and Mr. Nagel were well aware that the facility would cost considerably more than $13 million, as they reported to Mr. McConchie. In fact, the final cost of the facility was four times greater than that which was represented to Mr. McConchie.*

**Radioactive Waste Reduction**

• Mr. Nagel stated at both the March 1995 and the December 1995 meetings attended by Mr. McConchie that the Q-CEP process reduced radioactive waste volume by ratios of anywhere from 30 to one to 1,000 to one. During his private meetings with Mr. McConchie in February 1996, Mr. Haney reaffirmed that the Q-CEP facility had already demonstrated substantially reduced radioactive waste. Mr. Haney also provided Mr. McConchie with written materials authored by Mr. Nagel that claimed major reductions in radioactive waste via the CEP process. The radioactive waste reduction claimed by Mr. Haney and Mr. Nagel was important to Mr. McConchie because, if true, it would have meant that the process would have been significantly less costly than the alternative disposal technologies offered by MMT's competitors.

• *When Mr. McConchie arrived at MMT, he learned that the volume reduction of radioactive waste had not been demonstrated in the Q-CEP progress. After the Q-CEP facility's start-up in December 1996, Mr. McConchie learned that the radioactive waste reduction claimed by Mr. Haney and Mr. Nagel had not been achieved and that significant quantities of radioactive waste was generated in downstream dust and effluent. Mr. McConchie further learned in early 1997 that the actual amount of radioactive waste generated by the process exceeded the amount originally fed into the process.*

**M4 Tech Center**

• Mr. Nagel stated at the March 1995 meeting attended by Mr. McConchie that the M4 Tech Center (Combo) Plant in Oak Ridge, Tennessee was due to start up in late 1995. At the December 1995 meeting attended by Mr. McConchie, Mr. Nagel stated that the M4 facility was due to start operations that month, and that a radioactive waste pilot system had already begun the previous October. Mr. Haney and Mr. Nagel stated that the

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 6

cost of the M-4 facility was $25 million. In February 1996, Mr. Haney told Mr. McConchie that the M4 facility began commercial operations in 1995. These claims were important to Mr. McConchie because, if true, they would have demonstrated the commercial viability and economic value of the CEP process.

• *After joining MMT, Mr. McConchie learned that the M4 facility was not commercially operational. Instead, he discovered that the only operations at the facility were experimental, and that as of January 1996 – when Mr. Haney and Mr. Nagel were claiming otherwise – MMT did not expect the M4 facility to become fully operational until the second quarter of 1996. In fact, the M4 facility did not begin commercial radioactive waste processing until late 1997. Mr. Haney and Mr. Nagel were well aware during the recruitment period that the cost of the facility would be much greater than $25 million. In fact, the final cost of the facility was more than twice that which was represented to Mr. McConchie.*

**Bay City Facility**

• Mr. Nagel stated at the December 1995 meeting attended by Mr. McConchie that Hoechst Celanese ("HCC") and MMT were jointly constructing a CEP facility to manufacture synthesis gas product from both hazardous and non-hazardous wastes. He further stated that MMT would invest $25 million in the facility, which would start up on HCC biosolids in mid-1996. During Mr. Haney's private meetings with Mr. McConchie in February 1996, Mr. Haney reaffirmed that MMT was progressing rapidly on the HCC facility and that it was on schedule to begin operation in mid-1996. The start-up date of the HCC project and the cost claimed by Mr. Haney and Mr. Nagel were important to Mr. McConchie because, if true, it would have demonstrated the commercial viability and economic value of the CEP process.

• *When Mr. McConchie arrived at MMT, he learned that the HCC project was far behind schedule, that its capital costs had been grossly understated, and that the forecasted economics of the facility had been exaggerated. Specifically, he learned that the facility would cost more than two and a half times what he had been told by Mr. Haney and Mr. Nagel, and that serious technical problems would delay its start-up date. Mr. McConchie also learned that in early 1996 both Mr. Haney and Mr. Nagel had been informed of the cost overruns and delayed start-up date, but they did not convey this information to Mr. McConchie during the recruitment period. In fact, on information and belief the facility still has not begun operation.*

**Feed System and Reactor Control**

• Mr. Nagel stated at the March 1995 meeting attended by Mr. McConchie that the feed system and reactor control problems associated with the CEP process had been

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 7

solved and that the process was ready for implementation. Both Mr. Haney and Mr. Nagel stated at the meeting attended by Mr. McConchie in December 1995 that the technology related to feed line plugging, refractory wear, reactor control and reactor tapping was completely developed and had been fully demonstrated for liquid and bulk solid feeds. During his private meetings with Mr. McConchie in February 1996, Mr. Haney stated that this technology was ready for commercialization. The degree of flexibility of the process in feeding the range of liquids and solids claimed by Mr. Haney and Mr. Nagel was important to Mr. McConchie because, if true, the CEP process would have had a far broader range of market applications than the alternative technologies offered by MMT's competitors.

