UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT I. HANFLING,<br>  Chapter 7 Trustee of the Bankruptcy<br>  Estates of ATG, Inc. and ATG<br>  Catalytics LLC,<br><br>       Plaintiff,<br><br>       v.<br><br>EPSTEIN BECKER & GREEN, P.C.,<br>  et al.,<br><br>       Defendants. | Civil Action No. 05-10077-RGS |

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT
<u>EPSTEIN BECKER & GREEN, P.C. FOR SUMMARY JUDGMENT</u>**

Robert I. Hanfling, Chapter 7 Trustee of the bankruptcy estates of ATG, Inc. and ATG Catalytics LLC (the "Trustee"), has brought a claim for professional malpractice against Epstein Becker & Green, P.C. ("EBG") arising out of an alleged failure by EBG to disclose certain information to ATG, Inc. and ATG Catalytics LLC (collectively, "ATG"). The Trustee alleges that, while EBG was representing ATG in connection with the acquisition of assets from the bankruptcy estate of Molten Metal Technology, Inc. ("MMT"), including the assets of its catalytic extraction process ("CEP") business, EBG knew and failed to disclose to ATG certain information regarding MMT's CEP technology.

EBG is entitled to summary judgment for three separate and independently dispositive reasons. First, it is undisputed that EBG did not possess the "knowledge" attributed to it by the allegations of the Trustee's Complaint. Second, the limited

information about MMT and its CEP technology that EBG did possess was not, as a matter of law, material to its representation of ATG, and therefore EBG had no duty to disclose it. Third, it is undisputed that ATG already knew the information EBG allegedly failed to disclose. Accordingly, EBG had no duty to disclose information already known to its client, and any failure to disclose such information could not have proximately caused ATG's alleged harm.

EBG incorporates herein by reference its Local Rule 56.1 Statement of Undisputed Material Facts.

## ARGUMENT

Massachusetts law requires a plaintiff in a legal malpractice action to prove that the attorney owed him a duty, that the attorney breached that duty, and that the breach proximately caused the client's harm. *E.g., Fishman v. Brooks*, 396 Mass. 643, 646 (1986).[1] In this case, it is undisputed that EBG represented ATG in connection with the acquisition of certain MMT assets. Accordingly, it owed ATG both a duty to exercise a reasonable degree of care and skill in the performance of this task, *e.g., Wagenmann v. Adams*, 829 F.2d 196, 218 (1st Cir. 1987), and a duty of full and fair disclosure of facts

---

[1] Because this case was transferred to this Court from the Northern District of California pursuant to 28 U.S.C. § 1404, this Court will apply California choice of law principles. *Van Dusen v. Barrack*, 376 U.S. 612 (1964). California applies a two-step conflicts analysis. First, it inquires whether there is any difference in the laws of any jurisdiction that has a legitimate interest in the application of its law. If so, there is a true conflict, and the Court should "apply the law of the state whose interest would be more impaired if its law were not applied." *Ledesma v. Jack Stewart Produce, Inc.*, 816 F.2d 482, 484 (9th Cir.1987).

In this case, that law would be that of the Commonwealth of Massachusetts, insofar as this case is at heart a dispute about the professional performance of members of the Massachusetts bar. Factually, moreover, it arises out of an asset purchase transaction negotiated in the Commonwealth under the auspices of the United States Bankruptcy Court for the District of Massachusetts. The client, a California resident, knowingly retained Massachusetts counsel. "The reasonable expectations of the parties can only have been that [Massachusetts] law would apply to a dispute between them." *Waggoner v. Snow, Becker, Kroll, Klaris & Krauss*, 991 F.2d 1501, 1506-08 (9th Cir. 1993) (New York law applied to malpractice case brought against New York lawyer by California resident).

material to the client's interests in the representation, *Hendrickson v. Sears*, 365 Mass. 83, 90 (1974).

"An attorney's advice is measured against an objective yardstick, namely whether there is full disclosure of material facts and risks." *Sierra Fria Corp. v. Donald J. Evans, P.C.*, 127 F.3d 175, 179-80 (1st Cir. 1997). When it undertook the representation of ATG in connection with the acquisition of assets from MMT's bankruptcy estate, EBG undertook a duty to disclose to ATG material information in its possession bearing upon that representation.

