UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT J. HANFLING,
   Chapter 7 Trustee of the Bankruptcy
   Estates of ATG, Inc. and ATG
   Catalytics, LLC,

      Plaintiff,

v.                                                            Civil Action No. 05-10077-RGS

EPSTEIN BECKER & GREEN, P.C.,
et al.,

      Defendants.

## AFFIDAVIT OF WILLIAM M. HEWITT

I, William M. Hewitt, being duly sworn, depose and say:

1. From April 1997 until November 2000, I was employed by ATG, Inc. ("ATG") in various capacities. Initially I served as President of its Waste Management Services division. My role changed in 2000 to an internal consulting role due to my stated intent to exit the company and Frank and Doreen Chiu's request that I assist the company achieve a smooth management transition. I make this affidavit of my own personal knowledge.

2. In 1998, ATG, Inc. was a radioactive and hazardous waste management company headquartered in Fremont, California. ATG offered comprehensive treatment solutions for low level radioactive waste and low level mixed waste generated by the United States government (Department of Defense and Department of Energy) and privately owned nuclear power plants, medical facilities, and research institutions.

3.  As President of ATG Waste Management Services in 1998 I was familiar with Molten Metal Technology, Inc. ("MMT") and both its wet waste treatment and catalytic extraction processing ("CEP") businesses. Not only had MMT been in the news on a frequent basis over the preceding few years but it also was one of a relatively small number of companies in the same general field as ATG.

4.  ATG became aware during 1998 that MMT had filed a bankruptcy petition and had suffered a series of well-publicized legal problems. Through newspaper accounts and industry rumors, I was also generally aware of a federal investigation of MMT regarding allegations of improper Department of Energy contracting. I also was aware that MMT had suffered setbacks in the marketplace.

5.  In September 1998, ATG became aware that Stephen Gray, Chapter 11 bankruptcy Trustee of Molten Metal Technology, Inc. ("MMT") was accepting bids for the sale of MMT's assets. ATG's principal shareholders and founders, Frank and Doreen Chiu, expressed an interest in exploring the acquisition of certain assets through the MMT bankruptcy proceedings, in particular the "wet waste" asset. These same assets were also sought by other companies in the nuclear waste business including GTS Duratek and Nukem.

6.  MMT had acquired its wet waste treatment business from SEG, a waste management company that had been located in Oak Ridge, Tennessee. The wet waste business line was not part of MMT's primary catalytic extraction processing ("CEP") business line, but rather, addressed the transportation, processing (dewatering and simple volume reduction), packaging, and disposal of wet wastes (sludges and resins) without thermal treatment. The wet waste business line also included an innovative waste water

treatment process that was of interest to nuclear utilities. It appeared that the purchase of the wet waste business line would provide ATG with a large number of licensed nuclear waste transportation casks, intellectual property related to the waste water treatment business, contracts with the majority of nuclear utilities in the U.S., overseas utility contracts in South Korea and South America, and a presence in the eastern United States via operations in a portion of a facility at the MMT site in Oak Ridge, Tennessee that was operated under a State of Tennessee radioactive waste license to accept, store, and treat low level radioactive wastes. These features of the MMT wet waste business were (and still are) valuable business assets as evidenced by the competition for those assets during the MMT bankruptcy and their resale to Nukem during the subsequent ATG bankruptcy..

7.  I contacted and met with Mr. Gray and learned from him that a business group put together by John T. Preston and Chris Nagel, former members of MMT's board of directors/management team, was interested in acquiring assets of MMT's CEP business. Dr. Nagel was also the inventor of the CEP technology. Mr. Gray indicated that he had a greater interest in a bid that included both the wet waste business line and the CEP business line than separate bids for the two business lines.

8.  Following conversations with Frank and Doreen Chiu, I contacted Ken Weckstein of the Washington, D.C. office of Epstein Becker & Green, P.C. ("EBG"). I was familiar with Mr. Weckstein and EBG through ATG's use of their legal services on previous occasions and also earlier, when I was employed by Chem-Waste, Inc. I knew that EBG had a Boston office and could put me in touch with a corporate lawyer from that office.

