UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ <br> )<br>ROBERT J. HANFLING,                                    )<br>  Chapter 7 Trustee of the Bankruptcy          )<br>  Estates of ATG, Inc. and ATG                    )<br>  Catalytics LLC,                                          )<br>                                                                )<br>        Plaintiff,                                             )<br>                                                                )<br>            v.                                                   )<br>                                                                )<br>EPSTEIN BECKER & GREEN, P.C.,                )<br>  et al.,                                                       )<br>                                                                )<br>        Defendants.                                        )<br>_____) | Civil Action No. 05-10077-RGS |

## AFFIDAVT OF PAULA M. BAGGER

I, Paula M. Bagger, having been duly sworn, depose and state as follows:

1.    I am a member in good standing of the Bar of the Commonwealth of Massachusetts and of this Court.  I am a partner in the law firm of Cooke Clancy & Gruenthal LLP, which represents defendant Epstein Becker & Green, P.C. in the above-captioned action.

2.    Attached hereto as Exhibit A are true and accurate photocopies of pages of the transcript of the deposition of Jarvis P. Kellogg, taken in this action.

3.    Attached hereto as Exhibit B are true and accurate photocopies of pages of the transcript of the deposition of Christopher J. Nagel, taken in this action.

4.    Attached hereto as Exhibit C are true and accurate photocopies of pages of the transcript of the deposition of Carole Schwartz Rendon, taken in this action.

5.    Attached hereto as Exhibit D are true and accurate photocopies of pages from the transcript of the deposition of Michael J. Tuteur, taken in this action.

6.      Attached hereto as Exhibit E are true and accurate copies of pages from the transcript of the deposition of Kenneth B. Weckstein, taken in this action.

7.      Attached hereto as Exhibit F, G, H, and I are true and accurate photocopies of Exhibts F, H, I, and O marked at the deposition of Carole Schwartz Rendon.

8.      Attached hereto as Exhibit J are true and accurate photocopies of pages from the transcript of hearings before the Subcommittee on Oversight and Investigations, Committee on Commerce of the United States House of Representatives titled, "The Department of Energy's Funding of Molten Metal Technology."  This document was published by the U.S. Government Printing Office.

9.      Attached hereto as Exhibit K is a true and accurate photocopy of this Court's docket and list of attorney appearances in *Axler, et al. v. Molten Metal Technology, Inc., et al*., C.A. No. 97-10325-MLW.  These documents were printed from the PACER system.

10.     Attached hereto as Exhibit L is a true and accurate photocopy of the Complaint in *Friedland v. Molten Metal Technology, Inc., et al*., C.A. No. 97-10345-MLW.  This Complaint, filed on February 13, 1997, is essentially identical to four other complaints also filed in this Court in February 1997:  *Axler, et al. v. Molten Metal Technology, Inc. et al.*, C.A. No. 97-10325; *Levin v. Molten Metal Technology, et al.*, C.A. No. 97-10386; *Louisiana State Employees Retirement Sys., et al. v. Molten Metal Technology, et al.,* C.A. No. 97-10432;and *Muoio v. Molten Metal Technology, Inc., et al*., C.A. No. 97-10686.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7TH DAY OF JUNE, 2006.

_____/s/ Paula M. Bagger_____
Paula M. Bagger

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

1

```
 1                UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MASSACHUSETTS

 3

 4                              No. 05-10077-RGS

 5

     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

 6

 7   ROBERT I. HANFLING, CHAPTER 11 TRUSTEE FOR ATG, INC.,

 8   AND ATG CATALYTICS L.L.C.,

 9                              Plaintiff

     vs.

10

11   EPSTEIN, BECKER & GREEN, P.C., JOHN PRESTON, CHRISTOPHER

12   NAGEL, EUGENE BERMAN, ETHAN JACKS, QUANTUM CATALYTICS LLC.,

13   ABC CORPS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5,

14                              Defendants.

15   *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

16

17        DEPOSITION OF: JARVIS KELLOGG, a witness in the

18   above-entitled cause, taken before CINDY BERGLUND, CSR,

19   Registered Professional Reporter and Notary Public pursuant

20   to the applicable provisions of the Massachusetts Rules of

21   Civil Procedure, at the offices of GADSBY & HANNAH, LLP, 225

22   Franklin Street, Boston, MA 02110, on the 18TH day of APRIL,

23   2006, commencing at 10:40 A.M.

24
```

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

9

```
 1          Q.    It is ATG.   That's commonly referred to as ATG,

 2     Inc.

 3          A.    Yes.

 4          Q.    Can you tell me how it is that you are familiar

 5     with ATG?

 6          A.    In late November of or I'm sorry, in early

 7     November of 1998 I was asked by my partner, Gabor

 8     Garai, G-A-B-O-R, G-A-R-A-I, if I could work on a

 9     transaction that was initiated from Epstein Becker's

10     Washington office by one of my partners, Ken Weckstein.

11     Ken -- may I refer to it as ATG?

12          Q.    Yes, please.

13          A.    Ken represented ATG for a while.  It was an

14     existing client and they had an interest in acquiring

15     or at least bidding on some assets of a company called

16     Molten Metal which was in bankruptcy here in Boston.

17          Q.    Had you done -- had you personally done any work

18     for ATG prior to Mr. Weckstein asking you?

19          A.    No.

20          Q.    What about MMT?  Had you done any work for MMT

21     prior to this particular transaction that you were

22     referring to?

23          A.    No.

24          Q.    So you had no dealings with anybody from MMT prior
```

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

13

```
 1        meetings over at Mince Levin discussing a possible

 2        transaction between Quantum Catalytics and ATG.

 3        Q.   Do you recall who attended the meeting?

 4        A.   I'm going to try.  This is a recollection, but my

 5        memory is that Bill Hewitt who was the president, I

 6        believe, of ATG and was my contact there and myself

 7        representing ATG.  I believe at one time or another in

 8        these meetings at least two of my associates, Glen

 9        Burlingame and another associate whose name I hope will

10        come to me, neither of whom is with the firm any longer

11        or was with Epstein, Becker and Green, but both of who

12        were involved in the transaction and I believe that

13        obviously Rick was there and John Preston was there and

14        Chris Nagel was there and I'm not saying that all of

15        them were at all of the meetings, but that was sort of

16        the working group, I think is a fair way to

17        characterize that.

18        Q.   Do you recall if there was anyone from ATG present

19        at these meetings besides Bill Hewitt?

20        A.   No.  I don't believe there was.  I believe it was

21        Bill, and, you know, I know that he conferred from time

22        to time with Frank Chu who was an officer, I believe,

23        of ATG, but he was in California and Bill really was

24        the driver of the deal.  Bill was the guy who was
```

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

14

1          making the business decisions for the client.

2          Q.   So who was your primary contact at --

3          A.   Bill Hewitt.

4          Q.   Did you have any direct dealings with any other

5          ATG employees or officers or directors in connection

6          with the deal?

7          A.   I don't believe so.  I know at some point down the

8          line I probably had a phone conversation with Frank,

9          but it was -- I think it was well after the deal was

10         done.

11         Q.   Do you recall if Frank Chu himself had ever

12         attended any of these meetings?

13         A.   I recall that he was in Massachusetts at some

14         point, but I don't believe that he attended the

15         meetings.  He may have attended one, but I don't

16         believe so.  I believe it was Bill.

17         Q.   Do you recall if either Frank or Bill ever went

18         down to Tennessee in connection with the transaction?

19         A.   I believe they did.

20         Q.   What do you recall specifically about it?

21         A.   This is a recollection and it's not based on -- I

22         mean, it's based on my memory, but I believe, yes.  I

23         think Bill did go down to Tennessee.  I'm certain,

24         actually now that I think about it, he did go to

# Transcript of the Testimony of Christopher J. Nagel

### Taken: April 25, 2006

### Volume: 1

### In the Matter of:

Robert I. Hanfling ,
                                    Plaintiff,

v.

Epstein, Becker & Green, Et Al,
                                    Defendants.

### Reported By Maureen Pollard, RPR

O'CONNOR POLLARD REPORTING, INC.
Phone: 508-528-2950
Fax: 508-528-3927
Email: Mycourtreporter@comcast.net

CHRISTOPHER J. NAGEL
4-25-06

Page 21

1    bunch of documents, the DOJ, I don't know if

2    that's in the form of a subpoena, but I do know

3    I turned over a whole list, primarily financial

4    documents, personal financial documents.

5         Q.    Was that directed to you personally,

6    or was it directed to you in your capacity as --

7         A.    It was directed in the capacity of an

8    MMT employee.

9         Q.    Going back a bit, again you testified

10   that you had previously testified at a hearing

11   before -- did you say Paul Barton?

12        A.    Yes, the House of Representatives.

13        Q.    What was the subject of that

14   testimony?

15        A.    The official subject or --

16        Q.    Official subject, we'll start with

17   that.

18        A.    The official subject was whether or

19   not there was -- the DOE gave funds to MMT to

20   fund the technology inappropriately.

21        Q.    Did the actual testimony expand beyond

22   that subject in any way?

23             MS. MARONEY:   Objection.

24             Whose testimony?

CHRISTOPHER J. NAGEL
4-25-06

Page 22

1          BY MR. FLEISCHER:

2          Q.   Did your testimony?

3          A.   I was the first person to give my five

4    minute speech.  Paul Barton opened it by saying

5    "this is not about the technology, this is about

6    the people who are sitting to the right of you."

7    I read my speech, which is about the technology.

8    After six hours of sitting there he said "I'm

9    going to let you go but I have to ask you one

10   question because you sat here for the day, tell

11   me about the technology, how does it work?"  And

12   he excused me.

13         Q.   Who were the other people that were

14   seated beside you?

15              MS. BAGGER:  Objection.

16              BY MR. FLEISCHER:

17         Q.   Go ahead.

18         A.   I believe it was Vic Gatto, Gene

19   Berman, Bill Haney, I don't know if Ben Downs

20   was there or not.

21         Q.   Did you have counsel representing you

22   when you were testifying at the hearing?

23         A.   Yes.

24         Q.   Who represented you at the hearing?

O'CONNOR POLLARD REPORTING, INC.

CHRISTOPHER J. NAGEL
4-25-06

Page 23

1        A.    I don't know.

2              MS. MARONEY:   You mean physically at

3        the hearing that day?

4              MR. FLEISCHER:   Physically at the

5        hearing that day.

6        A.    Originally I wasn't meant to be at the

7        hearing, and I don't know who put me on, whether

8        it was their side or our side.  Carole Schwartz

9        Rendon had represented me, but she also had a DC

10       attorney, and I don't recall that person's name.

11             MS. BAGGER:   Motion to strike.

12             BY MR. FLEISCHER:

13       Q.    Was Carole Schwartz Rendon in the room

14       when you gave your testimony?

15       A.    I don't recall.  I don't think so.

16       Q.    Had you conferred with her prior to

17       appearing for testimony before Paul Barton?

18       A.    A little bit, but it was primarily

19       about how to -- form, you know, "you're under

20       oath and there are no rules."

21       Q.    Did you discuss with her at all the

22       substance of what you would be saying?

23       A.    I don't believe so.

24       Q.    Did you discuss with her at all the

CHRISTOPHER J. NAGEL
4-25-06

Page 28

1  my question will be whether or not you even

2  recognize the document.

3         A.    I do not recognize this document.

4         Q.    Okay.  You've never seen this document

5  before?

6         A.    I don't believe so.

7         Q.    Do you know who Karen Green is?

8         A.    Yes.

9         Q.    Who is Karen Green?

10        A.    Karen Green was the attorney for Bill

11 Haney in the, what I'll just call the DC

12 activities, and she was also my attorney in the

13 McConchie case, my attorney and Bill Haney's

14 attorney in the McConchie dispute.

15        Q.    This document, you said you -- and

16 again you've looked at each page there, and,

17 each page of this document, Exhibit 1, and this

18 document isn't familiar to you?

19        A.    It is not.

20        Q.    I'd ask you to turn to page six.

21 There's a statement in this document, Exhibit 1,

22 in the second to last paragraph, I'd ask you to

23 read the paragraph that begins "in many cases."

24 Do you see that?

CHRISTOPHER J. NAGEL
4-25-06

Page 32

1          MS. BAGGER:  Objection to the form of

2    the question.

3          A.    Certain ones referred -- received

4    certain accolades, but they were primarily based

5    on the customers.  So Duke Power was sending

6    their waste to the N-4 facility, Duquesne Power

7    & Light was sending their waste to Q-CEP,

8    Electric Power Research Institute did their

9    evaluation on Q-CEP.  The general EPA award was

10   done to Molten Metal as a company, not on the

11   technology, and the certifications and BDAT were

12   all on CEP, the non-radioactive piece.

13          BY MR. FLEISCHER:

14       Q.    Is that the hazardous side?

15       A.    Correct.

16       Q.    That doesn't include the rad waste?

17       A.    Correct.  It would be RCRA waste.

18       Q.    RCRA?

19       A.    Yes.

20       Q.    Which stands for?

21       A.    Probably Research, Conservation &

22   Recovery Act.

23          Q.    I'll talk to you a little bit about

24   Mr. McConchie who you mentioned a few months

CHRISTOPHER J. NAGEL
4-25-06

Page 33

1    ago.

2            (Whereupon, Nagel Exhibit 2 was marked

3            for identification.)

4            BY MR. FLEISCHER:

5       Q.   Dr. Nagel, I just handed you a

6    document consisting of, I believe, twelve pages.

7    I'll just ask you to take a look at that.

8            (Witness reviewing document.)

9            BY MR. FLEISCHER:

10      Q.   Do you recognize the document?

11      A.   I do.

12      Q.   Who is Earl McConchie?

13      A.   Earl McConchie was an employee of Dow

14   Chemical Company, I believe he was director of

15   European Research Operations, and when I met him

16   he was stationed in Texas.  And it was his

17   responsibility to evaluate alternative

18   technologies for the purpose of disposing of

19   hazardous waste.  CEP was one of the

20   technologies that he evaluated as a Dow employee

21   with Dow scientists for two years, might have

22   been two and a half years, coming to our

23   facilities, touring our facilities, and taking

24   data off of our facilities on their waste, with

CHRISTOPHER J. NAGEL
4-25-06

Page 38

1          Q.    Which city?

2          A.    Boston.

3          Q.    Do you recall who was the mediator?

4          A.    I don't.  I think the fellow's name

5     was Green, but I don't know that.

6          Q.    Were you represented by counsel in the

7     mediation?

8          A.    Yes.

9          Q.    Who represented you?

10         A.    Karen Green.

11         Q.    Do you recall when that mediation took

12    place?

13         A.    No.

14         Q.    Were you represented at any point in

15    time in connection with the McConchie matter by

16    any lawyers at Epstein, Becker & Green?

17         A.    I don't believe so.

18         Q.    Were you represented at any point in

19    time by Michael Tuteur in connection with the

20    McConchie matter?

21         A.    I don't believe so.

22         Q.    Do you recall ever discussing the

23    McConchie matter with Michael Tuteur?

24         A.    Yes.

CHRISTOPHER J. NAGEL
4-25-06

Page 44

1    that -- I don't technically know.

2        Q.    Had you been sued?

3        A.    Yes, definitely.

4        Q.    By who?

5        A.    By the trustee.

6        Q.    By the trustee of MMT, by Stephen

7    Gray?

8        A.    Correct.

9        Q.    Do you recall discussing at any time

10   the McConchie matter with Carole Schwartz

11   Rendon?

12           MS. BAGGER:  Objection, no foundation,

13   and objection to the form of the question,

14   "McConchie matter."

15       A.    I'm sorry, could you repeat the

16   question?

17           BY MR. FLEISCHER:

18       Q.    Do you recall ever discussing the

19   McConchie matter with Carole Schwartz Rendon?

20           MS. BAGGER:  Same objection.

21       A.    The only discussion that I recall

22   having with Carole Schwartz Rendon is asking her

23   advice, not -- I didn't discuss with her any of

24   the issues regarding the McConchie letter.  To

CHRISTOPHER J. NAGEL
4-25-06

Page 45

1    the best of my recollection, I was asking her

2    advice on what my -- where my risk or

3    liabilities would be in having joint counts of

4    representation with Bill Haney.

5            BY MR. FLEISCHER:

6        Q.   Do you recall when that discussion

7    was?

8        A.   Probably in April of '98 would be my

9    guess, but maybe the year is wrong.

10       Q.   And do you recall who -- did anybody

11   else participate in that discussion that you had

12   with Carole Schwartz Rendon?

13       A.   No.  It was a relatively short

14   discussion.  I don't -- I'm sure I would have

15   asked the advice of Gene Berman, and I asked the

16   advice of her.

17       Q.   Would Ethan Jacks have been involved

18   in that?

19       A.   I was not a very close friend of

20   Ethan, so it would not have been something I

21   would have done.

22       Q.   Do you recall how ultimately the

23   McConchie dispute was resolved?

24       A.   I do.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

- - -

Robert I. Hanfling,            )
Chapter 11 Trustee for         )
ATG, Inc., and ATG             )
Catalytics, LLC,               )
                               )
            Plaintiffs,        )
                               )
    vs.                        )     Case No: 05-10077-RGS
                               )
Epstein, Becker & Green,       )
P.C., et al.,                  )
                               )
            Defendants.        )

- - -


    Deposition of Carole Schwartz Rendon, a

witness, herein, called by the defendants for

direct examination pursuant to the Federal Rules of

Civil Procedure, taken before Constance Versagi,

Notary Public in and for the State of Ohio, at the

offices of Kushner & Rendon, 2680 BP Building,

Cleveland, Ohio on Tuesday, May 9, 2006, commencing

at 9:50 a.m.

- - -

2fd1eabc-05d5-4056-8827-0834d05023d0

1              of litigation matters, including, trade

2              secrets litigation and commercial, contract

3              litigation, plaintiff and defense.  We are in

4              essence a litigation boutique, can run the

5              gamut of all different kinds of litigation.

6    Q        Did I understand you correctly that your

7              tenure at Epstein, Becker & Green lasted from

8              approximately April of 1997 through August of

9              1998?

10   A        That's my best memory, yes.

11   Q        While you were at Epstein, Becker and Green

12             did you represent certain employees of Molten

13             Metal Technology, Inc?

14   A        Yes, I did.

15   Q        Can you describe how that representation came

16             about?

17   A        My best memory is that it was a referral from

18             Karen Green, who was at Hale & Door.  That is

19             just my best memory.  At the time as I recall,

20             there was an investigation that had begun that

21             was being conducted jointly by the Department

22             of Energy and the FBI, with slightly different

23             focuses between those two organizations.  A

24             number of employees were being contacted with

25             a request that they agree to an interview.  I

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 9

1    was then contacted and I don't recall who the

2    exact contact was, to see if I would be

3    interested in representing to extent that the

4    employees wanted me to, certain of the

5    employees of Molten Metal Technology.

6  Q    When you say you were contacted, that was by

7       somebody at Molten Metal Technology?

8  A    I believe ultimately Karen may have called me

9       initially to see if I was available.  Then

10      ultimately there was a discussion with

11      somebody I can't recall who at Molten Metal

12      Technology.

13 Q    Did you know Karen Green from the U.S.

14      Attorney's office?

15 A    Correct.

16          (Exhibit B

17          marked for identification.)

18 Q    Placing before you, Miss Rendon, a document

19      marked as Exhibit B in this deposition, can

20      you identify that document?

21 A    It is a letter that I sent to one of the

22      Molten Metal employees that I represented by

23      the name of James Howie, H-O-W-I-E, with at

24      least one attachment, although the letter of

25      reference says two attachments.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 10

1   Q   Did James Howie ultimately become a client of

2       yours?

3   A   Yes, he did.

4   Q   I call your attention to the second sentence

5       of the letter where it says the first -- I'll

6       read you the first two sentences.  Enclosed

7       herein please find two important items.  The

8       first is a letter addressed to you that

9       formally details your desire to retain

10      Epstein, Becker & Green, PC to represent you.

11          Is the document that is attached to the

12      first letter, is that the attachment that is

13      referenced in that second sentence?

14  A   Yes.

15  Q   What is that letter, that second letter?

16  A   It is a retention agreement between James

17      Howie and Epstein, Becker & Green.

18  Q   Did you send out more than one letter in the

19      form of Exhibit B?

20  A   Yes, I'm fairly confident that every one of my

21      clients received a letter that looked very

22      similar to Exhibit B, if not identical,

23      particularly the retention agreement portion.

24          (Exhibit C

25          Marked for identification.)

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 14

1          represent them?

2    A     Yes, I did.

3    Q     Were terms of their representation by Epstein

4          Becker the same as those reflected in

5          Mr. Howie's engagement letter?

6    A     Yes.

7                (Exhibit E

8                Marked for identification.)

9    Q     Showing you what is marked as Exhibit E in

10         this deposition, do you recognize this

11         document?

12   A     Yes, I do.

13   Q     Can you tell me what it is?

14   A     This is an internal Molten Metal Technology

15         letter, agreement from its chief general

16         counsel to Jim Howie dated August 18, 1997,

17         detailing the fact that Molten Metal

18         Technology has agreed to pay for Mr. Howie's

19         legal fees in connection with the

20         investigation.

21   Q     I draw your attention back to Exhibit D for a

22         moment.  The second page of Exhibit D, the

23         last paragraph of the second page where it

24         says in addition please provide to me for my

25         file a copy of this letter -- of the letter, a

1　　　　sample of which is attached as Exhibit A to

2　　　　this letter, executed by each of the employees

3　　　　listed above, setting forth Molten Metal

4　　　　Technology's agreement to indemnify them for

5　　　　legal expenses incurred in connection with the

6　　　　ongoing investigation detailed above; do you

7　　　　see where it says that?

8　A　　Yes.

9　Q　　Do you know whether Exhibit E is that formal

10　　　　letter?

11　A　　To the best of my memory the body of it is.  I

12　　　　do believe that I gave them a form of a letter

13　　　　that I thought would be sufficient and

14　　　　effective for my clients.  Then Mr. Jacks put

15　　　　it in final.

16　Q　　You are shown as a carbon copy on Exhibit E?

17　A　　Yes, I am.

18　Q　　Did you receive one of these for each of the

19　　　　employees that you represented?

20　A　　Yes, I did to the best of my memory.

21　Q　　Did you meet with any of the employees before

22　　　　they retained you?

23　A　　Yes, I believe I met with all the employees

24　　　　before they retained me.

25　Q　　You had discussions with them pre-retention?

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 17

**CONFIDENTIAL**

19    Q    To your knowledge, were any employees required

20         by Molten Metal Technology to use you as

21         counsel?

22    A    They were not.

23    Q    Did Epstein, Becker and Green at any point

24         represent Molten Metal Technology, itself?

25    A    No.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 18

1  Q    Did you ever send Molten Metal Technology an

2       engagement letter?

3  A    No, I did not.

4  Q    Do you have any information why the employees

5       retained separate counsel from Molten Metal

6       Technology?

7  A    In my experience it's pretty standard in

8       connection with these large scale criminal

9       investigations.

10          Ordinarily the government will object

11      to a single attorney representing both the

12      company and its employees, because from the

13      government's perspective the employees and the

14      company do not necessarily share a mutuality

15      of interest.  Normally, they will not permit

16      an attorney who represents the company to

17      participate in voluntary interviews of

18      employees as their counsel.

19          In this situation, as is typical, good

20      corporate citizens don't want their employees

21      having to deal with this on their own in the

22      sense of having to either pay for an attorney

23      out of their own pocket, or potentially appear

24      for an interview and/or Grand Jury appearance

25      without a lawyer if they can't afford to

2fd1eabc-05d5-4056-8827-0834d05023d0

1    retain a lawyer.  So frequently companies will

2    indemnify their employees, allow them to

3    retain counsel separate from the company's

4    counsel.

5  Q    Calling your attention back to Exhibit B.

6    Particularly the second letter or attachment

7    letter, the engagement letter.

8         In the first sentence do you see where

9    it says that the employee has retained

10   Epstein, Becker & Green as legal counsel with

11   respect to the investigation of Molten Metal

12   Technology, Inc. currently under way by the

13   Federal Bureau of Investigation and Department

14   of Energy office of the Inspector General?

15   Can you describe the subject of that

16   investigation?

17 A    Yes.  The Federal Bureau of Investigation, I

18   believe it was in conjunction with the

19   Department of Justice Campaign Finance Task

20   Force was investigating possible campaign

21   contribution violations.  The Department of

22   Energy Office of Inspector General was

23   investigating simultaneously the, for lack of

24   a better word, letting of contracts to Molten

25   Metal Technology from the Department of

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 20

1    Energy, which were referred to as PRDA,

2    P-R-D-A.  I don't any longer recall what the

3    letters stand for.  That is what the contracts

4    were called, PRDAs.

5    Q    Which entity, the FBI or DOE, was interviewing

6         the employees who were your clients?

7    A    Both.

8    Q    Were they doing it simultaneously?

9    A    Yes.

10              (Exhibit F

11              Marked for identification.)

12   Q    I'm showing you what has been marked as

13        Exhibit F in this deposition.  Can you

14        identify that document?

15   A    This is a memo that I prepared dated August

16        25, 1997, summarizing interviews of my clients

17        that had taken place prior to that date.

18

19

20

21                   **CONFIDENTIAL**

22

23

24   Q    Is this Exhibit F the final form of the

25        memorandum that was sent to the client in

FINCUN-MANCINI -- THE COURT REPORTERS
(216) 696-2272

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 23

1    Q    Why is this one dated later than Mr. Howie's

2         engagement letter?

3    A    Because not everybody was of interest to the

4         investigators early on, therefor in need of

5         counsel.  There were many, many employees of

6         Molten Metal Technology who were never asked

7         to appear for interview or provide documents

8         who to my knowledge never had to retain

9         counsel.  As individuals became relevant, in

10.       the course of the investigation, they would

11        sometimes seek counsel at that point in time.

12        It didn't all happen on one date.

13   Q    Do you recall whether Chris Nagel was

14        interviewed by the FBI/DOE?

15   A    I can't say for certain.

16   Q    Do you recall whether he provided any

17        documents to the FBI/DOE?

18   A    I also can't say for certain one way or the

19        other.  I believe that he did, I'm not

20        certain.

21   Q    Do you recall whether Chris Nagel was asked to

22        testify before Congress?

23   A    Yes, he was.

24   Q    What was your role in Mr. Nagel's

25        Congressional testimony?

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 24

1    A    I helped him prepare for that appearance.
2         Helped him prepare in some respects his
3         written statement.  By in some respects I mean
4         he primarily wrote it.  I tried to edit it in
5         some fashion.
6              I appeared with him at the
7         Congressional hearing as his counsel, but was
8         not called upon as I recall to participate in
9         any fashion.  I was the Oliver North potted
10        plant that day.
11   Q    In the course of representing the employees,
12        including Mr. Nagel, how familiar did you
13        become with MMT's technology?
14   A    Not that familiar.  I just obtained a passing
15        understanding of what the technology did but
16        nothing in depth.
17   Q    Did you consider it important to your
18        representation of the employees to understand
19        how the technology worked?
20   A    Not beyond surface level understanding of what
21        the technology did.
22   Q    Why was that?
23   A    It wasn't really relevant to issues my clients
24        were being asked in the course of the
25        investigation.

FINCUN-MANCINI -- THE COURT REPORTERS
(216)696-2272

2fd1eabc-05d5-4056-8827-0834d05023d0

1    Q    Was it important for you to understand whether

2         the technology worked or how well it worked?

3    A    Not in any detail.

4    Q    Why not?

5    A    Again, it wasn't that directly relevant.

6         Having a basic understanding of what the

7         company did, how the technology worked, what

8         individual clients did within the company was

9         of course necessary.  But to understand in any

10        kind of technical detail exactly how the

11        technology worked, or issues associated with

12        how well it worked, was just not relevant to

13        the nature of my representation of my clients.

14   Q    Did Chris Nagel ever speak to you about the

15        demand letter he received from a gentleman

16        named Earl McConchie?

17   A    Yes, he did.

18   Q    What do you recall about that communication?

19   A    I recall Chris calling me, telling me that

20        they had received a letter from a former

21        employee, that he described as threatening a

22        lawsuit.

23             Chris said that he understood either

24        from Karen Green or Bill Haney that Karen

25        Green's advice was she represent both of them

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 26

1          in connection with that matter.  That she had

2          prepared, she being Karen, had prepared some

3          type of a waiver of conflict form that she

4          wanted Chris to sign.

5               He wanted my advice on a very limit

6          question, which was, is the form okay, and is

7          it technically okay for Karen to represent

8          both of us in connection with this matter.

9          Both of us being Chris and Bill Haney.

10    Q    What did you tell Mr. Nagel?

11    A    My memory is I told Mr. Nagel to send me the

12         documents that he was referencing, and that he

13         did so.  That I reviewed them.

14               My memory is I thought that the form

15         that Karen had prepared was generally okay,

16         but a little weighted towards Bill Haney.  My

17         memory is it provided if a conflict arose, she

18         could continue to represent Bill Haney in

19         connection with that matter.  Earl McConchie,

20         I can't remember exactly his name, she

21         wouldn't be able to continue to represent

22         Chris Nagel.

23               I believe I suggested to Chris that it

24         would be in my opinion more even and more

25         balanced if the agreement was if a conflict

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 27

```
 1          arose, she could of course continue to
 2          represent Bill Haney in all of the other
 3          matters for which she was already representing
 4          him.  She would step aside, not represent
 5          either one of them in connection with the Earl
 6          McConchie matter.
 7    Q     Do you have any information about how that
 8          representation proceeded?
 9    A     None whatsoever.
10    Q     When did you say you left Epstein, Becker &
11          Green?
12    A     August of 1998.
13    Q     What was the status of the FBI/DOE
14          investigation at that point?
15    A     It had wound down to at most a trickle when I
16          left Epstein, Becker & Green.  I don't believe
17          there had been activity of any significance
18          for a period of time before I left.
19    Q     What was the status of the Congressional
20          hearings or investigation that point?
21    A     That has been concluded.
22    Q     Did you say you went to a firm called
23          Messerman & Messerman after you left Epstein?
24    A     Correct, here in Cleveland, Ohio.
25    Q     What was your practice at Messerman?
```

2fd1eabc-05d5-4056-8827-0834d05023d0

1   A   Very similar to my current practice.  A little

2       bit more weighted on the criminal defense side

3       than general litigation.  It's a litigation

4       boutique as well.

5   Q   Did you maintain contact with any of the

6       Molten Metal Technology employees when you

7       moved to Ohio?

8   A   The only one I recall having any contact with

9       after I moved was Chris Nagel.

10  Q   What was the nature of that contact?

11  A   My memory is that Chris contacted me shortly

12      after I moved to Ohio, in connection with

13      shareholder litigation that had been filed in

14      Massachusetts, that I had not previously

15      participate in.

16          At that time, he was contemplating

17      obtaining separate or additional counsel.  My

18      memory is Bingham Dana was representing him in

19      that litigation.  He was contacting me to see

20      whether or not I thought that it made sense

21      for me to represent him in connection with

22      that litigation.

23  Q   Did you ever represent Chris Nagel in the

24      shareholder litigation?

25  A   No, I did not.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 29

1    Q     Were you ever a party to a joint defense

2          agreement among counsel to that shareholder

3          litigation?

4    A     No, I was not.

5    Q     Did you receive any documents relative to that

6          shareholder litigation?

7    A     Yes, I did.  I believe on a couple of

8          occasions Chris asked one or more of the

9          lawyers at Bingham, Dana & Gould to send me

10         documents in connection with that litigation,

11         the specifics of which I can't recall as I sit

12         here today.

