UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROBERT i. HANFLING, <br>   Chapter 7 Trustee of the Bankruptcy <br>   Estates of ATG, Inc. and ATG <br>   Catalytics LLC, <br><br>       Plaintiff, <br><br>       v. <br><br> EPSTEIN BECKER & GREEN, P.C., <br>   et al., <br><br>       Defendants. | Civil Action No. 05-10077-RGS |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to this Court's Local Rule 56.1, defendant Epstein Becker & Green, P.C. ("EBG") submits its Statement of Undisputed Material Facts.

**EBG's Representation of MMT Employees**

1. Starting in early August 1997 and continuing through early 1998, Carole Schwartz Rendon, an attorney with the Boston office of Epstein Becker & Green, P.C. ("EBG"), represented a number of employees of Molten Metal Technology, Inc. ("MMT"). The employees had received requests for interviews in an investigation of MMT being conducted by the United States Department of Justice Campaign Finance Task Force and the Office of the Inspector General of the United States Department of Energy. Deposition of Carole Schwartz Rendon ("Rendon Dep.") at 8-9; 19-20.[1] The investigation focused upon allegations of campaign finance abuses and government

---

[1] True and accurate photocopies of pages from the transcript of Ms. Rendon's deposition are appended to the Bagger Affidavit as Exhibit C.

contract irregularities. Deposition of Michael J. Tuteur ("Tuteur Dep.") at 12;[2] Rendon Dep. at 19-20, 39-40. In addition, a federal grand jury was hearing testimony with respect to the campaign finance allegations. Rendon Dep. at 40-41.

    2.    Ms. Rendon was the only EBG attorney who represented the MMT employees in this investigation. Tuteur Dep. at 13-14. The work did not require Ms. Rendon to achieve a sophisticated understanding of how MMT's catalytic extraction process ("CEP") technology worked or to consider with any rigor how well it worked. Rendon Dep. at 24-25; 72. MMT's technology was not the focal point of the interviews. Rendon Dep. at 70. Rather, the interviews focused upon issues associated with campaign finance, including questions about specific campaign events, contributions, appearances by candidates at events, and relations between various individuals. There were also questions about the renewal of MMT's contract with the Department of Energy and dollar figures associated with the contract. Rendon Dep. at 82-83; Affidavit of Paula M. Bagger ("Bagger Aff.") Ex. F.

    3.    Commencing in the fall of 1997, Ms. Rendon also represented Christopher J. Nagel, MMT's Chief Technology Officer, in preparation for testimony before the Commerce Committee of the United States House of Representatives. Rendon Dep. at 23-24, 44; Nagel Dep. at 21-23. The Committee's focus was on the Department of Energy's contract with MMT. Deposition of Christopher J. Nagel ("Nagel Dep.") at 21.[3] At a hearing on February 12, 1998, Dr. Nagel read a prepared statement that focused on

---

[2]    True and accurate photocopies of pages from the transcript of Mr. Tuteur's deposition are appended to the Bagger Affidavit as Exhibit D.

[3]    True and accurate photocopies of pages from the transcript of Mr. Nagel's deposition are appended to the Bagger Affidavit as Exhibit B.

how MMT's technology worked, geared towards a lay audience. Bagger Aff. Ex. J. There was no substantive questioning of Dr. Nagel by the committee. Rendon Dep. at 44-45, Nagel Dep. at 22-23; Bagger Aff. Ex. J.

   4.  In April 1998, Dr. Nagel retained Hale and Dorr LLP to represent him in connection with a demand made by Earl McConchie, a former MMT employee who wrote a letter asserting that Dr. Nagel and MMT Chief Executive Officer William Haney had fraudulently induced him to accept employment with MMT. Nagel Dep. at 28, 32-33, 38; Bagger Aff. Ex. I. Before retaining Hale and Dorr, Dr. Nagel asked Ms. Rendon to advise him in connection with a conflict waiver that Hale and Dorr had requested in connection with that representation. Rendon Dep. at 25-27; Nagel Dep. at 44-45. Ms. Rendon never did any work for Dr. Nagel concerning Mr. McConchie's allegations, Rendon Dep. at 85, and Dr. Nagel and Ms. Rendon never discussed the substance of those allegations. Nagel Dep. at 44-45. Ms. Rendon took her file copy of the McConchie Letter with her when she left EBG, Rendon Dep. at 89, and did not talk to Michael Tuteur, who later represented Dr. Nagel, about the McConchie Letter, Rendon Dep. at 109.

