UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
ROBERT I. HANFLING, Chapter 7 Trustee         )
  of the Bankruptcy Estates of ATG, Inc. and  )
  ATG Catalytics, LLC,                        )
                                              )
           Plaintiff,                         )
                                              )
           v.                                 )          Civil Action No. 05-10077-RGS
                                              )
EPSTEIN BECKER & GREEN, P.C.,                 )
                                              )
           Defendant.                         )
_____       )

## OPPOSITION TO PLAINTIFF'S MOTION TO AMEND COMPLAINT

Defendant Epstein Becker & Green, P.C. ("EBG") opposes the motion of plaintiff Robert I.

Hanfling, Chapter 7 Trustee of the Bankruptcy Estates of ATG, Inc. and ATG Catalytics LLC (the

"Trustee"), to amend his Complaint.  The motion should be denied on grounds of futility, tardiness,

and prejudice.

The fundamental problem with the Trustee's motion is futility:  the proposed amendments

are unsupported either by the facts as they have developed during discovery or by the governing law.

 These shortcomings are fatal at this juncture:

> The appropriateness *vel non* of a district court decision denying a motion to amend on the
> grounds of futility depends, in the first instance, on the posture of the case.  If leave to amend
> is sought before discovery is complete and neither party has moved for summary judgment,
> the accuracy of the "futility" label is gauged by reference to the liberal criteria of Federal
> Rule of Civil Procedure 12(b)(6). . . .  If, however, leave to amend is not sought until after
> discovery has closed and a summary judgment motion has been docketed, the proposed
> amendment must be not only theoretically viable but also solidly grounded in the record.  *In
> that type of situation, an amendment is properly classified as futile unless the allegations of
> the proposed amended complaint are supported by substantial evidence.*

*Hatch v. Dep't for Children, Youth, and Their Families*, 274 F.3d 12, 19 (1st Cir. 2001)(emphasis

supplied)(citations omitted).  *Accord Robinson v. Bodoff*, 382 F. Supp.2d 229, 232 (D. Mass.

2005)(proposed amendment of legal malpractice action to allege conflict of interest denied on grounds of futility); *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994).

The allegations of the Trustee's proposed Amended Complaint are not "solidly grounded in the record" or "supported by substantial evidence." They are also untimely, and the apparently strategic delay has prejudiced EBG.

## PROCEDURAL BACKGROUND

This case was filed in December 2003 and transferred from the Northern District of California in November 2004. In June 2005, this Court entered the parties' agreed-upon Scheduling Order, which called for completion of discovery by December 2005. When the Trustee informed EBG that he would not be able even to finish reviewing his own documents by December 2005, EBG proposed, and the parties thereafter sought, an amended Scheduling Order, which extended the deadlines and also introduced phased discovery.

The Amended Scheduling Order, which the Court entered in November 2005, divided discovery into two phases. Phase I covered all liability issues except the technical question whether the catalytic extraction processing ("CEP") technology at issue in the case in fact worked.[1] Phase II

---

1       According to the Amended Scheduling Order, Phase I discovery included:

a.      The acquisition of assets of MMT from the MMT bankruptcy estate;

b.      Negotiations preceding such acquisition, including negotiations between ATG and Quantum Catalytics and negotiations between ATG/Quantum Catalytics and the MMT Trustee, including, but not limited to:

i.      statements made by all parties and any third parties about the proposed acquisition, the assets to be acquired, or the technology;

ii.     due diligence relative to the proposed acquisition;

iii     relationship between ATG and MMT and ATG familiarity with CEP and Q-CEP prior to MMT bankruptcy;

iv.     information available publicly with respect to MMT, its assets, or its technology;

would cover technical issues with respect to the CEP technology and all damages issues.  The Amended Scheduling Order contemplated motions for summary judgment on EBG's liability to the Trustee for legal malpractice at the close of Phase I discovery.  Phase II discovery, if necessary, would take place after the Court's ruling on summary judgment motions.

The Trustee made Phase I documents available to EBG pursuant to the Amended Scheduling Order during March and April 2006 (responding to document requests served on the Trustee in June 2005).  During April 2006, the Trustee took six depositions, while EBG took three (one of EBG's depositions, Carole Schwartz Rendon's, was postponed until early May 2006 owing to a personal emergency suffered by the witness).  In each of the nine depositions, the Trustee's questions focused upon as-yet unasserted allegations of conflict of interest that have only now been included in the proposed Amended Complaint.[2]  The Trustee appears to have waited deliberately until discovery had closed and EBG's summary judgment motion was filed to move to amend his Complaint.

Immediately after the completion of Ms. Rendon's deposition, on May 9, 2006, EBG sent the Trustee a letter, noting that the factual allegations of the original Complaint (most of which had been made "upon information and belief") were no longer viable given the facts developed during

---

c.    EBG's representation of ATG in connection with such acquisition, including the commencement and scope of that representation, the work performed, and communications between EBG and ATG;

d.    EBG's representation of MMT and/or its employees in any context through the date of closing of such acquisition, the commencement and scope of those representations, the work performed, and communications between EBG and MMT and/or its employees (subject to any restrictions imposed by the attorney-client privilege);

e.     Facts alleged by plaintiff to establish (1) duty on the part of Individual Defendants, and (2) breach of that duty, with respect to claims of negligent misrepresentation; and

f.    The extent of EBG's disclosures and/or communications to ATG regarding EBG's representation of MMT and/or its employees.

[2]    Contrary to the claim made in his motion to amend, the Trustee did not "discover" his amended claims during deposition discovery in this matter.  In fact, no witness with personal knowledge of these claims testified favorably to the Trustee's position.

discovery in this matter and asking the Trustee to withdraw his Complaint.  The Trustee responded with a letter in which he acknowledged that his initial view of the facts had been disproved and claiming that he would amend his complaint.  However, he waited over a month to do so, until after the deadline for filing motions for summary judgment; accordingly, EBG was forced to move for summary judgment on the original Complaint.[3]

Finally, almost two months after the close of Phase I discovery and two weeks after EBG filed its summary judgment motion, the Trustee has moved to amend his Complaint.  The proposed Amended Complaint incorporates an entirely new view of EBG's alleged malpractice:  an alleged failure to disclose a series of conflicts of interest.  It fails to correct certain fundamental factual errors from the original Complaint while introducing new, erroneous factual allegations that are not "solidly grounded in the record."  Significantly, it does not cure the most glaring deficiency of the original Complaint:  a lack of causation between the malpractice alleged and any damages.  Nor do the new allegations of malpractice -- alleged failures to disclose conflicts of interest -- survive scrutiny.

## **ARGUMENT**

### **I.     AMENDMENT IS FUTILE BECAUSE THE TRUSTEE HAS NOT CURED THE CENTRAL SHORTCOMING OF HIS INITIAL COMPLAINT – AN UTTER LACK OF CAUSATION.**

The first and most basic reason why amendment is futile is that the Trustee's proposed Amended Complaint has not cured the most significant shortcoming of his initial Complaint.  There is a fundamental and fatal lack of causation between the malpractice alleged and any damage alleged to have been suffered by ATG or ATG Catalytics.  "The existence of a conflict without proof of

---

[3]     When the motion to amend was not forthcoming, EBG reasonably concluded, based on the record and applicable law, that the Trustee had decided against amending his Complaint.

causally-related damages is insufficient." *Robinson v. Bodoff*, 382 F.Supp.2d 229, 234 (D. Mass.

2005)(denying motion to amend legal malpractice complaint to assert conflict of interest). *See also*

*McCann v. Davis, Malm & D'Agostine,* 423 Mass. 558, 559 (1996); *Van Brode Group, Inc. v.*

*Bowditch & Dewey, Inc*., 36 Mass. App. Ct. 509, 514 (1994).

>    **A.     Neither A Failure To Disclose That CEP Technology Did Not Work In the Past
>    Nor that It Would Not Work In The Future Could Have Caused ATG's Alleged
>    Damages.**

In his original Complaint, the Trustee claimed that EBG failed to disclose that it had learned

from various sources (Department of Energy investigators, Earl McConchie, class action plaintiffs)

that the CEP technology had not worked in the past.   As discussed in EBG's summary judgment

submission, it is undisputed that, in November 1998, ATG already knew that the CEP technology

had not worked in the past, and thus any alleged failure to disclose did not cause ATG's  alleged

damages. *See* Memorandum in Support of Motion of Defendant Epstein Becker & Green, P.C. for

Summary Judgment ("EBG Mem. SJ") at 15-18.  In his proposed Amended Complaint, the Trustee

seeks to evade this problem by adding a second, subtly different take on what EBG allegedly failed

to disclose.  Now, the Trustee also alleges that ATG did not know that Quantum Catalytics was not

telling the truth when it told ATG that the CEP technology would work in the future:

>    During the negotiations between ATG and Preston, Nagel and Quantum, Preston and Nagel
>    informed and assured ATG that technical issues with the CEP process had been worked out.
>    Consequently, although ATG realized that MMT had lost money on the CEP/Q-CEP
>    business, ATG negotiated a transaction with Quantum to jointly bid on assets of MMT.

Amended Complaint (Proposed) ¶ 45.

This revised allegation does not cure the problem with causation in the Trustee's case.  First

and foremost, the undisputed facts of record are that ATG did not rely on the claims of Quantum

Catalytics in making its acquisition decision at all but rather took all of these representations with a

grain of salt.

> It was known to ATG at the time of the transaction that the CEP technology had not operated reliably. As explained above, ATG approached the acquisition of the MMT CEP assets with a back-up plan due to the risk it perceived with the CEP process. If CEP had operated as promised by Quantum Catalytics (which ATG was skeptical of), it would have been an upside. If it did not, ATG's plan was to remove the CEP processors from the facility and replace that process with a process that had already been internally proven to treat resins.

Hewitt Affidavit ¶ 15(b). *See also id.* ¶ 10 ("Despite assurances by Drs. Preston and Nagel that the technical issues with the CEP process had been worked out, ATG considered the CEP process to pose a risk.").

### B.    The Court Must Consider The Overall Improbability Of The Trustee's New Damages Scenario.

Moreover, in ruling on the Trustee's motion to amend, the Court must put into context the utterly improbable set of facts upon which the Trustee's malpractice claim now rests. The Trustee's causation argument now relies upon the contention that Quantum Catalytics was lying to ATG in order to induce ATG to invest alongside it in technology that was neither safe, nor operable, nor commercially viable. Yet the undisputed fact that the Trustee seeks to mask through his deficient pleading is that Quantum Catalytics had no incentive to indulge in this conduct. Quantum Catalytics' owners were Christopher Nagel and John Preston, who were, respectively, former Chief Technology Officer of MMT and inventor of the technology and a former outside director. They were not *selling* the technology to ATG but rather were *purchasing it* jointly with ATG. ATG and Quantum Catalytics were both members of ATG Catalytics, the entity formed to acquire the Q-CEP assets. Kellogg Affidavit ¶ 5.[4] Moreover, under the terms of the asset acquisition, Quantum Catalytics and ATG Catalytics, each of which purchased a different set of CEP assets, were jointly

---

[4]    The ownership of ATG Catalytics in December 1998 is objectively verifiable. Moreover, the Trustee acts as a fiduciary for this company. There is no excuse for the Trustee to continue to allege, erroneously, in his proposed Amended Complaint that ATG Catalytics was a wholly-owned subsidiary of ATG, Inc. *See* Amended Complaint (Proposed), ¶ 6. It must be inferred that the Trustee did not wish the Court to know that, in fact, Quantum Catalytics owned ten percent of ATG Catalytics, as this is flatly inconsistent with his theory of this case.

6

and severally liable for the entire purchase price of the aggregated CEP assets.[5]  Kellogg Affidavit ¶ 5.  It simply made no business sense for Quantum Catalytics to participate in this transaction if it thought the assets being purchased by ATG Catalytics were unsafe, ineffective, or non-operational.[6]

> ### C.    Even If The Trustee's Conflicts Argument Were Factually Coherent, It Could Not In Any Event Have Resulted In Damage To ATG.

