UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ROBERT I. HANFLING, CHAPTER 7 TRUSTEE FOR ATG, INC. AND ATG CATALYTICS L.L.C.,** | |
| **Plaintiffs,** | **C.A. No. 05-10077-RGS** |
| **vs.** | |
| **EPSTEIN BECKER & GREEN, P.C., et al.,** | |
| **Defendants.** | **July 7, 2006** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO MOTION OF
DEFENDANT EPSTEIN BECKER & GREEN, P.C. FOR SUMMARY JUDGMENT**

The Plaintiffs, Robert I. Hanfling, Chapter 7 Trustee for ATG, Inc. and ATG Catalytics,

LLC (jointly, the "Plaintiffs"), by their attorneys, Jacobs Partners LLC, hereby submit this

Memorandum in Opposition to the Motion of Defendant Epstein Becker & Green, P.C.

(alternatively the "Defendant" or "EBG") for Summary Judgment. In support of their opposition

to Defendant's Motion, the Plaintiffs respectfully represent as follows:

**PERTINENT UNDISPUTED FACTS**

The following facts are not genuinely in dispute in this case.[1] On December 3, 1997,

Molten Metal Technology, Inc.("MMT"), based in Waltham, Massachusetts, and four of its

affiliates, filed petitions for relief under Chapter 11 of Title 11 of the United States Code (the

"Bankruptcy Code") with the United States Bankruptcy Court for the District of Massachusetts,

---

[1] Defendant makes reference in its Memorandum of Law to a Statement of Undisputed Facts. However, the Plaintiffs were not served such a statement, and the Court record in this case does not indicate that the Defendant ever filed a Statement of Undisputed Facts along with its motion for summary judgment.

Boston Division. Thereafter, Stephen S. Gray (the "MMT Trustee") was appointed the Chapter 11 Trustee of MMT and its affiliates.  Mr. Gray's counsel in the MMT bankruptcy case was the firm Riemer & Braunstein, LLP, based in Boston.  At the time it filed bankruptcy, MMT had two primary business lines: the so-called wet-waste business ("Wet Waste") and the Catalytic Extraction Process business ("CEP"). MMT had further developed the CEP business to treat radioactive resin waste generated by commercial facilities, such as nuclear power generators, through a system called Quantum Catalytic Extraction Process ("Q-CEP").  Following his assumption as duties as the Chapter 11 Trustee for MMT, the MMT Trustee undertook to sell of the assets of MMT, including the Wet Waste and CEP/Q-CEP business assets.

ATG, Inc. ("ATG"), based in California, was, like MMT, in the business of treating hazardous waste materials, including radioactive wastes generated by commercial and government sources.  Some time in the fall of 1998,  ATG became aware that the MMT Trustee was seeking to sell off certain assets of MMT. ATG was initially interested in purchasing the Wet Waste Assets.  In or about November of 1998, ATG retained the Defendant law firm to represent it in connection with a joint bid with Quantum Catalytics to acquire assets from MMT. Quantum Catalytics was an entity created and owned by John Preston and Chris Nagel, both of whom were previously affiliated with MMT.   On November 13, 1998, ATG and Quantum Catalytics submitted a joint bid to the MMT Trustee for the purchase of certain assets, including the Wet Wast assets and CEP/Q-CEP assets. On November 25, 1998, the Bankruptcy Court in MMT's bankruptcy Case entered an order approving the sale of the Wet Waste and CEP/Q-CEP assets to ATG and  Quantum Catalytics in accordance with the terms of the joint bid, as amended . Thereafter, on or about December 1, 1998, ATG and Quantum Catalytics closed on the transaction to acquire assets from MMT (the "Transaction").  Upon the closing of the Transaction, ATG Catalytics, LLC, a wholly subsidiary of ATG, acquired ownership of MMT's

CEP/Q-CEP facility located on Bear Creek Road in Oak Ridge, Tennessee (the "Q-CEP Facility").  ATG Nuclear Services, LLC, also a wholly owned subsidiary of ATG, acquired ownership of the assets associated with MMT's Wet West business. ATG guaranteed the obligations of ATG Catalytics, LLC and ATG Nuclear Services, LLC arising under the Transaction.

According to ATG's filings with the United States Securities and Exchange Commission, ATG abandoned operation of the Q-CEP business in 2000, and recorded a resultant non-cash asset impairment charge of $14.1 million, plus other charges amount to an additional 2.6 Million. See Form 10-k for ATG, for Fiscal Year Ended December 31, 2000, a copy of the relevant portions of which are attached to the Affidavit of Robert M. Fleischer (the "Fleischer Affidavit"), submitted in support of the Plaintiff's opposition to Defendant's Motion for Summary Judgment, as Exhibit H.  On December 3, 2001, ATG filed a petition for relief under Chapter 11 of the Bankruptcy Code. Plaintiff Robert I. Hanfling was subsequently appointed to serve as the Chapter 11 Trustee for ATG and its affiliates. On April 28, 2003, the Bankruptcy Court in ATG's bankruptcy cases converted ATG's cases to cases under Chapter 7 of the Bankruptcy Code. Thereafter, Plaintiff Robert I. Hanfling was appointed to serve as the Chapter 7 Trustee of ATG.

