# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**ROBERT I. HANFLING, CHAPTER 11 TRUSTEE FOR ATG, INC. AND ATG CATALYTICS L.L.C.**

                           **Plaintiff,**

      **vs.**

**EPSTEIN BECKER & GREEN, P.C., et al.,**

                          **Defendant(s)**

**C.A. No. 05-10077-RGS**

**July 7, 2006**

## AFFIDAVIT OF ROBERT M. FLEISCHER

I, Robert M. Fleischer, having been duly sworn, deposes and states as follows:

1.  I am a member in good standing of the Bar of the State of Connecticut and am admitted, *pro hace vice*, to this Court in this action.

2.  Attached hereto as Exhibit A are true and accurate photocopies of pages of the Proposed Amended Complaint in this action.

3.  Attached hereto as Exhibit B are true and accurate photocopies of Exhibit 3 marked at the Michael Tuteur deposition in this action.

4.  Attached hereto as Exhibit C are true and accurate photocopies of pages from the transcript of Carole Schwartz Rendon, taken in this action.

5.  Attached hereto as Exhibit D are true and accurate photocopies of Exhibit 12 marked at the deposition of Ethan Jacks in this action.

6.    Attached hereto as Exhibit E are true and accurate photocopies of the Consolidated Complaint in *In re: Molten Metal Technology, Inc. Securities Litigation* C.A. No. 97-10325-MLW.

7.    Attached hereto as Exhibit F are true and accurate copies of pages from the transcript of the deposition of Alan L. Braunstein, taken in this action.

8.    Attached hereto as Exhibit G are true and accurate photocopies of Epstein Becker & Green's Proof of Claim in *In re Molten Metal Techhnology, Inc.*, Case Number 21385-CJK with supporting documentation and cover letter which were produced by Epstein Becker & Green in this action.

9.    Attached hereto as Exhibit H are true and accurate copies of excerpts of ATG, Inc.'s Form 10-K (pages 1, 2 and 52) submitted to the Securities and Exchange Commission.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of July, 2006.

__s/Robert M. Fleischer_____
Robert M. Fleischer

**<u>Certification of Service</u>**

The undersigned hereby certifies that a copy of the foregoing Affidavit of Robert

M. Fleischer along with the attached exhibits were sent, by first class mail, postage

prepaid, on this 7th day of July, 2006, upon the following:

>   Paula M. Bagger, Esq.
>   Marjorie S. Cooke, Esq.
>   Cooke, Clancy & Gruenthal LLP
>   265 Franklin Street
>   Boston, MA 02110

                              By: <u>/s/ Robert M. Fleischer _____</u>
                                   Robert M. Fleischer

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**ROBERT I. HANFLING, CHAPTER 7**
**TRUSTEE FOR ATG, INC. and ATG**
**CATALYTICS L.L.C.,**

     **Plaintiffs,**

 **vs.**

**EPSTEIN BECKER & GREEN, P.C.,**

    **Defendant.**

**C.A. No. 05-10077-RGS**

## <u>AMENDED COMPLAINT (PROPOSED)</u>

  The plaintiffs, Robert I. Hanfling (the "Trustee"), the duly appointed Chapter 7

Trustee for ATG, Inc. ("ATG") and its wholly owned subsidiaries, and ATG Catalytics

L.L.C. ("ATG Catalytics", and jointly with the Trustee, the "Plaintiffs"), by their

undersigned counsel, as and for their amended complaint (the "Complaint") against the

defendant, Epstein Becker & Green, P.C. (the "Defendant" or "EBG"), allege and plead

as follows:

  1. Plaintiffs commenced this civil proceeding pursuant to section 542 of Title

11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy

Procedure 7001(1), to recover for the benefit of Plaintiff's bankruptcy estates damages

arising from the Defendant's actions and omissions in connection with the sale of certain

assets of Molten Metal Technology, Inc. ("MMT") to ATG Catalytics in December,

1998.

## <u>JURISDICTION AND VENUE</u>

  2. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §

1334.

3.      Venue is proper before this Court by virtue of, and in accordance with, 28 U.S.C. § 1409(a).

## NATURE OF THIS ACTION

4.      The Plaintiffs bring this action in order to recover damages against the Defendant for negligence and breach of contract arising from a transaction wherein certain assets of MMT were sold to ATG Catalytics.

## PARTIES

5.      The Trustee is the duly appointed chapter 7 bankruptcy trustee for ATG and its wholly owned subsidiaries.

6.      ATG Catalytics is, and was at all relevant times, a wholly owned subsidiary of ATG.

7.      Upon information and belief, the defendant EBG is a professional corporation organized under the laws of the State of New York with offices and a principal place of business located at 250 Park Avenue, New York, NY.

## FACTUAL BACKGROUND

8.      On December 3, 2001 (the "Petition Date") ATG filed a voluntary petition for relief under chapter 11 Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court").

9.      By order dated January 25, 2002, the Bankruptcy Court directed that the United States Trustee appoint a chapter 11 trustee for the Debtor.

10.      On February 6, 2002, the United States Trustee appointed, subject to Bankruptcy Court approval, the Trustee to serve as the chapter 11 trustee for the Debtor.

11.      On February 11, 2002, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee as chapter 11 trustee for the Debtor (Case No. 01-46389).

12.     On June 12, 2002, ATG Catalytics, at the direction of the Trustee, filed a voluntary petition in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code (Case No. 02-43164).

13.     On April 27, 2003, the Bankruptcy Court entered an order converting the bankruptcy cases of ATG and its wholly owned affiliates, including ATG Catalytics, to cases under chapter 7 of the Bankruptcy Code and thereafter the Trustee was appointed to serve as the chapter 7 trustee for the Debtor and each of the Debtor's wholly-owned subsidiaries, including ATG Catalytics.

**MMT and Q-CEP**

14.     MMT, based in Waltham, Massachusetts, and four of its affiliates, filed petitions for relief under chapter 11 of the Bankruptcy Code on December 3, 1997. Thereafter, Stephen S. Gray was appointed Chapter 11 Trustee for MMT (the "MMT Trustee"). MMT's bankruptcy case is pending in the United States Bankruptcy Court for the District of Massachusetts, Boston Division (Case No. 97-21385 (CJK)).

15.     MMT, prior to its bankruptcy case, was engaged in various business ventures, including the transportation and processing of hazardous and/or radioactive waste.

16.     MMT had two primary operating business assets: one was the so-called "wet-waste" business, which related to the transportation, processing, packaging and disposal of wet waste materials. The second was its Catalytic Extraction Process business ("CEP"), which, through fixed base operations in Fall River Massachusetts and Oak Ridge, Tennessee, was used to treat commercial wastes with the goals of extracting reusable products from the waste while dramatically reducing the volume of waste that required disposal. MMT further developed the CEP system to treat radioactive resin waste generated by commercial facilities, such as nuclear power generators, through a system called Quantum Catalytic Extraction Process ("Q-CEP") that was located at MMT's Bear Creak, Tennessee facility (the "Q-CEP Facility").

17.     At various times between 1993 and MMT's bankruptcy filing, MMT issued public statements that indicated, directly or by implication, that MMT's technologies, including Q-CEP, were operational and commercially viable.

18.     Upon information and belief, and contrary to MMT's public statements, although MMT invested significant resources into development of the CEP and Q-CEP technologies, MMT was never able to make those technologies effective, safe or profitable.

19.     Upon information and belief, at the time of MMT's bankruptcy filing, the CEP/Q-CEP technologies were, in fact, highly flawed and unsafe to operate. The full extent of the problems associated with the CEP/Q-CEP technologies were not generally known to the public.

**Federal Investigations of MMT**

20.     In September of 1993, MMT signed an agreement with the United States Department of Energy ("DOE") to participate in the DOE's Planned Research and Development Announcement program ("PRDA"). Under the PRDA, the DOE would fund research and development of technologies geared towards treatment and recycling of a variety of DOE wastes.

21.     Upon information and belief, between 1993 and 1997, the DOE paid millions of dollars to MMT to fund MMT's technologies in accordance with contracts entered into between DOE and MMT pursuant to the PRDA.

22.     Beginning in or about May of 1997, various federal government entities began investigating MMT in connection with the contracts awarded to MMT pursuant to the PRDA. These investigations included a joint investigation by the DOE Office of Inspector General, and the Federal Bureau of Investigation ("FBI"). The FBI was performing its investigation of MMT in conjunction with the Department of Justice Campaign Finance Task Force. In addition, the United States House of Representatives, House Commerce Committee, was also involved in the investigations of MMT, and was conducting its own hearings. The various federal investigations of MMT are referred to

hereinafter, collectively, as the "Federal Investigations." The Federal Investigations included a grand jury investigation.

23.    In connection with the Federal Investigations, MMT was represented by the law firm Latham & Watkins ("L&W"). On May 19, 1997, L&W entered into a written confidentiality and joint defense agreement (the "Joint Defense Agreement") with MMT, MMT's co-counsel (Bingham, Dana & Gould LLP), three of MMT's officers and directors and their respective counsel (the firms of Hale & Dorr, LLP, Vinson & Elkins LLP, and Duncan & Allen). As part of the Joint Defense Agreement, the parties to that agreement agreed to exchange with and disclose to each other various confidential defense materials, while preserving and protecting, as against those who were not parties to the Joint Defense Agreement, the confidentiality of such materials and any applicable privilege or protection. The Joint Defense Agreement permitted disclosure of defense materials to only a very small universe of persons, comprised of (a) employees of any counsel who are assisting in the representation of such counsel's client; and (b) experts or consultants working on behalf of or under direction of any counsel to the Joint Defense Agreement.

24.    In connection with the Federal Investigations, government investigators sought to interview various MMT employees. In addition, several MMT employees were subpoenaed to testify in grand jury proceedings, and at hearings being conducted by the House Commerce Committee. The government informed MMT that separate counsel would be necessary for the employees, that L&W would not be allowed to appear on their behalf and that the government would litigate the matter to conclusion, if necessary.

25.    In light of the government's demands, in August of 1997, MMT retained EBG to represent the MMT employees in connection with the Federal Investigations. EBG represented 24 separate MMT employees in connection with the Federal Investigations, including Christopher Nagel ("Nagel"), who at that time was an officer and director of MMT. Upon information and belief, each of the MMT employees' retention of EBG was at the insistence and recommendation of MMT, and MMT agreed

-6-

to pay EBG for all legal fees incurred by MMT and/or MMT employees in connection with EBG's representation of the MMT and/or MMT employees.

26.     The EBG attorney primarily responsible for the representation of MMT employees was Carole Schwartz Rendon ("Rendon").

27.     Neither EBG, Rendon, nor the individual MMT employees represented by EBG in connection with the MMT investigation had signed the Joint Defense Agreement. However, EBG and Rendon actively participated in the Joint Defense Agreement by participating in joint defense communications and conferences, and by sharing confidential written communications expressly subject to the Joint Defense Agreement and the attorney-client and attorney-work product privileges. By their active participation in the Joint Defense Agreement, Rendon and EBG became *de facto* parties to the Joint Defense Agreement.

28.     EBG's role in the Federal Investigations went beyond representing the MMT Employees and participating in the Joint Defense Agreement. EBG provided legal counseling and representation directly to MMT in connection with the Federal Investigations, such that there was a *de facto* attorney client relationship directly between MMT and EBG.

29.     After MMT filed its chapter 11 bankruptcy petition in December of 1997, MMT, then a debtor in possession, desired to obtain authority from the bankruptcy court in MMT's case to employ EBG as counsel in connection with the federal investigations. A draft application to employ EBG, to be filed with the bankruptcy court, was prepared on or about December 6, 1997. However, because EBG refused to waive its pre-bankruptcy petition claim against MMT for unpaid legal fees incurred in connection with the Federal Investigations, MMT could not pursue the application. MMT nonetheless desired to have EBG continue to represent MMT and the MMT employees. Consequently, MMT agreed to pay EBG for legal services rendered to MMT and the MMT employees during the chapter 11 proceeding by characterizing the payments as

-7-

"employee expense reimbursements," thereby side-stepping the requirements of sections 327 and 330 of the Bankruptcy Code.

**The McConchie Letter**

30.    On or about March 25, 1998, Nagel received a letter (the "McConchie Letter") from the law firm of Dwyer & Collora, LLP concerning Garnet Earl McConchie, the former Vice President of MMT's Chemicals Business. The McConchie Letter set forth at length the flaws in the CEP and Q-CEP technologies and the malfeasance and misfeasance of certain individuals, including Nagel, in connection with MMT's recruitment of Mr. McConchie.

31.    On or about April 20, 1998, Nagel sent a copy of the McConchie Letter to Rendon, and Rendon read the McConchie Letter. Rendon subsequently conferred with Nagel and Eugene Berman ("Berman"), MMT's vice president of governmental and external affairs about the McConchie matter.

32.    Upon information and belief, the dispute between McConchie and Nagel and Haney was resolved in an out of court settlement.

**Shareholder Class Action Litigation**

33.    During 1997, a series of five lawsuits were commenced by various shareholders of MMT against MMT and certain officers and directors. Subsequently in 1997, the five lawsuits were consolidated into a single class action lawsuit titled *In re Molten Metal Technology, Inc. Securities Litigation*, which was pending in the United States District Court for the District of Massachusetts (Case No. 97-10325-MLW) (the "MMT Litigation").

34.    Among the individual officers and directors of MMT named as individual defendants in the MMT Litigation were Nagel and John Preston ("Preston"), a former director of MMT.

35.    The plaintiffs in the MMT Litigation alleged numerous violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Specifically, the plaintiffs alleged that the defendants made numerous false and misleading public

-8-

statements about MMT and its technologies. Many of the public statements in issue in the MMT Litigation related to public statements regarding the capabilities of MMT's technology, including CEP and Q-CEP.

36.    The plaintiffs' consolidated complaint in the MMT Litigation outlined specific serious problems with the CEP/Q-CEP facilities, and alleged that, notwithstanding public statements made by MMT to the contrary, the CEP/Q-CEP systems were not capable of commercial, profitable, operation.

37.    On or before November 3, 1998, EBG began to represent Nagel in the MMT Litigation, and began to participate in a joint defense agreement with other defendants and their respective counsel in the MMT Litigation.

38.    Upon information and belief, the MMT Litigation was resolved in an out of court settlement.

**EBG Proof of Claim Against MMT**

39.    On or about March 19, 1998, EBG filed a proof of claim (the "Proof of Claim") in MMT's bankruptcy case, pursuant to which EBG asserted a claim against MMT's bankruptcy estate in the amount of $34,607.04 for unpaid legal services, which EBG rendered to MMT prior to the commencement of MMT's chapter 11 bankruptcy proceeding.

**ATG'S Purchase of Bear Creek CEP/Q-CEP Business**

40.    Subsequent to his appointment as MMT's Trustee, the MMT Trustee undertook to sell off the operational assets of MMT, including the Wet Waste business, and the CEP/Q-CEP operations located at Bear Creak Road in Oak Ridge, Tennessee, and in Fall River, Massachusetts.

41.    During 1998, Preston and Nagel were interested in jointly acquiring certain assets of MMT from the MMT Trustee. Preston and Nagel created Quantum Catalytic LLC ("Quantum"), an entity through which Preston and Nagel intended to acquire assets of MMT.

42.    In or about September 1998, ATG learned that the MMT Trustee was looking to sell off MMT assets. Also around this time, ATG learned that Nagel and Preston were interested in acquiring certain MMT assets.   Upon information and belief, ATG learned, first from the MMT Trustee, and later from Preston and Nagel, that there might be a benefit to ATG to work with Preston and Nagel on a joint bid to acquire various assets from MMT.

43.    ATG retained EBG to represent ATG in negotiations with Preston and Nagel on a joint bid for assets of MMT, and in negotiations with the MMT Trustee.

44.    Preston, Nagel and Quantum were represented by the firm Mintz Levin Cohn Ferris Glovsky and Popeo, PC ("Mintz Levin") in negotiations with ATG and the MMT Trustee in connection with a joint bid with ATG to acquire MMT assets.

45.    During the negotiations between ATG and Preston, Nagel and Quantum, Preston and Nagel informed and assured ATG that technical issues with the CEP process had been worked out. Consequently, although ATG realized that MMT had lost money on the CEP/Q-CEP business, ATG negotiated a transaction with Quantum to jointly bid on assets of MMT.  ATG's decision to go forward and negotiate a joint bid with Quantum and the MMT Trustee was based upon its understanding and beliefs that:

  a)  MMT's CEP/Q-CEP business had been run in an extremely inefficient manner by MMT and the MMT Trustee;

  b)  the CEP/Q-CEP process was on the verge of profitability, with a high upside potential;

  c)  MMT had already made most of the investments in CEP/Q-CEP required to achieve higher waste processing rates, and that the existing constraints were largely a function of completing on-going process tweaking and focusing trained personnel on the job at hand.

  d)  MMT's CEP/Q-CEP business was in a strong position in a strong market area; and

  e)  the CEP/Q-CEP business was close to profitability.

46.    On November 6, 1998, ATG and Quantum submitted a joint bid for substantially all of the assets of MMT, including the Wet Waste and CEP/Q-CEP assets. Thereafter, on November 13, 1998, ATG and Quantum submitted a revised bid (the "ATG/Quantum Bid") to the MMT Trustee for the MMT assets. Thereafter, the MMT Trustee determined that the ATG/Quantum Bid was the highest and best offer for the assets covered in the ATG/Quantum Bid.

47.    On November 24, 1998, the Bankruptcy Court in MMT's bankruptcy case conducted a hearing on, *inter alia*, the MMT Trustee's request for authority to sell MMT Assets pursuant to the ATG/Quantum Bid. Jarvis Kellogg, an attorney then employed with EBG, represented ATG at the November 24, 1998 hearing.

48.    On November 25, 1998, the Bankruptcy Court (Kenner, U.S.B.J.) in MMT's bankruptcy case, entered an order approving the sale of the Wet Waste and CEP/Q-CEP assets to ATG and Quantum in accordance with the terms of the ATG/Quantum Bid, subject to certain amendments. On December 1, 1998, the MMT Trustee, Quantum and ATG Catalytics entered into a letter agreement (the "Letter Agreement") pursuant to which the MMT Trustee agreed to sell, and ATG Nuclear Services, LLC ("Nuclear Services"), ATG Catalytics and Quantum each agreed to purchase, certain assets of MMT. Specifically, ATG Nuclear Services was to acquire MMT's Wet Waste business assets, and ATG Catalytics was to acquire all of MMT's CEP/Q-CEP business assets excluding certain CEP related assets that Quantum was acquiring.

49.    The monetary terms of the sale for the CEP/Q-CEP assets, subject to various adjustments, included an immediate cash payment to MMT of $100,000.00 and minimum annual installment payments for five years thereafter of at least $800,000.00 each, commencing on the one-year anniversary of the sale closing date. In addition, ATG agreed to pay, and guarantee the payment of ATG Catalytics' payment obligations.

Further, ATG assumed various liabilities, including certain environmental liabilities related to the CEP/Q-CEP facilities.

50.     On December 1, 1998, the parties closed on the sale and ATG Catalytics acquired ownership of MMT's CEP/Q-CEP business assets (except those assets acquired by Quantum). ATG was represented by EBG at the closing.

51.     In accordance with certain federal and state regulations, ATG purchased financial assurance in the form of an insurance policy (the "Financial Assurance Policy") from Indian Harbor Insurance Company ("Indian Harbor"), to cover closure and/or post-closure expenses associated with various ATG hazardous waste properties, including the CEP/Q-CEP facility in Oak Ridge, Tennessee. The Financial Assurance Policy guaranteed payment of closure costs and/or post-closure costs associated with the shut down of the CEP/Q-CEP facility. The Financial Assurance Policy included a provision requiring ATG to reimburse Indian Harbor for any amounts paid by Indian Harbor under the Financial Assurance Policy for closure and/or post-closure expenses. The Financial Assurance Policy contained a $4.8 million sub-limit for the CEP/Q-CEP facility in Oak Ridge, Tennessee.

**Failure of the CEP/Q-CEP Business**

52.     Upon its acquisition of the CEP/Q-CEP business assets from MMT and the MMT Trustee, ATG undertook to operate the CEP/Q-CEP business. However, ATG ran into immediate, severe problems with the CEP/Q-CEP facility, which prevented continuous, reliable operation of the CEP/Q-CEP system.

53.     The problems with the CEP/Q-CEP technology alleged by McConchie in the McConchie Letter, alleged by the shareholders in the MMT Litigation, and alleged by the government in the Federal Investigations, were true.

54.     On or about December 9, 1999, the one-year anniversary following the closing of the sale, the first annual installment of $800,000 relative to the CEP/Q-CEP assets was paid to MMT from collateral held by the MMT Trustee pursuant to the Letter Agreement.

55.     By the end of 2000, ATG was forced to shut down its operation of the CEP/Q-CEP business that it had acquired from MMT due to significant, insurmountable problems. ATG then defaulted on its remaining payment obligations to MMT under the Letter Agreement.

56.     On or about January 15, 2004, the State of Tennessee demanded forfeiture of the full sub-limit of the Financial Assurance Policy applicable to the CEP/Q-CEP facility in Oak Ridge, Tennessee. On or about February 24, 2004, Indian Harbor paid the State of Tennessee $4.8 million, the full sub-limit applicable to the CEP/Q-CEP facility, on account of the state's demand of forfeiture of the Closure Assurance Policy. Thereafter, Indian Harbor filed a proof of claim in ATG's bankruptcy case asserting, *inter alia*, a $4.8 million unsecured claim arising from ATG's obligation to reimburse Indian Harbor.

57.     The assumptions upon which ATG decided to move forward with a joint bid with Quantum to acquire the CEP/Q-CEP assets, outlined in Paragraph 45 above, were incorrect, insofar as:

    a) MMT and the MMT Trustee had operated, or attempted to operate, the CEP/Q-CEP facility in as efficient a manner as possible, given the constraints and limitations on the CEP/Q-CEP facility's operational capabilities;

    b) MMT's CEP/Q-CEP process was not on the verge of profitability, and did not have any upside potential whatsoever;

    c) No amount of additional investment in the CEP/Q-CEP facility by ATG would attain profitable operation of the facility. Further, existing constraints on the system's processing capabilities were the result of serious system design defects, and were not largely a function of completing on-going process tweaking and focusing trained personnel on the job at hand;

d) Given the serious operational constraints on the system, MMT's CEP/Q-CEP business was in a weak position in the market; and

e) The CEP/Q-CEP business was not close to being, and never could be, profitable.

58.    As a result of the transaction, ATG, *inter alia*, incurred approximately a $4.1 million liability to the MMT Trustee. Furthermore, ATG was required to pay, and did pay, approximately $296,000 to secure transfer of the required Closure/Post-Closure Bond/Insurance to ATG. ATG also incurred liability of not less than $4.6 million pertaining to environmental contamination of the real property in Oak Ridge Tennessee where the Q-CEP facility is located.

## EBG's Failure To Adequately Disclose Conflicts and Obtain Conflict Waivers

59.    Upon information and belief, EBG, after it had begun to represent ATG in connection with ATG's joint bid to acquire assets from MMT, conducted and completed an internal conflict of interest check.

60.    During its conflict check, EBG attorneys learned that EBG had represented MMT officers and employees, including Nagel, in connection with the Federal Investigations and the Shareholder Litigation.

61.    As a result of its prior representation of MMT and MMT employees and officers, including Nagel, and as a result of its pecuniary interest in MMT and its bankruptcy estate, EBG had a conflict of interest with respect to its representation of ATG in connection with ATG's joint bid and purchase of MMT assets.

62.    EBG did not, prior to commencing its representation of ATG in connection with ATG's joint bid to acquire assets from MMT, or after commencing its representation of ATG, disclose, or adequately disclose, its prior representations of MMT and MMT employees to ATG. Nor did EBG disclose that it held a pecuniary interest in MMT's bankruptcy estate, as reflected in EBG's Proof of Claim.

-14-

63.    EBG did not obtain any written conflict waivers from ATG or MMT before it commenced its representation of ATG in connection with its joint bid to acquire MMT assets.

## COUNT I
## NEGLIGENCE and BREACH OF CONTRACT (MALPRACTICE)

64.    The Plaintiffs incorporate herein the allegations set forth in all of the above paragraphs in their entirety as if set forth fully herein.

65.    EBG, as counsel to ATG, had a duty to fully and fairly disclose its conflicts, or potential conflicts, of interest to ATG prior to undertaking to represent ATG in connection with ATG's purchase of assets from MMT.

66.    EBG breached its duty to ATG when it failed, prior to undertaking its representation of ATG in connection with ATG's joint bid and purchase of MMT assets, to adequately disclose to ATG that:

(a)    EBG had participated in a joint defense agreement in connection with the Federal Investigations and in the MMT Litigation;

(b)    EBG had provided direct legal representation to MMT in the Federal Investigations;

(c)    EBG was representing Nagel in the MMT Litigation;

(d)    among the issues raised in both the Federal Investigations and the MMT Litigation were whether there were serious problems with MMT's CEP/Q-CEP technology;

(e)    among the issues raised in the Federal Investigations and the MMT Litigation, were the honesty and credibility of MMT officers and directors, including Preston and Nagel;

-15-

(f)    McConchie had outlined, in the McConchie Letter, his specific claims regarding serious defects with MMT's CEP/Q-CEP technology and related assets;

(g)    McConchie alleged, in the McConchie Letter, matters going to the honesty and credibility of, among others, Nagel; and

(h)    EBG possessed a pecuniary interest in MMT's bankruptcy estate, as evidenced by its Proof of Claim.

