UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT I. HANFLING, Chapter 7 Trustee of the Bankruptcy Estates of ATG, Inc. and ATG Catalytics, LLC,<br><br>    Plaintiff,<br><br>    v.<br><br>EPSTEIN BECKER & GREEN, P.C.,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 05-10077-RGS<br>)<br>)<br>)<br>)<br>) |

**REPLY MEMORANDUM IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Epstein Becker & Green, P.C. ("EBG") submits a reply brief in support of its motion for summary judgment on the legal malpractice claim of plaintiff Robert I. Hanfling, Chapter 7 Trustee of the Bankruptcy Estates of ATG, Inc. and ATG Catalytics LLC (the "Trustee").

After EBG moved for summary judgment, the Trustee filed a motion to amend his Complaint, which EBG has opposed on grounds of futility, tardiness, and prejudice. Although the motion to amend is pending, the Trustee has elected to abandon his original Complaint and oppose EBG's summary judgment motion as if it addressed the allegations of his proposed Amended Complaint. While this is questionable as a matter of procedure, it does not change the result. The proposed Amended Complaint does not cure the deficiencies – notably those with respect to the essential element of causation – of the Trustee's claim.

EBG is entitled to summary judgment because the Trustee has not satisfied his burden under Rule 56 to "set forth specific facts showing that there is a genuine issue for trial," as to every element of his claim. "[T]he evidence illustrating the factual controversy

cannot be conjectural or problematic . . . . [C]onclusory allegations, improbable inferences, and unsupported speculation will not suffice." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997) (citations omitted). EBG's motion was supported by sworn testimony, in the form of affidavits and deposition transcripts. The Trustee's opposition relies on undocumented assertions, speculation, and inadmissible evidence.

I.  THE TRUSTEE HAS NOT IDENTIFIED ANY GENUINE ISSUE OF MATERIAL FACT CONCERNING CAUSATION.

Causation is an essential element of a claim of a legal malpractice claim. This is no less true of the new conflict of interest claim than of the earlier claim of a failure to disclose material information. "The existence of a conflict without proof of causally-related damages is insufficient." *Robinson v. Bodoff*, 382 F.Supp.2d 229, 234 (D. Mass. 2005). *Accord McCann v. Davis, Malm & D'Agostine,* 423 Mass. 558, 559 (1996); *Van Brode Group, Inc. v. Bowditch & Dewey, Inc.*, 36 Mass. App. Ct. 509, 514 (1994. *See generally* R. MALLEN & J. SMITH, LEGAL MALPRACTICE § 16.18, at 926 (2006):

> [U]nlike a disqualification proceeding, the client must prove not only that there were conflicting interests that prevented the attorney from providing competent representation, but also that such was a proximate cause of the client's injury.
>
> As in a professional negligence action, the issue of proximate cause cannot be left to speculation. This is an important requirement, because allegations of conflict of interest are commonly made, frequently without any provable injury, in an effort to prejudice the trier of fact. The charge of disloyalty can be inflammatory. The representation of conflicting interests, however, is not actionable without proof that the conduct caused damages.

The Trustee's attempts to identify a genuine issue of material fact with respect to causation do not succeed. His arguments are either speculative, *e.g.,* Pl. Opp. at 20 ("[p]laintiffs believe" that ATG's assumptions about CEP technology would have been different had EBG disclosed facts in its possession); or unsupported, *e.g., id.* at 18 ("[p]laintiffs vehemently deny" assertion that William Hewitt spoke for ATG); or

2

impermissibly seek to shift the burden of proof, *e.g., id*. at 20 (EBG has not demonstrated "what impact disclosure would have had on ATG's analysis").

### A. Proof Of Causation Is Part Of The Trustee's Burden, And He Has Done Nothing To Show That He Can Satisfy It.

With respect to both the Trustee's original claim that EBG failed to disclose material information and the newer claim that EBG failed to disclose a conflict of interest, the burden of proof is on the Trustee. The Trustee briefly argues that the burden of proof in this case should shift to EBG as a fiduciary. *See* Pl. Opp. at 16. His citations are, however, completely inapposite. *Cleary v. Cleary*, 427 Mass. 286, 293 (1998), stands for the proposition that the burden of proof shifts to an attorney as fiduciary to justify his actions when he engages in a self-dealing transaction with a client.[1] When a client sues his attorney for malpractice, whether that malpractice action is pleaded as negligence or a breach of fiduciary duty, the burden of proof remains with the plaintiff. *McEvoy v. Robinson & Cole LLP*, 61 Mass. App. Ct. 1110 (2004); *see also Clark v. Rowe*, 428 Mass. 339, 345 (1998).