• By September 1996, Mr. McConchie realized that the CEP's feed system and reactor control problems had not been solved. Instead, he discovered that the CEP feed system was not fully developed and was plagued by system plugging, excessive refractory wear and frequent shutdowns. Mr. McConchie further learned that the CEP process did not have the capability to feed bulk solids or to remove solid phases from the reactor. All of these deficiencies severely restricted the technology's market value. In short, the feed system and reactor control system did not meet the claims of flexibility and reliability which Mr. Haney and Mr. Nagel made to Mr. McConchie during the recruitment process.

Dust Levels

• Mr. Nagel announced at the December 1995 meeting attended by Mr. McConchie that MMT had achieved minimal dust generation and expected dust levels in a commercial plant to be less than one percent. Mr. Nagel further stated that dusts were recycled to the system for closed-loop recycling. During his February 1996 meetings with Mr. McConchie, Mr. Haney also stated that MMT had solved all of the dust problems and had achieved minimal dust generation and dust recycling. These claims were important to Mr. McConchie because low dust generation and the ability to fully recycle dust were major factors in CEP's purported competitive advantage over alternative technologies.

• During the first several months of his employment at MMT, Mr. McConchie learned that the dust level problem associated with the CEP process had not been solved. Instead, he discovered that the CEP process was characterized by very high levels of dust. He learned that pilot operations and the Q-CEP facilities showed excessive dust generation, and that MMT was expecting dust levels to remain at approximately ten percent. Mr. McConchie further learned that the Q-CEP facilities and MMT's planned operations in Bay City, Texas did not include dust recycling.

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 8

## Product Quality

• Mr. Nagel stated at the March 1995 meeting attended by Mr. McConchie that the quality of the synthesis gas produced by the CEP process provided MMT with a competitive advantage over other reduction technologies because the gas contained less than one percent carbon dioxide. Mr. Nagel further stated that the CEP process had a demonstrated capability to produce high-quality hydrogen chloride, either in concentrated aqueous acid or anhydrous form. Mr. Nagel repeated this statement at the December 1995 attended by Mr. McConchie. At the February 1996 meetings, Mr. Haney provided Mr. McConchie with an article written by Mr. Nagel which stated that CEP produced minimal impurities in the synthesis gas, such as carbon dioxide, that the hydrogen chloride product surpassed typical hydrochloric acid specifications, and that it had the ability to produce anhydrous hydrogen chloride. Mr. Haney himself stated during these meetings that the CEP process dissolved waste compounds to their constituent elements in a molten metal bath and reconfigured the elements into useful raw materials. Mr. Haney and Mr. Nagel's material statements about the quality of CEP's product were important to Mr. McConchie because, if true, it would have enabled the process to receive a more favorable regulatory classification from the government and increased its marketability.

• *When Mr. McConchie arrived at MMT, he learned that the CEP process was incapable of operating reliably at low carbon dioxide levels in the synthesis gas and that it did not have a competitive advantage over other reduction technologies. Instead, he discovered that CEP products had a high carbon dioxide content (up to five percent). Mr. McConchie learned that the CEP process was plagued with acid quality problems and the option for producing anhydrous hydrogen chloride had not been developed or demonstrated. Mr. McConchie also learned that substantial volumes of wastes — not products — were generated in the CEP process in the form of dust, metal purges and water effluents. These product quality problems led to significantly higher capital and operational costs, reduced MMT's flexibility in utilizing products as raw materials, and increased regulatory concerns.*

## CEP Safety and Reliability

• At the March 1995 meeting attended by Mr. McConchie, Mr. Nagel stated that CEP was "safe, reliable and operable." At the December meeting, Mr. Nagel stated that MMT had successfully completed a long-term operability trial. In February 1996, Mr. Haney provided Mr. McConchie an article by Mr. Nagel stating that "safe operations were demonstrated during the processing of various feed streams." This was important to Mr. McConchie because safety and reliability were minimum requirements for processes in the chemical industry.

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 9

• After Mr. McConchie began work at MMT, he learned that the CEP was neither safe nor reliable. Instead, he discovered a significant number of safety problems arising out of the CEP process, including the lack of safety procedures, operating discipline, and an auditing system. In December 1996, he learned about feed reliability problems at Q-CEP and the inability of the CEP system to process feedstocks and recover a significant quantity of commercial-quality products. In early 1997, Mr. McConchie learned of contamination problems involving radioactive waste processing at the Q-CEP facilities.