Summary judgment is warranted when "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Trustee has the burden of proof on his claim of legal malpractice, and once EBG makes a *prima facie* showing that it is entitled to summary judgment, the burden shifts to the Trustee to respond with specific, admissible evidence demonstrating a triable issue of fact as to *each element of its claim*. If, as to any element, the Trustee cannot satisfy his burden, then summary judgment must enter for EBG. *E.g., Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

EBG is entitled to summary judgment because the Trustee cannot come forward with specific, admissible evidence: (1) that EBG possessed the information that the Trustee claims it possessed; (2) that any information that was in EBG's possession was material to its representation of ATG in connection with the asset purchase transaction; or (3) that any such failure was the proximate cause of ATG's harm.

I.    **EBG DID NOT HAVE THE KNOWLEDGE THAT THE TRUSTEE ALLEGES.**

Clearly, EBG could not breach its duty of loyalty to ATG by failing to disclose information that it did not possess.[2] It is undisputed that the factual allegations on which the Trustee relies in his Complaint (largely alleged upon information and belief) with respect to the information in EBG's possession, are incorrect.

The Trustee specifies two categories of "special knowledge," Complaint ¶ 45, that it alleges that EBG possessed but withheld from ATG. First, plaintiff claims that, at the time EBG represented ATG in connection with its acquisition of assets from the MMT bankruptcy estate, EBG represented one or more individuals in a shareholder class action then pending in this Court alleging flaws in the CEP technology and fraud and mismanagement on the part of various members of MMT management. ATG alleges:

> [A]t a point in time to be discovered, litigation was instituted against certain of the Individual Defendants regarding, inter alia, the CEP technology and its related flaws and hazards (the "MMT Litigation"). Upon further information and belief, certain among the Individual Defendants were represented in the MMT Litigation by EBG. Upon further information and belief, EBG, in the course of its representation of the defendants in the MMT Litigation became aware of the flaws and hazards associated with the CEP technology.

Complaint ¶ 25.   ATG claims that EBG committed malpractice because it did not disclose to ATG:

> that it represented the Individual Defendants and certain among the John Doe defendants in litigations based on allegations that the CEP technology was flawed and inoperable and on allegations of fraud, waste, mismanagement and breach of fiduciary duty against the Individual Defendants.

---

[2]    The parties have, with the Court's permission, phased the pretrial proceedings in this case. The question whether the "fact" that the CEP technology did not work is true is reserved, along with damages, for Phase II. For purposes of this motion, it is not relevant whether or not the CEP technology in fact worked. The issue in this phase is what information was known to EBG at the time it represented ATG in its acquisition of the CEP assets from the Trustee for the MMT bankruptcy estate.

Complaint ¶ 46.

However, the undisputed facts establish that EBG did *not* represent any defendant, any unidentified "John Doe," or anyone else in the shareholder class action (the "MMT Litigation") until *after* the ATG/MMT asset acquisition closed on December 1, 1998. Statement of Undisputed Material Facts ("Facts") ¶¶ 7-9. Thus, EBG cannot possibly have misled or induced ATG to purchase the CEP assets by failing to disclose its concurrent representation of defendants in the MMT Litigation,[3] as there was no such concurrent representation.

The second instance of alleged malpractice involved EBG's exposure to the so-called McConchie Letter:

> [O]n or about March 25, 1998, defendant Nagel received a letter (the "McConchie Letter") from the law firm of Dwyer & Collora, LLP, representing Garnet Earl McConchie, the former Vice President of MMT's Chemicals Business. The McConchie Letter set forth at length the flaws in the CEP technology and the malfeasance and misfeasance of certain of the Individual Defendants, and others, in connection with the recruitment of Mr. McConchie. . . Upon information and belief, in or about April 1998, the McConchie Letter and its contents were brought to the attention of EBG in its capacity as counsel for certain of the Individual Defendants, including defendant Nagel, as defendants in the MMT Litigation.

Complaint ¶¶ 26-27. The Trustee alleges that EBG committed malpractice by failing to bring the McConchie Letter or its allegations to the attention of ATG.