9. Jarvis Kellogg, the lawyer in EBG's Boston office who represented ATG in connection with this acquisition, and ATG commenced negotiations with counsel for Mr. Preston and his group relative to preparing a joint bid for MMT's wet waste and CEP assets on the theory that ATG would own and operate the wet waste business, Quantum Catalytics LLC, a firm formed by Mr. Preston and Mr. Nagel, would own the CEP business line and intellectual property rights, and both companies would share the MMT Oak Ridge, Tennessee facility at Bear Creek Road. The details of the business relationship between ATG and Quantum Catalytics were primarily worked out in private discussions that I was not a party to. ATG proceeded with due diligence relative to the purchase which included investigating the wet waste business line and other MMT assets including the CEP business line. The latter was investigated because of its collocation with the wet waste business line and also because ATG perceived a possible opportunity to establish itself in the treatment of high-activity radioactive waste ion exchange resins.

10. Despite assurances by Drs. Preston and Nagel that the technical issues with the CEP process had been worked out, ATG considered the CEP process to pose a risk. ATG perceived an opportunity, however, to replace the CEP process with a vitrification process it had successfully used on lower activity ion exchange resins in Richland, Washington. ATG decided to move forward with a joint bid that clearly differentiated the acquisition of the wet waste assets by ATG from the acquisition of MMT's Fall River, Massachusetts facility and CEP assets by Quantum Catalytics. That bid was submitted to the MMT Chapter 11 Trustee.

11. Shortly before the Bankruptcy Court hearing to review and decide on the final bids, the State of Tennessee made it known that it would not transfer licenses for

MMT's Bear Creek Facility – where the CEP process and wet waste business lines were located – to Quantum Catalytics LLC due to the inexperience of its management with direct responsibility for nuclear waste operations. That license was critical to the viability of the wet waste asset purchase by ATG given the collocation of the CEP and wet waste assets in the Oak Ridge facility.

12. Accordingly, Frank Chiu called me to discuss a plan he had formulated wherein ATG would purchase both the wet waste business and the physical CEP assets, including the Bear Creek Facility, and Quantum Catalytics would purchase MMT's Fall River, Massachusetts facility and certain MMT intellectual property. This approach would result in the license for the Bear Creek facility being held by ATG. The plan included certain risks associated with the CEP business line and existing contamination at the site, however, the magnitude of those risks, based upon MMT disclosures and ATG's prior due diligence, appeared to be offset by the upside benefits. This approach was consistent with one alternative considered during ATG's due diligence as mentioned previously in 10.

13. At Frank Chiu's direction, I prepared a memorandum on November 30, 1998, that outlined the business rationale for ATG closing on the CEP assets, including the Bear Creek facility. A true and accurate photocopy of that memorandum is appended hereto as Exhibit A. This memorandum set forth what were considered to be the business reasons for ATG to alter its initial strategy and move forward with the purchase MMT's CEP and wet waste assets. The rationale included:

    a.    As a practical matter, ATG needed to do so in order to move forward with the purchase the wet waste assets;

  b. ATG understood the resin processing business line that the CEP process addressed and, in fact, competed with MMT for resins at radioactivity levels that ATG could process in its Richland, WA vitrification process. ATG's costs for the Richland, WA process were substantially lower than those for the CEP process, however, the Richland, WA license and physical facility design would not permit ATG to compete in the higher activity resin market. Accordingly, ATG perceived benefits from the purchase of the CEP assets, including access to a market in high radiation resin processing services, access to an eastern United States facility and license that addressed that market, and established contracts in domestic and international nuclear power plants;

  c. ATG believed that if the CEP process could not be shown to be viable and profitable within the first 1-2 months following the acquisition, it could be replaced with a vitrification process similar to that used in Richland, WA that it knew was safe and effective to operate;

  d. The downside represented by Bear Creak legacy wastes (which potentially included the CEP process equipment), was decreased relative to what some other bidders might perceive due to ATG's internal ability to process the waste into different disposal pathways, some of which were available a small fraction of the costs of disposal at Barnwell, SC, the licensed radioactive waste disposal site closest to the Bear Creek facility; and

  e. Downside costs could be partially offset by outstanding MMT receivables that would accrue to ATG through the purchase.