13               (Exhibits H & I

14                marked for identification.)

15   Q     Put in front of you two documents that are

16         marked as Exhibit H and I.  I note they were

17         also marked as Exhibit 1 and 2 in the

18         deposition of Michael Tuteur, which was held

19         on April 13th.  I want you to flip past the

20         first page of each one.

21               Is it fair to say the first page of

22         both Exhibit H and I is transmission from you

23         to Michael Tuteur at Epstein, Becker & Green?

24   A     With respect to Exhibit I it is.  With respect

25         to Exhibit H, that cover letter was prepared

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 30

1          by my secretary, Karen.  That's not my

2          signature.  She wrote my name in.

3     Q    Flipping past the cover of each one of those.

4          Are Exhibits H and I, starting at the second

5          page of each one, documents that you received

6          from the law firm of Bingham, Dana & Gould?

7     A    Yes, they are.

8     Q    It's your understanding you received these

9          documents because Mr. Nagel asked to have them

10         forwarded to you?

11    A    That is my understanding, yes.

12    Q    Do you recall having a discussion with

13         Mr. Nagel about either one of them?

14    A    I do not have a specific recollection of a

15         discussion with Mr. Nagel about either of

16         these documents.

17    Q    Why did you send these two documents to

18         Mr. Tuteur?

19    A    I concluded pretty quickly that it made no

20         sense despite the fact I liked Chris Nagel

21         very much, for me to represent him from

22         Cleveland, Ohio in connection with a piece of

23         shareholder litigation that had been filed in

24         Boston, Massachusetts.  It seemed

25         unnecessarily expensive.  I had joined a law

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 31

1    firm that exceedingly busy with back to back

2    federal and state trials scheduled within

3    months of my rival.  Jerry Messerman was not

4    happy at the prospect of my working on

5    anything other than what he hired me to work

6    on.

7         So, I suggested to Chris that he might

8    want to consider meeting and talking to Mike

9    Tuteur, who I think very highly of, to see if

10   he, Chris, may want to retain Mike to

11   represent him in connection with the

12   shareholder litigation.  It was for that

13   reason that I forwarded these documents to

14   Mike, so that if and when Chris contacted him,

15   Mike would know what Chris was calling him

16   about.

17   Q   Do you know whether Chris Nagel did contact

18       Mike Tuteur?

19   A   Yes, I remember Mike telling me he met with

20       Chris.

21   Q   Do you remember when that was?

22   A   I do not.  It was subsequent to these

23       documents having been subpoena to Mike, I

24       couldn't give you an exact date.

25            MS. BAGGER:    No further questions.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 39

1          practicing here, they transferred them to us,

2          to our storage facility.

3    Q    The firm went out of business if that is okay?

4    A    Jerry and Gail Messerman retired.

5    Q    Before they ceased to operate, you left before

6          that happened?

7    A    Yes.

8    Q    You had talked a little bit earlier about the

9          federal investigation, DOE/FBI investigations.

10         You indicated that the two sides had different

11         focuses, FBI versus DOE.  I believe you

12         answered that in response to a question that

13         Paula asked you; do you recall that?

14   A    Yes, I do.

15   Q    Can you explain what the different focuses

16         were between the FBI side and the DOE side?  I

17         don't know if they were subtle or not, what

18         the differences would have been?

19              MS. BAGGER:       Object to the form of

20         the question.

21   A    To the best of my memory the FBI was focusing

22         on possible violations of campaign finance

23         laws.  The Department of Energy Office of

24         Inspector General was focusing on the issuance

25         of PRDA contracts to Molten Metal Technology.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 40

1    Q    You said you don't recall what PRDA stands

2         for?

3    A    I do not.

4    Q    I believe Chris Nagel did.  So for he's the

5         only one so far.

6              Do you recall who at the federal

7         government -- do you recall who on the federal

8         government side was working on the DOE side of

9         that investigation?

10             MS. BAGGER:       Objection to the form

11        of the question.

12   A    By name, no, I do not.

13   Q    Do you recall who on the federal side, the

14        government side was working on the FBI side of

15        that investigation?

16             MS. BAGGER:       Objection to the form

17        of the question.

18   A    I do not recall a name, no.

19   Q    Do you recall, also recall that there was a

20        Grand Jury proceeding?

21   A    Yes.

22   Q    Can you explain what you know about that Grand

23        Jury proceeding?

24   A    To the best of my memory the Grand Jury was

25        associated with the investigation into

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 41

```
1          possible violations of campaign finance laws.
2     Q    How did the Grand Jury investigation tie in,
3          if it did at all, with the FBI/DOE
4          investigations?
5     A    It was one branch, if you would, of the
6          ongoing investigation.  That there was both
7          investigators in the field interviewing
8          people, and a Grand Jury issuing subpoenas and
9          hearing live testimony.
10    Q    Do you recall which district the Grand Jury
11         was sitting in?
12    A    District of Columbia.
13    Q    Do you recall the federal prosecutor who would
14         have been working on that?
15    A    I don't.
16              MS. BAGGER:      His name you mean?
17    Q    Yes, the name?
18    A    I do not.
19    Q    Did you have an understanding as to who the
20         target or targets of that Grand Jury
21         investigation were?
22              MS. BAGGER:      Objection to the form
23         of the question.
24    A    I don't recall whether or not anybody had
25         received a formal target letter in connection
```

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 44

1    Q    Do you recall male or female?

2    A    I do not.

3    Q    You had also mentioned in your testimony a

4         little while ago that Chris had testified at a

5         Congressional hearing?

6              MS. BAGGER:        Chris Nagel?

7    Q    Yes.

8    A    Yes, that is correct.

9    Q    Do you recall which, what body of Congress

10        before which he testified?

11   A    I believe it was the House Subcommittee on

12        Commerce.

13   Q    Chris had a written statement that he prepared

14        for that testimony?

15   A    That's correct.

16   Q    Did I understand your testimony that he had

17        showed that to you beforehand?

18   A    Yes, he did.

19   Q    You had made some suggestions on changes to

20        that?

21   A    Yes, I did.

22   Q    Do you recall the substance of that document?

23        I'm sorry, strike that.  Do you recall the

24        substance of the statement that he was going

25        to make to Congress or to the Congressional

Page 45

1          committee?

2     A    Only in the most general terms.  I have not

3          seen it or reviewed it since then.  It's many

4          years ago.

5     Q    What do you recall generally about that

6          statement?

7     A    That Chris' focus was on how the Molten Metal

8          bath itself works.

9     Q    Was he getting into issues concerning the

10         technology itself?

11    A    In general terms, but geared towards the

12         audience.

13    Q    The audience being?

14    A    Members of Congress.

15    Q    Do you recall thinking back to the time of the

16         events in question here 1997, 1998, do you

17         recall what Ethan Jacks' position with MMT

18         was?

19    A    Yes, he was general counsel.

20    Q    You didn't personally represent Mr. Jacks; is

21         that correct?

22    A    That's correct, I did not.

23    Q    Do you recall conferring with Mr. Jacks on a

24         regular basis?

25    A    I did confer with Mr. Jacks as appropriate in

2fd1eabc-05d5-4056-8827-0834d05023d0

1        starts in many cases?

2   Q   Yes, the paragraph beginning in many cases.

3   A   Okay, I've read it.

4   Q   Do you recall that there was much testimony by

5        the witnesses or statements by the witnesses

6        concerning the technology and its operation?

7           MS. BAGGER:     Objection to the form

8        of the question.

9   A   My memory is it was not a focal point of the

10       interviews, but that some of the witnesses who

11       had knowledge with respect to the technology

12       did talk about it in the course of their

13       interviews.

14  Q   Do you recall which witnesses would have

15       talked about the technology in their

16       interviews?

17          MS. BAGGER:     Objection to the form

18       of the question.

19  A   I do not specifically, no.

20  Q   There is another sentence in that same

21       paragraph, I'll read it out loud for the

22       context of the question.  Investigators

23       clearly began the process with the

24       understanding that the technology does not

25       work.  That the PRDA was a colossal waste of

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 72

1          that statement that you made in the last

2          sentence there?

3     A    Specifically, no, but in general it would have

4          been the content of the interviews.

5     Q    In the preceding sentence again, the one that

6          began investigators clearly, do you know what

7          technology you were referring to there?  You

8          use the word technology, do you recall what

9          technology specifically you were referring to?

10    A    The technology that I was referring to was the

11         process by which the radioactive waste was

12         converted into something not as harmful.

13    Q    Is that the extent of your understanding of

14         it?

15    A    My memory it has something to do with a molten

16         metal bath.  The contents of the bath I

17         couldn't describe for you.  Something to do

18         with putting the radioactive waste stream into

19         a molten metal bath, things getting separated

20         to different levels of some sort.  I'm trying

21         to remember what CEP stands for and I can't.

22    Q    With respect to the term CEP, if I said the

23         term catalytic extraction process, would that

24         sound familiar to you?

25    A    That sounds right.

Page 82

1          Do you recall the basis for that statement?

2               MS. BAGGER:      I'm going to object

3      to the form of the question and its

4      characterization.

5  A   I do not recall specifically why I wrote that

6      as I did, that the investigators began the

7      process with the understanding that the

8      technology does not work and that the PRDA was

9      a colossal waste of money, other than it must

10     have been something that I gleaned from the

11     tone and/or content of their questions.

12 Q   Do you recall whether or not -- strike that.

13          Do you recall the extent to which the

14     questioning of the witnesses during the

15     investigation did relate to issues concerning

16     the technology and its operation?

17 A   I recall that there were questions regarding

18     the technology and its operation.  I do not

19     recall that being the focal point of the

20     interviews.

21 Q   What do you recall was the focal point?

22 A   Principally issues associated with campaign

23     finance contributions.  Both in terms of

24     individual contributions and events.  There

25     were a lot of questions about specific

Page 83

```
 1         campaign events and appearances by candidates

 2         at various events.  Questions regarding

 3         relationships between various individuals.

 4         You know, a list of do you know person A, do

 5         you know person B, do you know what kind of a

 6         relationship person A has with person B.  Then

 7         questions regarding the PRDA and as I recall

 8         reissuance of the PRDA, and dollar figures

 9         associated with the PRDA.

10    Q    You don't recall why they would have thought

11         it was a colossal waste of money?

12              MS. BAGGER:        Objection to the form

13         of the question and its characterization.

14    A    Must have been something I gleaned from the

15         tone or content of some of their questions to

16         some of my clients, no.

17    Q    Do you recall there were specific questions

18         concerning the technology?

19    A    I do recall my clients talking, some of my

20         clients, not all of them, talking about the

21         technology in the course of the interviews.

22    Q    Do you recall though that there were questions

23         presented to your clients concerning the

24         technology?

25    A    Specifically how the issue came up, I don't
```

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 85

1    Q    Are you referring to an entry that is dated
2         April 20, 1998?
3    A    Correct.
4    Q    Do you know whether or not besides the entry
5         that appears on 4-20-1998 any other records of
6         EBG would reflect any work you may have done
7         in connection with McConchie, in connection
8         with Earl McConchie or E. McConchie?
9    A    I think it's unlikely because I didn't do any
10        work in connection with that matter other than
11        to review documents Chris Nagel sent to me.
12   Q    You testified among the documents was a
13        conflict waiver?
14   A    I believe he sent me two documents.  I believe
15        one was a letter Earl McConchie had sent.  To
16        whom it was addressed I cannot tell you.  The
17        other was some type of a conflict waiver that
18        my memory is Karen Green prepared.
19             (Exhibit O
20             Marked for identification.)
21   Q    The court reporter just handed you Exhibit O,
22        what is marked as Exhibit O.  If you could
23        take a look at that, please.
24   A    Okay, I've looked through it.
25   Q    A moment ago you referenced a letter that was

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 86

```
 1              among the documents that Chris Nagel sent to
 2              you for review.  Do any of the documents
 3              contained or any of the pages contained within
 4              Exhibit O, are they familiar with you?
 5                   MS. BAGGER:       Objection to the form
 6              of the question.
 7    A         The letter dated March 25th, 1998 looks
 8              familiar to me.  Only because I have a
 9              recollection of having seen a letter that was
10              addressed to both Bill Haney and Chris Nagel
11              that related to Earl McConchie.
12    Q         Do you believe this might be that letter?
13    A         It's possible.  I don't recall seeing anything
14              with this kind of odd fonts.
15    Q         Other than the fonts being a little strange,
16              which they clearly are, does the document
17              otherwise seem familiar to you?
18    A         Only in very general terms in that I remember
19              Chris sending to me a letter that was
20              addressed to him and Bill Haney that had
21              something to do with Earl McConchie,
22              complaints that Earl McConchie had regarding
23              his termination.
24    Q         With respect to the April 20th time entry --
25                   MS. BAGGER:       Back on Exhibit N?
```

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 89

1        entry, I don't recall Gene -- I don't have an

2        independent memory of Gene being on the phone

3        call.  He must have been, that is how I

4        recorded it.  I don't remember Gene

5        participating in the conference call.

6    Q   The reference on the next page -- the next

7        time entry from the one we were just referring

8        to, the April 21, '98, it's referring to a

9        conflict letter.  What conflict letter are you

10       referring to in the 4-21-98 entry?

11   A   The waiver form that Karen Green had prepared,

12       she wanted Chris to sign.

13   Q   So that relates again to this McConchie

14       matter?

15   A   Yes.

16   Q   Did you retain a copy of the McConchie letter

17       in your file after April 20, 1998?

18   A   I may have, yes.

19   Q   Would you have taken that with you when you

20       left to go to Messerman & Messerman?

21           MS. BAGGER:        Objection to the form

22       of the question.

23   A   It's quite possible I would have if it was in

24       the file I took with me.

25   Q   Do you know if you would have taken notes in

Page 93

1        litigation?

2    A    I think Chris Nagel told me about it.

3    Q    Did he explain to you at all what the nature

4        of the allegations were in the shareholder

5        litigation?

6            MS. BAGGER:        At any time?

7    Q    At any time?

8    A    He may have, I don't recall one way or

9        another.

10   Q    Did anyone else explain to you the nature of

11       the allegations, plaintiff's allegations in

12       the shareholder litigation?

13   A    Not that I have a recollect of, no.

14   Q    Do you recall any discussion with Mike Tuteur

15       concerning the substance of the allegation,

16       the plaintiff's allegation in the shareholder

17       litigation?

18   A    Not concerning the substance of the

19       plaintiff's allegations, no.

20   Q    A nature of your discussion with Mike, your

21       oral discussions with him concerning the

22       shareholder litigation?

23            MS. BAGGER:        At any time?

24   Q    At any time?

25   A    I believe that in the fall, November time

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 94

1       frame 1998 after I moved to Cleveland I had

2       conversations with Mike Tuteur about the fact

3       that litigation existed.  That Chris had

4       contacted me about possibly representing him

5       individually.  That I concluded that didn't

6       make a lot of sense.  Didn't have the time

7       available to do it in any event.  That if Mike

8       didn't object, I was going to give Chris

9       Mike's name as somebody that he could contact,

10      talk to about possibly representing him in

11      connection with that litigation.

12  Q   Do you know what became of that?

13  A   I remember Mike telling me he met with Chris.

14      I believe at some point Chris retained him.  I

15      may have learned that fact in connection with

16      preparing for my deposition.

17  Q   Do you know how the shareholder litigation

18      resolved?

19  A   I do not.

20  Q   Do you have exhibit I think H?

21          MS. BAGGER:      The November 3rd?

22  A   I have it.

23  Q   This is a package.  Can I see the official

24      copy for a second, please?

25          You've previously identify this

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 99

1           at?

2       Q   Why don't we go on the April 13, 1998 invoice,

3           fourth page in.  I'm looking at an entry March

4           5, 1998, bottom entry, it scans over to the

5           next page.  Take a look at that.

6       A   I see it.

7       Q   Does this refresh your recollection whether or

8           not you had any discussions with Sabin

9           Willett?

10      A   It does not.  It clearly appears from my time

11          sheet I did, but I have no independent

12          recollection.  Must have been very short since

13          there are three phone calls and the whole

14          thing was only .5.

15      Q   Do you known what the nature of that

16          discussion would have been?

17      A   I do not.

18      Q   Do you recall discussing shareholder

19          litigation with Chris Nagel?

20      A   I recall Chris telling me about the

21          shareholder litigation, that it existed.  That

22          Bingham Dana was representing all the

23          defendants.

24              I recall discussing with Chris in the

25          fall, late fall, early winter of 1998, his

2fd1eabc-05d5-4056-8827-0834d05023d0

1   A     I don't recall when Mike called me.  Whether

2          it was before or after the conversation I

3          described earlier, where I told him, asked him

4          if it was okay to give Chris Nagel his name as

5          an attorney that Chris could contact to

6          represent him in connection with the

7          shareholder litigation.

8   Q     Do you recall whether the McConchie matter

9          ever came up in your conversation with Mike

10         Tuteur?

11   A     To my recollection, it did not.

12   Q     Do you recall -- strike that.  The period of

13         time that you were working on the MMT matter,

14         I'm referring to your representation of

15         various individuals, what was the scope of

16         time while you were at EBG, was that from

17         August, summer of 1997 all the way up to about

18         the time you left?

19   A     My memory is that my work for the Molten Metal

20         employees diminished pretty significantly

21         prior to my departure.  That there was very

22         little activity in the late spring and summer

23         of is it 1998.

24   Q     When was the high point of that work?

25   A     That work was at its busiest right after I was

2fd1eabc-05d5-4056-8827-0834d05023d0

1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3

4                          No. 05-10077-RGS

5

   * * * * * * * * * * * * * * * * * * * * * * * * *

6

7  ROBERT I. HANFLING, CHAPTER 11 TRUSTEE FOR ATG, INC.,

8  AND ATG CATALYTICS L.L.C.,

9                              Plaintiff

   vs.

10

11 EPSTEIN, BECKER & GREEN, P.C., JOHN PRESTON, CHRISTOPHER

12 NAGEL, EUGENE BERMAN, ETHAN JACKS, QUANTUM CATALYTICS LLC.,

13 ABC CORPS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5,

14                           Defendants.

15 * * * * * * * * * * * * * * * * * * * * * * * * *

16

17      DEPOSITION OF: MICHAEL TUTEUR, a witness in the

18 above-entitled cause, taken before CINDY BERGLUND, CSR,

19 Registered Professional Reporter and Notary Public pursuant

20 to the applicable provisions of the Massachusetts Rules of

21 Civil Procedure, at the offices of GADSBY & HANNAH, LLP, 225

22 Franklin Street, Boston, MA 02110, on the 13th day of APRIL,

23 2006, commencing at 1:12 p.m.

24

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

11

1      A.    Correct.

2      Q.    What was the nature of your representation for

3      Mr. Nagel?

4            ATTY. COOKE:  Objection.  Your questions are to be

5      limited to the period up to December 1, 1998 pursuant

6      to the phasing order and I think you are into 1999 and

7      beyond and attorney/client relationships.  Do you want

8      to put that in a time frame for us?

9      Q.    Did you do any work for Mr. Nagel in 1998?

10     A.    1998?

11           ATTY. COOKE:  Do you mean prior to December 1,

12     1998?

13     Q.    Prior to December 1 -- well, I'll ask it that way.

14           ATTY. COOKE:  If you find a need to go beyond a

15     little bit, let me know.  But that certainly is the

16     focus of phase 1 pursuant to the court's order.  And by

17     "you," you mean Mr. Tuteur; is that right?

18           THE WITNESS:  Me personally?  Not Epstein Becker?

19     Q.    The matters that you handled?

20     A.    I don't believe I actually did any legal work for

21     Dr. Nagel until after December 1, 1998.

22     Q.    What about Mr. Preston, again, we'll use this

23     December 1, 1998 deadline?

24     A.    I did -- I'm confident I did no work for

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

12

1        Mr. Preston before December 1, 1998.

2        Q.    And with respect to Mr. Strong?

3        A.    The same as Mr. Preston.  I did no work for -- no

4        legal work for Mr. Preston before December 1, 1998.

5        Q.    Were you aware of an investigation being performed

6        by the United States government or maybe a series of

7        investigations concerning MMT in about the 1997, 1998

8        time frame?

9        A.    Yes.

10       Q.    What is your understanding of those

11       investigations?

12       A.    To the best of my recollection, the Department of

13       Energy and the FBI and ultimately the United States

14       Congress did investigate MMT and officers and directors

15       of MMT, employees, in connection with a campaign

16       finance investigation arising out of the Gore campaign.

17       Q.    And do you know how MMT was involved in that

18       investigation?

19       A.    I don't know much.  What I recall is that there

20       were questions raised about campaign contributions to

21       the Gore campaign which appeared close in time to the

22       letting of contracts by the Department of Energy to

23       MMT.

24       Q.    Do you know if any attorneys with Epstein, Becker

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

13

```
 1        and Green had provided representation in connection

 2        with that investigation to any parties prior to

 3        December 1, 1998?

 4             ATTY. COOKE:  Objection.  I don't understand that

 5        question.

 6             ATTY. FLEISCHER:  What don't you understand?  I'm

 7        asking if the firm represented anybody in connection

 8        with that representation?

 9             ATTY. COOKE:  You mean in connection with those

10        investigations?

11             ATTY. FLEISCHER:  Yes.

12             ATTY. COOKE:  That's a different question.  I

13        don't have an objection to that question.

14             THE WITNESS:  Yes.

15        Q.   Who at Epstein Becker was providing that

16        representation?

17        A.   Ms. Rendon.

18        Q.   Any other attorneys?

19        A.   I think she may have had limited assistance from

20        an associate or a paralegal, but it was handled almost

21        exclusively, I believe, by Ms. Rendon.

22        Q.   Was that during the entire course of her working

23        on those matters that she worked essentially on her

24        own?
```

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

14

1          ATTY. COOKE:  Objection.  No foundation.

2          THE WITNESS:  I think that the -- as is often the

3     case in criminal investigations or quasi criminal

4     investigations, it's not uncommon for the lead person

5     to handle the matter pretty much by him or herself.

6     Q.   And to be clear, you weren't working on those

7     matters with her when she was working on those matters

8     while she was employed at Epstein, Becker and Green?

9     A.   Other than that she, you know, mentioned she had a

10    client.  I did not perform any legal services, I think,

11    to any of those -- in connection with that

12    investigation.

13    Q.   So did you have any communications in 1997 or 1998

14    with any of the officers or directors, employees of

15    MMT?

16    A.   I don't believe so.

17         ATTY. COOKE:  Are you talking about prior to

18    December 1998?

19         THE WITNESS:  On December 1, 1998 I had

20    communications with Dr. Nagel.

21    Q.   And I assume -- strike that.

22         And you had further communications after

23    December 1, 1998?

24    A.   With Dr. Nagel?

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

17

```
1              THE WITNESS:  I have no reason to believe that

2        they were.

3        Q.    That's essentially what I'm asking.

4        A.    Slightly different.

5        Q.    Do you recall specifically when you first started

6        speaking with -- strike the question.

7              When did you first start to get involved in the

8        MMT matter?

9              ATTY. COOKE:  Objection.  What do you mean by the

10       "MMT matter"?

11             ATTY. FLEISCHER:  The investigations.  The matters

12       that Ms. Rendon had been working on?

13             ATTY. COOKE:  Objection to the form of the

14       question.  No foundation.

15             THE WITNESS:  I don't believe that I ever actually

16       got involved with the investigations.  Ms. Rendon left

17       Epstein Becker and asked me whether I would, in the

18       event that the investigations continued, serve as local

19       counsel to her, you know, if she needed to come to

20       Boston or needed something done with the various

21       agencies.  My recollection is she took the file.  She

22       intended to continue to keep those clients if, but only

23       if, the investigation, in fact, continued.

24             My recollection is that it had pretty much run its
```

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

18

1       course by the time that she left.  So she asked me

2       whether I would do that and I agreed that I would do

3       that, but my recollection is that, in fact, I never

4       needed to do that.

5       Q.    Thank you.  That's what I was looking for.

6             Do you know who Rhonda Walker was?

7       A.    I know her only as an employee of MMT.

8       Q.    Are you familiar at all with the issues between

9       her and MMT?

10            ATTY. COOKE:  Objection.

11            THE WITNESS:  Only that there were -- I'm now

12      testifying about knowledge that I learned much later,

13      but that I came to understand that Ms. Walker had a

14      dispute with MMT.

15      Q.    Did you ever come to understand how it was

16      resolved?

17      A.    I have no idea.

18            ATTY. FLEISCHER:  I'll mark a document, please.

19            (Exhibit 1, 11/3/06 PACKAGE OF DOCUMENTS, marked

20            for identification.)

21

22      Q.    The document that we're marking is one of those

23      documents that is labeled as confidential.  It will be

24      Exhibit 1.  Just to let you know, the document was

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

23

```
1        shareholder's litigation, rather?

2        A.    I don't believe I worked on this because I wasn't

3        representing the parties at this time.

4        Q.    Do you have any understanding as to why this

5        document would have been directed to you by Ms. Rendon?

6        A.    Yes.

7        Q.    Why would she have sent this one to you, if you

8        know or if you can surmise?

9        A.    Well, I can't say specifically what Ms. Rendon was

10       thinking.

11       Q.    Right.  I wouldn't think you could.

12       A.    But in or about this time period, Ms. Rendon

13       called me and said that Dr. Nagel -- well, that she

14       was -- that Dr. Nagel was considering or was going to

15       need separate representation in the shareholder's case,

16       in the securities case and I don't remember exactly the

17       time frame or the time sequence, but originally

18       Ms. Rendon was contemplating that she would represent

19       Dr. Nagel in that matter and that perhaps I could

20       serve, subject to Dr. Nagel's okay and subject to the

21       insurance company's approval, that I would serve as

22       local counsel to her in the securities case.

23            As time progressed, and it may have been early in

24       November, later in November, I don't remember, it
```

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

24

1    became evident that it probably made more sense for me

2    to represent Dr. Nagel in the securities case if Dr.

3    Nagel wanted me to represent him and if EBG, Epstein

4    Becker, would be approved to go on the panel for, I

5    don't remember if it's Chub or AIG, the D and O

6    carrier.

7         So during the month of November preliminarily with

8    an idea towards potentially representing Dr. Nagel in

9    that case, Ms. Rendon sent me a small number of

10   documents to essentially apprise me of what was

11   happening in the securities case and I believe these

12   documents were her effort to do that.

13   Q.   Was any application -- strike that.

14        Did anything become of that representation in

15   1998, before December 1st of 1998?

16   A.   I believe I met with Dr. Nagel on the 1st, I think

17   it was the first time I ever met Dr. Nagel, perhaps I

18   met him in the hall at Epstein Becker when meeting with

19   Carole just to be introduced to say hello, but I

20   believe the first substantive meeting I ever had with

21   Dr. Nagel was on December 1, and my best recollection

22   is that on December 3, the insurance company indicated

23   that it was willing to allow Epstein Becker to be

24   counsel even though we had not previously been on their

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

26

1      A.    You are talking about two different things.  I

2      don't recall when or if I entered an appearance for

3      those three gentlemen in the securities case.  I just

4      don't remember.  I don't believe I did it in 1998 and I

5      don't remember when I did it, if I did it.

6           In December of 1998 I think Dr. Nagel, once we had

7      been approved, I think Dr. Nagel agreed, decided that

8      he did want me and Epstein Becker to represent him in

9      the securities case, to advise him, and he suggested

10     that in addition, his colleagues, Mr. Preston and

11     Mr. Strong, should be represented by Epstein Becker as

12     well.

13          So I think in December we began to represent the

14     three gentlemen, but I don't know about whether it was

15     formally in connection with the securities case.

16     Q.    Okay.

17           ATTY. FLEISCHER:  Please mark this.

18           (Exhibit 3, 11/16/98 EBG DOCUMENT, marked for

19           identification.)

20

21     Q.    This is Exhibit 3.

22     A.    Is it your intention that these three separate

23     documents would be one exhibit?

24     Q.    Yes.  They were provided to us stapled together so

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

37

1     that's reflected in the memorandum that was marked as

2     Exhibit 3.

3          Can you tell us in what capacity you were involved

4     in that decision making?

5     A.    I was the vice chair of Epstein, Becker and

6     Green's quality assurance committee.

7     Q.    I also want to ask you about the third page of

8     Exhibit 3, which is your memorandum to Kathryn Johnson,

9     Jarvis Kellogg and Mr. Torres dated November 16, 1998.

10         You previously testified that you did not

11    represent Mr. Nagel until after December 1, 1998.  I

12    want to draw your attention to the line in the second

13    paragraph there that says, "We, specifically I,

14    continue to represent Chris in connection with the

15    shareholder litigation against MMT and its former

16    officers and directors."

17         To what were you referring in that sentence?

18    A.    Well, by this time, Ms. Rendon had asked me

19    whether I would be interested, subject again to Dr.

20    Nagel's and the insurance company's okay, to serve as

21    counsel to Mr. Nagel -- Dr. Nagel in the shareholder

22    litigation.  By this time, she had sent me a couple of

23    these memos.

24         So at this point, we had had preliminary

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

38

1    discussions about the possibility of representation.

2    Hence, I believed that there was already confidential

3    information that had been provided to me and so

4    accordingly we had to examine the question about

5    whether that preliminary pre-representation status

6    affected Epstein Becker's potential representation of

7    ATG.  So that's what I meant by that.

8    Q.    And there is in, I believe it was Exhibit 2 -- is

9    that Exhibit 2?

10   A.    Yes.

11   Q.    Maybe Exhibit 1.  In Exhibit 1, there was a

12   reference to joint defense communication.

13         Was Epstein, Becker and Green a party to any joint

14   defense agreement with respect to the MMT shareholder

15   litigation prior to December 1, 1998?

16         ATTY. FLEISCHER:  Objection.  Foundation.

17         THE WITNESS:  I am unaware of -- I do not believe

18   Epstein Becker was a party to a joint defense agreement

19   during the Molten Metal shareholder litigation before

20   December 1, 1998.

21   Q.    When you referred to confidential information that

22   had been provided in these preliminary discussions

23   about the possibility, were you referring to the

24   documents that were provided to you by Ms. Rendon that

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

39

1          had been marked as Tuteur Exhibits 1 and 2?

2     A.    Yes.

3          ATTY. COOKE:   I have no further questions.

4

5          (Deposition concluded at 2:09 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF MASSACHUSETTS

3

4        _____

                                        )

5        ROBERT I. HANFLING, CHAPTER 11 )  Case No. 05-10077-RGS

         TRUSTEE FOR ATG, INC., AND     )

6        ATG CATALYTICS, L.L.C.,        )

                                        )

7               Plaintiffs,             )

                                        )

8        vs.                            )

                                        )

9        EPSTEIN, BECKER & GREEN, P.C., )

         JOHN PRESTON, CHRISTOPHER      )

10       NAGEL, EUGENE BERMAN, ETHAN    )

         JACKS, QUANTUM CATALYTICS,     )

11       L.L.C., ABC CORPS 1 THROUGH 5  )

         AND JOHN DOES 1 THROUGH 5,     )

12                                      )

                Defendants.             )

13       _____)

14

15                    DEPOSITION OF

16                 KENNETH B. WECKSTEIN

17                   Washington, D.C.

18                 Friday, April 28, 2006

19

20

21       Job No.:  1-77450

         Pages 1 through 63

22       Reported by:  John L. Harmonson, RPR


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF KENNETH B. WECKSTEIN
CONDUCTED ON FRIDAY, APRIL 28, 2006

9

1    preparation for this deposition?