   5.  In August 1998, Ms. Rendon left EBG, moved to Cleveland, Ohio, and accepted a position with Messerman & Messerman, a Cleveland law firm. When Ms. Rendon left EBG, there was no pending work at EBG for the employees of MMT in connection with the Congressional, Justice Department, and DOE investigations of MMT. Tuteur Dep. at 17-18; Rendon Dep. at 27, 108. No further work was done at EBG on any of these matters after Ms. Rendon's departure. Tuteur Dep. at 13-14.

6.     EBG never represented MMT itself. Rendon Dep. at 17. It entered into retention agreements with each of the MMT employees who sought its legal representation. Rendon Dep. at 10. It never entered into a retention agreement with MMT. Rendon Dep. at 17-18. Each of the MMT employees was party to an indemnification agreement with MMT, pursuant to which MMT agreed to pay for his or her legal representation in connection with the federal investigations of MMT. Rendon Dep. at 14-15.

**EBG's Later Representation of Dr. Nagel in the MMT Litigation**

7.     The only former MMT employee with whom Ms. Rendon remained in contact after leaving EBG was Dr. Nagel. Rendon Dep. at 28. While she was still at EBG, Ms. Rendon had learned from Dr. Nagel that he was a defendant in certain shareholder litigation against MMT and its former officers and directors that was pending in the United States District Court in Boston (the "MMT Litigation") and that he and the other defendants were represented by Bingham Dana LLP. Rendon Dep. at 28, 93-94, 99. After Ms. Rendon left EBG, Dr. Nagel spoke to her about the possibility of separate representation in the MMT Litigation. Rendon Dep. at 28, 93-94. Also after she left EBG, Ms. Rendon received a small number of documents from Bingham Dana, which she believed were sent to her at Dr. Nagel's request. Rendon Dep. at 29-30. Ms. Rendon subsequently told Dr. Nagel that it did not make sense for Ohio counsel to represent him in shareholder litigation pending in Massachusetts. Rendon Dep. at 94.

8.     In November 1998, Ms. Rendon spoke to Michael Tuteur of EBG's Boston office about possible representation of Dr. Nagel in the MMT Litigation should he decide to retain separate counsel. Rendon Dep. at 30-31, 93-94; Tuteur Dep. at 23-24.

4

Such possible representation would be subject, first, to Dr. Nagel's approval and, second, to the approval of MMT's directors' and officers' liability insurance carrier. Tuteur Dep. at 23-24. After this communication and in contemplation of such future representation of Dr. Nagel by EBG, Ms. Rendon forwarded to Mr. Tuteur the few documents which she had received from defense counsel in the case. Tuteur Dep. at 23-24; Rendon Dep. 30-31; Bagger Aff. Exs. G, H.

9. On December 1, 1998, Mr. Tuteur first met with Dr. Nagel. Tuteur Dep. at 24. Mr. Tuteur did not do any legal work for Dr. Nagel prior to December 1, 1998. Tuteur Dep. at 11-12. On December 3, 1998, MMT's directors' and officers' liability insurer approved EBG to advise Dr. Nagel in connection with the securities class action litigation. Tuteur Dep. at 23-24. Thereafter, Dr. Nagel retained EBG to advise him in connection with the MMT Litigation. Tuteur Dep. at 26. EBG first filed an appearance in the MMT Litigation in August 2000. Bagger Aff. Ex. K.

**EBG's Representation of ATG in the Asset Acquisition**

10. On October 29, 1998, William M. Hewitt, President of the Waste Management Services division of ATG, Inc., contacted Kenneth B. Weckstein, a partner in EBG's Washington, D.C. office. Deposition of Kenneth B. Weckstein ("Weckstein Dep.") at 49;[4] Affidavit of William M. Hewitt ("Hewitt Aff.") ¶ 8. ATG was at that time an established client of EBG. Weckstein Dep. at 9-10, 14-15; Hewitt Aff. ¶ 8. Mr. Hewitt asked EBG to represent ATG, Inc. in connection with a potential acquisition of

---

[4]   True and accurate photocopies of pages from the transcript of Mr. Weckstein's deposition are appended to the Bagger Affidavit as Exhibit E.

5

assets from the bankruptcy estate of MMT. Deposition of Jarvis P. Kellogg ("Kellogg Dep.") at 9;[5] Hewitt Aff. ¶ 8.