Causation fails for yet another reason.  Even assuming that EBG had a conflict of interest in December 1998 that required disclosure to ATG (which it did not, *see infra* Part II), the Trustee's claim of legal malpractice would nonetheless fail as a matter of law because the Trustee is unable to show that such an ethical violation could have caused any damages.

The Trustee alleges that, owing to EBG's failure to disclose its conflict, ATG never learned certain information about the CEP technology and its role in the federal campaign finance and government contracts investigations, the MMT shareholder litigation, and Earl McConchie's demand letter.  Yet, if EBG had disclosed the any of the alleged conflicts, ATG might have done either of two things:  it might have waived the conflict and continued to use EBG, or it might have gone to a different lawyer.  In either case, the result would have been the same:  ATG would not have learned any of the allegedly "non-public" information that it has claimed EBG failed to disclose.

There is no allegation in this case that the quality of EBG's representation of ATG was less

---

[5]    Indeed, when ATG Catalytics failed to make its second payment for the Q-CEP assets, due on December 1, 2000, the MMT Trustee first sued Quantum Catalytics, alone, for payment.  *Gray, Chapter 11 Trustee of  Molten Metal Technology, Inc. v. Quantum Catalytics LLC,* Adversary Proceeding No. 01-1205-CJK (Bankr. D. Mass.). This lawsuit put Quantum Catalytics out of business.  Only after this case settled did the MMT Trustee pursue ATG Catalytics, in state court in Tennessee.

[6]    The much more probable story is the one that is undisputed in the record of the case.  Bill Hewitt, who negotiated the asset purchase transaction for ATG, testified that Quantum Catalytics wanted to purchase all of the CEP Assets but was unable to do so because the State of Tennessee would not transfer the nuclear operating license to an inexperienced firm and demanded that ATG acquire the Bear Creek facility and hold the license.  Hewitt Affidavit ¶¶ 11-12.

than uniformly excellent, and therefore, ATG cannot demonstrate that it was damaged by its continued retention of EBG.  Proposed amendment of this legal malpractice claim to include allegations of conflict of interest would therefore be futile, for the same reason explained by this Court in *Robinson v. Bodoff*, when confronted with a request to amend a legal malpractice complaint to allege a conflict of interest:

> It is insufficient for the plaintiff to allege that, had the alleged conflict of interest been disclosed, he would have hired another attorney because there is no allegation that the result would have been any different.  Accordingly, for all of the articulated reasons, plaintiff's motion for leave to amend will be denied.

*Robinson v. Bodoff*, 392 F. Supp.2d at 234.

## II. AMENDMENT IS FUTILE BECAUSE THE TRUSTEE CANNOT SHOW SUBSTANTIAL SUPPORT IN THE RECORD FOR EITHER HIS OLD OR HIS NEW ALLEGATIONS OF MALPRACTICE.

The Trustee's initial Complaint alleged that EBG did not disclose to ATG information in its possession that was material to its representation of ATG.  EBG moved for summary judgment on this Complaint arguing that (a) it indisputably did not possess the information the Trustee claimed it did; (b) the information it did possess was not as a matter of law material to its later representation of ATG; and (c) none of these alleged failures to disclose in any event caused any damage to ATG. *See* EBG Mem. SJ at 1-2.   The proposed Amended Complaint retains the allegations of non-disclosure of allegedly material information, *see* Amended Complaint (Proposed) ¶¶ 66(d), (e), (f), (g), without curing their defects, which were comprehensively set forth in EBG's summary judgment motion.[7]  It also adds allegations with respect to various alleged conflicts of interest, *see id.*  ¶¶ 66(a), (b), (c), (h),[8]  which are not supported by the record.

---

[7]      With respect to the allegation that EBG possessed material information concerning the viability of CEP technology as a result of its representation of MMT employees in the Federal Investigations, *see* EBG Mem. SJ at 8-9. With respect to the allegation that EBG possessed material information concerning the viability of CEP technology from an involvement in the MMT Litigation, *see id.* at 4-5, 10-12.  With respect to the allegation that EBG possessed material information concerning the viability of CEP technology as a result of its brief exposure to the McConchie Letter, *see id.*

A.     **Failure To Disclose Prior Representation of MMT**.

The first new claim is that EBG breached a duty owed to ATG when it failed to disclose to ATG that "it had provided direct legal representation to MMT in the Federal Investigation." Amended Complaint (Proposed), ¶ 66(b).  This new factual allegation lacks any support in the record of this case. The record of this case, following full discovery, is clear that EBG represented a number of MMT employees who were interviewed, produced documents, or (in one case) testified before a grand jury in the investigations of MMT pursued in tandem by the Campaign Finance Strike Force of the United States Department of Justice and the Office of the Inspector General of the United States Department of Energy.   In addition, EBG also represented MMT employee

---

at 5-6, 12-14.

[8]     Paragraph 66 of the proposed Amended Complaint provides a comprehensive list of information and purported conflicts of interest that EBG allegedly failed to disclose:

> EBG breached its duty to ATG when it failed, prior to undertaking its representation of ATG in connection with ATG's joint bid and purchase of MMT assets, to adequately disclose that:
>
> (a)     EBG had participated in a joint defense agreement in connection with the Federal Investigations and in the MMT Litigation;
>
> (b)     EBG had provided direct legal representation to MMT in the Federal Investigations;
>
> (c)     EBG was representing Nagel in the MMT Litigation.
>
> (d)     among the issues raised in both the Federal Investigations and the MMT Litigation were whether there were serious problems with MMT's CEP/Q-CEP technology;
>
> (e)     among the issues raised in the Federal Investigations and the MMT Litigation, were the honest and credibility of MMT officers and directors, including Preston and Nagel;
>
> (f)     McConchie had outlined, in the McConchie Letter, his specific claims regarding serious defects with MMT's CEP/Q-CEP technology and related assets;
>
> (g)     McConchie alleged, in the McConchie Letter, matters going to the honesty and credibility of, among others, Nagel; and
>
> (h)     EBG possessed a pecuniary interest in MMT's bankruptcy estate, as evidenced by its Proof of Claim.

Amended Complaint (Proposed), ¶ 66.

Christopher Nagel in preparation for testimony before the House Commerce Committee, which was investigating the letting of government contracts to MMT. These MMT employees had indemnification agreements with MMT pursuant to which MMT agreed to pay their legal fees in connection with these federal investigations, and EBG invoiced MMT for the legal services it rendered to the employees. EBG did not, however, represent MMT itself.

These facts are supported by the testimony of each witness in a position to know, including Carole Schwartz Rendon, the EBG attorney who the Trustee alleges provided the legal services to MMT, and Ethan Jacks and Eugene Berman, former inside counsel to MMT. *See* Rendon Dep. at 9-10; 12-18 (Ex. A hereto); Berman Dep. at 21-24 (Ex. B hereto); Jacks Dep. at 16-17, 20-21 (Ex. C hereto).

The Trustee has alleged in his proposed Amended Complaint that an attorney-client relationship between EBG and MMT is implied by reason of MMT having sought and EBG having in fact provided legal advice. *See* Amended Complaint (Proposed) ¶ 28. At this point in the case – after full discovery on this Phase I issue, this new allegation must be assessed in light of the facts of record in this case -- not the mere possibility that the Trustee might some day develop some facts in discovery. The proposed amendment is futile because the record will not bear the inference that EBG offered legal advice to MMT or that MMT relied upon EBG for the same. In fact, the undisputed facts with respect to the circumstances of EBG's engagement to represent MMT employees clearly suggest otherwise. Moreover, while the record reflects communications between EBG attorney Carole Schwartz Rendon and MMT's in-house and outside lawyers, the undisputed testimony is that these discussions were limited to logistical issues, such as scheduling and budget. Jacks Dep. at 69; Berman Dep. at 45-47; Rendon Dep. at 47-48. Ms. Rendon also testified that there were limited discussions with respect to the coordination of the prepared statements of Christopher

Nagel and other MMT officers to the House Commerce Committee.  Rendon Dep. at 51-52.  The

record does not support the conclusion that MMT sought legal advice and EBG either provided that

advice or caused MMT to believe that such advice would be forthcoming.  *See, e.g., DeVaux v.*

*American Home Assurance Co.*, 387 Mass. 814 (1983).[9]

Finally, even if somehow it were determined that an attorney-client relationship had been

formed between EBG and MMT during the late 1997 through early 1998 time frame, this would not

have created an obligation to disclose that former attorney-client relationship to ATG in November

1998.  Rule 1.9 of the Massachusetts Rules of Professional Conduct governs an attorney's obligation

to disclose prior representations to a new client.  It provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent
> another person in the same or a substantially related matter in which that person's interests
> are materially adverse to the interests of the former client unless the former client consents
> after consultation.

Mass. Rule of Professional Conduct 1.9(a).  Even assuming that the two matters (federal

investigations of MMT campaign finance and government contracting procedures, on the one hand,

and an acquisition of certain assets from a bankruptcy estate, on the other hand) were "substantially

related" for purposes of Rule 1.9 – which is to be doubted -- the disclosure obligation runs solely to

the former client, whose client confidences could be perceived to be at risk, and not to the new

client.  There would have been no obligation to make any disclosure to ATG, and any cause of

action that might arise out of a violation of the rule would belong to the MMT Trustee, not ATG.

---

[9]      The Trustee may point to a memorandum in which Ms. Rendon summarized for MMT's in-house and outside
counsel the questions the FBI and OIG were asking the MMT employees.  Ms. Rendon provided this information to
MMT with her clients' permission and because she believed it was in her clients' best interests to do so.  Rendon Dep. at
21-22.  In one paragraph, Ms. Rendon highlights what she thought might be areas of concern for MMT.  This paragraph
of informal observations is not legal advice, and, within the context of Ms. Rendon's representation of the MMT
employees, insufficient to create reasonable reliance by MMT.  The record lacks evidence that MMT requested or relied
upon what Ms. Rendon wrote or upon EBG, generally, to provide it legal advice.  *See* Berman Dep. at 32-39; Jacks Dep.
at 41-47.

**B.**     **Failure To Disclose Representation Of Nagel In MMT Litigation.**

The Trustee has also added the new claim that EBG breached a duty owed to ATG when it failed to disclose to ATG that it had represented Christopher Nagel in the MMT Litigation.  It is, however, undisputed that EBG did not commence its representation of Christopher Nagel in the MMT Litigation until after the ATG asset acquisition closed on December 1, 1998.  *See* EBG Mem. SJ at 10-12.

In November 1998, when EBG undertook to represent ATG in connection with the asset acquisition, it did not represent Christopher Nagel.  Mr. Nagel was at that time a former client, as EBG's former representation of him in Congressional testimony had ended.  It was as a former client that EBG sought and obtained a waiver of any conflict of interest that might arise as a result of its prior representation of him.  Because he was a former client, there was no obligation to disclose his identity to ATG, the firm's current client.[10]

Again, in this procedural posture (full Phase I discovery is complete on EBG's representation of Dr. Nagel prior to December 1, 1998), the Court must assess whether proof of this allegation is "solidly grounded in the record."  The record reflects that EBG attorney Michael Tuteur first met with Christopher Nagel on December 1, 1998 and did not commence representing Dr. Nagel in the MMT shareholder litigation until a few days afterwards, when (a) Dr. Nagel had asked EBG to undertake the representation and (b) MMT's directors' and officers' liability insurance carrier approved EBG as counsel to Dr. Nagel.  Tuteur Dep. at 23-26 (Ex. D hereto).  Mr. Tuteur's

---

[10]     It is not uncommon and often prudent to make disclosures in situations not required by the ethical rules, and, accordingly, EBG in fact notified Bill Hewitt of ATG that Christopher Nagel, an investor in Quantum Catalytics, had been a client of the firm.  Weckstein Dep. at 54 and Ex. 11 (Exs. E hereto).

testimony is corroborated by EBG's billing records, which reflect no time billed to Mr. Nagel's

defense in the MMT shareholder litigation until December 1, 1998.[11]

**C.    Failure to Disclose Participation in Joint Defense Agreements.**

The Trustee also claims that EBG breached its duty when it failed to disclose that it had

participated in joint defense agreements in connection with both the federal investigations and the

MMT Litigation.   As with the other new allegations, the Court must assess whether this new claim

finds substantial support in the record.   There is no question that the record does not support the

claim that EBG was party to a joint defense agreement in either matter.