On June 23, 2006, the Plaintiffs filed a Motion for Leave to File Amended Complaint (doc. no. 57), together with a proposed amended complaint. In addition, the Plaintiffs filed a memorandum of law (*doc. no.* 58) in support of their motion for leave to file an amended complaint. By that motion, Plaintiffs seek leave to amend the complaint in order to reflect information learned by Plaintiffs in the course of discovery in this case.  Plaintiffs submit that EBG's motion for Summary Judgment should be evaluated against not merely the allegations contained in the Plaintiffs' original complaint, but against the allegations contained in the

Plaintiffs' proposed Amended Complaint. A copy of the Amended Complaint (Proposed) is set forth in Exhibit A to the Fleischer Affidavit. The Plaintiffs refer the Court to the Amended Complaint (Proposed) for a more exhaustive recitation of Plaintiff's allegations in this action.

## LAW AND ARGUMENT

### I. LEGAL STANDARD FOR SUMMARY JUDGEMENT UNDER FED. R. CIV. P. 56.

In considering a motion for summary judgment under Rule 56, the trial court examines the entire record "in the light most flattering to the nonmovant and indulg[es] all reasonable inferences in that party's favor." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997) (*citing Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir.1994)). Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment. *Id.* (*citing Greenburg v. Puerto Rico Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir.1987).

On summary judgment, the movant must first make a preliminary showing that there is no genuine issue of material fact which requires resolution at trial. Once this showing has been made, the burden shifts to the nonmovant to demonstrate, through specific facts, that a trial worthy issue remains. *Cadle Co.*, 116 F.3d at 960 (*citing National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995); *Maldonado-Denis*, 23 F.3d at 581.). For the purpose of summary judgment, an issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." *Id.*. For the same purpose, "material" facts are those which possess "the capacity to sway the outcome of the litigation under the applicable law." *Id.* (citing *National Amusements*, 43 F.3d at 735).

## II.  DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT

**A . There Is A Genuine Issue Of Fact As To The Information Possessed
By EBG Concerning The CEP/Q-CEP Assets Acquired By ATG**

First, EBG argues that it did not possess material information that it would have been

required to disclose in connection with its representation of ATG in the Transaction.  In the

Amended Complaint (Proposed), the Plaintiffs allege eight (8) separate categories of information

that EBG failed to disclose as follows:

> "66.   EBG breached its duty to ATG when it failed, prior to
> undertaking its representation of ATG in connection with ATG's
> joint bid and purchase of MMT assets, to adequately disclose to
> ATG that:
>
> (a) EBG had participated in a joint defense agreement in
>     connection with the Federal Investigations and in the MMT
>     Litigation;
>
> (b) EBG had provided direct legal representation to MMT in the
>     Federal Investigations;
>
> (c) EBG was representing Nagel in the MMT Litigation;
>
> (d) among the issues raised in both the Federal Investigations
>     and the MMT Litigation were whether there were serious
>     problems with MMT's CEP/Q-CEP technology;
>
> (e) among the issues raised in the Federal Investigations and the
>     MMT Litigation, were the honesty and credibility of MMT
>     officers and directors, including Preston and Nagel;
>
> (f) McConchie had outlined, in the McConchie Letter, his
>     specific claims regarding serious defects with MMT's
>     CEP/Q-CEP technology and related assets;
>
> (g) McConchie alleged, in the McConchie Letter, matters going
>     to the honesty and credibility of, among others, Nagel; and
>
> (h) EBG possessed a pecuniary interest in MMT's bankruptcy
>     estate, as evidenced by its Proof of Claim."

See Amended Complaint, Proposed, ¶66.

With respect to the MMT Litigation, EBG argues that it did not represent any party in that proceeding until after the closing of the Transaction. However, on November 16, 1998, Kenneth Weckstein, a partner with EBG, issued an internal confidential memorandum to Thomas Torres, Jarvis Kellogg and Micheal Tuteur, all attorneys employed with EBG. A copy of Mr.s Weckstein's November 16, 1998 memorandum is attached as Exhibit B to the Fleischer Affidavit. The November 16, 1998 memorandum was produced to the Plaintiffs by EBG in the course of discovery in this case. Along with the November 16, 1998 memorandum, EBG also produced two emails, both from Michael Tuteur, and both relating to the November 16, 1998 memorandum. Copies of these emails are included along with the copy of the November 16, 1998 Memorandum as Exhibit B to the Fleischer Affidavit. In the November 16, 1998 memorandum, attorney Weckstein indicates, with respect to EBG's representation of ATG, that he is not certain whether there is an actual conflict. He requests that Mike Tuteur advise whether there is a conflict. On November 16, 1998, Mr. Tuteur responded as follows:

> "In response to Ken's memo:
>
> To the best of my knowledge (which I will confirm with Carole Schwartz Rendon) we have never represented Molten Metal; rather, we have represented MMT's employees.
>
> Among the employees that we represented in the past is Chris Nagel. We (specifically, I) continue to represent Chris in connection with the shareholder litigation against MMT and its former officers and directors. While I understand that Chris is involved in the ATG matter, nothing I have heard to date suggests the existence of a conflict with a representation of ATG.
>
> Please let me know if there is additional information that you need."