67.    EBG further breached its duty to ATG when, upon learning of EBG's potential conflict of interest, it failed to perform a thorough and adequate conflict analysis.

68.    EBG knew, or should have known, that full and fair disclosure of the circumstances pertaining to its conflicts, or potential conflicts of interest, including the matters alleged in the preceding paragraph, would likely have altered ATG's determination to go forward with a joint bid and purchase of MMT assets.

69.    As a direct and proximate cause of EBG's failure to adequately disclose its conflicts of interest, and potential conflicts of interest to ATG, ATG suffered damages, in an amount to be determined at trial, but not less than $10,000,000.00.

**WHEREFORE,** the Plaintiffs request that judgment be entered in its favor and against the Defendant as follows:

i.    damages, in an amount to be determined at trial, but not less than $10,000,000.00;

ii.    costs, including attorneys' fees, to the extent permitted by law, and expenses incurred by the Plaintiffs in the commencement and prosecution of this Complaint from its initial analysis to preparation through trial and any subsequent appeal ("Costs");

iii.  interest, at a per annum rate deemed by this Court to be

appropriate, from the Petition Date until such amount ordered

by this Court, together with all interest and Costs, is paid in full

to the estate; and

iv.  such other and further relief as is just and proper.

Dated:  Norwalk, Connecticut
        June 23, 2006

THE PLAINTIFFS,
By their attorneys,
MORGENSTERN JACOBS& BLUE, LLC

By: / s/ Robert M. Fleischer_____
    Mark R. Jacobs
    Leslie L. Lane
    Robert M. Fleischer
    Merritt View
    383 Main Avenue
    Norwalk, Connecticut 06851
    Phone: (203) 846-6622
    Fax: (203) 846-6621




### Epstein Becker & Green

1227 25TH STREET, N.W.
WASHINGTON, D.C. 20037-1156
DIRECT:

202.861.1860

**CE MEMO**

gton, D.C.

**To:**      Thomas Torres

**cc:**      Jarvis P. Kellogg
             Michael J. Tuteur

<u>**CONFIDENTIAL**</u>

**From:**    Kenneth B. Weckstein

**Date:**    November 16, 1998

**Re:**      Allied Technology Group, Inc./Molten Metal Technology, Inc.
             Conflict Resolution

---

It seems to me that our clients in the Molten Metal matter are employees of Molten Metal, and not Molten Metal itself. If that is the case, our representation of Allied Technology Group, Inc. ("ATG") in its efforts to buy a portion of the assets of Molten Metal would not appear to create a conflict. In addition, because the sale of the Molten Metal assets is being conducted by a trustee appointed by a bankruptcy court for the benefit of Molten Metal's creditors, ATG may not even be adverse to Molten Metal. Finally, I understand that to the extent Molten Metal was a client of the firm, it was brought in by Carole Schwartz Rendon, who is no longer with the firm. I do not know whether the client left with Carol.

Notwithstanding the above, I am not certain whether our actual client under 30659, matter 100, is (or was) Molten Metal or its employees, and I am not certain whether there is an actual conflict. Accordingly, by copy of this letter, I am requesting that Mike Tuteur advise us whether there is a conflict, and, if so, what action we should take.

DC:38362.1

**EBG 2079**

**From:**      Michael Tuteur
**To:**        Johnson, Catherine, Kellogg, Jarvis, Torres, Tho...
**Date:**      11/18/98 9:45AM
**Subject:**   Molten Metal

As promised, I spoke with Carole Schwartz Rendon and she has confirmed that EBG never performed work for Molten Metal itself (as opposed to MMT's officers/employees). Accordingly, I do not perceive any conflict in representing ATG.

**EBG 2080**

Ken Weckstein - Re: Molten Metal Technology, Inc.

**From:**     Michael Tuteur
**To:**         Johnson, Catherine, Kellogg, Jarvis, Torres, Tho...
**Date:**     Mon, Nov 16, 1998 6:23 PM
**Subject:**  Re: Molten Metal Technology, Inc.

In response to Ken's memo:

To the best of my knowledge (which I will confirm with Carole Schwartz Rendon), we have never represented Molten Metal; rather, we have represented MMT's employees.

Among the employees that we represented in the past is Chris Nagel. We (specifically, I) continue to represent Chris in connection with the shareholder litigation against MMT and its former officers and directors. While I understand that Chris is involved in the ATG matter, nothing I have heard to date suggests the existence of a current conflict with a representation of ATG.

Please let me know if there is additional information that you need.

>>> Catherine Johnson 11/16 5:18 PM >>>

Please read the attached Interoffice Memorandum from Ken Weckstein.
Thanks.

EBG 2081

1   Q     Are you referring to an entry that is dated

2         April 20, 1998?

3   A     Correct.

4   Q     Do you know whether or not besides the entry

5         that appears on 4-20-1998 any other records of

6         EBG would reflect any work you may have done

7         in connection with McConchie, in connection

8         with Earl McConchie or E. McConchie?

9   A     I think it's unlikely because I didn't do any

10        work in connection with that matter other than

11        to review documents Chris Nagel sent to me.

12  Q     You testified among the documents was a

13        conflict waiver?

14  A     I believe he sent me two documents.  I believe

15        one was a letter Earl McConchie had sent.  To

16        whom it was addressed I cannot tell you.  The

17        other was some type of a conflict waiver that

18        my memory is Karen Green prepared.

19              (Exhibit O

20              Marked for identification.)

21  Q     The court reporter just handed you Exhibit O,

22        what is marked as Exhibit O.  If you could

23        take a look at that, please.

24  A     Okay, I've looked through it.

25  Q     A moment ago you referenced a letter that was

1     among the documents that Chris Nagel sent to

2     you for review.  Do any of the documents

3     contained or any of the pages contained within

4     Exhibit O, are they familiar with you?

5           MS. BAGGER:     Objection to the form

6     of the question.

7  A   The letter dated March 25th, 1998 looks

8     familiar to me.  Only because I have a

9     recollection of having seen a letter that was

10    addressed to both Bill Haney and Chris Nagel

11    that related to Earl McConchie.

12  Q  Do you believe this might be that letter?

13  A  It's possible.  I don't recall seeing anything

14    with this kind of odd fonts.

15  Q  Other than the fonts being a little strange,

16    which they clearly are, does the document

17    otherwise seem familiar to you?

18  A  Only in very general terms in that I remember

19    Chris sending to me a letter that was

20    addressed to him and Bill Haney that had

21    something to do with Earl McConchie,

22    complaints that Earl McConchie had regarding

23    his termination.

24  Q  With respect to the April 20th time entry --

25           MS. BAGGER:     Back on Exhibit N?

1    Q    Yes, Exhibit N, with respect to the Exhibit N

2         April 20th time entry, there is a statement

3         and review of related materials.  Was that

4         the -- are you referring to the materials that

5         Chris sent you, which included a letter which

6         may or may not be Exhibit O, and a conflict

7         form?

8    A    That is my memory of what those materials

9         were.  It would appear to me it may not have

10        been what is contained in Exhibit O because

11        time entry is March 20, the letter is dated

12        March 25th.  April 20th, sorry.  Maybe it is

13        this exact letter.  I apologize.

14             The material that I recall reviewing in

15        connection with this matter were a letter that

16        was addressed to both Bill Haney and Chris

17        Nagel, that had to do with Earl McConchie's

18        termination and conflict form that I

19        understand Karen Green had prepared.

20   Q    Do you recall whether or not that letter was

21        prepared by an attorney for Mr. McConchie?

22   A    That is my memory.  It could very well be the

23        letter that is contained within Exhibit O.  I

24        can't say that for certain.

25   Q    Do you know if you discussed, if you

1    reviewed -- strike that.

2          Do you know if you reviewed the letter

3    prior to discussing -- prior to your

4    discussion with Chris?

5          MS. BAGGER:        Objection.

6  Q  I'm referring to Chris Nagel.

7  A  My memory, it's reflected and refreshed by the

8    time entry that is that Chris called, and then

9    described the situation to me.  I asked him to

10   fax to me the letter and the conflict form.

11   He did so, I reviewed them, had a follow-up

12   conversation both that day and the following

13   day, briefly the following day with Chris.

14  Q  Did Mr. Nagel explain to you -- strike that.

15        Did Mr. Nagel go over with you his

16   substantive responses to what Mr. McConchie or

17   his counsel were saying in the letter?

18        MS. BAGGER:        Objection,

19   foundation.                    /

20  A  No, not to my memory.  The issue was is Karen

21   Green able to represent both Bill Haney and

22   myself.

23  Q  Do you recall what Gene Berman's involvement

24   was in that discussion?

25  A  I do not.  Other than seeing it in my time

Page 106

```
 1  Q    Yes.  Do you recall the document this April 7,
 2       1998 document?
 3  A    I don't have a specific independent memory of
 4       this, no.  Having read it, it looks familiar.
 5       I can't say I remember anything beyond what is
 6       in the document.
 7  Q    You don't -- strike that.  Do you know whether
 8       or not this letter had ever been actually
 9       issued to the Department of Justice?
10  A    I do not know.
11  Q    Do you have any reason to believe it may have
12       been?
13  A    I don't know one way or the other.
14  Q    Moving forward a bit.  Do you recall being
15       contacted sometime in 1998 by Epstein, Becker
16       concerning a conflict check they were
17       performing?
18  A    Yes.
19  Q    Who were you contacted by?
20  A    Mike Tuteur.
21  Q    Anyone else at Epstein, Becker & Green?
22  A    Not that I recall, no.
23  Q    What did -- mike called you?
24  A    Yes, he did.
25  Q    What did he say when he called you?
```

1   A     My memory is he asked me whether or not we had

2         ever represented Molten Metal Technology, the

3         entity, as opposed to employees of Molten

4         Metal Technology.

5   Q     What did you tell him?

6   A     I told him we had only represented employees

7         of Molten Metal Technology.  We, we being

8         Epstein, Becker & Green and myself never

9         represented Molten Metal Technology itself.

10  Q     Did he ask to review any of the files?

11  A     Not that I recall.

12  Q     Did you discuss with him any of the

13        communications that you had with other counsel

14        representing MMT, including the Latham,

15        Watkins attorneys?

16  A     No.

17  Q     Did he ask about your communications with

18        other counsel related to the federal

19        investigation?

20  A     Not that I recall, no.

21  Q     Did he ask you if the firm had been a party to

22        a joint defense agreement?

23  A     Not that I recall, no.

24  Q     Did you discuss with him or mention to him the

25        shareholder litigation?

1    A    I don't recall when Mike called me.  Whether

2         it was before or after the conversation I

3         described earlier, where I told him, asked him

4         if it was okay to give Chris Nagel his name as

5         an attorney that Chris could contact to

6         represent him in connection with the

7         shareholder litigation.

8    Q    Do you recall whether the McConchie matter

9         ever came up in your conversation with Mike

10        Tuteur?

11   A    To my recollection, it did not.

12   Q    Do you recall -- strike that.  The period of

13        time that you were working on the MMT matter,

14        I'm referring to your representation of

15        various individuals, what was the scope of

16        time while you were at EBG, was that from

17        August, summer of 1997 all the way up to about

18        the time you left?

19   A    My memory is that my work for the Molten Metal

20        employees diminished pretty significantly

21        prior to my departure.  That there was very

22        little activity in the late spring and summer

23        of is it 1998.

24   Q    When was the high point of that work?

25   A    That work was at its busiest right after I was

Page 114

1   Q     We were talking at one point about the

2         discussions that you had, discussion you had

3         with Mike Tuteur concerning his conflict

4         check.  Did he tell you who they were going to

5         represent or who the perspective client was?

6   A     Not to my memory, no.

7   Q     Does the name ATG sound familiar other than

8         seeing it in preparation for this deposition?

9   A     No.

10   Q     Do you recall how many separate discussions

11         you had with Mike?

12            MS. BAGGER:        On the subject of a

13         conflict?

14   Q     Yes, that would have occurred after you left

15         Epstein, Becker & Green?

16   A     I only recall the one.

17   Q     Were there -- do you know how long the

18         conversation was?

19   A     Well, we talked about our kids, our families

20         and stuff first.

21   Q     Subtracting out the personal?

22   A     A minute or two.

23   Q     That was it.  Were there any written

24         discussions as well?  Was there any written

25         communications regarding a conflict check

Page 10

```
 1         between you and Mike?

 2   A     Not that I recall, no.

 3   Q     I do want to touch back on this issue of your

 4         retention of Cooke, Clancy or by Cooke,

 5         Clancy.  Cooke, Clancy -- your retention of

 6         Cooke, Clancy to represent you in this

 7         deposition.  Let me ask you about it.

 8               When exactly did you retain Paula's law

 9         firm to represent you in this matter?

10   A     Paula and I discussed that last year in the

11         context of a discussion about the possibility

12         that I would be deposed.

13   Q     When did you decide to actually retain her law

14         firm?

15   A     When I received a notice from Paula that I was

16         going to be deposed.

17   Q     What was the reason why you needed to have

18         counsel represent you?

19   A     Because I always think it's better for a

20         witness to have a lawyer with them at a

21         deposition than to appear by themselves.

22   Q     Even if that the lawyer is also representing a

23         party in the proceeding?

24   A     She is representing my former law firm.

25   Q     Do you still have a financial connection to
```



MOLTEN METAL TECHNOLOGY, INC. D.I.P.

No. 43180

TE28-JUN-98

VENDOR NAME: EPSTEIN BECKER & GRE

VENDOR NO.: 4718

| INVOICE NO. | INVOICE DATE | DESCRIPTION | DISCOUNT AMOUNT | NET AMOUNT |
|---|---|---|---|---|
| 8279 | 24-JUN-98 | PROFESSIONAL SERVICES RENDERED | 0.00 | 1,091.80 |
| 8280 | 24-JUN-98 | PROFESSIONAL SERVICES FOR CHRI | 0.00 | 517.00 |
| | | | 0.00 | 1,608.80 |



MOLTEN METAL TECHNOLOGY INC. D.I.P.

No. 43180

| CHECK DATE | CHECK NUMBER | CHECK AMOUNT |
|---|---|---|
| 28-JUN-98 | 43180 | ****1,608.80 |

PAY One Thousand Six Hundred Eight Dollars And 80 Cents************

TO THE
ORDER OF
EPSTEIN BECKER & GREEN, P.C.
75 STATE STREET
BOSTON, MA 02109

AUTHORIZED SIGNATURE
CHECKS OVER $100,000 REQUIRE DUAL SIGNATURES

⑈043180⑈ ⑈011001331⑈ 110 0937836⑈

MOLTEN METAL TECHNOLOGY, INC. D.I.P.

43180

7628



D041832/DE2605.EPS

## EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW
75 STATE STREET
BOSTON, MASSACHUSETTS 02109

(617) 342-4000
FACSIMILE: (617) 342-4001

Rhonda Walker
12321 River Oak Point
Knoxville, TN 37922

June 24, 1998
Invoice # 238279

FOR PROFESSIONAL SERVICES RENDERED

through 05/31/98:

30688/1
DOE/FBI Investigation

| | | | |
|---|---|---|---|
| 04/03/98 C.S.Schwartz Rendon | Telephone conference with R. Walker; telephone conference with E. Jacks regarding letter; editing letter to D. Schneider | .3 | 70.50 |
| 04/06/98 C.S.Schwartz Rendon | Telephone conference with R. Walker regarding recent developments, attorney proffer, etc.; telephone conference with E. Jacks regarding authorization letter; drafting letter to D. Schneider regarding document subpoena. | 1.2 | 282.00 |
| 04/06/98 C.S.Schwartz Rendon | Telephone conference with R. Walker regarding recent developments, attorney proffer, etc., telephone conference with E. Jacks regarding authorization letter; drafting letter to D. Schneider regarding document subpoena | 1.2 | 282.00 |
| 04/07/98 C.S.Schwartz Rendon | Telephone conference with D. Schneider regarding attorney proffer; telephone conference with E. Jacks regarding authorization for | 1.2 | 282.00 |

PLEASE INCLUDE OUR REFERENCE NUMBER ON YOUR CHECK

# EPSTEIN BECKER & GREEN, P.C.

### ATTORNEYS AT LAW
#### 75 STATE STREET
#### BOSTON, MASSACHUSETTS 02109     Page:     2

#### (617) 342-4000
#### FACSIMILE: (617) 342-4001

Rhonda Walker

June 24, 1998

FOR PROFESSIONAL SERVICES RENDERED

DOE/FBI Investigation

|  |  |  |  |
|---|---|---|---|
|  | disclosure; finalizing documents for production; drafting letter to R. Walker regarding same. |  |  |
| 04/17/98 C.S.Schwartz Rendon | Telephone conference with R. Walker regarding developments | .2 | 47.00 |
| 04/20/98 C.S.Schwartz Rendon | Telephone conference with R. Walker regarding developments and course of action; fax to R. Walker regarding same | .5 | 117.50 |

Total Hours     4.6

Total For Services     $1,081.00

Disbursements Made on Behalf of Client:

|  |  |
|---|---|
| Photocopies | .80 |
| Air Courier | 10.00 |
| Disbursements Total | $10.80 |

### ATTORNEY SUMMARY

| Attorney | Hours Worked | Billed Per Hour | Bill Amount |
|---|---|---|---|
| C.S.Schwartz Rendon | 4.60 | 235.00 | 1,081.00 |
| Total all Attorneys | 4.60 | 235.00 | 1,081.00 |

Total This Invoice

$1,091.80

O.K. TO PAY

PLEASE INCLUDE OUR REFERENCE NUMBER ON YOUR CHECK

## EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW
75 STATE STREET
BOSTON, MASSACHUSETTS 02109

(617) 342-4000
FACSIMILE: (617) 342-4001

Christopher Nagel

June 24, 1998
Invoice # 238280

FOR PROFESSIONAL SERVICES RENDERED

through 05/31/98:

30716/1
DOE/FBI Investigation

| | | | | |
|---|---|---|---|---|
| 04/20/98 | C.S.Schwartz Rendon | Telephone conference with C. Nagel and G. Berman regarding E. McConchie; review of related materials, follow-up conversations with C. Nagel and G. Berman regarding joint representation issues | 2.1 | 493.50 |
| 04/21/98 | C.S.Schwartz Rendon | Telephone conference with C. Nagel regarding revised conflict letter | .1 | 23.50 |

Total Hours    2.2

Total For Services    $517.00

ATTORNEY SUMMARY

| Attorney | Hours Worked | Billed Per Hour | Bill Amount |
|---|---|---|---|
| C.S.Schwartz Rendon | 2.20 | 235.00 | 517.00 |
| Total all Attorneys | 2.20 | 235.00 | 517.00 |

Total This Invoice

$517.00

O.K. TO PAY

PLEASE INCLUDE OUR REFERENCE NUMBER ON YOUR CHECK

SHIP TO: ☐ Molten Metal Technology, Inc.
421 Currant Road
Fall River, MA 02720

SOLD TO: ☐ Molten Metal Technology, Inc.
51 Sawyer Road
Waltham, MA 02154

**Molten Metal Technology**

PURCHASE REQUISITION

☐ Other_____

**TN – PR# 008554**

| SUGGESTED VENDORS – IF NEW VENDOR, ADDRESS NEEDED | PURCHASE ORDER NO. | |
|---|---|---|
| *Epstein, Becker & Green* | | |
| *75 State Street* | DATE REQUIRED IN OUR PLANT | SHIP VIA |
| *Boston, MA 02109* | TERMS | PRICE & DELIVERY CONFIRMED BY |
| SUPPLIER TELEPHONE / FAX NO. *(617) 342-4000* | ACCT. REF. NO. | F.O.B. | DATE *7/20/9* |
| PROJECT CODE [ ] - [ ] | W.O. NO. | DELIVER TO: | RECEIPT REQUIRED Yes ☐ No ☐ | BUYER INITIAL |
| DEPARTMENT / G/L CODE *0110-26171* | COMMODITY CODE: | P.O. TYPE (circle one) S, B, C |
| | | ☐ MAIL P.O. ☐ FAX P.O. ☐ CONFIRMING ONLY |

| MMT PART NO. | QUANTITY | UNIT | DESCRIPTION & CATALOG NO. / COMMODITY CODE | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| | | | *Invoice # 238280  6/24/98* | | |
| | | | *Re: Christopher Nagel* | | |
| | | | *DOE/FBI Investigations* | | |
| | | | *Services through 5/31/98* | | |
| | | | | | |
| | | | | | |

*01*
*52*
*7T*
*7410*
*00*
*00*

ENTERED JUL 2 2 1998

| Equipment used on/or Project description | PROJECT LOCATION | Description |
|---|---|---|
| | ☐ Waltham | |
| | ☐ Fall River | |
| | ☐ Oak Ridge | |
| | ☐ | ☐ MMT Contract Agreement Required |

| Check Needed: | | | Give Check To: | Special Instructions: (i.e. Send Check with Order) |
|---|---|---|---|---|
| Yes | No | Date: | | |
| Budgeted | | | | |
| Yes | No | Date: | | REQUISITION TOTAL **517.00** |

*Rae-Ann M Edwards*
REQUISITIONER
*Rae-Ann M Edwards*
WHITE - PURCHASING    CANARY & PINK -

MANAGER
*Carl Berman*



SHIP TO: ☐ Molten Metal Technology, Inc.  SOLD TO: ☐ Molten Metal Technology, Inc.
421 Currant Road                                    51 Sawyer Road
Fall River, MA 02720                                Waltham, MA 02154

**Molten Metal Technology**

PURCHASE REQUISITION          ☐ Other_____          TN − PR# 008555

| SUGGESTED VENDORS - IF NEW VENDOR, ADDRESS NEEDED | | PURCHASE ORDER NO. | |
|---|---|---|---|
| *Epstein, Becker & Green P.C.* | | | |
| *75 State Street* | DATE REQUIRED IN OUR PLANT | SHIP VIA | |
| *Boston MA 02109* | TERMS | PRICE & DELIVERY CONFIRMED BY | |
| SUPPLIER TELEPHONE / FAX NO. *(617) 342-4000* | ACCT. REF. NO. | F.O.B. | DATE *7/20/9a* |
| PROJECT CODE   -   | W.O. NO.   DELIVER TO: | RECEIPT REQUIRED  Yes ☐  No ☐ | BUYER INITIAL |
| DEPARTMENT / G/L CODE  *01 01 - 2 6 71* | COMMODITY CODE: | P.O. TYPE (circle one)  S, B, C | |
| | | ☐ MAIL P.O.  ☐ FAX P.O.  ☐ CONFIRMING ONLY | |

| MMT PART NO. | QUANTITY | UNIT | DESCRIPTION & CATALOG NO. / COMMODITY CODE | UNIT PRICE | TOTAL |
|---|---|---|---|---|---|
| 01 | | | *Invoice # 238279   6/24/98* | | |
| 02 | | | *Re: DOE/ FBI Investigations* | | |
| 671 | | | *Services through* | | |
| 741° | | | *5/31/98* | | |
| 00 | | | | | |
| 00 | | | | | |
| | | | | | |
| | | | ENTERED JUL 2 2 1998 | | |

| Equipment used on/or Project description | PROJECT LOCATION | Description |
|---|---|---|
| | ☐ Waltham | |
| | ☑ Fall River | |
| | ☐ Oak Ridge | |
| | ☐ | ☐ MMT Contract Agreement Required |

| Check Needed: | | | Give Check To: | Special Instructions: (i.e. Send Check with Order) |
|---|---|---|---|---|
| Yes | No | Date: | | |
| **Budgeted** | | | | |
| Yes | No | Date: | | REQUISITION TOTAL  *1,091.80* |

REQUISITIONER *Kathleen M. Edwards*

MANAGER *Robert Bulman*

WHITE - PURCHASING    CANARY - P/INV





# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE MOLTEN METAL TECHNOLOGY, INC. SECURITIES LITIGATION | ) ) ) )    C.A. No. 97-10325-MLW |

## CONSOLIDATED COMPLAINT

Plaintiffs, individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to the allegations which pertain to the named plaintiffs and their counsel, which are alleged upon personal knowledge. Plaintiffs' information and belief is based, <u>inter alia</u>, on the investigation made by and through their attorneys, which investigation included, among other things, a review of the public documents and press releases of Molten Metal Technology, Inc. ("Molten Metal" or the "Company"), interviews with witnesses, review of documents of the United States Department of Energy, review of license files at the Tennessee Department of Environment and Conservation and the Massachusetts Department of Environmental Protection, and consultations with experts.

## INTRODUCTION

1.      This action arises from defendants' false and misleading representations, beginning prior to the commencement of the Class Period (March 28, 1995 through October 18, 1996), by which they misrepresented the development and capabilities of Molten Metal's waste processing technology. Defendants misrepresented that this

c:\wp\molten.met\concomp

technology was capable of operating on a commercial scale, and that it could recycle elements of waste materials into commercially valuable products. The defendants specifically misrepresented that two different facilities in Oak Ridge, Tennessee (the Q-CEP Facility and the M4 Technology Center) had commenced commercial operations. Contrary to defendants' public claims, the licensing files of the Tennessee Department of Environment and Conservation reveal that both of the facilities were unable to process waste materials as designed, and that major design and engineering changes were required. Neither of the facilities had commenced commercial operations before the end of the Class Period, and Molten Metal's joint venture partners in those facilities withdrew from the joint ventures. Defendants also made false representations concerning funding from the United States Department of Energy. Finally, defendants inflated Molten Metal's revenues and earnings by improperly reporting revenue and failing to report expenses from Molten Metal's 50%-owned subsidiary, M4 Environmental, L.P.