The Trustee complains that "EBG can point to no competent evidence" negating causation, "which may well require the introduction of expert testimony at trial," Trustee Facts ¶ 11 and n.4, betraying a lack of understanding of burdens of proof and the procedural posture of this case. First, the burden of proof on the sole claim against EBG in either the original or the proposed Amended Complaint – legal malpractice -- remains on the Trustee. Second, causation of damages is an essential element of a legal malpractice claim and thus part of the Trustee's burden. Third, on a motion for summary judgment, EBG's sole burden is to make a "preliminary showing that there is no genuine issue of material fact" requiring

---

[1] In *Cleary*, the attorney assisted an invalid aunt to designate him the beneficiary of her annuity contracts. The other two cases stray even further afield: in *Kwiat v. Doucette*, 81 B.R. 181, 189 (Bankr. D. Mass. 1987), the Court ruled that an attorney is a fiduciary within the meaning of 11 U.S.C. § 523(a)(4), and *Doe v. Harbor Schools, Inc.*, 63 Mass. App. Ct. 337, 346 (2005), addressed whether a counselor at a residential school was a fiduciary with respect to a minor student he was alleged to have sexually abused.

resolution at a trial.  *Cadle Co. v. Hayes*, 116 F.3d at 960.  It did so with affidavits from William Hewitt, former President of ATG's Waste Management Services Division, who testified to ATG's knowledge and thought processes at the time of the asset purchase transaction, and former EBG attorney Jarvis Kellogg, who testified to the structure and purpose of the transaction.  In order to stave off summary judgment, the Trustee now must, "by affidavits or as otherwise provided in this rule . . . set forth specific facts showing that there is a genuine issue for trial."   FED. R. CIV. P. 56(e).  This has not occurred.

EBG has presented several arguments why, on the undisputed facts and as a matter of law, the breaches of duty alleged did not cause the harm alleged and logically could not have done so.  The Trustee has not responded with any non-speculative factual issues for trial.  For instance, addressing his new conflict of interest claim, the Trustee writes: "EBG's responsibilities to MMT and the various employees it represented did, or certainly may have, materially limited EBG's representation of ATG."  Pl. Opp. at 15.  "May have" does not satisfy the Trustee's burden at this juncture.  "Did" is unsupported by citation to any authority – much less the required expert testimony.

The Trustee notes that the issue of causation "may well require the introduction of expert testimony at trial."  Trustee Facts ¶ 11.  The Trustee undoubtedly does need expert testimony to prove causation in this legal malpractice proceeding.  Expert testimony is required to establish the causal connection between breach of duty and injury in all cases except those in which causation is "within the ken of the ordinary juror."  *Atlas Tack Corp. v. Donabed*, 47 Mass. App. Ct. 221, 226-27 (1999); *accord Colucci v. Rosen, Goldberg, Slavet, Levenson & Wekstein, P.C.*, 25 Mass. App. Ct. 107, 115 (1987); *McCann v. Davis, Malm & D'Agostine*, 423 Mass. at 559-60.  The Trustee appears not to appreciate that, to defeat summary judgment, he also needs to present expert testimony to establish that the outcome

4

would have been different for ATG absent the alleged conflicts of interest and failures to disclose material information.[2]   Having failed to demonstrate that such proof will be forthcoming at trial, the Trustee cannot withstand EBG's motion for summary judgment.

> **B.      The Trustee Cannot Prove That Failure To Disclose Past Problems With CEP Injured ATG Because It Is Undisputed That ATG Knew CEP Had Not Worked In The Past.**

EBG has argued that the Trustee cannot prove injury flowing from non-disclosure of information about CEP technology because (1) EBG indisputably knew very little about CEP technology and (2) ATG already knew this limited information.  EBG Mem. SJ at 15-18.  The Trustee distorts this argument, arguing that that summary judgment should be denied because there is no evidence that EBG fully disclosed a broad range of allegations and items of information about MMT, without regard to whether this information was available to EBG.  EBG cannot be held responsible for disclosure of information it did not have.

The Trustee also misrepresents William Hewitt's complete and thoughtful testimony.  The Trustee claims that Mr. Hewitt does not address the "true" risks of acquiring the CEP assets.  Yet, in his affidavit, Mr. Hewitt is clear that ATG made a conscious decision to purchase the CEP assets knowing (a) that environmental clean-up efforts were needed, Hewitt Aff. ¶¶ 12, 13, and (b) that the technology might not work and need replacement, *id*. ¶¶ 13, 15.  ATG was ready for the worst and hopeful that things might be better.  The Trustee is wrong to claim that "[t]he issue in this case is not what ATG actually knew, but what it would have known had EBG made full disclosure." Pl. Opp. at 19.  Causation fails because what "ATG actually knew," as demonstrated by Mr. Hewitt's affidavit, is basically no different from what the undisputed facts demonstrate that EBG also knew.