## II.   LIABILITY

As the foregoing facts demonstrate, each of you made material misrepresentations to Mr. McConchie to induce him to give up his secure position at Dow and join MMT. Such conduct is actionable under Massachusetts law, as discussed below.

### A.   Intentional Misrepresentation

You are liable to Mr. McConchie if you made misrepresentations of material facts with actual knowledge of the falsity of your statements or if your statements concerned facts that were reasonably susceptible of actual knowledge. See Presto v. Sequoia Sys., 633 F. Supp. 1117, 1119 (D. Mass. 1986) (misrepresentations of facts with knowledge of falsity are actionable); Zimmerman v. Kent, 31 Mass. App. Ct. 72, 74 (1991) (misrepresentation of facts reasonably susceptible of actual knowledge are actionable). A reasonable person would have attached importance to the information you provided to Mr. McConchie, and thus the information was material. See Zimmerman at 78. Because the information on its face was reasonable, it is not a defense that Mr. McConchie may not have conducted his own investigation of these representations. See Zimmerman at 76 (1991) (investigation into the truth of a representation is not required of victim as long as the representation is not "preposterous or palpably false"); Ford v. Warner-Lambert Co., 1987 WL 9905 at *3 (D. Mass. 1987) ("[o]ne who has willfully made false representations with intent to deceive should not be relieved of liability because of his victim's lack of diligence").

### B.   Negligent Misrepresentation

Alternatively, you may be liable to Mr. McConchie if you negligently made material misrepresentations to induce him to join MMT. See Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 581 (1996) (defendant may be liable for negligent misrepresentation if he fails to exercise reasonable care or competence in obtaining or communicating information).

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 10

## III.  DAMAGES

You are liable to Mr. McConchie for his out-of-pocket losses, regardless of whether your actions were intentional or negligent. See Rice v. Price, 340 Mass. 502, 507-60 (1960) (measuring damages by out-of-pocket losses in intentional misrepresentation case); Danca v. Taunton Sav. Bank, 385 Mass. 1, 9 (1982) (measuring damages by out-of-pocket losses in negligent misrepresentation case).

Mr. McConchie's financial losses resulting from his departure from Dow total $2.572 million. The summary of damages that follows assumes (1) that Mr. McConchie would have remained at Dow until age 56 (as had been his intention prior to accepting the MMT job offer), when he would have been eligible to retire at maximum benefits, and (2) that he would have received Dow benefits until age 70 (although it should be noted that he would have been eligible for these benefits throughout his lifetime).

### Compensation Losses

Less than a year and a half after hiring Mr. McConchie, MMT terminated his employment. Unemployed at age 47, he is now forced to conduct a job search from a position of relative weakness. It is unlikely that he will be able to find employment that matches the salary, bonuses, stock and options he would have earned had he remained at Dow. Assuming he is re-employed by September 1998 at 70% of the total compensation he would have been receiving at Dow, Mr. McConchie anticipates that the present dollar value of his lost compensation during the period 1997 through 2006 will total approximately $1,132,000.

### Lost Retirement Income

Had Mr. McConchie retired from Dow at age 56, he would have been eligible to receive the maximum pension benefit, which he projects would have been approximately $163,000 annually. Instead, having retired in 1996, he is only eligible for a $33,000 annual pension. The present dollar value of the difference between his actual pension and the pension he would have received had he stayed at Dow until age 56 is approximately $569,000.

### Lost Life Insurance Subsidy

At age 50, Mr. McConchie would have been eligible for paid life insurance for life valued at over $1.5 million. The present dollar value of the additional cost to him to purchase equivalent insurance is approximately $549,000.

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 11

## Relocation Costs

Mr. McConchie moved himself and his family from Texas in order to join MMT. Mr. McConchie estimates that the cost for him to relocate his family back to Texas is approximately $103,000.

## Lost Medical Insurance Subsidy

At age 50, Mr. McConchie would have been eligible for paid medical insurance for life. The present dollar value of the additional cost to him to purchase equivalent insurance is approximately $135,000.

## Salaried Employee Savings Plan

As a Dow employee, Mr. McConchie was eligible to participate in the company's Salaried Employee Savings Plan ("SESP"), a program by which Dow matched employee contributions in a 401(k) investment fund. Mr. McConchie estimates that the present dollar value of the loss he will suffer by not being able to participate in this program is approximately $84,000.

## III.   CONCLUSION

As the foregoing discussion indicates, your potential liability in this matter is significant. Nonetheless, Mr. McConchie is willing to consider a settlement before initiating litigation. If you would like to discuss such a possibility, please contact us no later than Friday, April 24, 1998. Please send a copy of this letter to your insurance carriers to put them on notice of potential litigation.

We look forward to hearing from you.

Sincerely,

Nancy S. Shilepsky
David M. Osborne