It is undisputed that EBG did not represent anyone with respect to the McConchie allegations at any relevant time. The record establishes that MMT employee and director

---

[3] In any event, there is no evidence that EBG ever learned that the CEP technology was hazardous or flawed. There is no evidence that Christopher Nagel, MMT Chief Technology Officer, ever made any such statement to EBG. As inventor of those assets, and as a member of Quantum Catalytics LLC, the company with which ATG was submitting a joint bid to acquire the MMT assets, Dr. Nagel believed in his technology, as did the MMT employees represented by EBG in the federal investigations. Rendon Dep. at 77; Bagger Aff. Ex. J. For summary judgment purposes, however, it is sufficient that the record is devoid of any evidence that Dr. Nagel passed on any negative information about the assets.

5

Christopher Nagel received Mr. McConchie's demand letter and asked Carole Schwartz Rendon, then of EBG, to look over a conflict waiver that Hale and Dorr had sent him in connection with its representation of him. Facts ¶ 4. It is undisputed that there was no substantive discussion between Ms. Rendon and Dr. Nagel regarding Mr. McConchie's allegations. *Id*.

Even if Ms. Rendon had learned any facts regarding the McConchie claims that would later prove material to the asset purchase transaction, *see infra* Part II, EBG itself had no such knowledge at its disposal in the fall of 1998 when ATG retained it in connection with the asset purchase transaction. Ms. Rendon left EBG in August 1998 and moved to Cleveland, Ohio. She took her file copy of the McConchie letter with her when she left EBG. Facts ¶4. Moreover, she never told Michael Tuteur, who later undertook the representation of Dr. Nagel, about the McConchie Letter. *Id*. When Ms. Rendon left EBG, all knowledge (if any) of Mr. McConchie's allegations left with her,[4] and it cannot be attributed to EBG.

## II.   THE LIMITED INFORMATION THAT EBG DID HAVE ABOUT MMT WAS NOT MATERIAL TO ITS REPRESENTATION OF ATG.

Although EBG did not have the specific knowledge alleged in the Complaint, it did have some limited information about MMT at the time it was representing ATG in the acquisition of assets from the MMT bankruptcy estate. First, it was aware that the

---

[4]   Ms. Rendon's knowledge was not attributable to EBG after she left. A principal is bound by an agent's knowledge after the termination of the agency only when the agent had a duty to disclose the information in question during the term of the agency. Because the McConchie allegations did not become even arguably material to any other representation until after Ms. Rendon left EBG, it was not information that she as an agent had any duty to disclose during the period that she was employed by the principal. RESTATEMENT (SECOND) AGENCY § 278 (2005) and comment b. Any duty EBG had to disclose "facts" associated with the McConchie letter only arose in November 1998, when EBG undertook the representation of ATG in connection with the acquisition of assets from the MMT bankruptcy estate. By November 1998, however, Ms. Rendon was long gone from EBG, and no one at EBG had any knowledge at that time of the letter. Facts ¶ 5.

Department of Justice Campaign Finance Strike Force had initiated an investigation of alleged campaign finance abuses involving MMT, which was proceeding concurrently with a Department of Energy investigation into possible political interference in the letting and renewal of MMT's federal contract and a Congressional oversight hearing on the same topic.  Facts ¶¶ 1-3. Second, it was aware that a series of shareholder class actions had been filed against MMT and certain of its officers and directors, including Dr. Nagel, who told Ms. Rendon that he had been sued and that he was represented in that action by Bingham Dana LLP.  Facts ¶ 7.  In addition, although the undisputed evidence establishes that EBG had no actual knowledge of the McConchie letter at the time it undertook representation of ATG on the MMT asset acquisition, *see supra*, the Trustee claims that it should in any event have disclosed those allegations to ATG.  None of the limited information EBG did have, nor the allegations of the McConchie letter which it did not have, rose to a level that could be considered material as a matter of law given the undisputed facts of the representation at issue.