14. Accordingly, ATG concluded that there was a significant upside potential in this market available through the purchase if the operational problems could be solved and the costs brought under control, which ATG believed it had the capability to do

15. I now understand that ATG's Chapter 7 Trustee claims that EBG breached a duty to disclose information about CEP technology that was in its control prior to the December 1, 1998 closing. Without commenting about what information in fact was available to EBG at any given time (as to which I have no information), I can make the following summary comments:

    a. I did not ask EBG to provide factual due diligence with respect to the operation of CEP technology. EBG was retained by ATG to provide legal, not technical and marketing, counsel. ATG believed it had substantial internal expertise in the latter two areas; and

    b. It was known to ATG at the time of the transaction that the CEP technology had not operated reliably. As explained above, ATG approached the acquisition of the MMT CEP assets with a back-up plan due to the risk it perceived with the CEP process. If CEP had operated as promised by Quantum Catalytics (which ATG was skeptical of), it would have been an upside. If it did not, ATG's plan was to remove the CEP processors from the facility and replace that process with a process that had already been internally proven to treat resins.

SIGNED UNDER THE PENALTIES OF PERJURY THIS 12th DAY OF APRIL, 2006.

_____
William M. Hewitt

 INC. *Internal Memorandum*

---

**To:**      Steve Guerrettaz
   **cc:**   Frank Chiu
             Doreen Chiu

**From:**    Bill Hewitt

**Date:**    November 30, 1998

**Subject:** Benefits Accruing from MMT Assets Acquisition

The benefits accruing to ATG from the MMT Wet Waste Business lines are:

- A business line that should grow from ~$11 million in 1998 to $17 million in 1999
- Puts ATG into the growing waste water treatment market
- Puts ATG personnel at nuclear power plants on a year-round continuing basis
- Provides ATG with approximately ~50% of the cask fleet in the US for shielded waste shipments and 60 - 75% of the Type B casks in the US.
- Provides gross margins between those provided by Richland Waste Processing and Field Services

The benefits accruing to ATG from the MMT Catalytic Extraction Process (CEP) acquisition are as follows:

- Provides ATG with current corner on the high rad resin processing business in the US ($40 - $50 million market annually)
- Provides ATG with an eastern US operating base
- Once duplicate reactors are eliminated, increases ATG's contract base to > 85% of US commercial power reactors and increases ATG's DOE/DOP/International base (Brazil and Korea)

The CEP acquisition opens several questions due to that business line being in a loss position historically. The logic behind our interest in that acquisition is as follows:

1. It was necessary to acquire wet waste services.
2. It has been run in an extremely inefficient manner by MMT and the court appointed trustee.
3. The CEP process appears to be on the verge of profitability with a high upside potential (i.e., currently at approximately 90,000 pounds/month; breakeven at 110,000 to 120,000 pounds/month based upon the success of our cost cutting initiatives; capacity approximately 240,000 pounds/month for two reactors, each completing one cycle weekly at 30,000 pounds/cycle) MMT has already made most of the investments required to achieve higher waste processing rates. The current constraints are largely a function of completing on-going process tweaking and focusing trained personnel on the job at hand based upon information gained to date. Don Gagel and I will both be in Oak Ridge this week to further assess the situation and opportunities to accelerate passing the breakeven point including time and capital requirements.
4. If a Q1 turnaround cannot be achieved, we can replace the CEP process reactor(s) with IET units similar to those for MW processing. Most of the balance of plant equipment already is in place and can probably be simplified.

---

# ATG INC. *Internal Memorandum*

5. The resin processing business has a very large potential upside once we gain control of the costs and processing.

Relative to questions that we may receive, I believe that the simple and accurate answers to buying CEP are:
   A. It is in a strong position in a strong market area.
   B. Combined with ATG Richland, provides operating contracts with > 85% of reactors in US.
   C. We will either quickly bring it to profitability (appears close) or replace the reactors with GASVIT units
   D. Complements our existing capabilities and defers capital and operating costs otherwise required for Richland to compete in part of the resin market
   E. Operational effectiveness is enhanced by ATG's Richland processing capabilities (very synergistic)
   F. Provides longer-term opportunities for ATG to exploit synergy between Oak Ridge and Richland
   G. Enhances ATG's unique market position
   H. We have $2.5 to $3 million in waste requiring disposal (@ MMT rates) – we believe we can dispose of the waste for less using Richland.
   I. We pick up a cash Letter of Credit for $1.6 million, $3.4 million in receivables, and $0.6 million in inventory/spare parts.