2        A.    No.

3        Q.    Are you familiar with a company called

4    Allied Technology Group, Inc.?

5        A.    Yes.

6        Q.    And for the sake of speed of questioning,

7    I'll refer to them as ATG, if that's okay with you.

8        A.    That's fine.

9        Q.    How is it that you're familiar with ATG?

10       A.    They were a client of the firm.

11       Q.    Do you recall when they first became a

12   client of the firm?

13       A.    No, not precisely.

14       Q.    Did you personally ever provide any

15   services to ATG?

16       A.    Yes.

17       Q.    Do you recall when -- approximately when,

18   rather, you first started to do that?

19       A.    I think it was sometime in the 1990s.

20       Q.    What was the nature of the work that you

21   initially did for them back in that time frame, back

22   in the 1990s?

DEPOSITION OF KENNETH B. WECKSTEIN
CONDUCTED ON FRIDAY, APRIL 28, 2006

10

1        MS. BAGGER:  Objection to the form of the

2   question.

3        THE WITNESS:  ATG was a government

4   contractor.  It had a contract to perform work at a

5   military base on the West Coast; it might have been

6   Fort Ord.  I'm not sure exactly which one.  They

7   were terminated for default under the contract.  It

8   was a contract that involved identifying ordnances

9   on the military base that had been used for target

10  practice, and ATG's job was to go around and to tag

11  the ordnances as either inert, live, or with some

12  other manner.  The ordnance then was shipped on site

13  to a holding pen.

14        They were terminated for default under

15  that contract, and they retained me to represent

16  them in connection with that action.

17  EXAMINATION BY MR. FLEISCHER:

18      Q.    The ordnance, was it hazardous or

19  radioactive ordnance, to the best of your

20  recollection, or was it just standard --

21      A.    It was not radioactive.  It was alleged

22  to be hazardous.  If it's live, it's hazardous.

DEPOSITION OF KENNETH B. WECKSTEIN
CONDUCTED ON FRIDAY, APRIL 28, 2006

14

1    Q.    Do you recall what Frank Chiu's position

2  was with ATG at the time you were dealing with him

3  on that matter that we were just talking about?

4    A.    I believe he was a vice president,

5  because I think Doreen was the president.  But

6  again, I'm not sure.

7    Q.    I think that's right.  Not that I'm

8  testifying or anything, but I think your

9  recollection is correct.

10        Do you recall what position Bill Hewitt

11  had in the ATG organization at that time?

12        MS. BAGGER:  At the time of the ordnance

13  lawsuit?

14        MR. FLEISCHER:  Yes.

15        THE WITNESS:  Again, I don't know whether

16  Bill was there at the time of the ordnance lawsuit,

17  and I don't recall his position.  He was a senior

18  executive in the company.

19  EXAMINATION BY MR. FLEISCHER:

20    Q.    Now, other than the matter concerning the

21  ordnance that we just talked about, do you recall

22  representing ATG in connection with any other

15

1    matters, not including the representation of ATG in

2    connection with the purchase of assets from MMT that

3    occurred in late 1998?

4              MS. BAGGER:   Objection to the form of the

5    question.

6              THE WITNESS:   Putting aside the purchase

7    of assets?

8    EXAMINATION BY MR. FLEISCHER:

9         Q.    Right.

10        A.    There was spinout litigation, or spinoff

11   litigation regarding the ordnance explosion.   There

12   were wrongful death actions.   I believe there may

13   have been a criminal investigation, and we were

14   involved in assisting ATG in those matters.

15        Q.    And besides those spinoff litigations,

16   anything else that you can recall?   And again,

17   excluding the acquisition of the assets.

18        A.    Nothing specific.

19        Q.    And you personally worked on those

20   matters?

21        A.    I did.

22        Q.    Now, do you recall a point in time in

DEPOSITION OF KENNETH B. WECKSTEIN
CONDUCTED ON FRIDAY, APRIL 28, 2006

49

1    time?  Do you need to get copies?

2         (A recess was then taken.)

3         (Exhibit 8 marked for identification.)

4    EXAMINATION BY MS. BAGGER:

5         Q.    I'm showing you, Mr. Weckstein, a

6    document that's been marked as Exhibit 8 in this

7    deposition.  Can you identify the document?

8         A.    Those are notes that I took of a

9    conversation with Bill Hewitt on October 29, 1998.

10        Q.    Is that your handwriting?

11        A.    It is.

12        Q.    And you took those notes at or about the

13   same time as the phone call?

14        A.    At the same time as the phone call.

15        Q.    And do you recall why Bill Hewitt called

16   you on October 29, 1998?

17        A.    Exhibit 6 refreshed my memory that Bill

18   Hewitt was my initial contact at ATG, and Bill

19   called me on October 29, 1998, about a potential new

20   matter for ATG.  He gave me the name of the parties

21   that might be involved in the matter.

22        (Exhibit 9 marked for identification.)

EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW

75 STATE STREET

BOSTON, MASSACHUSETTS 02109†

———

(617) 342-4000

FAX: (617) 342-4001

250 PARK AVENUE
NEW YORK, NEW YORK 10177-0077†
(212) 351-4500

1227 25TH STREET, N.W.
WASHINGTON, D.C. 20037-1156†
(202) 861-0900

1875 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2501
(213) 556-8861

SIX LANDMARK SQUARE
STAMFORD, CONNECTICUT 06901-2704†
(203) 348-3737

ONE RIVERFRONT PLAZA
NEWARK, NEW JERSEY 07102
(201) 642-1900

TWO EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA 94111-5994
(415) 398-3500

12750 MERIT DRIVE
DALLAS, TEXAS 75251-1208†
(972) 490-3143

2400 SOUTH DIXIE HIGHWAY, SUITE 100
MIAMI, FLORIDA 33133-3141
(305) 856-1100

510 KING STREET, SUITE 301
ALEXANDRIA, VIRGINIA 22314-3132†
(703) 684-1204

†P.C. NEW YORK, WASHINGTON, D.C.
CONNECTICUT, VIRGINIA, NEW JERSEY
MASSACHUSETTS AND TEXAS ONLY



# M E M O R A N D U M

## PRIVILEGED AND CONFIDENTIAL:
## SUBJECT TO ATTORNEY-CLIENT
## AND ATTORNEY WORK PRODUCT PRIVILEGE

TO:        Ethan Jacks, Esq.
           General Counsel
           Eugene Berman
           V.P. Governmental and External Affairs
           Molten Metal Technology, Inc.

FROM:      Carole Schwartz Rendon

CC:        Karen F. Green, Esq.
           Hale & Dorr
           Roger Goldman, Esq.
           Latham & Watkins
           Joseph F. Savage, Jr.
           Testa, Hurwitz & Thibeault, LLP.

4555. 005



DATE:      August 25, 1997

RE:        Summary of Employee Interviews

=============================================================

     As you know, I now represent the following Molten Metal
Technology, Inc. ("MMT") current and former employees:  Charles
Shaver, B.J. Garner, Marc Thompson, Leonard Leal, James Marshall,
David Hoey, Gerrit Nicholas, Brian Payea, Kristy Rea, James
Howie, and Elliot Mark.  To date, each of my clients, with the
exception of Marc Thompson and Kristy Rea, have been interviewed
by Agents of the Federal Bureau of Investigation and the
Department of Energy.  Pursuant to your request, this memorandum

Witness Interview Summary
August 25, 1997
Page 2

summarizes the areas of questioning that were addressed during
the course of those interviews, the nature of the responses that
were given, and highlights any areas that may be of future
concern.

I.   <u>Background Questions</u>

     In general, each interview began with questions concerning
the individual's background - basic biological information,
educational background, and a discussion of how they came to work
for MMT.  In many instances, the same recruiter - a woman named
Terri Cantrell - was involved in the hiring process.  Most of the
witnesses were asked if they knew anyone at MMT prior to joining
the company.  Many of the witnesses were also asked for the names
of the people who interviewed them for their jobs.  Some of the
witnesses were asked about prior employment and why they decided
to leave Union Carbide, or Dow Chemical, or wherever to join MMT.
In addition, each witness was asked to explain the course of his
employment at MMT, i.e., what job titles he has held, what each
of those jobs entailed, and to whom he reported in each position.

II.  <u>Relationships</u>

     Most, but not all of the witnesses were asked a series of
questions about relationships.  During this questioning, the
witnesses were asked, in essence, do you know X, Y & Z, do you
know A, B & C, and do you know the nature of the relationship
between each person in each column.  In general, these lists
remained constant throughout the interviews and included the
following:  Do you know:  Peter Knight, Tom Grumley, Clyde Frank,
Daniel Greenbaum?  Do you know the nature of the relationship of
the following individuals with each of the people just listed:
Bill Haney, Vic Gatto, Gene Berman.  Occasionally, people would
be asked if they knew that Gene worked with Tom Grumley at Clean
Sites and, if so, did they know anything about Gene's
relationship with Tom Grumley from their days at Clean Sites.
Virtually every one of my clients knew some or all of the people
listed.  Only a very few had ever met any of the non-MMT people
who were listed.  No one knew of any relationship among the MMT
people and the non-MMT people other than their professional
relationships.  Some people were asked, in addition, if they knew
of any relationship between Vice President Gore and Bill Haney
and/or Vic Gatto.  Others were asked if they knew how Tom Grumley
came to be at the Fall River Grand Opening and/or if they knew
how Vice President Gore came to be at the Fall River facility for

Witness Interview Summary
August 25, 1997
Page 3


the Earth Day celebration.  Gerrit Nicholas knew quite a bit
about the Grand Opening, and explained the preparations in some
detail.  Although Gerrit worked on the Earth Day event, he did
not know how Vice President Gore came to participate.

    Many, but not all of my clients were asked to name anyone
else they knew at the Department of Energy.  Most of the
witnesses did not know anyone else.  Of those who knew other DOE
employees, there were few, if any, follow-up questions regarding
how they knew those people.

    Many of the witnesses were asked if they knew how Peter
Knight was employed by MMT.  Of those witnesses who knew, the
uniform response was that Peter Knight is not an MMT employee,
but rather a consultant hired by MMT.  Many of the witnesses were
asked if Peter Knight was still working as a consultant for MMT,
none of my clients knew the answer to that question.
Interestingly, no similar questions were asked about Jim Desmond
(in fact, I don't believe his name ever arose during these
interviews).  Also, none of the witnesses recognized the name
Daniel Greenbaum.

    In sum, the answers to the series of "relationship"
questions were entirely innocuous.

III. Campaign Contributions

    Each witness was asked to list every campaign contribution
that he had made.  With respect to each contribution, the
following general series of questions was asked:  Did you give in
connection with a particular event.  If so, a series of follow-up
questions were asked regarding the event such as:  who
asked/invited you to go?  Did you feel you had to attend?  Who
hosted the event?  Did you receive the invitation at home or at
work?  What other MMT employees do you recall seeing at the
event?  Who paid for various items at the event (food, drink,
etc.)?  In each instance, the witnesses could recall a few people
who may have hosted the event and/or a few MMT employees who may
have attended the event.  Most people recalled receiving
invitations at home.  With respect to the Kennedy '94 event, some
people recalled seeing an e-mail inviting people to attend
whether or not they wanted to contribute to the campaign.  None
of the people who were interviewed knew anything about who had
paid for what items, what they cost, etc.

3

Witness Interview Summary
August 25, 1997
Page 4


   In addition, for each contribution the witness made, he was
asked a series of questions about the contribution.  Those
questions were essentially as follows:  who solicited the
contribution?  Did you feel compelled to contribute?  Did you
think you would benefit in your career at MMT if you contributed?
Did you think your position at MMT would be adversely impacted if
you did not contribute?  Were you reimbursed in any fashion (in
cash or in kind) for your contribution?  Were your bonuses (both
cash and/or stock options) impacted by your decision to
contribute or not to contribute?  Did you solicit anyone else to
contribute?  Across the board, this group of witnesses indicated
that they did not solicit anyone else to contribute, they were
not reimbursed in any fashion for their contribution, and they
did not think (or have any evidence or knowledge) that they, or
anyone else at MMT, benefitted from or was penalized for a
decision to contribute or not contribute to any particular
campaign or event.  No one described any MMT employee as overtly
soliciting contributions rather, some of the witnesses remembered
discussing upcoming events with other employees and/or other
employees asking if they were planning to contribute.  On that
list of MMT employees who talked to people about events,
contributions, or levels of contributions were Doug Pitts, Vic
Gatto and Gene Berman.

   No one was asked if they had heard other employees
complaining about being solicited, or feeling compelled to give.

   Each person also was asked, with respect to each
contribution, why did you give to that particular candidate.  In
virtually every instance, the response was a combination of the
following:  I know him; I like his overall record; I like his
record on environmental issues; he supports ideas that I believe
are important; he covers a district or is on a committee whose
work or location is important to MMT and therefore to me.  With
Clinton/Gore the witnesses were very vocal about the contrast
between the Clinton/Gore environmental platform and their
Republican opponents.  Most everyone explained that, although
they personally strongly supported good environmental policies,
those policies were also good for their company and therefore
were good for them as employees of an environmental technology
company.

   Many of the witnesses were asked if they ever had made
campaign contributions prior to joining MMT.  Many of them
previously had made either individual contributions to various

4

Witness Interview Summary
August 25, 1997
Page 5


candidates, or had supported a PAC at their former place of
employment.

Most of the witnesses were asked why they gave to a
particular candidate at a particular point in time. Everyone
explained that they gave when presented with the opportunity to
give. Often the contributions were in connection with a
fundraising event that the person attended (or had hoped to
attend).

Everyone was asked, in connection with each contribution, if
it was by check. In every instance contributions were made in
the form of checks. None of the witnesses made any in kind
contributions. Each person also was asked to whom they had given
the check. In most instances, people simply could not remember
what they had done with the contribution checks. When pressed,
most of my clients indicated that one of three things had
happened: 1) they turned in the check to someone associated with
the campaign at the fundraiser, 2) they mailed the check to the
campaign organization, or 3) they gave the check to someone at
MMT who then presumably mailed it in. In regards to response
number 3), the following MMT employees were listed as people to
whom checks may have been given for various campaign events -
Kristy Rea, Josephina (Vic's assistant) and Kathy Santoro.

Virtually everyone was asked if they were part of the inner-
circle of MMT decision makers. Specifically, they were asked if
they attended regular, senior level staff meetings with Bill
Haney. All of the witnesses were asked if they knew (or had
heard) of strategy sessions at which Bill Haney and members of
his senior staff discussed which candidates to target for
contributions. No one had ever heard of any such thing. In that
same line of questions, many of the witnesses were asked to list
the MMT employees they felt were in Bill Haney's "inner-circle".
Although those listed varied slightly by person (and depending on
the reference time period), they often included Ethan Jacks, Gene
Berman, Charlie Shaver, and Ben Downs. Some people also included
Vic Gatto on that list.

IV.  The PRDA

Each of my clients was asked to detail what he knew about
the PRDA. Most of my clients knew next to nothing about the
PRDA, how it was granted, how it was extended, and whether its
objectives had been met. As a result, for most of the witnesses

5

Witness Interview Summary
August 25, 1997
Page 6

that series of questions was fairly short.  Of the witnesses who knew about the PRDA, very little information was actually developed as a result of the interviews.  In fact, I was quite surprised by how limited the PRDA related questioning was of witnesses, such as Brian Payea, who have extensive knowledge of the PRDA.

Of those witnesses with knowledge of the PRDA (however limited) the questions were essentially do you know how MMT got the PRDA?  Did anyone pull strings to get the PRDA for MMT?  Do you know if MMT was helped in the PRDA by campaign contributions by the company and/or employees?  Do you know how the PRDA was extended and expanded?  Did anyone pull strings to get the extensions and increases?  Did the campaigned contributions help?  In every instance, if people knew about the PRDA they were adamant that it had been obtained on a competitive basis; that MMT regularly met its objectives under the PRDA; that people at DOE were excited about the technology; that the PRDA always was meant to be larger than the original 1.2 million; that no one had pulled any strings to get the PRDA or extensions to the PRDA; and that, to their knowledge, the campaign contributions had not impacted the PRDA.

In many cases, these questions created an opening for the witnesses to educate the agents about the success of the technology, its operations, and the accomplishments under the PRDA.  In this area the witnesses were all terrific salesmen for the CEP process and MMT.  The investigators clearly began the process with the understanding that the technology does not work, and that the PRDA was a collosal waste of money.  I think that, by the end of the two days of interviews, the interviewers were questioning that factual premise.

V.    Concerns

In addition to the relatively minor, technical campaign contributions of which everyone seems to be aware (i.e., the possibility that one or more people went over the $2,000 limit with in-kind contributions; the bundling issue; and the use of company person-power and overhead in support of some of the campaign events) the following is a list of items that should be considered based on a combination of my personal interviews with the MMT employees, some information from the formal FBI/DOE interviews, and my review of some of the materials that other people have prepared.  It is important to note, however, that to

6

Witness Interview Summary
August 25, 1997
Page 7

date none of these issues surfaced in any of the FBI interviews.

1.    Vic Gatto and Clyde Frank had an exceptionally close
relationship.  Clyde may have gone over the line in promising to
deliver money to MMT without appropriate documented authorization
for such promises.

2.    Clyde may have asked Vic to have an MMT consultant try to
find out who in Congress was disparaging Clyde.  If so, Clyde may
be at risk.  If Vic agreed or acted on that request, he may have
some exposure.

3.    Some people may have felt pressure (particularly from Vic)
to make campaign contributions.

4.    MMT may have made more than de minimis contributions in
terms of employee time and general overhead, particularly in
connection with the 1994 events.

5.    There may be an issue as a result of MMT having run
commercial waste streams through Fall River when those runs were
billed to the PRDA.  I understand, however, that these runs were
in furtherance of the objects of the PRDA, that the results of
the runs were included in reports on the progress of the PRDA,
and that DOE would not (or could not) provide its own waste
streams for these runs.

V.    Conclusion

      The interviews of my clients were cordial, unnecessarily
lengthy, and almost completely useless from a criminal
investigation standpoint.  If this is all they have, the
investigation will die a slow, painful death.  If there is more
out there, the DOE and FBI people did not show their hands.
Interestingly, they did not ask for any follow-up documentation
from any of my clients (cancelled checks, etc.), nor have they
asked to interview some of the other MMT employees who should be
obvious, specifically Kathy Santoro and Kristy Rea.

      If you have any questions, or want additional information on
any of the subjects discussed above, please do not hesitate to
contact me.  Also, please feel free to provide copies of this
summary to the other attorneys involved in this matter pursuant
to our joint defense agreement.

## MESSERMAN & MESSERMAN CO., L.P.A.

ATTORNEYS AT LAW
4100 KEY TOWER ● 127 PUBLIC SQUARE
CLEVELAND, OHIO 44114
(216) 574-9990
FACSIMILE (216) 574-9596



November 3, 1998

Michael Tuteur, Esq.                                    CONFIDENTIAL
Epstein, Becker & Green
75 State Street
Boston, MA 02109

              Re:    Christopher Nagel

Dear Mike:

          Enclosed is a copy of a joint defense communication that I received today from Steven Hansen of Bingham, Dana. As you will note, a stipulation has been filed in bankruptcy court to lift the automatic stay in connection with the plaintiffs' class action securities litigation against Molten Metal Technology and several of its officers and directors. A hearing on this matter has been scheduled for November 30, 1998 before Judge Wolf. Judge Kenner has the Chapter 11 proceeding; Judge Wolf has the securities litigation.

          Please do not hesitate to contact me if you have any questions regarding this matter.

                                          Very truly yours,

                                          Carole Schwartz Rendon
                                          K

                                          Carole Schwartz Rendon

CSR:kas
Enclosures
cc:    Mr. Christopher Nagel

EXHIBIT
H

# BINGHAM DANA



BINGHAM DANA LLP
150 FEDERAL STREET
BOSTON, MASSACHUSETTS 02110-1726
TEL (617) 951-8000
FAX (617) 951-8736

BOSTON, NEW YORK, WASHINGTON,
LOS ANGELES, HARTFORD AND LONDON

Direct Dial: 617-951-8538

October 27, 1998

## JOINT DEFENSE COMMUNICATION

Carole Schwartz Rendone, Esq.
Messerman & Messerman
127 Public Square, Suite 4100
Cleveland, OH 44114

CONFIDENTIAL

   *Re: Molten Metal Technology, Inc.*

Dear Carole:

   Enclosed are copies of memoranda to clients on the stipulation and postponed status conference.

   Best regards.

        Very truly yours,

        *Steve Hansen*

        Steven W. Hansen

SWH:meh
Enclosures

**EBG 3903**

# BINGHAM DANA

LLP

# P R I V E L E G E D   A N D
# C O N F I D E N T I A L

## M E M O R A N D U M

**TO:**
Mr. Ben Downs
Mr. Victor E. Gatto, Jr.
Mr. William M. Haney, III
Mr. Christopher J. Nagel
Mr. John T. Preston
Mr. Maurice F. Strong
Ian C. Yates, Ph.D

*CONFIDENTIAL*

**FROM:**   Steve Hansen/Sabin Willett

**DATE:**   October 27, 1998

**RE:**   Molten Metal Technology Shareholders' Litigation

---

At the suggestion of the parties, the conference with the Court has been postponed until November 30, 1998. Pursuant to the stipulation, plaintiffs' counsel is preparing a motion to lift the stay of proceedings which is to be filed before the Bankruptcy Court. The expectation is that this motion will be determined in the next 30 days and that the stay will be lifted.


S.W.H.

**EBG 3904**

**BINGHAM DANA**
[LLP]

P R I V E L E G E D   A N D
C O N F I D E N T I A L

M E M O R A N D U M

TO:        Mr. Ben Downs
           Mr. Victor E. Gatto, Jr.
           Mr. William M. Haney, III          CONFIDENTIAL
           Mr. Christopher J. Nagel
           Mr. John T. Preston
           Mr. Maurice F. Strong
           Ian C. Yates, Ph.D

FROM:      Steve Hansen/Sabin Willett

DATE:      October 23, 1998

RE:        Molten Metal Technology Securities Litigation/Status
           Report

---

1.    Stay of Proceedings.

      The parties have agreed to the enclosed stipulation, which is expected
to lead to the lifting of the automatic stay and the case going forward against
both the individual defendants and the Company in the same suit. We expect
that either the parties will negotiate an agreed upon schedule for the filing of
motions or the Court will establish such a schedule.

      The Company has acknowledged in the enclosed bilateral letter (which
is not a filed document) that it has only a limited interest in the insurance
policies, specifically with respect to payment of attorneys' fees. While this
position is not binding on third-parties, such as plaintiffs, it may make it
more difficult for plaintiffs to seek to recover against the policies by settling
with the Company without also resolving the clams against individual
defendants.

      The Court has scheduled a status conference for Monday, October 26,
1998.

LITDOCS:260403.1

**EBG 3905**

BINGHAM DANA

2.    Settlement Negotiations.

CONFIDENTIAL

We met with plaintiffs' counsel, Thomas Shapiro, Norman Berman and Marianne Rossner, on Thursday, October 15. Plaintiffs' position was that individuals should contribute to a settlement. We said emphatically that this was not acceptable and that serious settlement negotiations could not occur on the premise that there would be individual contributions. Plaintiffs' counsel said that if there were a settlement without individual contributions, it would require the "lion's share" of the policies. We said that there were other claims within the same policy period and that notice of these had been acknowledged by the primary carrier. We said that any serious negotiations had to give consideration to the existence of these claims as well.

We pointed out that once the full facts were before the Court, they would provide a quite different view of events than the Complaint provides, particularly, with respect to trading by individual defendants.

It was left that plaintiffs' counsel would get back to us if they have a further proposal in light of our position.

*  *  *  *  *  *  *  *  *  *  *  *  *

We invite you to call if you have questions about this matter.


S.W.H.
S. W.

EBG 3906

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

In re Molten Metal Technology, Inc.   )
  Securities Litigation            )    Civil Action No. 97-10325-MLW
                                        )

## STIPULATION

Now come (i) Plaintiffs, by and through their undersigned attorneys, (ii) Molten Metal Technology, Inc. ("MMT"), a defendant herein and debtor in the Chapter 11 case of *In re Molten Metal Technology, Inc.*, No. 97-21385-CJK (the "Bankruptcy Case"), now pending before the Honorable Carol J. Kenner in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"), by and through Bingham Dana LLP, its counsel in this action, and Riemer & Braunstein, counsel to Stephen S. Gray, MMT's duly-appointed Chapter 11 Trustee (the "Trustee") in the Bankruptcy Case, and (iii) each of Benjamin T. Downs, Victor E. Gatto, Jr., William M. Haney III, Christopher Nagel, John T. Preston, Maurice F. Strong and Ian C. Yates (collectively, the "Individual Defendants"), by and through their undersigned counsel and jointly stipulate as follows:

1.     Plaintiffs filed five actions in February and March, 1997. The actions were consolidated by order of this Court dated May 23, 1997 (the consolidated cases hereinafter the "Securities Litigation").

2.     MMT maintained with National Union Fire Insurance Company of Pittsburgh, Pa. Directors, Officers and Corporate Liability Insurance Policy No. 484-74-93 (the "Primary

EBG 3907

Policy"), which provided, among other things, coverage for the Loss of MMT, or of any Director or Officer thereof, arising from a Securities Claim first made during the Policy Period (all as such capitalized terms are defined in the Primary Policy, and as further limited by the other terms and conditions of the Primary Policy). MMT also maintained three umbrella policies providing insurance in excess of the Limit of Liability, as defined by the Primary Policy for such a Loss (the Primary Policy and the umbrella insurance policies hereinafter the "Policies").

3.    On September 24, 1997, this Court issued a scheduling order related to the Securities Litigation (the "Scheduling Order").

4.    MMT commenced a Chapter 11 case by the filing of a voluntary petition for relief on December 3, 1997 (the "Petition Date"). MMT was a Debtor-in-Possession under Chapter 11 of Title 11 of the Code until August 24, 1998, when the Bankruptcy Court appointed Mr. Gray as Chapter 11 Trustee of MMT. Mr. Gray continues to act as Chapter 11 Trustee currently and is represented in the Bankruptcy Case by the firm of Riemer & Braunstein.

5.    None of the Individual Defendants has filed a case under Title 11 of the United States Code during the pendency of the Securities Litigation.

6.    Prior to the Petition Date, Bingham Dana LLP had appeared in the Securities Litigation on behalf of all defendants, including MMT.

7.    On or about December 11, 1997, the Individual Defendants filed their Motion to Vacate Paragraphs 3 and 5 of Scheduling Order (the "Motion"), and a memorandum in support thereof. As grounds for the Motion, the Individuals Defendants asserted that the filing of MMT's Chapter 11 petition created an automatic stay in favor of both MMT and the individual

2

EBG 3908

defendants, because of the joint interest of both MMT and the Individual Defendants in the proceeds of the Policies.

8.      The Plaintiffs objected to the Motion on the grounds that the automatic stay did not operate to stay the proceedings as against the Individual Defendants.

9.      During the pendency of the Motion, the Trustee was appointed.

10.     In order to resolve the issues raised by the Motion, the parties have agreed to the terms set forth in this Stipulation.

11.     Following the execution hereof, the Plaintiffs will file in the Bankruptcy Case a motion for relief from the automatic stay under Section 362(d) of the Bankruptcy Code (the "Stay Relief Motion"). The Stay Relief Motion will request that the Bankruptcy Court enter an order containing the relief set forth in this paragraph 11, and only such relief (hereinafter, "Defined Stay Relief"):

a.      To the extent the automatic stay applies at all (which Plaintiffs deny in the case of the Individual Defendants), modification of the automatic stay to permit the Plaintiffs to proceed in this Court with the Securities Litigation against all defendants, including MMT, and to pursue such litigation to settlement or final order of this Court or of any appellate court that may have jurisdiction of an appeal lying from an order of this Court;

b.      A provision prohibiting Plaintiffs from taking any action to collect from any assets of MMT or property of its estate (as defined in section 541 of the Bankruptcy Code) other than the Policies, except as specifically authorized by further order of the Bankruptcy Court; and further providing that, if there is a settlement of the Securities Litigation or judgment in the

3

**EBG 3909**

Securities Litigation favorable to the Plaintiffs, such settlement or judgment may be paid from the proceeds of the Policies, subject to the approval of the Bankruptcy Court; and

      c.    A provision ordering that all duly-filed claims of any Plaintiff against MMT shall be deemed objected to by the Trustee without further action by the Trustee or order of the Court, and that such claims shall be allowed or disallowed, as the case may be, by the Bankruptcy Court in accordance with the applicable final order(s) of this Court and section 510(b) of the Bankruptcy Code.

      12.    The filing of the Stay Relief Motion shall not be construed in any way as an acknowledgement by the Plaintiffs that such a motion or any similar application for relief directed to the Bankruptcy Court is necessary for the instant case to proceed against the Individual Defendants, or that the Bankruptcy Court has any jurisdiction over the Plaintiffs' claims against the Individual Defendants or any authority over the prosecution of the instant case except insofar as the automatic stay governs proceedings against MMT.

      13.    Each of the Trustee and the Individual Defendants will file in the Bankruptcy Case a response to the Stay Relief Motion advising the Bankruptcy Court that such party does not object to entry by the Bankruptcy Court of the Defined Stay Relief.

      14.    Plaintiffs acknowledge that, pursuant to the terms of Section 510(b) of the Bankruptcy Code, all claims asserted by Plaintiffs against MMT in the Securities Litigation are subordinated to all claims against, or interests in MMT other than interests held by holders of common stock, with which interests the claims of Plaintiffs are of equal priority.

4

EBG 3910

15.    Upon entry of an order of the Bankruptcy Court granting the Defined Stay Relief, the Individual Defendants shall withdraw the Motion, and the parties shall proceed with the Securities Litigation in accordance with such other and further orders as may be entered by this Court.

16.    In the event that the Bankruptcy Court denies the Stay Relief Motion, fails to enter the Defined Stay Relief or otherwise fails to act on the Stay Relief Motion by November 15, 1998, MMT and the Individual Defendants agree that they will assent to a request by the Plaintiffs that this Court hold a hearing and rule on the Defendants' Motion to Vacate Paragraphs 3 and 5 of the Scheduling Order at the Court's earliest convenience.

For the Plaintiffs:

Norman Berman, BBO No. 040460
BERMAN, DEVALERIO & PEASE LLP
One Liberty Square
Boston, MA 02109
(617) 542-8300

Thomas G. Shapiro, BBO No. 454680
SHAPIRO HABER & URMY LLP
75 State Street
Boston, MA 02109
(617) 439-3939

¤LITDOCS:256493.1

**EBG 3911**

For MMT and the Individual Defendants:

_____

Steven W. Hansen, BBO No. 220820
Sabin Willett, BBO No. 542519
**BINGHAM DANA LLP**
150 Federal Street
Boston, MA 02110
(617) 951-8000

For Stephen Gray, Chapter 11 Trustee
of Molten Metal Technology, Inc.