11. When Mr. Hewitt contacted EBG about this potential representation, he was already familiar with MMT and both its wet waste treatment and CEP businesses. He was aware that MMT had suffered setbacks in the marketplace and had filed a bankruptcy petition. He was aware of a series of well-publicized legal problems at MMT and was generally aware of a federal investigation of MMT that involved allegations of improper Department of Energy contracting procedures. Hewitt Aff. ¶¶ 3-4. He had already discussed with company management the prospect of bidding to acquire the so-called "wet waste" assets of MMT, *id.* ¶ 5, and had already met with MMT's Chapter 11 Trustee, Stephen Gray, to discuss such a bid, *id.* ¶ 7. He had already been informed by Mr. Gray that a business group formed by John T. Preston and Christopher J. Nagel, former members of MMT's Board of Directors, were interested in acquiring the assets of MMT's CEP business. Mr. Gray had already told Mr. Hewitt that a joint bid for the CEP and wet waste assets would be looked upon favorably. *Id*.

12. On ATG's behalf, EBG commenced negotiations with counsel for Quantum Catalytics LLC ("Quantum"), the entity formed by Mr. Preston and Dr. Nagel, of a joint bid for acquisition of MMT's wet waste assets (by ATG) and its CEP assets (by Quantum). Quantum was represented by Mintz Levin Cohn Ferris Glovsky & Popeo, P.C. Hewitt Aff. ¶ 9; Affidavit of Jarvis P. Kellogg ("Kellogg Aff.") ¶¶ 2-3. Although it contemplated acquiring only the wet waste assets, ATG commenced due diligence of both the wet waste and CEP business lines, first, because both businesses were operated

---

[5] True and accurate photocopies of pages from the transcript of Mr. Kellogg's deposition are appended to the Bagger Affidavit as Exhibit A.

out of the same Bear Creek Road facility in Oak Ridge, Tennessee and, second, because ATG saw possible opportunities as well as risks inherent in the CEP business line. Hewitt Aff. ¶ 9. ATG did not seek EBG's assistance with any factual due diligence or with any technical assessment of the MMT assets. Kellogg Aff. ¶ 3.

13. Before the bids were finalized, the State of Tennessee made it known that it would not allow the transfer of regulatory licenses for the Bear Creek Road facility to Quantum. Hewitt Aff. ¶ 11. Accordingly, ATG decided to acquire both the wet waste assets and the Bear Creek Road facility and physical CEP assets located there. ATG was fully aware of the business risks associated with the CEP business line and of environmental contamination at the Bear Creek Road facility, but decided that these risks were outweighed by potential upside benefits, including access to a facility in the eastern United States that was licensed to handle highly radioactive waste and established contracts for such services. *Id*. ¶¶ 12, 13 and Ex. A. Moreover, ATG realized that, as a practical matter given the State of Tennessee's position, it needed to purchase the CEP assets if it wanted to acquire the wet waste assets. *Id*. ATG's business decision was that it would try for a short period to make the CEP process viable and profitable at the Bear Creek Road facility and, if it could not, it would replace the CEP process with other technology in use at ATG's existing facilities. *Id*.

**The ATG/MMT Asset Acquisition**

14. On December 1, 1998, ATG closed on its acquisition of assets from the MMT bankruptcy estate. ATG Nuclear Services LLC ("ANS"), a wholly-owned subsidiary of ATG, Inc., acquired the wet waste assets. The purchase price for the wet

7

waste assets was $10.5 million in cash and a $1.0 million promissory note from ANS. ATG guaranteed the obligations of ANS under the promissory note. Kellogg Aff. ¶¶ 4, 6.

15. ATG Catalytics LLC ("AC") (90% owned by ATG, Inc. and 10% owned by Quantum) acquired the Bear Creek Road facility and certain physical CEP assets located therein. Quantum acquired certain CEP-related intellectual property together with MMT's Fall River, Massachusetts plant. As consideration for the acquisition of these assets, AC and Quantum each undertook to pay a sum equal to five percent of earnings attributable to the assets each was purchasing, before interest, taxes, and depreciation, for the next five years, with an aggregate minimum payment of $800,000 per year, for which AC and Quantum would be jointly and severally liable. ATG guaranteed AC's obligation to make these payments. Kellogg Aff. ¶ 5.

> EPSTEIN BECKER & GREEN, P.C.
>
> ___/s/_Marjorie Sommer Cooke_____
> Marjorie Sommer Cooke (BBO # 097800)
> Paula M. Bagger (BBO # 547703)
> COOKE, CLANCY & GRUENTHAL, LLP
> 265 Franklin Street
> Boston, MA  02110
> (617) 428-6800

Dated:  June 7, 2006

## CERTIFICATE OF SERVICE

I, Paula M. Bagger, hereby certify that I have this 7th day of July, 2006, served a true copy of the foregoing upon counsel for the plaintiff through the Court's ECF filing system.

> _____/s/ Paula M. Bagger_____
> Paula M. Bagger