With respect to the federal investigations, Ms. Rendon testified unequivocally that EBG was

not party to a joint defense agreement in the federal investigations, Rendon Dep. at 21-22, 52-57,

and there was no testimony to the contrary, see Berman Dep. at 30-31; Tuteur Dep. at 16-17; Jacks

Dep. at 33-34.   Ms. Rendon's explanation of the reasons why her employee clients were not parties

to the joint defense agreement is sensible and consistent with the facts of record:

> I believe that there were instances where my clients and MMT had common interests in
> connection with the investigation, which is why in some instances I felt comfortable sharing
> information with MMT, but no, I didn't believe that we were all similarly situated
> sufficiently that it would have made sense or been appropriate for my clients to be part of a
> joint defense agreement.   For starters, none of my clients were either subjects or targets of
> the investigation. That from a very immediate standpoint put them in a different position
> than many of the other players.

---

[11]    The Trustee may seek to rely on an email written by Mr. Tuteur in November 1998, in response to a conflicts
inquiry generated by EBG's undertaking to represent ATG in the asset acquisition.  Mr. Tuteur responded to an inquiry
about the status of EBG's representation of former MMT employees with the comment that he "continued" to represent
Dr. Nagel in shareholder litigation, although he had in fact not yet represented Dr. Nagel at all.  Mr. Tuteur explained that
he had phrased the memorandum that way because he had already had discussions with Carole Schwartz Rendon about
possibly representing Dr. Nagel and had already received (from Ms. Rendon, who had moved to Ohio) two memoranda
prepared by Bingham Dana LLP, counsel to all defendants in the MMT Litigation.  Tuteur Dep. at 37-39.  As he had
engaged in preliminary discussions about the possibility of representing Dr. Nagel (albeit with Ms. Rendon, not with Dr.
Nagel), Mr. Tuteur thought it prudent "to examine the question about whether the preliminary pre-representation status
affected Epstein Becker's potential representation of ATG."  *Id.* at 38.  This memorandum, considered in light of Mr.
Tuteur's explanation and the other compelling evidence that EBG did not commence representing Dr. Nagel in the MMT
Litigation until after December 1, 1998, does not provide the "substantial evidence" of liability that the Trustee needs at
this juncture.

Rendon Dep. at 55-56.  *See Wellman v. Willis*, 400 Mass. 494, 499 (1987)(no joint defense between company and its employees when FTC investigation focused on owners and employees were not targets).  The fact that Ms. Rendon, with her clients' permission, sent MMT's in-house and outside counsel a memorandum about the employee interviews does not evidence a joint defense agreement:  Ms. Rendon testified that she sent the memorandum because MMT and its employees had "common interests" and sharing information was in her clients' best interests.

The allegation that EBG was party to a joint defense in the MMT Litigation prior to December 1, 1998 also finds no support in the record.  Mr. Tuteur, who testified that he did not even represent Mr. Nagel until after the ATG asset transaction had closed, *see supra*, also testified that EBG was not party to a joint defense agreement with the other defendants in the MMT Litigation prior to the closing of the ATG asset acquisition on December 1, 1998, Tuteur Dep. at 38.

Even if EBG had engaged in a joint defense in either of these matters, that would not without more have created an attorney-client relationship between MMT and EBG.  Moreover, as discussed above, any expectation of confidentiality that a joint defense may have created would have meant that the subsequent representation of ATG would need to be disclosed to MMT, *see* Massachusetts Rule of Professional Conduct 1.9, but would not have required any disclosure to ATG.

### D.    Failure to Disclose Pecuniary Interest in MMT Bankruptcy Estate.

Finally, the Trustee proposes to add the entirely new claim that EBG breached a duty owed to ATG when it failed to disclose that it had previously submitted a proof of claim in the MMT bankruptcy proceedings.  The theory apparently is that, as a creditor in the MMT bankruptcy, EBG had a pecuniary interest in maximizing the amount the MMT Trustee received for the CEP assets.

This theory is no better grounded in the record of the case than those previously discussed.  There is no evidence in the record that EBG's corporate attorney, Jarvis  Kellogg, was aware that

14

there was a proof of claim filed in the MMT bankruptcy when he handled the ATG asset acquisition; indeed, he testified that he was not even aware of EBG's prior representation of the MMT employees until January or February 1999, Kellogg Dep. at 22-23 (Ex. F hereto). Nor is there any evidence that Mr. Kellogg's loyalties were not completely with ATG in his handling of the asset acquisition or, put another way, that anything would have occurred differently if there had not been a proof of claim on file in the MMT bankruptcy.

## III.    PLAINTIFF'S PROPOSED AMENDMENT IS NOT TIMELY AND THE APPARENTLY STRATEGIC DELAY HAS PREJUDICE EBG.

A substantial number of the facts that the Trustee has "corrected" in or added to his proposed Amended Complaint were at his disposal – had he only troubled to look at his own documents -- at the time he drafted his initial Complaint. (For instance, the Trustee has claimed that the documents "proving" EBG's participation in a joint defense were produced to him by the MMT Trustee in early April 1996. In fact, the Trustee produced those documents to EBG in late 1995.) Despite this delay, however, by the time depositions in this case commenced, in April 1996, the Trustee's focus had turned to issues of conflict of interest, and they dominated his questioning at the depositions in this matter. The Trustee was in a position to seek to amend his Complaint in this matter well before he did.[12] However, despite the imminence of the summary judgment deadline, and its knowledge that EBG was preparing a motion for summary judgment, the Trustee waited until two weeks *after* EBG filed and served its motion for summary judgment to move to amend his complaint.

There was no apparent reason for this delay, except perhaps a wish to review EBG's legal arguments on summary judgment before preparing an amended complaint. Allowing this late amendment will require EBG to submit an entirely new set of summary judgment papers, to address

---

[12]        It does not appear that plaintiff waited (or needed to wait) until Carole Schwartz Rendon's deposition was completed before drafting the proposed Amended Complaint, as the allegations of the Complaint are at odds with

claims that the Trustee was in a position to assert much earlier. While not as important as the futility of the proposed amendments, this conscious tardiness and the unnecessary work it has caused EBG are factors the Court may consider in ruling on the motion to amend.

## **CONCLUSION**

For all of the foregoing reasons, EBG requests that the Trustee's Motion to Amend Complaint be denied.

EPSTEIN BECKER & GREEN, P.C.


___/s/ Marjorie Sommer Cooke_____
Marjorie Sommer Cooke (BBO#097800)
Paula M. Bagger (BBO#547703)
COOKE, CLANCY & GRUENTHAL, LLP
265 Franklin Street
Boston, MA  02110
(617) 428-6800


Dated: July 7, 2006

## **CERTIFICATE OF SERVICE**

I, Paula M. Bagger, hereby certify that service upon plaintiff's counsel was effected through the Court's CM/ECF system this 7th day of July 2006.


____/s/ Paula M. Bagger_____
Paula M. Bagger

---

Ms. Rendon's testimony in every particular. *See supra* Part I.

                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                          - - -


Robert I. Hanfling,        )
Chapter 11 Trustee for     )
ATG, Inc., and ATG         )
Catalytics, LLC,           )
                           )
           Plaintiffs,     )
                           )
      vs.                  )   Case No: 05-10077-RGS
                           )
Epstein, Becker & Green,   )
P.C., et al.,              )
                           )
           Defendants.     )

                          - - -



     Deposition of Carole Schwartz Rendon, a

witness, herein, called by the defendants for

direct examination pursuant to the Federal Rules of

Civil Procedure, taken before Constance Versagi,

Notary Public in and for the State of Ohio, at the

offices of Kushner & Rendon, 2680 BP Building,

Cleveland, Ohio on Tuesday, May 9, 2006, commencing

at 9:50 a.m.

                          - - -

2fd1eabc-05d5-4056-8827-0834d05023d0

1    was then contacted and I don't recall who the

2    exact contact was, to see if I would be

3    interested in representing to extent that the

4    employees wanted me to, certain of the

5    employees of Molten Metal Technology.

6    Q    When you say you were contacted, that was by

7         somebody at Molten Metal Technology?

8    A    I believe ultimately Karen may have called me

9         initially to see if I was available.  Then

10        ultimately there was a discussion with

11        somebody I can't recall who at Molten Metal

12        Technology.

13   Q    Did you know Karen Green from the U.S.

14        Attorney's office?

15   A    Correct.

16             (Exhibit B

17             marked for identification.)

18   Q    Placing before you, Miss Rendon, a document

19        marked as Exhibit B in this deposition, can

20        you identify that document?

21   A    It is a letter that I sent to one of the

22        Molten Metal employees that I represented by

23        the name of James Howie, H-O-W-I-E, with at

24        least one attachment, although the letter of

25        reference says two attachments.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 10

1   Q    Did James Howie ultimately become a client of

2        yours?

3   A    Yes, he did.

4   Q    I call your attention to the second sentence

5        of the letter where it says the first -- I'll

6        read you the first two sentences.  Enclosed

7        herein please find two important items.  The

8        first is a letter addressed to you that

9        formally details your desire to retain

10       Epstein, Becker & Green, PC to represent you.

11            Is the document that is attached to the

12       first letter, is that the attachment that is

13       referenced in that second sentence?

14  A    Yes.

15  Q    What is that letter, that second letter?

16  A    It is a retention agreement between James

17       Howie and Epstein, Becker & Green.

18  Q    Did you send out more than one letter in the

19       form of Exhibit B?

20  A    Yes, I'm fairly confident that every one of my

21       clients received a letter that looked very

22       similar to Exhibit B, if not identical,

23       particularly the retention agreement portion.

24            (Exhibit C

25            Marked for identification.)

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 12

1         with respect to this draft memorandum?

2    A    Because I was going to be providing

3         information to the lawyers representing other

4         individuals and other parties.

5    Q    Did you in fact receive the authorization then

6         from each client from whom you requested

7         authorization?

8    A    Yes, I did.

9    Q    Do you recall whether any of the clients

10        provided input as requested?

11   A    I don't recall one way or the other.

12            (Exhibit D

13            Marked for identification.)

14   Q    I show you what is marked as Exhibit D to this

15        deposition, Miss Rendon, ask you if you can

16        identify it?

17   A    This is a letter that I sent to Bill Haney on

18        August 18, 1997, regarding Molten Metal

19        Technology's agreement to indemnify its

20        employees.

21   Q    Who is Bill Haney?

22   A    Bill Haney was the chairman, president and CEO

23        of Molten Metal Technology.

24   Q    Why did you send the letter?

25   A    Because we had reached an agreement by which

1          Molten Metal Technology agreed to pay for

2          attorney's fees for its employees, and this

3          was detailing my understanding of what they

4          had agreed to do.

5     Q    If you look at the first paragraph of that

6          letter, at the end of the first paragraph

7          there is a list of names; do you see that?

8     A    Yes, I do.

9     Q    Were those the Molten Metal employees whom you

10         represented at that point?

11    A    That's correct.

12    Q    Had each of those Molten Metal employees

13         received a letter the form of Exhibit B?

14    A    They ultimately did.  They may or may not have

15         received them by that date, the date of August

16         18, 1997.

17    Q    In fact, is it fair to say they were more

18         likely to have received it on August 25, 1997,

19         according to Exhibit B?

20    A    Yes, based on Exhibit B, I would say that is

21         fair.

22    Q    Did you come to represent other Molten Metal

23         Technology employees later?

24    A    Yes, I did.

25    Q    Did you send engagement letters as you came to

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 14

1         represent them?

2    A    Yes, I did.

3    Q    Were terms of their representation by Epstein

4         Becker the same as those reflected in

5         Mr. Howie's engagement letter?

6    A    Yes.

7              (Exhibit E

8              Marked for identification.)

9    Q    Showing you what is marked as Exhibit E in

10        this deposition, do you recognize this

11        document?