*See* Fleischer Affidavit, Exhibit B, page "EBG 2081." Thus, in his email of November 16, 1998 (well before the closing of the Transaction), Michael Tuteur indicated that EBG <u>continued</u> to represent Chris Nagel in the shareholder litigation. Mr. Tuteur's email is entirely inconsistent

with EBG's position (and Mr. Tuteur's testimony in deposition) that EBG did not begin to represent Mr. Nagel in the shareholder litigation until <u>after</u> the closing of the Transaction in December of 1998.  At the very least, Mr. Tuteur's November 16, 1998 creates a genuine issue of material fact as to EBG's representation of Chris Nagel in the shareholder litigation at the time EBG undertook to represent ATG in connection with the Transaction.[2]

    EBG further argues that it did not represent anyone in connection with the claims asserted by Garnet Earl McConchie (the "McConchie Matter"), as outlined in the letter (the "McConchie Letter") referred to in the complaint (and the proposed Amended Complaint in this action). A copy of the McChonchie Letter is attached as Exhibit I to the affidavit of Paula Bagger  (the "Bagger Affidavit"), submitted by EBG in support of its Motion for Summary Judgment.  An attorney-client relationship need not be based on an express contract, and may be implied through preliminary consultations.  *Fiduciary Trust Co. v. Bingham, Dana & Gould*, No. CIV. A. 96-5581-E, 1997 WL 214839 at *3 (Mass.Super. April 7, 1997) (*citing Bays v. Theran*, 418 Mass. 685, 639 (1994)). In the absence of an express contract to provide legal services, an attorney-client relationship may be implied when (1) a person seeks advice or assistance from an attorney, (2) the advice or assistance sought pertains to matters within the attorney's professional competence, and (3) the attorney expressly or impliedly agrees to give or actually gives the desired advise or assistance. *Sheinkopf v. Stone*, 927 F.2d 1259, 1264 (1st Cir. 1991); *In re Mahoney Hawkes*, *LLP*, 334 B.R. 41, 49 (Bankr. D. Mass. 2005).  Here, there is no dispute that Christopher Nagel sent the McConchie letter to attorney Rendon, and that attorney Rendon reviewed the letter at it his request. Attorney Rendon acknowledged this in her deposition (See Transcript of Deposition of Carol Schwarz Rendon, May 9, 2006 (Hereinafter "Rendon Tr.") at p. 85, line 25 through p.88, line 13 (A copy of the relevant portions of the Rendon transcript are

---

[2] Further, Mr. Tuteur's statement that EBG did not represent Molten Metal, but rather MMT's employees, was, for reasons explained below, incorrect.

attached as Exhibit C to the Fleischer Affidavit).  Furthermore, EBG billed Chris Nagel for the services performed by Attorney Rendon relating to the McConchie matter.  *See* EBG billing invoice dated June 24, 1998, (entries for "04/20/98" and "04/21/98") a copy of which is annexed as Exhibit D to the Fleischer Affidavit.

The fact that attorney Rendon claims that she did not actually discuss the substance of the letter with Christopher Nagel does not matter. What matters is that she read the letter in the course of providing legal assistance to Christopher Nagel and acquired knowledge regarding allegations of misrepresentations sn malfeasance by Chris Nagel and of problems with MMT assets, specifically including the CEP/Q-CEP assets.

EBG argues that because attorney Rendon left EBG before EBG began to represent ATG in connection with the Transaction, and because, allegedly, all knowledge of the allegations in the McConchie letter left with her, that EBG had no duty of disclosure to ATG concerning the McConchie matter. EBG fails, however, to take into account its obligations arising under the Massachusetts Rules of Professional Conduct ("MRPC"), including Rule 1.7 ("Conflict of Interest: General Rule").  Under MRPC Rule 1.7, a lawyer is prohibited from representing a client if the representation of that client would be directly adverse to another client, or if the representation would be materially limited by the lawyer's responsibilities to another client or to a third person. *See* MRPC Rule 1.7 (a), and (b).  Rule 1.7 does permit representation, when certain conditions are satisfied, including obtaining the client(s)' consent, after consultation.  *Id.* There is no dispute that EBG did not fully and fairly disclose the nature of its representation of Chris Nagel to ATG, which included their failure to disclose anything related to the shareholder litigation or the McConchie matter. Consequently, EBG cannot be found to have consulted ATG about these matters, and ATG cannot be found to have consented to EBG's conflicting representation in the Transaction, as required by MRPC 1.7(a) and (b).