2.      As a result of defendants' conduct as alleged herein, the Individual Defendants were able to sell over $15.6 million of Molten Metal stock during the Class Period at inflated prices, and Molten Metal used its stock to pay for transactions with other companies.

3.      When the true facts began to be revealed in October of 1996, the price of Molten Metal stock dropped approximately 50%, with a loss in the market value of Molten Metal's stock of over $300 million. Since the end of the Class Period, the price

c:\wp\molten.met\concomp                    2

004422

of Molten Metal stock has declined further by approximately $10 per share, with an additional loss in market value of approximately $230 million.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. 78aa] and 28 U.S.C. §§ 1331 and 1337.

5.      This action arises under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C. 78j(b)], Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. 240.10b-5] and Section 20(a) of the Exchange Act [15 U.S.C. 78t(a)].

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  Molten Metal has its corporate headquarters in this District, and the acts complained of herein, including the preparation, issuance and dissemination of materially false and misleading information to the investing public, occurred in substantial part in this District.

7.      In connection with the acts alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications and the facilities of the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), a national securities exchange.

004423

## PARTIES

8.    Marilyn Axler purchased 500 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 500 | 03/28/96 | $36.28 |

9.    Saul Schwartz purchased 2,000 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 2,000 | 09/25/96 | $32.55 |

10.    Kenneth G. Davis purchased 5,000 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 1,000 | 08/20/96 | $32.50 |
| 1,000 | 09/20/96 | 32.25 |
| 1,000 | 09/24/96 | 31.50 |
| 1,000 | 09/24/96 | 33.75 |
| 1,000 | 10/18/96 | 30.00 |

11.    Steven Somkin purchased 400 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No Shares | Trade Date | Price |
|---|---|---|
| 400 | 04/18/96 | $32.00 |

004424

12.    The James M. Friedland Trust, purchased 800 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 200 | 06/01/95 | $22.00 |
| 400 | 08/22/95 | 22.25 |
| 200 | 07/29/96 | 25.25 |

13.    Albert H. Socolov purchased 1,500 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 1,000 | 05/02/95 | $17.75 |
| 500 | 10/17/95 | 35.75 |

14.    The Louisiana Employees State Retirement System purchased 43,800 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 5,100 | 03/29/95 | $15.569 |
| 800 | 03/31/95 | 16.755 |
| 1,400 | 04/03/95 | 17.50 |
| 12,400 | 05/31/96 | 30.125 |
| 6,900 | 06/28/96 | 29.00 |
| 1,800 | 07/16/96 | 23.875 |
| 900 | 07/17/96 | 25.875 |
| 3,300 | 07/23/96 | 25.775 |
| 2,200 | 07/24/96 | 23.792 |
| 1,000 | 07/25/96 | 24.615 |
| 8,000 | 07/30/96 | 26.00 |

004425

15.    Viviane Brahms purchased 3,000 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 3,000 | 04/24/96 | $35.00 |

16.    Stephen A. Levin purchased 200 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 200 | 06/20/96 | $29.50 |

17.    Joseph Muoio purchased 7,900 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 200 | 11/27/95 | $38.50 |
| 400 | 06/12/96 | 32.50 |
| 700 | 07/17/96 | 26.25 |
| 600 | 07/26/96 | 23.00 |
| 1,000 | 08/07/96 | 26.25 |
| 1,000 | 09/16/96 | 31.00 |
| 4,000 | 10/18/96 | 28.25 |

18.    James A. Black purchased 8,000 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 200 | 04/06/95 | $17.50 |
| 800 | 04/07/95 | 17.50 |
| 780 | 04/11/95 | 16-5/8 |
| 1,000 | 04/18/95 | 18.25 |
| 220 | 06/19/95 | 25.25 |
| 1,000 | 07/26/95 | 24.75 |
| 1,000 | 09/26/95 | 27.50 |
| 350 | 09/28/95 | 32.00 |

004426

| | | |
|---|---|---|
| 650 | 09/28/95 | 32.50 |
| 1,000 | 10/24/95 | 37.00 |
| 1,000 | 10/25/95 | 37.50 |

19.    Mark D'Angelo purchased 8,000 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 1,000 | 06/04/96 | $30.75 |
| 2,000 | 08/07/96 | 26.25 |
| 5,000 | 10/14/96 | 29.00 |

20.    Thea Landesberg and William C. Schillaci purchased 150 shares of Molten Metal stock in the open market during the Class Period as follows and were damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 150 | 02/13/96 | $37.00 |

21.    Harvey Crosby purchased 1,100 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 500 | 04/18/96 | $31.50 |
| 200 | 04/24/96 | 32.25 |
| 400 | 05/20/96 | 31.25 |

22.    Brian Eagleston purchased 100 shares of Molten Metal stock in the open market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 100 | 10/08/96 | $32.00 |

004427

23.    Morton Sherman purchased 100 shares of Molten Metal stock in the open

market during the Class Period as follows and was damaged thereby:

| No. Shares | Trade Date | Price |
|---|---|---|
| 100 | 10/27/95 | $36.50 |

24.    Defendant Molten Metal is a Delaware corporation with its principal

executive offices in Waltham, Massachusetts. Molten Metal describes itself as an

environmental technology company commercializing cost-effective high-quality

environmental solutions for converting hazardous wastes to useful materials. At all

relevant times, Molten Metal common stock was publicly traded on the NASDAQ

National Market System and was registered pursuant to Section 12 of the Exchange Act

(15 U.S.C. §78e). The market for Molten Metal common stock was therefore open, well

developed and efficient at all relevant times. Molten Metal files annual, quarterly and

other reports with the SEC in accordance with the Exchange Act. As of November 12,

1996, the Company had outstanding more than 23 million shares of common stock.

25.    Defendant William M. Haney, III ("Haney") is, and at all times relevant

hereto has been, President, Chief Executive Officer and Chairman of the Board of

Directors of Molten Metal. In fiscal year 1995, Haney received cash compensation in

excess of $300,000, plus options to purchase Molten Metal stock. As of March 11, 1996,

Haney was a beneficial owner of approximately 5.4 million shares of Molten Metal

common stock, including 754,860 shares issuable upon exercise of outstanding options,

representing approximately 23 percent of all shares then outstanding. Haney was a co-

004428

founder of Molten Metal.  Haney sold over $3 million of Molten Metal stock during the Class Period as alleged below.

26.    Defendant Christopher J. Nagel ("Nagel") currently holds the titles Vice President of Fundamentals, Chief Technical Officer and Founding Scientist.  He is, and at all times relevant hereto, has been a Director of Molten Metal.  He has been a Vice President or Executive Vice President of Molten Metal at all relevant times.  During all or most of the Class Period, Nagel held the position of Executive Vice President of Science and Technology.  In fiscal year 1995, Nagel received cash compensation in excess of $200,000, plus options to purchase Molten Metal stock.  As of March 11, 1996, Nagel was a beneficial owner of approximately 2.07 million shares of Molten Metal common stock, almost all of which were issuable upon exercise of outstanding options, representing approximately 8 percent of all shares then outstanding.  Nagel sold over $3 million of Molten Metal stock during the Class Period as alleged below.

27.    Defendant John T. Preston ("Preston") is, and at all times relevant hereto, has been a Director of Molten Metal and a member of the Audit Committee and Compensation Committee of the Board of Directors.  Preston owned approximately 2.3 million shares of Molten Metal stock as of March 11, 1996.  He participates in the Company's Amended and Restated 1989 Long-Term Incentive Compensation Plan, which provides for the grant of stock options to non-employee directors.  Preston sold almost $2 million of Molten Metal stock during the Class Period as alleged below.

28.    Defendant Maurice F. Strong ("Strong") is, and at all times relevant hereto, has been a Director of Molten Metal.  Strong owned approximately 40,000 shares of

004429

Molten Metal stock as of March 11, 1996. Another 262,000 shares of Molten Metal stock were owned by a company of which Strong is Chairman. He participates in the Company's Amended and Restated 1989 Long-Term Incentive Compensation Plan, which provides for the grant of stock options to non-employee directors. Strong sold almost $3 million of Molten Metal stock during the Class Period as alleged below.

29.    Defendant Benjamin T. Downs ("Downs") is, and at all times relevant hereto, has been the Company's Executive Vice President of Finance and Administration, Chief Financial Officer and Treasurer. Downs reportedly is also a former college roommate of defendant Haney. Downs sold approximately $1.6 million of Molten Metal stock during the Class Period as alleged below.

30.    Defendant Victor E. Gatto, Jr. ("Gatto") is, and at all times relevant hereto, has been the Company's Vice President of Government Sector. Gatto sold approximately $100,000 of Molten Metal stock during the Class Period as alleged below.

31.    Defendant Ian C. Yates ("Yates") served as Vice President of Sales and Market Development of Molten Metal from September 1992 until he left the Company in April 1996. Yates sold approximately $2.7 million of Molten Metal stock during the class period as alleged below.

32.    Defendants Haney, Nagel, Preston, Strong, Downs, Gatto and Yates are sometimes referred to herein collectively as the "Individual Defendants."

33.    Each of the Individual Defendants, by reason of his management position, his membership on the Molten Metal Board of Directors and/or stock ownership was, at

004430

relevant times, a "controlling person" of Molten Metal within the meaning of

Section 20(a) of the Exchange Act.

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

34.    Plaintiffs bring this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who

purchased shares of Molten Metal common stock on the open market during the period

from March 28, 1995 through October 18, 1996, inclusive (the "Class Period"), and who

were damaged thereby (the "Class"). Excluded from the Class are defendants; members

of the immediate family of each of the Individual Defendants; any director, officer,

agent, subsidiary, affiliate or a joint venture partner of Molten Metal; any entity in which

any excluded person has a controlling interest; and their legal representatives, heirs,

successors and assigns.

35.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to plaintiffs at this

time and can only be ascertained through appropriate discovery, plaintiffs believe that

there are thousands of members of the Class located throughout the United States. As

of November 12, 1996, there were more than 23 million shares of Molten Metal common

stock outstanding. Throughout the Class Period, Molten Metal common stock was

actively traded on the NASDAQ National Market System. Record owners and other

members of the Class may be identified from records maintained by Molten Metal

and/or its transfer agent and may be notified of the pendency of this action by mail and

publication, using forms of notice similar to those customarily used in securities class actions.

004431

36.    Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

37.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

38.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

(b)    Whether defendants participated in and pursued the illegal course of conduct complained of herein;

(c)    Whether documents, press releases, public filings, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, financial condition and operations of Molten Metal;

(d)    Whether the market price of Molten Metal common stock during the Class Period was artificially inflated due to the material misrepresentations and omissions complained of herein; and

(e)    To what extent the members of the Class have sustained damages and the proper measure of damages.

004432

39.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class individually to seek redress for the wrongs done to them.   There will be no difficulty in the management of this suit as a class action.

### FACTUAL ALLEGATIONS

### I.   The Company's Technology

40.    Molten Metal claims to be an environmental technology company with an innovative, proprietary processing technology known as "Catalytic Extraction Processing" ("CEP"), which is purportedly capable of processing hazardous, nonhazardous, radioactive and mixed wastes.   According to defendants' representations, industrial wastes, referred to as "feedstocks," are introduced into a molten metal bath operating at approximately 3,000° Fahrenheit.   The molten metal bath breaks down the molecular structure of the feedstocks into their constituent elements that then dissolve into the molten metal.

41.    The Company has repeatedly represented that it has demonstrated the capability of its technology to process a variety of hazardous wastes on a commercial scale.

42.    The Company has also repeatedly represented to the investing public that the Company's proprietary CEP technology is capable of recycling wastes so that a variety of commercially useful products can be recovered and reused as raw materials or sold to others.   Molten Metal refers to this recycling as "Elemental Recycling."   Molten

004433

Metal has claimed that by adding selected chemicals, referred to as "reactants," to the molten metal bath, it can reformulate waste products into new usable products that can be recovered.

43.    On September 20, 1993, Molten Metal issued a press release announcing that the Company had officially opened its $15 million Recycling-Research & Development (R&D) Facility in Fall River, Massachusetts (hereafter the "Fall River Facility"). The press release stated that the opening of the facility marked "the facility's commencement of commercial scale demonstration of Catalytic Extraction Processing (CEP), Molten Metal Technology's breakthrough technology for recycling hazardous and non-hazardous wastes." Defendant Haney was quoted in the press release as stating that the opening of the facility "represents a cornerstone achievement in the commercialization of CEP."

## II. Defendants' False Statements that Molten Metal's Technology Can be Operated on a Commercial Scale

44.    Molten Metal has claimed that its technology can be operated on a commercial scale in numerous public statements, including Molten Metal's annual report on Form 10-K for the year ended December 31, 1994, filed with the SEC on March 28, 1995 (hereafter sometimes referred to as the "1994 Form 10-K") and Molten Metal's annual report on Form 10-K for the year ended December 31, 1995, filed on April 1, 1996 (hereafter sometimes referred to as the "1995 Form 10-K"). Defendants Haney, Nagel, Downs, Preston and Strong signed both the 1994 Form 10-K and the 1995 Form 10-K.

004434

45.    Prior to the Class Period, Molten Metal had claimed in the September 20, 1993 press release that the largest CEP system in the Fall River Facility was "a commercial-scale prototype capable of recycling up to two tons of waste per hour."

46.    The 1994 Form 10-K represented:

". . . . A series of pre-operational tests and commercial-scale demonstrations on feedstock samples representative of those of prospective customers from the chemical, petrochemical and environmental service industries and the United States Department of Energy have shown the safety and reliability of CEP and feedstock conversion meeting or exceeding regulatory standards for a wide range of chemical components and physical forms."

47.    The 1995 Form 10-K similarly represented:

"Since February 1993 . . . the Company has demonstrated CEP's ability to dissociate feedstocks and recover products in laboratory, bench-scale, pilot-scale and commercial-scale trials in its Fall River Facility. These pre-operational tests and commercial-scale demonstrations on feedstock samples representative of those of prospective customers from the chemical, petrochemical and environmental service industries and the DOE and DoD have shown the safety and reliability of CEP and feedstock conversion meeting or exceeding regulatory standards for a wide range of chemical components and physical forms."

48.    In both the 1994 Form 10-K and the 1995 Form 10-K, Molten Metal described its plans to build commercial CEP facilities, thereby representing that the technology could be operated on a commercial scale. The 1994 Form 10-K represented that "MMT has formed relationships with market leaders to deliver initial CEP plants."

49.    The 1995 Form 10-K represented that the technology was ready for Molten Metal to enter commercial operations.

"For the initial commercialization of CEP, MMT has identified three markets where it believes CEP offers the greatest immediate value and meets pressing customer needs . . . . In each of these markets, MMT has

004435

formed, and is in the process of forming, relationships with market leaders to deliver initial CEP systems."

50.    In its 1995 Annual Report to Shareholders, issued on or about April 3, 1996, Molten Metal claimed that in 1995 it had moved "beyond our roots in technical developments to our future in commercial operations."

51.    Molten Metal's claim that its Fall River Facility is capable of processing two tons of waste per hour is false and misleading. In fact, according to a report by the National Research Council issued in or about September 1996, the Fall River Facility required 120 hours, or five days, to process two tons. That is a rate of 33 pounds per hour, a rate that was not economically viable for a waste processing facility and that was not a commercial-scale operation.

52.    In an application filed with the Massachusetts Department of Environmental Protection ("Mass. DEP") on March 15, 1994, Molten Metal stated that it intended to process 8,640 pounds of waste over a 72-hour period, i.e., a rate of 120 pounds per hour. Molten Metal never disclosed that its supposed commercial-scale unit in the Fall River Facility never actually processed waste at a rate more than a tiny fraction of the two tons of waste per hour capability that had been claimed. A rate of 120 pounds per hour is substantially less that what would be required for commercial scale processing of wastes.

53.    On January 9, 1996, Molten Metal issued a statement that falsely touted the commercialization of its technology. The statement characterized Molten Metal as: "An entrepreneurial success story -- a company that is successfully commercializing an innovative proprietary pollution prevention and recycling technology . . . ."

004436

54.    The January 9, 1996 statement further claimed that "Molten Metal technology is successfully delivering on its commercialization plan." As evidence of "delivering on its commercialization plan," Molten Metal cited the alleged "significant milestones" of commissioning a Quantum-CEP facility (the "Q-CEP Facility") and a second facility (the "M4 Facility") that "commercially processes heterogeneous liquid and solid mixed wastes from the U.S. Department of Energy." The January 9, 1996 statement also represented that Molten Metal's CEP technology is "economically attractive" and "has a broad range of economically-compelling applications."

55.    When the January 9, 1996 statement was issued, defendants knew that the Q-CEP Facility and the M4 Facility were not operational and required substantial design and engineering changes which might or might not work (see Sections V and VI below).

56.    Contrary to defendants' representations, the Company was not capable of operating its technology on a commercial basis at any time during the Class Period because of numerous problems, including at least the following:

(a)    Molten Metal has not been able to operate the CEP process on a continuous basis for more than a few days at a time.

(b)    The lines or pipes through which the feedstock is injected into the molten bath have repeatedly clogged, preventing the injection of additional feedstock into the bath and requiring that the system be shut down.

(c)    The molten metal has chemically attacked the walls of the chamber containing the molten bath, causing wear of the walls and the necessity to replace the containment vessel frequently. Replacement of the containment vessel, or refractory

004437

walls, is a complicated and extended process that involves cooling down the reactor, replacing the containment vessel, and then gradually reheating the metal bath.

(d)    All of the feedstock is not dissolving in the molten bath. Instead, a significant amount of carbon in the form of dust is passing through the bath and entering the gas that is produced by the CEP process. This "dusting" has resulted in contamination of the gas and other problems with the operation of the systems. Molten Metal has attempted different approaches to solve this problem, including filter systems.

(e)    The CEP process produces volatile metals that exit the molten metal bath and enter the gas train that is generated by the process. Throughout the Class Period, Molten Metal was experimenting with different methods to separate these volatile metals from the gas train. Separating these volatile metals and disposing of them involves substantial costs that defendants have not disclosed. The March 15, 1994 application to the Mass. DEP projects that almost 5% of the feedstock will become volatile metals in the gas train that will have to be separated, placed in suitable containers, and shipped to a licensed disposal facility. In September 1996, near the end of the Class Period, Molten Metal decided to attempt using two metal baths in series in one application of the CEP process so that "unprocessed volatile material" that exits the molten bath will be processed in a second molten bath. In other applications of the CEP process, Molten Metal is attempting to separate the volatile metals from the gas train by means of a wet scrubber system that involves passing the gas through an aqueous solution. This scrubber system produces large volumes of contaminated water that has to be disposed of as a waste.

004438

### III.  Defendants' False Statements
### Concerning Molten Metal's Recycling Ability

57.    Defendants have repeatedly claimed that Molten Metal's technology is a recycling technology, and that 90% of the waste that is processed will be converted into valuable products.  The recycling ability of Molten Metal's technology is critical for both economic and regulatory reasons.  A recycling process is exempt from many regulations that would otherwise be applicable.  The supposed ability to generate revenue from recycled products is essential to Molten Metal's ability to compete with alternative, less expensive waste disposal methods, such as rotary kiln incinerators, vitrification, pyrolysis and plasma arc.

58.    Molten Metal's 1994 Form 10-K described Molten Metal's Elemental Recycling as follows:

> "The addition of various reactants to the molten metal enables reformation and recovery of products ("Elemental Recycling") for reuse as a raw material by the feedstock generator or for sale to other users."

59.    The 1994 Form 10-K also contained the following representations, among others:

(a)    a "series of pre-operational tests and commercial-scale demonstrations on feedstock samples representative of those of prospective customers .... have demonstrated product recovery from such feedstocks."

(b)    Molten Metal "has demonstrated that CEP systems can be customized to make specific products by adding different reactants or by varying the composition of the molten metal bath."

(c)    "The primary use of [the] Fall River Facility is to perform TDPs [Technical Development Programs] that demonstrate CEP's Elemental Recycling capability on a variety of feedstocks...."

60.    The 1995 Form 10-K similarly represented:

004439

(a)    "recovered products can be reused as raw materials in the production process or sold to other industrial customers."

(b)    CEP has the "ability . . . to process . . . wastes and industrial by-products while recovering products for reuse or sale."

(c)    The Company "has formed, and is in the process of forming, relationships with market leaders to deliver initial CEP systems" for, among other things, "conversion of waste streams into industrial gasses."

(d)    Molten Metal "has demonstrated CEP's ability to dissociate feedstocks and recover products in laboratory, bench-scale, pilot-scale and commercial-scale trials in its Fall River Facility."

(e)    "The primary use of [the] Fall River Facility is to perform TDPs that demonstrate CEP's Elemental Recycling capability on a variety of feedstocks...."

(f)    The Fall River Facility contains an area for "recovered material storage."

(g)    ". . . . commercial-scale trials . . . have demonstrated that CEP has the potential, through Elemental Recycling, to recover commodity and specialty products, such as industrial gasses, ceramics and metals, from feedstocks."

(h)    Molten Metal "has demonstrated that CEP systems can be customized to make specific products by adding different reactants or by varying the composition of the molten metal bath. CEP is designed to permit recovered products to be reused as raw materials by the feedstock generator in potential closed-loop applications or to be sold to other industrial customers."

61.    Contrary to these representations about "commercial-scale trials" demonstrating Molten Metal's ability to recover products, Molten Metal had not conducted any such commercial-scale trials. On February 16, 1996, in a letter to the Mass. DEP transmitting Molten Metal's *1995 Annual Report for Hazardous Waste Recyclers*, Molten Metal stated as follows:

"There was no hazardous waste recycled at the [Fall River] facility in greater than treatability study quantities, therefore items 6 and 7 [in the Annual Report] regarding the name and quantity of the material recycled are not applicable."

Items 6 and 7 in Molten Metal's report were answered as follows:

"6 - NAME OF MATERIAL RECYCLED N/A

7 - QUANTITY RECYCLED/YEAR None in 1995"

62.    In both the 1994 Form 10-K and the 1995 Form 10-K, Molten Metal stated

that it believes that among the "primary factors that create demand for CEP" was the

ability of CEP to recover products for reuse or sale.

63.    The 1994 Form 10-K also claimed that the CEP process produced three

distinct phases from which products could be recovered.

"Within the CEP system, the elemental constituents of the feed and
reactants separate and can be recovered from three distinct phases: (i)
gases which rise above the molten metal bath; (ii) molten ceramic products
which form a separate layer on top of the liquid metal; and (iii) metallic
elements which dissolve and collect in the liquid metal bath."

Contrary to this statement, Molten Metal has not been able to recover ceramic materials

separately from metals.

64.    In its March 15, 1994 application to the Mass. DEP, Molten Metal

admitted that "it is expected that the ceramic material will not be recovered separately

from the metal alloy." While the application claimed that the inability to recover

ceramic material was due to "the unique geometry of MMT's R&D reactor," there was

nothing unique about the reactor. The reactor referred to in the application was the

one-ton "commercial-scale" reactor at the Fall River Facility.

65.    In both its Form 10-Q for the quarter ended March 31, 1996, filed with the

SEC on or about May 13, 1996, and its Form 10-Q for the quarter ended June 30, 1996,

filed with the SEC on or about August 12, 1996, Molten Metal described its technology

004441

as broadly applicable to a wide variety of wastes and capable of recycling elements into useful raw materials. In those Forms 10-Q, Molten Metal represented as follows:

> "Molten Metal . . . . is an environmental technology company commercializing pollution prevention and waste recycling methods that are broadly applicable to a wide variety of hazardous, non-hazardous and radioactive wastes. The Company developed its core technology, Catalytic Extraction Processing ("CEP") to dissolve waste compounds to their constituent elements in a molten metal bath and reconfigure the elements into useful raw materials." (Emphasis added.)

66.    Molten Metal's representations concerning its supposed recycling ability were false and misleading. Molten Metal has not been able to recover reformulated products by means of its Elemental Recycling technology, with the sole exception that Molten Metal apparently can produce synthesis gas. (As noted below, even the synthesis gas does not meet commercial specifications and cannot be produced on an economic basis.) Molten Metal's representations that it can recover commodity and specialty products, such as industrial gases, chemicals and metals through elemental recycling and that it can customize CEP systems to make specific products by adding different reactants and/or by varying the composition of the Molten Metal bath as alleged above are therefore false and misleading.

67.    The March 15, 1994 application to the Mass. DEP referred to above also revealed that the synthesis gas expected to be recovered did not meet commercial specifications. For example, the application disclosed that "representative commodity product specifications" for synthesis gas called for less than one part per million by volume of nitrogen compounds, oxygen and carbon compounds. According to the application, Molten Metal projected that "representative gas product composition data"

004442

for the gas produced by the tests would substantially exceed these limits for nitrogen, oxygen and carbon compounds.

68.    The March 15, 1994 application to the Mass. DEP also stated that Molten Metal in the future intended to reduce the nitrogen levels in the synthesis gas by one of several technologies.  The least expensive of the technologies listed is pressure swing absorption.  However, the cost of applying pressure swing absorption technology is approximately $2.00 per thousand cubic feet of synthesis gas.  Molten Metal's application indicated that the projected value of the synthesis gas was approximately $2.08 per thousand cubic feet.  Thus, there is clearly no economic value from Molten Metal's recovery of synthesis gas.