---

[2]      The Trustee correctly observes that the Scheduling Order in this case does not call for expert discovery until the end of the second phase of discovery.  This does not, however, relieve the Trustee of the need to come forward with the evidence – percipient or expert – necessary to establish a triable issue of fact.

> **C. The Trustee Cannot Prove That Failure To Disclose That Dr. Nagel and Mr. Preston Were Not Trustworthy Injured ATG Because It Is Undisputed That ATG Did Not Rely Upon Their Claims About CEP Technology.**

In his proposed Amended Complaint, the Trustee's focus shifts to what EBG allegedly failed to disclose about the credibility of Christopher Nagel and John Preston. The Trustee alleges that ATG did not know that Dr. Nagel and Mr. Preston (negotiating through their new company, Quantum Catalytics) were lying when they said that technical issues had been worked out and CEP technology would work in the future:

> During the negotiations between ATG and Preston, Nagel and Quantum, Preston and Nagel informed and assured ATG that technical issues with the CEP process had been worked out. Consequently, although ATG realized that MMT had lost money on the CEP/Q-CEP business, ATG negotiated a transaction with Quantum to jointly bid on assets of MMT.

Amended Complaint (Proposed) ¶ 45.[3]

This revised allegation does not cure the Trustee's causation problems. It is undisputed that ATG did not rely on representations by Dr. Nagel or Mr. Preston in its decision-making but rather upon its own internal due diligence and its comfort level in its own well-conceived back-up plan in the event that CEP technology should not work as hoped. EBG Facts ¶¶ 12, 13, 15. The Trustee incorrectly claims that "Mr. Hewitt does not indicate that ATG placed no or little weight in the assurances made by Dr. Preston and Nagel," Pl. Opp. at 18, but Mr. Hewitt is crystal clear that ATG did not rely on the claims of Quantum Catalytics in making the acquisition but rather took what it said with a grain of salt:

> It was known to ATG at the time of the transaction that the CEP technology had not operated reliably. As explained above, ATG approached the acquisition of the MMT CEP assets with a back-up plan due to the risk it perceived with the CEP process. If CEP had operated as promised by Quantum Catalytics (which ATG was skeptical of), it would have been an upside. If it did not, ATG's plan was to remove the CEP processors from the facility and replace that process with a process that had already been internally proven to treat resins.

---

[3]   This allegation, of course, utterly undercuts ATG's allegation that it did not know that CEP technology had not worked in the past.. *See supra* Part I.B.

6

Hewitt Aff. ¶ 15(b).  *See also id.* ¶ 10 ("Despite assurances by Drs. Preston and Nagel that the technical issues with the CEP process had been worked out, ATG considered the CEP process to pose a risk.").

In assessing whether a "genuine" issue of material fact has been identified, the Court may also consider the utter implausibility of the assumption underlying ATG's new causation theory – that Quantum Catalytics defrauded ATG and EBG failed to sound the alarm.  The facts concerning the structure of the ATG acquisition are undisputed.  *Compare* EBG Facts ¶¶ 14-15 *with* Trustee Facts ¶¶ 14-15.  Quantum Catalytics was owned by Dr. Nagel, former Chief Technology Officer at MMT and inventor of CEP technology, and Mr. Preston, a former outside director.  Quantum Catalytics and ATG negotiated the terms pursuant to which they would jointly bid to purchase the assets of MMT.  Those terms included creation of an entity, ATG Catalytics LLC, of which they were both members, which took title to certain of the CEP assets (including the Bear Creek facility), while Quantum Catalytics took title to other CEP assets by itself.  ATG Catalytics and Quantum Catalytics were jointly and severally liable to the MMT Trustee for the purchase price of the CEP assets.  Because Quantum Catalytics was not *selling* the assets to ATG but rather *purchasing them* jointly with ATG, there is no "genuine" issue of fact on this theory:  Quantum Catalytics may have been too optimistic about the future of CEP technology (and ATG recognized this), but the record will not square with the allegation that EBG prevented ATG from uncovering a fraud.

> D.   The Allegedly Undisclosed Conflicts Caused No Harm Because Even If EBG Had Known Material Information About The Failures of CEP Technology, It Could Not Have Disclosed That Information To ATG.

The Trustee's causation arguments are all based upon injury alleged to flow from EBG's failure to disclose *facts* that it learned in one or more prior engagements.  He does not

even pretend that any injury flowed from the alleged conflicts of interest themselves or a failure to disclose them. No harm arises from the allegedly undisclosed conflicts as a matter of law because -- whether or not EBG had a conflict of interest during November 1998 when it negotiated and documented the ATG transaction -- it could not in any event have disclosed to ATG any information it learned as a result of its representation of a different client.