An attorney's duty of disclosure is limited to information that is "material" to its representation.  "Materiality" is judged by an objective standard:  a fact is "material" if "a reasonable man would attach importance [to the fact not disclosed] in determining his choice of action in the transaction in question*.*"  *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 78 (1991)(quoting *Rogen v. Ilikon* Corp., 361 F.2d 260, 266 (1st Cir. 1966)).  A defendant does not satisfy its burden of proving materiality by simply claiming, *ex post*, that it would have been nice to know more.  *E.g., Adelson v. Adelson*, 60 Mass. App. Ct. 753, 763 (2004)(not enough that the plaintiff "might find information interesting or desirable . . . to satisfy the materiality requirement").

Thus, the Trustee must be able to demonstrate that the information of which he was allegedly deprived would have changed the response of a reasonable man. He cannot do so here. While materiality is often a question of fact, it is determined as a matter of law when reasonable minds can reach only one result – in this case, that a reasonable man would not have been influenced in his decision-making by the alleged omitted information. *E.g.,* RESTATEMENT (SECOND) TORTS §538 comment e (2005); *STAR Centers, Inc. v. Faegre & Benson LLP*, 644 N.W.2d 72 (Minn. 2002).

**The Federal Investigations**

In 1997 and early 1998, EBG attorney Carole Schwartz Rendon represented a number of MMT employees who had received requests for interviews in an investigation of MMT being conducted by the United States Department of Justice Campaign Finance Task Force and the Office of the Inspector General of the United States Department of Energy. The investigation focused upon allegations of campaign finance abuses and irregularities in the letting of government contracts. Facts ¶ 1. Ms. Rendon represented one employee who was called to testify before a grand jury in connection with the campaign finance issues, *id*., and also represented MMT employee and director Christopher Nagel in connection with testimony before the Commerce Committee of the United States House of Representatives, which was conducting oversight hearings on MMT's federal contracts. Facts ¶ 3. There is no evidence that any of this work caused EBG to learn that MMT's technology was flawed or inoperable or any other information with respect to MMT that was material to its representation of ATG.

Ms. Rendon, the only EBG attorney to perform this work, prepared the witnesses and attended interviews conducted by the FBI and the DOE Office of Inspector General.

Technology came up in the employee interviews but not in any manner that caused Ms. Rendon to learn anything material about whether or how well it worked. The interviews focused upon issues associated with campaign finance, including campaign contributions, appearances by candidates at company events, relationships among MMT employees, and a more limited set of questions about MMT's federal contracts. Facts ¶ 2; Affidavit of Paula M. Bagger ("Bagger Aff."), Ex. F. When Dr. Nagel testified before the House Commerce Committee, he read a prepared statement explaining, in lay terms, how the technology worked, but he did not field any substantive questions. Facts ¶ 3; Bagger Aff. Ex. J.

None of this work required Ms. Rendon to achieve a sophisticated understanding of how MMT's CEP technology worked or to consider with any rigor how well it worked. Facts ¶ 2. The most that can be said is that she may on occasion have been confronted with a suggestion by a government investigator that the technology was not as successful or valuable as MMT believed it was. (Significantly, there is no evidence that she heard any such assertions from her clients, the MMT employees, who told her they believed in the technology.[5]) Any isolated and unresolved statements criticizing the CEP technology cannot as a matter of law constitute material information.

---

[5]   The Trustee appears to place great weight on the following passage in a memorandum Ms. Rendon wrote summarizing the content of the employee interviews by the FBI and DOE:

> The investigators clearly began the process with the understanding that the technology does not work, and that the PRDA was a callosal *[sic]* waste of money. I think that, by the end of two days of interviews, the interviewers were questioning that factual premise.

Bagger Aff. Ex. F. This isolated comment about the apparent mindset of federal investigators at the outset of an investigative process does not establish that the CEP technology did not work, particularly when the value of the technology was not even the subject of the investigation, and it should not have caused, and did not cause, Ms. Rendon to draw any conclusions or create any obligation of disclosure of problems with the technology. Indeed, the point of Ms. Rendon's comment is that the employees supported their company's

**The MMT Litigation**

There is no evidence in the record that, prior to December 1, 1998, EBG had any information about the shareholder litigation other than Dr. Nagel's statement that he had been sued in his capacity as a director of MMT and was represented by a different firm. Facts ¶ 7. There is not even any evidence in the record that any EBG attorney had *read* any of the six nearly identical shareholder complaints then on file in this Court. Bagger Aff. ¶ 10 and Exs. K and L.