_____

Peter H. Sutton
Alan L. Braunstein
**RIEMER & BRAUNSTEIN**
3 Center Plaza
Boston, MA 02108
(617) 523-9000

Dated: October 2 6, 1998

¤LITDOCS:256493.1

TOTAL P.08

**EBG 3912**

# BINGHAM DANA

BINGHAM DANA LLP
150 FEDERAL STREET
BOSTON, MASSACHUSETTS 02110-1726
TEL: (617) 951-8000
FAX: (617) 951-8736

BOSTON, NEW YORK, WASHINGTON,
LOS ANGELES, HARTFORD AND LONDON

Sabin Willett
Direct Dial: 617-951-8775

October 15, 1998

## VIA HAND DELIVERY

Alan L. Braunstein, Esq.
Riemer & Braunstein
3 Center Plaza
Boston, MA 02108

> Re:  In re Molten Metal Technology, Inc.
> Bankruptcy Case No. 97-21385-CJK:
> In re Molten Metal Technology, Inc.
> U.S.D.C. Case No. 97-103250 MLW

Dear Alan:

This letter will confirm our understanding relative to the Chapter 11 case of Molten Metal Technology, Inc. ("MMT"), now pending in the United States Bankruptcy Court for the District of Massachusetts, No. 97-21385-CJK (the "Bankruptcy Case") and the securities litigation now pending against MMT and seven individuals, No. 97-103250-MLW (the "Securities Case"). Capitalized terms in this letter are defined herein or in the stipulation that is attached as an exhibit hereto (the "Stipulation"). Your office represents Mr. Stephen S. Gray, the Chapter 11 Trustee (the "Trustee") for MMT. This office represents the Individual Defendants and MMT in the Securities Case. We have agreed as follows:

1.     Pursuant to the Stipulation, you have agreed, on behalf of the Trustee and MMT, that the automatic stay may be lifted against MMT in conformity with the Stipulation.

2.     The Individual Defendants and this office have agreed that this office will continue representing MMT in the defense of the Securities Case, and look for payment of its fees and expenses only to the Policies and to the Individual Defendants. We have advised the insurers of the terms of this agreement and they understand that the Trustee does not intend to use any assets of MMT other than its potential rights under the Policies for the purposes of retaining counsel and defending the Securities Case. We believe that the insurers also understand that in the event conflicts were to develop

EBG 3913

BINGHAM DANA

Alan L. Braunstein. Esq.
October 15, 1998
Page 2

between the interests of MMT and those of any other defendant, it might be necessary to retain additional counsel to represent MMT, and that such counsel would have to be compensated solely by proceeds of the Policies. We are not currently aware of such a conflict.

Further, in light of all of the facts and circumstances involved in the Securities Case and the Bankruptcy Case, and in light of the provisions of Section 510(b) of the Bankruptcy Code, the Trustee agrees that except to the extent necessary to pay the defense costs of MMT in connection with the Securities Case. neither MMT nor the Trustee has any interest in the Policies with respect to the claims asserted in the Securities Case. Similarly, each of the Individual Defendants agrees that any claim for reimbursement or contribution arising from the Securities Case is subordinated to all other claims against or interests in MMT other than interests arising from ownership of common stock. None of the Individual Defendants has agreed to subordinate any other claim he might have against MMT.

If the foregoing accurately sets forth our agreement, please countersign the counterpart to indicate the Trustee's acceptance and agreement.

Very truly yours,

Sabin Willett

PSW/kmc

cc:    Steven W. Hansen. Esq.
       Julia Frost-Davies, Esq.

**EBG 3914**

BINGHAM DANA

Alan L. Braunstein. Esq.
October 15, 1998
Page 3


Accepted And Agreed To:

STEPHEN S. GRAY
CHAPTER 11 TRUSTEE OF
MOLTEN METAL TECHNOLOGY, INC.,

By his attorneys:


_____

Alan L. Braunstein. Esq.
Riemer & Braunstein
3 Center Plaza
Boston, MA 02108

EBG 3915

# MESSERMAN & MESSERMAN CO., LPA
## ATTORNEYS AT LAW
### 4100 KEY TOWER - 127 PUBLIC SQUARE
### CLEVELAND, OH 44114
### (216) 574-9990
### (216) 574-9596 - Fax No.



## FACSIMILE TRANSMISSION COVER SHEET

**DATE:** November 19, 1998

**TO:** Mike Tuteur, Esq.

CONFIDENTIAL

**FAX NUMBER:** (617) 342-4001

**Re:** Attached draft of proposed motion and order

**FROM:** Carole Schwartz Rendon  (Karen)

Total Pages Including Cover Sheet: _10_

The information contained in this facsimile message is privileged and confidential information intended only for the use of the individual or entity named above. If you receive this communication in error. Please immediately notify us by telephone.

**EXHIBIT**
I

PENGAD 800-631-6989

**EBG 3916**

# BINGHAM DANA

## CONFIDENTIAL

BINGHAM DANA LLP
150 FEDERAL STREET
BOSTON, MASSACHUSETTS 02110-1726
TEL: (617) 951-8000
FAX: (617) 951-8736

BOSTON, NEW YORK, WASHINGTON,
LOS ANGELES, HARTFORD AND LONDON

| FROM | | DTE INITIALS | CLIENT/CASE NO. | DATE |
|------|---|--------------|-----------------|------|
| Sabin Willett, Esq. | | PSW | 91318 | NOVEMBER 19, 1998 |

PLEASE DELIVER THE FOLLOWING PAGES TO:        TOTAL NO. OF PAGES INCLUDING COVER PAGE: ➡ 9

| CO. FAX NO.: | NAME: | COMPANY: | CO. TEL NO.: |
|--------------|-------|----------|--------------|
| ~~216-123-4561~~ | ~~Thomas Q. Chapin~~ | ~~Masterson & Masterson~~ | ~~216-000-0001~~ |
| 216-574-9596 | C. Schwartz-Rendon, Esq. | Masterson & Masterson | 216-574-9990 |
| 617-526-5000 | Karen Green, Esq. | Hale & Dorr | 617-526-6207 |

COMMENTS / SPECIAL INSTRUCTIONS

OUR FACSIMILE NUMBER IS (617) 951-8736. IF THERE ARE PROBLEMS DURING THIS TRANSMISSION, PLEASE CALL (617) 951-8925.

THE INFORMATION IN THIS TRANSMITTAL IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE RECIPIENT(S) LISTED ABOVE. IF YOU ARE NEITHER THE INTENDED RECIPIENT(S) NOR A PERSON RESPONSIBLE FOR THE DELIVERY OF THIS TRANSMITTAL TO THE INTENDED RECIPIENT(S), YOU ARE HEREBY NOTIFIED THAT ANY UNAUTHORIZED DISTRIBUTION OR COPYING OF THIS TRANSMITTAL IS PROHIBITED. IF YOU HAVE RECEIVED THIS TRANSMITTAL IN ERROR, PLEASE NOTIFY US IMMEDIATELY AT (617) 951-8925 AND RETURN THE TRANSMITTAL TO US AT THE ABOVE ADDRESS, MARKED TO THE ATTENTION OF THE SUPPORT SERVICES DEPARTMENT. THANK YOU.

| TO:   psw | FLOOR:   18 | FAX OPERATOR'S NAME: |
|-----------|-------------|----------------------|

YOUR FACSIMILE
HAS BEEN
SENT TO:

DATE/TIME STAMP

GAM _____
GSM _____
PSK _____
CSR ➤
MRH _____
FILE _____
_____
_____
_____

COPY

**EBG 3917**

# BINGHAM DANA

BINGHAM DANA LLP
150 FEDERAL STREET
BOSTON, MASSACHUSETTS 02110-1726
TEL: (617) 951-8000
FAX: (617) 951-8736

BOSTON, NEW YORK, WASHINGTON
LOS ANGELES HARTFORD AND LONDON

Sabin Willett
Direct Dial: 617-951-8775

November 18, 1998

**_VIA TELECOPIER_**

Thomas G. Shapiro, Esq.
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109

Re:   MMT

Dear Tom:

Enclosed please find my mark up of your proposed motion and my proposed order.

Very truly yours,

Sabin Willett

PSW/kmc
Enclosure

cc:   Alan Braunstein, Esq.
      (via telecopier)
      Steven W. Hansen, Esq.
      Julia Frost-Davies, Esq.
      (each w/enclosure)

**EBG 3918**

# BINGHAM DANA

Thomas G. Shapiro, Esq.
November 18, 1998
Page 2


bcc:        Karen Green, Esq.
            Carole Schwartz Rendon, Esq.
              (via telecopier)

EBG 3919

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### EASTERN DIVISION

|  |  |
|---|---|
| In re:<br><br>MOLTEN METAL TECHNOLOGY, INC.,<br>MMT OF TENNESSEE INC., MMT<br>FEDERAL HOLDINGS, INC., M4<br>ENVIRONMENTAL MANAGEMENT<br>INC., and M4 ENVIRONMENTAL L.P.,<br><br>     Debtors | Chapter 11<br><br>Case Nos. 97-21385-CJK through<br>97-21389-CJK<br>(Jointly Administered) |

*The parties agree that The automatic stay applies to The claims asserted in*

*Assented-to*

## ~~Joint~~ MOTION FOR RELIEF FROM STAY

*Pursuant to 11 U.S.C. §362(d)(1), Fed. R. Bankr. P. 4001 and MLBR 4001-1,* Viviane Brahms, Steven Somkin, Thea Landesberg and William Schillaci, Brian Eagleston, James Black, Harvey Crosby, Kenneth Davis, Albert Socolov, Morton Sherman, Saul Schwartz, Mark D'Angelo, Marilyn Axler, Myra Friedland, Marcia Last and Stephen Levin (hereafter the "Stock Purchaser Claimants") ~~request that the Court~~ *hereby move* ~~enter the accompanying Order on the following grounds:~~ *an order modifying the automatic stay (to The extent that the automatic stay applies) in accordance with The proposed form of order filed herewith. As grounds the Stock Purchaser Claimants say:*

~~2~~ **I.** There is currently pending in the United States District Court *for the District of Massachusetts* a consolidated ~~securities fraud class~~ action asserting claims on behalf of a class of persons *claim to have* who purchased common stock of Molten ~~Metal Technology, Inc.~~ *Metal (The "Securities Litigation")* ("Molten Metal"). ~~That action is hereafter referred as the "Securities Litigation".~~ The defendants in the Securities Litigation are Molten Metal and certain ~~present or former~~ *non-debtor* officers or directors of Molten Metal, namely, William M. Haney, III, Christopher J. Nagel, Benjamin T. Downs, Victor E. Gatto, Jr., Ian C. Yates, John T. Preston and Maurice F. Strong (collectively the "Individual Defendants"). The Securities Litigation ~~has been stayed as~~

*1. ~~MMT~~ filed a voluntary petition for relief under Title 11 of the United States Code (the "Bankruptcy Code") on December 3, 1997. On August 21, 1998, the Court appointed Mr. Stephen Gray as Chapter 11 Trustee of MMT. The Stock Purchaser Claimants have asserted claims in Molten Metal's case and claim to be parties-in-interest Therein*

*Debtor Molten Metal Technology, Inc. ("Molten Metal")*

EBG 3920

against Molten Metal, ~~pursuant to the automatic stay provision of the Bankruptcy Code.~~

The plaintiffs and the Individual Defendants have disputed whether the ~~Securities~~ automatic stay also applies to the claims in the Securities Litigation against ~~Litigation has been or should be stayed as to~~ the Individual Defendants, as a ~~result of~~ consequence of the shared liability insurance that exists between Molten Metal and the Individual ~~Molten Metal's bankruptcy.~~ Defendants.

4. ~~2~~  ~~There exist four directors, officers and corporate liability insurance policies,~~

3. ~~which insure the Individual Defendants and Molten Metal for the claims alleged in the~~

OPY ~~Securities Litigation.~~  Each of those policies has a limit of liability of $5 million, or a

2 of tipotation  total limit of liability of $20 million for the four P~~olicies~~. The P~~olicies also provide for~~

payment of defense costs in the Securities Litigation, which defense costs are included in

and are ~~not in~~ addition to the limits of liability.

Cause exists under section 362(d)(1) of the Bankruptcy Code to modify the automatic stay

5.
6. ~~3~~  ~~The requested order will permit~~ the Securities Litigation ~~to~~ proceed against

to order to resolve their dispute concerning the automatic stay, the parties in the securities litigation executed a stipulation that would permit the securities litigation to proceed against all defendants including Molten Metal,

Molten Metal and the Individual Defendants, ~~subject to the limitation that the plaintiffs~~

in the Securities Litigation have agreed to limit any recovery as against Molten Metal to

recovery from the insurance policies, and ~~not to take any action to attempt to collect~~

from any other assets of Molten Metal ~~or property of its estate~~ (as defined in Section

541 of the Bankruptcy Code), ~~except as may be specifically authorized by further order~~

~~of the Bankruptcy Court.~~

May (to the extent that it may apply to claims against the individual Defendants, which the Stock Porchaser claimants deny) so that

because the claims of the Stock Porchaser Claimants are subordinated under section 510(b) of the Bankruptcy Code, and thus Molten Metal's

7. ~~4~~  The requested order will ~~also~~ obviate the need to litigate in the Bankruptcy

Cause for stay relief further exists in that

Court the proofs of claim that have been filed in this bankruptcy proceeding on behalf of

the plaintiffs in the Securities Litigation. ~~The requested order provides that those claims~~

~~shall be allowed or disallowed, as the case may be, in accordance with any settlement or~~

~~final judgment in the Securities Litigation and Section 510(b) of the Bankruptcy Code.~~

but limit The Stock Porchaser Claimants from seeking recovery from
assets of Molten Metal or its estate other than the Policies.

2

Financial condition is such that there is no prospect of a satisfaction of general unsecured claims. Accordingly, Molten Metal has no practical interest in the proceeds of the Policies.

EBG 3921

8.
~~9.~~    By filing this motion, the Stock Purchaser Claimants do not acknowledge

or agree that the Securities Litigation has been stayed as against the Individual

Defendants or that the Bankruptcy Court has any jurisdiction over those claims.

Nevertheless, in order to avoid the delay in litigating the issue of whether there is a stay

as concerns the Individual Defendants, the requested order provides that to the extent

the automatic stay applies at all to the claims against the Individual Defendants, those

claims may proceed.

<u>ASSENT TO THE MOTION</u>

9. The Stock Purchaser Claimants are authorized to state that the Trustee and the

Individual Defendants assent to entry of the requested order.  Their assents to the

requested order are being filed together with this motion.

Dated:  November __, 1998

WHEREFORE, The Stock Purchaser
Claimants, request That the
Court enter an order modifying
The automatic stay (to
The extent, if at all) The
Same applies on to the
Claims of the S-P-C-
against the I-D-s in
the S-L-,
in accordance with The
form of order submitted
herewith.

By their attorneys,

Thomas G. Shapiro BBO #454680
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109
(617) 439-3939

Norman Berman BBO #040460
BERMAN DEVALERIO & PEASE LLP
One Liberty Square
Boston, MA 02109
(617) 542-8300

3

Note - ensure that cert. of
service complies w/.
4001 + MLBR 4001.

EBG 3922

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

In re:                                          )
                                                )
MOLTEN METAL TECHNOLOGY, INC.,                  )       Chapter 11
MMT OF TENNESSEE INC., MMT FEDERAL              )
HOLDINGS, INC., M4 ENVIRONMENTAL                )       Case Nos. 97-21385-CJK
MANAGEMENT INC., AND M4 ENVIRONMENTAL           )       through  97-21389-CJK
L.P.,                                           )       (Jointly Administered)
                    Debtors.                    )
                                                )

## ORDER

The Court having considered the Motion of Stock Purchase Claimants for Relief

from Stay (the "Motion"), and the assents of the Individual Defendants (that term, and

other capitalized terms in this Order being defined in the Motion) and the Chapter 11

Trustee thereto, and it appearing that the Movants have complied with the requirements

of Fed. Rr. Bankr. P. 4001 and 9014 and MLBR 4001-1; and it further appearing that

cause exists for modification of the automatic stay, if the same applies to the Securities

Claims asserted by the Stock Purchase Claimants against the Individual Defendants (a

question as to which this Court makes no finding or ruling); and for the other good and

sufficient reasons set forth in the Motion,

EBG 3923

-2-

NOW, THEREFORE, it is hereby ORDERED, that:

1.     The automatic stay applicable under 11 U.S.C. §362 is hereby modified to the extent necessary to permit all parties in a certain consolidated securities action currently pending in the United States District Court for the District of Massachusetts, entitled *In re Molten Metal Technology, Inc. Securities Litigation*, No. 97-10325-MLW (the "Securities Action"), in which debtor Molten Metal Technology, Inc. ("Molten Metal") is a named defendant, and certain other non-debtors also are defendants, to pursue all claims and defenses pending in the Securities Action to settlement or final judgment in such court, or in any appellate court having jurisdiction over such claims and defenses, consistent with the terms of this Order.

2.     The Plaintiffs in the Securities Action, including, but not limited to the Stock Purchase Claimants, shall not take any action to collect any settlement or judgment from any assets of Molten Metal or property of its estate (as defined in section 541 of the Bankruptcy Code) other than the Policies, unless specifically authorized to do so by further order of this Court.

3.     All defendants in the Securities Action are hereby authorized to use the proceeds of the Policies in accordance with the terms thereof, for the payment of defense costs and the payment of any settlement or judgment of the Securities Action, without further order of this Court.

4.     All duly-filed claims of any Plaintiff against Molten Metal shall be deemed objected to by the Trustee without further action by the Trustee or order of the

EBG 3924

-3-

Court, and such claims shall be allowed or disallowed, as the case may be, by this Court

in accordance with the applicable final order(s) of this Court and section 510(b) of the

Bankruptcy Code.

Hon. Carol J. Kenner
United States Bankruptcy Judge

EBG 3925



**Molten Metal Technology**

Molten Metal Technology, Inc., 421 Currant Road, Fall River, MA 02720
Tel: (508) 324-6901                    Fax: (508) 324-6401

| TO: | Name:<br><br>Dan Cohn, Cohn & Kelakos<br>and<br>John Graham, Aon Risk Services | Date:<br><br>March 30, 1998<br>3:06 PM |
|---|---|---|
| | Company:<br><br>Cohn & Kelakos<br>Aon Risk Services | Fax No:<br><br>(617) 951-0679<br>(617) 542-2597 |

| FROM: | Name:<br><br>Ethan E Jacks | Telephone:<br><br>(508) 324-6901 |
|---|---|---|

**CC:**  Gene Berman, Gordon Bitter

**REFERENCE:**  Earl McConchie

**MESSAGE:**  Attached please find a letter dated March 26, 1998 sent by counsel to Earl McConchie to Bill Haney, and Chris Nagel. Chris provided a copy to me.

I would like to set up a conference call in the next day or so to discuss this letter. I will have my assistant, Darry Pattinson arrange the call.

Ethan

This facsimile message is confidential. It may contain information which is privileged or subject to other confidentiality requirements and exemptions from disclosure under applicable law. It is intended solely for the use of the individual(s) named above. If you are not the intended recipient(s), or the person responsible to deliver it to the intended recipient(s), you are hereby advised that any dissemination, distribution or copying of this communication is prohibited. If you have received this facsimile message in error, please immediately notify the sender by telephone collect, and return the original message to the sender by US Mail. Postage in return facsimile transmission will be refunded.

page 1 of 12





■Dwyer & Collora, LLP

Federal Reserve Plaza
600 Atlantic Avenue
Boston, Massachusetts 02210-2211
Telephone (617) 371-1000
Fax (617) 371-1037

Nancy S. Shilepsky
(617) 371-1003

## CONFIDENTIAL -- FOR SETTLEMENT PURPOSES ONLY

March 25, 1998

BY CERTIFIED MAIL

Mr. William M. Haney, III                Mr. Christopher J. Nagel
61 Lincoln Road                          28 Highland Circle
Wayland, Massachusetts 01778             Wayland, Massachusetts 01778

Re:   Garnet Earl McConchie

Dear Messrs. Haney and Nagel:

This firm represents Garnet Earl McConchie, who was terminated from Molten Metal Technology, Inc. ("MMT") in September 1997. After reviewing the circumstances surrounding his recruitment to MMT from December 1995 through April 1996, we have advised Mr. McConchie that he has legal claims against both of you individually for misrepresentation. We are writing to inquire whether you wish to discuss a settlement of this matter before Mr. McConchie commences litigation against you.[1]

Section I of this letter sets out the facts as we understand them. Your liability is set out in Section II, and Mr. McConchie's damages -- which total approximately $2.572 million -- are set out in Section III. If you know of any additional facts that you believe are relevant, please inform us about them. This letter is sent without prejudice and is for settlement purposes only.

I.    FACTUAL BACKGROUND

Prior to joining MMT, Mr. McConchie was a twenty-four year employee of Dow Chemical Company ("Dow"). He rose steadily through the ranks at Dow, becoming the Global Director of Chlorinated Waste, Hydrogen Chloride and Incineration Business in

---

[1] This letter should not be construed in any way as a demand upon MMT.

Thomas E. Dwyer, Jr.    William H. Kettlewell    David J. Burgess    Anthony D. Rizzotti    Michael B. Galvin
Michael A. Collora      Joey L. Newman           Maria R. Durant     David M. Osborne       Tracy B. Fitzpatrick
Nancy S. Shilepsky      David A. Bunis           Amy Baron-Evans     Ellen J. Zucker        Of Counsel

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 2


1992. Based in Texas, he reported to the Commercial Vice President of the Chemicals
Business. As one of Dow's top 200 executives, he managed an operation with more than
$1.5 billion in assets and over 500 employees at more than a dozen global facilities. In
1996, in addition to his total estimated compensation of $260,000 annually, he was eligible
for Dow's generous executive benefit package, including retirement at age 50, paid life
and medical insurance for life, and a matching 401(k) investment plan.

Around the time that Mr. McConchie assumed the position of Global Business
Director, MMT targeted Dow as a potential development partner and customer for its
Catalytic Extraction Process ("CEP"). From 1992 through 1995, MMT pursued these
relationships with Dow. As a Dow representative, Mr. McConchie personally attended
more than a half-dozen meetings with MMT executives – including Mr. Haney and Mr.
Nagel – during this period. These meetings were held at Dow facilities in Freeport,
Texas, MMT facilities in Waltham and Fall River, Massachusetts, and other conference
sites. During these meetings, Mr. Haney and Mr. Nagel repeatedly presented specific
information that painted a glowing picture of MMT, the promise of its CEP technology,
and potential markets.

As the Dow-MMT negotiations progressed, Mr. Haney and Mr. Nagel began to
realize that Mr. McConchie had unique skills and experience that could be of great benefit
to MMT. Beginning around 1995, Mr. Haney and Mr. Nagel launched a campaign to
recruit Mr. McConchie to MMT. At first, Mr. Haney's overtures to Mr. McConchie were
subtle and indirect, but over time they became increasingly serious and direct. On several
occasions, these overtures were made in the presence of other Dow employees. Because
Mr. McConchie was satisfied with his position, career prospects and compensation
package at Dow, he consistently conveyed to Mr. Haney his lack of interest in joining
MMT.

By the end of the 1995, Mr. Haney's recruitment efforts became so boldly direct
and persistent that Mr. McConchie was induced to reconsider his lack of interest in
employment at MMT. In December 1995, during a meeting with Dow executives at the
Houstonian Hotel in Houston, Texas, Mr. Haney and Mr. Nagel presented information
regarding the status of MMT's technology, stating that it was fully developed and ready
for commercial implementation. At the lunch break, Mr. Haney approached Mr.
McConchie and explicitly solicited him to join MMT. Mr. Haney's representations of
enormous CEP markets, MMT's financial stability and growth, technology readiness, and
promises of financial rewards and career growth were so upbeat that Mr. McConchie
agreed to meet with him at a later time to discuss an employment proposal. However, Mr.
McConchie believed it was extremely unlikely that these talks would lead to anything, and
he warned Mr. Haney that he was very satisfied with his job at Dow and that MMT
"would not be able to afford" him, or words to that effect.

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 3

On or about February 8, 1996, Mr. Haney and Mr. McConchie met again at the
Houstonian Hotel to discuss specific employment opportunities at MMT. Mr. Haney
made an intense pitch for Mr. McConchie to leave Dow for MMT. During meetings over
the next two days totaling four hours in length, Mr. Haney explained MMT's business plan
in detail, including the company's projections of high growth rates and huge potential
markets. He showed Mr. McConchie information about MMT's commercialization
schedules, customer base, organizational structure and financials. He also described the
status of MMT's CEP technology at length, repeatedly stressing that the technology was
completely developed and ready for commercialization. He specifically proposed that Mr.
McConchie join MMT as Vice President of the Chemicals Business. While still skeptical
about compensation, long-term job security, and family relocation issues, Mr. McConchie
agreed to discuss the matter further with Mr. Haney at a later time.

Mr. Haney returned to Texas on or about February 27, 1996 to talk with Mr.
McConchie about the terms of a job offer, including salary, stock, options, bonuses and
career growth. A week later, Mr. Haney extended Mr. McConchie a formal offer. During
the next two weeks, while Mr. McConchie considered the offer, Mr. Haney exerted a
great deal of pressure on him to accept it. He repeatedly called him, both at work and at
home -- sometimes several times a day. Mr. Haney also contacted employees at Dow to
exert additional pressure on Mr. McConchie to accept the MMT job.

Based on the presentations and statements by Mr. Haney and Mr. Nagel, by early
March 1996 Mr. McConchie was convinced that MMT's technology was fully developed,
that commercial plants were already operating, that the markets for CEP were extremely
large, and that MMT's finances were stable with high projected growth. However, Mr.
McConchie continued to have reservations about his long-term job security at MMT,
relocation costs and the high cost of living in Boston, and the effects of being separated
from his daughter and her family. Mr. Haney was so determined to hire Mr. McConchie
away from Dow that he responded to Mr. McConchie's concerns by agreeing to give Mr.
McConchie a ten-year employment contract (with a guarantee of five years' severance if
MMT terminated him), to increase his restricted stock grant by 10,000 shares (valued at
$350,000) to cover housing differential costs, and to provide employment to Mr.
McConchie's son-in-law, Clay Provence, so Mr. McConchie's family could remain
together.[2]

After much reflection on the representations and promises made by Mr. Haney and
Mr. Nagel, on March 29, 1996, Mr. McConchie finally accepted the MMT job offer. In
doing so, he made significant personal and economic sacrifices, including giving up a
secure, well-paying job at Dow and relocating his family 2,200 miles from Texas to
Massachusetts. However, he was willing to accept these sacrifices for one reason: Mr.

---

[2] Mr. Provence was terminated by MMT in May 1997.

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 4

Haney and Mr. Nagel had persuaded him that the CEP technology was fully developed
and commercially proven, and that by joining MMT his family would benefit from even
greater financial security. With this in mind, he began work at MMT on April 30, 1996.

Over the next few months, as Mr. McConchie became privy to the true situation at
MMT, he began to realize that the representations made to him by Mr. Haney and Mr.
Nagel about the company and the status of its CEP technology had been blatantly false
and purposefully misleading. All of the misrepresentations were integral to his decision to
join MMT. However, if Mr. McConchie had known the true facts about any *one* of these
misrepresentations, he would have doubted the commercial value and viability of the CEP
process and decided not to leave Dow. Some of these misrepresentations are discussed
below.

## Dioxin Production

- During meetings with Mr. McConchie in 1995, Mr. Nagel repeatedly stated that
the CEP process did not provide the pathways for the formation of dioxins and furans and
that dioxin and furan formation had not been detected. Mr. Haney made these same
assurances during the December 1995 meeting and his private meetings with Mr.
McConchie in February 1996. Mr. Haney also provided Mr. McConchie with written
materials — including materials authored by Mr. Nagel — touting MMT's dioxin-free
technology. This was significant to Mr. McConchie because dioxins and furans are
extremely toxic compounds, and their production is highly regulated by the federal
government. The claim that the CEP process did not produce dioxins and furans was
important to Mr. McConchie because, if true, the process would have enjoyed a very
strong economical and environmental advantage over alternative technologies offered by
MMT's competitors.

- *In October 1996, Mr. McConchie learned that the CEP process was not dioxin-
free. Instead, he discovered that the CEP process did in fact produce dioxins and furans
in significant quantities. He also learned that MMT had performed analytical work in
1995 which showed conclusively that dioxins and furans were produced during the CEP
process, including excessively high levels of dioxins and furans in the process's dust and
products.*

## Commercial Operations at Q-CEP

- Mr. Nagel stated during the December 1995 meeting attended by Mr.
McConchie that the Quantum-CEP ("Q-CEP") facility in Oak Ridge, Tennessee was
scheduled to be operational on radioactive waste that month. Mr. Haney and Mr. Nagel
stated that the cost of the Q-CEP facility was $13 million. During Mr. Haney's private
meetings with Mr. McConchie in February 1996, he reaffirmed that the Q-CEP facility had



Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 5

been operational on radioactive waste since December 1995. These claims about the
facility's start-up and operation on radioactive waste and the cost of the facility were
important to Mr. McConchie because, if true, they would have established the commercial
viability of the CEP process.

- *When Mr. McConchie arrived at MMT, he learned that the Q-CEP facility was
not operational. The facility did not begin commercial radioactive waste operation until
December 1996, a full year later than the start-up date represented to Mr. McConchie.
During the recruitment period, Mr. Haney and Mr. Nagel were well aware that the
facility would cost considerably more than $13 million, as they reported to Mr.
McConchie. In fact, the final cost of the facility was four times greater than that which
was represented to Mr. McConchie.*

**Radioactive Waste Reduction**

- Mr. Nagel stated at both the March 1995 and the December 1995 meetings
attended by Mr. McConchie that the Q-CEP process reduced radioactive waste volume by
ratios of anywhere from 30 to one to 1,000 to one. During his private meetings with Mr.
McConchie in February 1996, Mr. Haney reaffirmed that the Q-CEP facility had already
demonstrated substantially reduced radioactive waste. Mr. Haney also provided Mr.
McConchie with written materials authored by Mr. Nagel that claimed major reductions in
radioactive waste via the CEP process. The radioactive waste reduction claimed by Mr.
Haney and Mr. Nagel was important to Mr. McConchie because, if true, it would have
meant that the process would have been significantly less costly than the alternative
disposal technologies offered by MMT's competitors.

- *When Mr. McConchie arrived at MMT, he learned that the volume reduction of
radioactive waste had not been demonstrated in the Q-CEP process. After the Q-CEP
facility's start-up in December 1996, Mr. McConchie learned that the radioactive waste
reduction claimed by Mr. Haney and Mr. Nagel had not been achieved and that
significant quantities of radioactive waste was generated in downstream dust and
effluent. Mr. McConchie further learned in early 1997 that the actual amount of
radioactive waste generated by the process exceeded the amount originally fed into the
process.*

**M4 Tech Center**

- Mr. Nagel stated at the March 1995 meeting attended by Mr. McConchie that
the M4 Tech Center (Combo) Plant in Oak Ridge, Tennessee was due to start up in late
1995. At the December 1995 meeting attended by Mr. McConchie, Mr. Nagel stated that
the M4 facility was due to start operations that month, and that a radioactive waste pilot
system had already begun the previous October. Mr. Haney and Mr. Nagel stated that the

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 6

cost of the M-4 facility was $25 million. In February 1996, Mr. Haney told Mr.
McConchie that the M4 facility began commercial operations in 1995. These claims were
important to Mr. McConchie because; if true, they would have demonstrated the
commercial viability and economic value of the CEP process.

 • *After joining MMT, Mr. McConchie learned that the M4 facility was not*

*commercially operational. Instead, he discovered that the only operations at the facility
were experimental, and that as of January 1996 – when Mr. Haney and Mr. Nagel were
claiming otherwise – MMT did not expect the M4 facility to become fully operational
until the second quarter of 1996. In fact, the M4 facility did not begin commercial
radioactive waste processing until late 1997. Mr. Haney and Mr. Nagel were well aware
during the recruitment period that the cost of the facility would be much greater than $25
million. In fact, the final cost of the facility was more than twice that which was
represented to Mr. McConchie.*

**Bay City Facility**

 • Mr. Nagel stated at the December 1995 meeting attended by Mr. McConchie
that Hoechst Celanese ("HCC") and MMI were jointly constructing a CEP facility to
manufacture synthesis gas product from both hazardous and non-hazardous wastes. He
further stated that MMT would invest $25 million in the facility, which would start up on
HCC biosolids in mid-1996. During Mr. Haney's private meetings with Mr. McConchie in
February 1996, Mr. Haney reaffirmed that MMT was progressing rapidly on the HCC
facility and that it was on schedule to begin operation in mid-1996. The start-up date of
the HCC project and the cost claimed by Mr. Haney and Mr. Nagel were important to Mr.
McConchie because, if true, it would have demonstrated the commercial viability and
economic value of the CEP process.