12   A    Yes, I do.

13   Q    Can you tell me what it is?

14   A    This is an internal Molten Metal Technology

15        letter, agreement from its chief general

16        counsel to Jim Howie dated August 18, 1997,

17        detailing the fact that Molten Metal

18        Technology has agreed to pay for Mr. Howie's

19        legal fees in connection with the

20        investigation.

21   Q    I draw your attention back to Exhibit D for a

22        moment.  The second page of Exhibit D, the

23        last paragraph of the second page where it

24        says in addition please provide to me for my

25        file a copy of this letter -- of the letter, a

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 15

1    sample of which is attached as Exhibit A to

2    this letter, executed by each of the employees

3    listed above, setting forth Molten Metal

4    Technology's agreement to indemnify them for

5    legal expenses incurred in connection with the

6    ongoing investigation detailed above; do you

7    see where it says that?

8  A   Yes.

9  Q   Do you know whether Exhibit E is that formal

10    letter?

11  A   To the best of my memory the body of it is.  I

12    do believe that I gave them a form of a letter

13    that I thought would be sufficient and

14    effective for my clients.  Then Mr. Jacks put

15    it in final.

16  Q   You are shown as a carbon copy on Exhibit E?

17  A   Yes, I am.

18  Q   Did you receive one of these for each of the

19    employees that you represented?

20  A   Yes, I did to the best of my memory.

21  Q   Did you meet with any of the employees before

22    they retained you?

23  A   Yes, I believe I met with all the employees

24    before they retained me.

25  Q   You had discussions with them pre-retention?

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 16

1    A      Yes, I did.

2    Q      Can you summarize that discussion?

3    A      Yes.  For the record it's my understanding

4           that with respect to my communications with my

5           clients who have not waived their

6           attorney/client privilege, that the substance

7           of those communications will be protected

8           under the confidentiality order.

9                  In general terms, I told them about

10          myself, I told them about my law firm.  Told

11          them what I knew at that point in time about

12          the nature of the investigation.  Explained to

13          them that Molten Metal Technology had agreed

14          to indemnify its employees, so that they would

15          not have to personally pay out of pocket

16          expenses for legal representation in

17          connection with the investigation.  Answered

18          questions that they had.

19                 Told them that it was entirely their

20          decision as to whether or not they wanted to

21          retain me to represent them in connection with

22          the investigation.  That if they did want to

23          retain me, in each instance I was also happy

24          to represent each of these individuals in

25          connection with the investigation.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 17

1  Q   Was there any discussion of the fact you were

2      representing a number of different employees

3      in connection with the representation?

4  A   Yes, there was.

5  Q   What was that?

6  A   I explained to them the potential for

7      conflicts that can arise in situations where

8      an attorney is representing more than one

9      individual.  Detailed for them all of the

10     potential conflicts that I could at that point

11     think of, with respect to the possibility of

12     multiple representation and the issues

13     associated with a client deciding to retain

14     counsel who was also representing other

15     individuals.  Made sure that they understood

16     all of those issues, answered any questions

17     that they had with respect to concerns

18     regarding multiple representation.

19 Q   To your knowledge, were any employees required

20     by Molten Metal Technology to use you as

21     counsel?

22 A   They were not.

23 Q   Did Epstein, Becker and Green at any point

24     represent Molten Metal Technology, itself?

25 A   No.

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 18

1   Q    Did you ever send Molten Metal Technology an
2        engagement letter?
3   A    No, I did not.
4   Q    Do you have any information why the employees
5        retained separate counsel from Molten Metal
6        Technology?
7   A    In my experience it's pretty standard in
8        connection with these large scale criminal
9        investigations.
10            Ordinarily the government will object
11       to a single attorney representing both the
12       company and its employees, because from the
13       government's perspective the employees and the
14       company do not necessarily share a mutuality
15       of interest.  Normally, they will not permit
16       an attorney who represents the company to
17       participate in voluntary interviews of
18       employees as their counsel.
19            In this situation, as is typical, good
20       corporate citizens don't want their employees
21       having to deal with this on their own in the
22       sense of having to either pay for an attorney
23       out of their own pocket, or potentially appear
24       for an interview and/or Grand Jury appearance
25       without a lawyer if they can't afford to

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 21

1          draft form in the document that has been

2          marked as Exhibit C?

3   A    It appears to be, yes.

4   Q    Was it your understanding that Molten Metal

5          Technology would keep the contents of this

6          memorandum confidential?

7   A    To the extent that they could.  I was hopeful

8          that they wouldn't provide a copy to the

9          Boston Globe.  I did not think it would be in

10         anybody's best interest if they did.

11             Yes, I hoped that they would keep it

12         confidential.  Could they guarantee that if

13         they received a subpoena, weren't able to keep

14         it confidential, no.

15  Q    Did you consider it in your client's best

16         interest to send they memorandum to Molten

17         Metal Technology?

18  A    Yes, I did.

19  Q    Why was that?

20  A    Among other things what my clients wanted was

21         for Molten Metal Technology to stay a viable

22         vibrant business and survive the

23         investigation.  By providing, in general

24         terms, information to the attorneys who were

25         representing Molten Metal Technology and

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 22

1    others, I believe that I would help further

2    that important objective that my clients had.

3              In addition, I was hopeful that to the

4    extent that I was able to provide information,

5    that it was in my client's best interest to

6    provide, that I might in turn also get

7    information if it was in somebody else's

8    client's best interest to provide it to me.

9    Although I don't have -- there was no

10   expectation this was going to be a quid pro

11   quo.  Just my internal analysis that when

12   people are cooperative, that sometimes that

13   can be beneficial to the clients.

14   Q    Did you believe that you and your clients were

15        party to a joint defense agreement with Molten

16        Metal Technology?

17   A    No, we were not.

18             (Exhibit G

19             Marked for identification.)

20   Q    I place in front you what has been marked as

21        Exhibit G for this deposition.  Can you

22        identify it?

23   A    This is a retainer agreement between Epstein

24        Becker & Green and Christopher Nagel, dated

25        September 23, 1997.

Page 47

1    Q    You don't have any independent recollection of

2         this document?

3    A    No, I do not.

4    Q    Does this refresh your recollection in any way

5         whether or not Ethan was your initial contact

6         at MMT?

7    A    It does not.

8    Q    So much for that document.

9              You indicated that you did speak on a

10        periodic basis, I'm characterizing what you

11        said, periodic basis with Mr. Jacks; is that

12        correct?

13             MS. BAGGER:       Objection.

14   A    That is a fair characterization.

15   Q    What were the nature of your discussions with

16        Mr. Jacks?

17             MS. BAGGER:       Generally?   Object to

18        the question.

19   A    To the best of my memory, if I looked at my

20        time sheets I might be able to give you more

21        detailed information, I believe that I talked

22        to Mr. Jacks about MMT's agreement to

23        indemnify its employees.

24             I believe I talked to Mr. Jacks on

25        occasion regarding my invoices which were sent

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 48

1      to MMT pursuant to that indemnification

2      agreement.

3          I believe I talked to Mr. Jacks on

4      occasion when an employee would contact him to

5      let him know that they had been contacted by

6      either the FBI or DOE, asked him basically

7      what do I do next.

8          I talked to Ethan Jacks prior to

9      Mr. Nagel's appearance before Congress.

10  Q  What did you discuss with Mr. Jacks in

11     connection with Mr. Nagel's appearance before

12     Congress?

13  A  Who had been asked to testify.  Mr. Jacks may

14     have provided me with a copy of correspondence

15     from Congress.  Other than that I can't off

16     the top of my head think of any other subject

17     matters of conversations with Mr. Jacks.

18  Q  Did you have any discussions at all with

19     Mr. Jacks concerning strategic matters related

20     to representation of either MMT or individual

21     employees of MMT?

22  A  Strategic matters, not that I recall.  I do

23     recall talking to him about the fact that

24     certain employees had agreed to appear for

25     interview.  Some of those interviews took

Page 51

1         looking at a document I can't recall his exact

2         position.

3    Q    Did you have any direct dealings with

4         Mr. Berman?

5    A    You mean conversations?

6    Q    Yes.

7    A    Yes, I did.

8    Q    Do you recall how periodically you would speak

9         with Mr. Berman?

10   A    Off the top of my head, no.  I did speak to

11        him on occasion.

12   Q    What were the nature of your discussions with

13        Mr. Berman?

14   A    To the best of my memory they would have been

15        similar to the nature of my conversations with

16        Mr. Jacks.

17   Q    Again, do you recall if you had any

18        discussions concerning strategic matters with

19        Mr. Berman?

20   A    Not that I recall.  I don't recall

21        conversations about planning any kind of

22        strategy.  The only thing that might fit into

23        that category is a discussion in which

24        Mr. Berman may have participated in connection

25        with the Congressional hearing, sort of making

Page 52

1          sure that everybody wasn't going to be saying

2          the same thing.  So that different people who

3          had been asked to speak, would focus on

4          different general themes, rather than each

5          person repeating what the person before him

6          had already said.

7     Q    Paula asked you a little earlier about a joint

8          defense agreement.  I understand it's your

9          testimony that you were not party to a joint

10         defense agreement?

11    A    That's correct.

12    Q    Was your firm a party to a joint defense

13         agreement, Epstein, Becker & Green?

14    A    No, it was not.

15    Q    Were your clients parties to a joint defense

16         agreement?

17    A    No, they were not.

18    Q    Do you have an understanding whether or not

19         other parties involved in the FBI/DOE

20         investigation were parties to a joint defense

21         agreement?

22    A    Yes, I believe in the documents that I

23         reviewed that have been produced in this case,

24         there was a written joint defense agreement

25         executed by a number of the other parties to

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 53

1        the investigation.

2    Q   When you say you weren't or EBG wasn't, or

3        your clients weren't a party to a joint

4        defense agreement, are you including in that

5        any nonwritten agreements as well, informal

6        agreements?

7    A   There was no joint defense agreement that I

8        entered into.  I did on occasion provide

9        information to other lawyers, that I hoped

10       they would keep confidential, when I thought

11       that it was in my client's best interest to do

12       that.  I may have loosely used the terminology

13       with them joint defense agreement.  Not in the

14       formal sense of the word.  Just in an informal

15       and imprecise use of language by lawyers.

16   Q   What does the term joint defense agreement

17       mean to you, what is your understanding of a

18       joint defense agreement?

19   A   My understanding of a joint defense agreement

20       is that you agree that your clients have

21       common interest in a particular piece or

22       pieces of litigation.  That their position in

23       connection with that litigation is

24       sufficiently similar that you can work

25       together as if you were jointly representing

Page 54

1    the clients.  Share information among one

2    another, with an agreement that it will not be

3    shared outside of that circle.

4         That if there is a subpoena issued for

5    example for that information, that you will

6    notify all of the other attorneys, and jointly

7    resist the production of those records.

8         That in the event that a client agrees

9    for example to cooperate with the government,

10   you will immediately withdraw from the joint

11   defense agreement, notify the other parties

12   that you are withdrawing.  Ordinarily return

13   to them any information that you have received

14   as a result of the joint defense agreement.

15        When I've been involved in joint

16   defense agreements we've often circulated

17   drafts of briefs or documents to one another

18   for input from other attorneys before they are

19   filed.

20        I've been involved in joint defense

21   agreements where I have filed pleadings on

22   behalf of both myself and other lawyers'

23   clients, but as part of the joint defense

24   agreement I was assigned the task of preparing

25   a particular pleading.  They can contain other

Page 55

1          types of things.

2                    In essence you are drawing a circle

3          around a group of people, considering that you

4          are all in this together, representing your

5          clients basically jointly as part of joint

6          defense.

7     Q    Do you believe that that, referring to the

8          last characterization you describe being all

9          in it together, you don't believe that applied

10         in connection with MMT employees and other

11         entities involved in the FBI/DOE

12         investigation, specifically MMT itself?