Moreover, the MRPC rules specifically contemplate circumstances under which a law firm may represent a client with interests adverse to those of a former client of the firm who had been represented by an attorney not currently with the firm. *See* MRPC Rule 1.10.  MRPC Rule 1.10(b) provides a safe-harbor for a firm to represent such adverse interests under certain circumstances. However, because Chris Nagel was a client of EBG before and during EBG's representation of ATG in connection with the Transaction, EBG cannot look to MRPC Rule 1.10(b) to excuse its failure to make full disclosure to ATG. [3]  EBG had a duty to make proper disclosure to, and consultation with, ATG, and that duty imposed an obligation upon EBG to conduct a careful review of its prior and current representations to determine the full extent of its potential conflict in representing ATG. In fact, EBG failed to conduct a careful review.[4]

## B .  The Information Possessed By EBG Concerning the CEP/Q-CEP Assets Was Material To EBG's Representation Of ATG And EBG Had Conflicting Duties

EBG argues that the information it possessed through its prior representations related to MMT were not material to its subsequent of ATG in connection with the Transaction. Throughout its argument, EBG places great emphasis on its belief that the EBG attorney(s) that represented MMT employees in connection with the Federal Investigations did not, herself, come to believe that there were any significant problems with MMT's technologies.   Specifically, EBG asserts that "there is no evidence that any of the work [in connection with the Federal Investigations] caused EBG to learn that MMT's technology was flawed or inoperable or any other information with respect to MMT that was material to its representation of MMT.  EBG

---

[3] Official comment no. 7 to MRPC Rule 1.10(b) states, in relevant part, that  "Rule 1.10(b) operates to permit a law firm, under certain circumstances, to represent a person with interests directly adverse to those of a client represented by a lawyer who formerly was associated with the firm.  The Rule applies regardless of when the formerly associated lawyer represented the client.  However, the law firm may not represent a person with interests adverse to those of a present client of the firm, which would violate Rule 1.7."  MRCP Rule 1.10, comment 7.

[4] Carol Rendon recalled, during her deposition, receiving a telephone call from Mike Tuteur in connection with the conflict check being performed by EBG relative to its representation of ATG in the Transaction.  Ms. Rendon and Mr. Tutuer  only spent a "minute or two" discussing the potential conflict.  Rendon Tr. p. 106, line 14 - p.108, line 11, and p. 114, line 1 through p. 115, line 2.

asserts that "none of Ms. Rendon's work required her to achieve a sophisticated understanding of how MMT's CEP technology worked or to consider with any rigor how well it worked." *See* Defendant's Memorandum of Law in Support of Motion for Summary Judgment ("Defendant's Memorandum"), pp. 8-9. It did not matter whether the technology was in fact flawed. It did not matter whether Ms. Rendon (or any other EBG attorney) acquired a sophisticated understanding of MMT's technology. EBG attempts to avoid Plaintiffs' point entirely. The issue is whether EBG attorneys became aware that there were allegations of serious problems and defects with the technology.

Plaintiffs do place great weight, as EBG suggests, on Ms. Rendon's confidential memorandum to MMT dated August 25, 1997. *See* Defendant's Memorandum p. 9, footnote 5. The passage includes the following statement:  "The investigators clearly began the process with the understanding that the technology does not work, and the PRDA was a callosal [*sic*] waste of money."  That statement indicates that EBG, through its representation of MMT[5] and MMT employees, became aware that various federal investigators had issues with the efficacy and status of MMT's technology.  It is irrelevant to this proceeding whether attorney Rendon believed the allegations or not.  EBG attempts to characterize the statement as "an isolated comment."  This statement does not make sense. It may be an isolated comment by Ms. Rendon, but does not appear to have been made based upon isolated comments from the federal investigators, and Ms. Rendon's words suggest otherwise.

EBG further argues that it did not have any material information concerning the MMT securities class action lawsuit (the "MMT Litigation").  Specifically, EBG argues that there is no

---

[5] Throughout this litigation, EBG has maintained that it never represented MMT, only "MMT Employees." Plaintiffs dispute EBG's assertion that it did not represent  MMT. Plaintiffs' position is supported by, *inter alia*, Ms. Rendon's August 25, 1997 Memorandum to MMT (See Bagger Affidavit, Exhibit F) which Ms. Rendon issued to MMT under the caption "Privileged and Confidential, Subject to Attorney Client and Attorney Work Product Privileges."