## IV.  Defendants' False Representations Concerning the Waste Produced from Molten Metal's Technology

69.    Molten Metal's Form 10-K for 1994 and its Form 10-K for 1995 contained the following representation:

> "In addition, compared to conventional treatment methods, MMT believes that CEP can be utilized in a manner which minimizes or eliminates the creation of residual waste, thereby reducing the costs and risks associated with the residual waste disposal."

70.    These representations were false and misleading and failed to disclose that substantial amounts of waste are generated by the CEP process, which require disposal at considerable expense.

71.    For example, the March 15, 1994 application to the Mass. DEP disclosed that 5% of the feedstock to be used in the proposed test was expected to become volatile

metals that will be removed, placed into suitable enclosed containers, and shipped to a licensed disposal facility.

72.    The application also contemplated that the processing of 8,640 pounds of waste would generate 1,000 gallons of liquid solution from the gas scrubber that would be a waste requiring disposal.  One thousand gallons of the liquid waste would weigh at least 8,300 pounds.

73.    After waste is processed, the metal composing the molten metal bath is cooled into a solid ingot.  At a conference in March 1997, defendant Downs indicated that the amount of revenue generated by Molten Metal from the sale of recycled products had been minuscule.  In other words, Molten Metal had sold at best only a minuscule amount of the tons of metal used for the molten metal baths.  This substantial amount of material has been a waste product requiring disposal.  The metal from the metal baths used in processing radioactive wastes are contaminated with radioactive material and require disposal as radioactive waste.

74.    As noted above, the refractory, or chamber, that holds the metal bath must be replaced periodically because of wear.  The used refractory material also constitutes waste that must be disposed of.

75.    Molten Metal's process requires extensive filtering, and the filters have to be disposed of periodically as waste.

**V. Defendants' False Representations**
     **Concerning the Q-CEP Facility**

76.    On February 22, 1994, Molten Metal announced that it had signed an agreement with Scientific Ecology Group, Inc. ("SEG"), a wholly-owned subsidiary of

004444

Westinghouse Electric Corporation, "to work together to demonstrate that molten metal systems can be applied to the treatment of commercial low-level and mixed radioactive waste." The announcement stated that, "Upon successful completion of the demonstrations, SEG and Molten Metal Technology will develop a jointly owned commercial-scale system which could be operational in 1995."

77.    On December 5, 1994, it was announced that Molten Metal and SEG had signed a contract to build a $15 million commercial facility for the processing of radioactive resins from commercial nuclear power plants. The announcement stated that the two companies "recently completed a research and development program that demonstrated the effectiveness of Molten Metal Technology's proprietary Quantum-CEP Technology for processing resins." The facility was "scheduled to be operational mid-1995."

78.    The defendant Haney was quoted in the December 5, 1994 press release as follows:

> "Our relationship with SEG proves how effective collaboration on technology development can result in the timely delivery of critical new solutions. Quantum-CEP is emerging as the safest, most efficient means of processing radioactive material."

79.    Molten Metal's 1994 Form 10-K, filed with the SEC on March 28, 1995, reported that Molten Metal and SEG "are currently constructing a Quantum-CEP facility that is designed to process radioactively-contaminated ion exchange resins generated by nuclear power plants." The 1994 Form 10-K further stated that the facility "is estimated to cost $15 million and is expected to be operational in 1995."

80.     On August 22, 1995, Molten Metal issued a press release announcing that the Quantum-CEP plant being built with SEG (the "Q-CEP Facility") "will be fully commissioned by December 1995. Fabrication of the plant's process units will be complete in the third quarter of 1995." The press release further stated:

> "Initial waste shipments have already been received from customers. The currently required permits are in place, and the facility . . . is expected to be fully-permitted for operations by December 1995."

81.     The representation that all required permits are in place was false and misleading, in that only an EPA air discharge permit was required prior to construction. A radioactive material license that was required prior to commencing operations had not been issued. Molten Metal had applied for such a license on May 22, 1995. On July 11, 1995, the State of Tennessee requested substantial additional information or clarification, which information had not even been provided by August 22, 1995.

82.     The representation in the August 22, 1995 press release that "initial waste shipments have already been received from customers" was false and misleading. A license to receive such waste had not been issued. Either Molten Metal received waste without a license in violation of applicable law, or the waste shipments had been received by SEG pursuant to its license which was not related to the Q-CEP facility. As noted below, on June 14, 1996, almost a year after the August 22, 1995 press release, the State of Tennessee directed "immediate action to remove" radioactive resins from the Q-CEP facility because "it appears that the present continued possession of these materials will cause you to violate . . . your license."

83.    The representations in the December 5, 1994 and August 22, 1995 press releases were also misleading in at least the following additional respects. The so-called "research and development program that demonstrated the effectiveness" of Molten Metal's technology consisted of the operation of a pilot scale system with a 20 pound molten metal bath. The proposed Q-CEP Facility was to have the capacity for a 2.5 ton (5,000 pounds) molten metal bath. The license application stated that "a normal charge of metal will be approximately 1,800 pounds." The construction of the Q-CEP Facility involved designs and equipment that had never been tested. It was therefore false and misleading to indicate that the effectiveness of the technology had been demonstrated.

84.    On December 19, 1995, Molten Metal announced in a press release that the Q-CEP Facility was commencing operations. The press release stated as follows:

"Scientific Ecology Group, Inc. . . . and Molten Metal Technology, Inc. announced today the commissioning of their Quantum-CEP plant for processing ion exchange resins. The Quantum-CEP facility is capable of processing 650 High Integrity Containers or 130,000 cubic feet of ion exchange resins per year, representing 65 percent of the U.S. market for low-level radioactive ion exchange resins.

'The facility has all required regulatory permits, is mechanically complete, and has been turned over to operations. The major systems have been tested and the instrumentation and controls have been calibrated.

"'I am happy to announce that this facility is available on schedule and we expect tremendous success with volume reduction and recycling of this difficult waste,' said Bud Arrowsmith, SEG president. 'We've already received spent ion exchange resins from our customers and are pleased to offer this new, high-tech solution to the marketplace.'"

"'This is the largest and most sophisticated system in the world for handling this difficult radioactive material,' said William M. Haney, III, president and chief executive officer of Molten Metal Technology. 'We are extremely pleased with the market's response to Quantum-CEP.'" (Emphasis added.)

004447

85.    These representations concerning the Q-CEP facility were false and misleading.  On December 19, 1995, the Q-CEP Facility was not capable of processing any waste, much less radioactive waste, and it was not ready to commence operations. On the contrary, when Molten Metal attempted to operate the facility with surrogate, non-radioactive waste, it was unable to do so.  As detailed below, in the months following December 1995, the facility underwent substantial design changes in an effort to make it operational.

86.    Three days after the December 1995 announcement, defendant Nagel sold 102,500 shares of Molten Metal stock for proceeds in excess of $3.5 million.  On December 29, 1995, defendant Strong sold 10,000 shares of Molten Metal stock for proceeds of $326,300.

87.    Notwithstanding the fact that the facility failed start-up testing in December 1995 and the defendants knew that substantial design changes and license amendments were required, the defendants' public statements continued to represent that the plant was in commercial operations.

88.    In a January 2, 1996 press release issued by Molten Metal, defendant Yates commented in part:  "As our first commercial facilities come on-line in the U.S. . . . ."

89.    In a letter addressed "Dear Stakeholders" dated January 5, 1996, signed by defendant Haney, Molten Metal characterized the Q-CEP Facility as one of the Company's "first commercial facilities" and stated that it "was commissioned for the processing of radioactive-contaminated ion exchange resins."  This letter failed to

disclose that the facility was not able to complete its initial test runs, that the facility was not operational, and that it required significant design and engineering changes.

90.    In a press release issued by Molten Metal on March 6, 1996, defendant Haney claimed that "1995 was a year in which we successfully launched our first product line and commissioned our first commercial facilities." These statements were false and misleading and failed to disclose that the Q-CEP Facility was not operational.

91.    Shortly thereafter, defendant Haney sold 88,000 shares of Molten Metal stock for over $3 million on March 21-22, 1996.

92.    On or about April 3, 1996, Molten Metal issued its 1995 Annual Report to Shareholders. This report contained a number of representations that falsely and misleadingly suggested the Q-CEP facility was operating as follows:

    A.    "The Q-CEP facility processes spent ion exchange resins."

    B.    "In 1995, Molten Metal Technology commercialized several 'applications.'"

    C.    "Molten Metal Technology's commercial facility with Westinghouse SEG is processing radioactive ion exchange resins from utilities."

93.    The 1995 Annual Report contained a Chairman's letter signed by defendant Haney, which contained the following false and misleading representations:

    a.    "We started up our first commercial facilities. . . ."

    b.    "In 1995, we launched our first application, Quantum-CEP to process radioactive waste."

    c.    "In less than a year, we designed, built, permitted and started up a robotically-operated Quantum CEP plant with Westinghouse SEG. . . ."

    d.    "We successfully introduced our first CEP applications."

004449

e.    "We have reached the stage of commercial execution."

94.    These representations were false and misleading because the plant was not operating, much less at a commercial scale, throughout the Class Period. Instead, Molten Metal was attempting to solve the following problems, among others:

a.    <u>The Waste Feed Preparation System</u>

(i) The Q-CEP facility was designed to process radioactive resins from nuclear power plants. The radioactive resins to be processed were received from the customers with substantial free and bound water. This resin had to be sluiced from, or washed out of, the shipping casks and then processed to remove the water. When testing of the feed preparation system began in December of 1995 with nonradioactive surrogate waste, several aspects of the feed preparation system failed. As reflected in information submitted to the Tennessee Department of Environment and Conservation (hereafter "Tennessee Department"), the screens in the Dewatering Tank failed immediately. The dewatering and conveyor capability did not meet required process flows even after several variations in the testing scenarios. The Slurry Feed Pump piping had to be modified. The resin dryer particulate carryover was more than anticipated, causing rapid dust and moisture loading of the pre-filter. These failures required substantial modifications to the feed preparation system, including elimination of the screw conveyor for moving the resin through the system and the installation of a Horizontal Solid Bowl Centrifuge, modifying the piping, adding a multilevel decant system, and installing a cartridge dust collector. These proposed modifications had to be designed, engineered and manufactured, and the plant had to be retrofitted to

accommodate the new drying system. Molten Metal never publicly disclosed the failure of the feed preparation system and the modifications to it.

      (ii)  On May 22, 1996, an application was made to the Tennessee Department for an amendment to the license for the Q-CEP Facility in order to modify the "Feed Preparation System," specifically, the bulk ion exchange resin dewatering system, slurry feed system, T-1 Tank Decant operation, and the ion exchange resin dryer exhaust ventilation system. That request was supplemented with the submission of additional information on June 13, 1996. The records of the Tennessee Department reflect that the requested modifications of the Feed Preparation System "were deemed necessary by Q-CEP personnel as a result of start-up testing using non-radioactive ion exchange resins." The requested amendment to the license called for, among other things, a new design for the drying system by replacing the screw conveyor system with a centrifuge system, increasing the capacity of the slurry feed system and making modifications in the design of the slurry feed equipment. The requested amendment also called for installation of a dust collector because "resin dryer particulate carryover was more than anticipated." The application also indicated that the process would have to change from a continuous feed to a batch operation, and that the capacity per run would be reduced from six to four containers (or "liners") of resin.

      (iii)  The requested amendment was granted on June 14, 1996.

      (iv)  On June 30, 1996, there was an application for a further amendment to the license, to authorize a further modification of the "Slurry Thickening System" which was part of the feed preparation system. This required the installation of

another "Horizontal Solid Bowl Centrifuge." That amendment was granted on July 10, 1996.

(v)  On August 28, 1996, an application was made for yet a further amendment of the license, requesting authorization for additional modifications to the Slurry Thickening System. The requested amendment to the license was granted on September 11, 1996.

(vi)  As reflected in these amendments to the license for the Q-CEP Facility, a feed preparation system was not operational and the facility was not capable of commercial operations until some date after September 11, 1996. The licensing records reflect that from December 1995 to at least September 1996, Molten Metal and SEG were experimenting with the feed preparation system and design modifications in an effort to determine how to prepare wastes for injection into the molten bath.

b.    **Sulphur Contamination**

(i)  As indicated in the Company's license application to the Tennessee Department, the radioactive resins to be processed typically contain as much as 37% sulfur by weight after removal of all water. Some of the sulphur was expected to exit the molten bath in the gas train, along with other volatile materials, including radioactive cesium and zinc. The design of the Q-CEP facility provided for a zeolite trap, or filter, to filter radioactive elements out of the gas train. However, it was anticipated that sulphur in the gas train would interfere with the operation of the zeolite trap, thereby substantially reducing the trap's ability to capture zinc and cesium. The Department inquired of Molten Metal how the sulfur could be prevented from poisoning

004452

the zeolite trap. In its response to the Department, the Company indicated that its tests

showed 95% of the sulfur would remain in the metal bath, and 5% of the sulphur would

enter the gas train. The Company further indicated that the sulphur in the gas train

would be removed by a wet hydrogen sulphide ($H_2S$) scrubber. It was estimated that a

fully operational Q-CEP system operating at design capacity would generate 600 gallons

of liquid waste per day from the $H_2S$ scrubber. On November 14, 1996, a request was

made to amend the license to install a solidification system to solidify the liquid waste

generated by the $H_2S$ scrubber. The application requested permission to process 6,000

gallons per day, not the 600 gallons stated in the original application. On December 17,

1996, an amendment was requested to install a temporary storage solution for 700,000

gallons (the amount of liquid waste from the scrubber estimated to be generated in six

months) while the Company was installing the proposed solidification system. This waste

must be disposed of in a licensed facility. This amount of waste generated by the $H_2S$

scrubber would be 17.5 times the 80,000 cubic feet per year that it was projected the Q-

CEP facility could process. Molten Metal never disclosed that the facility would

generate this substantial amount of secondary waste.

     (ii) The requested amendment was granted on December 30, 1996.

    c.   **The Dusting Problem**

     (i) According to the design of the Q-CEP Facility, the waste to be

processed was injected into the bottom of the molten metal bath by means of a feed

pipe. The intention was that the waste would dissociate into different elements, some of

which were to remain in the metal bath and some of which would exit the bath in

004453

gaseous form, becoming what was referred to as the gas train. However, some of the carbon did not volatize into gaseous form but instead entered the gas stream in tiny particles as a particulate dust formation referred to as "dust." The amount of carbon dust generated by the process was much higher than Molten Metal had designed the facility to handle. However, based on its experience in its Fall River demonstration units, Molten Metal knew or recklessly disregarded that there would be substantially more carbon dust in the gas train than was estimated in the design for the Q-CEP Facility.

(ii)  This carbon dust in the gas train created several problems. First, it had to be filtered out of the gas, which required modification of the filtration system. As noted above, the gas train contained radioactive cesium, and the plant design called for removing the cesium by a filtering device known as a cesium or zeolite trap. However, the dust clogged the cesium trap; therefore, the dust had to be filtered out of the gas train before it reached the cesium trap. Second, the dust caused electrical interference with an induction coil that was used to provide heat necessary for the operation of the molten metal process. These electrical problems caused the system to shut down. Molten Metal attempted various modifications of the electrical system but had not solved this problem by the end of October 1996.

### The Truth about the Q-CEP Facility

95.  Contrary to defendants' representations about the Q-CEP Facility, and contrary to defendants' representations in Molten Metal's 1994 Form 10-K, 1995 Form 10-K and elsewhere that "commercial-scale demonstrations . . . have shown the safety

004454

and reliability of CEP," the Q-CEP Facility was still not operational at the end of the Class Period. In order to keep potential customers and the public from learning the truth about the failures of the Q-CEP Facility, Molten Metal accepted radioactive resins from some customers and induced SEG to store those resins in SEG's facilities. When the Tennessee Department discovered that radioactive materials intended for processing at the Q-CEP Facility were being stored in the SEG facility, the Tennessee Department sent a letter dated June 14, 1996 requesting "immediate action to remove" radioactive resins from the site. The letter further stated that "it appears that the present continued possession of these materials will cause you to violate . . . your license." The licensing authority did not permit radioactive resins to be held at the site because the Q-CEP Facility was not able to process those resins. Furthermore, the resins were not being held at the Q-CEP Facility itself. Instead, they were being held by SEG in an area of SEG's facility that was independent of the Q-CEP Facility.

96.     The first batch of radioactive waste processed at the Q-CEP Facility was processed in a test run on December 27, 1996. A second test run of radioactive waste occurred on January 16, 1997. This was more than a year after Molten Metal's December 19, 1995 press release represented that "the facility . . . has been turned over to operations" and "is available on schedule."

97.     In Molten Metal's 1996 Annual Report to Shareholders, issued in April 1997, defendants admitted that Molten Metal "began processing radioactive waste at the Q-CEP facility in December 1996." The 1996 Annual Report further admitted that "the Company did not receive any revenue from plant operations" in 1996.

004455

98.    Furthermore, defendants knew that the Q-CEP Facility was uneconomical for these resins as early as 1995 for the following reasons.

99.    On January 23, 1997, shortly after those test runs of radioactive waste, a letter was submitted to the Tennessee Department requesting approval of "an alternate disposal process". This letter stated in part:

> "Recent changes to the cost schedule for waste disposal at the Waste Disposal Site at Barnwell, SC caused a re-evaluation of the Q-CEP process as it applies to ion exchange resin with relatively low levels of activity."

> "When the resin contains activity below $15mCi/ft^3$, it is <u>more economical</u> to alter the process by <u>eliminating the injection into molten metal step</u>." (Emphasis added.)

"Eliminating the injection into molten metal step" would eliminate the entire CEP process, which was the foundation for Molten Metal's business. The resin that Molten Metal proposed to process and dispose of without using its CEP technology constitutes as much as 50% of the radioactive resins that the Q-CEP Facility was designed to process.

100.    However, the so-called "recent changes" to the cost schedule for waste disposal at Barnwell were not recent, but had been promulgated prior to July 1, 1995. The Barnwell facility had promulgated a revised rate schedule entitled "Barnwell's Low-Level Radioactive Waste Management Facility Rate Schedule," effective July 1, 1995, that contained a number of new surcharges based on the weight of the material being buried.

101.    Molten Metal's process resulted in a large amount of secondary waste, thereby substantially increasing the weight of the total amount of waste requiring disposal at Barnwell. According to Molten Metal's own projections, for each 1,600

c:\wp\molten.met\concomp                                36

004456

pounds of dried radioactive resin, there will be 8,000 pounds of waste to be disposed of.
This 8,000 pounds of waste is made up of the radioactive components in the resin, the
metal from the molten metal bath, the crucible that holds the molten metal bath, and
certain accessory equipment such as the zeolite trap. Further, the weight of the waste to
be disposed of requires a heavy container to hold it. Molten Metal's license from the
state of South Carolina specifies that the weight of the container will range from 3,000
pounds to 12,000 pounds based on the level of radioactivity in the waste. It appears that
the containers Molten Metal will be required to use will weigh 12,000 pounds. The gross
weight of a container, including the contents, will therefore be 20,000 pounds for each
1,600 pounds of resin that is processed.

102.    The burial records of the Barnwell, South Carolina facility through mid-
September 1997 reveal that the Q-CEP Facility had still not yet processed radioactive
wastes on a commercial scale.

103.    The burial records reflect that there have been six batches of waste
processed through the molten metal bath in the Q-CEP Facility. The first batch, buried
at Barnwell on June 13, 1997, contained no radioactive material. The absence of
radioactive material indicates that surrogate, non-radioactive waste was processed. Two
batches were buried on July 23, 1997. One of the batches contained no radioactive
material, and the other contained 3.09 curies, an extremely small amount of radioactivity
that indicates the facility was not processing waste on a commercial scale. Two batches
were buried on August 1 and August 11, 1997, respectively, neither of which contained
any radioactive material. On August 29, 1997, a sixth batch was buried that contained

004457

approximately 22.38 curies. This amount of radioactivity demonstrates that the waste was not processed on a commercial scale. The Q-CEP Facility was designed to process a batch of four "liners," or 200 cubic feet containers, of resin at a time, with each liner containing approximately 18 curies, or about 70 curies for a batch of four liners. The batch buried on August 29, 1997 contained only 22.38 curies, or only approximately one-third of the radioactive material that should have been processed in a batch according to the design of the Q-CEP Facility.

### VI. Defendants' False Representations Concerning the M4 Technology Center

104.    In August, 1994, Molten Metal announced a joint venture agreement with Martin Marietta Corporation (subsequently Lockheed Martin Corporation ("Lockheed")) to create a jointly owned limited partnership known as M4 Environmental, L.P. ("M4"), with an exclusive license to deliver Molten Metal's CEP technology for Department of Defense (DoD) and Department of Energy (DOE) environmental remediation projects. The announcement noted that the annual budget of those two agencies for waste management and clean-up program is approximately $10 billion. M4 constructed a complex known as the Technology Center in Oak Ridge, Tennessee.

105.    Molten Metal owned 50% of M4 and had the authority to control the management and operations of the M4. M4's Executive Committee, which also served as its Board of Directors, was staffed with an equal number of senior representatives designated by Molten Metal and by Lockheed. The Chairman of M4 was a senior executive of Molten Metal.

004458

106.    On December 15, 1995, M4 falsely announced the "commissioning of its first commercial Quantum-CEP system." The so-called "first commercial" system was in fact a pilot scale unit that had been built to perform experimental testing at Molten Metal's Fall River Facility and then transferred to the M4 Technology Center.

107.    The December 15, 1995 press release also made the false and misleading statement that "this Quantum-CEP facility is licensed for mixed waste, which contains both radioactive and hazardous constituents." In fact, the license was a temporary license limited to processing 1,100 kilograms of certain DOE waste referred to as sludge. The license was valid only until January 31, 1996, and it did not authorize the processing of waste for commercial customers.

108.    On or about January 5, 1996, Molten Metal issued a letter, signed by defendant Haney, addressed to "Dear Stakeholders." This letter made the following false and misleading representation about the "commercial Quantum-CEP plant" at the M4 Technology Center:

> ". . . capable of processing up to one million pounds of waste annually, this facility is now processing hydrogenous liquid and solid mixed wastes from the U.S. Department of Energy, and will process mixed wastes from commercial utilities."

109.    As noted above, what Molten Metal touted as a "commercial plant" was a pilot plant. It was described in the license application to the Tennessee Department as a "pilot-scale Q-CEP reactor unit designed . . . to perform experimental testing." It was not capable of processing one million pounds of waste annually.

110.    It was also false and misleading to represent that the facility was "capable of processing up to 1 million pounds of waste annually [and] is now processing . . . waste

004459

from the [DOE]" without disclosing that it was operating under a temporary license that expired on January 31, 1996 and that was limited to processing 1,100 kilograms of a specific waste.

111.    Moreover, according to a letter from M4 to the Tennessee Department dated January 25, 1996, as of that date the facility had processed only 23 pounds of waste "in the initial and only . . . run to date . . . . [which] started at approximately 7:00 a.m. on December 21, 1995 and was terminated at approximately 4:00 p.m. the same day." In other words, it took nine hours to process 23 pounds, which was less than 1% of what the facility was authorized to process by the terms of the temporary license.

112.    It was false and misleading to represent in the January 5, 1996 letter referred to above that the "facility is now processing . . . wastes" in light of the fact that the facility had only one very limited run on December 21, 1995.

113.    In fact, it appears that Molten Metal and M4 conducted this one extremely limited run before the end of 1995 so that Molten Metal could then publicly claim that this "commercial facility" was operating. Molten Metal's 1995 Annual Report to Shareholders falsely represented that "in 1995, Molten Metal Technology commercialized several applications that run on the CEP operating system to process specific wastes."

114.    The 1995 Annual Report to Shareholders further falsely represented that ". . . in 1995 . . . we designed, built, permitted, and started up a Quantum-CEP facility in less than six months. The plant is now processing waste material . . . ." This statement was false because the facility had not been designed and built in less than six

004460

months; it was a pilot-scale research unit that had previously been used in Fall River and transported from Fall River to the M4 Technology Center.

115.    As a result of the inability of the facility to process the 1,100 kilograms of DOE waste pursuant to the terms of the temporary license, the Company requested that the term of the license be extended from January 31, 1996 to February 29, 1996. This extension was approved on January 29, 1996. No further processing of the 1,100 kilograms of DOE waste occurred between January 25 and at least February 29, 1996. By letter dated February 27, 1996, M4 requested a further extension of the expiration date of the temporary license.

116.    The January 25, 1996, letter from M4 to the Tennessee Department referred to above also advised the licensing authority that completion of the permanent ventilation for the facility had been delayed, allegedly on account of severe weather in the Oak Ridge area. The lack of permanent ventilation means that the facility, contrary to Molten Metal's representations, was not complete and was neither capable of nor licensed to conduct commercial operations.

117.    The Tennessee Department ultimately issued a radioactive material license on March 15, 1996, but this license limited the amount of radioactivity on the site to less than five curies. This limitation meant that the facility was not permitted to engage in commercial operations, which would require receiving and processing radioactive materials substantially in excess of five curies. By way of comparison, the Q-CEP Facility built by Molten Metal and SEG had a license that permitted up to 1,000 curies.

118.    On February 28, 1996, Molten Metal issued a press release that falsely represented "M4 has facilities processing mixed wastes . . . in its Technology Center in Oak Ridge, Tennessee."