Rule 1.6(a) of the Massachusetts Rules of Professional Conduct provides that "[a] lawyer shall not reveal confidential information relating to representation of a client unless the client consents after consultation . . . ." This broad prohibition "applies not merely to matters communicated in confidence by the client but also to virtually all information relating to the representation, whatever its source." Rule 1.6 comment 5.[4] The Trustee alleges that, owing to EBG's failure to disclose its conflict, ATG never learned certain information about the failings of CEP technology and Dr. Nagel's untrustworthy nature. Yet, if EBG had disclosed that it had a conflict, ATG might have done either of two things: it might have waived the conflict and continued to use EBG as its lawyer, or it might have gone to a different lawyer. In neither case would EBG have disclosed the information of which ATG claims it was deprived, and in either case the result in the underlying corporate transaction would have been the same.

In a sense, the Trustee puts his finger directly on the problem when he writes in his Opposition, "If EBG's responsibilities to MMT and the MMT employees would not have permitted EBG to make full disclosure to ATG, then EBG was obliged to decline the representation [of ATG] altogether." Pl. Opp. at 16. If EBG had declined the representation of ATG, ATG would have been no differently situated than it was because the new lawyers

---

[4] The comment to Rule 1.6 notes that the word "virtually" is included because "some information is so widely available or generally known that it need not be treated as confidential." Rule 1.6 comment 5B. The Trustee alleges that the material that EBG purportedly possessed and did not disclose was not publicly available information. *E.g.,* Pl. Opp. at 11.

8

would not have known the confidential information the Trustee alleges EBG learned. (There are no allegations in this case that the quality of EBG's representation of ATG was less than uniformly excellent of that matters would have been handled better by another lawyer.) *See, e.g., Robinson v. Bodoff*, 392 F. Supp.2d at 234 ("It is insufficient for the plaintiff to allege that, had the alleged conflict of interest been disclosed, he would have hired another attorney because there is no allegation that the result would have been any different.").

## II.   THE TRUSTEE HAS IDENTIFIED NO GENUINE ISSUE OF MATERIAL FACT CONCERNING EBG'S ALLEGED BREACHES OF DUTY.

The Trustee has also failed to identify any genuine issue of material fact on its allegations – old and new -- that EBG breached a duty to ATG. These allegations fall neatly into two categories. The original claim is that the Trustee alleged a failure to disclose information in EBG's possession that was material to its representation of ATG, including the subject of the federal investigations of MMT, the content of the McConchie letter, and the allegations lodged against MMT's officers and directors in the MMT Shareholder Litigation. The proposed Amended Complaint claims failure to disclose conflicts of interest, including: EBG's alleged representation of MMT (and not just its employees) in the federal investigations; EBG's alleged participation in a joint defense effort in the federal investigations; EBG's alleged representation of MMT employees into the fall of 1998, after the ATG engagement commenced; EBG's alleged representation of Dr. Nagel in the MMT Shareholder Litigation prior to December 1998; and the proof of claim that EBG had filed in the MMT bankruptcy.

The Trustee can defeat summary judgment only by coming forward with evidence of a "genuine" dispute of "material" fact as to these alleged breaches of duty.

> For the purpose of summary judgment, an issue of fact is "genuine" if it "may reasonably be resolved in favor of either party."  . . .  For the same purpose,

9

> "material" facts are those which possess "the capacity to sway the outcome of the litigation under the applicable law."  . . .  Still, establishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise.  "If the evidence [adduced in opposition to the motion] is merely colorable, or is not significantly probative, summary judgment may be granted."

*Cadle Co. v. Hayes*, 116 F.3d at 960 (citations omitted).  Lacking any substantial evidence after full discovery, the factual disputes the Trustee seeks to create are too insubstantial to be "genuine."[5]  "Effusive rhetoric and optimistic surmise" replace citations to the summary judgment record.  As to each alleged instance of malpractice, the Trustee has failed to create a triable issue of fact not only as to causation but also as to EBG's alleged breach of duty.

### A.  Failure to Disclose Material Information:  the Original Complaint.

**1.  Federal Investigation of MMT.**  In order to create a dispute of fact with respect to what EBG learned about "serious defects" in CEP technology during the course of the federal investigations, the Trustee has only one piece of "evidence" to which he can point:  a sentence, out of context, from a memorandum Ms. Rendon wrote in September 1997.  In a seven-page memorandum summarizing the interviews her clients gave the FBI and DOE, Ms. Rendon included one sentence that mentioned the technology:  "The investigators clearly began the process with the understanding that the technology does not work, and the PRDA was a callosal *[sic]* waste of money."  Bagger Aff. Ex. F, at 6.  Taken alone, it is to be doubted whether this sentence is enough to create a genuine issue of fact whether "EBG attorneys became aware that there were allegations of serious problems and defects" with CEP.  Taken in context, however, it unquestionably does not.  The sentence that follows (omitted by the Trustee) completely undercuts the idea that the participants in