However, even if any EBG attorney had looked at one of these complaints, he or she would have learned nothing material to the decisions facing ATG in its bid to acquire assets from the MMT bankruptcy estate. The complaints relate to an entirely different time period -- the class period is March 28, 1995 through October 18, 1996 – and the allegations do not flag issues that would be relevant to a potential acquirer of the company's assets over two years later.[6] Moreover, the class period is significant not only because it is so much earlier, severely attenuating its relevance, but also because the complaints themselves allege that the class period ended with public disclosure by MMT of previously undisclosed information (for instance, they allege that there was public

---

technology and praised it in the interviews. Ms. Rendon knew that her clients believed in MMT's technology and wanted to see it succeed in the marketplace. Rendon Dep. at 77.

[6]   The initial complaints in the MMT Litigation contained three main sets of allegations:

- That a 1993 press release misstated the speed with which MMT's Fall River facility processed waste (a facility which ATG did not seek to acquire);

- That certain 1994 and 1995 disclosures had exaggerated the cost advantage afforded by the technology's recycling capabilities; and

- That the Department of Energy would only be giving MMT $6 million in funding in 1996, rather than the $20 million it had announced it expected to receive.

Bagger Aff. ¶ 10 and Ex. L.

disclosure in 1996 that MMT's "major commercial projects were being delayed indefinitely," Bagger Aff. Ex. L, at 3-4).

In his Supplemental Answers to Interrogatories, the Trustee places great weight on the allegations contained in the Amended and Consolidated Shareholder Complaint that was filed in the MMT Litigation. The Trustee specifies that this pleading (in apparent contrast with the original Complaints) makes specific allegations concerning the alleged drawbacks of the assets ATG was purchasing. The problem with the Trustee's reliance on the Amended and Consolidated Shareholder Complaint is that it was not filed until February 1999, close to three months *after* the ATG/MMT asset acquisition closed! Bagger Aff. Ex. K.

The Trustee speculates that EBG must have known more than the bare allegations of the shareholder complaints prior to the closing of the asset purchase transaction on December 1, 1998, because it represented Dr. Nagel in the MMT Litigation during that period. However, the undisputed facts establish that EBG did not represent Dr. Nagel until after December 1, 1998, and had no discussions with Dr. Nagel until that time. Facts ¶ 9.

Ms. Rendon, who had represented Dr. Nagel and other MMT employees in the federal investigations, left EBG and moved to Ohio in August 1998. After she moved to Ohio, Dr. Nagel contacted her to discuss the possibility of separate representation in the MMT Litigation. She told him that it made no sense to have an Ohio lawyer represent him in shareholder litigation pending in Massachusetts and suggested that he consider retaining Michael Tuteur of EBG to advise him in connection with the MMT Litigation. Facts ¶¶ 5, 7. Dr. Nagel did not meet with Mr. Tuteur until December 1, 1998, to discuss

prospective representation, and did not retain EBG until shortly thereafter, when MMT's directors' and officers' liability insurer had approved the representation. Facts ¶¶ 7-8. Dr. Nagel's meeting with Mr. Tuteur on December 1, 1998, was his first substantive communication with EBG regarding the allegations of the shareholder complaints. *Id*.

Ms. Rendon sent Mr. Tuteur two documents related to the shareholder litigation, in contemplation of a future representation of Dr. Nagel by Mr. Tuteur, but neither sheds any light on the allegations of that Complaint or provided any material information about MMT or its CEP technology. Facts ¶ 8 and Bagger Aff. Exs. G and H. Nor does anything in either of these documents suggest that EBG was in fact representing Dr. Nagel prior to December 1, 1998.[7]