 • *When Mr. McConchie arrived at MMT, he learned that the HCC project was far
behind schedule, that its capital costs had been grossly understated, and that the
forecasted economies of the facility had been exaggerated. Specifically, he learned that
the facility would cost more than two and a half times what he had been told by Mr.
Haney and Mr. Nagel, and that serious technical problems would delay its start-up date.
Mr. McConchie also learned that in early 1996 both Mr. Haney and Mr. Nagel had been
informed of the cost overruns and delayed start-up date, but they did not convey this
information to Mr. McConchie during the recruitment period. In fact, on information
and belief the facility still has not begun operation.*

**Feed System and Reactor Control**

 • Mr. Nagel stated at the March 1995 meeting attended by Mr. McConchie that
the feed system and reactor control problems associated with the CEP process had been

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 7

solved and that the process was ready for implementation. Both Mr. Haney and Mr.
Nagel stated at the meeting attended by Mr. McConchie in December 1995 that the
technology related to feed line plugging, refractory wear, reactor control and reactor
tapping was completely developed and had been fully demonstrated for liquid and bulk
solid feeds. During his private meetings with Mr. McConchie in February 1996, Mr.
Haney stated that this technology was ready for commercialization. The degree of
flexibility of the process in feeding the range of liquids and solids claimed by Mr. Haney
and Mr. Nagel was important to Mr. McConchie because, if true, the CEP process would
have had a far broader range of market applications than the alternative technologies
offered by MMT's competitors.

• By September 1996, Mr. McConchie realized that the CEP's feed system and
reactor control problems had not been solved. Instead, he discovered that the CEP feed
system was not fully developed and was plagued by system plugging, excessive refractory
wear and frequent shutdowns. Mr. McConchie further learned that the CEP process did
not have the capability to feed bulk solids or to remove solid phases from the reactor. All
of these deficiencies severely restricted the technology's market value. In short, the feed
system and reactor control system did not meet the claims of flexibility and reliability
which Mr. Haney and Mr. Nagel made to Mr. McConchie during the recruitment process.

Dust Levels

• Mr. Nagel announced at the December 1995 meeting attended by Mr.
McConchie that MMT had achieved minimal dust generation and expected dust levels in a
commercial plant to be less than one percent. Mr. Nagel further stated that dusts were
recycled to the system for closed-loop recycling. During his February 1996 meetings with
Mr. McConchie, Mr. Haney also stated that MMT had solved all of the dust problems and
had achieved minimal dust generation and dust recycling. These claims were important to
Mr. McConchie because low dust generation and the ability to fully recycle dust were
major factors in CEP's purported competitive advantage over alternative technologies.

• During the first several months of his employment at MMT, Mr. McConchie
learned that the dust level problem associated with the CEP process had not been solved.
Instead, he discovered that the CEP process was characterized by very high levels of
dust. He learned that pilot operations and the Q-CEP facilities showed excessive dust
generation, and that MMT was expecting dust levels to remain at approximately ten
percent. Mr. McConchie further learned that the Q-CEP facilities and MMT's planned
operations in Bay City, Texas did not include dust recycling.

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 8

## Product Quality

• Mr. Nagel stated at the March 1995 meeting attended by Mr. McConchie that the quality of the synthesis gas produced by the CEP process provided MMT with a competitive advantage over other reduction technologies because the gas contained less than one percent carbon dioxide. Mr. Nagel further stated that the CEP process had a demonstrated capability to produce high-quality hydrogen chloride, either in concentrated aqueous acid or anhydrous form. Mr. Nagel repeated this statement at the December 1995 attended by Mr. McConchie. At the February 1996 meetings, Mr. Haney provided Mr. McConchie with an article written by Mr. Nagel which stated that CEP produced minimal impurities in the synthesis gas, such as carbon dioxide, that the hydrogen chloride product surpassed typical hydrochloric acid specifications, and that it had the ability to produce anhydrous hydrogen chloride. Mr. Haney himself stated during these meetings that the CEP process dissolved waste compounds to their constituent elements in a molten metal bath and reconfigured the elements into useful raw materials. Mr. Haney and Mr. Nagel's material statements about the quality of CEP's product were important to Mr. McConchie because, if true, it would have enabled the process to receive a more favorable regulatory classification from the government and increased its marketability.

• *When Mr. McConchie arrived at MMT, he learned that the CEP process was incapable of operating reliably at low carbon dioxide levels in the synthesis gas and that it did not have a competitive advantage over other reduction technologies. Instead, he discovered that CEP products had a high carbon dioxide content (up to five percent). Mr. McConchie learned that the CEP process was plagued with acid quality problems and the option for producing anhydrous hydrogen chloride had not been developed or demonstrated. Mr. McConchie also learned that substantial volumes of wastes — not products — were generated in the CEP process in the form of dust, metal purges and water effluents. These product quality problems led to significantly higher capital and operational costs, reduced MMT's flexibility in utilizing products as raw materials, and increased regulatory concerns.*

## CEP Safety and Reliability

• At the March 1995 meeting attended by Mr. McConchie, Mr. Nagel stated that CEP was "safe, reliable and operable." At the December meeting, Mr. Nagel stated that MMT had successfully completed a long-term operability trial. In February 1996, Mr. Haney provided Mr. McConchie an article by Mr. Nagel stating that "safe operations were demonstrated during the processing of various feed streams." This was important to Mr. McConchie because safety and reliability were minimum requirements for processes in the chemical industry.

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 9

* After Mr. McConchie began work at MMT, he learned that the CEP was neither safe nor reliable. Instead, he discovered a significant number of safety problems arising out of the CEP process, including the lack of safety procedures, operating discipline, and an auditing system. In December 1996, he learned about feed reliability problems at Q-CEP and the inability of the CEP system to process feedstocks and recover a significant quantity of commercial-quality products. In early 1997, Mr. McConchie learned of contamination problems involving radioactive waste processing at the Q-CEP facilities.

## II.    LIABILITY

As the foregoing facts demonstrate, each of you made material misrepresentations to Mr. McConchie to induce him to give up his secure position at Dow and join MMT. Such conduct is actionable under Massachusetts law, as discussed below.

### A.    Intentional Misrepresentation

You are liable to Mr. McConchie if you made misrepresentations of material facts with actual knowledge of the falsity of your statements or if your statements concerned facts that were reasonably susceptible of actual knowledge. See Presto v. Sequoia Sys., 633 F. Supp. 1117, 1119 (D. Mass. 1986) (misrepresentations of facts with knowledge of falsity are actionable); Zimmerman v. Kent, 31 Mass. App. Ct. 72, 74 (1991) (misrepresentation of facts reasonably susceptible of actual knowledge are actionable). A reasonable person would have attached importance to the information you provided to Mr. McConchie, and thus the information was material. See Zimmerman at 78. Because the information on its face was reasonable, it is not a defense that Mr. McConchie may not have conducted his own investigation of these representations. See Zimmerman at 76 (1991) (investigation into the truth of a representation is not required of victim as long as the representation is not "preposterous or palpably false"); Ford v. Warner-Lambert Co., 1987 WL 9905 at *3 (D. Mass. 1987) ("[o]ne who has willfully made false representations with intent to deceive should not be relieved of liability because of his victim's lack of diligence").

### B.    Negligent Misrepresentation

Alternatively, you may be liable to Mr. McConchie if you negligently made material misrepresentations to induce him to join MMT. See Fox v. F & J Gattozzi Corp., 41 Mass. App. Ct. 581, 583 (1996) (defendant may be liable for negligent misrepresentation if he fails to exercise reasonable care or competence in obtaining or communicating information).

Mr. William M. Haney, III
Mr. Christopher J. Nagel
March 25, 1998
Page 10

## III.   DAMAGES

You are liable to Mr. McConchie for his out-of-pocket losses, regardless of whether your actions were intentional or negligent. See Rice v. Price, 340 Mass. 502, 507-60 (1960) (measuring damages by out-of-pocket losses in intentional misrepresentation case); Danca v. Taunton Sav. Bank, 385 Mass. 1, 9 (1982) (measuring damages by out-of-pocket losses in negligent misrepresentation case).

Mr. McConchie's financial losses resulting from his departure from Dow total $2.572 million. The summary of damages that follows assumes (1) that Mr. McConchie would have remained at Dow until age 56 (as had been his intention prior to accepting the MMT job offer), when he would have been eligible to retire at maximum benefits, and (2) that he would have received Dow benefits until age 70 (although it should be noted that he would have been eligible for these benefits throughout his lifetime).

### Compensation Losses

Less than a year and a half after hiring Mr. McConchie, MMT terminated his employment. Unemployed at age 47, he is now forced to conduct a job search from a position of relative weakness. It is unlikely that he will be able to find employment that matches the salary, bonuses, stock and options he would have earned had he remained at Dow. Assuming he is re-employed by September 1998 at 70% of the total compensation he would have been receiving at Dow, Mr. McConchie anticipates that the present dollar value of his lost compensation during the period 1997 through 2006 will total approximately $1,132,000.

### Lost Retirement Income

Had Mr. McConchie retired from Dow at age 56, he would have been eligible to receive the maximum pension benefit, which he projects would have been approximately $163,000 annually. Instead, having retired in 1996, he is only eligible for a $33,000 annual pension. The present dollar value of the difference between his actual pension and the pension he would have received had he stayed at Dow until age 56 is approximately $569,000.

### Lost Life Insurance Subsidy

At age 50, Mr. McConchie would have been eligible for paid life insurance for life valued at over $1.5 million. The present dollar value of the additional cost to him to purchase equivalent insurance is approximately $549,000.

Mr. William M. Haney, III
Mr. Chrisopher J. Nagel
March 25, 1998
Page 11

## Relocation Costs

Mr. McConchie moved himself and his family from Texas in order to join MMT. Mr. McConchie estimates that the cost for him to relocate his family back to Texas is approximately $103,000.

## Lost Medical Insurance Subsidy

At age 50, Mr. McConchie would have been eligible for paid medical insurance for life. The present dollar value of the additional cost to him to purchase equivalent insurance is approximately $135,000.

## Salaried Employee Savings Plan

As a Dow employee, Mr. McConchie was eligible to participate in the company's Salaried Employee Savings Plan ("SESP"), a program by which Dow matched employee contributions in a 401(k) investment fund. Mr. McConchie estimates that the present dollar value of the loss he will suffer by not being able to participate in this program is approximately $84,000.

## III.    CONCLUSION

As the foregoing discussion indicates, your potential liability in this matter is significant. Nonetheless, Mr. McConchie is willing to consider a settlement before initiating litigation. If you would like to discuss such a possibility, please contact us no later than Friday, April 24, 1998. Please send a copy of this letter to your insurance carriers to put them on notice of potential litigation.

We look forward to hearing from you.

Sincerely,

Nancy S. Shilepsky
David M. Osborne

# THE DEPARTMENT OF ENERGY'S FUNDING OF MOLTEN METAL TECHNOLOGY—Part 2

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON
## OVERSIGHT AND INVESTIGATIONS

OF THE

## COMMITTEE ON COMMERCE
## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIFTH CONGRESS

FIRST SESSION

NOVEMBER 21, 1997 and FEBRUARY 12, 1998

## Serial No. 105-77

Printed for the use of the Committee on Commerce



U.S. GOVERNMENT PRINTING OFFICE

47-414CC                    WASHINGTON : 1998

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-057109-X

## COMMITTEE ON COMMERCE

### TOM BLILEY, Virginia, *Chairman*

W.J. "BILLY" TAUZIN, Louisiana
MICHAEL G. OXLEY, Ohio
MICHAEL BILIRAKIS, Florida
DAN SCHAEFER, Colorado
JOE BARTON, Texas
J. DENNIS HASTERT, Illinois
FRED UPTON, Michigan
CLIFF STEARNS, Florida
BILL PAXON, New York
PAUL E. GILLMOR, Ohio
  *Vice Chairman*
SCOTT L. KLUG, Wisconsin
JAMES C. GREENWOOD, Pennsylvania
MICHAEL D. CRAPO, Idaho
CHRISTOPHER COX, California
NATHAN DEAL, Georgia
STEVE LARGENT, Oklahoma
RICHARD BURR, North Carolina
BRIAN P. BILBRAY, California
ED WHITFIELD, Kentucky
GREG GANSKE, Iowa
CHARLIE NORWOOD, Georgia
RICK WHITE, Washington
TOM COBURN, Oklahoma
RICK LAZIO, New York
BARBARA CUBIN, Wyoming
JAMES E. ROGAN, California
JOHN SHIMKUS, Illinois

JOHN D. DINGELL, Michigan
HENRY A. WAXMAN, California
EDWARD J. MARKEY, Massachusetts
RALPH M. HALL, Texas
RICK BOUCHER, Virginia
THOMAS J. MANTON, New York
EDOLPHUS TOWNS, New York
FRANK PALLONE, Jr., New Jersey
SHERROD BROWN, Ohio
BART GORDON, Tennessee
ELIZABETH FURSE, Oregon
PETER DEUTSCH, Florida
BOBBY L. RUSH, Illinois
ANNA G. ESHOO, California
RON KLINK, Pennsylvania
BART STUPAK, Michigan
ELIOT L. ENGEL, New York
THOMAS C. SAWYER, Ohio
ALBERT R. WYNN, Maryland
GENE GREEN, Texas
KAREN McCARTHY, Missouri
TED STRICKLAND, Ohio
DIANA DeGETTE, Colorado

JAMES E. DERDERIAN, *Chief of Staff*
CHARLES L. INGEBRETSON, *General Counsel*
REID P.F. STUNTZ, *Minority Staff Director and Chief Counsel*

### SUBCOMMITTEE ON OVERSIGHT AND INVESTIGATIONS

#### JOE BARTON, Texas, *Chairman*

CHRISTOPHER COX, California
  *Vice Chairman*
JAMES C. GREENWOOD, Pennsylvania
MICHAEL D. CRAPO, Idaho
RICHARD BURR, North Carolina
BRIAN P. BILBRAY, California
GREG GANSKE, Iowa
TOM COBURN, Oklahoma
TOM BLILEY, Virginia,
  (Ex Officio)

RON KLINK, Pennsylvania
HENRY A. WAXMAN, California
PETER DEUTSCH, Florida
BART STUPAK, Michigan
ELIOT L. ENGEL, New York
THOMAS C. SAWYER, Ohio
JOHN D. DINGELL, Michigan,
  (Ex Officio)

(II)

# CONTENTS

Page

Hearings held in Washington, DC:
    November 21, 1997 ................................................................................................ 1
    February 12, 1998 ................................................................................................ 75
Testimony of:
    Berman, Eugene, Vice President for Regulatory, Legal, and External
        Affairs, Molten Metal Technology, Inc ................................................. 85
    Gatto, Victor E., Vice President of Government and Nuclear Sector, Mol-
        ten Metal Technology, Inc ..................................................................... 98
    Haney, William M., III, former Chairman and CEO, Molten Metal Tech-
        nology, Inc ............................................................................................... 9?
    Huber, William J., Project Manager, Environmental Waste, Management
        Division, Federal Energy Technology Center, Department of Energy ..... 4
    Nagel, Christopher J., Vice President and Chief Technical Officer, Molten
        Metal Technology, Inc ............................................................................ 94
    Zeh, Charles M., Director, Gas Power Systems Division, Federal Energy
        Technology Center, Department of Energy ........................................... 4
Additional material submitted for the record:
    Huber, William J., Project Manager, Environmental Waste, Management
        Division, Federal Energy Technology Center, Department of Energy,
        letter dated April 29, 1998, to Hon. Joe Barton ................................. 73

(III)

94

Mr. BARTON. Thank you.

I think, is it Mr. Nagel, now? Mr. Nagel is the vice president and chief technical officer of Molten Metal Technology. And I believe that you are the inventor or the original developer of this technology and have a number of patents on it. We certainly recognize you for such time as you may consume.

## TESTIMONY OF CHRISTOPHER J. NAGEL

Mr. NAGEL. Thank you, Mr. Chairman, and members of the committee.

I appreciate the invitation to appear before you today. My name is Christopher John Nagel. I am chief technical officer, vice president, and founding scientist at Molten Metal Technology. I am founder of the company and the co-inventor of the company's core technology—catalytic extraction processing.

While I was working at U.S. Steel, my previous professor from Wayne State University and I discovered that employing a metal bath could provide tremendous benefits for safe and effective recycling of waste. Eager to explore commercial applications for my new invention, I entered MIT's chemical engineering doctoral program. There I was able to refine the idea and meet many scientists and graduate students who would help shape the technology into what became the basis for Molten Metal Technology.

Over the 8 years since MMT was founded, I have worked with many talented scientists and engineers throughout the world to methodically develop this idea into a socially useful product. Scientists and engineers at Dow Chemical, Dupont, Lockheed Martin, Hoechst, Westinghouse, Fluor Daniel, Nippon Steel, and Krupp Uhde, and DOE personnel from field offices and headquarters have contributed their ideas and experiences to help develop our technology.

Today, two commercial facilities are in operation accepting and processing a variety of radioactive and mixed wastes from industrial customers. Process performance is exceptional. It has been validated by numerous customers. As EPRI—the research arm of the investor-owned electrical utility industry—recently wrote in a technical report distributed to its member companies, "prior to this demonstration, no commercially available processing option existed for several of these wastes." I have attached to my statement a number of these publications by customers.

Allow me to briefly explain how this technology works. It employs a unique feature of metals. Metals only dissolve elements. You take a feed—it doesn't really matter what that organic or inorganic food is—you break it down into its constituent elements. At this particular point it could be one carbon, it could be multiple carbons. That's the beauty of the metal—once you dissolve it, it becomes one single monatomic element. At that point, you have a consistent predictable intermediate. You can manufacture a product without any of the progenitors of that feed carrying through. You can take carbon, push it over to carbon monoxide; hydrogen either to a halo acid for recovery or H2 if you combine the CO for synthesis gas. You can manipulate this thermomimenic space to change where you want those materials to partition.

But, for example, at Q-CEP, where we have an ion exchange resin—it has a lot of cobalt, a lot of cesium, sulphur and sodium; we introduce them—the ion exchange—either in HICs—these are called high-integrity containers. We pull the sulphur out in the gas phase. We concentrate the cobalt in the ceramic phase. We typically get volume reductions of greater than 30 to 1. Conventional technologies get volume reductions of between two and eight to one—those that achieve volume reduction as opposed to volume expansion. What's most important is that we are able to achieve this product manufacture, or volume reduction, or both, in an environmentally sound manner that offers a potential of unusually compelling total life-cycle economics.

Since the beginning, MMT's technical team has been supervised by a highly engaged technical advisory board. Members include: Norman Hackerman, professor emeritus at Rice University, distinguished professor emeritus of chemistry, and National Medal of Science recipient; Jeff Tester, MIT professor of chemical engineering and director of MIT's energy laboratory; Adel Sarofim, MIT professor emeritus of chemical engineering and recipient of DOE's Homer H. Lowery Award; Dudley Hershbach, Harvard professor of chemistry and Nobel laureate; Bill Manly, retired executive vice president of Cabot Corporation, one of the first fellows of the American Society of Metals, and National Medal of Engineering recipient; and many others. We and our partners have conducted thousands of tests on a variety of wastes to provide data to prospective customers like Westinghouse, Hoechst, and the DOE.

Some people have suggested that the support that MMT has received has not been grounded in extensive scientific evaluation. I can emphatically and categorically state that this is false. We have been subjected to exhaustive, intense, and what often seems like continuous, technical scrutiny from the DOE as part of the PRDA, by our customers and private-sector partners, not to mention numerous reviews by the NAE, NRC, and the scientists who serve on our technical advisory board. These reviews have critiqued, buttressed, and strengthened the scientific underpinnings of CEP, and, as a consequence, the number of potential suitable applications has expanded.

As you can well expect, technologists do not always agree—Einstein did not support the duality-of-light concept in his latter years; Edison did not support the widespread application of AC power, and a select few individuals in the DOE did not support numerous conclusions of peer reviews of our technology. These disagreements should not be unexpected, given the radical nature of CEP and its assault on the conventional and frequently environmentally unsound and inevitably unpopular paradigm of incineration as a means of dealing with waste. Even with technologies rich in commercial histories at well-established firms, there is disagreement.

As any young company like MMT bringing a first-of-a-kind technology to the marketplace, it faces early criticism. Indeed, it is often helpful. But contrary to poorly investigated news articles that reference old reports out of context, many scientists from industry and government, from this country and abroad, have favorably reviewed CEP with respect to the commercial alternatives. Of even greater relevance, the vast majority of the nuclear power plants in

the United States today are employing CEP as their technology of choice.

As you might imagine, CEP means a lot to me. I have dedicated 15 years of my life to the advancement of CEP—a technology that is capable of solving some of the world's most pernicious waste problems for the benefit of the community and the economy. I am proud of our accomplishments. In less than 7 years, we have commercially deployed and are successfully operating the first mixed waste recycling facility in the Nation, and the only remotely handled ion exchange resin processing facility. Our operations have processed more than 1.5 million pounds of radioactive waste, and more than 300 curies of radioactivity—threefold more radioactivity than is estimated to be in Oak Ridge National Lab's entire mixed waste inventory.

We have demonstrated what DOE's EM–50 recommended in 1995, "if ongoing enhancements, particularly in bulk solids feeding and remote operation are proven, CEP could be a promising process for DOE mixed low-level waste, contact-handled transuranic waste, and remote-handled transuranic wastes." We also delivered on DOE's stated policy objective, "to demonstrate the processing of mixed waste by December 1995."

Moreover, if EPRI's statement suggesting the applicability of CEP to more than 90 percent of the commercial nuclear plant mixed waste inventory is applicable to DOE's mixed low-level waste inventory, then we also met DOE's second policy objective, "demonstrate the applicability of a technology to greater than 90 percent of the mixed low-level waste inventory by December 1997."

I am happy today to answer any questions you may have about our technology. I am anxious to put these questions to rest, so that we can get back to more important matters—engineering appropriate applications of this technology to solve our Nation's biggest environmental challenges and to make this world a better place for our children and our children's children.

Thank you.

[The prepared statement of Christopher J. Nagel follows:]

PREPARED STATEMENT OF CHRISTOPHER J. NAGEL, VICE PRESIDENT AND CHIEF TECHNICAL OFFICER, MOLTEN METAL TECHNOLOGY, INC.

Thank you Mr. Chairman and members of the Committee. I appreciate the invitation to appear before you today. My name is Christopher John Nagel. I am Chief Technical Officer, Vice President, and Founding Scientist at Molten Metal Technology. I am a founder of the company and the co-inventor of the company's core technology, Catalytic Extraction Processing.

Since I was a child I have struggled with how to apply my inventive talents to advance the values and responsibilities taught by my parents: contribute to the betterment of your family, the nation, and the world. I saw an opportunity to do so in the mid 1980's, while I was working at U.S. Steel (now USX) with a former professor from Wayne State University, after earning a bachelor's degree in chemical engineering at Michigan Technological University. We were studying the use of waste materials to improve energy efficiency in steel making when we discovered the benefits for safe and effective waste recycling through the use of a molten metal bath.

Eager to explore commercial applications for my new invention, I left US Steel in 1986 to enter Massachusetts Institute of Technology's chemical engineering doctoral program. While at MIT, I expanded my knowledge and was able to refine the idea of using molten metal for recycling wastes. By the time I earned my degree, I had met many MIT scientists and fellow graduate students who would help to shape my idea.

97

Eventually the idea developed and became the basis for a technology start-up company, Molten Metal Technology.

Over the eight years since Molten Metal was founded, I have worked with talented scientists and engineers throughout the world to methodically develop this early idea into a socially useful product. Scientists and engineers at Dow Chemical and DuPont, at Lockheed Martin, Hoechst, and Westinghouse, Flour Daniel, Nippon Steel, Krupp Uhde, and DOE personnel from field offices and headquarters have contributed their ideas and experiences to help us develop our technology. First we developed computational models. Then we built bench-scale and pilot-scale systems and began to demonstrate the technology on a small scale. In 1993 we started up a commercial-scale prototype and began to demonstrate to prospective customers what our technology could do on a large scale. Now, we are operating our first two commercial plants. We are taking customer waste and using a molten metal bath to treat or recycle materials from a variety of radioactive and mixed (i.e., radioactive and hazardous) wastes. Most importantly, we are able to achieve this recovery in an environmentally-sound way that offers the potential of unusually compelling total life cycle economics.

Allow me to briefly explain, using these two charts, how the technology works.

Catalytic extraction processing is a technology that uses thermodynamic and separation principles similar to those that caused the stratification of the earth and the subsequent development of what we today describe as the earth's natural resources. CEP uses a molten metal bath as a catalyst for elemental dissociation and a medium for reaction engineering. This technique enables the consistent manufacture and recovery of products without sacrificing regulatory environmental standards that control the release of toxins (e.g. dioxins and furans). With CEP, a high percentage of the materials processed can be recovered as industrial-grade products.

While the process differs somewhat from feed to feed and has some particularly unique characteristics when applied to radioactive or extremely toxic chemicals like nerve gas, its fundamental chemistry is the same.

Since the beginning, Molten Metal Technology's technical team has been supervised by a highly engaged technical advisory board, which includes Norman Hackerman, former President Emeritus of Rice University, Distinguished Professor Emeritus of Chemistry, and National Medal of Science recipient; Jefferson Tester, MIT Professor of Chemical Engineering and Director of the MIT Energy Laboratory, Adel Sarotim, Professor Emeritus of Chemical Engineering and recipient of DOE's Homer H. Lowery Award in Fossil Fuel; Dudley Hershbach, Harvard Professor of Chemistry and Nobel laureate recipient; and, Bill Manly, retired Executive Vice President of Cabot Corporation, is one of the first fellows of the American Society for Metals, and National Medal of Engineering recipient. MMT scientists and our partners at these and other universities around the world have conducted thousands of tests on a variety of wastes to develop the technology's scientific bases. The data from these programs has been used by companies like Westinghouse and Hoechst to determine whether to build a facility, and the DOE to begin to evaluate our technology's effectiveness on DOE feeds.

Some people have suggested that the support that Molten Metal has received has not been grounded in extensive scientific evaluation. I can categorically state that this is false! We have been subject to exhaustive, intense, and often what seems like continuous technical scrutiny—from the DOE as part of the PRDA and by our customers and private-sector partners, not to mention numerous reviews by the NAE, NRC, and the scientists who serve on our Technical Advisory Board. These reviews have critiqued, assisted, and enhanced the scientific underpinnings of CEP and expanded the number of potential suitable applications.

As you can well expect technologists do not always agree: Einstein did not support the duality of light concept in his latter years, Edison did not support the widespread application of AC power, and select individuals in the DOE did not support the conclusions of numerous peer reviews of our technology. These disagreements are not uncommon given the radical nature of CEP or its assault on the conventional paradigm regarding how we deal with wastes. Indeed, even with technologies with rich commercial histories in well established firms such as DuPont's TiO2 process or Badger's ethyl benzene/styrene process there was and is disagreement—yet today these technologies dominate their respective markets.

MMT is a young organization with a young technology. As a young organization brings a first-of-a-kind technology to the marketplace, early criticism is expected—indeed it is often helpful. But contrary to the recent news articles that reference old reports out of context, many of the scientists, including numerous representatives from the DOE, DoD, NAE, NRC, and industry, have favorably reviewed CEP with respect to the competitive alternatives.

98

As you might imagine, CEP means a lot to me. I have dedicated 15 years of my life to the advancement of the ideas and the equipment that embody CEP in our first commercial platforms: a technology that is capable of solving some of the world's most pernicious waste problems for the benefit of the community and the economy. I am proud of our accomplishments, my parents are proud, and I believe the nation will be proud when the scientific facts are revealed. In less than 7 years we have commercially deployed and are successfully operating the first mixed waste recycling facility in the nation and the only remote handled ion exchange resin (a low level radioactive waste) processing facility. Cumulative commercial operations have processed more than 1 million pounds and more than 300 curies—three-fold more radioactivity than is estimated to be in Oak Ridge National Lab's mixed waste inventory—via contact handled and remote handled operation. We have demonstrated what DOE's EM-50 recommended in 1995: "If ongoing enhancements, particularly in bulk solids feeding (>>1 inch) and remote operation are proven, CEP could be a promising process for DOE MLLW (i.e., mixed low level waste), CH-TRU (i.e., contact handled transuranic waste), and RH-TRU (i.e., remote handled transuranic wastes)".

I am happy today to answer any question you may have about our technology. I am anxious to put these questions to rest so we can get back to more important matters—figuring out how we can appropriately apply this technology to solve our nation's biggest environmental challenges and make this world a better place for my children and my children's children.

Mr. BARTON. Thank you, Mr. Nagel. I want to stipulate I'm a professional engineer. I made "C's" in chemistry, but I did make a "D" in thermal dynamics. I doubt that many of us are going to ask many technical questions of you. We'll stipulate that what you said is true. I barely understood some of what you said, but you said it very well.

We're going to recognize last, but not least, Mr. Vic Gatto, who's the vice president of government and nuclear sector for Molten Metal Technology. Again, your statement is submitted in its entirety for the record. And we'll set the clock at 7 minutes kind of just as a general parameter.

## TESTIMONY OF VICTOR E. GATTO

Mr. GATTO. Thank you, Mr. Chairman.

Prior to your acknowledgment of Dr. Nagel's statement, I was thinking that my role was to be—since I spent 22 years in academia—to query the committee on his speech. Failing that, however——

Mr. BARTON. You can do that if you want.

Mr. GATTO. Given your record, I'll proceed to talk to you about my role at Molten Metal.

When I first began working with the company as a consultant in 1991, the company was focused primarily on opportunities to apply its new technology to process and recycle chemical hazardous wastes. Since joining the company, I've concentrated my efforts on trying to apply it to, I think, what has become, our biggest customer, the U.S. Government.

The company was new to Government contracting, but my basic philosophy was to treat the Government as a customer. Our customer, the DOE, expressed an important goal which you've heard, to commercially process mixed waste by December 1995. Together Molten Metal and DOE technical personnel created an ambitious plan to pursue that goal which required accelerated work and accelerated funding. I am proud to say we met our goal by processing DOE mixed waste in Oak Ridge, Tennessee, in December 1995, right around Christmastime.