13    A    I believe that there were instances where my

14         clients and MMT had common interests in

15         connection with the investigation, which is

16         why in some instances I felt comfortable

17         sharing information with MMT, but no, I didn't

18         believe that we were all similarly situated

19         sufficiently that it would have made sense or

20         been appropriate for my clients to be part of

21         a joint defense agreement.

22                    For starters, none of my clients were

23         either subjects or targets of the

24         investigation.  That from a very immediate

25         standpoint put them in a different position

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 56

1          than many of the other players.

2     Q    Do you believe that a joint defense agreement

3          would have to be something executed in

4          writing?

5               MS. BAGGER:      Are you asking her

6          generally?

7               MR. FLEISCHER:    Yes, what her

8          understanding is.

9     A    I have a preference for written joint defense

10         agreements in appropriate cases, so that there

11         is a record of exactly what it is you have

12         agreed to do and not to do.

13    Q    I guess what I'm asking you is, do you believe

14         it's absolutely necessary for such an

15         agreement to be in writing?

16              MS. BAGGER:      I will object.

17    A    As with any contract, you can have an

18         enforceable oral contract.  Most often in my

19         experience as a criminal defense attorney,

20         when you entered into a joint defense

21         agreement, it is ordinarily in writing.  It's

22         also something you have to discuss with your

23         client, get their authorization to participate

24         in.

25    Q    Have you seen a copy of the other joint

2fd1eabc-05d5-4056-8827-0834d05023d0

Page 57

1      defense agreement between the other parties in

2      the litigation at any point in time?

3  A   I saw it in connection with my preparation for

4      my deposition.  I don't recall whether or not

5      I ever saw it prior to that.  I don't believe

6      so because I didn't have a recollection of

7      having seen it.  I do recall knowing that they

8      had a joint defense agreement.  I don't recall

9      ever seeing it in writing.

10 Q   Going to your recollection as it was back in

11     1997, who do you recall were the parties to

12     that joint defense agreement?

13         MS. BAGGER:       Objection to the form

14     of the question.

15 A   I don't know that I'll be able to tell you

16     everybody.  Certainly I understood that Molten

17     Metal Technology, Bill Haney, Vic Gatto I

18     believe, Ethan Jacks, Eugene Berman to the

19     best of my memory were all parties to a joint

20     defense agreement.

21         MR. FLEISCHER:    Let's mark K.

22         (Exhibit K

23         Marked for identification.)

24 Q   Miss Rendon, the court reporter has handed you

25     what has been marked as Exhibit K.  I ask you

2fd1eabc-05d5-4056-8827-0834d05023d0

# O'BRIEN &LEVINE

Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert Hanfling v. Epstein, Becker & Green, et. al.

**Transcript of the Testimony of:**

# Eugene Berman

# April 13, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**



Cindy Berglund   1-18971

21

```
 1      recollection is the company and individuals in the

 2      company did receive letters.  I do not recall reviewing

 3      any letter to any individual employee of the company --

 4      Q.   Do you --

 5      A.   -- other than my own.

 6      Q.   Do you recall reviewing any subpoena in connection

 7      with the investigation to any employees of the company?

 8      A.   I did not.

 9      Q.   And did you actually testify?

10      A.   I did.

11      Q.   Was that under oath?

12      A.   I did.

13      Q.   How long were you testifying for in terms of days?

14      A.   One day before the house committee, and I don't

15      recall which committee or subcommittee, and before a

16      federal grand jury.

17      Q.   Do you recall the -- strike that.

18           Do you recall who represented the various, any of

19      the various employees of Molten Metal Technology that

20      had received subpoenas or letters to testify?

21      A.   Yes.

22      Q.   Who was that?

23      A.   I can't say comprehensively I recall, but Bill

24      Haney was represented by Hale and Dorr.  Karen Green, I
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

22

```
 1        believe, was the individual.  Vic Gatto was represented

 2        by a guy named Touhey who is now the baseball

 3        commissioner, I think it's Bill Touhey.  It doesn't

 4        matter, and a number of individuals in the company were

 5        represented by Epstein, Becker and Green.

 6        Q.   Do you recall the specific attorney that

 7        represented the individuals?

 8        A.   I don't recall her full name.

 9        Q.   If I said the name Carole Schwartz Rendon, would

10        that refresh your recollection?

11        A.   It seemed like her name changed midway, but, yes,

12        Carole is the individual that I recall.

13        Q.   Do you know why MMT's counsel, Latham and Watkins,

14        didn't represent everyone connected with MMT in

15        connection with the investigation?

16        A.   Various employees had either employment agreements

17        or the company policy was that if someone was accused

18        of any wrongdoing in the course of their employment,

19        the company had agreed to reimburse those individuals

20        for obtaining counsel and in that context, individuals

21        who chose to be represented, in fact, their attorney's

22        fees were paid and that was the case with regard to the

23        individuals who were represented by Epstein, Becker and

24        Green.
```

23

```
1        Q.    Do you know why Latham and Watkins didn't

2        represent any of those individuals?

3        A.    I do not.

4        Q.    Do you recall the time frame when Epstein, Becker

5        and Green first got involved in representing the

6        individuals in connection with the investigations?

7        A.    The only time frame I remember is 1998 because at

8        that time, one of my responsibilities was to review

9        bills.

10       Q.    Reviewing bills from who?

11       A.    From various counsel.  We were operating under

12       Chapter 11 and our expenditures were being reviewed by

13       the creditor's committees and we had to present to them

14       projected expenditures and document expenditures that

15       were made, including expenditures of this type which

16       were the ones that I was more familiar with for the

17       representation of individuals in the context of these

18       investigations.

19       Q.    Prior to MMT's bankruptcy, did you review bills

20       for counsel, outside counsel then?

21       A.    No.

22       Q.    So it was really only after the bankruptcy that

23       you started to --

24       A.    Let me clarify that, if I may.  I did review
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

24

1          environmental.  My responsibilities were for

2          environmental permitting and we had counsel in Texas or

3          counsel in Tennessee who did environmental work for us

4          and that was part of my budget and part of my

5          responsibilities.  Sometime in 1998 because I was

6          involved and there were fewer people in the company, I

7          was given the responsibility of reviewing these bills,

8          as well.

9     Q.   Do you recall how -- well, strike that.

10         Were you at all involved in the decision to hire

11         Epstein, Becker and Green to represent the individuals

12         in --

13         ATTY. BAGGER:  Objection.  Foundation.

14    Q.   -- in connection with the investigation?

15         ATTY. BAGGER:  Objection.  Lack of foundation for

16         the question.

17         THE WITNESS:  I was not involved in the decision

18         on anybody's part to hire Epstein, Becker and Green.

19         My knowledge is limited to the review of bills of

20         individuals, billings from Epstein Becker for

21         individuals who had elected, for whatever reason, to be

22         represented by Epstein Becker.

23    Q.   Do you recall whether you had any discussions

24         directly with Ms. Rendon prior to her being retained by

30

1        party to a joint defense agreement of any form in

2        connection with the investigations?  I'm not

3        questioning you on the document, by the way.

4        A.    Okay.  I'm not sure I have a -- I certainly don't

5        have a specific recollection of that.

6        Q.    What do you recall generally then?

7              ATTY. BAGGER:  About joint defense agreements?

8              ATTY. FLEISCHER:  About joint defense agreements.

9              THE WITNESS:  I have to say my recollection is

10       unclear on that.  Just in my general experience with

11       multi-party cases, joint defense agreements are common.

12       I wouldn't be surprised if there was one, but I don't

13       recall there specifically being one.

14             ATTY. FLEISCHER:  I'm going to mark this as the

15       next document here.

16             (Exhibit 3, 10/23/97 FAX TRANSMISSION, marked for

17             identification.)

18

19       Q.    Mr. Berman, as you look at that document, I would

20       draw your attention to the "re".

21             ATTY. BAGGER:  On the first page?

22             ATTY. FLEISCHER:  Yes.

23             THE WITNESS:  Okay.

24       Q.    And also to the subject, the subject line on the

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

31

1        second page.   I believe you've looked at that?

2        A.   Yes.

3        Q.   Does this refresh your recollection whether there

4        was a joint defense agreement or arrangement concerning

5        the investigations?

6             ATTY. BAGGER:  Objection.

7             THE WITNESS:  I think I previously testified I

8        would not have been surprised if there is one, but my

9        actually testimony is I honestly don't recall that

10       there, in fact, was one.

11       Q.   And this document doesn't change your recollection

12       or refresh your recollection?

13       A.   It just confirms what I said a moment ago.  I

14       would not find this to be surprising.  It would suggest

15       there was one, but, again, I don't recall whether there

16       was or was not.

17       Q.   Do you have any reason to think there wouldn't

18       have been one?

19            ATTY. BAGGER:  Objection.

20            THE WITNESS:  I have no reason to know whether

21       there was or wasn't or why there was or wasn't a joint

22       defense agreement.

23       Q.   Do you have any recollection of whether or not

24       attorneys from Epstein, Becker and Green and

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

32

1          specifically Carole Schwartz Rendon, were communicating

2          directly with lawyers from Latham and Watkins

3          concerning the investigations?

4          A.   I have no knowledge.

5               ATTY. BAGGER:  Objection.  Foundation.

6               THE WITNESS:  I have no knowledge of that.

7               ATTY. FLEISCHER:  Let's mark this.

8               (Exhibit 4, 8/25/97 MEMO FROM CAROLE SCHWARTZ

9               RENDON, marked for identification.)

10

11         Q.   Okay.  Mr. Berman, you've just been handed what's

12         been marked as Exhibit 4, and if you could just take a

13         look at this document, please?

14         A.   Okay.

15         Q.   Do you have any recollection of having ever seen

16         this document before?

17         A.   I don't have a specific recollection of seeing

18         this document, no.

19         Q.   Do you have a general recollection of the matters

20         that are addressed in this memorandum?

21         A.   Let me be clear on how I'm answering this.  Yes,

22         the matters in here I'm certainly, as I previously

23         testified, that there were issues of campaign

24         contributions, it pertained to the PRDA, which was one

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

33

1      of the DOE contracts.

2      Q.    Do you recall what PRDA stands for?

3      A.    Planned Research Development Agreement or Program.

4      I'm not absolutely certain.

5      Q.    But you have no specific recollection of the

6      document itself?

7      A.    I do not.

8      Q.    Do you have any specific recollection of

9      discussing the matters raised in this memorandum with

10     Carole Schwartz Rendon?

11     A.    I have no recollection of discussing these matters

12     with Ms. Rendon.

13     Q.    And do you recall whether or not you had any hand

14     in drafting this document?

15     A.    It purports to be from Ms. Rendon and I appear to

16     be a recipient of it.  To answer your question, no.  I

17     have no recollection of me having a hand in drafting

18     this, no.

19     Q.    Do you recall if you have ever seen it in draft

20     form?

21     A.    I don't have a recollection of it.

22     Q.    Can you turn to Page 6 of this document, Exhibit

23     4?