evidence that EBG ever read the complaints.  Whether or not the EBG attorneys actually read the complaints cannot be determinative of whether EBG was aware of the allegations in the MMT litigation concerning the credibility of MMT officers and directors, of allegations of material misstatements by MMT officers and directors concerning the status of MMT technologies, and of allegations regarding specific problems. The record does demonstrate that EBG, at the time it began to represent ATG in the Transaction, was in fact already involved in the MMT Litigation, where these issues had been raised. EBG asserts that the Court must find the information in the MMT Litigation to be not material because the class action period "is so much earlier, severely attenuating its relevance" and "because the complaints themselves allege that the class period ended with public disclosure of previously undisclosed information."  EBG fails to explain how or why the Court can conclude, on summary judgment, that the time period of the MMT Litigation is too attenuated from the matters related to its representation of ATG.  In fact, if the evidence adduced at trial demonstrates, as a technical matter, that the undisclosed problems with MMT's technologies, as alleged in the MMT Litigation, continued to cause problems after ATG acquired the assets, then the matters alleged in the MMT Litigation could not be considered too attenuated. With respect to the public disclosures ultimately made by MMT, EBG fails to demonstrate that the matters ultimately disclosed by MMT at the end of the class action period ultimately put ATG on full notice of the matters asserted in the action and relieved EBG of its fiduciary duties to ATG.

    EBG further asserts that the Plaintiff cannot rely on the Consolidated Complaint filed in the MMT Litigation because the complaint, as amended, was not filed until February of 1999. See Defendant's Memorandum, p. 11. However, the parties have obtained, through discovery from counsel for the MMT bankruptcy trustee, a copy of the consolidated complaint in the MMT Litigation that is dated October 30, 1997.  A copy of the Consolidated Complaint is attached to

the Fleischer Affidavit as Exhibit E.     That complaint contains specific allegations of very serious problems with the MMT's CEP/Q-CEP technologies.  Moreover, that complaint bears two official court stamps, including one from the Clerk of the of the United States Bankruptcy Court for the District of Massachusetts, dated in July of 1998. The other court stamp is largely illegible. See Fleisher Affidavit, Exhibit E.

Finally, EBG again asserts that EBG did not represent Dr. Nagel in this litigation until after December 1, 1998. As explained above, that position is contrary with Michel Tutuer's email of November 16, 1998 in which he informs other EBG attorneys that the firm "continued" to represent Dr. Nagel in the MMT Litigation. *See* Fleischer Affidavit, Exhibit B.  Further, EBG would apparently have this Court believe that it represented Chris Nagel until Carol Rendon left EBG, then stopped representing him, then began representing him anew after ATG closed on the purchase of the MMT assets. The suggestion is inconsistent with EBG's own statements in this case (in the Tuteur email) and defies reality.

Next, EBG attacks the Plaintiffs' reliance on the McConchie letter as evidence that EBG had material information germane to its representation of ATG.  Specifically, EBG asserts that the allegations in the McConchie Letter are too broad, and relate to three separate plants, not just the CEP/Q-CEP facility acquired by ATG. *See* Defendant's Memorandum, p. 13.  The McConchie letter, however, contains very specific allegations regarding problems with Q-CEP, the facility acquired by ATG. *See* McConchie Letter (Bagger Affidavit, Exhibit I), p. 4 (Commercial Operations at Q-CEP"); p. 5 ("Radioactive Waste Reduction"); and p. 7 ("Dust Levels").

EBG also asserts that the allegations in the letter were "stale" by the time EBG undertook to represent ATG.  *See* Defendant's Memorandum, p. 13.  As with the allegations in the MMT Litigation, the Court is in no position at this stage of this litigation to determine whether the

allegations in the McConchie letter were "stale" or whether they had a bearing on ATG's decision to purchase the MMT assets. That determination can only be made in light of evidence comparing the problems with the MMT assets existing at the time ATG acquired the ownership with the allegations in the McCochie letter. That evidence will be the subject of Phase II discovery in this case, which has not yet begun.

EBG also asserted that the allegations in the McConchie Letter are unsupported and untested, and therefore cannot be considered material. Defendants' Memorandum, p. 13. Again, EBG misses the point entirely. It does not matter whether EBG believed that Mr. McConchie's allegations were true. What matters is that the allegations, which are in fact quite detailed and specific, were made, and EBG is was chargeable with knowledge that the allegations had been made. With that knowledge, EBG representation if ATG was hopelessly conflicted. EBG further suggests that the Court should, at this stage, make a credibility determination as between Mr. McConchie and Christopher Nagel. However, the Court's resolution of summary judgment should be made without regard to credibility determinations. *Cadle Co. v. Hayes*, 116 F.3d at 95. In any event, the level of detail in the McConchie Letter certainly suggests credibility in the statements contained therein. The Court should not be surprised that Chris Nagel, one of the individuals to against whom Mr. McConchie's allegations of misrepresentation and malfeasance were directed, would contend that the statements in the McConchie Letter are not accurate. Furthermore, according to Alan Braunstein, counsel for the MMT bankruptcy Trustee, MMT paid Mr. McConchie $350,000 to settle the dispute, a curiously large amount to settle a claim that lacked merit. *See* Braunstein Tr., p. 70, line 19 through p. 82, line 1.