119.    On March 27, 1996, Molten Metal announced that M4 had entered into a $1.23 million waste services agreement to process mixed hazardous and radioactive waste generated by Duke Power Company.    The press release claimed that:

> "Duke Power's mixed waste will be processed using Molten Metal Technology's proprietary Quantum-CEP technology at M4's Technology Center in Oak Ridge, Tenn.  M4's Technology Center is capable of accepting a wide variety of hazardous and radioactive wastes from government and commercial operators."

120.    These statements were false and misleading in representing that the Technology Center had the necessary licenses and that it was capable of processing wastes on a commercial basis, neither of which was true for the reasons set forth above.

121.    In contrast to these public statements that M4 had a commercial unit processing customer wastes, M4's communications to the Tennessee Department acknowledged that M4 was still engaged in research and evaluation.  In a letter dated March 13, 1996 from M4 to the Tennessee Department, the following statements were made:

> "M4 is currently in a critical phase of collecting [Q-CEP] data on [DOE] sludge material.  This data is vital to our continued efforts to prove Q-CEP is the safest and most economical method to recycle mixed waste."

122.    It was not until March 15, 1996 that M4 received a license for any units other than the pilot-scale unit that had been transported from Fall River [the "RPU-3 Unit"].  However, the conditions in the March 15, 1996 license did not permit M4

004462

actually to operate any commercial units.  In fact, M4 was not capable of operating the

CEP technology on a commercial basis.

123.    Beginning in March 1996, M4 continued to do research with two small

bench scale CEP units (referred to as RPU-2).  According to a submission to the

Tennessee Department dated October 24, 1996, these bench scale units had processed a

total of 1.78 kilograms, or 3.9 pounds, of waste.  Processing this 3.9 pounds of waste

generated 89 cubic feet of secondary waste that weighed thousands of pounds.

124.    M4's October 24, 1996 submission to the Tennessee Department included

the following statement:

> "The RPU-2 system [i.e., the bench-scale units] has been instrumental in
> providing [M4] with process information on the correct [CEP] chemistry
> required to recycle waste, keeping secondary waste production and risk at a
> minimum due to the small quantities of waste required for the tests.  Once
> the proper chemistry is defined, larger volumes of waste are scheduled for
> processing in RPU-3 or RPU-4.  (Emphasis added.)

In other words, as of October 1996, the "proper chemistry" for the CEP processing had

not yet been defined.

125.    The October 24, 1996 submission to the Tennessee Department further

revealed that the bench scale system:

> "is unable to successfully process bulk solids due to the potential for
> unprocessed volatile material to exit the molten metal zone of the CEP
> unit and enter the gas handling train.  Using two CEP units in series will
> allow the bulk feed of solids to the first unit (RPU-2C) and ensure the
> unprocessed volatile material that may escape the molten metal of RPU-
> 2C is processed in the second CEP unit (RPU-2A/B)."

This is a startling admission that the CEP process as designed did not adequately process

volatile material; Molten Metal's CEP process did not do what it had been claimed to do

in defendants' representations as alleged herein.  Because of the failure "to successfully process bulk solids," Molten Metal applied for permission to experiment with a radically different design for the technology:  processing waste through two successive molten metal baths in series.

126.   The October 24, 1996 submission explained that the proposed studies with two baths in series

> "will include materials from various [DOE], [DOD] and commercial mixed waste clients in order to generate process and regulatory information to support larger scale tests and process operations."

In other words, in late October 1996, after the end of the Class Period, Molten Metal needed to conduct further studies with two experimental CEP units in series to generate test data needed "to support larger scale tests and process operations."  This proposal to conduct experiments with a different design for the CEP technology is in stark contrast with defendants' previous representations that the technology had been successfully demonstrated in commercial-scale tests.

127.   On September 26, 1996, Molten Metal issued a press release which included the following statement by defendant Haney:

> ". . . . of the two existing technologies in the world qualified to process complicated radioactive wastes, only CEP is a new technology and a recycling technology."

In that same press release, defendant Gatto stated:

> ". . . . CEP is one of only two technologies in the world capable of solving one of the world's most difficult environmental problems, processing of highly radioactive waste."

004464

These statements were false and misleading because the CEP technology was not able to process radioactive wastes other than, at best, on an experimental level, and Molten Metal's technology was not capable of recycling products. Indeed, on October 24, 1996, approximately one month after these representations, Molten Metal requested permission from the Tennessee Department as described above to use with two CEP units in series in an experimental effort to identify a way in which CEP might be able to process radioactive wastes.

128.    Molten Metal continued to make false and misleading representations about the M4 Technology Center after the end of the Class Period. In a March 27, 1997 press release, Molten Metal claimed that the Technology Center "contains two commercial CEP systems. One of the commercial systems has been operating since December of 1995. . . ." For the reasons set forth above, that unit was not a commercial unit, and it had operated on a limited basis on one day only, December 21, 1995.

## VII.    Defendants' False Representations Concerning the United States Department of Energy

129.    As part of the scheme to misrepresent the development of Molten Metal's technology and its commercial potential, defendants disseminated materially false and misleading statements and omissions regarding the nature of Molten Metal's relationship with the United States Department of Energy (DOE). These statements were designed to persuade the investing public that the DOE endorsed CEP. The Company used the DOE's funding, and potential DOE contracts, as evidence of the DOE's endorsement, even though it knew by February of 1995 that CEP was unsuitable to the disposal of the

004465

DOE's waste, and that the DOE was unlikely to renew its funding. The Company made public representations that the DOE was, and would remain, a significant source of future revenue.

130. Molten Metal began publicizing its relationship with the DOE in April 1993. At that time it announced that it would receive research and development funding from the DOE's planned research and development announcement program (PRDA Program).

131. On September 30, 1993, the Company signed an agreement to participate in the PRDA program. By November of that year, the Company reported that the DOE had requested that it provide a proposal to enhance certain aspects of its existing statement of work and to provide for delivery of a more comprehensive final report of its technical results. The Company did so. Subsequently, the DOE pledged additional funding of $9 million in 1994.

132. During January 1995, a DOE Technical Review Panel ("TRP"), including eight DOE scientists and engineers, visited Molten Metal's Fall River pilot facility. On or about February 9, 1995, Carl Cooley ("Cooley"), a DOE Senior Technical Advisor, discussed the TRP's recommendations, which were contained in a draft TRP report, with Nagel and other Molten Metal employees. Cooley said the TRP was concerned that little advancement had been made with respect to processing mixed low-level waste. Mixed low-level waste contains radioactive and hazardous constituents. In the case of the Company's PRDA Program, the mixed low-level waste was contaminated scrap metal. Cooley added that the TRP recommended Molten Metal focus on "establishing a

better understanding of the likely application of CEP to DOE mixed low-level waste . . .

at DOE sites and to identifying future development activities." In addition, he told

Nagel the TRP concluded that the Company's pilot facility at Fall River was not

designed for radioactive waste pilot tests. In this respect, the TRP noted that Molten

Metal had not even begun to consider the, "hazards, concerns, and special requirements

incumbent with radioactive operations." This report reasonably should have eroded any

confidence Molten Metal had in its belief that the DOE viewed CEP as the antidote to

its waste disposal problems. Indeed, as a result of their discussion, Nagel wrote to

Cooley in mid-February, 1995, to promote the advantages of CEP over vitrification

(burning and encapsulating waste simultaneously) and other methods for processing soils

and other inorganic sludges.

133.    The Company's CEP progress was again under scrutiny when

representatives from both Molten Metal and the DOE attended the Technical Peer

Review Meeting held in Dallas on November 13-15, 1995. At this meeting, Molten

Metal presented its CEP technology to a peer review panel. Although the meeting was

conducted under the auspices of the DOE, the peer review panel did not include any

DOE scientists or engineers. The peer review panel gave the Molten Metal

representatives their findings immediately after the Molten Metal presentation ended.

The peer review panel then put their findings in a report. The report recommended that

Molten Metal's PRDA Program funding not be renewed. Specifically, the report stated:

004467

## "MAJOR CONCLUSIONS

"The panel notes that there are many ways to achieve the same objective and finds more methods are being sponsored than needed. Two recommendations are made:

1. . . . The panel . . . recommends that funding either not be initiated or present funding be halted after FY [fiscal year] 1996 on the following: . . . Molten Metal Technology, . . .

2. Future development support should focus on more advanced methods of treating mixed and TRU [radioactive] wastes. The mission of future developments should be focused on developing processes that have a good likelihood of being able to process a wide variety of waste types.

Responsible stewardship of funds dictates that the development of a melter for each specific waste stream is not prudent. Rather, a high-temperature melter that can process a diversity of waste should be pursued. Two methods appear worthy of continuing development -- the DC Graphite Arc Melter and the plasma hearth. Also recommended for continued funding are the Transportable Vitrification System and development of vitreous ceramics [materials that may be vitrified] with higher waste loadings.

*  *  *

### Summary of Specific Technology Recommendations

*  *  *

### Molten Metal

Sufficient DOE-EM investment has been made and industrial confidence developed that the market place will make its own judgement. Future funding beyond the current contract is not recommended unless waste is actually being processed." (Emphasis added.)

Defendants did not disclose the contents of this report to the investing public. Even worse, they continued to falsely promote the DOE's funding and "endorsement" of the Company's CEP technology.

004468

134.    For example, on December 27, 1995, during a Company sponsored conference call with analysts, defendant Haney stated that he expected Molten Metal's 1995 fourth quarter earnings to be "profitable" and lift the entire year's earnings for the first time in its operating history to "break even" levels.  Haney further stated, "We expect 1996 to be a dramatic improvement over 1995 and 1995 was a dramatic improvement over 1994."  He added that the Company expected a jump in revenues for 1996 (as compared to 1995) which would keep pace with the increase in 1995.  These statements, which were picked up and relied upon by analysts and others in issuing highly favorable reports and recommendations regarding Molten Metal, were materially false and misleading.  While Haney stated that he expected 1996 net income to be a "dramatic improvement" over 1995's results, he knew that continued DOE PRDA Program funding was in serious jeopardy because of the conclusions of the November 1995 peer review, and that any limitation or reduction in such DOE funding would have a material adverse effect on the Company's revenues and earnings.

135.    On January 23 and 24, 1996, a DOE Technical Review Team (TRT) conducted a review of Molten Metal's technology.  Defendant Gatto and other representatives of Molten Metal met with the TRT during this review session.  In March 1996, the TRT issued its findings in "Report of the Technical Review Team on the Catalytic Extraction Process."  The TRT noted several persistent problems with CEP that Molten Metal had not been able to solve and that posed serious obstacles to its commercial implementation.  These problems included:

the emission of dust and other volatiles from the molten bath;

c:\wp\molten.met\concomp                          49

wear of the refractory liners requiring periodic replacement;

the inability to recover ceramic waste in any consistent and usable form;

the excess gases produced by the addition of water and hydrocarbons to the molten bath could exceed the design capacity of the CEP's off-gas treatment system;

the design concepts for CEP operation with radioactive material had not been assembled or tested;

characterization of the waste to be processed or adequate analysis of the waste during introduction to the bath had not been demonstrated;

the extra stage necessary to destroy the organic vapors created by shredding larger feedstocks (greater than 2-5 inches) which were otherwise too large for treatment using CEP;

the processing of large drums of mixed low-level waste (the kind that DOE had at Hanford, WA and Idaho National Engineering Laboratory) appeared unsuited for CEP;

the lack of an "extended" run using typical DOE mixed low-level wastes to demonstrate the operation of the technology;

the application of CEP to wastes other than "mixed low-level wastes" had not yet been fully explored by Molten Metal; and

lack of operating experience from which to predict the reliability of CEP.

Based upon this unfavorable review by the DOE, defendants knew or recklessly disregarded that the CEP technology was not capable of operating on a commercial basis. Furthermore, defendants failed to disclose the fundamental problems with the development and commercialization of the Company's CEP technology as specifically identified by the DOE.

136. On January 26, 1996, Molten Metal received notification from the Project Manager of the Environmental & Waste Management Division of the DOE that Molten

004470

Metal's PRDA Program was scheduled to expire on April 30, 1996, and that Molten

Metal would need to submit draft topical reports to the DOE at least 60 days before the

project completion deadline.

137.    In February 1996, Molten Metal representatives met with the DOE to

discuss certain enhancements of Molten Metal's statement of work to be performed after

April 30, 1996.  It was determined that the DOE would fund an "undetermined amount"

of Molten Metal's R&D activities under the PRDA Program after April 30, 1996.

Although DOE's funding level for Molten Metal's post-April 1996 R&D activities was

not firmly established as of February 1996, DOE set a $2 million "ceiling" on additional

funding available to Molten Metal under the PRDA Program.  This phase of Molten

Metal's PRDA contract was referred to by the Company and DOE as "ECP III".

138.    Despite the $2 million ceiling, Molten Metal executives stated during

March 1996 discussions with Oppenheimer & Co. analysts that the Company expected to

receive $20 million in R&D grants from the DOE during 1996.

139.    Based upon these discussions, on March 13, 1996, Oppenheimer & Co.

issued a report that stated:

> "*A brief review of 1996 revenue projections*.  We expect Molten Metal's revenue to
> approximate $95 million in 1996. . . . we expect. . . contract R&D activity to
> contribute about $20 million. . . ."

                                    * * *

> "We continue to rate Molten Metal a buy. . . . Our earnings estimates
> reflect an expectation of five to six plants commissioned by year-end 1996,
> but the bulk of revenue and income for the year will be derived from other
> sources (construction, license fees, R&D contracts)."

004471

140.    On or about April 1, 1996, Molten Metal filed its 1995 Form 10-K for the year ended December 31, 1995 ("1995 Form 10-K"). With respect to the DOE's funding of Molten Metal's R&D activities, the 1995 Form 10-K stated:

"During 1995, revenue from the DOE accounted for approximately 30% of the Company's total revenue, and the Company anticipates that a substantial portion of its revenue for 1996 also will be from the DOE. Failure to reach agreement with the DOE regarding additional funding could have a material effect on 1996 revenue." (Emphasis added.)

141.    Defendants' representations in Molten Metal's 1995 Form 10-K regarding continued DOE funding were designed to and did convey the materially false and misleading impression that the Company expected a "substantial portion of its revenues for 1996 [to] be from the DOE." This statement was false and misleading because in November 1995, defendants had learned that a technical peer review group had recommended to the DOE that PRDA Program funding by the DOE should not be renewed. Then in March 1996, defendants learned that DOE considered its technology inappropriate for continued funding. Furthermore, the statement "[f]ailure to reach agreement with the DOE regarding additional funding could have a material effect on 1996 revenue" was misleading because in February 1996, the DOE informed Molten Metal that it would only provide Molten Metal with a maximum of $2 million in additional funding.

142.    On April 30, 1996, the day Molten Metal's PRDA Program was scheduled to end, the DOE granted Molten Metal a two week extension of its contract, until May 15, 1996.

004472

143.    In late April and early May 1996, representatives of Molten Metal and the DOE again met to discuss the modification of Molten Metal's PRDA Program, first discussed in February 1996. Specifically, Molten Metal and the DOE discussed the amount of funding available from the DOE under ECP III, the final phase of Molten Metal's PRDA Program with the DOE. Pursuant to a Modification of Contract, signed on May 10, 1996, the DOE established $8 million as the new "ceiling" for the DOE's share of Molten Metal's R&D activities under ECP III. The DOE informed Molten Metal that it would award the Company $2 million effective May 10, 1996 and that Molten Metal could expect an additional $6 million in DOE funding prior to the completion of the PRDA Program on September 30, 1996.

144.    The DOE's additional funding was, at least in part, motivated by the difficulties Molten Metal was encountering in designing a Catalytic Processing Unit ("CPU") which could accept large feedstocks. Molten Metal had been able to process only smaller, single-type feedstocks. These smaller single-type feedstocks substantially decreased the commercial and economic value of Molten Metal's CEP process due to the extremely high costs associated with feedstock characterization and the preparation necessary before the feedstocks could be injected into the CPU. Only by eliminating the requirement for feedstock characterization and preparation would Molten Metal's CEP process be of any value for processing the DOE's substantial inventory of high level waste which was packaged in large drum-sized containers. In addition to the feedstock characterization and preparation problems, Molten Metal was experiencing substantial difficulties with the formation of dust and other carbon by-products during the CEP

064473

process. The DOE's funding under "ECP III" was designed to explore these specific problems.

145.    On May 1, 1996, Molten Metal reported that revenues for the first quarter ended March 31, 1996, increased to $22,373,544 from $4,625,697 reported for the same period in the prior year. Reported net income was $215,428, or $0.01 per share, compared with a net loss of $3,003,792, or $0.14 per share, reported for the first quarter ended March 31, 1995. In addition to the Company's announcement, Molten Metal representatives stated in a conference call with analysts that the Company was on track to achieving its government budgeted revenues for 1996. In addition, they represented that commercialization plans and construction schedules remained on track as well, with demand for Molten Metal's CEP system higher than ever. These representations were materially false and misleading at least for the reasons stated above.

146.    On or about May 13, 1996, Molten Metal filed its Report on Form 10-Q for the quarter ended March 31, 1996. With respect to its cost-sharing contract with the DOE, Molten Metal stated:

> "The Company has received a unilateral modification from the DOE, with a funding limitation of $2,000,000, for work on an enhancement to its current statement of work. The Company plans to submit a proposal to the U.S. government in response to this modification, which, if approved, could result in additional revenues in 1996."

This representation was designed to and did convey the materially false and misleading impression that the Company anticipated receiving additional funding from the DOE above and beyond what the DOE had already committed to Molten Metal. This statement was materially false and misleading because Molten Metal could expect only

c:\wp\molten.met\concomp                54                              004474

an additional $6 million in DOE funding. Furthermore, defendants knew or recklessly disregarded that after the completion of ECP III, the DOE did not plan to continue participation in a cost-sharing arrangement with Molten Metal.

147.    On or about July 2, 1996, Molten Metal filed a Form 8-K with the SEC which purported to contain certain risk disclosures. The Form 8-K was signed by defendant Downs. The Company disclosed the following:

> "The Company has historically been dependent on two customers, M4 Environmental L.P. and the Department of Energy, for a substantial portion of its revenues and anticipates that a substantial portion of its revenues in 1996 will be from these two customers. Variations from this expectation could have a material effect on the Company's 1996 revenues."

148.    The above described "risk disclosures" were materially false and misleading when made. The Company, as of July 2, 1996, knew that $2 million in DOE funding was currently committed, with only an additional $6 million of R&D funding available before September 30, 1996. This was far less R&D funding than the $20 million the Company and the financial markets expected the Company to receive in 1996, based upon the Company's statements to Oppenheimer & Co. analysts. The failure to disclose these material facts rendered these alleged "risk disclosures" inherently incomplete and misleading.

149.    On July 18, 1996, DOE issued a 90-day "Stop Work" Order directing Molten Metal to stop all work associated with the Company's activities under the PRDA Program, except as necessary to finalize and resubmit certain required topical reports prior to August 15, 1996. Defendants did not disclose this fact to the public.

c:\wp\molten.met\concomp                55

004475

150.    Molten Metal representatives held a conference call with analysts on or about August 8, 1996 to review Molten Metal's second quarter results, during which they stated that the second half of 1996 would show substantial commercialization of the Company's CEP technology.  This representation was materially false and misleading at least for the reasons stated above.  In addition, Molten Metal's management indicated that, at that time, it hoped to receive "additional R&D funding from the DOE."  Once again this statement was misleading because as of August 8, 1996, defendants knew and failed to disclose that only $2 million had been committed to Molten Metal by DOE, that the Company expected only an additional $6 million at most, and that a "Stop Work" Order had been issued by DOE.

151.    On August 8, 1996, Oppenheimer & Co. issued a report that stated:

"We continue to rate Molten Metal a "BUY."  We expect a substantial uptick in activity over the remainder of 1996, including several government contracts as well as agreements for 2-3 industrial facilities."

152.    On or about August 28, 1996, Molten Metal filed an S-3 Notes Registration Statement to register $142,750,000 of convertible subordinated notes sold by the Company in May 1996.  Defendants Haney, Nagel, Downs, Preston, and Strong signed the Notes Registration Statement.  Although Molten Metal was obligated by the federal securities laws to disclose all material information concerning the Company, it omitted from disclosure in the Notes Registration Statement the material fact that the Company's R&D funding from DOE would be significantly less than the defendants had led the market to expect, and that this reduction would adversely effect results for Molten Metal's 1996 third and fourth quarters.

004476

153.    Additionally, the Notes Registration Statement contained the following false and misleading statement on page 8:

> "Also, during 1995, revenue from the DOE accounted for approximately 30% of the Company's total revenue, and the Company anticipates that a substantial portion of its revenue for 1996 also will be from the DOE. Failure to reach agreement with the DOE regarding additional funding could have a material adverse effect on 1996 revenue and results of operations."

154.    This statement was materially false and misleading when made for the reasons set forth above.

155.    On or about September 20, 1996, Molten Metal filed another Form S-3 Registration Statement to register to sell 307,735 shares of 308,000 shares of common stock which were given to Lockheed as part of the expansion of M4 (the "Lockheed Registration Statement"). Lockheed was the sole selling shareholder in this offering. The Lockheed Registration Statement, which was signed by Defendants Haney, Nagel, Downs, Preston, and Strong, failed to disclose material facts about DOE funding levels and the July 18, 1996 "Stop Work" Order described above.

156.    On September 30, 1996, the scheduled completion date of Molten Metal's PRDA Program, the DOE issued a Modification of Contract which removed the July 18, 1996 "Stop Work" Order, and revised the estimated contract costs and scheduling. Under the new Modification, the period of performance was extended to March 31, 1997 and DOE agreed to provide Molten Metal with $3,631,812 in R&D funding.

157.    On September 30, 1996, Molten Metal and DOE understood that a Modification authorizing the final $2.4 million (of a total $8 million) in R&D funding would be issued by DOE in November 1996.

**VIII.  Defendants Utilized False Financial Statements to Reinforce Their False Representations That the CEP Process Was Commercially Viable**

158.   Defendants materially overstated Molten Metal's revenues and income in its financial statements disseminated during the Class Period by improper reporting in connection with its investment in M4.  Through this device, defendants fraudulently confirmed the supposed commercial viability of Molten Metal's technology by falsely representing that the Company had achieved operating profitability.

**(a)    Molten Metal's Improper Recognition Of Revenue Associated With License Rights That It Granted To M4**

159.   As set forth above, Molten Metal had an indirect 50% ownership interest in M4, and had at least a 50% say in the management, conduct, control and operation of M4's business.

160.   On August 9, 1994, Molten Metal, Lockheed and M4 entered into a license agreement whereby Molten Metal granted M4 a license to utilize Molten Metal's CEP technology in the conduct of its business.

161.   Molten Metal's financial statements for the year ended December 31, 1995 report that it recognized $9 million in licensing fees from M4.  Similarly, Molten Metal's financial statements for each of its quarters March 31, 1996, June 30, 1996 and September 30, 1996 included revenue that it recognized from license fees it granted to M4 totalling $3.75, $3.75 and $5.83 million, respectively.

162.   However, Molten Metal's reporting of such revenue on its licensing transactions was grossly improper, and constituted a knowing or reckless departure from Generally Accepted Accounting Principles ("GAAP").  First, Molten Metal accounts for

its investment in M4 using the equity method of accounting.  In applying the equity method, profits from transactions between an investor and an investee (in this case, Molten Metal and M4) must be eliminated from an investor's financial statements.  See, e.g., Accounting Principles Board ("APB") Opinion No. 18, "The Equity Method Of Accounting For Investments In Common Stock" and the AICPA's Accounting Interpretations thereunder.  Nonetheless, and despite reporting in its fiscal 1995 financial statements that "all significant intercompany balances and transactions have been eliminated in consolidation," Molten Metal knowingly or recklessly violated GAAP by failing to eliminate its intercompany profit in this regard in its fiscal 1995 and 1996 financial statements.

163.    Even apart from Molten Metal's failure to apply the equity method of accounting, Molten Metal's recognition of licensing revenue was improper because, in light of Molten Metal's 50% ownership and control of M4, no effective transfer of the license rights to a separate entity had occurred.  Therefore, no recognition of revenue was permissible under authoritative accounting literature such as Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Concepts No. 5, ¶ 83; APB Opinion No. 10, ¶ 12.  See also SEC Staff Accounting Bulletin Topic 5.80.

(b)    **Molten Metal's Improper Recognition Of Revenue Associated With R&D It Provided To M4**

164.    M4's financial statements for the year ended December 31, 1995 included in Molten Metal's 1995 financial statements disclose that "[i]n return for its 49.5%

limited partnership interest, [Molten Metal] has agreed to spend $30,000,000 (at its cost) for research and development activities directed toward enhancing CEP . . . ."

165.   Molten Metal's financial statements for 1995 and various quarters in 1996 include revenue that it recognized for "providing R&D and certain other technical services" to M4.  For the year ended December 31, 1995, the Company recognized $21.6 million in revenue from such services, of which $13.1 million were uncollected at December 31, 1995.  For the quarter ended September 30, 1995, the Company recognized $7.1 million in revenue from such services, at least $5.5 million of which were uncollected.  Likewise, Molten Metal's financial statements for the quarters ending March 31, 1996, June 30, 1996 and September 30, 1996 include revenue that it recognized from the R&D services it provided to M4 totalling $17.4, $12.9 and $6.8 million, respectively, at least $4.9 and $6.6 of which, respectively, were uncollected at March 31, 1996 and June 30, 1996.