---

[5] The non-material issues of fact created by the Trustee can be ignored.  For instance, when EBG alleged that Carole Rendon was the only EBG attorney to represent MMT employees in the federal investigations, EBG Facts ¶ 2, the Trustee responded that, on a single day, one EBG associate billed time for sitting through a preparation session and one employee interview, Trustee Facts ¶ 2.  This does not create an issue of *material* fact.

the interviews were discussing "serious defects" in CEP technology: "I think that, by the end of two days of interviews, the interviewers were questioning that factual premise." *Id*. Moreover, the balance of the lengthy memorandum recounts detailed questions about campaign finance and improper influence in government contract procurement. As this is the only "fact" put forward by the Trustee to demonstrate that he is entitled to a trial on whether EBG learned material information about "allegations of serious problems and defects with the CEP technology" in the federal investigations, summary judgment is appropriate.

      2.     **McConchie Letter.** No facts actually appear to be in dispute regarding the McConchie Letter but rather only what conclusions may permissibly be drawn. EBG does not deny that it gave legal advice to Dr. Nagel, in two telephone calls, when Carole Rendon spoke to him about retaining Hale and Dorr LLP as his counsel to respond to the McConchie Letter. EBG's summary judgment arguments were: (1) this representation was over the day after it began, in April 1998 and did not extend into the fall of 1998; (2) the representation did not cause EBG to focus on or consider the merits of the allegations made by Mr. McConchie in the letter; and (3) once Ms. Rendon left EBG without having told anyone else about the McConchie Letter or leaving a copy behind in the files, EBG both legally and as a practical matter no longer possessed the information. *See* EBG Mem. SJ at 12-15.

      The Trustee responds by arguing that EBG had a conflict and citing to Rule 1.10 of the Massachusetts Rules of Professional Responsibility. EBG's initial point had been slightly different – that EBG simply no longer had access to the information in the McConchie letter once Ms. Rendon left the firm (significantly, a fact that the Trustee does not controvert). But there is also no conflict because Rule 1.10(b) allows a firm to represent a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm so long as no lawyer remaining with the firm is

11

privy to any material, confidential information. The rule sums up EBG's situation in November 1998, when EBG no longer represented Dr. Nagel and no EBG lawyer any longer knew anything about the McConchie matter. There was no conflict, and there was no failure to disclose information because no one at EBG had anything to disclose.

3. **MMT Shareholder Litigation.** The Trustee has no evidence that EBG had any knowledge about the substance of the MMT Shareholder Litigation prior to December 1998. EBG posited this as an undisputed fact and, in opposition, the Trustee replied:

> [w]hether or not EBG attorneys actually read the complaints cannot be determinative of whether EBG was aware of the allegations in the MMT litigation concerning the credibility of MMT officers and directors, of allegations of material misstatements by MMT officers and directors concerning the status of MMT technologies, and of allegations regarding specific problems.

Pl. Op. at 11. The Trustee apparently cannot point to anything that shows that any EBG lawyer was familiar with the issues in the MMT Shareholder Litigation (let alone familiar with allegations that might have been material to the issues actually facing ATG in November 1998, *see* EBG Mem. SJ at 17-18). The EBG internal time records upon which the Trustee has asserted he will rely (Trustee Facts ¶ 1 & n. 2)[6] in fact prove that EBG was not working on the MMT Shareholder Litigation during November 1998, Bagger Supp. Aff. Ex. A, and the two documents that Ms. Rendon sent to EBG during the month do not address the substance of the claims, Bagger Aff. Exs. G, H. The Trustee has not located or offered any evidence probative of EBG's familiarity with the MMT Shareholder Litigation.

B. **EBG's Alleged Conflicts of Interest: Proposed Amended Complaint.**

1. **Alleged Direct Representation of MMT.** The first alleged conflict identified by the Trustee is that EBG represented MMT itself (and not just its employees) in

---

[6] The Trustee indicated that it would file three documents in this matter under seal, because they had been designated CONFIDENTIAL under the Protective Order in this case. Dr. Nagel has waived his attorney-client privilege as a term of his settlement with the Trustee, and two of these documents, EBG 3634-3635 and 3796, need not be filed under seal.

the federal investigation.  The Trustee has provided no competent evidence to create a dispute as to any of the following facts, as set forth and supported by EBG:

> EBG never represented MMT itself.  Rendon Dep. at 17.  It entered into retention agreements with each of the MMT employees who sought its legal representation.  Rendon Dep. at 10.  It never entered into a retention agreement with MMT.  Rendon Dep. at 17-18.  Each of the MMT employees was party to an indemnification agreement with MMT, pursuant to which MMT agreed to pay for his or her legal representation in connection with the federal investigations of MMT.  Rendon Dep. at 14-15.