**The McConchie Letter**

Ms. Rendon acknowledges that she received a copy of a letter addressed to Dr. Nagel and William Haney, former CEO of MMT "that had something to do with . . . complaints Earl McConchie had about his termination." Rendon Dep. at 86; Facts ¶ 4. However, it is undisputed that Ms. Rendon and Dr. Nagel did not discuss the contents of the letter, because the sole issue Dr. Nagel raised was whether it was appropriate for Karen Green of Hale and Dorr LLP to represent both Dr. Nagel and Mr. Haney in defense of any claims asserted by Mr. McConchie. Facts ¶ 4. Even putting aside the fact that

---

[7] The Trustee makes much of an email written by Mr. Tuteur in November 1998, in response to a conflicts inquiry. Mr. Tuteur responded to an inquiry about the status of EBG's representation of former MMT employees with the comment that he "continued" to represent Dr. Nagel in shareholder litigation, although he had in fact not yet represented Dr. Nagel at all. Mr. Tuteur explained that he had phrased the memorandum that way because he had already had discussions with Carole Rendon about possibly representing Dr. Nagel and had already received (via Ms. Rendon in Ohio) two memoranda prepared by Bingham Dana LLP, counsel to all defendants in the MMT Litigation. Tuteur Dep. at 37-39. As he had engaged in preliminary discussions about the possibility of representing Dr. Nagel (albeit with Ms. Rendon, not with Dr. Nagel), Mr. Tuteur thought it prudent "to examine the question about whether the preliminary pre-representation status affected Epstein Becker's potential representation of ATG." *Id*. at 38. However, the record is clear that Mr. Tuteur never spoke with or provided any legal services to Dr. Nagel prior to December 1, 1998.

12

Ms. Rendon, the only EBG lawyer to have known about the McConchie allegations, had left the firm before ATG asked EBG to represent it and thus before the "knowledge" could possibly have become material, it is also indisputable that the nature and quality of Mr. McConchie's allegations did not, as a matter of law, rise to a level of materiality that required their disclosure to ATG.

In his demand letter, Mr. McConchie claimed that he had been fraudulently induced to accept employment with MMT as a result of misrepresentations about the company's technology.  Bagger Aff. Ex. I.  The letter's sweeping allegations touch not only upon the Bear Creek Road, or Q-CEP facility, which ATG later acquired from the MMT bankruptcy trustee, but also upon the so-called Tech Center, or M4 facility, and the Bay City plant, which it did not acquire. The letter discussed representations about the status of these three plants and technologies used at them during late 1995 and early 1996. *Id*.

Even if EBG lawyers had known about Mr. McConchie's assertions and been able to disclose them when EBG undertook representation of ATG in the acquisition of the CEP assets, the information would not have been material, as a matter of law, and therefore EBG would have been under no duty to disclose it.  First, Mr. McConchie's complaints regarding the CEP technology involved statements about its status back in 1995 and early 1996, when Mr. McConchie was allegedly being recruited.  As with the allegations in the MMT Litigation, they were completely stale by the time Ms. Rendon became aware of them in 1998.  Second, his allegations were simply unsupported and untested assertions.

The assertions in Mr. McConchie's letter fail as a matter of law to create a basis for liability for some of the same reasons that the allegations made against the law firm of Faegre & Benson, commenced by one of its clients in *STAR Centers, Inc. v. Faegre & Benson L.L.P.*, 644 N.W.2d 72 (Minn. 2002), failed. In that case, the Minnesota Supreme Court considered whether the law firm's failure to disclose to its client STAR information it had learned in its representation of another client constituted a breach of its duty of full disclosure to STAR. Faegre was representing STAR in a financing transaction and had previously represented Consortium, the entity from which STAR was seeking financing, in litigation in which the plaintiff claimed that Consortium had breached a construction loan agreement by failing to fund the loan. In the course of that litigation, plaintiff's counsel told Faegre attorneys that he thought Consortium engaged in fraud and that it did not have sufficient capital to fund its commitments, and he requested documentation of Consortium's other deals in an effort to prove this claim. When Faegre subsequently represented STAR in its financing transaction with Consortium, it did not inform STAR of these assertions. The Minnesota Supreme Court held this information to be immaterial as a matter of law and upheld the lower court's entry of summary judgment, reasoning that there was no evidence in the record that Faegre had reason to believe these statements, which were made in the context of litigation. The Court ruled:

> Without some evidence to support the oral allegations, Faegre had no reason to think that they were anything but litigation tactics, and reasonable minds can conclude only that the unsubstantiated allegations of fraud were not material to Faegre's representation of STAR.