CLOSED

# United States District Court
## District of Massachusetts (Boston)
## CIVIL DOCKET FOR CASE #: 1:97-cv-10325-MLW

Axler, et al v. Molten Metal, et al
Assigned to: Chief Judge Mark L. Wolf
Demand: $0
Related Cases: 1:01-cv-10062-MLW
                1:97-cv-10386-MLW
                1:98-cv-10161-MLW
                1:97-cv-10686-MLW
Cause: 15:78m(a) Securities Exchange Act

Date Filed: 02/12/1997
Jury Demand: Both
Nature of Suit: 160 Stockholders Suits
Jurisdiction: Federal Question

**Plaintiff**

**Saul Schwartz**
*on behalf of himself and all others
similarly situated*

represented by **Peter A. Pease**
Berman DeValerio Pease Tabacco Burt
& Pucillo
One Liberty Square
8th Floor
Boston, MA 02109
617/542-8300
Fax: 617/542-1194
Email: ppease@bermanesq.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Kenneth G. Davis**
*on behalf of himself and all others
similarly situated*

represented by **Peter A. Pease**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Steven Somkin**
*on behalf of himself and all others
similarly situated*

represented by **Peter A. Pease**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Marilyn Axler**
*on behalf of herself and all others
similarly situated*

represented by **Norman Berman**
Berman DeValerio Pease Tabacco Burt
& Pucillo
One Liberty Square
Boston, MA 02109
617-542-8300
Email: NBerman@Bermanesq.com

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter A. Pease**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas G. Shapiro**
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02108
617-439-3939
Fax: 617-439-0134
Email: tshapiro@shulaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Molten Metal Technology, Inc.,**    represented by    **Peter Sabin Willett**
Bingham McCutchen LLP
150 Federal Street
19th Fl.
Boston, MA 02110
617-951-8775
Fax: 617-951-8736
Email: sabin.willett@bingham.com
*TERMINATED: 04/04/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven W. Hansen**
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
617-951-8538
Fax: 617-951-8736
Email: steven.hansen@Bingham.com
*TERMINATED: 04/02/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**William M. Haney, III**    represented by    **Karen F. Green**
Wilmer Cutler Pickering Hale and Dorr
LLP
60 State Street
Boston, MA 02109

617-526-6000
Fax: 617-526-5000
Email: karen.green@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Sabin Willett**
(See above for address)
*TERMINATED: 04/04/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William H. Paine**
Wilmer Cutler Pickering Hale and Dorr
LLP
60 State Street
Boston, MA 02109
617-526-6134
Fax: 617-526-5000
Email: william.paine@wilmerhale.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Christopher J. Nagel**                    represented by  **Carrie J. Fletcher**
EEOC
7 World Trade Center, 18th Floor
New York, NY 10048
617-342-4000
Fax: 617-342-4001
Email: cfletcher@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Michael J. Tuteur**
Foley & Lardner, LLP
Suite 2600
111 Huntington Avenue
Boston, MA 02199
617-342-4000
Fax: 617-342-4001
Email: mtuteur@foley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter Sabin Willett**
(See above for address)
*TERMINATED: 04/04/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Benjamin T. Downs**                    represented by **Ian Crawford**
                                         Todd & Weld LLP
                                         28 State Street
                                         31 st Floor
                                         Boston, MA 02109
                                         617-720-2626
                                         Fax: 617-227-5777
                                         Email: icrawford@toddweld.com
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Victor E. Gatto, Jr.**                 represented by **Peter Sabin Willett**
                                         (See above for address)
                                         *TERMINATED: 04/04/2000*
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Richard C. Heidlage**
                                         Attorney General's Office
                                         Commonwealth of Massachusetts
                                         200 Portland Street
                                         Boston, MA 02114
                                         617-727-2200
                                         Fax: 617-727-2008
                                         Email:
                                         richard.heidlage@ago.state.ma.us
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

                                         **Steven W. Hansen**
                                         (See above for address)
                                         *TERMINATED: 04/02/2000*
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Ian C. Yates**                         represented by **Andrew C. Glass**
                                         Kirkpatrick & Lockhart Nicholson
                                         Graham LLP
                                         State Street Financial Center
                                         One Lincoln Street
                                         Boston, MA 02111-2950
                                         617-261-3107
                                         Fax: 617-261-3175
                                         Email: aglass@klng.com
                                         *LEAD ATTORNEY*
                                         *ATTORNEY TO BE NOTICED*

**Peter Sabin Willett**
(See above for address)
*TERMINATED: 04/04/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Rory J. Fitzpatrick**
Kirkpatrick & Lockhart
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
617-261-3100
Fax: 617-261-3175
Email: rfitzpatrick@klng.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven W. Hansen**
(See above for address)
*TERMINATED: 04/02/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**
**John T. Preston**                    represented by    **Peter Sabin Willett**
(See above for address)
*TERMINATED: 04/04/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven W. Hansen**
(See above for address)
*TERMINATED: 04/02/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**
**Maurice F. Strong**                  represented by    **Peter Sabin Willett**
(See above for address)
*TERMINATED: 04/04/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven W. Hansen**
(See above for address)
*TERMINATED: 04/02/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Movant**

**MMT Recovery LLC**                          represented by   **David L. Evans**
                                                               Hanify & King
                                                               Professional Corporation
                                                               One Beacon Street, 21st Floor
                                                               Boston, MA 02108-3107
                                                               617-423-0400
                                                               Fax: 617 423-0498
                                                               Email: dle@hanify.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **John D. Hanify**
                                                               Hanify & King
                                                               One Beacon Street
                                                               Boston, MA 02108
                                                               617-423-0400
                                                               Fax: 617-423-0498
                                                               Email: jdh@hanify.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

                                                               **Sharon H. Patton**
                                                               Hanify & King
                                                               Professional Corporation
                                                               One Beacon Street
                                                               Boston, MA 02108-3107
                                                               617-423-0400
                                                               Fax: 617-423-0498
                                                               Email: shp@hanify.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

**Trustee**

**Stephen S. Gray**                          represented by   **Thomas G. Hoffman**
                                                               Greene & Hoffman, PC
                                                               Suite 1410
                                                               125 Summer Street, 14th Floor
                                                               Boston, MA 02110
                                                               617-261-0040
                                                               Fax: 617-261-3558
                                                               Email: thoffman@greenehoffman.com
                                                               *LEAD ATTORNEY*
                                                               *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/12/1997 | 1 | Complaint filed. . Receipt #: 121030 Amount:$ 150.00. Fee Status: paid (fmr) (Entered: 02/12/1997) |

| 02/24/1997 | 2 | Return of service executed as to John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 with service on 2/13/97 filed. Answer due on 3/5/97 for Maurice F. Strong, for John T. Preston, for Victor E. Gatto Jr., for Benjamin T. Downs, for Christopher J. Nagel, for William M. Haney III, for Molten Metal. (scj) (Entered: 02/24/1997) |
| 03/03/1997 | 3 | Return of service executed as to Ian C. Yates in 1:97-cv-10325 with service on 2/15/97 filed. Answer due on 3/7/97 for Ian C. Yates (scj) (Entered: 03/04/1997) |
| 03/12/1997 | 4 | Motion by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, John T. Preston in 1:97-cv-10325 to extend time to June 1, 1997 to file an answer or otherwise plead to the complaint . filed, c/s. (scj) (Entered: 03/14/1997) |
| 03/12/1997 | 5 | Motion by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325 to extend time to June 1, 1997 to answer the complaint or otherwise plead . filed, c/s. (scj) (Entered: 03/14/1997) |
| 03/26/1997 | | Judge Patti B. Saris . Endorsed Order entered granting [5-1] motion to extend time to June 1, 1997 to answer the complaint or otherwise plead . cc/cl (scj) (Entered: 03/28/1997) |
| 04/14/1997 | 6 | Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, Myra Friedland in 1:97-cv-10345, Albert H. Socolov in 1:97-cv-10345, Stephen A. Levin in 1:97-cv-10386, Joseph Muoio in 1:97-cv-10686 to consolidate cases as class action and for the appointment of lead plaintiff's and lead counsel . filed, c/s. (scj) (Entered: 04/15/1997) |
| 04/14/1997 | 7 | Memorandum by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, Myra Friedland in 1:97-cv-10345, Albert H. Socolov in 1:97-cv-10345, Stephen A. Levin in 1:97-cv-10386, Joseph Muoio in 1:97-cv-10686 in support of [6-1] motion to consolidate cases as class action and for the appointment of lead plaintiff's and lead counsel in 1:97-cv-10325, [7-1] motion to consolidate cases as class action and for the appointment of lead plaintiff's and lead counsel in 1:97-cv-10345, [8-1] motion to consolidate cases as class action and for the appointment of lead plaintiff's and lead counsel in 1:97-cv-10386, [2-1] motion to consolidate cases as class action and for the appointment of lead plaintiff's and lead counsel in 1:97-cv-10686. filed, c/s. (scj) (Entered: 04/15/1997) |
| 04/14/1997 | | Proposed Pre-Trial Order No. 1 by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, Myra Friedland in 1:97-cv-10345, Albert H. Socolov in 1:97-cv-10345, Stephen A. Levin in 1:97-cv-10386, Joseph Muoio in 1:97-cv-10686 received for approval of the Court (scj) (Entered: 04/15/1997) |
| 04/16/1997 | 8 | STIPULATION (Motion) by Saul Schwartz in 1:97-cv-10325, Kenneth |

| | | |
|---|---|---|
| | | G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, to extend time to June 1, 1997 to file a responsive pleading . filed, c/s. (scj) (Entered: 04/16/1997) |
| 04/16/1997 | 9 | STIPULATION (Motion) by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, to extend time to June 1, 1997 to file a responsive pleading . filed, c/s. (scj) (Entered: 04/16/1997) |
| 04/16/1997 | 10 | Notice of appearance of attorney for Molten Metal in 1:97-cv-10325 by Steven W. Hansen. filed, c/s. (scj) (Entered: 04/16/1997) |
| 04/17/1997 | | Judge Patti B. Saris . Endorsed Order entered granting [8-1] stipulation motion to extend time to June 1, 1997 to file a responsive pleading . cc/cl (scj) (Entered: 04/17/1997) |
| 04/18/1997 | 11 | Judge Patti B. Saris . Order of Recusal entered: I hereby recuse myself from this action because my daughter has stock in Molten Metal; cc/cl in this action and in related cases CA 97-10345-PBS, CA 97-10386-PBS, CA 97-10432-PBS, and CA 97-10686-PBS. (fmr) (Entered: 04/22/1997) |
| 04/22/1997 | | Case reassigned from Judge Saris to Judge William G. Young . (fmr) (Entered: 04/22/1997) |
| 04/22/1997 | 12 | Notice of reassignment to Judge Young, filed, cc/cl. (fmr) (Entered: 04/22/1997) |
| 04/23/1997 | 13 | Judge William G. Young . Order of recusal entered. (efs) (Entered: 04/23/1997) |
| 04/23/1997 | | Case reassigned from Judge Young to Judge Mark L. Wolf . (efs) (Entered: 04/23/1997) |
| 04/23/1997 | 14 | Notice of transfer of case to Judge Wolf , filed. cc/cl (efs) (Entered: 04/23/1997) |
| 05/05/1997 | 15 | Return of service executed as to Maurice F. Strong in 1:97-cv-10325 with service on 4/18/97 filed. Answer due on 5/8/97 for Maurice F. Strong (sad) (Entered: 05/08/1997) |
| 05/23/1997 | | Judge Mark L. Wolf . Endorsed Order entered granting [6-1] motion to consolidate cases as class action and for the appointment of lead plaintiff's and lead counsel . (ktb) (Entered: 09/19/1997) |
| 05/23/1997 | 22 | Judge Mark L. Wolf. Stipulated Pretrial Order re Consolidation of Cases, with Master File being Docket No. CA. 97-10325, entered. cc/cl. (ktb) |

| | | (Entered: 09/22/1997) |
|---|---|---|
| 05/28/1997 | 16 | ASSENTED TO Motion by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 to continue , filed. (sad) (Entered: 05/29/1997) |
| 08/20/1997 | 17 | Judge Mark L. Wolf . Notice of Hearing/conference: set scheduling conference for 3:45 9/24/97 cc/cl. (ktb) (Entered: 08/26/1997) |
| 08/22/1997 | | Terminated document: mooting [16-1] motion to continue Requested by ktb (ktb) (Entered: 08/22/1997) |
| 09/08/1997 | 19 | Proposed Proposed Agenda by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 received for filing. (ktb) (Entered: 09/19/1997) |
| 09/18/1997 | 18 | Joint statement by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 , re: Rule 16.1, FILED, c/s. (ktb) (Entered: 09/19/1997) |
| 09/18/1997 | 20 | Proposed Scheduling Order by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 received for filing. (ktb) (Entered: 09/19/1997) |
| 09/18/1997 | 21 | Certificate of Compliance with Local Rule 16.1(D)(3) , filed, c/s. (ktb) (Entered: 09/19/1997) |
| 09/24/1997 | | Judge Mark L. Wolf. Re Submitted Proposed Scheduling order. #20, Scheduling Order entered. Pltfs' Motion to Consolidate Class Actions and for the Appointment of Lead Pltfs and Lead Counsel has been allowed. Defts shall file any motion to dismiss, and any supporting papaers, on or before 12/8/97, or a statement that no motion to dismiss will be filed. A hearing will be held on 2/25/98 at 3:00 p.m. cc/cl. (ktb) Modified on 09/25/1997 (Entered: 09/25/1997) |
| 10/24/1997 | 23 | STIPULATION (Motion) by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten |

| | | |
|---|---|---|
| | | Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, to extend time to 10/30/97 for pltfs to file consolidated complaint , filed, c/s. (ktb) (Entered: 11/06/1997) |
| 10/24/1997 | | Judge Mark L. Wolf . Endorsed Order entered granting [23-1] stipulation motion to extend time to 10/30/97 for pltfs to file consolidated complaint. (ktb) (Entered: 11/06/1997) |
| 10/30/1997 | 24 | CONSOLIDATED Complaint filed. Case assigned to Judge: Wolf. (sad) (Entered: 11/10/1997) |
| 11/18/1997 | | Terminated document: mooting [4-1] motion to extend time to June 1, 1997 to file an answer or otherwise plead to the complaint Requested by mlw. (ktb) (Entered: 11/18/1997) |
| 12/04/1997 | 25 | Suggestion of bankruptcy by Molten Metal in 1:97-cv-10325 FILED, c/s. (ktb) (Entered: 12/11/1997) |
| 12/11/1997 | 26 | Motion by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 to vacate paragraph 3 and 5 of the Court's Scheduling Order , FILED, c/s. (ktb) (Entered: 12/29/1997) |
| 12/11/1997 | 27 | Memorandum by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 in support of [26-1] motion to vacate paragraph 3 and 5 of the Court's Scheduling Order entered 9/24/97, filed, c/s. (ktb) (Entered: 12/29/1997) |
| 12/31/1997 | 28 | Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325 to extend time to 1/9/98 to respond to Motion to Vacate Paragraphs 3 and 5 of the Scheduking Order filed by the individual defts, ASSENTE TO , filed, c/s. (ktb) (Entered: 01/05/1998) |
| 01/09/1998 | 29 | Memorandum by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325 in opposition to [26-1] motion to vacate paragraph 3 and 5 of the Court's Scheduling Order , filed. c/s (sad) (Entered: 01/12/1998) |
| 01/16/1998 | 30 | Motion by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 for leave to file reply , filed. c/s (sad) (Entered: 01/23/1998) |
| | | |

| 01/16/1998 | 31 | Affidavit of Ethan E. Jacks, FILED, c/s. (ktb) (Entered: 01/29/1998) |
|---|---|---|
| 01/22/1998 | 32 | Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325 for Hearing on Defts' Motion to Vacate Paragraph 3 and 5 Scheduling Order , filed, c/s. (ktb) (Entered: 01/29/1998) |
| 01/29/1998 | | Judge Mark L. Wolf . Endorsed Order entered granting [30-1] motion for leave to file reply. cc/cl. (ktb) (Entered: 01/29/1998) |
| 01/29/1998 | 33 | Reply by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 to response to [26-1] motion to vacate paragraph 3 and 5 of the Court's Scheduling Order, filed, c/s. (ktb) (Entered: 01/29/1998) |
| 01/30/1998 | 34 | Certification Under Local Rule 7.1(A)(2), FILED, c/s. (ktb) (Entered: 02/02/1998) |
| 01/30/1998 | 35 | Motion by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 for leave to file affidavit of Ethan E. Jacks , filed, c/s. (ktb) (Entered: 02/02/1998) |
| 02/13/1998 | 36 | Judge Mark L. Wolf. Order entered. It is ORDERED that the parties shall be prepared to address the Motion to Vacate Paragraphs 3 and 5 of the Scheduling Order at the hearing scheduled for 2/25/98 at 3:00 p.m. cc/cl. (ktb) (Entered: 02/17/1998) |
| 05/08/1998 | | Judge Mark L. Wolf . Endorsed Order entered granting [35-1] motion for leave to file affidavit of Ethan E. Jacks . (fmr) (Entered: 05/08/1998) |
| 07/30/1998 | | Terminated document: mooting [28-1] motion to extend time to 1/9/98 to respond to Motion to Vacate Paragraphs 3 and 5 of the Scheduking Order filed by the individual defts, ASSENTE TO Requested by mlw. (ktb) (Entered: 07/30/1998) |
| 07/30/1998 | | Terminated document: mooting [32-1] motion for Hearing on Defts' Motion to Vacate Paragraph 3 and 5 Scheduling Order Requested by mlw. (ktb) (Entered: 07/30/1998) |
| 08/04/1998 | | Judge Mark L. Wolf . Endorsed Order entered mooting [9-1] stipulation motion to extend time to June 1, 1997 to file a responsive pleading . (fmr) (Entered: 08/04/1998) |
| 08/11/1998 | 37 | Judge Mark L. Wolf . Notice of Hearing/conference: Motion hearing set for 3:00 9/18/98 for [26-1] motion to vacate paragraph 3 and 5 of the Court's Scheduling Order . (ktb) (Entered: 08/12/1998) |
| 09/16/1998 | 38 | Letter dated: 9/15/98 to: Basil Cronin re the rescheduling of the motion hearing from 3:00 to 2:00 p.m., FILED, c/s. (ktb) (Entered: 09/16/1998) |

| 09/22/1998 | 39 | Judge Mark L. Wolf . Notice of Hearing/conference: set status conference for 3:00 10/26/98 cc/cl. (ktb) (Entered: 09/24/1998) |
|---|---|---|
| 09/23/1998 | | Judge Mark L. Wolf . Endorsed Order entered withdrawing [26-1] motion to vacate paragraph 3 and 5 of the Court's Scheduling Order . (fmr) (Entered: 09/23/1998) |
| 10/22/1998 | 40 | Letter by Thomas G. Shapiro in 1:97-cv-10325 dated: 10/22/98 to: Basil Cronin enclosing a Stipulation signed by counsel for the pltfs and for the defts as well as counsel for the bankruptcy trustee of Molten Metal Technology, Inc., FILED. cc/cl. (ktb) (Entered: 10/22/1998) |
| 10/22/1998 | 41 | Statement of counsel (Stipulation) Signed by counsel for the pltfs, for the defts, and by counsel for the bankruptcy trustee of Molten metal Technology, Inc. in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, fILED, c/s. (ktb) (Entered: 10/22/1998) |
| 11/30/1998 | 42 | Judge Mark L. Wolf. Order entered, The parties shall by 12/14/98 file in the Bankruptcy Court their proposed motion for relief from the automatic stay under 362(d) of the Bankruptcy Code. The parties shall report promptly the decision of the Bankruptcy Court and the implications of that decision. If the Bankruptcy Court lifts the stay, then the parties shall, joinlty id possible, seperatly if necessary, file a new proposed scheduling order. If the Bankruptcy Court does not lift the stay, then the parties shall request a date for a hearing on the Motion to Vacate Paragraphs 3 and 5 of the Scheduling Order. This case is otherwise STAYED. cc/cl. Status report due on 12/14/98 . (ktb) (Entered: 12/01/1998) |
| 11/30/1998 | | Status conference held. Case is STAYED. (ktb) (Entered: 12/03/1998) |
| 11/30/1998 | 43 | Judge Mark L. Wolf. Clerk's Notes: re: Status Conference; This case is stayed. Parties to file application to the Bankruptcy by 12/14/98; Report to the Court promptly the Bankruptcy Court's decision and respective views on how to proceed. The court will schedule a hearing at that time. Court Reporter: Coppola (ktb) (Entered: 12/03/1998) |
| 11/30/1998 | | Case stayed Reason: pending decision from the Bankruptcy Court (ktb) (Entered: 12/03/1998) |
| 01/26/1999 | 44 | Joint Status report and Proposed Scheduling Order by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, FILED, c/s. (ktb) (Entered: 01/27/1999) |

| 02/12/1999 | 45 | Amended Consolidated Complaint by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 filed. (Answer due 2/22/99 for Maurice F. Strong, for John T. Preston, for Ian C. Yates, for Victor E. Gatto Jr., for Benjamin T. Downs, for Christopher J. Nagel, for William M. Haney III, for Molten Metal ), FILED. adding . (ktb) (Entered: 02/16/1999) |
| 02/22/1999 | | Judge Mark L. Wolf . Endorsement re: [44-1] status report and Proposed Scheduling Order: "This schedule is hereby ADOPTED." cc/cl. (ktb) (Entered: 02/24/1999) |
| 04/06/1999 | 46 | Motion by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325 for leave to file Memo of LAw in excess of 20 pages , filed, c/s. (ktb) (Entered: 04/12/1999) |
| 04/06/1999 | | Judge Mark L. Wolf . Endorsed Order entered granting [46-1] motion for leave to file Memo of LAw in excess of 20 pages. cc/cl. (ktb) (Entered: 04/12/1999) |
| 04/09/1999 | 47 | Motion by John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 to dismiss , filed, c/s. (ktb) (Entered: 04/13/1999) |
| 04/09/1999 | 48 | Motion by Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325 to dismiss , filed, c/s. (ktb) (Entered: 04/13/1999) |
| 04/09/1999 | 49 | Motion by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325 to dismiss , filed, c/s. (ktb) (Entered: 04/13/1999) |
| 04/09/1999 | 50 | Memorandum by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325 in support of [49-1] motion to dismiss, filed, c/s. (ktb) (Entered: 04/13/1999) |
| 04/09/1999 | 51 | Memorandum of Law by John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 in support of [47-1] motion to dismiss, FILED, c/s. (ktb) (Entered: 04/13/1999) |
| 04/09/1999 | 52 | Memorandum of Law by Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325 in support of [48-1] motion to dismiss, filed, c/s. (ktb) (Entered: 04/13/1999) |
| 04/09/1999 | 53 | Appendix/exhibits of Relevant Documents by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325 in support of , filed. (ktb) (Entered: 04/13/1999) |
| 04/09/1999 | 54 | Appendix/exhibits of Accounting Literature by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston and |

| | | Maurice Strong in 1:97-cv-10325, FILED. (ktb) Modified on 04/13/1999 (Entered: 04/13/1999) |
|---|---|---|
| 04/09/1999 | 55 | Appendix/exhibits by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 filed. (ktb) (Entered: 04/13/1999) |
| 05/11/1999 | 56 | ASSENTED TO Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325 to modify Scheduling Order , filed, c/s. (ktb) (Entered: 05/11/1999) |
| 05/13/1999 | | Judge Mark L. Wolf . Endorsed Order entered granting [56-1] motion to modify Scheduling Order. cc/cl. (Pltfs may file opposition to motions to dismiss by 6/23/99, and defts may file reply memoranda by 7/14/99.) cc/cl. (ktb) (Entered: 05/17/1999) |
| 05/18/1999 | | Supplemental Memorandum by Scientific Ecology in 1:98-cv-10161, H.W. "Bud" Arrowsmith in 1:98-cv-10161 in support of [15-1] motion to dismiss the amended complaint , filed. c/s. (fmr) (Entered: 05/19/1999) |
| 06/23/1999 | 57 | Memorandum by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325 in opposition to [49-1] motion to dismiss, [48-1] motion to dismiss, [47-1] motion to dismiss , filed. (ktb) (Entered: 06/25/1999) |
| 06/23/1999 | 58 | Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 for leave to file a Memorandum in Excess of Twenty Pages , filed, c/s. (ktb) (Entered: 06/25/1999) |
| 06/25/1999 | | Judge Mark L. Wolf . Endorsed Order entered granting [58-1] motion for leave to file a Memorandum in Excess of Twenty Pages cc/cl. [EOD Date 6/29/99] (ktb) (Entered: 06/29/1999) |
| 07/14/1999 | 60 | Memorandum by John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 in support of [47-1] motion to dismiss, filed, c/s. (ktb) (Entered: 07/15/1999) |
| 07/14/1999 | 61 | Memorandum by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325 in support of [49-1] motion to dismiss, filed, c/s. (ktb) (Entered: 07/15/1999) |
| 07/14/1999 | 62 | Appendix/exhibits by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 of Relevant Documents, FILED, c/s. (ktb) (Entered: 07/15/1999) |
| 07/14/1999 | 59 | Memorandum by Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325 in support of [48-1] motion to dismiss, filed, c/s. (ktb) |

| | | (Entered: 07/15/1999) |
|---|---|---|
| 09/03/1999 | 63 | Letter by Sabin Willett in 1:97-cv-10325 dated: 9/3/99 to Judge Wolf informing the court that parties are in the process of effecting settlement and that in due course will submit the necessary settlement papers, FILED. (ktb) (Entered: 09/03/1999) |
| 09/15/1999 | | Judge Mark L. Wolf. Endorsement re: [63-1] Letter: "In view of the foregoing this case is hereby STAYED. The parties shall, by November 1, 1999 report further with regard to settlement." cc/cl. (ktb) (Entered: 09/21/1999) |
| 10/06/1999 | 64 | Motion by Molten Metal in 1:97-cv-10325 for Steven W. Hansen to withdraw as attorney , filed, c/s. (ktb) (Entered: 10/08/1999) |
| 10/06/1999 | 65 | Memorandum by Molten Metal in 1:97-cv-10325 in support of [64-1] motion for Steven W. Hansen to withdraw as attorney , filed, c/s (ktb) (Entered: 10/08/1999) |
| 10/20/1999 | 66 | Assented To Motion by Molten Metal in 1:97-cv-10325 to extend time to 11/10/99 to respond to motion for leave to withdraw appearance , filed, c/s. (ktb) (Entered: 10/21/1999) |
| 10/21/1999 | | Judge Mark L. Wolf . Endorsed Order entered granting [66-1] motion to extend time to 11/10/99 to respond to motion for leave to withdraw appearance. cc/cl. [EOD Date 10/25/99] (ktb) (Entered: 10/25/1999) |
| 11/01/1999 | 67 | Status report Concerning Settlement by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, filed, c/s. (ktb) (Entered: 11/01/1999) |
| 12/01/1999 | 68 | Further Status report and reuest that the Court continue to defer acting on the pending motions to dismiss, and that the parties further report on 1/7/00, with Proposed Confidentialty Order by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, FILED, c/s. (ktb) Modified on 12/03/1999 (Entered: 12/03/1999) |
| 12/12/1999 | 69 | Judge Mark L. Wolf. Confidentiality Order, entered. [EOD cc/cl. Date 12/14/99] (ktb) (Entered: 12/14/1999) |
| 12/13/1999 | | Judge Mark L. Wolf . Endorsement re: [68-1] status report. "Allowed. The aprties shall report further on 1/3/00." cc/cl. (ktb) (Entered: 12/13/1999) |

| 01/03/2000 | 70 | Further Status report Concerning Settlement and Requesting leave to file a further ststus rreport on or before 1/31/00, by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, filed. (ktb) Modified on 01/10/2000 (Entered: 01/04/2000) |
| --- | --- | --- |
| 01/06/2000 | | Judge Mark L. Wolf . Endorsement re: [70-1] status report "Allowed." Parties allowed to file a further status report on or before 1/31/00. cc/cl. on or before 1/31/00." (ktb) (Entered: 01/10/2000) |
| 02/01/2000 | 71 | Pltfs' and Individual Defts Status report, FILED, c/s. (requesting a 30 day stay until 3/1/00 at which time parties expect to have filed a Stipulation of Settlement) (ktb) Modified on 02/08/2000 (Entered: 02/07/2000) |
| 02/08/2000 | | Judge Mark L. Wolf . Endorsed Order entered granting [71-1] status report. the parties shall report further by 3/8/00. This case is otherwise Stayed. cc/cl. [EOD Date 2/14/00] (mlb) (Entered: 02/14/2000) |
| 03/08/2000 | 72 | Status report by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 , with request for the proceedings to be stayed for an additional 45 days to April 13, 2000. filed, c/s (scj) (Entered: 03/09/2000) |
| 04/02/2000 | | Judge Mark L. Wolf . Endorsed Order entered granting [64-1] motion for Steven W. Hansen to withdraw as attorney (Terminated attorney Steven W. Hansen for Maurice F. Strong in 1:97-cv-10325, attorney Steven W. Hansen for John T. Preston in 1:97-cv-10325, attorney Steven W. Hansen for Ian C. Yates in 1:97-cv-10325, attorney Steven W. Hansen for Victor E. Gatto Jr. in 1:97-cv-10325, attorney Steven W. Hansen for Molten Metal in 1:97-cv-10325. "Allowed, provided counsel for the Trustee files a notice of appearance forthwith." cc/cl. [EOD Date 4/4/00] (ktb) Modified on 04/04/2000 (Entered: 04/04/2000) |
| 04/10/2000 | 73 | Status report by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 , filed. (fmr) (Entered: 04/11/2000) |
| 04/21/2000 | | Judge Mark L. Wolf. Endorsement re: [73-1] status report: "Allowed. The parties shall respond again by May 20, 2000." cc/cl. (ktb) (Entered: 04/24/2000) |

| 04/25/2000 | 74 | Notice of appearance of attorney for Stephen S. Gray in 1:97-cv-10325 by Thomas G. Hoffman, filed, c/s. (ktb) (Entered: 04/26/2000) |
|---|---|---|
| 05/26/2000 | 75 | Status report by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 , filed. (ktb) (Entered: 06/06/2000) |
| 06/05/2000 | | Judge Mark L. Wolf . Endorsement re: [75-1] status report. "Allowed. The parties shall report further by July, 7, 2000." cc/cl. (ktb) (Entered: 06/06/2000) |
| 07/07/2000 | 76 | Status report by Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 , filed. (ktb) (Entered: 07/10/2000) |
| 08/02/2000 | | Judge Mark L. Wolf. Endorsement re: [76-1] status report: "Allowed. If the Trustee wishes to object to the proposed settlement, he shall do so by 9/15/00. The party shall provide a copy of this Order to the Trustee." cc/cl. (ktb) (Entered: 08/04/2000) |
| 08/07/2000 | 77 | Answer by Stephen S. Gray in 1:97-cv-10325 to amended complaint, filed.; jury demand (ktb) (Entered: 08/11/2000) |
| 08/14/2000 | 78 | Motion by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 for Steven Hansen, Savin Willett to withdraw as attorney , filed, c/s. (ktb) (Entered: 08/15/2000) |
| 08/14/2000 | 79 | Notice of appearance of attorney for William M. Haney III in 1:97-cv-10325 by Karen Falkenstein Green, William H. Paine, filed, c/s. (ktb) (Entered: 08/15/2000) |
| 08/14/2000 | 80 | Notice of appearance of attorney for Christopher J. Nagel in 1:97-cv-10325 by Michael J. Tuteur, Carrie J. Fletcher, filed, c/s. (ktb) (Entered: 08/15/2000) |
| 08/14/2000 | 81 | Notice of appearance of attorney for Benjamin T. Downs in 1:97-cv-10325 by Ian Crawford, filed, c/s. (ktb) (Entered: 08/15/2000) |
| 08/14/2000 | 82 | Notice of appearance of attorney for Ian C. Yates in 1:97-cv-10325 by Rory J. Fitzpatrick, Andrew C. Glass, filed, c/s. (ktb) (Entered: 08/15/2000) |
| 08/14/2000 | 83 | Notice of appearance of attorney for Victor E. Gatto Jr. in 1:97-cv-10325 by Richard C. Heidlage, filed. (ktb) (Entered: 08/15/2000) |
| 08/18/2000 | | Judge Mark L. Wolf . Endorsed Order entered granting [78-1] motion for |