24     A.    Yes.

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

34

```
1      Q.   And there is a section there that's titled, V, in

2      Roman Numerals, "Concerns"?

3      A.   Yes.

4      Q.   I would ask you if you could read that section

5      just a little closely to yourself and that runs onto

6      Page 7, through Points 1, 2, 3, 4 and 5.  Just let me

7      know when you've read those.

8      A.   Okay.

9      Q.   And now, turning back to Page 7, we'll go to the

10     first numbered point.

11     A.   Yes.

12     Q.   Do you know who Clyde Frank was?

13     A.   I have a general recollection that he was an

14     employee of the Department of Energy.

15     Q.   Now, Mr. Gatto, how do you pronounce his name?

16     A.   That's correct, Gatto.

17     Q.   Do you recall who represented Mr. Gatto in

18     connection with the investigations?

19     A.   Mr. Touhey.

20     Q.   He was not represented by Epstein, Becker and

21     Green?

22     A.   Not to my knowledge, no.

23     Q.   Do you recall having any discussions with

24     Ms. Rendon concerning the substance of Point 1?
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

35

1       A.    I do not.

2       Q.    Do you recall having any discussions with any of

3       the other officers or directors, employees of MMT

4       concerning the substance of the matters raised in Point

5       1?

6       A.    I do not.

7       Q.    Do you understand how the matter or the substance

8       of the matter raised in Point 1 would have affected

9       other individual employees of MMT?

10            ATTY. BAGGER:    Objection to the form of the

11      question.

12            THE WITNESS:    I do not.

13      Q.    With respect to Point 2, do you recall having any

14      discussion with Ms. Rendon concerning the substance of

15      Point 2?

16      A.    I do not.

17      Q.    Do you recall having any discussions with any

18      other officers or directors or employees of MMT

19      concerning the substance of the matter addressed in

20      point 2?

21      A.    I do not.

22      Q.    And do you have any understanding of how the

23      substance of the -- strike that.

24            Do you understand how the issue raised in Point 2

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

36

1        would directly affect clients of Ms. Rendon --

2            ATTY. BAGGER:  Objection.

3        Q.   -- in the investigation?

4            ATTY. BAGGER:  Objection.  Foundation.

5            THE WITNESS:  I do not.

6        Q.   Point 3, do you recall discussing the substance of

7        Point 3 with Ms. Rendon?

8        A.   I do not.

9        Q.   Do you recall discussing the substance of Point 3

10       with any other officers, directors or employees of MMT

11       with Ms. Rendon -- strike that question.

12           Do you recall discussing the substance of the

13       matter raised in Point 3 with any other officers or

14       directors or employees of MMT?

15       A.   I don't have any specific recollection of that.

16       Although, I do recall generally that discussions were

17       had about what the campaign contribution laws were and

18       what we needed to do to make sure we were legal in what

19       we did.

20       Q.   Do you recall who you might have had those

21       discussions with?

22       A.   No.

23       Q.   Could it have been with Ms. Rendon?

24       A.   No.  I thought your question was MMT employees.

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

37

1     Q.    I'm asking a different question now.

2           ATTY. BAGGER:   To which I object to.   Asked and

3     answered.

4     Q.    Do you have any understanding how the issue raised

5     in Point 3 would have directly affected Ms. Rendon's

6     clients in the investigation?

7           ATTY. BAGGER:   Objection.   Foundation.

8           THE WITNESS:   I do not.

9     Q.    Point 4, please.   Do you recall having any --

10    strike that.

11          Do you recall having any discussions with

12    Ms. Rendon concerning the issue raised in Point 4?

13    A.    I do not.

14    Q.    Do you recall having any discussions with any

15    other officers or directors or employees of MMT

16    concerning the issue raised in Point 4?

17    A.    Other than repeating what I said before,

18    contributions, whether they be cash or in kind, we were

19    sensitive and I would recall general discussions of

20    that issue for compliance reasons, but I don't recall

21    any specific conversations or with whom I might have

22    had that conversation within MMT.

23    Q.    Say that again.

24    A.    With MMT employees.   I have no such recollection

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

38

1          of any such conversations with Ms. Rendon.  I'm

2          answering that with regard to what I thought your

3          question was with regard to MMT employees.

4          Q.   Do you recall the specific MMT employees?

5          A.   I do not.

6          Q.   Do you have any understanding of how the issue

7          raised in Point 4 would have any effect on Ms. Rendon's

8          clients in the investigation?

9          A.   I do not.

10         Q.   And, lastly, I'm going to ask the same series of

11         questions with respect to Point 5.

12         A.   Certainly.

13         Q.   Do you recall having any discussions with

14         Ms. Rendon concerning the issues raised in Point 5?

15         A.   I do not.

16         Q.   Do you recall having any discussions with other

17         officers, directors or employees of MMT -- I'm sorry.

18         Strike that.

19             ATTY. BAGGER:  You keep saying other employees and

20         officers of MMT after asking about Ms. Rendon who is

21         not an officer or employee of MMT.

22             ATTY. FLEISCHER:  I struck the question and for

23         that reason.

24             ATTY. BAGGER:  Okay.

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

39

1       Q.    Do you recall having any discussions with any

2       officers or directors or employees of MMT concerning

3       the issues raised in Point 5?

4       A.    I do not.

5       Q.    Do you have any understanding as to how the issue

6       raised in Point 5 would have any impact on Ms. Rendon's

7       clients?

8             ATTY. BAGGER:  Objection.

9             THE WITNESS:  I do not.

10      Q.    We're done with that document.  You don't have to

11      look at it anymore.

12      A.    Thank you.

13            ATTY. BAGGER:  Anymore than you need to.

14            ATTY. FLEISCHER:  Off the record a second.

15

16            (Recess taken.)

17

18            ATTY. FLEISCHER:  Back on the record.  Mark this.

19            (Exhibit 5, JOINT DEFENSE DOCUMENT, marked for

20            identification.)

21

22      Q.    You've just been handed what's been marked Exhibit

23      5, I believe, Mr. Berman.

24      A.    Yes.

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

45

1      A.    I have no, you know, current recollection of it.

2      Although, I have no reason to think it's not an

3      accurate depiction of what -- well, it looks like my

4      signature at the bottom.

5      Q.    Turn to the fourth page.

6      A.    Fourth page of the whole document?

7      Q.    Yes, and what does that appear to you to be

8      there -- strike that.

9            What is it that you note there -- strike that, as

10     well.

11     A.    I want to make sure I'm looking at the right page.

12     Q.    There are the numbers RW852 in the lower

13     right-hand corner.

14     A.    Correct.

15     Q.    Do you see time entries for 2/27/98?

16     A.    I do.

17     Q.    Can you just take a look at those, read those to

18     yourself for a moment?

19         ATTY. BAGGER:  Can you read the Bates number

20     again?

21         ATTY. FLEISCHER:  RW852.

22         ATTY. BAGGER:  Thank you.

23         THE WITNESS:  Okay.

24     Q.    Who was J. Grabmeier?

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

46

1       A.    One of the accounting people at MMT.

2       Q.    He was an MMT employee?

3       A.    Correct.

4       Q.    Do you recall having -- and, again, do you recall

5       having any particular, any telephone conferences with

6       Carole Schwartz Rendon?

7       A.    Well, this certainly suggests I did have them.    To

8       answer your question specifically, I don't really

9       recall having those conversations.

10      Q.    And these -- the time entries that appear on this

11      document and there are several here that reference you?

12      A.    Correct.

13      Q.    None of them refresh your recollection as to

14      conferences with Carole Schwartz Rendon?

15          ATTY. BAGGER:   To whether there were conversations

16      or the context of the conversations?

17          ATTY. FLEISCHER:   I'm not asking about the

18      contents.   Just whether or not it refreshes his

19      recollection.

20          ATTY. BAGGER:   As to whether he had conversations

21      with Carole Rendon?

22          THE WITNESS:   As I said, I previously testified I

23      think that I knew who she was.   My job was to review

24      invoices for payment.   Reading this, the only further

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

47

1       refreshment of my recollection would be there were also

2       scheduling issues as far as when these people were to

3       be made available and when they were, you know, being

4       either subpoenaed to testify and I do -- I would

5       certainly think at least that's what the substance of

6       these entries might suggest.

7       Q.    So you do recall that you spoke with her directly

8       about scheduling the testimony of the individuals that

9       she represented?

10      A.    My recollection is most clearly that it was on

11      budgetary concerns, but I do have a general

12      recollection, and this somewhat refreshes it, that I

13      would have logically additionally spoke about

14      scheduling, availability and when these -- we had a

15      very small company at that point and getting these

16      people kind of pulled out of the office and tied up was

17      one of the concerns that I was also addressing, yes.

18      Q.    With respect to the budget, was there a set budget

19      for each of the firms involved or was there a

20      litigation budget?

21      A.    At some juncture there was a set budget that was

22      approved by the creditor's committee.  That's the only

23      strong recollection that I have.  Prior to that, prior

24      to let's say the Chapter 11 proceedings being

# O'BRIEN &LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert Hanfling v. Epstein, Becker & Green, et. al.

**Transcript of the Testimony of:**

# Ethan Jacks

# April 12, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**



Cindy Berglund   1-18972

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

16

```
1     A.   My recollection is that, and, again, I don't know
2          specifically what they were asked to do other than I do
3          recall that they were asked to provide, be available
4          for interviews and as to the number, I would hazard,
5          this is just my recollection, somewhere between ten and
6          twenty.
7     Q.   With respect to the individual employees, officers
8          and directors that were required to provide
9          information, did they have representation, do you
10         recall, in the investigation?
11    A.   I think that there were a group of individuals
12         who, like myself, retained personal counsel and we also
13         retained a woman named Carole something Rendon, who I
14         think was with Epstein Becker, I don't remember that
15         specifically, to represent a number of folks
16         individually except, I believe, we, the company, agreed
17         to pay the costs of that representation up to some
18         point or some amount, but I don't remember the details.
19    Q.   Do you think the name was Carole Schwartz Rendon?
20    A.   Yes.  That's correct.
21    Q.   Do you know why Latham and Watkins didn't assume
22         the role of representing individual officers, directors
23         and employees in the investigation?
24         ATTY. BAGGER:  Objection to the form of the
```

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

17

1      question as compound.

2           THE WITNESS:  I don't remember why and I -- I

3      don't remember why.  I can only assume now in

4      retrospect that there was some view that if Latham was

5      oriented to company counsel, that there would be a

6      reason to have somebody -- you know, a different lawyer

7      from a different law firm focused on individuals, but I

8      don't remember the specific reason.

9      Q.   Do you recall when about -- about when, excuse me,

10     EBG began to represent employees in the investigation?

11          ATTY. BAGGER:  Objection.  Foundation.

12          THE WITNESS:  "EBG" is Epstein Becker?

13     Q.   Yes.  Another definition, when I refer to "EBG,"

14     I'm referring to the firm of Epstein, Becker and Green.

15     A.   Unfortunately, I don't remember exactly when.  I

16     assume it would have been contemporaneous with the

17     receipt of the request for information, but I don't

18     remember specifically when.

19          ATTY. FLEISCHER:  I'm going to mark a document.

20     This will be one.

21          (Exhibit 1, 8/5/97 DOCUMENT, marked for

22          identification.)

23

24     Q.   Okay.  Mr. Jacks, I've just handed you what's been

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

20

1          ATTY. FLEISCHER:  That's fair.

2     Q.   With respect to those employees that were

3     represented by Epstein, Becker and Green, did MMT have

4     a role in determining who that counsel would be?

5          ATTY. BAGGER:  Objection.

6     Q.   You may answer.

7     A.   I would say insofar as I was the general counsel,

8     you know, among my job was to help advise the company

9     on decisions and selections like this, yes.  You know,

10    the corporation rarely speak with one voice.  They

11    speak with officers and directors making decisions

12    about things.  So indirectly, yes, but it would have

13    been sort of through me and I assume our outside

14    counsel, Latham and Watkins, would have been advising

15    me on these decisions.

16    Q.   Those individuals that were represented by EBG in

17    the investigations, did they have much input, do you

18    recall, in the selection of their attorney?

19         ATTY. BAGGER:  Objection.

20         THE WITNESS:  I honestly don't remember the

21    details.  I think our decision was to try to offer, not

22    require, but offer Carole as somebody who could

23    represent them if they chose, but to not in any way

24    mandate that.

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

21

```
1        Q.    Do you recall thinking back to the period whether

2        or not it was important to MMT that those employees

3        that were represented by Carole Schwartz Rendon in fact

4        all be represented by the same counsel?

5        A.    I don't know if that was a driving factor.    I

6        think the driving factor was more to see if we could

7        simply be helpful to people and to fray some of the

8        costs and anxiety by saying here is a lawyer that you

9        might use if you choose to.

10            ATTY. FLEISCHER:    I'm going to mark another

11       document.    This is number 2.

12            (Exhibit 2, DOCUMENTS, marked for identification.)

13

14       Q.    Mr. Jacks, you were just handed a document, what's

15       been marked as Exhibit 2.    Can you please take a look

16       at that document?    Do you recall ever seeing this

17       document before?

18       A.    I don't remember specifically seeing this

19       document.

20       Q.    Okay.    You are familiar with the law firm of Cohn

21       and Kelakos, LLP?