Furthermore, prior to representing ATG in connection with the Transaction, EBG filed a proof of claim in the MMT bankruptcy case, pursuant to which EBG asserted a claim against MMT for legal fees due and owing by MMT to EBG for legal services provided by EBG prior to

MMT's bankruptcy filing.  A copy of EBG's proof of claim is attached to the Fleischer Affidavit as Exhibit G.   By virtue of its proof of claim, EBG possessed a pecuniary interest in the MMT bankruptcy, and was presumably entitled to share in any distributions made to other, equally situated creditors of MMT in accordance with the applicable provisions of the United States Bankruptcy Court.   Thus, as  a creditor of MMT, EBG stood to benefit from the very Transaction in which it was representing ATG.  Under these circumstances, EBG was required, under MRPC Rule 1.7(b), to make full disclosure to ATG of its direct pecuniary interest in MMT.  However there is nothing in the record in this case to indicate that EBG ever disclosed to ATG that it was a creditor of MMT.  Nor is there anything in the record to indicated that EBG did not intend to pursue its claim against  MMT.  In fact, it appears that EBG did intend to press its claim.  Attorney Alan Braunstein (counsel for the MMT Trustee) testified in his deposition that he had learned during his investigations that EBG had refused to permit MMT to seek Bankruptcy Court approval to employ EBG as special counsel for the purpose of permitting EBG to continue to represent MMT and MMT employees in connection with the Federal Investigations. EBG would not agree to be employed as special counsel because to do so would have required EBG to waive its pre-petition claim against MMT.  EBG was not willing to waive its pre-petition claim.  *See* Braunstein Tr. p. 39, line 19 - p. 40, line 7 and p. 50, line 24  - p. 51, line 13).

### C . ATG Did Not Possess All Of The Information Known By EBG   And Material To EBG's Representation Of ATG

   1. *EBG had A Duty To Make Full Disclosure Regardless Of What ATG Knew Or Might Have Known.*

EBG argues that it cannot be held liable to the Plaintiffs because, purportedly, ATG already knew what the Plaintiffs now complains EBG did not tell it. EBG further argues that

ATG's purported knowledge excuses EBG's failure to make disclosure to ATG, as a matter of duty and causation. *See* Defendant's Memorandum, p. 15.

First, EBG ignores the fact that it had an independent duty to ATG to make full disclosure arising under the MRPC, including Rule 1.7. Pursuant to MRPC Rule 1.7(b), where a lawyer's representation of a client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, the lawyer is prohibited from representing the client unless (1) the lawyer reasonably believes the representation will not be adversely affected, <u>and</u> (2) the client consents after consultation. *See* MRPC Rule 1.7(b). In this case, EBG, in the course of representing MMT and various MMT employees, including Christopher Nagel, became aware of allegations regarding (1) the credibility and honesty of MMT employees, and (2) serious problems with MMT's technologies, including the CEP/Q-CEP assets being acquired by ATG. Certainly it was not in the best interest of MMT, Christopher Nagel, or EBG, for those allegations and facts to be brought to the attention of ATG, as they could well have caused ATG not to purchase the MMT assets. Furthermore, EBG failed to disclose that is was a claimant in the MMT bankruptcy, a fact which imbued EBG with a pecuniary interest in assuring that the Transaction went forward, and a fact which, in and of itself, would have raised issues as to how it came to pass that EBG was owed money by MMT.

On the other hand, it was in ATG's best interest to be apprised of all relevant information regarding in the possession of its attorneys that might have a bearing on ATG's decision to purchase the assets. In this regard, EBG's responsibilities to MMT and the various employees it represented did, or certainly may have, materially limited EBG's representation of ATG. Also, having asserted a claim for unpaid attorneys' fees against the MMT bankruptcy estate, EBG had a vested interest in the completion of the Transaction, as the proceeds from the sale were to have been paid to the MMT bankruptcy estate for distribution to MMT's creditors. Under these

circumstances, EBG had a clear duty to make full disclosure to ATG.  If EBG's responsibilities

to MMT and the MMT employees would not have permitted EBG to make full disclosure to

ATG, then EBG was obliged to decline the representation altogether. The rules of professional

conduct make no exception for circumstances where the firm believes that the client knows, or

should know, the substance of the matters to be disclosed disclosure.

Moreover, EBG ignores the fact that its relationship with ATG was, as a matter of law,

strictly fiduciary in nature. *Cleary v. Clearly*, 427 Mass. 286, 293 (1998); *Doe v. Harbor

Schools, Inc.*, 63 Mass.App.Ct 337, 346 (2005), *rev'd on other grounds*, 446 Mass. 245 (2006);

*see also Kwiat v. Doucette*, 81 B.R. 184, 189 (D.Mass. 1987).  As a "strict" fiduciary of ATG,

EBG bears the burden to prove that it fulfilled its duties to ATG. *Cleary*, 427 Mass. at 293.