166.   Molten Metal knowingly or recklessly materially misrepresented its true operating results and violated GAAP by improperly recognizing revenue from its R&D arrangement with M4.  First, R&D payments up to $30 million should not have been reported as revenue because the Company's expenditures in that amount constituted an agreed capital contribution by Molten Metal to M4.  Consequently, the R&D revenue recognized should have been accounted for as capital transactions.  Accordingly, the R&D payments which were actually received by Molten Metal represented return of capital, rather than revenue.  See Statement of Financial Accounting Concepts No. 6, ¶¶ 67-69.

167.    Alternatively, Molten Metal's R&D arrangement with M4 should have

been accounted for as a financing transaction, and therefore revenue should not have

been recognized in connection with R&D payments to Molten Metal.  See FASB's SFAS

No. 68, "Research and Development Arrangements."  Under GAAP, a transaction in

which a related party, such as M4, is paying Molten Metal's R&D expenses must be

accounted for as a financing arrangement, with the amount paid to Molten Metal treated

as creating a liability of Molten Metal to the related party (M4) rather than as revenue

received from the related party.

168.    Consistent with the foregoing, as part of the ultimate restructuring of its

relationship with Lockheed, Molten Metal agreed to "contribute" $14.6 million of its

outstanding accounts receivable from M4 to the capital of M4.

(c)    **Molten Metal's Improper Understatement Of Expenses Associated With Its Investment In M4**

169.    Molten Metal's financial statements during the Class Period included

revenues from M4 as a part of Molten Metal's reported income, but did not include

related M4 expenses.

170.    The M4 limited partnership agreement provides that non-liquidating

distributions of cash shall be distributed 50% to Molten Metal and 50% to Lockheed

and that upon dissolution and winding up of the partnership's affairs, the partnership's

assets shall be equally distributed to Molten Metal and Lockheed.

171.    In light of the fact that cash distributions to Lockheed and Molten Metal

were to be made on a 50/50 basis, under GAAP Molten Metal was precluded from

004481

reporting M4's share of income without recognizing an equal share of M4's expenses. E.g., Statement of Position 78-9, "Accounting For Investments In Real Estate Ventures."

172. Molten Metal's financial statements for the year ended December 31, 1995 and the quarters ended September 30, 1995, March 31, 1996, June 30, 1996 and September 30, 1996 include "equity income" that it reported on its investment in M4. For the year ended December 31, 1995, it recognized $835,000 in such income, but improperly failed to recognize 50% of M4's operating expenses. Molten Metal's share of such losses (without providing for intercompany profit eliminations) totalled $13.7 million during the year ended December 31, 1995. Similarly, for the quarter ended September 30, 1996, the Company recognized $2.8 and $5.5 million in equity income on its investment in M4 during the quarter and nine months ended September 30, 1996, but improperly failed to recognize Molten Metal's share of M4's operating expenses, as required by GAAP. These losses (without providing for intercompany profit eliminations) totalled $7.9 and $18.2 million during the quarter and nine months ended September 30, 1996, respectively.

173. Although Molten Metal's 1996 first and second quarter financial statements improperly omit disclosing summarized income statement information of M4, thereby making it impossible to quantify M4's operating expenses during such periods, it is likely that Molten Metal's nonrecognition of M4's operating expenses also materially overstated its operating performance during the quarters ended March 31, 1996 and June 30, 1996.

004482

**(d)    Impact Of The Accounting Fraud**

174.    As a result of the above accounting machinations, Molten Metal's financial performance and the commercial viability of its business was repeatedly distorted to the detriment of unsuspecting investors.  As set forth in the charts below, even without giving effect to Molten Metal's improper failure to recognize tens of millions of dollars of its share of M4's operating expenses, Molten Metal materially overstated its operating results during the Class Period.

**RESULTS AS REPORTED:**

**For The Quarter Ended**

|  | 03/31/95 | 06/30/95 | 09/30/95 | 12/31/95 | 03/31/96 | 06/30/96 | 09/30/96 |
|---|---|---|---|---|---|---|---|
| Revenues (000s) | $ 4,626 | $ 7,471 | $12,225 | $19,859 | $22,374 | $20,447 | $15,574 |
| Net Income (000s) | - 3,004 | - 368 | 1,147 | 2,579 | 215 | 2,084 | - 3,308 |
| EPS | - 0.14 | - 0.02 | 0.04 | 0.11 | 0.01 | 0.08 | - 0.14 |

**RESULTS WITHOUT RECOGNITION OF LICENSING FEE AND R&D REVENUE:**

**For The Quarter Ended**

|  | 03/31/95 | 06/30/95 | 09/30/95 | 12/31/95 | 03/31/96 | 06/30/96 | 09/30/96 |
|---|---|---|---|---|---|---|---|
| Revenues (000s) | $ 2,642 | $ 4,034 | $ 3,311 | $ 3,626 | $ 1,258 | $ 3,786 | $ 3,188 |
| Net Income (000s) | - 4,988 | - 3,805 | - 7,767 | -13,654 | -20,901 | -14,577 | -15,677 |
| EPS | - 0.22 | - 0.17 | - 0.29 | - 0.55 | - 0.76 | - 0.53 | - 0.67 |

004483

175.   After an earlier Complaint in this litigation was filed (including the false financial

statements allegation), Molten Metal disclosed on its 1996 Form 10-K filed with the SEC on or

about May 27, 1997, that it had restated its 1996 second and third quarter operating results due

to "disputes" between Molten Metal and M4, concerning research and development and other

services purportedly provided by Molten Metal to M4.  According to Note 17 of the financial

statements included in the Form 10-K, as a result of the "disputes", Molten Metal reversed

revenue of $2.593 million and $481,000 that it had recognized on transactions with M4 during

the quarters ended June 30, 1996 and September 30, 1996, respectively.  In addition, Molten

Metal reported a $1.484 million charge in the quarter ended September 30, 1996 to reflect the

doubtful collection of a "bad debt" owed to it by M4.  Such charge was also the result of

"disputes" between the Company and M4 concerning revenue that Molten Metal had recognized

on transactions with M4 during the quarter ended September 30, 1996 and in prior quarters.  In

addition, the Company reported that it would not pursue the "disputed" amounts from M4.

176.   Molten Metal's 1996 restatement is an admission by defendants that the Company

artificially inflated its reported "revenues" on transactions with M4 during the Class Period.  The

Company's 1996 Form 10-K discloses:

> "In April 1997, the Company's Board of Directors appointed a committee of three
> outside directors to review matters concerning the Company's financial statements for
> the year ended December 31, 1996 and the allegations contained in the securities class
> actions . . .  The committee has completed its review of matters affecting the presenta-
> tion of the Company's financial statements, including the restatement discussed in . . .
> the financial statements."

177.   After that review, Molten Metal's reported net income of $2.1 million during the

quarter ended June 30, 1996 was restated to a <u>loss</u> of $509,000.  Similarly, the Company's

reported net loss of $3.3 million during the quarter ended September 30, 1996 was restated to a

004484

loss of $5.3 million. Molten Metal's Board appointed the above committee shortly after M4's outside auditors, Coopers & Lybrand, resigned in March of 1997, after this litigation was commenced.

## IX. The End of the Class Period

178. On Sunday, October 20, 1996, Molten Metal issued an announcement that stated:

"Molten Metal Technology announced today that government-funded research and development revenues will not meet company expectations for 1996."

179. Later that same day, Molten Metal held a conference call with analysts in which it disclosed, without explanation, that the DOE had decided to end its PRDA Program funding of Molten Metal's CEP technology and that the Company would only receive $8 million of $20 million of expected funding for the remainder of 1996. In addition, Molten Metal revealed during the conference call that the Company would cancel or defer development of most of the CEP projects it had touted during the Class Period, including Molten Metal's plans to treat incinerator fly ash in Japan and auto shredder waste in Switzerland. Molten Metal apparently also disclosed that commercial operations at both the M4 Technology Center and the Q-CEP facility were experiencing delays. Molten Metal attempted to place a positive "spin" on its disclosures by falsely stating that the change in the Company's CEP commercialization plans was based upon its own determination that the Company was spreading itself out too thin and not based on any fundamental problems with the operation or commercialization of Molten Metal's CEP technology.

180. On October 21, 1996, the brokerage firm Alex. Brown issued a report which stated in part:

"The Company had targeted multiple opportunities, but has closed on fewer than expected. In addition, the ramp-up of commercial operations at both the M4 and Q-CEP plants have fallen behind expectations."

181. On October 21, 1996, *Bloomberg Business News* reported that defendant Downs had told the analysts that "The U.S. Department of Energy will give the company only $8 million of an expected $20 million for research into the recycling of radioactive scrap metal."

182. On October 24, 1996, the *Boston Globe* reported that the Company was saying that its R&D funding was not being "cut" by the DOE but that the Company had "overestimated how much it would receive from the DOE." A Company spokeswoman said, "In our internal estimate, made earlier this year, we were off."

183. Although the stock market and the analysts who followed Molten Metal were completely surprised by the Company's disclosures regarding the cut in the DOE funding, defendants had known, beginning as early as November 1995, that DOE funding would be reduced and that DOE would not provide the funding that Molten Metal claimed it "expected."

184. On October 21, 1996, the next trading day following defendants' surprise disclosures, the price of Molten Metal common stock plunged 49%, or $13 7/8 per share, to close at $14 1/4 per share, from a closing price of $28 1/8 per share on October 18, 1996, in record trading of 5,745,600 shares. In addition, analysts immediately cut their ratings of Molten Metal common stock and slashed their 1996 and 1997 earnings estimates for the Company.

185. On October 22, 1996, the *Wall Street Journal* reported that the DOE's decision not to renew its research contract with the Company "amid doubts that its much-touted toxic waste-disposal methodology is commercially viable" and the Company's plan to "refocus" its operations on a few projects after losing $12 million in expected government funding was what led to the

49% price "plunge" in Molten Metal common stock on October 21, 1996.  In addition, the *Wall Street Journal* reported that the Company "stunned" analysts with its disclosure that it would postpone development of its European venture to dispose of nonmetal parts of old cars and its Japanese venture to dispose of ash from incinerated municipal waste.  Following the Company's adverse disclosures, the *Wall Street Journal* reported that, according to analyst Douglas Augenthaler of Oppenheimer & Co., investors would be looking for "proof" that the Company's CEP technology could be profitable, specifically at the Company's Oak Ridge facility, which had yet to accept any commercial waste.  In addition, the *Wall Street Journal* reported that, during a Molten Metal conference call on October 21, 1996, investors expressed their serious long-term concerns about the Company and focused on the insider selling that occurred prior to the Company's adverse disclosures, particularly that of defendant Strong who sold over 40,000 shares of Molten Metal common stock on September 18-19, 1996, at prices of $31.50-$31.94 per share.  The *Wall Street Journal* also noted defendant Preston's September 1996 sales of 40,000 shares of Molten Metal common stock for $31.50 per share and the insider selling of defendant Gatto shortly before the Company's adverse disclosures.

186.    Similarly, the *Boston Globe* reported on October 22, 1996, that Molten Metal's common stock lost almost half of its value on October 21, 1996 because of concerns raised by the Company's "sudden about-face" from its plans to commercialize its CEP technology.

187.    On October 22, 1996, Molten Metal stock fell another 13.2% to close at $12 3/8 per share, the lowest price at which Molten Metal common stock had closed since going public in February 1993.  In just two days, the total market value of Molten Metal's outstanding common stock had declined by $430 million.

188.  On October 22, 1996, Oppenheimer & Co. issued a report which stated:

"With the sharp price drop, it is unreasonable to expect a quick rebound, but we believe the concerns raised by the estimate reductions of yesterday have only one resolution: full commercial and profitable operation of CEP units in the field."

189.  On November 12, 1996, Molten Metal reported its third quarter results for the quarter ended September 30, 1996.  For the third quarter, the Company reported a net loss of $3,307,942, or $0.14 per share, compared to net income of $1,147,342, or $0.04 per share, reported in the third quarter of 1995.  This loss was even greater than the loss that analysts had been expecting following the Company's adverse disclosures in October 1996.  In addition, Molten Metal disclosed that it would eliminate 58 out of 480 positions within the Company (or 12% of its workforce) as part of a restructuring to reduce costs.

190.  On November 13, 1996, Deutsche Morgan issued a report noting that Molten Metal's third quarter 1996 results were lower than had been expected.  In addition, the Deutsche Morgan report stated:

"We are maintaining our HOLD rating on the shares.  We still have relatively low confidence in the timing of commercial contracts for CEP and other events that would drive the stock higher."

191.  In mid-1996, Westinghouse's subsidiary SEG decided to withdraw from the joint venture with Molten Metal and to dispose of its interest in the Q-CEP Facility.  On October 3, 1996, just before the end of the Class Period and shortly after defendants Strong and Preston each sold over $1 million of Molten Metal stock, Molten Metal announced that it had signed a letter of intent to acquire all of SEG's interest in the Q-CEP Facility.  Molten Metal attempted to put a positive spin on this development.  Defendant Haney characterized the agreement as

004488

an opportunity to "deepen our involvement with the important commercial radioactive waste industry."

192.    By early 1997 at the latest, Lockheed decided to divest its interest in the M4 Technology Center. On March 27, 1997, Molten Metal issued a press release disclosing the execution of a letter of intent pursuant to which Molten Metal would become the sole owner of M4 and of M4's primary asset, the Technology Center in Oak Ridge, Tennessee. Molten Metal similarly attempted to put a positive spin on Lockheed's decision to dispose of its interest in M4. In a Molten Metal press release issued on May 29, 1997, defendant Haney was quoted in part as stating that:

> "The new agreement with Lockheed Martin will give us control of the M4 Technology Center, which we believe will position us well to achieve long-term growth and sustained profitability."

193.    On December 30, 1996, Molten Metal common stock closed at an all time low price of $10 1/8 per share and, as of the filing of this Consolidated Complaint, trades in the range of only $5 per share.

X.  The Importance of Molten Metal's
    Stock Price to Defendants

194.    Defendants had several personal and corporate reasons for causing Molten Metal shares to trade at artificially inflated prices. First, as alleged above, the Individual Defendants owned substantial numbers of shares of Molten Metal common stock and had stock options.

195.    Second, in May, 1996, shortly after the filing of Molten Metal's 1995 Form 10-K, Molten Metal raised $142,750,000 from the issuance of Convertible Subordinated Notes Due 2006 (the "Notes"). The Notes are convertible into common stock at a conversion price of $38.75 per share.

196.    Third, Molten Metal has used its stock as currency to pay for part of its 50% equity investment in M4.  In March, 1996, Molten Metal used 307,735 shares of its common stock to purchase certain assets that were contributed to M4 to match an investment in M4 by Lockheed.  On September 20, 1996, as noted above, Molten Metal filed the Lockheed Registration Statement to register those 307,735 shares.

197.    Molten Metal had also used its stock to pay other third parties for services provided to Molten Metal or joint ventures with Molten Metal.

198.    Finally, all of the Individual Defendants sold Molten Metal stock at artificially inflated prices during the Class Period totaling over $15 million while in the possession of material non-public information.  Those sales were as follows:

## DEFENDANTS' INSIDER SALES

| DEFENDANT | DATE | AMOUNT | PRICE | PROCEEDS |
|---|---|---|---|---|
| HANEY | 03/21/96<br>03/22/96 | 66,000<br>20,000 | $35.25<br>$35.25 | $2,326,500<br>$  705,000 |
| Total Proceeds | | | | $3,031,500 |
| NAGEL | 12/22/95 | 102,500 | $35.01 | $3,588,525 |
| DOWNS | 03/20/96 | 45,000 | $36.25 | $1,631,250 |
| GATTO | 08/13/96 | 3,500 | $29.04 | $  101,640 |

| DEFENDANT | DATE | AMOUNT | PRICE | PROCEEDS |
|---|---|---|---|---|
| YATES | 09/12/95 | 1,000 | $24.00 | $ 24,000 |
| | 09/13/95 | 5,000 | $23.53 | $ 117,650 |
| | 09/15/95 | 5,000 | $24.00 | $ 120,000 |
| | 03/20/96 | 15,000 | $36.25 | $ 543,750 |
| | 05/14/96 | 6,638 | $34.25 | $ 227,352 |
| | 05/15/96 | 2,500 | $32.00 | $ 80,000 |
| | 05/17/96 | 10,500 | $32.00 | $ 336,000 |
| | 05/28/96 | 7,000 | $32.00 | $ 224,000 |
| | 05/31/96 | 8,000 | $30.00 | $ 240,000 |
| | 07/02/96 | 9,000 | $30.00 | $ 270,000 |
| | 07/03/96 | 1,000 | $30.00 | $ 30,000 |
| | 08/09/96 | 8,000 | $29.00 | $ 232,000 |
| | 08/12/96 | 7,500 | $30.00 | $ 225,000 |
| | 08/16/96 | 1,883 | $30.13 | $ 55,228 |
| Total Proceeds | | | | $2,724,980 |
| PRESTON | 09/29/95 | 15,000 | $33.00 | $ 495,000 |
| | 09/04/96 | 7,500 | $31.50 | $ 236,250 |
| | 09/05/96 | 10,000 | $31.50 | $ 315,000 |
| | 09/12/96 | 2,500 | $31.50 | $ 78,750 |
| | 09/16/96 | 20,000 | $31.50 | $ 630,000 |
| Total Proceeds | | | | $1,755,000 |
| STRONG | 04/11/95 | 1,000 | $16.00 | $ 16,000 |
| | 10/23/95 | 3,000 | $35.50 | $ 106,500 |
| | 10/23/95 | 10,000 | $36.00 | $ 360,000 |
| | 10/25/95 | 10,000 | $38.00 | $ 380,000 |
| | 12/29/95 | 10,000 | $32.63 | $ 326,300 |
| | 04/02/96 | 6,500 | $35.00 | $ 227,500 |
| | 04/10/96 | 3,500 | $34.50 | $ 120,750 |
| | 09/18/96 | 8,000 | $31.94 | $ 225,520 |
| | 09/19/96 | 33,000 | $31.50 | $1,039,500 |
| Total Proceeds | | | | $2,802,070 |

## COUNT I

### (Violations Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder
### Against All Defendants)

199.    Plaintiffs repeat and reallege the allegations set forth above as though fully set

forth herein. This claim is asserted against all defendants.

200.    During the Class Period, Molten Metal and the Individual Defendants, and each

of them, carried out a plan, scheme and course of conduct which was intended to and did: (i)

deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii)

artificially inflate and maintain the market price of Molten Metal common stock; and (iii) cause

plaintiffs and other members of the Class to purchase Molten Metal stock at artificially inflated

prices. In furtherance of this unlawful scheme, plan and course of conduct, Molten Metal and

the Individual Defendants, and each of them, took the actions set forth herein.

201.    These defendants: (a) employed devices, schemes, and artifices to defraud; (b)

made untrue statements of material fact and/or omitted to state material facts necessary to

make the statements not misleading; and (c) engaged in acts, practices and a course of business

which operated as a fraud and deceit upon the purchasers of the Company's common stock in

an effort to maintain artificially high market prices for Molten Metal common stock in violation

of Section 10(b) of the Exchange Act and Rule 10b-5. These defendants are sued as primary

participants in the wrongful and illegal conduct charged herein. The Individual Defendants are

also sued herein as controlling persons of Molten Metal, as alleged below.

202.    In addition to the duties of full disclosure imposed on defendants as a result of

their making or participating in the making of affirmative statements and reports to the

004492

investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. 210.01 et seq.) and S-K (17 C.F.R. 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

203.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's technology and performance at all relevant times; and (iii) the Individual Defendants were aware of the dissemination of information to the investing public as alleged above which they knew or recklessly disregarded was materially false and misleading.

204.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Molten Metal's operating condition,

004493

business practices and future business prospects from the investing public and supporting the artificially inflated price of its stock.

205.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Molten Metal's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of Molten Metal's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class acquired Molten Metal common stock during the Class Period at artificially inflated high prices and were damaged thereby.

206.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had plaintiffs and the other members of the Class known of the true facts concerning Molten Metal, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Molten Metal securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

207.    Plaintiffs and the members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of defendants' misrepresentations, omissions and other fraudulent conduct alleged herein. The decline in Molten Metal common stock was caused by the public dissemination at the end of the Class

Period of the true facts, which were previously concealed or hidden. Absent defendants'
wrongful conduct, plaintiffs and the members of the Class would not have been injured.

208.    By virtue of the foregoing, Molten Metal and the Individual Defendants each
violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

209.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and
the other members of the Class suffered damages in connection with their purchases of the
Company's securities during the Class Period.

### COUNT II

#### (Violation Of Section 20(a) Of The Exchange Act
#### Against The Individual Defendants)

210.    Plaintiffs repeat and reallege the allegations set forth above as if set forth fully
herein. This claim is asserted against the Individual Defendants.

211.    The Individual Defendants were and acted as controlling persons of Molten
Metal within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of
their high-level positions with the Company, participation in and/or awareness of the
Company's operations and/or intimate knowledge of the Company's actual performance, the
Individual Defendants had the power to influence and control and did influence and control,
directly or indirectly, the decision-making of the Company, including the content and
dissemination of the various statements which plaintiffs contend are false and misleading. Each
of the Individual Defendants was provided with or had unlimited access to copies of the
Company's reports, press releases, public filings and other statements alleged by plaintiffs to be
misleading prior to and/or shortly after these statements were issued and had the ability to
prevent the issuance of the statements or cause the statements to be corrected.

004435

212.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

213.    As set forth above, Molten Metal and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III

### (For Negligent Misrepresentation
### Against All Defendants)

214.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein. This claim is asserted by plaintiffs against all defendants based upon common law principles of negligent misrepresentation.

215.    Defendants made and participated in the making of negligent misrepresentations of material facts as alleged herein.

216.    Defendants knew and intended that plaintiffs and the members of the Class would rely on the false and misleading misrepresentations of defendants.

217.    At the time of said misrepresentations, plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. In reliance, directly and/or indirectly, on said misrepresentations and in reliance upon the superior knowledge and expertise

of defendants, plaintiffs and the other members of the Class were induced to and did purchase

Molten Metal securities. Had plaintiffs and the other members of the Class known the truth,

they would not have made such purchases or purchased at the prices they did. By reason

thereof, plaintiffs and the other members of the Class have been damaged.

## COUNT IV

### (For Common Law Fraud Against All Defendants)

218.  Plaintiffs repeat and reallege the allegations set forth above as if fully set forth

herein. This claim is asserted by plaintiffs against all defendants based upon common law

principles of fraud.

219.  As alleged herein, defendants' statements were false and misleading because they

included untrue statements of material fact and/or omitted to state material facts necessary to

make the statements made, in light of the circumstances under which they were made, not

misleading.

220.  The representations so made by defendants were known by them to be false and

misleading. The representations so made by defendants were made with the intention to

deceive and to defraud plaintiffs.

221.  In ignorance of the misrepresentations and omissions alleged herein, and believing

in the truth and completeness of defendants' statements, plaintiffs and other members of the

Class relied on said representations, directly and/or indirectly, in purchasing Molten Metal

securities.

222.    As a direct and proximate result of defendants' fraud, plaintiffs and other members of the Class have been damaged in connection with their purchases of Molten Metal securities.

## COUNT V

### (For Insider Trading Against Defendants Preston, Yates and Strong)

223.    Plaintiffs repeat and reallege the allegations set forth above as if fully set forth herein. This claim is asserted by plaintiffs Crosby, D'Angelo, Davis, Muoio, Sherman and Black against defendants Preston, Yates and Strong. It is brought by these plaintiffs on behalf of all members of the Class who purchased shares of Molten Metal stock contemporaneously with sales by defendants Preston, Yates and Strong as alleged in this count.

224.    Defendants Preston, Yates and Strong sold shares of Molten Metal common stock, while in possession of material, non-public information about Molten Metal, which sales were contemporaneous with purchases by plaintiffs of shares of Molten Metal common stock, as follows:

(a)  Plaintiff Muoio purchased 1,000 shares on September 16, 1996 contemporaneous with defendant Preston's sale of 20,000 shares on September 16, 1996.

(b)  Plaintiff Crosby purchased 1,000 shares on Monday, May 20, 1996 contemporaneous with defendant Yates's sales of 6,638 shares on May 14, 1996, 2,500 shares on May 15, 1996 and 10,500 shares on Friday, May 17, 1996.

(c)  Plaintiff D'Angelo purchased 1,000 shares on Tuesday, June 4, 1996, contemporaneous with defendant Yates's sale of 8,000 shares on Friday, May 31, 1996.

(d)  Plaintiff Davis purchased 1,000 shares on Tuesday, August 20, 1996, contemporaneous with defendant Yates's sale of 1,883 shares on Friday, August 16, 1996.

(e)  Plaintiff Davis purchased 1,000 shares on September 20, 1996, contemporaneous with defendant Strong's sales of 33,000 shares on September 19, 1996 and 8,000 shares on September 18, 1996.

(f)  Plaintiff Sherman purchased 100 shares on October 27, 1995, contemporaneous with defendant Strong's sales of 13,000 shares on October 23, 1995 and 10,000 shares on October 25, 1995.

(g)  Plaintiff Black purchased 1,000 shares on October 24, 1995 and 1,000 shares on October 25, 1995, contemporaneous with defendant Strong's sales of 13,000 shares on October 23, 1995 and 10,000 shares on October 25, 1995.