EBG Facts ¶ 6.  The Trustee only cannot deny that there was no express retention and only argues that an implied attorney-client relationship somehow existed.  He ignores the testimony of each of the three individuals in a position to know who MMT's lawyers were: EBG attorney Carole Schwartz Rendon and Ethan Jacks and Eugene Berman, inside counsel to MMT.  Each has testified that EBG did not represent MMT.  Rendon Dep. at 9-10; 12-18 (Bagger Supp. Aff. Ex. C); Berman Dep. at 21-24 (Bagger Supp. Aff. Ex. E); Jacks Dep. at 16-17, 20-21 (Bagger Supp. Aff. Ex. D).  He relies instead on unsupported factual claims and strained inferences which do not rise to the level of material fact.

An attorney-client relationship may be implied when legal advice is sought and the attorney impliedly agrees to give or actually gives legal advice.  The latter element may be established by proof of detrimental reliance on the part of the clients.  *Sheinkopf v. Stone*, 927 F.2d 1259, 1264 (1st Cir.1991).  The Trustee has brought forward no evidence tending to prove either of these elements.  Rather, he offers the following:

▪    The Trustee asserts that EBG must have represented MMT because EBG's invoices reference telephone calls meetings with MMT in-house counsel Jacks and Berman.  Trustee Facts ¶¶ 6(a)-(d).  He does not explain why this inference should be drawn, and he ignores the testimony of Mr. Jacks, Mr. Berman, and Ms. Rendon, denying an attorney-client relationship between MMT and EBG and explaining the nature of these communications

(logistics, scheduling, budget, billing, and other non-legal subjects, such as coordination of the prepared statements of Christopher Nagel and other MMT officers to the House Commerce Committee and discussions how to handle grand jury questions about the confidential settlement of a Title VII claim). *See* Jacks Dep. at 69 (Bagger Supp. Aff. Ex. D); Berman Dep. at 45-47 (Bagger Supp. Aff. Ex. E); Rendon Dep. at 47-48, 51-52 (Bagger Supp. Aff. Ex. C).

▪ The Trustee introduces a set of unfounded allegations with respect to the representation of Rhonda Walker, an employee of an MMT affiliate, in the federal investigations. Based on inadmissible speculation by Alan Braunstein (who has no personal knowledge of any of these issues), the Trustee claims that MMT forced Ms. Walker to retain EBG's services as part of an unrelated settlement agreement, presumably to prevent her from testifying fully and truthfully in the federal investigations. Trustee Facts ¶ 7 at 7. Leaving aside the absence of support for this outlandish claim,[7] the Trustee does not explain how it tends to prove that EBG represented MMT.

▪ Ms. Rendon sent MMT in-house counsel a memorandum on August 27, 1998, reporting on the form and content of the employee interviews. Bagger Aff. Ex. F. A section comprising perhaps one-half a page out of seven includes Ms. Rendon's observations on several issues of interest to MMT. This paragraph of informal observations is not legal advice, and, particularly within the context of Ms. Rendon's representation of the MMT

---

[7] Mr. Jacks testified that he did not recall requiring Ms. Walker to accept EBG's representation. Jacks Dep. at 55 (Bagger Supp. Aff. Ex. D). In a particularly egregious misrepresentation, the Trustee has not submitted Ms. Walker's Title VII settlement agreement, which is in his possession, as he produced it to EBG in this litigation. The settlement agreement does no more than memorialize MMT's agreement that it would indemnify Ms. Walker for her attorneys' fees incurred in the federal investigation – a concession on MMT's part insofar as Ms. Walker was no longer an employee of MMT.

This unsupported allegation provides a neat example of the prejudice EBG has suffered by the Trustee's eleventh-hour proposal to amend his Complaint. Had EBG been aware of this argument (which it cannot be expected to have foreseen), it could have had Mr. Jacks authenticate this document at his deposition.

employees, there is no evidence that that legal advice was sought or expected, Berman Dep. at 32-39 (Bagger Supp. Aff. Ex. E); Jacks Dep. at 41-47 (Bagger Supp. Aff. Ex. D). Moreover, as already discussed in the opening brief, Ms. Rendon fully explained why she sent this memorandum to non-clients and why she included a header with the words "attorney-client privilege," and contrary to the Trustee's claim, Ms. Rendon also explained how making helpful observations to MMT's lawyers advanced the interests of her own clients, employees of MMT. Rendon Dep. at 76-77 (Bagger Supp. Aff. Ex. C).[8]

Finally, even if all of the above somehow translated into proof that an attorney-client relationship had formed between EBG and MMT during the late 1997 and early 1998, this would not in any event have created a conflict of interest in November 1998 about which ATG could complain. Rule 1.9 of the Rules of Professional Conduct provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

MASS. R. PROF. CONDUCT 1.9(a). Even assuming that the two matters (federal investigations of MMT campaign finance and government contracting procedures, on the one hand, and an acquisition of certain assets from a bankruptcy estate, on the other hand) were "substantially related" for purposes of Rule 1.9, the disclosure obligation under this rule runs solely to the former client, whose client confidences are perceived to be at risk, and not to the new client. Even if EBG had previously represented MMT, any claim that might arise out of a violation of the rule would belong to the MMT Trustee, not ATG.