644 N.W.2d at 78. Accordingly, the Court held "as a matter of law that Faegre did not learn information that was material to its representation of STAR." *Id.*

The same reasoning is applicable here. The allegations of the McConchie letter could not, as a matter of law, be material to EBG's representation of ATG, as they did not rise above the status of "unsubstantiated allegations."[8] And, of course, in this case the McConchie allegations were old – they referred to Mr. McConchie's view of the status of MMT's technology more than two years before the transaction whereby ATG acquired the CEP assets.

### III.   EBG CANNOT BE HELD LIABLE FOR FAILING TO DISCLOSE INFORMATION THAT ATG ALREADY HAD.

Even if EBG had material information that it had a duty to disclose to ATG, EBG would still be entitled to summary judgment on the separate and independent ground that ATG already knew what it now complains that EBG did not tell it. Whether the issue is analyzed as one of duty or of causation, EBG cannot be held liable for failing to disclose information that ATG already had.

It cannot be disputed that ATG entered the asset purchase transaction with its eyes wide open and after an intelligent decision-making process. This fact is set forth in detail in the Affidavit of William M. Hewitt, submitted herewith. Mr. Hewitt was a senior executive of ATG, Inc, who contacted EBG about the potential acquisition. He was closely involved in ATG's decisionmaking and was the direct interface with ATG's

---

[8]   The context also strongly urges the unreliability of the McConchie assertions. Earl McConchie had been an executive with Dow Chemical. He was hired away from Dow by MMT to serve in an executive marketing position. Nagel Dep. at 33-34. He lost his job with MMT in 1997 and was unable to sue MMT for the severance that would otherwise have been due for breach of his employment contract because the company filed for bankruptcy. Instead, Mr. McConchie sent a demand letter to two MMT executives, CEO William Haney and Dr. Nagel, claiming that they had fraudulently induced him to accept employment with MMT. Bagger Aff. Ex. I. One could well see these claims as an effort to get around the bankruptcy and find another pocket for his lost severance benefits, particularly in the context in which Ms. Rendon was reading it: in her representation of the MMT employees, Ms. Rendon had heard the employees' expressions of support for their company and its groundbreaking technology. *See, e.g.*, Rendon Dep. at 77 (employees "believed in the company" and wanted it to succeed); Bagger Aff. Ex. J (Nagel testimony).

15

counsel in the negotiation and closing of the acquisition. Kellogg Dep. at 13-14. As Mr. Hewitt acknowledges, ATG was fully aware that there were both technical and economic problems with the CEP technology that it was acquiring from the MMT Trustee. Facts ¶¶ 12-13; Hewitt Aff. Ex. A.

The Complaint alleges that "EBG knew, or should have known, that ATG was relying in the purchase of the MMT assets on the express or implied representations of the Individual Defendants that the CEP technology was operational, safe, effective, and profitable." Complaint ¶ 47.[9] It is clear from the record, however, that if there were any representations, ATG was not relying on them. It is undisputed that ATG did not accept representations made by Quantum Catalytics LLC uncritically and that ATG walked into the MMT asset purchase transaction with knowledge of the CEP technology. Facts ¶¶ 11-13.

As Mr. Hewitt so clearly states in his detailed Affidavit, ATG was knowledgeable about MMT and its assets even before it contacted EBG. It is undisputed that when Mr. Hewitt contacted EBG about representing ATG, he was already familiar with MMT and its wet waste treatment and CEP businesses; he was already aware that MMT had suffered setbacks in the marketplace and had filed a bankruptcy petition; he was already aware of a series of well-publicized legal problems at MMT; and he was already generally aware of a federal investigation of MMT that involved allegations of improper Department of Energy contracting procedures. Facts ¶ 11.