| | | Steven Hansen, Savin Willett to withdraw as attorney (Terminated Hansen and Willet EOD Date cc/cl. 8/18/00] (ktb) (Entered: 08/18/2000) |
|---|---|---|
| 08/24/2000 | 84 | FURTHER Status report by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, Stephen S. Gray in 1:97-cv-10325, filed; c/s. (sat) (Entered: 08/24/2000) |
| 09/05/2000 | | Judge Mark L. Wolf. Endorsement re: [84-1] status report requesting that the time within which the trustee may file any objections to the proposed settlement be extended to 10/3/00, "Allowed." cc/cl. (ktb) (Entered: 09/05/2000) |
| 09/15/2000 | 85 | Copy of the final form of stipulation of settlement sent to Atty Thomas Hoffman from Atty Wm. Paine, FILED. (ktb) (Entered: 09/18/2000) |
| 09/19/2000 | 86 | Stipulation of Settlement, FILED, c/s. (ktb) (Entered: 09/22/2000) |
| 09/19/2000 | 87 | Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, Stephen S. Gray in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325 for preliminary approval of settlement filed, c/s. filed. (ktb) (Entered: 09/22/2000) |
| 10/03/2000 | 88 | Motion by Stephen S. Gray in 1:97-cv-10325 for leave to file memorandum in excess of 20 pages , filed. Referred to Judge Mark L. Wolf (fmr) (Entered: 10/05/2000) |
| 10/03/2000 | | Judge Mark L. Wolf . Endorsed Order entered granting [88-1] motion for leave to file memorandum in excess of 20 pages . [EOD Date 10/5/00] (fmr) (Entered: 10/05/2000) |
| 10/03/2000 | 89 | Objection by Stephen S. Gray in 1:97-cv-10325 re: [87-1] motion for preliminary approval of settlement , filed. (fmr) (Entered: 10/05/2000) |
| 10/03/2000 | 90 | Certificate of service by Stephen S. Gray in 1:97-cv-10325 re: [89-1] miscellaneous, [0-0] endorsed order , filed. (fmr) (Entered: 10/05/2000) |
| 11/01/2000 | 91 | Reply/response by Marilyn Axler in 1:97-cv-10325, Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325 to [89-1] miscellaneous, filed, c/s. (ktb) (Entered: 11/01/2000) |
| 11/01/2000 | 92 | Certificate of service re: [91-1] reply, filedt, c/s. (ktb) (Entered: 11/01/2000) |
| 11/01/2000 | 93 | Appendix/exhibits by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in |

| | | 1:97-cv-10325 in support of [91-1] reply , filed. (ktb) (Entered: 11/01/2000) |
|---|---|---|
| 11/16/2000 | 94 | Letter by Thomas G. Shapiro in 1:97-cv-10325 dated: 11/16/00 to: Mr. Cronin requesting a hearing on the issue of approval of settlement, FILED. (ktb) (Entered: 11/17/2000) |
| 11/27/2000 | 95 | Judge Mark L. Wolf . Notice of Hearing/conference: Motion hearing set for 3:00 1/17/01 for [87-1] motion for preliminary approval of settlement cc/cl. (ktb) (Entered: 12/04/2000) |
| 12/18/2000 | 96 | Motion by Stephen S. Gray in 1:97-cv-10325 for leave to file Supplemental Memorandum of Chapter 11 Trusett in opposition to proposed Stipulation of Settlement and in Support of Trustee's Motion to Enforce Terms of Stipulation , filed, cs/. (ktb) (Entered: 12/20/2000) |
| 01/10/2001 | 97 | Motion by MMT Recovery LLC in 1:97-cv-10325 to intervene , filed, c/s. (ktb) (Entered: 01/12/2001) |
| 01/10/2001 | 98 | Memorandum by MMT Recovery LLC in 1:97-cv-10325 in support of [97-1] motion to intervene, filed, c/s. (ktb) (Entered: 01/12/2001) |
| 01/11/2001 | 99 | Supplemental Memorandum by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 in response to objection to Settlement by Chapter 11 Trustee, filed, c/s. (ktb) (Entered: 01/12/2001) |
| 01/11/2001 | 102 | Reply/response by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 to [101-1] Order, filed, c/s. (ktb) (Entered: 01/16/2001) |
| 01/12/2001 | 100 | Response by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 in opposition to [97-1] motion to intervene, filed, c/s. (ktb) (Entered: 01/12/2001) |
| 01/12/2001 | 101 | Judge Mark L. Wolf. Order entered. Parties asking preliminary approval of settlement in this court (Docket No. 87) shall, by 1/16/01 at 12:00 p.m., file a brief statement clarifying their position on this issue. cc/cl. [EOD Date 1/12/01] (ktb) Modified on 01/16/2001 (Entered: 01/12/2001) |
| 01/16/2001 | 103 | Exhibits by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 [99-1] memorandum, FILED, c/s. (ktb) (Entered: 01/16/2001) |
| 01/16/2001 | 104 | Individual Defts'Brief Concerning Bankruptcy Court Approval Pursuant to the Court's Order dated 1/12/01 by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 filed, with attachments. (ktb) (Entered: 01/16/2001) |
| 01/16/2001 | 105 | Letter by William H. Paine in 1:97-cv-10325 dated: 1/16/01 to: Ms. Boyce enclosing an Amended Proposed Order and Final Judgment, an |

| | | Amended Notice of Pendency of Class Action, Hearing on Proposed Settlement and Attorneys' fee petition, and right to Share in Settlement Fund, filed. (ktb) (Entered: 01/16/2001) |
|---|---|---|
| 01/16/2001 | 106 | Copy of Transcript fo hearing held in the US Bankruptcy Court on 11/29/00 before Hudge Carol J. Kenner, J.U.S.B.C. FILED. (ktb) (Entered: 01/16/2001) |
| 01/16/2001 | 107 | Response by William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325 in opposition to [97-1] motion to intervene, filed, c/s. (ktb) (Entered: 01/17/2001) |
| 01/17/2001 | | Motion hearing held. (ktb) (Entered: 01/26/2001) |
| 01/17/2001 | 109 | Judge Mark L. Wolf . Clerk's Notes:, set hearing for 3:00 1/25/01 The parties shall report by 1/22/01 whether they have resolved the objections of trustee Stephen Gray to proposed settlement. A Hearing will be held if necessary on 1/25/01 at 3:00 P.m. (ktb) (Entered: 01/26/2001) |
| 01/24/2001 | 108 | Letter by Thomas G. Shapiro in 1:97-cv-10325 dated: 1/23/01 to: Judge Wolf re: agreement filed. (fmr) (Entered: 01/24/2001) |
| 01/25/2001 | | Motion hearing re: Approval of Settlement (ktb) (Entered: 01/29/2001) |
| 01/25/2001 | 110 | Judge Mark L. Wolf. Clerk's Notes: re: Hearing on Approval of Settlement set further hearing for 3:00 3/9/01 re approval of settlement All necessary filings should be filed by 2/23/01. Court Reporter: Twomey (ktb) (Entered: 01/29/2001) |
| 02/21/2001 | 111 | Letter to Basil Cronin, Deputy Clerk dated: 1/26/01 from Thomas Shapiro, Esq. enclosing a status report and request for extension of time requesting that the time for submitting settlement papers be extended to 3/9/01, FILED. (ktb) (Entered: 02/22/2001) |
| 02/21/2001 | 112 | Motion and Status Report by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 to extend time to submit revised settlement papers to 3/9/01 and to reschedule the 3/9/01 hearing , filed. (ktb) (Entered: 02/22/2001) |
| 02/22/2001 | | Judge Mark L. Wolf . Endorsed Order entered granting [111-1] Letter: "Allowed, to the extent that settlement papers and supporting memoranda shall be filed in both cases by 3/6/01. A hearing to aprove conditional the settlement in both cases will be held on 3/9/01 at 3:00 p.m. cc/cl. [EOD Date 2/23/01] (ktb) (Entered: 02/23/2001) |
| 03/08/2001 | 113 | REVISED STIPULATION OF SETTELEMT WITH ATTACHED EXHIBITS, by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Molten Metal in 1:97-cv-10325, William M. Haney III in 1:97-cv-10325, Christopher J. Nagel in 1:97-cv-10325, Benjamin T. Downs in 1:97-cv-10325, Victor E. Gatto Jr. in 1:97-cv-10325, Ian C. Yates in 1:97-cv-10325, John T. Preston in |

| | | 1:97-cv-10325, Maurice F. Strong in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, Stephen S. Gray in 1:97-cv-10325, MMT Recovery LLC in 1:97-cv-10325 , filed. (ktb) (Entered: 03/08/2001) |
|------------|-----|---|
| 03/09/2001 | 114 | Judge Mark L. Wolf. Order for Notice and Hearing, entered. A hearing (the "Settlement Fairness Hearing") pursuant to F.R.Civ.P. is hereby scheduled to be held before the Court on 8/6/01 at 5:00 p.m. cc/cl. [EOD Date 3/13/01] (ktb) (Entered: 03/13/2001) |
| 03/09/2001 | 115 | Judge Mark L. Wolf . Order entered denying as moot: [47-1] motion to dismiss denying as moot [48-1] motion to dismiss denying as moot [49-1] motion to dismiss denying [87-1] as moot motion for preliminary approval of settlement denying as moot [96-1] motion for leave to file Supplemental Memorandum of Chapter 11 Trusett in opposition to proposed Stipulation of Settlement and in Support of Trustee's Motion to Enforce Terms of Stipulation denying as moot [97-1] motion to intervene. cc/cl. [EOD Date 3/13/01] (ktb) (Entered: 03/13/2001) |
| 03/09/2001 | 117 | Judge Mark L. Wolf . Clerk's Notes: re: oral request for continuance at hearing denied. Motion to preliminary approve settlements allowed. Proposed classes conditionally certified. Notice to be sent to class members within 30 days., reset status conference for 3:00 8/6/01 Court Reporter: Twomey (eaf) (Entered: 03/20/2001) |
| 03/13/2001 | 116 | Letter by Thomas G. Shapiro in 1:97-cv-10325 dated: 3/13/01 to: clerk re: advising all defts have agreed to the new paragraph 16 in Exhibit C to the Revised Stipulation of Settlement filed. (eaf) (Entered: 03/19/2001) |
| 05/02/2001 | | Terminated document: mooting [112-1] motion to extend time to submit revised settlement papers to 3/9/01 and to reschedule the 3/9/01 hearing Req by MLW (ktb) (Entered: 05/02/2001) |
| 08/01/2001 | 118 | Memorandum of law support of the proposed class settlement by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325, filed, cs/. (ktb) (Entered: 08/02/2001) |
| 08/01/2001 | 119 | Affidavit of Thomas G. Shapiro, Esq. in 1:97-cv-10325 , re: [113-1] stipulation, filed, c/s. (ktb) (Entered: 08/02/2001) |
| 08/01/2001 | 120 | Affidavit by Michael Rosenbaum of Mailing and Publication, FILED, c/s. (ktb) (Entered: 08/02/2001) |
| 08/01/2001 | 121 | Affidavit of Lisa M. Palin, FILED, c/s. (ktb) (Entered: 08/02/2001) |
| 08/01/2001 | 123 | Appendix/exhibits in support of [122-1] joint motion , filed, c/s. (ktb) (Entered: 08/02/2001) |
| 08/01/2001 | 122 | Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 for award of attorney fees , filed, c/s. (ktb) Modified on 08/03/2001 (Entered: 08/03/2001) |
| 08/03/2001 | 124 | Letter by Thomas G. Shapiro Dennis O'Leary, Courtroom Deputy in |

| | | |
|---|---|---|
| | | 1:97-cv-10325 dated: 8/3/01 re his 8/1/01 letter in which it was mistakenly stated that the settlememnt approval hearing was set for 8/30/01 and confirming the correct date of 8/6/01, FILED. (ktb) (Entered: 08/03/2001) |
| 08/06/2001 | 125 | Judge Mark L. Wolf. Order and Final Judgment Pltfs' counsel are hereby awarded the sum of $3, 916, 778.00 in fees which the sum the Court finds to be fair and reasonalbe, and all $311,578 in reimbursement of expenses, which sahh be paid to pltfs' co-lead counsell, and $311,578 in reimbursement of expenses, which shall be paid to pltfs' co-counsel....cc/cl. entered. cc/cl. [EOD Date 8/9/01] (ktb) Modified on 08/09/2001 (Entered: 08/09/2001) |
| 08/06/2001 | | Case closed. (ktb) (Entered: 08/09/2001) |
| 08/06/2001 | | Motion hearing re class settlement (ktb) (Entered: 08/13/2001) |
| 08/06/2001 | 127 | Judge Mark L. Wolf. Clerk's Notes: Letter dated 8/1/01 from Steven Somkin marked as Exhibit 1. Court adks if there are any objections to be filed that have not already done so - no resoinse. Court finds a basis for class certification and certifies each of the settlement classes in the above referecned matters. Court approves the class settlement in each case as they are faur, resonalbe, and adequate. Court wards attys' fees in the amount of $3,916,778.00 and costs in the amount of $371,578, to be distributed by lead counsel. Atty Shapiro informs court that amount will not be increased by interwt. Recommends court insert the amount of #0.00 in the 98-10161 judgment. Court notes that all amounts shall be entered in the Molten Metal Judgment ans zeros will be added in the scientific ecology judgment. been Court Reporter: Tyomey (ktb) Modified on 08/13/2001 (Entered: 08/13/2001) |
| 08/09/2001 | | Text not available. (Entered: 08/09/2001) |
| 08/10/2001 | 126 | Letter dated: 8/1/01 to Judge Wolf from Steven Somkin, FILED. (ktb) (Entered: 08/10/2001) |
| 03/18/2002 | 128 | Motion by Saul Schwartz in 1:97-cv-10325, Kenneth G. Davis in 1:97-cv-10325, Steven Somkin in 1:97-cv-10325, Marilyn Axler in 1:97-cv-10325 for order of Authorizing Disbursement of Settlement Fund , filed, c/s. (ktb) (Entered: 03/20/2002) |
| 03/18/2002 | 129 | Affidavit of Thomas G. Shapiro in 1:97-cv-10325 , re: [128-1] motion for order of Authorizing Disbursement of Settlement Fund , filed. (ktb) (Entered: 03/20/2002) |
| 03/18/2002 | 130 | Affidavit of Michael Rosenbaum in support of Motion to Distribute the Net Settlement Funds, filed, c/s. (ktb) (Entered: 03/20/2002) |
| 04/23/2002 | 131 | Letter by Thomas G. Shapiro in 1:97-cv-10325 dated: 4/18/02 to: Judge Wolf requesting that proposed order, submitted along with the 3/18/02 Motion for order Authorizing Disbusement of Settlement Funds, be entered, filed. (ktb) (Entered: 04/24/2002) |
| 06/27/2002 | 132 | Judge Mark L. Wolf. Order Authorizing Disbursement of the Settlement, |

| | | entered. cc/cl.[EOD Date 7/3/02] (ktb) (Entered: 07/03/2002) |
|---|---|---|
| 06/27/2002 | | Judge Mark L. Wolf . Endorsed Order entered granting [128-1] motion for order of Authorizing Disbursement of Settlement Fund . [EOD Date 7/3/02] (ktb) (Entered: 07/03/2002) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 06/06/2006 12:47:33 | | | |
| **PACER Login:** | cc0336 | **Client Code:** | 0964 |
| **Description:** | Docket Report | **Search Criteria:** | 1:97-cv-10325-MLW |
| **Billable Pages:** | 13 | **Cost:** | 1.04 |

**1:97-cv-10325-MLW** Axler, et al v. Molten Metal, et al
Mark L. Wolf, presiding
**Date filed:** 02/12/1997
**Date terminated:** 08/06/2001 **Date of last filing:** 06/27/2002

# Attorneys

**Norman Berman**
Berman DeValerio Pease Tabacco Burt &
Pucillo
One Liberty Square
Boston, MA 02109                               representing      **Marilyn Axler**
617-542-8300                                                    *(Plaintiff)*
NBerman@Bermanesq.com
 *Assigned: 02/17/1998*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*


**Ian Crawford**
Todd & Weld LLP
28 State Street
31 st Floor
Boston, MA 02109                               representing      **Benjamin T. Downs**
617-720-2626                                                    *(Defendant)*
617-227-5777 (fax)
icrawford@toddweld.com
 *Assigned: 08/14/2000*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*


**David L. Evans**
Hanify & King
Professional Corporation
One Beacon Street, 21st Floor
Boston, MA 02108-3107
617-423-0400                                   representing      **MMT Recovery LLC**
617 423-0498 (fax)                                              *(Movant)*
dle@hanify.com
 *Assigned: 01/12/2001*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*


**Rory J. Fitzpatrick**
Kirkpatrick & Lockhart
State Street Financial Center
One Lincoln Street

Boston, MA 02111-2950
617-261-3100
617-261-3175 (fax)
rfitzpatrick@klng.com
  *Assigned: 08/14/2000*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

            representing       **Ian C. Yates**
                                *(Defendant)*

**Carrie J. Fletcher**
EEOC
7 World Trade Center, 18th Floor
New York, NY 10048
617-342-4000
617-342-4001 (fax)
cfletcher@foley.com
  *Assigned: 08/14/2000*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

            representing       **Christopher J. Nagel**
                                *(Defendant)*

**Andrew C. Glass**
Kirkpatrick & Lockhart Nicholson Graham
LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111-2950
617-261-3107
617-261-3175 (fax)
aglass@klng.com
  *Assigned: 08/14/2000*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

            representing       **Ian C. Yates**
                                *(Defendant)*

**Karen F. Green**
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
617-526-6000
617-526-5000 (fax)
karen.green@wilmerhale.com
  *Assigned: 08/14/2000*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

            representing       **William M. Haney, III**
                                *(Defendant)*

**John D. Hanify**
Hanify & King
One Beacon Street

Boston, MA 02108
617-423-0400
617-423-0498 (fax)
jdh@hanify.com
  *Assigned: 01/12/2001*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

representing

**MMT Recovery LLC**
*(Movant)*

**Steven W. Hansen**
Bingham McCutchen LLP
150 Federal Street
Boston, MA 02110
617-951-8538
617-951-8736 (fax)
steven.hansen@Bingham.com
  *Assigned: 04/16/1997*
  *TERMINATED: 04/02/2000*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

representing

**Molten Metal Technology, Inc.,**
*(Defendant)*

**Ian C. Yates**
*(Defendant)*

**John T. Preston**
*(Defendant)*

**Maurice F. Strong**
*(Defendant)*

**Victor E. Gatto, Jr.**
*(Defendant)*

**Richard C. Heidlage**
Attorney General's Office
Commonwealth of Massachusetts
200 Portland Street
Boston, MA 02114
617-727-2200
617-727-2008 (fax)
richard.heidlage@ago.state.ma.us
  *Assigned: 08/14/2000*
  *LEAD ATTORNEY*
  *ATTORNEY TO BE NOTICED*

representing

**Victor E. Gatto, Jr.**
*(Defendant)*

**Thomas G. Hoffman**
Greene & Hoffman, PC
Suite 1410
125 Summer Street, 14th Floor
Boston, MA 02110
617-261-0040
617-261-3558 (fax)
thoffman@greenehoffman.com
*Assigned: 04/25/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**Stephen S. Gray**
*(Trustee)*

**William H. Paine**
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
617-526-6134
617-526-5000 (fax)
william.paine@wilmerhale.com
*Assigned: 08/14/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**William M. Haney, III**
*(Defendant)*

**Sharon H. Patton**
Hanify & King
Professional Corporation
One Beacon Street
Boston, MA 02108-3107
617-423-0400
617-423-0498 (fax)
shp@hanify.com
*Assigned: 01/12/2001*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**MMT Recovery LLC**
*(Movant)*

**Peter A. Pease**
Berman DeValerio Pease Tabacco Burt &
Pucillo
One Liberty Square
8th Floor
Boston, MA 02109
617/542-8300
617/542-1194 (fax)
ppease@bermanesq.com
*Assigned: 02/12/1997*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

representing

**Kenneth G. Davis**
*(Plaintiff)*

**Saul Schwartz**
*(Plaintiff)*

**Steven Somkin**
*(Plaintiff)*

**Marilyn Axler**
*(Plaintiff)*

**Thomas G. Shapiro**
Shapiro Haber & Urmy LLP
53 State Street
Boston, MA 02108
617-439-3939
617-439-0134 (fax)                                   representing    **Marilyn Axler**
tshapiro@shulaw.com                                                  *(Plaintiff)*
 *Assigned: 02/17/1998*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

**Michael J. Tuteur**
Foley & Lardner, LLP
Suite 2600
111 Huntington Avenue
Boston, MA 02199
617-342-4000                                          representing    **Christopher J. Nagel**
617-342-4001 (fax)                                                   *(Defendant)*
mtuteur@foley.com
 *Assigned: 08/14/2000*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

**Peter Sabin Willett**
Bingham McCutchen LLP
150 Federal Street
19th Fl.
Boston, MA 02110                                                     **Molten Metal Technology,**
617-951-8775                                          representing    **Inc.,**
617-951-8736 (fax)                                                   *(Defendant)*
sabin.willett@bingham.com
 *Assigned: 03/28/1997*
 *TERMINATED: 04/04/2000*
 *LEAD ATTORNEY*
 *ATTORNEY TO BE NOTICED*

**Christopher J. Nagel**
*(Defendant)*


**Ian C. Yates**
*(Defendant)*


**John T. Preston**
*(Defendant)*


**Victor E. Gatto, Jr.**
*(Defendant)*


**William M. Haney, III**
*(Defendant)*


**Ian C. Yates**
*(Defendant)*


**John T. Preston**
*(Defendant)*


**Maurice F. Strong**
*(Defendant)*


**Victor E. Gatto, Jr.**
*(Defendant)*

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/06/2006 12:29:21 | | |
| **PACER Login:** cc0336 | **Client Code:** | 0964 |
| **Description:** | Attorney List | **Search Criteria:** | 1:97-cv-10325-MLW |
| **Billable Pages:** 2 | **Cost:** | 0.16 |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MYRA FRIEDLAND, AS A TRUSTEE
OF THE JAMES M. FRIEDLAND
TRUST, and ALBERT H. SOCOLOV,

       Plaintiffs,

VS.

MOLTEN METAL TECHNOLOGY, INC.,
WILLIAM M. HANEY, III,
CHRISTOPHER J. NAGEL, JOHN T.
PRESTON and MAURICE F. STRONG,

       Defendants.

C.A. No. 97-

Jury Trial Demanded

<u>COMPLAINT</u>

Plaintiffs, individually and on behalf of all others
similarly situated, by and through their attorneys, allege the
following upon information and belief, except as to the
allegations which pertain to the named plaintiffs and their
counsel, which are alleged upon personal knowledge. Plaintiffs'
information and belief is based, <u>inter alia</u>, on the investigation
made by and through their attorneys, which investigation
included, among other things, a review of the public documents
and press releases of Molten Metal Technology, Inc. ("Molten
Metal" or the "Company"), interviews with witnesses, review of
documents of the United States Department of Energy and

consultations with experts in chemistry and hazardous waste
processing.

NATURE OF ACTION

1.    Plaintiffs bring this action on behalf of themselves
and all other persons who purchased the common stock of Molten
Metal during the period from March 28, 1995 through and including
October 18, 1996 (the "Class Period").

2.    Molten Metal claims to be an environmental technology
company with innovative, proprietary processing technologies
known as "Catalytic Extraction Processing" ("CEP") and "Elemental
Recycling," which are purportedly capable of processing hazardous
wastes and recycling them into products which can be reused.
Molten Metal claims that its proprietary technology utilizes a
molten metal bath to break down the molecular structure of wastes
and industrial by-products, including hazardous wastes, into
their elements.  Moreover, Molten Metal claims that by
introducing selected chemicals into the bath, usable products can
be formed and recovered from the bath for use or sale, a
capability that Molten Metal calls "Elemental Recycling."

3.    A major source of Molten Metal's revenue has come from
research and development ("R&D" ) grants received from the United
States Department of Energy ("DOE").  From 1992 through 1995,
Molten Metal received approximately $25 million from the DOE in
the form of research grants.  The Company repeatedly disclosed
that a primary source of its 1996 revenues was to come from DOE
R&D grants.

2

4.    Throughout the Class Period, Molten Metal, through a series of public announcements, artificially inflated the price of Molten Metal's stock by materially misrepresenting the capability of its technology.  In particular, Molten Metal has falsely claimed that its Elemental Recycling technology can produce a variety of valuable products that can be used or sold to third parties.  Molten Metal has falsely represented that this Elemental Recycling capability gives Molten Metal a cost advantage over other waste processing technologies.  Molten Metal has also falsely represented that it has a facility capable of processing two tons of waste per hour, when in fact Molten Metal has taken five days to process approximately two tons of waste. The rate of processing waste is a material factor in assessing the commercial viability of waste processing technology.

5.    In addition to the scheme to misrepresent Molten Metal's technological capability, in March, 1996 Molten Metal represented that it expected to receive substantial funding in the amount of $20 million from the Department of Energy ("DOE") for research and development in 1996.  This statement was either false or recklessly misleading when made or known to be false or recklessly misleading by the end of April 1996 when the Company was told privately by DOE that additional funding for the year to end March 31, 1997 would total a maximum of $8 million.

6.    When the Company disclosed on Sunday, October 20, 1996, that DOE funding for research and development would be below previously announced expectations, and that major commercial

3

projects were being delayed indefinitely, Molten Metal's stock
price collapsed, plunging 49% in a single day, from its closing
price of $28.125 per share on Friday October 18, 1996 to close at
$14.25 per share on October 21, 1996, on extraordinarily high
volume of 5.6 million shares, or 40 times the three month daily
average.

7.    During the Class Period, defendants Maurice Strong and
John Preston, both directors of Molten Metal, sold $2.5 million
worth of their Molten Metal common stock, and Ian C. Yates, a
vice president of Molten Metal, sold almost 77,000 shares,
representing virtually his entire holding of Molten Metal stock.

<u>JURISDICTION AND VENUE</u>

1.    This Court has jurisdiction of this action pursuant to
Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C.
§§ 1331 and 1337.

2.    This action arises under and pursuant to Section 10(b)
of the Securities Exchange Act of 1934 (the "Exchange Act") [15
U.S.C. § 78j(b)], Rule 10b-5 promulgated thereunder by the
Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-
5] and Section 20(a) of the Exchange Act [15 U.S.C. §§ 78t(a)].

3.    Venue is proper in this District pursuant to Section 27
of the Exchange Act and 28 U.S.C. § 1391(b) and (c).  Molten
Metal Technology, Inc. has its corporate headquarters in this
District, and the acts complained of herein, including the
preparation, issuance and dissemination of materially false and

4

misleading information to the investing public, occurred in substantial part in this District.

4.    In connection with the acts alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications and the facilities of the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), a national securities exchange.

PARTIES

5.    The James M. Friedland Trust purchased 800 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 200 | 06/01/95 | $22.00 |
| 400 | 08/22/95 | $22.25 |
| 200 | 07/29/96 | $25.25 |

6.    Plaintiff Albert H. Socolov purchased 1500 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 1000 | 05/02/95 | $17.75 |
| 500 | 10/17/95 | $35.75 |

7.    Plaintiff Viviane Brahms purchased 2500 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 2500 | 04/24/96 | $35.00 |

8.    Defendant Molten Metal Technology, Inc. ("Molten Metal" or the "Company") is a Massachusetts corporation with its principal office in Waltham, Massachusetts.  Molten Metal describes itself as an environmental technology company commercializing cost-effective high-quality environmental solutions for converting hazardous wastes to useful materials. At all relevant times, Molten Metal common stock was publicly traded on the NASDAQ National Market System and was registered pursuant to Section 12 of the Exchange Act (15 U.S.C. § 78e). The market for Molten Metal common stock was therefore open, well-developed and efficient at all relevant times.  Molten Metal files annual, quarterly and other reports with the SEC in accordance with the Exchange Act.  As of November 12, 1996, the Company had outstanding more than 23 million shares of common stock.

9.    Defendant William M. Haney, III ("Haney") is, and at all times relevant hereto has been, President, Chief Executive Officer and Chairman of the Board of Directors of Molten Metal. In fiscal year 1995, Haney received cash compensation in excess of $300,000, plus options to purchase Molten Metal stock.  As of March 11, 1996, Haney was a beneficial owner of approximately 5.4 million shares of Molten Metal common stock, including 754,860 shares issuable upon exercise of outstanding options, representing approximately 23 percent of all shares then outstanding.  Haney was a co-founder of Molten Metal.

10.   Defendant Christopher J. Nagel ("Nagel") is, and at all times relevant hereto, has been Executive Vice President of Science and Technology and a Director of Molten Metal.  In fiscal year 1995, Nagel received cash compensation in excess of $200,000, plus options to purchase Molten Metal stock.  As of March 11, 1996, Nagel was a beneficial owner of approximately 2.07 million shares of Molten Metal common stock, almost all of which were issuable upon exercise of outstanding options, representing approximately 8 percent of all shares then outstanding.

11.   Defendant John T. Preston ("Preston") is, and at all times relevant hereto, has been a Director of Molten Metal and a member of the Audit Committee and Compensation Committee of the Board of Directors.  Preston owned approximately 2.3 million shares of Molten Metal stock as of March 11, 1996.  He participates in the Company's Amended and Restated 1989 Long-Term Incentive Compensation Plan, which provides for the grant of stock options to non-employee directors.

12.   Defendant Maurice F. Strong ("Strong") is, and at all times relevant hereto, has been a Director of Molten Metal.  Strong owned approximately 40,000 shares of Molten Metal stock as of March 11, 1996.  Another 262,000 shares of Molten Metal stock were owned by a company of which Strong is Chairman.  He participates in the Company's Amended and Restated 1989 Long-Term Incentive Compensation Plan, which provides for the grant of stock options to non-employee directors.

7

13.  Defendants Haney, Nagel, Preston and Strong are sometimes referred to herein collectively as the "Individual Defendants."

14.  It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false and misleading information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the Individual Defendants and others.  Each of the Individual Defendants, by virtue of his high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and/or was privy to confidential proprietary information concerning the Company and its operations, performance, technological capabilities and future prospects as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein, were aware or recklessly disregarded that false and misleading statements were being issued regarding the Company and approved or ratified these statements, in violation of the federal securities laws.

15.  Each of the Individual Defendants, by reason of his management position, his membership on the Molten Metal Board of Directors and stock ownership was, at all relevant times, a "controlling person" of Molten Metal within the meaning of Section 20(a) of the Exchange Act.

8

16.   Each of the defendants is liable as a participant in a
fraudulent scheme and course of business that operated as a fraud
and deceit on purchasers of Molten Metal stock.

<u>PLAINTIFFS' CLASS ACTION ALLEGATIONS</u>

17.   Plaintiffs bring this action as a class action pursuant
to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of
a Class consisting of all persons who purchased shares of Molten
Metal common stock on the open market during the period from
March 28, 1995 through October 18, 1996, inclusive (the "Class
Period"), and who were damaged thereby (the "Class").  Excluded
from the Class are defendants; members of the immediate family of
each of the Individual Defendants; any director, officer,
subsidiary, affiliate or a joint venture partner of Molten Metal;
any entity in which any excluded person has a controlling
interest; and their legal representatives, heirs, successors and
assigns.