22       A.    In deed.

23       Q.    And who were they?

24       A.    They were, and I'm not sure if they still are, a
```

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

33

```
1              ATTY. FLEISCHER:  Back on the record.
2      Q.   I've just handed you what the court reporter has
3      marked as Exhibit 4.  Again, I'll disclose to you this
4      was a document produced by the firm Reimer Braunstein
5      in --
6      A.   Reimer.  There is no rhyme or reason to the names,
7      is there?
8      Q.   -- Reimer and Braunstein in response to the
9      document subpoena issued by Defendant's counsel in this
10     case.  I would ask you take a look at that for a
11     moment.
12     A.   I'm sorry, what was the preface you gave to this?
13     Q.   That the document was produced by the firm Reimer
14     and Braunstein in response to a document subpoena in
15     this litigation, the instant litigation.
16     A.   Okay.
17     Q.   My question on this document for you relates to
18     the "re" on the first page and the subject on the
19     second page.  There is a reference there to joint
20     defense, joint defense conference call.  Do you see
21     that?
22     A.   I do.
23     Q.   Can you see that on both documents?
24     A.   Yes.
```

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

34

| | |
|---|---|
| 1 | Q.   Do you recall whether or not there was a joint |
| 2 | defense agreement among the various counsel that are |
| 3 | listed on these documents? |
| 4 | A.   Well, first of all, I don't -- I don't recall this |
| 5 | document to start with that. |
| 6 | Q.   I'm not asking if you recall the document.  I'm |
| 7 | asking whether you recall a joint defense? |
| 8 | A.   I do remember the discussion of joint defense |
| 9 | agreement and I do believe there was a joint defense |
| 10 | agreement in effect.  But I could not tell you, I |
| 11 | assume -- I know the company was party to a joint |
| 12 | defense agreement, but I couldn't tell you specifically |
| 13 | with who. |
| 14 | Q.   Do you know or do you have an idea as to whether |
| 15 | Epstein Becker was a party to the joint defense |
| 16 | agreement? |
| 17 | ATTY. BAGGER:  Objection. |
| 18 | THE WITNESS:  Again, I can't recall literally the |
| 19 | form or substance of any joint defense agreement.  I do |
| 20 | recall discussions not infrequently about the reason, |
| 21 | the wisdom for joint defense agreements and I have a |
| 22 | vague recollection of having signed one, but I can't |
| 23 | remember the time, place or specifics of it. |
| 24 | Q.   And, again, do you have, and I know you don't know |

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

41

```
 1        counsel involved in the investigations?

 2        A.    Well, again, based on having seen Exhibit 3, there

 3        seems to be a correlation there, yes.

 4        Q.    I'll have you turn to Page 7.

 5        A.    Which one?

 6        Q.    Page 7 of Exhibit 5.

 7        A.    Okay.

 8        Q.    And you'll note at the top of the page, these

 9        actually appear under Section V, Concerns, which runs

10        over from the prior page.

11        A.    Okay.

12        Q.    I just want to just ask you some questions about

13        these numbered concerns.

14        A.    Okay.

15        Q.    Take a look at the first numbered concern.  I'll

16        read it, "Vic Gatto, G-A-T-T-O and Clyde Frank had an

17        exceptionally close relationship.  Clyde may have gone

18        over the line in promising to deliver money to MMT

19        without appropriate documented authorization for such

20        promises."  Who was Clyde Frank?

21        A.    By the way, it's -- I'm sorry I keep doing this to

22        you, it's pronounced Gatto, at least that's how I

23        recall it being pronounced.

24              I believe Clyde Frank was a Department of Energy
```

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

42

1      employee.  I don't recall his specific title.

2      Q.   Do you know his connection to MMT at the time?

3           ATTY. BAGGER:  Clyde Frank?

4      Q.   Clyde Frank, yes.

5      A.   I believe he was one of the folks and probably one

6      of the more senior folks that we interacted with, I

7      don't know specifically what his title or division was

8      at the Department of Energy, but just that he worked at

9      Department of Energy and that he was interested in our

10     technology and probably in the group of folks that were

11     responsible for reviewing our request for government

12     contracts through the DOE.

13     Q.   Do you have any recollection of how this issue

14     outlined in paragraph, the first numbered paragraph

15     here, how that was resolved?

16          ATTY. BAGGER:  Objection.

17          THE WITNESS:  No, I don't.  I don't even know what

18     your question is exactly.

19     Q.   Do you know if anything ever became of this issue

20     beyond this memorandum?

21     A.   The "issue" being what exactly?

22     Q.   The issue being whether or not Clyde went over the

23     line in promising to deliver money to MMT without

24     appropriate documenting authorization?

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

43

```
 1        A.   I don't remember specifically how that issue such

 2        as it was or at least characterized in this document

 3        was resolved.  Having reread some of these documents to

 4        get back to our original case, there was clearly

 5        some -- within the investigation there was a DOE piece

 6        and my recollection is that after the investigations

 7        were over, there was no action.  I don't remember any

 8        specific action taken.  So I assume that it was

 9        resolved relevant to the parties' satisfaction.

10        Q.   Do you recall having any discussions with other

11        MMT officers or directors or counsel regarding the

12        issue that is raised in this first point?

13        A.   No.  No recollection of that.

14        Q.   I'll have you read quickly number 2 to yourself

15        and then number 3.

16        A.   Okay.

17        Q.   Just tell me when you are all set.

18        A.   Okay.

19        Q.   Do you recall having any discussions with other

20        MMT officers, directors or employees regarding the

21        issue raised in Point 2?

22        A.   Absolutely not.

23        Q.   Do you recall having any discussions with any of

24        the other attorneys involved in the investigations
```

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

**44**

1          regarding the points raised in number 2?

2          A.    No.

3          Q.    Do you recall ever having a discussion with Carole

4          Schwartz Rendon about the matters rasied in number 2?

5          A.    Nope.

6          Q.    Okay.  Going to number 3, I think you've read

7          number 3 already?

8          A.    Yes.

9          Q.    Do you recall having any discussions with any

10         other MMT officers, directors or employees regarding

11         issues raised in number 3?

12         A.    I have no current recollection of that, no.

13         Q.    Do you have any recollection of discussing that

14         matter with any of the attorneys involved in the

15         investigations?

16         A.    No specific recollection.  I can see, having read

17         this memo, that the subject of campaign contributions

18         was one of the focal points of the investigation and

19         from having read this, it appears that that was not a

20         problem.  But I have no specific recollection of having

21         discussed it.

22         Q.    And take a look now at number 4 and number 5.  Let

23         me know when you've finished reading those.

24         A.    Okay.

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

45

1       Q.   With respect to Point 4 there on Page 7, do you

2       recall having any discussions with other officers or

3       directors or employees of MMT regarding the issue

4       raised in Point 4?

5            ATTY. BAGGER:  Objection.  Do you mean the subject

6       matter or the fact that it was flagged in this memo?

7            ATTY. FLEISCHER:  No.  The subject matter.

8            THE WITNESS:  No.

9       Q.   Do you recall ever having any discussions with any

10      of the attorneys involved in the investigations

11      regarding the substance of the matter raised in Point

12      4?

13      A.   I don't have a recollection of that, no.

14      Q.   With respect to Point 5, and again with respect to

15      the substance of the matter raised in Point 5, before I

16      go on -- strike that.

17           Do you recall ever having any discussion with

18      Carole Schwartz Rendon about the substance of the

19      matter raised in Point 4?

20      A.   No.  I don't have a recollection of that.

21      Q.   With respect to Point 5, do you recall having any

22      discussion with any other MMT officers, directors or

23      employees regarding that matter?

24      A.   I have no specific recollection of that.  That's

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

46

1       getting into, frankly, very technical areas that I

2       don't think were within my scope of responsibilities.

3       Q.   Do you have any general recollection?

4       A.   No.   I remember now having read this document, I

5       had forgotten even what the acronym -- the PRDA

6       acronym, but it was then known as, it was pronounced

7       the "PRDA" and that's what we called it and that was

8       one of the government contracts we had and my

9       recollection is that it was extended once or twice.   So

10      it was a significant you know -- significant to the

11      company and I don't recall any problems with the

12      administration of it.

13      Q.   Do you recall what PRDA stands for?

14      A.   I don't.   Just that we called it the "PRDA", but

15      that's just the phonetic pronunciation of the acronym.

16      Q.   Can you describe what the PRDA was?

17      A.   I can't specifically because, again, that was not

18      my area of responsibility or expertise.   But I believe

19      that was the -- that was the primary government

20      contract with the Department of Energy that we had at

21      least in the beginning and I think it stayed in effect

22      for several years.

23      Q.   Okay.   And, again, you don't recall ever having

24      any discussion with Carole Schwartz Rendon about the

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

47

1       substance of the matter raised in Point 5?

2       A.   I don't recall that, no.

3       Q.   Okay.

4       A.   Again, I'll point out, this is now, you know,

5       coming up on nine years ago.

6       Q.   Nine years.  I don't mean to swamp you with paper

7       here.

8            ATTY. FLEISCHER:  Off the record.

9

10           (Recess taken.)

11

12           ATTY. FLEISCHER:  Back on the record.  Can you

13      mark this as 7, please.

14           (Exhibit 7, 4/7/98 LETTER, marked for

15           identification.)

16

17      Q.   I've handed you a document that's been marked as

18      Exhibit 7.  I'll ask you to take a look at that and the

19      attachment, as well.

20      A.   Okay.

21      Q.   The first page, can you identify that document,

22      please?

23           ATTY. BAGGER:  The entire document or just the

24      first page?

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

69

```
 1        Q.    Were you aware that Epstein Becker had filed a

 2        proof of claim in the MMT bankruptcy case?

 3        A.    I was not aware of that, no.

 4        Q.    So had you ever seen this document before?

 5        A.    No not to my recollection.

 6        Q.    And no one had ever asked you to review the

 7        documents -- I mean, the pages contained in the proof

 8        of claim?

 9        A.    No, not to my recollection.

10        Q.    Do any of the entries, and I note that you thumbed

11        through it, do any of those entries refresh your

12        recollection as to discussions you may have had with

13        Carole Schwartz Rendon independently of just having

14        seen them in this document?

15        A.    Again, I don't remember specific discussions with

16        Carole.  I do remember the fact that she worked for us

17        or she was retained on behalf of employees, but paid by

18        us, "us" meaning Molten Metal, and that from seeing

19        these time entries, it indicates that she and I had

20        discussions about different matters during the relevant

21        time period.