Moreover, it was EBG's responsibility to take the necessary precautions to ensure that proof

existed that its dealings with ATG were fair and that ATG was fully informed.  *Id.*

2. *The Court Cannot Conclude On Summary Judgment That
   ATG Was Fully Informed Regarding The Transaction.*

EBG next relies on William Hewitt's Affidavit to attempt to demonstrate that ATG was

fully informed of the risks associated with the Transaction. In fact, Mr. Hewitt's affidavit raises

many more questions and issues then it resolves.  First, the Hewitt Affidavit fails to provide any

detail concerning the specific problems of which ATG was actually aware, and fails to compare

that knowledge with the knowledge that ATG would have obtained had it been informed about

the allegations in the Federal Investigations, the MMT Litigation and in the McConchie Matter.

Furthermore, Mr. Hewitt fails to explain how the risk/benefit analysis performed by ATG in

connection with its decision to purchase the CEP/Q-CEP assets would or could have been altered

by the information that should have been disclosed by ATG.

As to ATG's risk/benefit analysis, the substance of that analysis is summarized in Mr.

Hewitt's memorandum of November 30, 1998 (the "Hewitt Memo") to Steve Guerrettaz, Frank

16

Chiu and Doreen Chiu.  Mr. Hewitt confirms in his affidavit that he prepared the Hewitt Memo

and that the copy attached to his affidavit as Exhibit A is a true and accurate copy. *See* Hewitt

Affidavit, ¶ 13.   The Hewitt Memo sets forth a number of assumptions and beliefs that Mr.

Hewitt asserts had a direct bearing on ATG's decision to purchase the CEP/Q-CEP assets from

MMT. These assumptions included the following:

a)  that the CEP/Q-CEP process was on the verge of profitability, with a high upside

potential;

b)  that MMT had already made most of the investments in CEP/Q-CEP required to

achieve higher waste processing rates, and that the existing constraints were

largely a function of completing on-going process tweaking and focusing trained

personnel on the job at hand.

c)  that MMT's CEP/Q-CEP business was in a strong position in a strong market

area; and

d)  that the CEP/Q-CEP business was close to profitability.

*See* Hewitt Memo.  Again, Mr. Hewitt now provides absolutely no analysis regarding the

accuracy of these assumptions (based upon ATG's experience subsequent to ATG's acquisition

of the CEP/Q-CEP assets).[6]  Nor does he explain how those assumptions might have changed

had EBG made full disclosure to ATG.  For example, Mr. Hewitt does not, indeed, could not,

indicate whether ATG would have purchased the CEP/Q-CEP assets had it known the

assumptions outlined in the Hewitt Memo were, in fact, incorrect. Nor could he so state, as there

is nothing in the record to indicate that Mr. Hewitt possessed final decision making authority

with respect to the Transaction.  To the extent EBG or Mr. Hewitt assert that Mr. Hewitt did

---

[6] At trial, Plaintiffs believe they will be able to demonstrate that all of these assumptions were, in fact, incorrect. Evidence of such relates to technical issues with the CEP/Q-CEP assets, discovery of which has been reserved for the second discovery phase in this case. It would be premature for the Court to determine at this stage, whether the Plaintiffs can adduce evidence that the assumptions outline in the Hewitt Memo were incorrect.

possess final decision making authority, or the authority to speak on behalf of ATG in any way, the Plaintiffs vehemently deny such assertions.

Mr. Hewitt states that in 1998 ATG had become aware of MMT's legal problems and that ATG was "generally aware" of the federal investigations of MMT. See Hewitt Affidavit, ¶4. However, Mr. Hewitt fails to indicate and describe the extent of ATG's knowledge and awareness with any detail. He does not indicate whether ATG was aware of the issues raised concerning the credibility and honesty of ATG officers and directors (including John Preston and Christopher Nagel). Nor does he describe the specific problems with CEP/Q-CEP that ATG became aware of during that time period.

Mr. Hewitt states that the MMT Trustee had a greater interest in a bid that included both the wet waste business line and the CEP business line than separate bids for the two business lines. *See* Hewitt Affidavit, ¶7. But the Court cannot ascertain from Mr. Hewitt's affidavit whether or not the MMT Trustee would, in fact, have been willing to consider separate bids, and if so, under what circumstances. Mr. Hewitt states that, despite assurances by Drs. Preston and Nagel that technical issues with the CEP process had been worked out, ATG considered the CEP process to pose a risk. *See* Hewitt Affidavit, ¶ 10. But Mr. Hewitt does not indicate that ATG placed no or little weight in the assurances made by Dr. Preston and Nagel. Nor does he elaborate on the extent of the perceived risk. He does not indicate the extent to which information that should have been disclosed by EBG would have affected ATG's perception of the risks.