225.  Defendants Preston, Yates and Strong, by virtue of said sales, violated Section 20A of the Exchange Act.

226.  Pursuant to Section 20A, subdivision (a), defendants Preston, Yates and Strong are liable for damages to plaintiffs Muoio, Crosby, D'Angelo, Davis, Sherman and Black and all other members of the Class who purchased shares of Molten Metal common stock contemporaneously with defendants' said sales.

**WHEREFORE,** plaintiffs pray for judgment as follows:

(a)  Determining that this action is a proper class action and certifying plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as class counsel;

004499



(b)    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding damages against defendants Preston, Yates and Strong pursuant to Section 20A of the 1934 Act, including interest thereon;

(d)    Awarding plaintiffs and Class members their reasonable costs and expenses incurred in the filing and prosecution of this action, including counsel fees and expert fees; and

(e)    Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  October 30, 1997

**SHAPIRO HABER & URMY LLP**

By: _____
Thomas G. Shapiro BBO #454680
Michelle H. Blauner BBO #549049
75 State Street
Boston, MA 02109
(617) 439-3939

**BERMAN, DEVALERIO & PEASE LLP**

By: _____
Norman Berman, BBO # 040460
Vincent R. McDonough, BBO # 559233
One Liberty Square
Boston, MA 02109
(617) 542-8300

004500

**BADER AND BADER**
I. Walton Bader
65 Court Street
White Plains, NY 10601
(914) 682-0072

**WOLF POPPER LLP**
Robert Kornreich
Robert Finkel
845 Third Avenue
New York, NY 10022
(212) 759-4600

**MILBERG WEISS BERSHAD
HYNES & LERACH LLP**
David J. Bershad
Jerome M. Congress
Salvatore J. Graziano
One Pennsylvania Plaza
49th Floor
New York, NY 10119
(212) 594-5300

**KAPLAN, KILSHEIMER & FOX LLP**
Frederic S. Fox
Christine M. Comas
685 Third Avenue
New York, NY 10017
(212) 687-1980

**LOWEY DANNENBERG BEMPORAD &
SELINGER, P.C.**
Richard Bemporad
David C. Harrison
The Gateway
One North Lexington Avenue
White Plains, NY 10601
(914) 997-0500

**POMERANTZ, HAUDEK, BLOCK & GROSSMAN**
Marc Gross
100 Park Avenue
New York, NY 10017
(212) 661-1100

004501

**GILMAN AND PASTOR**
  David Pastor
  One Boston Place
  Boston, MA 02108
  (617) 589-3750

**STULL STULL & BRODY**
  Howard Longman
  6 East 45th Street
  New York, NY 10017
  (212) 682-7230

**SIROTA & SIROTA**
  Howard Sirota
  747 Third Avenue
  New York, NY 10017
  (212) 759-5555

**LAW OFFICES OF LAWRENCE**
  **G. SOICHER**
  Lawrence G. Soicher
  300 Park Avenue
  New York, New York  10022
  (212) 980-7000

**JAROSLAWICZ AND JAROS**
  David Jaroslawicz
  150 Williams Street
  New York, NY 10038
  (212) 227-2780

**SCHATZ & NOBEL**
  Jeffrey Nobel
  216 Main Street
  Hartford, CT 06106
  (860) 493-6292

**BLUMENTHAL OSTROFF & MARKHAM**
  1420 Kettner Boulevard
  San Diego, CA 92101
  (619) 239-1111

004502

**SCHIFFRIN & CRAIG, LTD.**
Richard Schiffrin
Three Bala Plaza East
Bala Cynwyd, PA 19004
(610) 667-7706

**THE LAW OFFICES OF ALFRED G. YATES, JR.**
Alfred G. Yates, Jr.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
(412) 391-5164

**KOHN, SWIFT & GRAF, P.C.**
Joseph Kohn
1101 Market Street
Philadelphia, PA 19107

**MORRIS & MORRIS**
Karen Morris
1105 North Market Street
Wilmington, DE 19801
(302) 426-0400

I HEREBY CERTIFY THAT A TRUE COPY OF THE ABOVE
DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD
FOR EACH OTHER PARTY BY MAIL-HAND-FAX ON 12/30/97

Carols X. Hoch

PLAINTIFF'S CERTIFICATION OF
SECURITIES FRAUD CLASS ACTION COMPLAINT

MORTON SHERMAN hereby certifies that the following is true
and correct to the best of his knowledge, information and belief:

1.   I have reviewed the Complaint filed against Molten
Metal Technology and others.

2.   I am willing to serve as a representative party on
behalf of a class, including providing testimony at deposition
and trial, if necessary.

3.   My transactions in Molten Metal Technology common stock
during the Class Period were as follows:

| Date | Transaction | Amount | Price Per |
|------|-------------|--------|-----------|
| 10/27/95 | Bought | 100 shares | $36.50 |

4.   I did not purchase these securities at the direction of
counsel, or in order to participate in any private action arising
under the Securities Exchange Act of 1934.

5.   I have not served as a named plaintiff in a securities
fraud law suit during the three-year period preceding the date of
signing this Certification.

6.   I will not accept any payment for serving as a
representative on behalf of the Class beyond my pro rata share of
any possible recovery, except for an award, as ordered or
approved by the Court, for reasonable costs and expenses
(including lost wages) directly relating to the representation of
the Class.

004504

CONTINUE FROM PREVIOUS PAGE

Signed under the penalties of perjury this _29_ day of

October, 1997.

<u>_Morton Sherman_</u>
MORTON SHERMAN

2

004505

Page 39

1    you believe they said "work product"?

2        A.    Or privilege, or something, that buzz word

3    that led me to make that observation that there was

4    some attorney/client privilege that existed between

5    the two.

6        Q.    Do you have a recollection sitting here

7    today what they said?

8        A.    On the cover letter or what they may have

9    said --

10       Q.    Well, you said work product --

11       A.    Confidential, privileged, work product.

12   Again, I don't remember exactly the buzz word.  But

13   when I looked at it I said it's not -- if I were

14   representing the company, that's the kind of bill

15   that I would send to the company or to the company's

16   general counsel or to the assistant general counsel,

17   Gene Berman.  So I mean the bills and the cover

18   letters themselves, as well.

19       Q.    Anything else that you rely upon for the

20   conclusion?

21       A.    Yes.  Specifically I had a meeting with

22   Dan Cohn after I reviewed some records at his

23   office, including a draft application to employ

24   Epstein Becker as special counsel.  And I inquired

Page 40

1    about, from Mr. Cohn, I believe this was in the year

2    2000, what happened with regard to that.  And he

3    informed me that Epstein Becker -- it was not filed

4    with the court and I asked him why.  And he informed

5    me that Epstein Becker would not go forward unless

6    their -- would not waive, would not go forward and

7    waive its claim in the bankruptcy case.

8         Q.   Would not go forward to do what, did he

9    say?

10        A.   Would not represent the debtor as special

11   counsel or represent interests of the debtor as its

12   special counsel, I believe representing certain

13   individuals.

14        Q.   So you remember that they were

15   representing -- I guess what is your memory of what

16   the draft --

17        A.   Well, the conversation --

18        Q.   No, no.  Let me finish the question.

19             What is your memory of what, first

20   of all, of what the draft application to employ

21   indicated that Epstein Becker was going to do?

22        A.   I don't remember.

23        Q.   Okay.  What is your memory about who --

24   this is Dan Cohn?

ALAN L. BRAUNSTEIN
4-10-06

Page 50

1      Q.   I believe you testified a moment ago that

2   it was not, in fact, the memo that's been marked as

3   Exhibit 5 that caused you to believe that there was

4   an attorney/client relationship between Epstein,

5   Becker & Green and Molten Metal Technology, but,

6   rather, an oral conversation that you had with Mr.

7   Cohn, is that correct?

8      A.   There were -- again, that was one of the

9   indicia, not that per say, obviously, but --

10     Q.   But the conversation you had with Mr. Cohn

11  was a factor in your conclusion that there was an

12  attorney/client relationship --

13     A.   It was one of the factors --

14     Q.   -- there was an attorney/client

15  relationship between Epstein Becker and Molten

16  Metal, correct?

17     A.   That's correct.

18     Q.   And you told me that Mr. Cohn told you

19  that Epstein, Becker & Green had continued billing

20  the debtor in possession without filing an

21  application to employ, correct?

22     A.   No, I didn't tell you that Mr. Cohn told

23  me that.

24     Q.   Okay.  What did Mr. Cohn tell you, since

Page 51

1    Mr. Cohn -- take a step back.  Was there anything

2    that Mr. Cohn told you during this conversation in

3    which you saw Exhibit 5 that led you to believe that

4    there was an attorney/client relationship between --

5    that was a factor in causing you to believe that

6    there was an attorney/client relationship between

7    Epstein, Becker & Green and Molten Metal Technology?

8         A.    Only a factor.

9         Q.    What was it that he said?

10        A.    That he intended to employ Epstein Becker

11   because Bingham was not going to be special counsel,

12   and that Epstein would not agree to that application

13   you see there if it had to waive its claim.

14        Q.    Do you know what work Bingham was doing

15   for Molten Metal Technology during the

16   debtor-in-possession period?

17        A.    No, Bingham did not represent the debtor

18   during the debtor-in-possession period.

19        Q.    And that's --

20        A.    This is prior to --

21        Q.    And that's your understanding from Mr.

22   Cohn?

23        A.    That's, again, Bingham was not employed,

24   retained or otherwise in the bankruptcy case by any

ALAN L. BRAUNSTEIN
4-10-06

Page 70

1    other attorneys who specifically were involved or

2    knew about the M4 issue, M4 invoice issue.

3         Q.    Let me follow up on that and then I'll

4    repose my question.

5         A.    Okay, sure.

6         Q.    Do you have any basis, do you have any

7    knowledge as to what the content of the

8    conversations in the bills between Carole Rendon and

9    those lawyers were?

10        A.    No.

11        Q.    Okay.  Other than Carole Rendon's, the

12   allegation that Carole Rendon knew about the Q2/Q3

13   invoice issue, is there any other information that

14   you believe Carole Rendon had that suggests to you

15   that there was a broader scope to the

16   representation?

17        A.    I think that with each of the various

18   employees, each one had, from here it looks like

19   they represented potentially 20 employees, so I

20   believe Jean Baulch also had information, and I

21   think that she was one of the Epstein Becker, but

22   they had a number of people and I don't know which

23   ones knew or not of the M4.  I know Rhonda Walker

24   did.

Page 71

1      Q.    And through, I guess the question is

2    through the representation of Rhonda Walker or any

3    of the other 20-some employees is there any other

4    information that you believe or that you have reason

5    to believe Carole Rendon gained that supports the

6    conclusion that you have drawn that the scope of her

7    representation was broader than just that of the

8    employees?

9      A.    Again, just from the time records.  That's

10   it.

11     Q.    Has the Trustee made documents available

12   to Mr. Hanfling prior to today?

13     A.    In connection with the settlement there

14   were documents that were exchanged.

15     Q.    And what kind of documents were those?

16     A.    I don't know specifically because they

17   dealt with the negotiation between the parties, that

18   ATG didn't have certain documents in its file that

19   we had showing, for example, the escrow agreements,

20   some of the sale closing documents, and also ATG

21   presumably had some of the documents that were

22   necessary in connection with an SEG litigation that

23   we were pursuing.  So I don't know specifically what

24   was exchanged or not exchanged in connection with

ALAN L. BRAUNSTEIN
4-10-06

Page 72

1    that.

2        Q.    Okay.  Did the Trustee make available to

3    Mr. Hanfling a quantity of documents from, that

4    originated in the files of Bingham Dana?

5        A.    To my knowledge, no, but that I would not

6    necessarily know or not know.  I don't know where

7    certain things may have come from if they were

8    informally exchanged.

9        Q.    Leaving aside documents with respect to

10   the escrow and the financial arrangements of the

11   settlement between Mr. Gray and Mr. Hanfling, were

12   documents, have documents before today been made

13   available to Mr. Hanfling to assist in the

14   prosecution of this litigation, the litigation in

15   which we're having this deposition today?

16       A.    In connection with our settlement or what

17   -- there may have been documents that may have been

18   requested by -- again, when I say documents such as

19   proof of claims that Epstein may have filed, I don't

20   know and don't recollect exactly what was asked for

21   and what was given.

22       Q.    Okay.  In paragraph 10 of the settlement

23   agreement that we were looking at just a moment ago,

24   in addition to the waiver of -- I'm sorry, I'm not

Page 73

1    looking at 10.  I meant to look at 9.  Number 9

2    recites that the parties agree to cooperate with

3    each other in connection with each party's ongoing

4    litigation and efforts to recover assets for the

5    bankruptcy estates from third parties and to

6    preserve records that may be relevant in that

7    regard.  In furtherance of Mr. Gray's obligations

8    under that paragraph have documents before today

9    been transmitted from Mr. Gray's custody to Mr.

10   Hanfling?

11        A.    I don't believe since this time period

12   that there have been any documents, but I'd stand

13   corrected by, if there were.  But I don't believe

14   so.  I know there were, again, documents while we

15   were going through the negotiations in connection

16   with that, but that I can't remember.

17        Q.    Were any documents provided to Mr.

18   Hanfling to assist in the prosecution of this

19   litigation prior to the execution of this settlement

20   agreement?

21        A.    There may have been like the proof of

22   claim or something that were public records that may

23   have been provided.  Again, I would defer to Mr.

24   Hanfling.  I just don't remember.

ALAN L. BRAUNSTEIN
4-10-06

Page 74

1                    MR. FLEISCHER:   Documents were

2    provided prior to that agreement and I want to say

3    that was in 2003.   Every document that we have

4    received copies have been provided to you along with

5    our discovery.   There's nothing outside of those

6    documents that have been provided to you that have

7    been provided to that time period.

8                    MS. BAGGER:   Let me just follow up

9    with you with one question and then we'll get back.

10   The documents that were on the CD that were the PDF

11   files which were pretty obviously from Bingham Dana,

12   did those come from Mr. Gray?

13                    MR. FLEISCHER:   I don't recall

14   documents coming from Bingham and Dana.   I'm not

15   sure what the source of that disk was.   It might

16   have -- and I'm not sure of the timing of that one.

17   I didn't recall that documents came from Bingham and

18   Dana.

19                    MS. BAGGER:   We can pursue it off

20   the record.

21                    MR. FLEISCHER:   Okay.

22                    MR. SUTTON:   Well, I have a

23   question.   You have documents purporting to be

24   records of Molten Metal Technology on a disk?

Page 75

```
1                    MS. BAGGER:  We can do this on, do

2      you want to do this on the record?

3                    MR. SUTTON:  Off the record.

4                    MS. BAGGER:  Off the record is fine.

5                    (Discussion off the record.)

6          Q.   Are you familiar with a litigation that

7      was commenced by Mr. Gray against ATG down in state

8      court in Tennessee?

9          A.   I was.

10         Q.   And that case was later removed to the

11     federal court in Tennessee?

12         A.   Again, the documents speak for itself.  We

13     employed special counsel to do that.

14         Q.   Do you know whether documents were

15     produced by either party in that litigation?

16         A.   I don't know.  I did not handle it.  We

17     employed special counsel, I believe Greenbaum Dole.

18     And though we had communications with them, I could

19     not remember what were or were not produced.  But my

20     understanding is we didn't get too far in that

21     because ATG filed for bankruptcy.

22         Q.   And the follow-up question was whether you

23     -- if there were any document productions or

24     depositions in that case, are they in your
```

ALAN L. BRAUNSTEIN
4-10-06

Page 76

1    possession at this point?

2        A.    If they were, they would have been, I

3    presume, given to you because we would have had

4    their file if they sent it to us.  I don't believe

5    that we received any documents.  We received copies

6    of pleadings, that I believe we received.

7                MS. BAGGER:  Mark this as the next

8    and potentially last exhibit.

9                (Deposition Exhibit No. 7

10                marked for identification.)

11        Q.    Put in front of you a document that was

12    marked as Exhibit 7 in this litigation.

13                (Document handed to witness.)

14        Q.    Do you know if you've ever seen this

15    document before?

16        A.    I've not seen this document.

17        Q.    You'd agree with me that it appears to be

18    the, Mr. Hanfling's supplemental interrogatory

19    answers in this case?

20        A.    Right.  Document would speak for itself.

21        Q.    Okay.  I'd like to call your attention to

22    the supplemental answer to interrogatory number 1.

23        A.    What page is that on?

24        Q.    That starts at page 2.

ALAN L. BRAUNSTEIN
4-10-06

Page 77

1      A.    Okay.

2      Q.    And I just want to ask you a couple of

3  questions about it, if you want to look over the

4  answer.

5      A.    Just the supplemental answer itself?

6      Q.    Yeah.

7      A.    Okay.

8              (Discussion off the record.)

9      A.    Okay.  I may have to read it again to

10  answer a specific question, but I'm familiar.

11      Q.    You've at least looked it over and

12  familiarized yourself with it?

13      A.    I have.

14      Q.    Had you read that answer before today?

15      A.    No.

16      Q.    Was the answer provided to you in draft

17  form before the interrogatories were submitted?

18      A.    No.

19      Q.    First sentence, if I can draw your

20  attention to the first sentence where it says,"

21  Prior to the commencement of this action plaintiffs'

22  counsel were contacted by counsel for Stephen S.

23  Gray, specifically Alan L. Braunstein."  I've

24  paraphrased a little bit, but is that a fair reading

Page 78

1   of the first two sentences?

2       A.    Except the matters alleged in the

3   complaint, it was regarding the whole host of

4   matters that did not involve and did not begin with

5   matters alleged in the complaint.

6       Q.    What caused you to contact Mr. Hanfling's

7   counsel?

8       A.    There were two matters.  One, we had a

9   proof of claim that was filed by ATG in the

10  bankruptcy case arising from what ATG was alleged as

11  a certain environmental derivative claim, if you

12  will, that was being claims against Molten's estate.

13  They filed a two million dollar administrative

14  claim.  And additionally, obviously, we filed the

15  complaint there and everything was stayed by virtue

16  of ATG's filing.  Additionally, ATG had records that

17  special counsel thought would be necessary in

18  connection with -- when I mean special counsel for

19  Stephen Gray, the Trustee, in connection with the

20  SEG litigation.

21      Q.    Drawing your attention to the, I guess

22  it's the middle of the paragraph, maybe the fourth,

23  perhaps the fifth.  "Mr. Braunstein informed

24  plaintiffs' counsel about the McConchie letter

ALAN L. BRAUNSTEIN
4-10-06

Page 79

1    referred to in the complaint and in prior discovery

2    responses." What do you recall telling Mr.

3    Hanfling's counsel about the McConchie letter?

4        A.    Well, during the stage of the negotiations

5    and the discussions actually in connection with that

6    the McConchie letter came up in context. I don't

7    know in what context it came up. And during that

8    time, at that point when it came up, if I remember

9    correctly, Mr. Hanfling had no idea what this

10   McConchie letter was or anything about that. And

11   there were questions that were asked and so we

12   provided responses to those questions. So really it

13   really became a Molten Metal Trustee call that

14   turned into what I believe formed the basis of the

15   litigation. In other words, I did not call him

16   saying you had a claim. This had to do with a long

17   series of conversations with myself and special

18   counsel on the phone with ATG.

19       Q.    Do you recall any of the questions that

20   were asked by ATG about the McConchie letter?

21       A.    I believe certain questions like when,

22   where, how and why, and who had copies of it. And I

23   think what happened is that we, when we mentioned

24   that we believed law firms had it, I believe that's

ALAN L. BRAUNSTEIN
4-10-06

Page 80

1    when we first mentioned Epstein, Becker & Green and

2    that's when I think the light bulb went on with

3    them, because we believed that Nagel's counsel had a

4    copy of it and that's how it came out.  But there

5    was no -- the phone call was not made to induce them

6    to bring litigation.  We didn't know that they

7    didn't know about McConchie and Epstein Becker.

8         Q.    But your recollection is that you told Mr.

9    Hanfling that you believed that Epstein Becker had a

10   copy of this letter?

11        A.    We believed, at that time we named all the

12   people that we believed had a copy of that letter

13   and we said Nagel and Nagel's counsel is Epstein

14   Becker.  I think that's how it went.

15        Q.    And what was your, what was the basis for

16   believing that Epstein Becker had a copy of the

17   letter?

18        A.    Three reasons.  One, Christopher Nagel is

19   one of the parties that's alleged to have induced

20   McConchie into this.  Two, during this time period

21   of the settlement with regard to, during this time

22   period of the negotiations I believe that Mike

23   Dutore (phonetic) was representing Christopher Nagel

24   and John Preston in the trustees litigation, and

ALAN L. BRAUNSTEIN
4-10-06

Page 81

1    ultimately, and there was some coalescence, if you

2    will, between the representation and their guidance

3    of Preston and Nagel because Bingham had been

4    representing all of the officers and directors and

5    Molten and there was a conflict waived -- I mean

6    conflict raised and I think Dutore came in and

7    represented Nagel and Preston in the follow-up of

8    that shareholder litigation.

9                I don't know, I'm, again, with

10   regard to that, this is why I mentioned that I

11   thought Nagel's attorney would have it, because at

12   that time period in the shareholder litigation we

13   found out, unbeknownst to us and not disclosed to

14   anyone, that the shareholder litigation, which made

15   no reference to McConchie, was carving out $350,000

16   to pay Earl McConchie.

17               That's what caused a lot of this to

18   blow up.  Why is McConchie getting money?  Why is he

19   getting it from the shareholder litigation?  Why is

20   he carving it out?  That's when we found and thought

21   there was something subversive in connection with

22   the whole shareholder litigation process and the

23   fact being why would you carve out that money?  And

24   it was really an end run around relief from the

Page 82

1    automatic stay to get him the money.

2        Q.    Besides the fact that Nagel was the

3    recipient of the letter and that Epstein Becker came

4    in to represent Christopher Nagel in the shareholder

5    litigation after Bingham was conflicted out, was

6    there anything else that led you to believe that

7    Epstein Becker might have a problem because of a

8    conflict?

9        A.    Because also remember, they had were

10   representing presently, I believe, Nagel in the

11   Trustee's litigation.  Trustee had sued Nagel, among

12   others, at that time.  And there were the bills that

13   showed an entry, at least one I remember, in the

14   same entry with the name Nagel and McConchie at

15   about the time period, I think within a month or so

16   of when the McConchie letter was, had been drafted

17   and was kept from everyone.

18       Q.    When you say that the McConchie letter was

19   kept from everyone, can you explain what you mean?

20       A.    The McConchie letter came to light

21   inadvertently, if you will, when I had been informed

22   by Cohn's office that there were certain records in

23   storage that had not been given to us at the

24   beginning of the case, that they were, quote,

EPSTEIN BECKER & GREEN, P.C.

ATTORNEYS AT LAW

75 STATE STREET

BOSTON, MASSACHUSETTS 02109[1]

(617) 342-4000

FAX: (617) 342-4001

250 PARK AVENUE
NEW YORK, NEW YORK 10177-0077[1]
(212) 351-4500

1227 25TH STREET, N.W.
WASHINGTON, D.C. 20037-1156[1]
(202) 861-0900

1875 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2501
(213) 556-8861

SIX LANDMARK SQUARE
STAMFORD, CONNECTICUT 06901-2704[1]
(203) 348-3737

ONE RIVERFRONT PLAZA
NEWARK, NEW JERSEY 07102[1]
(201) 642-1900

TWO EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA 94111-5994
(415) 398-3500

12750 MERIT DRIVE
DALLAS, TEXAS 75251-1209[1]
(972) 490-3143

2400 SOUTH DIXIE HIGHWAY, SUITE 100
MIAMI, FLORIDA 33133-3141
(305) 856-1100

510 KING STREET, SUITE 301
ALEXANDRIA, VIRGINIA 22314-3132[1]
(703) 684-1204

[1]P.C. NEW YORK, WASHINGTON, D.C.
CONNECTICUT, VIRGINIA, NEW JERSEY
MASSACHUSETTS AND TEXAS ONLY

March 18, 1998

United States Bankruptvcy Court
10 Causeway Street
Boston, MA 02222-1074

    Re:  Case No. 97-21385 CJK
         Molten Metal Technology, Inc.
         52-1659959

Dear Sir/Madam:

    Enclosed please find completed original and copy of the
Proof of Claim along with supporting documentation, which is
being filed on behalf of Epstein Becker & Green, P.C., as a
Creditor in this action.  Also attached is a stamped self-
addressed envelope.

    Thank you for your attention to this matter.  If you have
any questions, please call me.

                        Very truly yours,

                        Carole Schwartz Rendon

CSR/g
Enclosures

cc:  Daniel C. Cohn, Esq.