---

[8] This testimony by Ms. Rendon – with respect to why her clients considered it in their best interest to have EBG cooperate with MMT's counsel – was designated CONFIDENTIAL under the Confidentiality Agreement and Protective Order filed in this case. It has not been reproduced here so that the reply memorandum would not need to be filed under seal. The excerpts from Ms. Rendon's deposition will be filed under seal prior to oral argument of this motion.

     **2.**     **<u>Failure to Disclose Joint Defense Agreement.</u>**  The Trustee also claims that EBG participated in a joint defense agreement in connection with the federal investigation,[9] but he has come forward with no substantial evidence to support that claim. Ms. Rendon testified unequivocally that EBG was not party to a joint defense agreement in the federal investigations, Rendon Dep. at 21-22, 52-57 (Bagger Supp. Aff. Ex. C), and there was no testimony to the contrary, *see* Berman Dep. at 30-31 (Bagger Supp. Aff. Ex. E); Tuteur Dep. at 16-17 (Bagger Supp. Aff. Ex. F); Jacks Dep. at 33-34 (Bagger Supp. Aff. Ex. D).  Even the Trustee grudgingly concedes that EBG was not party to the formal joint defense agreement entered into by MMT and counsel for certain officers and directors, an undisputed fact that is evident not only from a review of the agreement itself (produced by the Trustee in discovery but omitted from his summary judgment papers), but also a finding of fact made by Judge Kenner in *In re Molten Metal Technology,* 289 B.R. 50 (Bankr. D. Mass. 2003), to which the Trustee refers the Court.  *See id*. at 508 (listing members of joint defense agreement).[10]  The evidence that EBG was nonetheless a party to this joint defense agreement consists of Ms. Rendon having included the legend "attorney-client privilege" on a memorandum that she sent to MMT's inside counsel, with the prior permission and approval of each of her clients.  As noted *supra,* Ms. Rendon considered information sharing in her clients' best interests, and she placed an "attorney-client privilege" legend on it to

---

[9] It is unclear whether the Trustee means to argue that EBG was a member of a joint defense agreement in connection with the MMT Shareholder Litigation.  *See* Trustee Facts ¶ 6(d).  There is not a speck of evidence supporting such a claim.  EBG, which did not even represent Dr. Nagel until after the ATG asset transaction closed, *see infra,* was not party to a joint defense agreement in the MMT Shareholder Litigation until well after the closing of the ATG asset acquisition, Tuteur Dep. at 38 (Bagger Aff. Ex. D).

[10] This decision also gives a good flavor of the subject of the federal investigation, which included matters such as "whether MMT improperly billed and booked revenue from its subsidiary, M4, for work performed for the federal government, in criminal violation of its cost-sharing contracts . . . ." 289 B.R. at 507.

discourage its dissemination. Her explanation why her employee clients were not parties to the joint defense agreement is sensible and consistent with the facts of record:

> I believe that there were instances where my clients and MMT had common interests in connection with the investigation, which is why in some instances I felt comfortable sharing information with MMT, but no, I didn't believe that we were all similarly situated sufficiently that it would have made sense or been appropriate for my clients to be part of a joint defense agreement. For starters, none of my clients were either subjects or targets of the investigation. That from a very immediate standpoint put them in a different position than many of the other players.

Rendon Dep. at 55-56 (Bagger Supp. Aff. Ex. C). *See Wellman v. Willis*, 400 Mass. 494, 499 (1987)(no joint defense between company and its employees when investigation focused on owners and employees were not targets).

Moreover, even if EBG had engaged in a joint defense of the federal investigations, that would not in any event have created an attorney-client relationship between MMT and EBG. "[T]he duty of confidentiality arises because the agreement to share and maintain confidences is enforceable. The agreement neither creates an attorney-client relationship nor an obligation of undivided loyalty, just confidentiality of the matters disclosed." R. MALLEN & J. SMITH, *supra,* § 17.21, at 1043 (citing cases). Beyond that, the representation was over before the ATG representation commenced, rendering Rule 1.7 inapplicable.