---

[9] This allegation is stranger than it appears on its face. It is important to recall that the "Individual Defendants" in this case – including Christopher Nagel, John Preston, and Quantum Catalytics LLC – were not the sellers of the allegedly flawed assets but joint bidders with ATG to purchase them out of bankruptcy. The allegation that the Trustee is making is not that EBG failed to save its client ATG from misrepresentations made by the seller of the assets but that it failed to save ATG from an entity, Quantum Catalytics, which was seeking to purchase these allegedly flawed assets, and in particular, an individual, Christopher Nagel, who was the inventor of the technology and its consistent supporter.

16

Moreover, before he called EBG, Mr. Hewitt had already discussed with company management the prospect of bidding to acquire the so-called "wet waste" assets of MMT, and had already met with MMT's Chapter 11 Trustee, Stephen Gray, to discuss such a bid. *Id*. He had already been informed by Mr. Gray that a business group formed by John T. Preston and Christopher Nagel, former members of MMT's Board of Directors, were interested in acquiring the assets of MMT's CEP business and had been told by Mr. Gray that a joint bid for the CEP and wet waste assets would be looked upon favorably. *Id*.

ATG knew that there were problems – as well as opportunities – presented by the CEP assets. ATG initially wished only to purchase the so-called "wet waste" assets and to avoid the CEP assets. Facts ¶¶ 11-12. Nevertheless, ATG engaged in due diligence that covered the CEP business line because the CEP and wet waste business lines were not completely separable as a practical matter. For example, both were based out of the Bear Creek Road (Q-CEP) facility and, even if ATG only purchased the wet waste assets, it would nonetheless need to worry about the liability issue with respect to Q-CEP. Hewitt Aff. ¶ 12. ATG indisputably had its arms around the technical issues concerning its potential acquisition: it was looking for EBG's assistance in negotiations with Quantum Catalytics LLC (as joint bidder) and the MMT Trustee (as seller), and it needed to have the documents for the transaction drafted. ATG was not looking to EBG for the performance of technical due diligence. Kellogg Aff. ¶ 3.

As Mr. Hewitt explains, when the idea of acquiring only the wet waste business proved impossible, owing to regulatory and licensing restrictions imposed by the State of Tennessee, ATG considered the entire situation and made the informed decision to

acquire the CEP assets. Facts ¶ 13. The crux of ATG's analysis was that there was value in an acquisition of the CEP assets even if they should turn out to be as unproductive and unprofitable as ATG feared they might be. *Id*. This analysis was set down in writing in Mr. Hewitt's November 30, 1998 memorandum, which neatly presents the extent of ATG's knowledge with respect to the CEP assets. Hewitt Aff. Ex. A. The record will not support the Trustee's attempt to argue that ATG did not know precisely what it was doing when it acquired the CEP assets.

To succeed on a claim of legal malpractice, the Trustee must establish that the losses he alleges were caused by the conduct he challenges. *McCann v. Davis, Malm & D'Agostine,* 423 Mass. 558, 559 (1996); *Van Brode Group, Inc. v. Bowditch & Dewey, Inc.*, 36 Mass. App. Ct. 509, 514 (1994). In this case, regardless of what EBG's duties were with respect to the information that the Trustee alleges EBG possessed and failed to disclose, the Trustee will not be able to establish causation. Given the undisputed evidence of ATG's knowledgeable and thoughtful decision-making process, the Trustee cannot prove that EBG's alleged failures to disclose caused ATG any harm.

## **CONCLUSION**

For all of the foregoing reasons, EBG requests that its motion for summary judgment be allowed.

                                              EPSTEIN BECKER & GREEN P.C.

                                              ___/s/_ Marjorie Sommer Cooke_____
                                              Marjorie Sommer Cooke (BBO # 097800)
                                              Paula M. Bagger (BBO # 547703)
                                              COOKE, CLANCY & GRUENTHAL, LLP
                                              150 Federal Street
                                              Boston, MA  02110
Dated:  June 7, 2006                         (617) 428-6800

## **CERTIFICATE OF SERVICE**

  I, Marjorie Sommer Cooke, hereby certify that I have this 7th day of June, 2006, served a true copy of the foregoing upon counsel for the plaintiff through the Court's ECF filing system.


            _____/s/ Marjorie Sommer Cooke_____
            Marjorie Sommer Cooke