18.   The members of the Class are so numerous that joinder
of all members is impracticable.  While the exact number of Class
members is unknown to plaintiffs at this time and can only be
ascertained through appropriate discovery, plaintiffs believe
that there are thousands of members of the Class located
throughout the United States.  As of November 12, 1996, there
were more than 23 million shares of Molten Metal common stock
outstanding.  Throughout the Class Period, Molten Metal common
stock was actively traded on the NASDAQ National Market System.
Record owners and other members of the Class may be identified

9

from records maintained by Molten Metal and/or its transfer agent and may be notified of the pendency of this action by mail and publication, using forms of notice similar to those customarily used in securities class actions.

19.   Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

20.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

21.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)   Whether defendants participated in and pursued the illegal course of conduct complained of herein;

(c)   Whether documents, press releases, public filings, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, financial condition and operations of Molten Metal;

(d)   Whether the market price of Molten Metal common stock during the Class Period was artificially inflated due to

10

the material misrepresentations and omissions complained of
herein; and

       (e)  To what extent the members of the Class have
sustained damages and the proper measure of damages.

    22.  A class action is superior to all other available
methods for the fair and efficient adjudication of this contro-
versy since joinder of all members is impracticable.  As the
damages suffered by individual Class members may be relatively
small, the expense and burden of individual litigation make it
impossible for members of the Class individually to seek redress
for the wrongs done to them.  There will be no difficulty in the
management of this suit as a class action.

FACTUAL ALLEGATIONS

I. The Company's Technology

    23.  Molten Metal claims to be an environmental technology
company with an innovative, proprietary processing technology
known as "Catalytic Extraction Processing" ("CEP"), which is
purportedly capable of processing hazardous wastes.  Molten Metal
claims that its proprietary technology utilizes a molten metal
bath to break down the molecular structure of wastes and
industrial by-products, including hazardous wastes, into their
elements.  Industrial by-products or wastes, referred to as
"feedstocks," are introduced into a molten metal bath operating
at approximately 3,000° Fahrenheit.  The feedstocks dissociate
into their constituent elements and dissolve into the molten
metal.

11

24.  The Company, through a series of public announcements, has represented to the investing public that the Company's proprietary CEP technology is capable of recycling hazardous wastes so that a variety of commercially useful products can be recovered and re-used as raw materials or sold to others.  Molten Metal refers to this recycling as "Elemental Recycling."  Molten Metal has claimed that by adding selected chemicals, referred to as "reactants," to the molten metal bath, it can reformulate waste products into new usable products that can be recovered. In fact, Molten Metal's technology has not recovered any such reformulated or recycled products, nor does Molten Metal have the ability to recover any such products in pure, usable form, with one possible exception.

25.  Molten Metal was established in 1989.  In its current marketing materials, the Company claims the following developments in the commercialization of its CEP technology:

1991     "bench-scale CEP experiments conducted"

1992     "commercial-scale CEP trials held in Sweden"

1993     "commercial-scale CEP demonstrations began at Recycling-R&D Facility; Plans announced for initial commercial CEP systems."

26.  On September 20, 1993, Molten Metal issued a press release announcing that the Company had officially opened its $15 million Recycling-Research & Development (R&D) Facility in Fall River, Massachusetts (hereafter the "Fall River Facility").  The press release stated that the opening of the facility marked "the

12

facility's commencement of commercial-scale demonstration of
Catalytic Extraction Processing (CEP), Molten Metal Technology's
breakthrough technology for recycling hazardous and non-hazardous
wastes." The press release further represented that the facility
housed seven CEP systems, "the largest of which is a commercial-
scale prototype capable of recycling up to two tons of waste per
hour." Defendant Haney was quoted in the press release as
stating that the opening of the facility "represents a
cornerstone achievement in the commercialization of CEP."

27. The representation that Molten Metal had a commercial-
scale facility capable of recycling up to two tons of waste per
hour was material to any evaluation of the Company's commercial
potential. Because waste processing companies are typically paid
a given price per unit of weight recycled, the rate at which
waste is recycled is a material element in calculating the
economics of a waste processing facility. Molten Metal has never
withdrawn or retracted the representation that it has a
commercial-scale facility capable of recycling up to two tons of
waste per hour.

28. Molten Metal's claim that its Fall River facility is
capable of processing two tons of waste per hour is false or
misleading. In fact, according to a report by the National
Research Council issued in or about September, 1996, <u>the Fall
River facility has required 120 hours, or five days, to process
two tons</u>.

13

29.  In an article carried over PR Newswire on November 21, 1995, Ian C. Yates, Vice-President of Sales and Market Development for Molten Metal, stated that "Our technology has been successfully demonstrated on a wide variety of industrial and government wastes."

30.  On March 28, 1995, Molten Metal filed with the SEC an annual report on Form 10-K for the year ended December 31, 1994 (hereafter sometimes referred to as the "1994 Form 10-K"). Defendants Haney, Nagel, Preston and Strong signed the 1994 Form 10-K.

31.  The Company represented in the 1994 Form 10-K that the Fall River Facility was "equipped with several commercial-scale CEP systems" and that the Company had "conducted numerous ... commercial-scale demonstrations" in the Fall River Facility.  The report further represented that the Company had conducted "[a] series of pre-operational tests and commercial-scale demonstrations on feedstock samples representative of those of prospective customers . . . [which] have shown the safety and reliability of CEP."

The Company's Representations as to
its Ability to Recover Recycled Products
with its Elemental Recycling Technology.

32.  As alleged above, defendants have represented that the Company's CEP technology has the ability to recycle products, a claimed technology that Molten Metal refers to as "Elemental Recycling."  The Company has falsely claimed that its CEP technology can recover recycled products for re-use or sale.

33. Molten Metal's Form 1994 Form 10-K described its Elemental Recycling as follows:

"The addition of various reactants to the molten metal enables reformation and recovery of products ("Elemental Recycling") for reuse as a raw material by the feedstock generator or for sale to other users."

34. In the 1994 Form 10-K, defendants also represented that a "series of pre-operational tests and commercial-scale demonstrations on feedstock samples representative of those of prospective customers . . . . have demonstrated product recovery from such feedstocks."

35. The Company also represented in the 1994 Form 10-K that it "has demonstrated that CEP systems can be customized to make specific products by adding different reactants or by varying the composition of the molten metal bath."

36. In the section entitled the "Fall River Facility," the 1994 Form 10-K represented:

The primary use of [the] Fall River Facility is to perform TDPs [Technical Development Programs] that demonstrate CEP's Elemental Recycling capability on a variety of feedstocks . . . ."

37. These representations in the 1994 Form 10-K were false or misleading as alleged below.

38. Molten Metal's annual report on Form 10-K for the year ended December 31, 1995, was filed with the SEC on or about April 1, 1996 (hereafter the "1995 Form 10-K"). It was signed by defendants Haney, Nagel, Preston and Strong.

39. In its 1995 Form 10-K, Molten Metal again represented that the CEP process is capable of Elemental Recycling and that

15

"recovered products can be re-used as raw materials in the production process or sold to other industrial customers."

40. The 1995 Form 10-K also referred to the "ability of CEP to process . . . wastes and industrial by-products while recovering products for re-use or sale." The Company reinforced the impression it believed it could recycle and recover commercial quantities of useful materials by representing in the 1995 Form 10-K that it "has formed, and is in the process of forming, relationships with market leaders to deliver initial CEP systems" for, among other things, "conversion of waste streams into industrial gasses."

41. In a section of the 1995 Form 10-K entitled "Technological Demonstration and Testing of CEP," the Company represented that it "has demonstrated CEP's ability to dissociate feedstocks and recover products in laboratory, bench-scale, pilot-scale and commercial-scale trials in its Fall River Facility." In a section of the 1995 Form 10-K entitled "Fall River Facility," Molten Metal stated that, "The primary use of [the] Fall River Facility is to perform TDPs that demonstrate CEP's Elemental Recycling capability . . . ." and that the Fall River Facility contains an area for "recovered material storage."

42. The Company further represented in the 1995 Form 10-K, in a section entitled "Recoverable Products," that

"commercial-scale trials . . . have demonstrated that CEP has the potential, through Elemental Recycling, to recover commodity and specialty products, such as industrial gasses, ceramics and metals, from feedstocks.

16

It was further represented that Molten Metal

> "has demonstrated that CEP systems can be customized to
> make specific products by adding different reactants or
> by varying the composition of the molten metal bath.
> CEP is designed to permit recovered products to be re-
> used as raw materials by the feedstock generator in
> potential closed-loop applications or to be sold to
> other industrial customers."

43.   Molten Metal filed a registration statement on Form S-3
with the SEC on August 28, 1996, to register $142,750,000 of
convertible subordinated notes sold by the Company in May, 1996.
The registration statement contained the following
representations about the Company's CEP technology, including
Elemental Recycling.

> "The addition of various selected chemicals
> ('reactants') to the molten metal bath enables reformation
> and recovery of products ('Elemental Recycling (TM)')
> for re-use as a raw material by the feedstock generator
> or for sale to other users."

Each of the Individual Defendants signed the registration
statement.

44.   This registration statement also repeated the Company's
earlier representations that the Fall River facility "is equipped
with several commercial-scale CEP systems," and that "the Company
has demonstrated CEP's ability to dissociate feedstocks and
recover products in ... commercial-scale trials in its Fall River
facility."

45.   Although the registration statement contained the
disclaimer that "there can be no assurance" the Company's CEP
process will be successful in recovering materials in a form that
is commercially usable or saleable, this warning was misleading,

because the Company in fact knew that its CEP process is not capable of recovering materials in a form that is commercially usable or saleable, with the possible exception of synthesis gas. And, even as to synthesis gas, Molten Metal's technology is not competitive with other methods of producing the gas.

46. In both the Form 10-Q for the quarter ended March 31, 1996, filed with the SEC on or about May 13, 1996, and the Form 10-Q for the quarter ended June 30, 1996, filed with the SEC on or about August 12, 1996, Molten Metal described its technology as broadly applicable to a wide variety of wastes and capable of recycling elements into useful raw materials. In the Forms 10-Q, Molten Metal represented as follows:

> Molten Metal ... is an environmental technology company commercializing pollution prevention and waste recycling methods that are broadly applicable to a wide variety of hazardous, non-hazardous and radioactive wastes. The Company developed its core technology, Catalytic Extraction Processing ("CEP"), to dissolve waste compounds to their constituent elements in a molten metal bath and reconfigure the elements into useful raw materials. (Emphasis added.)

47. The Company's repeated representations that it had recovered a variety of products for re-use or sale in commercial-scale trials and that the products recovered can be customized by the selection of specific reactants and/or varying the composition of the molten metal bath, were false and misleading. Molten Metal has not been able to recover reformulated products by means of its Elemental Recycling technology, with the sole exception that Molten Metal apparently can produce synthesis gas. Molten Metal's representations that it can recover commodity and

specialty products, such as industrial gases, chemicals and metals through elemental recycling and that it can customize CEP systems to make specific products by adding different reactants and/or by varying the composition of the Molten Metal bath as alleged above are therefore false and misleading.

48.  Moreover, the cost of producing synthesis gas by means of Molten Metal's technology is not competitive with other methods for producing synthesis gas.  Therefore, Molten Metal's ability to produce synthesis gas is economically and commercially worthless.

49.  In a press release issued on February 22, 1996, Molten Metal announced the signing of a letter of intent to create a joint venture with two Japanese companies, Nichimen Corporation ("Nichimen") and NKK Plant Engineering Corporation ("NKK"), to process Japanese municipal solid waste incinerator fly ash and to recycle the incinerator ash to recover ceramic and metal products.  The press release indicated that this joint venture had tremendous revenue potential for Molten Metal.  It represented that the joint venture would sell, license, own and operate CEP facilities to service more than 1,800 municipal solid waste incinerators in Japan, and that NKK operated 85 of the 100 largest municipal waste incinerators in Japan.  The press release further stated that the joint venture intended to purchase approximately 40 CEP systems from Molten Metal over the first ten years of operations, starting with a $9-15 million commercial-scale demonstration system to be ordered when the joint venture

19

agreements were finalized.  The press release stated that the first CEP system was expected to be commissioned in 1996.  These representations imply that Molten Metal believed it had the ability to build such a commercial-scale system.

50.  The press release announcing this joint venture was deceptive and misleading, because Molten Metal did not and does not have the ability to recover ceramic and metal products.

51.  The 1995 Form 10-K reported the signing of the letter of intent to create a joint venture with Nichimen and NKK, and stated that "once formed, the joint venture would employ [Molten Metal's] proprietary Cerex-CEP technology to recycle incinerator ash to recover ceramic and metal products."  This statement is false and misleading, because Molten Metal's technology is not able to recover ceramic and metal products.

## II. DOE Research Funding

52.  Prior to 1996, a major source of revenues for Molten Metal was R&D grants from the DOE pursuant to a cost-sharing contract between Molten Metal and the DOE entered into on September 30, 1993 (the "September 30, 1993 Contract").

53.  Pursuant to the contract, on September 30, 1993, Molten Metal entered into a cost-sharing "Research of Contaminated Scrap Metal" contract with the DOE.  Pursuant to the contract, the DOE provides part of the cost of the research and development for CEP.  The percentage of the total costs to be borne by the DOE was 68.5 percent.

54.    From September 30, 1993 through December 30, 1995, Molten Metal received a total of $25.2 million in research grants from DOE.

55.    During 1993, 1994, 1995 and 1996, a series of Modifications of the Contract were issued by DOE in order to authorize additional fundings for the project.  Substantial increases in funding were made when the Statement of Work to be performed was revised on March 24, 1994 and February 15, 1995.

56.    On June 14, 1995, a Modification Contract was issued which increased the total estimated cost of the project to $36,830,594 and added $4 million to DOE's share of funding, for a total of $19,227,853 in funds available to Molten Metal from DOE. The time for completion of the project was extended until April 30, 1996.

57.    Over the next six months, DOE's share of the funding was gradually increased to 68.5 percent, or $25,227,853.  This phase of the project was completed on or about May 15, 1996 after a two-week extension of the period of performance.

58.    In late April and early May, 1996, Molten Metal and DOE discussed certain additional work to be performed after completion of the current phase.  Agreement was reached, and on May 10, 1996, a Modification of Contract, including a new Statement of Work, was signed.

59.    In the May 10, 1996 Modification, Molten Metal and DOE agreed that the estimated cost to complete was raised $2 million to $38,830,594 and $2 million was added to DOE's current funding,

bringing it to $27,227,853. The period of performance was extended until September 30, 1996.

60. In late April and early May, 1996, DOE and Molten Metal also discussed the next phase of the project to be completed on or about March 31, 1997, and the amount of funding available from DOE for that purpose. According to sources at DOE, DOE informed Molten Metal that it could expect a maximum of $6 million in DOE funding in addition to the Modification signed on May 10, 1996.

61. Douglas Augenthaler is a stock market analyst at Oppenheimer & Co., Inc. ("Oppenheimer") who has followed and written research reports concerning Molten Metal since at least 1994. During discussions with Augenthaler in March, 1996, Molten Metal executives stated that they expected to receive $20 million in R&D grants from the DOE during 1996. As Oppenheimer stated in its report concerning the Company dated March 13, 1996:

> A brief review of 1996 revenue projections. We expect Molten Metal's revenue to approximate $95 million in 1996, which completely excluded M4 operations (which will be accounted as equity income) but includes the operations of the SEG/Molten Metal facility, which the company hopes to consolidate. On this basis, we expect plant operations to contribute $8-$10 million, contract R&D activity to contribute about $20 million, construction and equipment activity to contribute roughly $60 million and license fees to add $6-$7 million. (Emphasis added.)

62. Oppenheimer's March 13, 1996 report concluded that:

> We continue to rate Molten Metal a buy. We are entering the commercialization phase for the CEP technology and expect that harder data on plant economics won't be available until the second quarter earnings release. Management continues to express its satisfaction with plant operations to date. Our earnings estimates reflect an expectation of five to six plants commissioned by year end 1996, but the bulk

ilure

<u>of revenue and income for the year will be derived from
other sources (construction, license fees, R&D
contracts)</u>.  (Emphasis added.)

63.  Molten Metal's 1995 Form 10-K, filed with the SEC on or

about April 1, 1996, described the history of the DOE contract

and represented as follows:

"During 1995, revenue from the DOE accounted for
approximately 30% of the Company's total revenue, and
the Company anticipates that a substantial portion of
its revenue for 1996 will also be from the DOE.
Failure to reach agreement with the DOE regarding
additional funding could have a material effect on 1996
revenue."

Molten Metal had approximately $44 million in revenues in 1995.

The approximately 30% of total revenue received from DOE was

therefore approximately $13.2 million.

64.  Augenthaler, on August 26, 1996, issued another

research report regarding Molten Metal.  He continued to rate the

stock a buy (priced at $31.75 per share) and stated that "Our

earnings estimate for 1996 remains $0.75 to $1.00 although we are

focusing on the low end of that range.  <u>The primary sources of

revenue during the year will be R&D funding from the government</u>,

construction-related revenue and technology transfer fees.

Although EPS in the first half of 1996 is meager relative to the

target for the year, <u>we note that both construction and R&D

revenue will be weighted to the second half of the year</u> . . ."

(emphasis added).

65.  On or about July 2, 1996, Molten Metal filed a Form 8-K

with the SEC which purported to contain certain risk disclosures

regarding the purchase of Molten Metal securities by investors.
On page 2 of the Form 8-K, the Company disclosed as follows:

> The Company has historically been dependent on two
> customers, M4 Environmental L.P. and the Department of
> Energy, for a substantial portion of its revenues and
> <u>anticipates that a substantial portion of its revenues in
> 1996 will be from these two customers</u>.  Variations from this
> expectation could have a material effect on the Company's
> 1996 revenues.  (Emphasis added.)

66.  This "risk disclosure" was materially false and
misleading when made.  The Company, as of July 2, 1996, <u>knew</u> that
DOE had granted Molten Metal only an additional $2 million, and
that Molten Metal could reasonably expect only an additional $6
million by March 31, 1997, far less R&D funds than the $20
million the Company and the financial markets expected the
Company to receive in 1996, based upon the Company's statements
to Augenthaler, the Oppenheimer analyst.  Consequently, this
statement was materially misleading in that it failed to disclose
that 1996 revenues from the DOE will be substantially less than
the Company's prior expectations, as reflected in Oppenheimer's
research report.

67.  The Form 8-K also contained another misleading "risk
disclosure:"

> The Company anticipates that a significant portion of the
> market for CEP systems will be United States government
> agencies such as the Department of Energy and the Department
> of Defense.  <u>The Company's existing government contracts can
> generally be canceled, delayed or modified at the sole
> option of the government and are generally subject to annual
> funding limitations</u> and public sector financing constraints.
> The Company believes that any future government contracts
> will be structured similarly.  (Emphasis added.)

24

68.  This "risk disclosure" was false and materially misleading when made.  As of July 2, 1996, Molten Metal knew that the DOE had already materially modified the existing contract the Company had with the DOE regarding R&D funding, and that only $2 million in additional DOE funding was currently committed.  The failure to disclose this material fact rendered this alleged "risk disclosure" inherently incomplete and misleading.

69.  On July 18, 1996, DOE issued a "Stop Work" Modification directing Molten Metal to stop all work except as necessary to finalize certain reports and resubmit them prior to August 15, 1996.  Defendants did not disclose this fact.

70.  During a conference call with stock market analysts, on or about August 8, 1996, to discuss the Company's just released 1996 second quarter results, Molten Metal's management indicated that, at that time, it hoped to receive "additional R&D funding from the DOE."  Once again, the statement was misleading because it failed to reveal that only $2 million had been committed, that the Company expected only an additional $6 million at best, and that a Stop Work Order had been received.

71.  On August 28, 1996 Molten Metal filed an S-3 Notes Registration Statement.  Each of the individual defendants signed the notes registration statement.  Although Molten Metal was obligated by the federal securities laws to disclose all material information concerning the Company, it omitted from disclosure in the notes registration statement the material fact that the Company's R&D funding from DOE would be significantly less than

25

the Company's expectations as expressed to the public by the
Company's statements to Augenthaler of Oppenheimer, and that this
would adversely effect results for its 1996 third and fourth
quarters.

72.  Additionally, the notes registration statement
contained the following false and misleading statement at page 8:

> Also, during 1995, revenue from the DOE accounted for
> approximately 30% of the Company's total revenue, and
> the Company anticipates that a substantial portion of
> its revenue for 1996 also will be from the DOE.
> Failure to reach agreement with the DOE regarding
> additional funding could have a material adverse effect
> on 1996 revenue and results of operations.

73.  This statement was materially false and misleading when
made on or about August 28, 1996.  At the time, the defendants
knew or recklessly disregarded the fact that the DOE had already
informed Molten Metal that it had granted Molten Metal only an
additional $2 million on May 10, 1996, and that DOE would be
providing Molten Metal with R&D funding of only $6 million more,
and not the $20 million that the Company had been expecting to
receive.  The statement that "a substantial portion of its
revenue from 1996 also will be from the DOE" was materially
misleading in that it failed to disclose to investors that the
DOE had already informed Molten Metal that 1996's level of R&D
funding was significantly less than 1995's level and even more
below the $20 million the Company had told the financial markets
it was expecting.  Additionally, the statement that "Failure to
reach agreement with the DOE regarding additional funding could
have a material effect on 1996 revenue and results of operations"

26

was false as the Company already knew that DOE's commitment was
only for $2 million and perhaps an additional $6 million by March
31, 1997.  Further, the defendants failed to disclose that Molten
Metal had received a Stop Work Order on July 18, 1996.

74.  Molten Metal, on September 20, 1996, filed another Form
S-3 Registration Statement to register 307,735 shares of 308,000
shares of common stock which were given to Lockheed Martin
Corporation ("Lockheed") as part of the expansion of a joint
venture partnership between Molten Metal and Lockheed known as M4
(the "Lockheed Registration Statement").  Lockheed was the sole
selling shareholder in this offering.  The Lockheed Registration
Statement, which was signed by each of the Individual Defendants
on September 19, 1996, failed to disclose the material fact that
the Company's R&D funding from DOE was set at a level
significantly less than the Company's expectations which would
adversely affect results for its 1996 third and fourth quarters.

75.  On September 30, 1996, DOE issued a Modification of
Contract which canceled the July 18, 1996 Stop Work Order, and
revised the estimated contract costs and scheduling.  Under the
new Modification, the estimated contract costs were increased to
$48,514,536. and the period of performance was extended to March
31, 1997.  The DOE's share of current funding was increased
$3,631,812. to $30,859,665.

76.  On September 30, 1996, Molten Metal and DOE understood
that DOE's share of the funding would increase to a fully funded
amount of $33,227,853. or 68.5 percent of the total estimated

27

contract costs, as progress was made.  A Modification authorizing this funding was issued by DOE on November 18, 1996.

77.  Accordingly, on September 30, 1996, defendants knew that DOE had authorized an additional $3.6 million in current funding, and would likely authorize an additional $2.4 million in the near future, consistent with DOE's statements to Molten in April and May of 1996.

78.  Molten Metal failed to update or correct the statement in its 1995 Form 10-K quoted above that "failure to reach agreement with the DOE regarding additional funding could have a material effect on 1996 revenue."

The End of the Class Period

79.  On Sunday, October 20, 1996, Molten Metal issued a press release entitled "Molten Metal Technology Updates Research and Development Funding."  The Company stated that "government-funded research and development revenues will not meet company expectations for 1996."  The press release continued that "this research and development revenue shortfall [is expected to] adversely effect its third and fourth quarter earnings."

80.  In an interview with Bloomberg Business News, an officer of Molten Metal stated that "The U.S. Department of Energy will give the company only $8 million of an expected $20 million for research into the recycling of radioactive scrap metal."

81.  The Company subsequently clarified that its R&D funding was not being "cut" by the DOE but that the Company had

"overestimated how much it would receive from the DOE."  A
Company spokeswoman, Sarah Lawson, said that "In our internal
estimate, made earlier this year, we were off."

82.  Molten Metal held a conference call with securities
analysts on Sunday night, October 20, 1996.  In addition to
discussing the level of government-funded research and
development revenues, Molten Metal stated that it would delay
entry into the incinerator fly ash market and other markets,
because Molten Metal believed it may be overextending its
resources by pursuing too many markets at once.

83.  In a second conference call with securities analysts on
October 21, 1996, defendant Haney gave a different reason for the
delay with the Japanese joint venture.  In a report by Reuters
Financial Service on October 21, 1996, Haney was quoted as
stating that the delay came because "the negotiations are going
slower than we expected."  Haney claimed that the Japanese joint
venture parties were still interested in the technology.

84.  During the Class Period, Molten Metal shares traded as
high as $41.25 per share and closed at $28-1/8 per share on
Friday, October 18, 1996.  The price of Molten Metal shares
dropped approximately 50% on October 21, 1996, to a closing price
of $14-1/4, on extraordinarily high volume of over 5.7 million
shares.  Molten Metal shares are currently trading in a range
below $14.  As a result of this plunge in the price of Molten
Metal shares, plaintiff and the class have suffered damages
aggregating millions of dollars.

<u>The Importance of Molten Metal's</u>
<u>Stock Price to the Defendants</u>

85.  Defendants had several personal and corporate reasons for causing Molten Metal shares to trade at artificially inflated prices.  First, as alleged above, at least certain of the Individual Defendants owned substantial numbers of shares of Molten Metal common stock and had stock options.

86.  Second, in May, 1996, shortly after the filing of Molten Metal's 1995 Form 10-K, Molten Metal raised $142,750,000 from the issuance of Convertible Subordinated Notes Due 2006 (the "Notes").  The Notes are convertible into common stock at a conversion price of $38.75 per share.

87.  Third, Molten Metal has used its stock as currency to pay for part of its 50% equity investment in M4 Environmental LP, a Delaware limited partnership ("M4") formed by the Company and Lockheed Martin Corporation ("Lockheed"), in which the Company and Lockheed each effectively own 50%.  In March, 1996, Molten Metal used 307,735 shares of its common stock to purchase certain assets that were contributed to M4 to match an investment in M4 by Lockheed.  On September 20, 1996, as noted above, Molten Metal filed the Lockheed Registration Statement to register those 307,735 shares.

88.  Finally, certain of the individual defendants sold over $2.5 million in Molten Metal stock at artificially inflated prices during the Class Period.  Those sales were as follows:

| Defendant | Date | Number of Shares | Proceeds |
|-----------|------|------------------|----------|
| Preston | September, 1996 | 40,000 | 1,260,000 |
| Strong | September, 1996 | 41,000 | 1,290,020 |
| | | 81,000 | $2,550,020 |

In addition, Ian C. Yates, a vice president of Molten Metal, sold
77,000 shares of Molten Metal stock, representing virtually his
entire holdings, at artificially inflated prices.  Yates sold
15,000 shares in March 1996, 34,638 shares in May 1996, 10,000
shares in July 1996, and 17,333 shares in August 1996, totaling
almost 77,000 shares.

### COUNT I.
### [Against All Defendants For Violations of
### Section 10(b) of the Exchange Act] and Rule 10b-5

89.    Plaintiffs repeat and reallege each and every
allegation set forth above.

90.    This claim is brought pursuant to Section 10(b) of the
Exchange Act and Rule 10b-5 promulgated pursuant thereto against
all defendants.

91.    Defendants individually and in concert, directly and
indirectly, by the use of means or instrumentalities of
interstate commerce and/or of the mails, engaged and participated
in a continuous course of conduct to misrepresent material
information about the operating conditions, technology and future
prospects of Molten Metal as specified herein.  Defendants
employed devices, schemes and artifices to defraud, while in
possession of material adverse non-public information and engaged
in acts, practices, and a course of conduct as alleged herein in

an effort to mislead investors of Molten Metal's value and potential, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Molten Metal in the light of the circumstances under which they were made, not materially misleading, as set forth more particularly herein, and engaged in transactions, practices and course of business which operated as a fraud and deceit upon the purchasers of Molten Metal common stock during the Class Period.

92.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose, and which had the effect, of misrepresenting and concealing material information about Molten Metal from the investing public and supporting the artificially inflated price of its stock.

93.    Defendants knew that the marketplace would rely upon the statements they were making about Molten Metal's technology and future prospects in establishing the price at which Molten Metal's common stock would trade, and that plaintiffs and the Class would rely, directly or indirectly, upon that information in deciding whether to purchase shares of Molten Metal stock.

94.  As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Molten Metal common stock was artificially inflated throughout the Class Period.  In ignorance of the materially false and misleading nature of the reports and statements described above, plaintiffs and other members of the Class relied, to their damage, on the reports and statements described above and/or on the integrity of the market price of Molten Metal common stock and the completeness and accuracy of the information disseminated to Molten Metal investors in connection with the purchase of the Company's common stock.

(a)  At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  In reliance on said misrepresentations and in reliance upon the superior knowledge and expertise of defendants, plaintiffs and other members of the Class were induced to and did purchase Molten Metal common stock at artificially inflated prices.  Had plaintiffs and other members of the Class known the truth, they would not have purchased their Molten Metal stock during the Class Period or, if they had purchased Molten Metal stock during the Class Period, they would not have done so at the artificially inflated prices that were paid.

95.  Plaintiffs and the Class were injured because the risks that materialized were risks of which they were unaware as a

result of defendants' misrepresentations, omissions and other
fraudulent conduct.

96.   By virtue of the foregoing, defendants have violated
Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated
thereunder.

97.   Plaintiffs and other members of the Class have been
damaged by defendants' violations as described in this Count and
seek recovery for the damages caused thereby.

### COUNT II.
### [Against the Individual Defendants For Violations
### Of Section 20(a) of the Exchange Act]

98.   Plaintiffs repeat and reallege each and every
allegation set forth above.

99.   This claim is brought pursuant to Section 20(a) of the
Exchange Act against the Individual Defendants.

100. Throughout the Class Period, each of the Individual
Defendants was a "controlling person" of Molten Metal within the
meaning of § 20(a) of the Exchange Act.

101. Because of his position as an executive and/or director
of Molten Metal during the relevant period, each of the
Individual Defendants had access to the adverse and material
information about Molten Metal, approved the misleading
statements and omissions described above and acted to conceal
such adverse information from the investing public.  Because of
their respective positions of control and authority as principal
executive officers and/or directors of Molten Metal during the
relevant time period, the Individual Defendants were able to and

did directly or indirectly control the contents of Molten Metal's various publicly disseminated reports, press releases and filings with the SEC.

102. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Molten Metal's business operations so that the market price of Molten Metal's securities would be based on truthful, accurate and timely disclosure of all material information.

103. By virtue of the defendants named in this Count each being a "controlling person", they are liable for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 committed by defendant Molten Metal as alleged in Count I above.

## PRAYERS FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

A.  declaring this action to be a plaintiff class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying the plaintiffs as appropriate plaintiffs and class representatives;

B.  awarding plaintiffs and other members of the Class damages, with interest thereon;

C.  awarding plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

35

D.    awarding plaintiffs and other members of the Class such

other and further relief as may be just and proper

under the circumstances.

By their attorneys,

Thomas G. Shapiro
BBO #454680
Shapiro Haber & Urmy LLP
75 State Street
Boston, MA 02109
(617) 439-3939

Glen DeValerio, BBO #122010
Peter A. Pease, BBO #392880
Berman, DeValerio & Pease LLP
One Liberty Square
Boston, MA 02109
(617) 542-8300


Richard Bemporad
Lowey Dannenberg Bemporad &
  Selinger, P.C.
The Gateway
One North Lexington Avenue
White Plains, NY 10601
(914) 997-0500

Howard B. Sirota
Sirota & Sirota
747 Third Avenue
New York, NY 10017
(212) 759-5555

David Jaroslawicz
Jaroslawicz and Jaros
150 William Street
New York, NY 10038
(212) 227-2780

c:\molten.met\complain.nov

36