22        Q.    Okay.

23              ATTY. FLEISCHER:  That's actually all I have,

24        Paula.
```

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

## Robert Hanfling v. Epstein, Becker & Green, et. al.

**Transcript of the Testimony of:**

# Michael Tuteur

# April 13, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street
Boston, MA 02109
(617) 399-0130  888.825.DEPO(3376)**



Cindy Berglund   1-18970

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

16

1          ATTY. COOKE:  If it is, I'm not going to have a

2      problem with it.  But you are asking him now about

3      conversations he had with people in 1999.

4          ATTY. FLEISCHER:  Well, let's understand what the

5      litigation is about here.  It's about representation of

6      Allied Technology Group that took place in late 1998

7      and into 1999.

8          ATTY. COOKE:  No.  The liability phase goes to

9      what happened with respect to what Epstein, Becker and

10     Green knew prior to the closing on December 1, 1998.

11     We have a court order.  I might even have it with me.

12         ATTY. FLEISCHER:  Let's go off the record.

13

14         (Discussion held off record.)

15

16         ATTY. FLEISCHER:  Back on the record.

17     Q.   Are you -- do you have any understanding of

18     whether or not Epstein, Becker and Green was party to a

19     joint defense agreement in connection with the MMT

20     investigations?

21     A.   I don't know whether they were or not.

22     Q.   You don't know.  Do you have any reason to believe

23     they may have been?

24         ATTY. COOKE:  Objection.

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

17

1          THE WITNESS:  I have no reason to believe that

2      they were.

3      Q.    That's essentially what I'm asking.

4      A.    Slightly different.

5      Q.    Do you recall specifically when you first started

6      speaking with -- strike the question.

7          When did you first start to get involved in the

8      MMT matter?

9          ATTY. COOKE:  Objection.  What do you mean by the

10     "MMT matter"?

11         ATTY. FLEISCHER:  The investigations.  The matters

12     that Ms. Rendon had been working on?

13         ATTY. COOKE:  Objection to the form of the

14     question.  No foundation.

15         THE WITNESS:  I don't believe that I ever actually

16     got involved with the investigations.  Ms. Rendon left

17     Epstein Becker and asked me whether I would, in the

18     event that the investigations continued, serve as local

19     counsel to her, you know, if she needed to come to

20     Boston or needed something done with the various

21     agencies.  My recollection is she took the file.  She

22     intended to continue to keep those clients if, but only

23     if, the investigation, in fact, continued.

24         My recollection is that it had pretty much run its

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

1      shareholder's litigation, rather?

2      A.    I don't believe I worked on this because I wasn't

3      representing the parties at this time.

4      Q.    Do you have any understanding as to why this

5      document would have been directed to you by Ms. Rendon?

6      A.    Yes.

7      Q.    Why would she have sent this one to you, if you

8      know or if you can surmise?

9      A.    Well, I can't say specifically what Ms. Rendon was

10     thinking.

11     Q.    Right.  I wouldn't think you could.

12     A.    But in or about this time period, Ms. Rendon

13     called me and said that Dr. Nagel -- well, that she

14     was -- that Dr. Nagel was considering or was going to

15     need separate representation in the shareholder's case,

16     in the securities case and I don't remember exactly the

17     time frame or the time sequence, but originally

18     Ms. Rendon was contemplating that she would represent

19     Dr. Nagel in that matter and that perhaps I could

20     serve, subject to Dr. Nagel's okay and subject to the

21     insurance company's approval, that I would serve as

22     local counsel to her in the securities case.

23          As time progressed, and it may have been early in

24     November, later in November, I don't remember, it

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

24

1    became evident that it probably made more sense for me

2    to represent Dr. Nagel in the securities case if Dr.

3    Nagel wanted me to represent him and if EBG, Epstein

4    Becker, would be approved to go on the panel for, I

5    don't remember if it's Chub or AIG, the D and O

6    carrier.

7        So during the month of November preliminarily with

8    an idea towards potentially representing Dr. Nagel in

9    that case, Ms. Rendon sent me a small number of

10    documents to essentially apprise me of what was

11    happening in the securities case and I believe these

12    documents were her effort to do that.

13    Q.    Was any application -- strike that.

14        Did anything become of that representation in

15    1998, before December 1st of 1998?

16    A.    I believe I met with Dr. Nagel on the 1st, I think

17    it was the first time I ever met Dr. Nagel, perhaps I

18    met him in the hall at Epstein Becker when meeting with

19    Carole just to be introduced to say hello, but I

20    believe the first substantive meeting I ever had with

21    Dr. Nagel was on December 1, and my best recollection

22    is that on December 3, the insurance company indicated

23    that it was willing to allow Epstein Becker to be

24    counsel even though we had not previously been on their

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

25

```
1        D and O panel.

2        Q.   Epstein Becker -- strike par.

3             Did Epstein Becker represent Dr. Nagel in the

4        securities investigation?

5             ATTY. COOKE:  Objection as to time.

6             THE WITNESS:  I guess ultimately, yes.

7        Q.   When you say "ultimately" --

8        A.   Bingham Dana represented all the officers and

9        directors in the securities litigation.  And at some

10       point, and I don't remember exactly when, the

11       determination was made that Bingham could no longer

12       represent all the officers and directors and this is

13       sometime I think, I think well after December 1, 1998

14       Bingham withdrew as counsel for all the officers and

15       directors and they each got separate counsel and at the

16       time, I began to represent Dr. Nagel, Mr. Preston and

17       Mr. Strong.

18       Q.   About when did that representation commence?

19       A.   I think -- I guess the question is:  What do you

20       mean by "representation"?

21       Q.   Serve as counsel, advise regarding liability in

22       that connection, strategy, defense, all of the things

23       that you might typically think of when you are

24       defending somebody in a litigation.
```

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

26

1       A.    You are talking about two different things.   I

2       don't recall when or if I entered an appearance for

3       those three gentlemen in the securities case.   I just

4       don't remember.   I don't believe I did it in 1998 and I

5       don't remember when I did it, if I did it.

6            In December of 1998 I think Dr. Nagel, once we had

7       been approved, I think Dr. Nagel agreed, decided that

8       he did want me and Epstein Becker to represent him in

9       the securities case, to advise him, and he suggested

10      that in addition, his colleagues, Mr. Preston and

11      Mr. Strong, should be represented by Epstein Becker as

12      well.

13           So I think in December we began to represent the

14      three gentlemen, but I don't know about whether it was

15      formally in connection with the securities case.

16      Q.    Okay.

17            ATTY. FLEISCHER:   Please mark this.

18            (Exhibit 3, 11/16/98 EBG DOCUMENT, marked for

19            identification.)

20

21      Q.    This is Exhibit 3.

22      A.    Is it your intention that these three separate

23      documents would be one exhibit?

24      Q.    Yes.   They were provided to us stapled together so

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

37

1    that's reflected in the memorandum that was marked as

2    Exhibit 3.

3        Can you tell us in what capacity you were involved

4    in that decision making?

5    A.    I was the vice chair of Epstein, Becker and

6    Green's quality assurance committee.

7    Q.    I also want to ask you about the third page of

8    Exhibit 3, which is your memorandum to Kathryn Johnson,

9    Jarvis Kellogg and Mr. Torres dated November 16, 1998.

10        You previously testified that you did not

11    represent Mr. Nagel until after December 1, 1998.  I

12    want to draw your attention to the line in the second

13    paragraph there that says, "We, specifically I,

14    continue to represent Chris in connection with the

15    shareholder litigation against MMT and its former

16    officers and directors."

17        To what were you referring in that sentence?

18    A.    Well, by this time, Ms. Rendon had asked me

19    whether I would be interested, subject again to Dr.

20    Nagel's and the insurance company's okay, to serve as

21    counsel to Mr. Nagel -- Dr. Nagel in the shareholder

22    litigation.  By this time, she had sent me a couple of

23    these memos.

24        So at this point, we had had preliminary

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

38

1      discussions about the possibility of representation.

2      Hence, I believed that there was already confidential

3      information that had been provided to me and so

4      accordingly we had to examine the question about

5      whether that preliminary pre-representation status

6      affected Epstein Becker's potential representation of

7      ATG.  So that's what I meant by that.

8      Q.    And there is in, I believe it was Exhibit 2 -- is

9      that Exhibit 2?

10     A.    Yes.

11     Q.    Maybe Exhibit 1.  In Exhibit 1, there was a

12     reference to joint defense communication.

13           Was Epstein, Becker and Green a party to any joint

14     defense agreement with respect to the MMT shareholder

15     litigation prior to December 1, 1998?

16           ATTY. FLEISCHER:  Objection.  Foundation.

17           THE WITNESS:  I am unaware of -- I do not believe

18     Epstein Becker was a party to a joint defense agreement

19     during the Molten Metal shareholder litigation before

20     December 1, 1998.

21     Q.    When you referred to confidential information that

22     had been provided in these preliminary discussions

23     about the possibility, were you referring to the

24     documents that were provided to you by Ms. Rendon that

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

39

```
 1          had been marked as Tuteur Exhibits 1 and 2?

 2     A.   Yes.

 3          ATTY. COOKE:  I have no further questions.

 4

 5          (Deposition concluded at 2:09 p.m.)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   _____
                                      )
 5   ROBERT I. HANFLING, CHAPTER 11 ) Case No. 05-10077-RGS
     TRUSTEE FOR ATG, INC., AND        )
 6   ATG CATALYTICS, L.L.C.,           )
                                       )
 7        Plaintiffs,                  )
                                       )
 8   vs.                               )
                                       )
 9   EPSTEIN, BECKER & GREEN, P.C., )
     JOHN PRESTON, CHRISTOPHER         )
10   NAGEL, EUGENE BERMAN, ETHAN       )
     JACKS, QUANTUM CATALYTICS,        )
11   L.L.C., ABC CORPS 1 THROUGH 5 )
     AND JOHN DOES 1 THROUGH 5,        )
12                                     )
          Defendants.                  )
13   _____)
14
15                    DEPOSITION OF
16                KENNETH B. WECKSTEIN
17                  Washington, D.C.
18              Friday, April 28, 2006
19
20
21   Job No.:  1-77450
     Pages 1 through 63
22   Reported by:  John L. Harmonson, RPR
```

COPY


L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF KENNETH B. WECKSTEIN
CONDUCTED ON FRIDAY, APRIL 28, 2006

54

1    represent ATG so that Epstein Becker could go and

2    look at documents that were then with the trustee.

3              Gabor then went and spoke with Nagel, or

4    he told me he spoke with Nagel, and he told me that

5    that was acceptable, that we could go ahead with the

6    representation.

7              I then called Bill Hewitt -- that is the

8    document that is Exhibit 11 -- and indicated that a

9    number of things -- he made the first two comments

10   about just being interested in the wet waste

11   services and he was not interested in certain other

12   assets.  And I advised him that there was another

13   potential conflict beyond that of the Molten Metal

14   individuals which he previously had agreed was not a

15   conflict and would be okay, and that was the

16   Nagel/Preston relationship.  He indicated that that

17   was fine, he wanted to move on, and he asked who he

18   would be meeting with in Boston regarding pursuing

19   this matter.

20             MS. BAGGER:  I have no further questions.

21   EXAMINATION BY MR. FLEISCHER:

22        Q.   With respect to the waiver of a potential

**CONFIDENTIAL**

Tel - Bill
10/2/98

Just interested in
wet Waste Services

Not interested in
Fossil - resins
patents (other than
wet Waste)

Advised of potential conflict

¿ Who would he meet with
¿ Boston re contracts.

FBG 2074

# O'BRIEN &LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

**Transcript of the Testimony of:**

# Jarvis Kellogg

# April 18, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**



Cindy Berglund   18973

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

22

1       A.   No.

2       Q.   And in 2000?

3       A.   No.

4       Q.   Were you -- are you aware of -- did you become

5       aware prior to December 1st of 1998 that MMT had been

6       involved in a securities class action litigation?

7       A.   No.

8       Q.   Did you ever become aware that MMT was involved in

9       a securities class action litigation?

10      A.   Yes.

11      Q.   To the best of your recollection, when did you

12      first become aware of that?

13      A.   I can't recall, but I believe it was sometime in

14      the -- in January or February of 1999.

15      Q.   Do you know who Carole Schwartz Rendon is?

16      A.   I do.

17      Q.   Do you personally know her?

18      A.   I do.

19      Q.   When did you first meet Carole Schwartz Rendon?

20      A.   I honestly don't recall.  I interviewed her as a

21      part of the possibility that she would join us as a

22      lawyer and I don't remember the dates on that.  I don't

23      remember the years, but that's when I first met her.

24      Q.   Would that have been prior to 1998?

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

23

1    A.    I think it probably was.  It would have been, yes.

2    Q.    Did you work with her at Epstein Becker?

3    A.    No.

4    Q.    Did you work at the same office where she worked?

5    A.    You mean the same -- did she work at the Boston

6    office?

7    Q.    Yes.

8    A.    Yes.

9    Q.    Did you become aware that she had represented

10   various individuals in connection with certain

11   investigations, federal government investigations of

12   Molten Metal Technology, Inc.?

13   A.    I would say yes, but my awareness is very dim.  In

14   other words, I don't have any -- I seem to recall that

15   she was involved in some way or another, but I have no

16   memory of what it was about.

17   Q.    Do you recall when you may have first became

18   aware?

19   A.    I believe it was -- I believe it was at the time

20   that John Preston became a client of the firm.

21   Q.    When was that?

22   A.    I think that was in January or maybe February of

23   1999.

24   Q.    Did you have any discussions with Mr. Preston