Mr. Hewitt states that the State of Tennessee would not transfer the license for the CEP facility at Bear Creek (i.e. the Q-CEP Facility) to Quantum Catalytics, and that the licenses was critical to the viability of the wet waste assets. *See* Hewitt Affidavit, ¶11. Mr. Hewitt does not explain how or why the license of the Q-CEP Facility was critical to ATG's operation of the Wet

Waste assets. And to the extent that operation of the Bear Creek facility was critical to the Wet Waste assets, Mr. Hewitt does not explain whether a suitable arrangement could be worked out with any third party holding the license. In fact, Mr. Hewitt admits that he was not privy to the discussions between ATG and Quantum Catalytics concerning the business arrangement between the two entities. *See* Hewitt Affidavit, ¶9. In any event, to the extent the CEP/Q-CEP Facility was not operable, the license to operate that facility was of little significance.

Mr. Hewitt indicates that the magnitude of the risks in acquiring the CEP business, based upon MMT's disclosures and ATG's prior due diligence, appeared to be offset by the upside benefits. *See* Hewitt Affidavit, ¶ 12. Again, Mr. Hewitt fails to elaborate as to the perceived risks, and how ATG's perceptions might have changed had EBG made full disclosure. The issue in this case is not what ATG actually knew, but what it would have known had EBG made full disclosure.

Mr. Hewitt states that as a practical matter ATG needed to purchase the CEP assets in order to move forward with its purchase of the Wet Waste assets. *See* Hewitt Affidavit, ¶13(a). But Mr. Hewitt does not indicate whether ATG would have been prepared to move forward with the purchase of any assets from MMT, including Wet Waste, had ATG understood the true extend of the problems with the CEP/Q-CEP technology. If in fact the license to the Bear Creek facility was so "critical" to the Wet Waste Business, as Mr. Hewitt suggests, then it would seem that ATG might well have opted not to purchase any of the MMT assets.

Mr. Hewitt describes how ATG perceived a benefit from the acquisition of the CEP assets in terms of permitting ATG to compete in new market areas. *See* Hewitt Affidavit, ¶13(b). However, Mr. Hewitt does not explain whether ATG would have perceived any such benefit had it understood that the CEP/Q-CEP facility could not be operated on a commercially viable basis. Furthermore, Mr. Hewitt states that ATG understood that it could have replaced the CEP

business operations with ATG's existing operations in Richland, Washington, in the event the CEP process could not be shown viable. See Hewitt Affidavit, ¶13(c).  Again, this was based upon certain assumptions regarding the likely risks associated with the acquisition of CEP, which assumptions, Plaintiffs believe, would have turned out differently had EBG made full disclosure to ATG.  In addition, Mr. Hewitt comments that the downside costs could be partially offset by outstanding MMT receivables. *See* Hewitt Affidavit, ¶13(c). Mr. Hewitt provides no specifics or details on this point.

Mr. Hewitt readily acknowledges that he does not know what information was available to EBG at the time of the Transaction. See Hewitt Affidavit, ¶ 15.  Lacking such knowledge, he cannot opine on what impact disclosure would have had on ATG's analysis concerning an acquisition of MMT's assets.  Moreover, as previously stated, Mr. Hewitt did not have final decision making authority as to the Transaction.  Accordingly, it remains an issue of material fact whether ATG's assumptions and perceptions of the risks and benefits would have been altered had EBG made full and proper disclosure, and whether ATG would have consummated the transaction at all. Accordingly, the Court cannot, on summary judgment, determine that EBG's breach of its duty of disclosure did not cause damages to ATG.

## CONCLUSION

For the forgoing reasons, the Court should deny EBG's Motion for Summary Judgment in its entirety and grant Plaintiffs such other and further relief as this Court deems just and proper.

## REQUEST FOR ORAL ARGUMENT

The Plaintiffs believe that oral argument may assist the Court and wish to be heard.

Dated:    Norwalk, Connecticut
          July 7, 2006

                                            THE PLAINTIFFS,
                                            By their attorneys,
                                            JACOBS PARTNERS LLC

By:    _____*/s/ Robert M. Fleischer*_____
       Mark R. Jacobs
       Leslie L. Lane
       Robert M. Fleischer
       Merritt View
       383 Main Avenue
       Norwalk, Connecticut 06851
       Phone: (203) 846-6622
       Fax: (203) 846-6621

       -    and-

       McCARTER & ENGISH, LLPP
       William A. Zucker
       David Himmelfarb
       225 Franklin Street
       Boston, MA 02110
       (617) 345-7000

## CERTIFICATION OF SERVICE

The undersigned hereby certifies that a copy of the foregoing PLAINTIFFS'

MEMORANDUM IN OPPOSITION TO DEFENDANT EPSTEIN BECKER & GREEN P.C.'S

MOTION FOR SUMMARY JUDGMENT was sent, by first class mail, postage prepaid, on this

7th day of July, 2006, to the following:

> Paula M. Bagger, Esq.
> Marjorie S. Cooke, Esq.
> Nancy Maroney, Esq.
> Cooke, Clancy & Gruenthal LLP
> 265 Franklin Street
> Boston, MA 02110
> *Fax: 617-428-6868*

By: */s/ Robert M. Fleischer*
   Robert M. Fleischer, Esq.