[rendon\30659.100\usbank]

EBG 3653

Motlen Metal Technologies, Inc
400-2 Totten Pond Rd.
Waltham, MA 02154

March 17, 1998
*DRAFT*  MEMO 122902

through 02/28/98:

30659/100
General

| | | | |
|---|---|---|---|
| 08/28/97 C.S.Schwartz Rendon | Meeting w/Kristi Rea re: continued interview. | 2.3 | 540.50 |
| 09/04/97 C.S.Schwartz Rendon | Drafting letters for Kristi Rea re: payment terms and conflict issues. | .2 | 47.00 |
| 09/10/97 C.S.Schwartz Rendon | Tel. conference w/Karen Green re: Bill Nancy's interview. | .2 | 47.00 |
| 09/16/97 C.S.Schwartz Rendon | Travel to Molten Metal for meeting with Ethan Jacks re: recent developments. | 3.2 | 752.00 |
| 10/10/97 C.S.Schwartz Rendon | Telephone conferences with E. Jacks, J. Maguidad, W. Corpening (FBI); meeting with J. Maguidad; telephone conferences with K. Rea and M. Thompson | 3.6 | 846.00 |
| 10/14/97 C.S.Schwartz Rendon | Telephone conference with B. Froeberg, DOE regarding interview schedule; drafting letters for Josefina Maguidad regarding representation; conference call with G. Berman; telephone conference with K. Rea; telephone conference with C. Nagel. | 2.4 | 564.00 |
| 10/15/97 C.S.Schwartz Rendon | Travel to Molten Metal for meeting with C. | 4.2 | 987.00 |

EBG 3654

Page:    2

Motlen Metal Technologies, Inc                    March 17, 1998
                                                  *DRAFT*  MEMO 122902

General
                          Nagel and G. Berman;
                          telephone conferenc
                          ewith K. Green;
                          telehone conference
                          with K. Bender
                          regarding interview
                          schedule.
10/16/97 C.S.Schwartz RendonTelephone conferences      1.1      258.50
                          with B. Froeberg, G.
                          Berman and M. Guzman
10/17/97 C.S.Schwartz RendonTelephone conference        .2       47.00
                          with B. Froeberg
                          regarding interview
                          schedule; telephone
                          conference with G.
                          Berman
10/20/97 C.S.Schwartz RendonTelephone conference       3.2      752.00
                          with M. Thompson
                          regarding interview;
                          numerous telephone
                          conferences with other
                          MMT employees and B.
                          Froeberg regarding
                          same.
10/21/97 C.S.Schwartz RendonMeeting with A.            3.4      799.00
                          Protopapas regarding
                          FBI interview;
                          conference with G.
                          Berman, et al.,
                          telephone conference
                          with K. Bender
                          regarding subpoenas;
                          finalizing interview
                          schedule.
10/22/97 C.S.Schwartz RendonTelephone conference       3.2      752.00
                          from E. Mark regarding
                          D. Pitts; telephone
                          conference to B.
                          Cobinha regarding same;

Page:    3

Motlen Metal Technologies, Inc                    March 17, 1998
                                                *DRAFT* MEMO 122902

General

|  |  |  |
|---|---|---|
|  | review of document subpoenas; telephone conferences with G. Berman, K. Bender, R. Walker and J. Browne; telephone conference with E. Jacks and E. Mark. |  |
| 10/23/97 C.S.Schwartz RendonReview of documents from D. Becker; calls to G. Berman, C. Collete; draft retainer and conflict letters for new clients; review of Browne subpoena and follow-up phone call; telephone conferences with D. Schneider and counsel to V. Gatto. | 6.2 | 1,457.00 |
| 10/24/97 C.S.Schwartz RendonTravel to Molten Metal; conference with J. Campbell, D. Reilly and M. Sullivan; conference call with G. Berman; meeting with C. Collette. | 10.5 | 2,467.50 |
| 10/27/97 C.S.Schwartz RendonFBI interviews of T. Behrens, J. Maguigad, C. Collete and D. Reilly; meeting with T. Behrens; Telephone conference with E. Jacks, Dennis Sawyer (sp) and M. Guzman | 11.3 | 2,655.50 |
| 10/28/97 C.S.Schwartz RendonTelephone conference with E. Jacks, J. Browne, C. Nagel and K. Rea; interview of E. Ghoniem and preparation | 6.9 | 1,621.50 |

EBG 3656

Page:    4

Motlen Metal Technologies, Inc

March 17, 1998
*DRAFT*  MEMO 122902

General

|  |  |  |  |
|---|---|---|---|
| | of E. Ghoniem. | | |
| 10/29/97 C.S.Schwartz RendonTravel to Molten Metal Technologies for meetings with B. Payea, M. Sullivan and K. Rea; meeting with I. Yates and FBI interview regarding same; telephone conference with E. Jacks, D. Schneider and G. Berman | 10.2 | 2,397.00 |
| 10/30/97 C.S.Schwartz RendonTelephone conferences with E. Jacks, B. Codinha, K. Green, M. Lundrum, J. Coyle and others; FBI interviews of C. Nagel and S. Blanchard | 10.0 | 2,350.00 |
| 10/31/97 C.S.Schwartz RendonMeeting with M. Thompson and prepare for interview; interviews with M. Thompson, A. Protopapas and J. Campbell; telephone conference with D. Hoey, D. Schneider | 5.5 | 1,292.50 |
| 11/02/97 C.S.Schwartz RendonDrafting letter to M. Guzman regarding subpoenas; telephone conference with E. Jacks; review of information from FBI interviews; drafting letter to R. Walker regarding subpoena. | 2.7 | 634.50 |
| 11/04/97 C.S.Schwartz RendonTelephone conferences with E. Jacks, M. Guzman and L. Ghoniem | 2.8 | 658.00 |

EBG 3657

Page:    5

Motlen Metal Technologies, Inc                          March 17, 1998
                                                  *DRAFT*  MEMO 122902

General

|            |                  | regarding telephone interview; review of notes regarding L. Ghoniem's FBI interviews. |      |          |
|------------|------------------|---------------------------------------------------------------------------------------|------|----------|
| 11/06/97 C.S.Schwartz Rendon | Telephone conferences with D. Schneider and L. Ghoniem regarding update | .7 | 164.50 |
| 11/07/97 C.S.Schwartz Rendon | Telephone conferences to D. Schneider; telephone conference with M. Guzman; telephone conference with C. Nagel's secretary regarding subpoena; telephone conferences with L. Ghoniem. | 3.4 | 799.00 |
| 11/10/97 C.S.Schwartz Rendon | Telephone conferences with E. Jacks, B. Froeberg, J. Browne, K. Santoro regarding FBI interviews; drafting letters to D. Schneider regarding employment dates; continued work on subpoena responses | 5.3 | 1,245.50 |
| 11/11/97 C.S.Schwartz Rendon | Telephone conferences to K. Green, M. Sullivan, K. Rea and B. Froehberg regarding FBI interviews | 1.3 | 305.50 |
| 11/12/97 C.S.Schwartz Rendon | Meeting with K. Green regarding preparation for M. Sullivan; meeting with M. Sullivan to prepare for FBI interview; FBI | 7.5 | 1,762.50 |

EBG 3658

Page:   6

Molten Metal Technologies, Inc                    March 17, 1998
                                            *DRAFT*  MEMO 122902

General

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | interview of M. Sullivan. |  |  |
| 11/13/97 | C.S.Schwartz Rendon | Meeting with K. Rea regarding preparation for FBI interview; FBI interview of K. Rea; telephone conference with E. Jacks. | 6.5 | 1,527.50 |
| 11/14/97 | M.R. Anderson | Prepare documents for production to FBI | .2 | 17.00 |
| 11/14/97 | C.S.Schwartz Rendon | Telephone conference with E. Jacks regarding update; telephone conference with J. Balch regarding representation; telephone conference with D. Schneider regarding same; preparation of documents for subpoena response. | 4.2 | 987.00 |
| 11/17/97 | M.R. Anderson | Prepare documents for copying; T.T. copy centers re: status | .4 | 34.00 |
| 11/17/97 | C.S.Schwartz Rendon | Telephone conference with Kathleen regarding C. Shaver's subpoena; finalizing documents for production; telephone conferences with D. Schneider, E. Jacks, D. Saylor, J. Andrews, B. Froehberg and G. Nicholas. | 4.1 | 963.50 |
| 11/18/97 | M.R. Anderson | Prepare documents for production | .7 | 59.50 |
| 11/18/97 | C.S.Schwartz Rendon | Telephone conference from B. Froehberg | 1.1 | 258.50 |

EBG 3659

Page:    7

Motlen Metal Technologies, Inc                     March 17, 1998
                                                   *DRAFT* MEMO 122902

General

|  |  |  |  |  |
|---|---|---|---|---|
| | | regarding J. Browne and other issues; drafting letter to C. Shaver regarding subpoena; telephone conerence with M. Thompson regarding subpoena. | | |
| 11/19/97 | C.S.Schwartz Rendon | Telephone conference from M. Thompson regarding subpoena; telephone conference from J. Balch regarding FBI interview; telephone conferences to E. Jacks, B. Froeberg and G. Nicholas; preparation of third document package regarding grand jury subpoenas; telephone conference with K. Green. | 1.9 | 446.50 |
| 11/20/97 | M.E. Basile | Meeting w/Carole Schwartz Rendon and Jean Balch to prepare Ms. Balch for her interview w/FBI; attend interview at FBI offices and take notes of interview | 5.2 | 832.00 |
| 11/20/97 | C.S.Schwartz Rendon | Meeting with J. Balch to prepare for FBI interview; FBI interview of J. Balch. | 5.8 | 1,363.00 |
| 11/21/97 | C.S.Schwartz Rendon | Telephone conference with J. Andrews regarding R. Walker; telephone conference to R. Walker regarding | .8 | 188.00 |

EBG 3660

Page:    8

Motlen Metal Technologies, Inc                     March 17, 1998
                                          *DRAFT*  MEMO 122902

General

                          representation;
                          drafting letters for J.
                          Balch regarding
                          representation;
                          telephone conference to
                          B. Froehberg regarding
                          schedule.
11/25/97 C.S.Schwartz RendonTelephone conferences        .4        94.00
                          with G. Berman and R.
                          Walker; telephone
                          conference with D.
                          Schneider
12/16/97 M.R. Anderson    Review documents; T.T.         .1         8.50
                          Copy Center re: billing
01/22/98 M.R. Anderson    Search files for Nagel         .2        17.00
                          documents
03/04/98 M.R. Anderson    Review files at               1.9       161.50
                          Bankruptcy Court; T.T.
                          D. Cohn re: creditor
                          list

                          Total Hours  145.0

                          Total For Services    $33,160.00

Disbursements Made on Behalf of Client:

        Local Transportation EPSTEIN BECKER & GREEN,        40.00
        P.C. 10/97 BOS P.CASH
        Local Transportation LIMOUSINES INC. 21426         241.50

        Telephone                                           57.75
        Fax/Telex                                           33.00
        Postage                                              1.19
        Photocopies                                         33.60
        Air Courier                                        251.50
        Meals                                               69.78
        Parking/Mileage/Tolls/Rental                        86.00
        Travel Expense - Taxis                             468.80

EBG 3661

Page:    9

Motlen Metal Technologies, Inc                    March 17, 1998
                                                  *DRAFT*  MEMO 122902

General

        Outside Photocopy                              106.22
        Outside Messenger Service                       57.70

        Disbursements Total                         $1,447.04

                    ATTORNEY SUMMARY

                         Hours      Billed      Bill
                         Worked   Per Hour    Amount
Attorney             ------------ ----------- -----------
--------------------
M.E. Basile               5.20     160.00     832.00
M.R. Anderson             3.50      85.00     297.50
C.S.Schwartz Rendon     136.30     235.00   32,030.50
================================ ============ ============
Total all Attorneys     145.00     228.68   33,160.00

        Total This Invoice                         $34,607.04

EBG 3662

B10 (Official Form 10)
(Rev. 7/95)

| United States Bankruptcy Court | PROOF OF CLAIM |
|---|---|
| District of Massachusetts | |

| In re (Name of Debtor) Molten Metal Technology, Inc. | Case Number 97-21385 CJK |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property) Epstein Becker & Green, P.C. | ☐ Check box if you are aware that any-one else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
|---|---|
| Name and Address Where Notices Should be Sent Epstein Becker & Green, P.C. 75 State Street Boston, MA 02109 | ☐ Check box if you have never received any notices from the bankruptcy court in this case. |
| 617-342-4000 Telephone No. | ☐ Check box if the address differs from the address on the envelope sent to you by the court. |

THIS SPACE IS FOR COURT USE ONLY

| ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR: | Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated:_____ |
|---|---|

**1. BASIS FOR CLAIM**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other (Describe briefly)

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (Fill out below)
  Your social security number_____
  Unpaid compensation for services performed
  from_____ to_____
  (date)              (date)

| 2. DATE DEBT WAS INCURRED October – December, 1997 | 3. IF COURT JUDGMENT, DATE OBTAINED: |
|---|---|

**4. CLASSIFICATION OF CLAIM.** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another. CHECK THE APPROPRIATE BOX OR BOXES that best describe your claim and STATE THE AMOUNT OF THE CLAIM AT TIME CASE FILED.

☐ SECURED CLAIM $_____
Attach evidence of perfection of security interest
Brief Description of Collateral:
☐ Real Estate  ☐ Motor Vehicle  ☐ Other (Describe briefly)

Amount of arrearage and other charges at time case filed included in secured claim above, if any $_____

☒ UNSECURED NONPRIORITY CLAIM $ 34,607.04
A claim is unsecured if there is no collateral or lien on property of the debtor securing the claim or to the extent that the value of such property is less than the amount of the claim.

☐ UNSECURED PRIORITY CLAIM $_____
Specify the priority of the claim.

☐ Wages, salaries, or commissions (up to $4000),* earned not more than 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier—11 U.S.C. § 507(a)(3)

☐ Contributions to an employee benefit plan—11 U.S.C. § 507(a)(4)

☐ Up to $1,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use—11 U.S.C. § 507(a)(6)

☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child—11 U.S.C. § 507(a)(7)

☐ Taxes or penalties of governmental units—11 U.S.C. § 507(a)(8)

☐ Other—Specify applicable paragraph of 11 U.S.C. § 507(a)_____
*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

| 5. TOTAL AMOUNT OF CLAIM AT THE TIME CASE FILED: | $ 34,607.04 (Unsecured) | $_____ (Secured) | $_____ (Priority) | $ 34,607.04 (Total) |
|---|---|---|---|---|

☐ Check this box if claim includes charges in addition to the principal amount of the claim. Attach itemized statement of all additional charges.

6. CREDITS AND SETOFFS: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim. In filing this claim, claimant has deducted all amounts that claimant owes to debtor.

7. SUPPORTING DOCUMENTS: *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, or evidence of security interests. If the documents are not available, explain. If the documents are voluminous, attach a summary.

8. TIME-STAMPED COPY: To receive an acknowledgement of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any) |
|---|---|

EBG 3663

# UNITED STATES BANKRUPTCY COURT

US Bankruptcy Court
10 Causeway Street
Boston MA 02222-1074

### District of Massachusetts

### NOTICE OF COMMENCEMENT OF CASE UNDER CHAPTER 11
### OF THE BANKRUPTCY CODE,
### MEETING OF CREDITORS, AND FIXING OF DATES
(Corporation/Partnership Case)

Case Number:        97-21385  CJK

Date Filed (or Converted) :    12/03/97

IN RE(NAME OF DEBTOR)
Molten Metal Technology, Inc.,
52-1659959

| | |
|---|---|
| Molten Metal Technology, Inc | 97-21385 |
| MMT of Tennessee, Inc. | 97-21386 |
| MMT Federal Holdings, Inc | 97-21387 |
| M4 Environmental Mgmt. Inc. | 97-21388 |
| M4 Environmental LP | 97-21389 |

ADDRESS OF DEBTOR
400-2 Totten Pond Road
Waltham, MA 02154

NAME/ADDRESS OF ATTORNEY FOR DEBTOR
Daniel C. Cohn
Cohn & Kelakos
265 Franklin Street
Boston, MA 02110

NAME/ADDRESS OF TRUSTEE

Telephone Number: (617) 951-2505
DATE/TIME/LOCATION OF MEETING OF CREDITORS
January 9, 1998 at 10:30 am
10 Causeway Street Room 1190
Boston, MA 02222

Telephone Number:

[x] Corporation  [ ] Partnership
Filing Claims: If the Court sets a Deadline for Filing a Proof of Claim, you will be notified.

COMMENCEMENT OF CASE. A petition for reorganization under chapter 11 of the Bankruptcy Code has been filed in this court by or against the debtor named above, and an order for relief has been entered. You will not receive notice of all documents filed in this case. All documents filed with the court, including lists of the debtor's property and debts, are available for inspection at the office of the clerk of the bankruptcy court.

CREDITORS MAY NOT TAKE CERTAIN ACTIONS. A creditor is anyone to whom the debtor owes money or property. Under the Bankruptcy Code, the debtor is granted certain protection against creditors. Common examples of prohibited actions by creditors are contacting the debtor to demand repayment, taking action against the debtor to collect money owed to creditors or to take property of the debtor, and starting or continuing foreclosure actions or repossessions. If unauthorized actions are taken by a creditor against a debtor, the court may penalize that creditor. A creditor who is considering taking action against the debtor or the property of the debtor should review Sec. 362 of the Bankruptcy Code and may wish to seek legal advice. If the debtor is a partnership, remedies otherwise available against general partners are not necessarily affected by the commencement of this partnership case. The staff of the clerk of the bankruptcy court is not permitted to give legal advice.

MEETING OF CREDITORS. The debtor's representative, as specified in Bankruptcy Rule 9001(5), is required to appear at the meeting of creditors on the date and at the place set forth above for the purpose of being examined under oath. Attendance by creditors at the meeting is welcomed, but not required. At the meeting, the creditors may examine the debtor and transact such other business as may properly come before the meeting. The meeting may be continued or adjourned from time to time by notice at the meeting, without further written notice to the creditors.

PROOF OF CLAIM. Schedules of creditors have been or will be filed pursuant to Bankruptcy Rule 1007. Any creditor holding a scheduled claim which is not listed as disputed, contingent, or unliquidated as to amount may, but is not required to, file a proof of claim in this case. Creditors whose claims are not scheduled or whose claims are listed as disputed, contingent, or unliquidated as to amount and who desire to participate in the case or share in any distribution must file their proofs of claim. A creditor who desires to rely on the schedule of creditors has the responsibility for determining that the claim is listed accurately. The place to file a proof of claim, either in person or by mail, is the office of the clerk of the bankruptcy court. Proof of claim forms are available in the clerk's office of any bankruptcy court.

PURPOSE OF CHAPTER 11 FILING. Ch. 11 of Bankruptcy Code enables a debtor to reorganize pursuant to a plan. A plan isn't effective unless approved by court at a confirmation hearing. Creditors will be given notice concerning any plan, or in the event the case is dismissed or converted to another chapter of the Bank. Code. Debtor will remain in possession of its property and will continue to operate any business unless a trustee is appointed. Notice is hereby given that any creditor or other interested party who wishes to receive the notice of the trustee's intention to abandon property of the estate pursuant to 11 U.S.C. Sec 554(a) must file with Court and serve upon trustee and US Trustee a written request for such notice within ten days from date first scheduled for meeting of creditors.

the Court:

Date:  12/15/97

FORM B9F        0001

Bancap 341 7/26/97 smc

EBG 3664

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

[X] Annual Report pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934.
For the fiscal year ended December 31, 2000.

[_] Transition report pursuant to Section 13 or 15(d) of the
Securities Exchange Act of 1934.
For the transition period from _____ to _____.

*Commission File Number 0-23781*

# ATG INC.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| California | 94-2657762 |
| State or other jurisdiction of | (IRS Employer |
| Incorporation or organization) | Identification Number) |

47375 Fremont Boulevard
Fremont, California 94538
(Address of principal executive offices)

(510) 490-3008
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(g) of the Act:**
**Common Stock, No par value**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for at least the past 90 days:

Yes [X] No [_]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulations S-K (Paragraph 229.405 of this Chapter) is not contained herein, and will not be contained, to the best of Registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

On April 2, 2001, there were issued and outstanding 17,014,746 shares of Common Stock. The aggregate market value of Common Stock held by non-affiliates of the Registrant on that date was approximately $14,611,808 based on the closing sale price of the Common Stock, as reported by the NASDAQ National Market.

**Documents Incorporated By Reference**

None

1

PART I

**Item 1. Business**

**Forward-Looking Information**

Statements in this report concerning expectations for the future constitute forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements are subject to a number of known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements of ATG or industry trends to differ materially from those expressed or implied by the forward-looking statements. These risks and uncertainties include, among others, those discussed in Item 1 of Part I under the heading "Factors Affecting Future Operating Results" and elsewhere in this report and those described from time to time in ATG's other filings with the Securities and Exchange Commission, press releases and other public communications.

**General**

ATG Inc. was incorporated in Texas in 1976 under the name Allied Nuclear, Inc., reincorporated in California in 1980 and changed its name to "ATG Inc." in 1987. ATG is a radioactive and hazardous waste management company that offers comprehensive treatment solutions for low-level radioactive waste and low-level mixed waste generated by the U.S. Department of Defense, the U.S. Department of Energy and commercial entities such as nuclear power plants, medical facilities and research institutions. Our thermal treatment technologies achieve substantial volume and mass reductions for treated waste streams while encapsulating the non-volatile waste remains in a glass matrix or metal matrix for final disposal. Both of these final waste forms offer greater intrinsic safety and environmental benefits at competitive prices than either incinerator ash or non-thermal waste processing techniques.

ATG operates through two primary business lines, the Fixed Facilities Group and the Field Engineering Group. The Fixed Facilities Group operates ATG's fixed facilities in Richland, Washington and Oak Ridge, Tennessee, which are used to process low-level radioactive waste and low-level mixed waste. The Fixed Facilities Group also performs nuclear related work at its customer sites which normally results in waste being sent to its fixed facilities for processing prior to disposal. ATG's fixed facilities operate under radioactive material licenses issued by the State of Washington for its Richland facilities and the State of Tennessee for its Oak Ridge facilities. Our radioactive materials licenses include reciprocity provisions that allow us to treat radioactive waste at customer sites in all fifty states. Our licenses and permits for our Richland, Washington facilities also include the most comprehensive mixed waste processing permit in the United States. Our mixed waste processing capabilities resulted in substantial mixed waste revenue starting in 2000 which is expected to continue in 2001 and is anticipated to help attract additional wastes to our processing facilities for low-level radioactive waste.

The Field Engineering Group performs a broad range of construction management projects and hazardous waste remediation projects at customer sites. Its primary customer base is private industry and the Department of Defense. It carries out both fixed price and time and materials contracts related to the clean-up of customer sites under the U.S. Comprehensive Environmental Response, Compensation and Liability Act of 1980, commonly referred to as CERCLA, and the U.S. Resources Conservation and Recovery Act of 1976, commonly referred to as RCRA, asbestos abatement projects, as well as various specialized construction management projects, such as the construction of levies.

In December 1998, ATG acquired assets and business lines from the former Molten Metal Technologies, Inc. The assets acquired from Molten Metal Technologies included substantially all of the operating assets, contracts, licenses and permits associated with the wet waste treatment and catalytic extraction processing for ion exchange resins used to clean various nuclear power plant waste streams. During the quarter ended June 30, 2000, ATG announced and completed a restructuring plan that was aimed primarily at improving cost efficiencies and waste treatment processes. During the quarter ended December 31, 2000, ATG completed a review of the Tennessee fixed facilities concerning the utilization of a modified Q-CEP thermal treatment system for the processing of specialty niche waste streams. Due to the prohibitive cost and the unknown prospect of success related to the proposed system modification, ATG formally abandoned the Q-CEP thermal treatment system.

We believe that we possess a number of competitive advantages which distinguish our company from other radioactive and hazardous waste management companies. These include:

. a very comprehensive range of services;

2

**Restructuring**

During the quarter ended June 30, 2000, the Company announced and completed a restructuring plan, which included a workforce reduction of approximately 110 employees at its Tennessee facilities. The plan was primarily aimed at improving cost efficiencies and waste treatment processes. The Company recorded a $500 maintenance supply inventory write-down and a restructuring charge of $1.9 million which included non cash charges of $800 for equipment taken out of service and abandoned.

Asset Abandonment

During the fourth quarter of 2000, the Company completed a review of the Tennessee fixed facilities concerning the utilization of a modified Q-CEP thermal treatment system for the processing of specialty niche waste streams. Due to the prohibitive cost and the unknown prospect of success related to the proposed system modification, the Company formally abandoned the Q-CEP thermal treatment system during the fourth quarter of 2000 and recorded a non cash asset impairment charge of $14.1 million. In addition, the Company recorded non cash charges regarding the $1.4 million write-down of goodwill from its acquisition of the Q-CEP assets, a $307 maintenance supply inventory write-down that was charged to cost of revenue, and an $828 write-down of other assets. Furthermore, a charge of $1.2 million was recorded for processing and disposal of secondary waste associated with the shutdown of the Q-CEP facility, of which $1.0 million remains accrued at December 31, 2000.

### 4. Accounts Receivable

|  | December 31, | |
| --- | --- | --- |
|  | 2000 | 1999 |
| **U.S. Government:** | | |
| Amounts billed.................................. | $ 3,987 | $ 2,867 |
| Amounts unbilled................................ | 8,193 | 7,314 |
| Total U.S. Government........................ | 12,180 | 10,181 |
| **Commercial customers:** | | |
| Amounts billed.................................. | 6,078 | 10,847 |
| Amounts unbilled................................ | 3,825 | 4,982 |
| Total commercial............................. | 9,903 | 15,829 |
| Total accounts receivable..................... | 22,083 | 26,010 |
| Less: allowances for doubtful accounts............... | (3,417) | (1,522) |
|  | $18,666 | $24,488 |

Recoverable costs and accrued profit on progress completed but not billed on U.S. government contracts are based on estimates of reimbursable overhead and general and administrative expenses calculated in accordance with contractually determined methods of calculation. These amounts are subject to final determination by the U.S. federal government after the contracts have been completed. As such, the actual recoverable amounts on these contracts may differ from these estimates.

Included in the unbilled portion within the above amounts is $3,941 and $3,595, as of December 31, 2000 and 1999, respectively, related to claims for additional services rendered.