       **3.** **<u>Ongoing Representation of MMT Employees.</u>** In opposing EBG's summary judgment motion, the Trustee claims that the record insufficiently reflects the end of EBG's representation of the MMT employees when Ms. Rendon left EBG. The Trustee argues that Ms. Rendon's deposition provides an insufficient basis to conclude that EBG's work on the matter ended when she left for Cleveland. This is debatable but irrelevant because of the unequivocal testimony of Mr. Tuteur, which the Trustee simply ignores, that the matter was inactive when Ms. Rendon left; that Ms. Rendon took the file with her and asked Mr. Tuteur whether he would be available to assist as local counsel if any further work

17

arose; and that EBG was not asked to do further work on the file. Tuteur Dep. at 17-18. His testimony is corroborated by the EBG bills submitted by the Trustee in opposition to summary judgment, none of which reflect any work done by EBG on the federal investigation after Ms. Rendon's departure from the firm. Fleischer Supp. Aff. Exs. I-M.

### 4.   Failure To Disclose Representation Of Nagel In MMT Litigation.

The Trustee also claims that EBG was representing Dr. Nagel in the MMT Litigation in November 1998, when it was also negotiating and documenting the ATG acquisition. He claims that there is a genuine, triable issue regarding when EBG undertook the representation of Dr. Nagel in that action. Michael Tuteur, who handled the matter of EBG, testified that he did not start representing Dr. Nagel until after (1) Dr. Nagel asked him to and (2) the D&O insurer agreed. This was after Mr. Tuteur and Dr. Nagel met for the first time on December 1, 1998. EBG Facts ¶ 8. This timeline is corroborated by EBG's internal time records, which reflect an initial meeting between Michael Tuteur and Dr. Nagel on December 1, 1998. Bagger Supp. Aff. Ex. A. There is no evidence of work performed by EBG on litigation for Dr. Nagel prior to sometime in December 1998.

The Trustee responds with one document, an email written by Mr. Tuteur in November 1998, in response to a conflicts inquiry triggered by the opening of a new matter for ATG. This email, addressed in EBG's opening brief, EBG Mem. SJ at 12 and n. 7, was thoroughly addressed by Mr. Tuteur. Without any other evidence tending to show any work performed by EBG on the MMT Shareholder Litigation, the email, with Mr. Tuteur's undisputed explanation of what he said and why, is not "sufficiently probative," *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986), to defeat summary judgment. In a further attempt to create an issue of fact whether EBG was representing Dr. Nagel in November 1998, the Trustee references a conflict report from October 1998, which reflects a conflict

check undertaken in connection with 30 minutes of work performed by Edwin Baker, a partner in EBG's New York office, on October 1, 1998, when he spoke to Dr. Nagel about a personal tax matter. Bagger Supp. Aff. Ex. A (Nagel billing record); Bagger Supp. Aff. Ex. B (Conflicts Investigation Report for Christopher Nagel matter No. 02, "Tax Advice."). The fact that a matter was opened and completed on one day in October 1998, reflecting tax advice to Dr. Nagel, is undisputed and completely immaterial to this action.

     **5.**     **Failure to Disclose Proof of Claim in MMT Bankruptcy**. Finally, the Trustee claims that EBG failed to disclose to ATG that, in the spring of 1998, it had submitted a Proof of Claim in the MMT bankruptcy for $34,607.04 in legal fees billed under the indemnification agreement its clients had with MMT. *See* Fleischer Aff. Ex. G. The Trustee's apparent theory is that EBG thus had an interest in maximizing the size of the MMT bankruptcy estate and is no better grounded in the summary judgment record than the rest of his "conflicts" arguments. The Trustee has pointed to no evidence that EBG's corporate attorney, Jarvis Kellogg, was aware of the Proof of Claim when he handled the ATG asset acquisition. Mr. Kellogg, who was not involved in the conflict check, was not even aware of EBG's prior representation of the MMT employees until 1999, Kellogg Dep. at 22-23 (Bagger Supp. Aff. Ex. G), and, in fact, the Trustee has identified no attorney at EBG who was aware of the Proof of Claim after Ms. Rendon left the firm. No evidence suggests that Mr. Kellogg's loyalties or the loyalties of any other EBG attorney were anywhere except with ATG throughout the transaction. There is nothing from which a legal malpractice action can be erected.

## CONCLUSION

     For the foregoing reasons, and those set forth in EBG's previously-filed memorandum of law, EBG requests that its Motion for Summary Judgment be allowed.

EPSTEIN BECKER & GREEN, P.C.


__/s/ Paula M. Bagger_____
Marjorie Sommer Cooke (BBO#097800)
Paula M. Bagger (BBO#547703)
COOKE, CLANCY & GRUENTHAL, LLP
265 Franklin Street
Boston, MA  02110
(617) 428-6800

Dated: July 24, 2006

### CERTIFICATE OF SERVICE

I, Paula M. Bagger, hereby certify that service upon plaintiff's counsel was effected through the Court's CM/ECF system this 24th day of July 2006.

____/s/ Paula M. Bagger_____
Paula M. Bagger