UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
ROBERT J. HANFLING,                                 )
  Chapter 7 Trustee of the Bankruptcy            )
  Estates of ATG, Inc. and ATG                   )
  Catalytics LLC,                                 )
                                                    )
      Plaintiff,                                )
                                                    )
        v.                                    )    Civil Action No. 05-10077-RGS
                                                    )
EPSTEIN BECKER & GREEN, P.C.,                       )
  et al.,                                         )
                                                    )
      Defendants.                               )
_____)

## SUPPLEMENTAL AFFIDAVT OF PAULA M. BAGGER

I, Paula M. Bagger, having been duly sworn, depose and state as follows:

1.      I am a member in good standing of the Bar of the Supreme Judicial Court of the Commonwealth of Massachusetts and of this Court.  I am a partner in the law firm of Cooke Clancy & Gruenthal LLP, which represents defendant Epstein Becker & Green, P.C. in the above-captioned action.

2.      Attached hereto as Exhibit A is a true and accurate photocopy of a document, produced by EBG in discovery, Bates-stamped EBG 3634-35, to which the plaintiff refers in his Statement of Material Facts in Dispute.  Plaintiff represented that he would file this document under seal, but he need not do so, as Christopher Nagel waived the attorney-client privilege as part of his settlement agreement with the Trustee.

3.      Attached hereto as Exhibit B is a true accurate photocopy of a document, produced by EBG in discovery, Bates-stamped EBG 3637, to which the plaintiff refers in his

Statement of Material Facts in Dispute.  Plaintiff represented that he would file this document under seal, but he need not do so, as Christopher Nagel waived the attorney-client privilege as part of his settlement agreement with the Trustee.

4.     Attached hereto as Exhibit C are true and accurate photocopies of pages of the transcript of the deposition of Carole Schwartz Rendon, taken in this action.

5.     Attached hereto as Exhibit D are true and accurate photocopies of pages of the transcript of the deposition of Ethan Jacks, taken in this action.

6.     Attached hereto as Exhibit E are true and accurate photocopies of pages of the transcript of the deposition of Eugene Berman, taken in this action.

7.     Attached hereto as Exhibit F is a true and accurate photocopy of pages from the transcript of the deposition of Michael J. Tuteur, taken in this action.

8.     Attached hereto as Exhibit G are true and accurate copies of pages from the transcript of the deposition of Jarvis Kellogg, taken in this action.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 24th DAY OF JULY, 2006.


                        _____/s/ Paula M. Bagger_____
                        Paula M. Bagger

CONFIDENTIAL

Page 1

EBG 3634

Client Number: 030716
Client Name: Christopher Nagel
Report Description: Billed and Unbilled Recap of Time  [3/31/2004 4:52:16 PM]

| Date | Initials | Name/Invoice Number | Hours | Amount | Description | Matter Number | Index |
|---|---|---|---|---|---|---|---|
| 01/01/1966 | 00718 | Michael James Tuteur | 0.00 | 0.00 | (Conv) Written off | 030716-00100 | 1683911 |
| 07/16/1998 | | Invoice=239858 | 0.00 | 168.60 | | | |
| 01/01/1966 | 00718 | Michael James Tuteur | 0.00 | 0.00 | (Conv) Write up/down OR Atty sum if pre-1996 | 030716-00100 | 1634467 |
| 07/16/1998 | | Invoice=239858 | 0.00 | -168.60 | | | |
| 01/28/1998 | 00734 | Carole S. Schwartz Rendon | 1.50 | 352.50 | Conference call with G. Berman, E. Jacks and | 030716-00001 | 601135 |
| 03/12/1998 | | Invoice=228496 | 1.50 | 352.50 | counsel for numerous MMT employees regarding upcoming congressional hearings and recent grand jury appearances | | |
| 02/05/1998 | 00734 | Carole S. Schwartz Rendon | 0.20 | 47.00 | Telephone conference with C. Nagel regarding | 030716-00001 | 601136 |
| 03/12/1998 | | Invoice=228496 | 0.20 | 47.00 | developments | | |
| 02/06/1998 | 00734 | Carole S. Schwartz Rendon | 2.30 | 540.50 | Telephone conference with E. Jacks; review of | 030716-00001 | 601137 |
| 03/12/1998 | | Invoice=228496 | 2.30 | 540.50 | documents regarding meeting scheduled for 2/9/98 | | |
| 02/07/1998 | 00734 | Carole S. Schwartz Rendon | 0.90 | 211.50 | Telephone conference with C. Nagel regarding Q2 | 030716-00001 | 601138 |
| 03/12/1998 | | Invoice=228496 | 0.90 | 211.50 | invoices and meeting scheduled for 2/9/98 | | |
| 02/09/1998 | 00734 | Carole S. Schwartz Rendon | 9.80 | 2,303.00 | Meeting at Molten Metal regarding preparation | 030716-00001 | 601139 |
| 03/12/1998 | | Invoice=228496 | 9.80 | 2,303.00 | for congressional hearings with G. Berman, B. Haney, V. Gatto, E. Jacks, K. Green, D. Wilson, J. Coyle and M. Perry; telephone conference with C. Nagel regarding same and schedules | | |
| 02/10/1998 | 00734 | Carole S. Schwartz Rendon | 3.60 | 846.00 | Telephone conference with M. Guzman regarding | 030716-00001 | 601140 |
| 03/12/1998 | | Invoice=228496 | 3.60 | 846.00 | statements; review of relevant documents regarding congressional hearings | | |
| 02/11/1998 | 00734 | Carole S. Schwartz Rendon | 13.50 | 3,172.50 | Travel to D.C. for preparation for | 030716-00001 | 601141 |
| 03/12/1998 | | Invoice=228496 | 13.50 | 3,172.50 | congressional hearings; meeting with C. Nagel regarding same | | |
| 02/12/1998 | 00734 | Carole S. Schwartz Rendon | 10.50 | 2,467.50 | Representation of C. Nagel at his appearance | 030716-00001 | 601142 |
| 03/12/1998 | | Invoice=228496 | 10.50 | 2,467.50 | before the House Commerce Committee; return to Boston; telephone conference with E. Jacks regarding update | | |
| 04/20/1998 | 00734 | Carole S. Schwartz Rendon | 2.10 | 493.50 | Telephone conference with C. Nagel and G. | 030716-00001 | 601143 |
| 06/24/1998 | | Invoice=238280 | 2.10 | 493.50 | Berman regarding E. McConchie; review of | | |

CONFIDENTIAL

Client Number: 030716
Client Name: Christopher Nagel
Report Description: Billed and Unbilled Recap of Time [3/31/2004 4:52:16 PM]

| Date | Initials | Name | Invoice Number | Hours | Amount | Description | Matter Number | Index |
|---|---|---|---|---|---|---|---|---|
| | | | | | | related materials, follow-up conversations with | | |
| | | | | | | C. Nagel and G. Berman regarding joint | | |
| | | | | | | representation issues | | |
| 04/21/1998 | 00734 | Carole S. Schwartz Rendon | Invoice=238280 | 0.10 | 23.50 | Telephone conference with C. Nagel regarding | 030716-0001 | 601144 |
| 06/24/1998 | | | | 0.10 | 23.50 | revised conflict letter | | |
| 10/01/1998 | 00281 | Edwin H. Baker | Invoice=250785 | 0.50 | 165.00 | T/C Nagle re use of NOLs; T/G Garai | 030716-00002 | 601145 |
| 11/12/1998 | | | | 0.50 | 165.00 | | | |
| 11/30/1998 | 00718 | Michael James Tuteur | Invoice=256267 | 0.20 | 63.00 | Telephone conference to Ms. Rendon regarding | 030716-00003 | 601146 |
| 01/12/1999 | | | | 0.20 | 63.00 | status; telephone conference with Mr. Nagel | | |
| | | | | | | regarding representation. | | |
| 12/01/1998 | 00718 | Michael James Tuteur | Invoice=256267 | 1.60 | 504.00 | Preliminary background meeting with Mr. Nagel. | 030716-00003 | 601147 |
| 01/12/1999 | | | | 1.60 | 504.00 | | | |

REDACTED

EBG 3635

# Conflicts Investigation Report

| | | |
|---|---|---|
| Idno: | 044202 | Names Searched: |
| Form Number: | 020577 | Date Searched: 2/9/2004 |
| Date Modified: | 10/15/98 | Time: 3:39:26 PM |
| Record Type: | CM | |
| Client Number: | 30716 | |
| Matter Number: | 000002 | Record 6 Count 7 |
| Client Name: | **CHRISTOPHER NAGEL** | |
| Client Address: | 28 HIGHLAND AVENUE | |
| City: | WAYLAND | |
| State: | MA | |
| Client Telephone | (508) 324-6402 | |
| Office Code: | BOSTON | |
| Resp Attorney: | GABOR GARAI | |
| Billing Attorney: | GABOR GARAI | |
| Billing Attorney Two: | EDWIN H. BAKER | |
| Orig Attorney: | GABOR GARAI | |
| Matter Open Date: | 10/13/98 | |
| Practice Area: | OTHER | |
| Desc of Matter: | MATTER NAME - TAX ADVICE | |
| | TAX ADVICE | |

Affiliates and Individuals Associated with Client

CONFIDENTIAL

*Christopher Nagel*

**Opposing Party:**    Not Submitted
**Assoc with Opposing:**
Conflict Waiver:   NO
Status:   Closed
Image:     \EB010121\012\18.tif
              \EB010121\012\19.tif

EBG 3796

Excerpts from Deposition of Carole Schwartz Rendon:
to be filed under seal pursuant to
Confidentiality Stipulation and Protective Order

# O'BRIEN&LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert Hanfling v. Epstein, Becker & Green, et. al.

**Transcript of the Testimony of:**

# Ethan Jacks

# April 12, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**

Cindy Berglund   1-18972

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

---

**14**

1 company's counsel in carrying out the company's
2 responsibilities to respond to it, I learned over time
3 more about it.
4 Q. And what did you learn, you know, over your time
5 dealing with this, was the focus of the investigation
6 or investigations?
7 A. My recollection is that it had to do with
8 questions involving contributions made by the company
9 or its officers or directors, and I should point out
10 that individuals also were asked to provide testimony,
11 myself included.
12 So, in other words, in addition to representing
13 the company, I, and others, individually had to provide
14 information and meet with the FBI.
15 Q. So did you personally receive a subpoena directed
16 to you?
17 A. I am sure I did because -- and I don't remember
18 exactly when or how, but I did have to produce personal
19 records as well and I was represented by counsel at the
20 time.
21 Q. Okay. MMT, did MMT have its own counsel to
22 represent it in the investigation matters?
23 A. I believe it did and I believe, and this is again
24 a long time ago, at least primary counsel was Latham

---

**16**

1 A. My recollection is that, and, again, I don't know
2 specifically what they were asked to do other than I do
3 recall that they were asked to provide, be available
4 for interviews and as to the number, I would hazard,
5 this is just my recollection, somewhere between ten and
6 twenty.
7 Q. With respect to the individual employees, officers
8 and directors that were required to provide
9 information, did they have representation, do you
10 recall, in the investigation?
11 A. I think that there were a group of individuals
12 who, like myself, retained personal counsel and we also
13 retained a woman named Carole something Rendon, who I
14 think was with Epstein Becker, I don't remember that
15 specifically, to represent a number of folks
16 individually except, I believe, we, the company, agreed
17 to pay the costs of that representation up to some
18 point or some amount, but I don't remember the details.
19 Q. Do you think the name was Carole Schwartz Rendon?
20 A. Yes. That's correct.
21 Q. Do you know why Latham and Watkins didn't assume
22 the role of representing individual officers, directors
23 and employees in the investigation?
24 ATTY. BAGGER: Objection to the form of the

---

**15**

1 and Watkins.
2 Q. Was there another firm also representing MMT in
3 the investigation?
4 A. I don't recall any other. It's possible, but I
5 don't recall other firms.
6 Q. Do you recall who at Latham and Watkins you would
7 have dealt with?
8 A. Sure. Their primary lawyer, I think I've got his
9 name right, Roger Goldman, and also a gentleman who has
10 gone on to a much bigger job, Michael Chertoff.
11 Q. Now, you indicated a moment ago that you were
12 aware that individual employees, officers, directors
13 maybe you didn't say that, but you said individuals
14 were required to respond directly to information
15 requests?
16 A. Right.
17 Q. These were individuals that received subpoenas?
18 A. I don't know for a fact that they -- I don't
19 remember specifically how the individuals were
20 individually contacted. So I don't know the specifics
21 of that.
22 Q. Do you recall the number or approximately the
23 number of employees that were required to provide
24 information?

---

**17**

1 question as compound.
2 THE WITNESS: I don't remember why and I -- I
3 don't remember why. I can only assume now in
4 retrospect that there was some view that if Latham was
5 oriented to company counsel, that there would be a
6 reason to have somebody -- you know, a different lawyer
7 from a different law firm focused on individuals, but I
8 don't remember the specific reason.
9 Q. Do you recall when about -- about when, excuse me,
10 EBG began to represent employees in the investigation?
11 ATTY. BAGGER: Objection. Foundation.
12 THE WITNESS: "EBG" is Epstein Becker?
13 Q. Yes. Another definition, when I refer to "EBG,"
14 I'm referring to the firm of Epstein, Becker and Green.
15 A. Unfortunately, I don't remember exactly when. I
16 assume it would have been contemporaneous with the
17 receipt of the request for information, but I don't
18 remember specifically when.
19 ATTY. FLEISCHER: I'm going to mark a document.
20 This will be one.
21 (Exhibit 1, 8/5/97 DOCUMENT, marked for
22 identification.)
23
24 Q. Okay. Mr. Jacks, I've just handed you what's been

---

5 (Pages 14 to 17)

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

| 18 | 20 |
|---|---|

**18**

1  marked as Exhibit 1 for this deposition. Can you take
2  a look at that, please?
3  A. Sure.
4  Q. Do you recognize the document?
5  A. Not specifically, no.
6  Q. And do you recall having received this document?
7  A. No.
8  Q. Does it in any way refresh your recollection as to
9  about when EBG may have started to perform services in
10  connection with the investigation?
11  A. Only insofar as it's got a date of August 5, 1997
12  and it is a bio for Carole that might suggest was the
13  time, but other than that, no.
14  Q. Would you have any reason to believe that it
15  wasn't about that time that you started -- that
16  Epstein, Becker and Green started to perform services?
17  A. No. I have no reason to think it's any other
18  time.
19  Q. Okay. Do you know if you had spoken directly with
20  Ms. Schwartz Rendon before she started to represent
21  employees, directors or officers in connection with the
22  investigation?
23  A. I do remember again, in general, speaking to it's
24  Carole, right?

**19**

1  Q. Yes, Carole.
2  A. But I did not -- my recollection is I did not know
3  Carole prior to having heard her name and I don't
4  remember, frankly, how I heard her name. But I didn't
5  have any dealings with her prior to discussing this
6  matter with her.
7  Q. Did you discuss the representation with her
8  though, before she was, before she actually started to
9  provide services?
10  A. Again, I don't have a specific recollection, but
11  given my job, I assume I would have been an important
12  person in making the decision to hire her. So I assume
13  I spoke to her about the matter in advance of her
14  taking on the matter.
15  Q. Did MMT determine who was going to represent the
16  individuals, officers or directors or have a role in
17  that?
18  ATTY. BAGGER: Objection. Again, compound. I
19  really think, Rob, that the directors, officers and
20  employees of the company are a fairly diverse group of
21  people and there has already been testimony that they
22  were represented by different people. So I think
23  lumping them together in all these questions is
24  problematic.

**20**

1  ATTY. FLEISCHER: That's fair.
2  Q. With respect to those employees that were
3  represented by Epstein, Becker and Green, did MMT have
4  a role in determining who that counsel would be?
5  ATTY. BAGGER: Objection.
6  Q. You may answer.
7  A. I would say insofar as I was the general counsel,
8  you know, among my job was to help advise the company
9  on decisions and selections like this, yes. You know,
10  the corporation rarely speak with one voice. They
11  speak with officers and directors making decisions
12  about things. So indirectly, yes, but it would have
13  been sort of through me and I assume our outside
14  counsel, Latham and Watkins, would have been advising
15  me on these decisions.
16  Q. Those individuals that were represented by EBG in
17  the investigations, did they have much input, do you
18  recall, in the selection of their attorney?
19  ATTY. BAGGER: Objection.
20  THE WITNESS: I honestly don't remember the
21  details. I think our decision was to try to offer, not
22  require, but offer Carole as somebody who could
23  represent them if they chose, but to not in any way
24  mandate that.

**21**

1  Q. Do you recall thinking back to the period whether
2  or not it was important to MMT that those employees
3  that were represented by Carole Schwartz Rendon in fact
4  all be represented by the same counsel?
5  A. I don't know if that was a driving factor. I
6  think the driving factor was more to see if we could
7  simply be helpful to people and to fray some of the
8  costs and anxiety by saying here is a lawyer that you
9  might use if you choose to.
10  ATTY. FLEISCHER: I'm going to mark another
11  document. This is number 2.
12  (Exhibit 2, DOCUMENTS, marked for identification.)
13
14  Q. Mr. Jacks, you were just handed a document, what's
15  been marked as Exhibit 2. Can you please take a look
16  at that document? Do you recall ever seeing this
17  document before?
18  A. I don't remember specifically seeing this
19  document.
20  Q. Okay. You are familiar with the law firm of Cohn
21  and Kelakos, LLP?
22  A. In deed.
23  Q. And who were they?
24  A. They were, and I'm not sure if they still are, a

6 (Pages 18 to 21)

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

30

1  A.  Wilmer, it's now Wilmer Hale.
2  **Q.  Just for the record, I didn't prepare this**
3  **document.**
4  A.  Evidently.
5  **Q.  Not that my spelling is very good.**
6  **So Hale and Dorr, as it was then known,**
7  **represented Bill Haney in the investigations?**
8  A.  Well, Karen Green.
9  **Q.  But with the firm?**
10 A.  Yes.
11 **Q.  Do you know who paid the bills for Hale and Dorr**
12 **to represent Bill Haney?**
13 A.  I don't recall.  I don't know.
14 **Q.  Do you know --**
15 A.  My recollection is that I paid my bills for my,
16 yes, for Dennis Sayler.  So I would assume, but I can't
17 prove, that the company -- I would assume if I paid,
18 therefore other people paid.  But I don't know that for
19 a fact.
20 **Q.  Do you recall reviewing bills for approval from**
21 **attorneys involved in this investigation?**
22 A.  Not specifically, no.
23 **Q.  Now, Ben Downs, I think you did reference him a**
24 **little while ago?**

31

1  A.  He was the CFO, again, up until the filing.
2  **Q.  And did Ben receive -- to the best of your**
3  **recollection, did Ben receive a subpoena in the**
4  **investigations?**
5  A.  Again, I can't recall and I'm not sure I ever knew
6  what happened to individuals besides myself.
7  **Q.  So do you happen to know if he was represented by**
8  **Michael Kendel?**
9  A.  Now having seen the name, my recollection is that
10 that was Ben's individual lawyer, yes.
11 **Q.  And that was a firm that was then known as**
12 **McDermott, Wills and Emery?**
13 A.  Well, it was actually McDermott Will and it still
14 is McDermott, Will and Emery and for the record, I used
15 to be a partner there.  It's a small town.
16 **Q.  Is there anything on this list that is not spelled**
17 **wrong?**
18     ATTY. BAGGER:  Duncan and Allen.
19 **Q.  I don't know who prepared this document.  Just for**
20 **the record, this document was produced by the counsel**
21 **for Steven Gray in response to a subpoena issued by**
22 **Defendant's counsel in this litigation.  I should have**
23 **mentioned that before I handed it to you.**
24 A.  Okay.

32

1  **Q.  Vic Gatto, who is he?**
2  A.  Vic was a vice president at Molten Metal.  I think
3  his primary area of work was government sales, if you
4  will, as contrasted to commercial sales.
5  **Q.  And do you recall if Vic had received a subpoena**
6  **to testify in the investigations?**
7  A.  Again, same answer.  I don't know the specifics.
8  **Q.  Do you recall any dealings with his attorneys**
9  **at --**
10 A.  I do recall speaking to, I think it's pronounced
11 Touhey, Mark Touhey at Vinson and Elkins, but I don't
12 remember specific times or places, but I do remember
13 speaking to Mark.
14 **Q.  What about William, is that Laller?**
15 A.  Yes.  That name I don't recall.
16 **Q.  Okay.**
17     ATTY. FLEISCHER:  I'm now marking another
18 document.
19     (Exhibit 4, DOCUMENT, marked for identification.)
20
21     THE WITNESS:  Is it okay to take a bathroom break?
22     ATTY. FLEISCHER:  Yes.  We'll go off the record.
23
24     (Recess taken.)

33

1      ATTY. FLEISCHER:  Back on the record.
2  **Q.  I've just handed you what the court reporter has**
3  **marked as Exhibit 4.  Again, I'll disclose to you this**
4  **was a document produced by the firm Reimer Braunstein**
5  **in --**
6  A.  Reimer.  There is no rhyme or reason to the names,
7  is there?
8  **Q.  -- Reimer and Braunstein in response to the**
9  **document subpoena issued by Defendant's counsel in this**
10 **case.  I would ask you take a look at that for a**
11 **moment.**
12 A.  I'm sorry, what was the preface you gave to this?
13 **Q.  That the document was produced by the firm Reimer**
14 **and Braunstein in response to a document subpoena in**
15 **this litigation, the instant litigation.**
16 A.  Okay.
17 **Q.  My question on this document for you relates to**
18 **the "re" on the first page and the subject on the**
19 **second page.  There is a reference there to joint**
20 **defense, joint defense conference call.  Do you see**
21 **that?**
22 A.  I do.
23 **Q.  Can you see that on both documents?**
24 A.  Yes.

9 (Pages 30 to 33)

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

34

1    Q.  Do you recall whether or not there was a joint
2    defense agreement among the various counsel that are
3    listed on these documents?
4    A.  Well, first of all, I don't -- I don't recall this
5    document to start with that.
6    Q.  I'm not asking if you recall the document. I'm
7    asking whether you recall a joint defense?
8    A.  I do remember the discussion of joint defense
9    agreement and I do believe there was a joint defense
10   agreement in effect. But I could not tell you, I
11   assume -- I know the company was party to a joint
12   defense agreement, but I couldn't tell you specifically
13   with who.
14   Q.  Do you know or do you have an idea as to whether
15   Epstein Becker was a party to the joint defense
16   agreement?
17       ATTY. BAGGER: Objection.
18       THE WITNESS: Again, I can't recall literally the
19   form or substance of any joint defense agreement. I do
20   recall discussions not infrequently about the reason,
21   the wisdom for joint defense agreements and I have a
22   vague recollection of having signed one, but I can't
23   remember the time, place or specifics of it.
24   Q.  And, again, do you have, and I know you don't know

35

1    for certain, but do you recall whether Epstein, Becker
2    and Green may have been a party to a joint defense
3    agreement, whether written or implicit?
4        ATTY. BAGGER: Objection.
5        THE WITNESS: Other than the logic of them being a
6    party to it, but, no. I can't remember specifics about
7    whether they were or weren't.
8    Q.  With respect to the logic, can you articulate what
9    you mean by that?
10   A.  My recollection generally is that parties that
11   have a common defense or common view of a case have the
12   right to establish a joint, I'm not an expert and I'm
13   not a litigator by the way, have a right and
14   opportunity to create a joint defense relationship
15   which can be written or not written and that those were
16   discussed at the time, but that's all I remember.
17   Q.  Do you remember participating in conferences that
18   were with other counsel in the context of joint defense
19   of the investigations?
20   A.  Generally, I recall that there was a joint defense
21   agreement in effect. I don't remember specifically who
22   was or wasn't a party to it, and, again, almost by
23   deduction that conversations among the counsel who were
24   party to it would have been covered by the joint

36

1    defense.
2    Q.  Do you recall at the time, and, again, back during
3    the investigations, whether you had an expectation that
4    discussions that occurred among the parties to the
5    joint defense agreement, whether discussions would have
6    been subject to attorney/client privilege?
7    A.  Again, my non-litigator's understanding which is
8    weak by the way.
9    Q.  Whatever your -- I'm asking what your
10   understanding was?
11   A.  It's that I think that's part of the point, that
12   you get to protect either under the attorney/client
13   privilege or some other doctrine, the details of those
14   discussions. That that's part of the point.
15   Q.  And, therefore, would it have been your
16   expectation that those discussions would have been kept
17   confidential?
18   A.  Within whatever the bounds of that doctrine are,
19   which I couldn't tell you because I'm not an expert.
20   Q.  Okay.
21       ATTY. FLEISCHER: We'll mark another document.
22       (Exhibit 5, DOCUMENT, marked for identification.)
23
24   Q.  Mr. Jacks, again, just to let you know where this

37

1    document came from. This document was also produced by
2    Steven Gray's counsel in response to a document
3    subpoena issued by defense counsel in the instant
4    litigation.
5        I would ask you to take a look at that, if you
6    don't mind?
7    A.  Sure. It's a walk down memory lane here.
8    Q.  You've read the document?
9    A.  Yes. Scanned it.
10   Q.  Do you recall ever seeing this document before?
11   A.  I know that it was directed to, me but I don't
12   have a current recollection of having read or received
13   it.
14   Q.  I know you just reviewed the contents of the
15   document while sitting here.
16   A.  I skimmed it.
17   Q.  Do you have a general recollection of the matters
18   that are reported in this document?
19   A.  Again, now having read this and having had my
20   memory refreshed a little bit, I do remember. I would
21   say I have some form of recollection of most of what's
22   discussed in here.
23   Q.  And do you recall having any discussions with
24   Carole Schwartz Rendon about the information that is

10 (Pages 34 to 37)

Case 1:05-cv-10077-RGS    Document 70-5    Filed 07/24/2006    Page 6 of 10
Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

38

1    reported in this document?
2    A.  I don't have any current recollection of
3    discussing specifically anything with Carole given the
4    amount of time that has passed.
5    Q.  Do you recall whether or not you had reviewed this
6    document in any draft form?
7    A.  No.  I don't recall having seen a draft or final
8    other than the fact I see it was directed to me.
9    Q.  Do you have any reason to think you might not have
10   received this document?
11   A.  I have no reason to think that I did or didn't,
12   but I'm assuming since it was directed to me that I
13   did.
14       ATTY. FLEISCHER:  I'm going to quickly mark one
15   additional document here.
16       (Exhibit 6, DOCUMENTS, marked for identification.)
17
18   Q.  I'm handing you another document.  It's marked 6.
19   Same source as the other document, Mr. Jacks, from
20   Mr. Gray's counsel.
21       ATTY. BAGGER:  Are you sure?
22       ATTY. FLEISCHER:  Yes.  It came in the same
23   package.
24       ATTY. BAGGER:  It's got a different set of Bates

39

1    markings on it.
2        ATTY. FLEISCHER:  I pulled it out of the material
3    that Sutton gave us the other day.
4        ATTY. BAGGER:  Okay.  It looks very much like the
5    one you produced to me quite a while ago and it's got a
6    different Bates labeling system.
7        ATTY. FLEISCHER:  It's not my Bates labeling
8    system.
9        ATTY. BAGGER:  Okay.
10   Q.  Okay.  Let me ask you what you notice is
11   immediately the major difference between these
12   documents, as far as you can tell?
13       ATTY. BAGGER:  Objection.
14   Q.  What is different about the document number 6 from
15   5 that's obvious to you?
16       ATTY. BAGGER:  Objection.
17       THE WITNESS:  Is this like a children's game, what
18   is different about this picture?
19   Q.  Right.
20   A.  Maybe I'm just being tired this morning, but it's
21   not jumping out at me.
22   Q.  I note that this document is titled "draft".
23   A.  I'm sorry.  Thank you.  I should have seen that.
24       ATTY. BAGGER:  Objection to it's titled "draft".

40

1    Q.  Well, it's stamped "draft".  Do you agree that
2    it's stamped "draft"?
3    A.  Yes.  I see the word "draft" stamped.
4    Q.  That appears on each page, do you agree with that?
5    A.  Having now carefully flipped through the pages, I
6    agree with you.
7    Q.  Do you recall whether or not you may have reviewed
8    this document in draft form before it was issued in
9    final form?
10   A.  No, I don't.
11   Q.  You don't recall whether or not you may have
12   contributed to the preparation of the document?
13   A.  I have no specific recollection of this document
14   and, thus, no specific recollection or even indirect
15   recollection of having read or reviewed or commented
16   upon this document.
17   Q.  Other than a specific recollection, do you have a
18   general recollection?
19   A.  I don't.
20       ATTY. BAGGER:  Objection.
21       THE WITNESS:  I don't recall it specifically or
22   generally, except I note that it was directed to me and
23   Gene Berman with copies to various counsel.
24   Q.  And the counsel copied on that, those are other

41

1    counsel involved in the investigations?
2    A.  Well, again, based on having seen Exhibit 3, there
3    seems to be a correlation there, yes.
4    Q.  I'll have you turn to Page 7.
5    A.  Which one?
6    Q.  Page 7 of Exhibit 5.
7    A.  Okay.
8    Q.  And you'll note at the top of the page, these
9    actually appear under Section V, Concerns, which runs
10   over from the prior page.
11   A.  Okay.
12   Q.  I just want to just ask you some questions about
13   these numbered concerns.
14   A.  Okay.
15   Q.  Take a look at the first numbered concern.  I'll
16   read it, "Vic Gatto, G-A-T-T-O and Clyde Frank had an
17   exceptionally close relationship.  Clyde may have gone
18   over the line in promising to deliver money to MMT
19   without appropriate documented authorization for such
20   promises."  Who was Clyde Frank?
21   A.  By the way, it's -- I'm sorry I keep doing this to
22   you, it's pronounced Gatto, at least that's how I
23   recall it being pronounced.
24       I believe Clyde Frank was a Department of Energy

11 (Pages 38 to 41)

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

| 42 | 44 |
|---|---|
| 1 employee. I don't recall his specific title. | 1 regarding the points raised in number 2? |
| 2 **Q. Do you know his connection to MMT at the time?** | 2 A. No. |
| 3 ATTY. BAGGER: Clyde Frank? | 3 **Q. Do you recall ever having a discussion with Carole** |
| 4 **Q. Clyde Frank, yes.** | 4 **Schwartz Rendon about the matters rasied in number 2?** |
| 5 A. I believe he was one of the folks and probably one | 5 A. Nope. |
| 6 of the more senior folks that we interacted with, I | 6 **Q. Okay. Going to number 3, I think you've read** |
| 7 don't know specifically what his title or division was | 7 **number 3 already?** |
| 8 at the Department of Energy, but just that he worked at | 8 A. Yes. |
| 9 Department of Energy and that he was interested in our | 9 **Q. Do you recall having any discussions with any** |
| 10 technology and probably in the group of folks that were | 10 **other MMT officers, directors or employees regarding** |
| 11 responsible for reviewing our request for government | 11 **issues raised in number 3?** |
| 12 contracts through the DOE. | 12 A. I have no current recollection of that, no. |
| 13 **Q. Do you have any recollection of how this issue** | 13 **Q. Do you have any recollection of discussing that** |
| 14 **outlined in paragraph, the first numbered paragraph** | 14 **matter with any of the attorneys involved in the** |
| 15 **here, how that was resolved?** | 15 **investigations?** |
| 16 ATTY. BAGGER: Objection. | 16 A. No specific recollection. I can see, having read |
| 17 THE WITNESS: No, I don't. I don't even know what | 17 this memo, that the subject of campaign contributions |
| 18 your question is exactly. | 18 was one of the focal points of the investigation and |
| 19 **Q. Do you know if anything ever became of this issue** | 19 from having read this, it appears that that was not a |
| 20 **beyond this memorandum?** | 20 problem. But I have no specific recollection of having |
| 21 A. The "issue" being what exactly? | 21 discussed it. |
| 22 **Q. The issue being whether or not Clyde went over the** | 22 **Q. And take a look now at number 4 and number 5. Let** |
| 23 **line in promising to deliver money to MMT without** | 23 **me know when you've finished reading those.** |
| 24 **appropriate documenting authorization?** | 24 A. Okay. |

| 43 | 45 |
|---|---|
| 1 A. I don't remember specifically how that issue such | 1 **Q. With respect to Point 4 there on Page 7, do you** |
| 2 as it was or at least characterized in this document | 2 **recall having any discussions with other officers or** |
| 3 was resolved. Having reread some of these documents to | 3 **directors or employees of MMT regarding the issue** |
| 4 get back to our original case, there was clearly | 4 **raised in Point 4?** |
| 5 some -- within the investigation there was a DOE piece | 5 ATTY. BAGGER: Objection. Do you mean the subject |
| 6 and my recollection is that after the investigations | 6 matter or the fact that it was flagged in this memo? |
| 7 were over, there was no action. I don't remember any | 7 ATTY. FLEISCHER: No. The subject matter. |
| 8 specific action taken. So I assume that it was | 8 THE WITNESS: No. |
| 9 resolved relevant to the parties' satisfaction. | 9 **Q. Do you recall ever having any discussions with any** |
| 10 **Q. Do you recall having any discussions with other** | 10 **of the attorneys involved in the investigations** |
| 11 **MMT officers or directors or counsel regarding the** | 11 **regarding the substance of the matter raised in Point** |
| 12 **issue that is raised in this first point?** | 12 **4?** |
| 13 A. No. No recollection of that. | 13 A. I don't have a recollection of that, no. |
| 14 **Q. I'll have you read quickly number 2 to yourself** | 14 **Q. With respect to Point 5, and again with respect to** |
| 15 **and then number 3.** | 15 **the substance of the matter raised in Point 5, before I** |
| 16 A. Okay. | 16 **go on -- strike that.** |
| 17 **Q. Just tell me when you are all set.** | 17 **Do you recall ever having any discussion with** |
| 18 A. Okay. | 18 **Carole Schwartz Rendon about the substance of the** |
| 19 **Q. Do you recall having any discussions with other** | 19 **matter raised in Point 4?** |
| 20 **MMT officers, directors or employees regarding the** | 20 A. No. I don't have a recollection of that. |
| 21 **issue raised in Point 2?** | 21 **Q. With respect to Point 5, do you recall having any** |
| 22 A. Absolutely not. | 22 **discussion with any other MMT officers, directors or** |
| 23 **Q. Do you recall having any discussions with any of** | 23 **employees regarding that matter?** |
| 24 **the other attorneys involved in the investigations** | 24 A. I have no specific recollection of that. That's |

12 (Pages 42 to 45)

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

---

46

1   getting into, frankly, very technical areas that I
2   don't think were within my scope of responsibilities.
3   **Q. Do you have any general recollection?**
4   A. No. I remember now having read this document, I
5   had forgotten even what the acronym -- the PRDA
6   acronym, but it was then known as, it was pronounced
7   the "PRDA" and that's what we called it and that was
8   one of the government contracts we had and my
9   recollection is that it was extended once or twice. So
10   it was a significant you know -- significant to the
11   company and I don't recall any problems with the
12   administration of it.
13   **Q. Do you recall what PRDA stands for?**
14   A. I don't. Just that we called it the "PRDA," but
15   that's just the phonetic pronunciation of the acronym.
16   **Q. Can you describe what the PRDA was?**
17   A. I can't specifically because, again, that was not
18   my area of responsibility or expertise. But I believe
19   that was the -- that was the primary government
20   contract with the Department of Energy that we had at
21   least in the beginning and I think it stayed in effect
22   for several years.
23   **Q. Okay. And, again, you don't recall ever having**
24   **any discussion with Carole Schwartz Rendon about the**

---

47

1   **substance of the matter raised in Point 5?**
2   A. I don't recall that, no.
3   **Q. Okay.**
4   A. Again, I'll point out, this is now, you know,
5   coming up on nine years ago.
6   **Q. Nine years. I don't mean to swamp you with paper**
7   **here.**
8   ATTY. FLEISCHER: Off the record.
9
10   (Recess taken.)
11
12   ATTY. FLEISCHER: Back on the record. Can you
13   mark this as 7, please.
14   (Exhibit 7, 4/7/98 LETTER, marked for
15   identification.)
16
17   **Q. I've handed you a document that's been marked as**
18   **Exhibit 7. I'll ask you to take a look at that and the**
19   **attachment, as well.**
20   A. Okay.
21   **Q. The first page, can you identify that document,**
22   **please?**
23   ATTY. BAGGER: The entire document or just the
24   first page?

---

48

1   ATTY. FLEISCHER: The first page.
2   THE WITNESS: By the face of it, it's a letter
3   dated April 7, 1998 to Carole Rendon from me in my
4   capacity as general counsel regarding Rhonda Walker.
5   **Q. Does that look like your signature on the bottom?**
6   A. Yes.
7   **Q. Who was Rhonda Walker?**
8   A. Rhonda was an employee who worked in the, as I
9   eluded to earlier, the government side, government
10   sales part of our business.
11   **Q. And do you recall having sent this letter to**
12   **Ms. Rendon?**
13   A. I don't have any current recollection of it, no.
14   **Q. So do you have any recollection of why you would**
15   **have put the joint defense document attorney/client**
16   **privilege label on the top?**
17   A. Other than by logic, that there was a joint
18   defense agreement in effect and that one was meant to
19   legend correspondence if one was in effect.
20   **Q. The attachment, again, that's a document that is**
21   **stamped with the word "draft" on each page?**
22   A. Right.
23   **Q. Do you recall -- this appears to be a draft**
24   **proffer?**

---

49

1   A. Again, I'm not an expert in litigation generally
2   or proffers inspecific, but I do see that word here,
3   yes.
4   **Q. And do you recall if you had any involvement in**
5   **the preparation of this document?**
6   A. I don't have any recollection of having prepared
7   this document.
8   **Q. Do you recall whether you had any discussions with**
9   **Carole Schwartz Rendon regarding the substance of a**
10   **proffer to be provided regarding Ms. Walker?**
11   A. I have no present recollection of it other than as
12   I read it for the -- read it now in front of me that
13   there was a, you know, the letter says that I consent
14   to providing information regarding Rhonda Walker's
15   severance agreement in connection with a request from
16   that Campaign Finance Task force.
17   **Q. But you don't recall discussing the substance of**
18   **this with Ms. Rendon?**
19   A. As I said, I don't think I recall any specific
20   discussions with Carole Rendon ever and that's not
21   because they didn't happen. I just don't remember
22   them.
23   **Q. You are not saying you didn't have discussions?**
24   A. I just don't remember.

13 (Pages 46 to 49)

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

54

1  Q. Again, I'm not an expert on Title 7.
2  A. Well, having read something earlier today, it
3  looks like it was in Exhibit 7, where there is a
4  discussion about her having brought -- I think there's
5  a discussion about her having bought or threatened to
6  bring a Title 7 claim against Molten Metal.
7  Q. Do you recall whether or not there was a
8  settlement reached with Ms. Walker?
9  A. Again, having read this document which talks about
10 a settlement, yes. I have a general recollection of
11 having reached a settlement with her about any claim
12 she might have in connection with her employment by
13 Molten Metal.
14 Q. Do you recall any of the terms of the settlement
15 with her?
16 A. I don't remember the details other than again
17 having read in this document some reference to a
18 payment, a severance payment and picking up her fees
19 and letting her retain some company property, fax
20 machines, and computers. But, again, that's having
21 been refreshed by this document right in front of me.
22    ATTY. BAGGER: I want the record to reflect that
23 Mr. Jacks is looking at what has been marked as Exhibit
24 7 in this deposition.

55

1  Q. Do you have any recollection of whether, as a
2  condition of the settlement, Ms. Walker would have been
3  required to retain Epstein, Becker and Green to
4  represent her in the investigations?
5     ATTY. BAGGER: Objection. Foundation.
6     THE WITNESS: No. I don't have a recollection to
7  that effect.
8  Q. Do you have a general recollection to that effect?
9     ATTY. BAGGER: Objection. Foundation.
10    THE WITNESS: No.
11 Q. Do you know whether or not Ms. Walker was
12 subpoenaed in the investigations?
13 A. Well, I have a recollection.
14 Q. Regardless of the documents, do you have a
15 recollection?
16    ATTY. BAGGER: Objection. What is the question
17 now?
18    ATTY. FLEISCHER: Does he have a recollection of
19 whether Ms. Walker was subpoenaed in the
20 investigations?
21    ATTY. BAGGER: Okay.
22    THE WITNESS: I do have a recollection. Although,
23 it could have been stimulated by something I saw today.
24 But I do have a recollection that she was, yes.

56

1  Q. Do you know if she, in fact, retained counsel to
2  represent her in the investigations?
3  A. Again, maybe it's just based on what I saw today.
4  I thought it was Carole Rendon.
5  Q. *Okay. Now, as general counsel, did you have
6  responsibilities for oversight of the payment to the
7  various law firms that provided services to MMT?
8     ATTY. BAGGER: Could you read that back.
9
10    (*Question read back.)
11
12    THE WITNESS: I would say in general, yes.
13 Although, that would apply to the firms that were
14 providing work of a general corporate nature, if you
15 will. So if, for example, there was a regulatory
16 matter that Gene Berman was responsible for, then it's
17 possible, in fact, probable that those bills would get
18 reviewed by him. If it was an employment matter, it's
19 possible that it was reviewed and approved by somebody
20 in HR. But for general corporate, yes.
21    By the way, I just remembered this going back to
22 your questions about who I reported to. At some point
23 I think after Ben Downs left, I think I reported to
24 Gene Berman for the balance of my time at MMT. So I

57

1  just recalled that.
2  Q. Okay.
3     ATTY. FLEISCHER: Mark this.
4     (Exhibit 9, DOCUMENT, marked for identification.)
5
6  Q. You have just been handed what's been marked as
7  Exhibit 9. I would ask you to take a look at that,
8  please.
9  A. Okay.
10 Q. Do you recall this document?
11 A. I don't recall this document and now just having
12 read it, I'm confused by it.
13 Q. How are you confused by it?
14 A. It says I'm the author and then in the text it
15 says, "Ethan and I," suggesting I'm not the author or
16 I'm not the only author. So I find that confusing, but
17 I don't remember the document specifically.
18 Q. Would this have been a customary way of
19 communicating with Gene, a memo of this form?
20 A. Well, I'm not -- I'm not even sure. It's also
21 copying Gordon Bitter.
22 Q. Who is Gordon Bitter?
23 A. Gordon Bitter was the I'll call him, I think he
24 was effectively, if not in fact, the CEO of Molten

15 (Pages 54 to 57)

Ethan Jacks 4-12-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

| 66 | | 68 | |
|---|---|---|---|
| 1 | in order here. I'll ask you about each one. | 1 | ATTY. BAGGER: Are you asking whether he recalls |
| 2 | A. Sure. | 2 | seeing any portion of the -- |
| 3 | Q. Exhibit 12, take a look at that one. | 3 | ATTY. FLEISCHER: Any portion of Exhibit 13, any |
| 4 | A. Okay. | 4 | of the pages contained within Exhibit 13. |
| 5 | Q. Do you recall having reviewed or received this | 5 | THE WITNESS: I don't have any present |
| 6 | document ever? | 6 | recollection of having received these. I see that my |
| 7 | A. By "this document," you mean what? | 7 | name is referred to in some of the time entries. |
| 8 | Q. Any of the collection of documents? | 8 | Q. Can you kind of point out where you see those? |
| 9 | ATTY. BAGGER: Any portion of it? | 9 | ATTY. BAGGER: Where he sees his name? |
| 10 | Q. Yes, any portion at all? | 10 | ATTY. FLEISCHER: Yes. |
| 11 | A. Again, I have no current recollection of it. I | 11 | THE WITNESS: It is pattern recognition. I see it |
| 12 | see that my name is referred to in it. | 12 | on -- |
| 13 | Q. Where do you see your name referred to? | 13 | Q. Let me strike the question. |
| 14 | A. I see in some of the entries on the second page | 14 | The second page of the letter to Gene Berman from |
| 15 | the time entries by Carole Rendon, referring to | 15 | Carole Schwartz Rendon, do you recall ever having seen |
| 16 | conversations with me having to do with Rhonda Walker. | 16 | that document? |
| 17 | Q. Do you recall discussing the Rhonda Walker matter | 17 | A. Again, I have no present recollection of having |
| 18 | with Carole Schwartz Rendon? | 18 | seen this. |
| 19 | A. Not specifically, no. | 19 | Q. That goes for all the pages attached? |
| 20 | Q. Take a look at the third to last page in the group | 20 | A. Yes, it does. |
| 21 | and take a look in there, specifically at the detail of | 21 | Q. Okay. I won't ask you anymore questions on that. |
| 22 | the time entries for April 20, 1998. | 22 | And take a look at the document that is marked |
| 23 | A. I'm sorry, is this the same page? | 23 | Exhibit 14. |
| 24 | Q. No. I meant to say the third page from the end. | 24 | A. Okay. |

| 67 | | 69 | |
|---|---|---|---|
| 1 | ATTY. BAGGER: Just so we're all on the same page, | 1 | Q. Were you aware that Epstein Becker had filed a |
| 2 | is this the invoice that says Christopher Nagel | 2 | proof of claim in the MMT bankruptcy case? |
| 3 | June 24, 1998? | 3 | A. I was not aware of that, no. |
| 4 | ATTY. FLEISCHER: That's correct. | 4 | Q. So had you ever seen this document before? |
| 5 | THE WITNESS: The question again? | 5 | A. No not to my recollection. |
| 6 | Q. I hadn't asked the question. I would ask you to | 6 | Q. And no one had ever asked you to review the |
| 7 | take a look at the detail and time entry for April 20, | 7 | documents -- I mean, the pages contained in the proof |
| 8 | 1998. | 8 | of claim? |
| 9 | A. Right. | 9 | A. No, not to my recollection. |
| 10 | Q. Do you recall, I don't know if this refreshes your | 10 | Q. Do any of the entries, and I note that you thumbed |
| 11 | recollection, whether or not Carole Rendon had been in | 11 | through it, do any of those entries refresh your |
| 12 | any way involved in the McConchie matter? | 12 | recollection as to discussions you may have had with |
| 13 | A. From the face of this document, I see time entries | 13 | Carole Schwartz Rendon independently of just having |
| 14 | indicating that she spoke to Chris Nagel and Gene | 14 | seen them in this document? |
| 15 | Berman regarding the McConchie matter. | 15 | A. Again, I don't remember specific discussions with |
| 16 | Q. Do you have any independent recollection? | 16 | Carole. I do remember the fact that she worked for us |
| 17 | A. No, I do not. | 17 | or she was retained on behalf of employees, but paid by |
| 18 | Q. Okay. Like I said, we'll go in order. Go through | 18 | us, "us" meaning Molten Metal, and that from seeing |
| 19 | 13. | 19 | these time entries, it indicates that she and I had |
| 20 | A. Okay. | 20 | discussions about different matters during the relevant |
| 21 | Q. Do you recall having received any of these | 21 | time period. |
| 22 | documents at all? | 22 | Q. Okay. |
| 23 | A. Any of these documents? | 23 | ATTY. FLEISCHER: That's actually all I have, |
| 24 | Q. The documents that are within Exhibit 13? | 24 | Paula. |

18 (Pages 66 to 69)

# O'BRIEN & LEVINE

## Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert Hanfling v. Epstein, Becker & Green, et. al.

Transcript of the Testimony of:

# Eugene Berman

# April 13, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**



Cindy Berglund   1-18971

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

21

```
 1          recollection is the company and individuals in the

 2          company did receive letters.  I do not recall reviewing

 3          any letter to any individual employee of the company --

 4          Q.   Do you --

 5          A.   -- other than my own.

 6          Q.   Do you recall reviewing any subpoena in connection

 7          with the investigation to any employees of the company?

 8          A.   I did not.

 9          Q.   And did you actually testify?

10          A.   I did.

11          Q.   Was that under oath?

12          A.   I did.

13          Q.   How long were you testifying for in terms of days?

14          A.   One day before the house committee, and I don't

15          recall which committee or subcommittee, and before a

16          federal grand jury.

17          Q.   Do you recall the -- strike that.

18               Do you recall who represented the various, any of

19          the various employees of Molten Metal Technology that

20          had received subpoenas or letters to testify?

21          A.   Yes.

22          Q.   Who was that?

23          A.   I can't say comprehensively I recall, but Bill

24          Haney was represented by Hale and Dorr.  Karen Green, I
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

22

1    believe, was the individual.  Vic Gatto was represented

2    by a guy named Touhey who is now the baseball

3    commissioner, I think it's Bill Touhey.  It doesn't

4    matter, and a number of individuals in the company were

5    represented by Epstein, Becker and Green.

6    Q.    Do you recall the specific attorney that

7    represented the individuals?

8    A.    I don't recall her full name.

9    Q.    If I said the name Carole Schwartz Rendon, would

10   that refresh your recollection?

11   A.    It seemed like her name changed midway, but, yes,

12   Carole is the individual that I recall.

13   Q.    Do you know why MMT's counsel, Latham and Watkins,

14   didn't represent everyone connected with MMT in

15   connection with the investigation?

16   A.    Various employees had either employment agreements

17   or the company policy was that if someone was accused

18   of any wrongdoing in the course of their employment,

19   the company had agreed to reimburse those individuals

20   for obtaining counsel and in that context, individuals

21   who chose to be represented, in fact, their attorney's

22   fees were paid and that was the case with regard to the

23   individuals who were represented by Epstein, Becker and

24   Green.

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

23

1      Q.   Do you know why Latham and Watkins didn't

2      represent any of those individuals?

3      A.   I do not.

4      Q.   Do you recall the time frame when Epstein, Becker

5      and Green first got involved in representing the

6      individuals in connection with the investigations?

7      A.   The only time frame I remember is 1998 because at

8      that time, one of my responsibilities was to review

9      bills.

10     Q.   Reviewing bills from who?

11     A.   From various counsel.  We were operating under

12     Chapter 11 and our expenditures were being reviewed by

13     the creditor's committees and we had to present to them

14     projected expenditures and document expenditures that

15     were made, including expenditures of this type which

16     were the ones that I was more familiar with for the

17     representation of individuals in the context of these

18     investigations.

19     Q.   Prior to MMT's bankruptcy, did you review bills

20     for counsel, outside counsel then?

21     A.   No.

22     Q.   So it was really only after the bankruptcy that

23     you started to --

24     A.   Let me clarify that, if I may.  I did review

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

24

```
1        environmental.  My responsibilities were for

2        environmental permitting and we had counsel in Texas or

3        counsel in Tennessee who did environmental work for us

4        and that was part of my budget and part of my

5        responsibilities.  Sometime in 1998 because I was

6        involved and there were fewer people in the company, I

7        was given the responsibility of reviewing these bills,

8        as well.

9        Q.   Do you recall how -- well, strike that.

10            Were you at all involved in the decision to hire

11       Epstein, Becker and Green to represent the individuals

12       in --

13            ATTY. BAGGER:  Objection.  Foundation.

14       Q.   -- in connection with the investigation?

15            ATTY. BAGGER:  Objection.  Lack of foundation for

16       the question.

17            THE WITNESS:  I was not involved in the decision

18       on anybody's part to hire Epstein, Becker and Green.

19       My knowledge is limited to the review of bills of

20       individuals, billings from Epstein Becker for

21       individuals who had elected, for whatever reason, to be

22       represented by Epstein Becker.

23       Q.   Do you recall whether you had any discussions

24       directly with Ms. Rendon prior to her being retained by
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

30

1       party to a joint defense agreement of any form in

2       connection with the investigations?  I'm not

3       questioning you on the document, by the way.

4       A.    Okay.  I'm not sure I have a -- I certainly don't

5       have a specific recollection of that.

6       Q.    What do you recall generally then?

7             ATTY. BAGGER:  About joint defense agreements?

8             ATTY. FLEISCHER:  About joint defense agreements.

9             THE WITNESS:  I have to say my recollection is

10      unclear on that.  Just in my general experience with

11      multi-party cases, joint defense agreements are common.

12      I wouldn't be surprised if there was one, but I don't

13      recall there specifically being one.

14            ATTY. FLEISCHER:  I'm going to mark this as the

15      next document here.

16            (Exhibit 3, 10/23/97 FAX TRANSMISSION, marked for

17            identification.)

18

19      Q.    Mr. Berman, as you look at that document, I would

20      draw your attention to the "re".

21            ATTY. BAGGER:  On the first page?

22            ATTY. FLEISCHER:  Yes.

23            THE WITNESS:  Okay.

24      Q.    And also to the subject, the subject line on the

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

31

1        second page.  I believe you've looked at that?

2        A.   Yes.

3        Q.   Does this refresh your recollection whether there

4        was a joint defense agreement or arrangement concerning

5        the investigations?

6             ATTY. BAGGER:  Objection.

7             THE WITNESS:  I think I previously testified I

8        would not have been surprised if there is one, but my

9        actually testimony is I honestly don't recall that

10       there, in fact, was one.

11       Q.   And this document doesn't change your recollection

12       or refresh your recollection?

13       A.   It just confirms what I said a moment ago.  I

14       would not find this to be surprising.  It would suggest

15       there was one, but, again, I don't recall whether there

16       was or was not.

17       Q.   Do you have any reason to think there wouldn't

18       have been one?

19            ATTY. BAGGER:  Objection.

20            THE WITNESS:  I have no reason to know whether

21       there was or wasn't or why there was or wasn't a joint

22       defense agreement.

23       Q.   Do you have any recollection of whether or not

24       attorneys from Epstein, Becker and Green and

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

32

1         specifically Carole Schwartz Rendon, were communicating

2         directly with lawyers from Latham and Watkins

3         concerning the investigations?

4         A.    I have no knowledge.

5               ATTY. BAGGER:   Objection.   Foundation.

6               THE WITNESS:   I have no knowledge of that.

7               ATTY. FLEISCHER:  Let's mark this.

8               (Exhibit 4, 8/25/97 MEMO FROM CAROLE SCHWARTZ

9               RENDON, marked for identification.)

10

11        Q.    Okay.   Mr. Berman, you've just been handed what's

12        been marked as Exhibit 4, and if you could just take a

13        look at this document, please?

14        A.    Okay.

15        Q.    Do you have any recollection of having ever seen

16        this document before?

17        A.    I don't have a specific recollection of seeing

18        this document, no.

19        Q.    Do you have a general recollection of the matters

20        that are addressed in this memorandum?

21        A.    Let me be clear on how I'm answering this.   Yes,

22        the matters in here I'm certainly, as I previously

23        testified, that there were issues of campaign

24        contributions, it pertained to the PRDA, which was one

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

33

```
 1        of the DOE contracts.

 2        Q.   Do you recall what PRDA stands for?

 3        A.   Planned Research Development Agreement or Program.

 4        I'm not absolutely certain.

 5        Q.   But you have no specific recollection of the

 6        document itself?

 7        A.   I do not.

 8        Q.   Do you have any specific recollection of

 9        discussing the matters raised in this memorandum with

10        Carole Schwartz Rendon?

11        A.   I have no recollection of discussing these matters

12        with Ms. Rendon.

13        Q.   And do you recall whether or not you had any hand

14        in drafting this document?

15        A.   It purports to be from Ms. Rendon and I appear to

16        be a recipient of it.  To answer your question, no.  I

17        have no recollection of me having a hand in drafting

18        this, no.

19        Q.   Do you recall if you have ever seen it in draft

20        form?

21        A.   I don't have a recollection of it.

22        Q.   Can you turn to Page 6 of this document, Exhibit

23        4?

24        A.   Yes.
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

34

1    Q.    And there is a section there that's titled, V, in

2    Roman Numerals, "Concerns"?

3    A.    Yes.

4    Q.    I would ask you if you could read that section

5    just a little closely to yourself and that runs onto

6    Page 7, through Points 1, 2, 3, 4 and 5.  Just let me

7    know when you've read those.

8    A.    Okay.

9    Q.    And now, turning back to Page 7, we'll go to the

10   first numbered point.

11   A.    Yes.

12   Q.    Do you know who Clyde Frank was?

13   A.    I have a general recollection that he was an

14   employee of the Department of Energy.

15   Q.    Now, Mr. Gatto, how do you pronounce his name?

16   A.    That's correct, Gatto.

17   Q.    Do you recall who represented Mr. Gatto in

18   connection with the investigations?

19   A.    Mr. Touhey.

20   Q.    He was not represented by Epstein, Becker and

21   Green?

22   A.    Not to my knowledge, no.

23   Q.    Do you recall having any discussions with

24   Ms. Rendon concerning the substance of Point 1?

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

35

1      A.   I do not.

2      Q.   Do you recall having any discussions with any of

3      the other officers or directors, employees of MMT

4      concerning the substance of the matters raised in Point

5      1?

6      A.   I do not.

7      Q.   Do you understand how the matter or the substance

8      of the matter raised in Point 1 would have affected

9      other individual employees of MMT?

10         ATTY. BAGGER:  Objection to the form of the

11     question.

12         THE WITNESS:  I do not.

13     Q.   With respect to Point 2, do you recall having any

14     discussion with Ms. Rendon concerning the substance of

15     Point 2?

16     A.   I do not.

17     Q.   Do you recall having any discussions with any

18     other officers or directors or employees of MMT

19     concerning the substance of the matter addressed in

20     point 2?

21     A.   I do not.

22     Q.   And do you have any understanding of how the

23     substance of the -- strike that.

24         Do you understand how the issue raised in Point 2

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

36

```
1        would directly affect clients of Ms. Rendon --

2             ATTY. BAGGER:  Objection.

3   Q.    -- in the investigation?

4             ATTY. BAGGER:  Objection.  Foundation.

5             THE WITNESS:  I do not.

6   Q.    Point 3, do you recall discussing the substance of

7   Point 3 with Ms. Rendon?

8   A.    I do not.

9   Q.    Do you recall discussing the substance of Point 3

10  with any other officers, directors or employees of MMT

11  with Ms. Rendon -- strike that question.

12            Do you recall discussing the substance of the

13  matter raised in Point 3 with any other officers or

14  directors or employees of MMT?

15  A.    I don't have any specific recollection of that.

16  Although, I do recall generally that discussions were

17  had about what the campaign contribution laws were and

18  what we needed to do to make sure we were legal in what

19  we did.

20  Q.    Do you recall who you might have had those

21  discussions with?

22  A.    No.

23  Q.    Could it have been with Ms. Rendon?

24  A.    No.  I thought your question was MMT employees.
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

37

1       Q.    I'm asking a different question now.

2             ATTY. BAGGER:  To which I object to.  Asked and

3       answered.

4       Q.    Do you have any understanding how the issue raised

5       in Point 3 would have directly affected Ms. Rendon's

6       clients in the investigation?

7             ATTY. BAGGER:  Objection.  Foundation.

8             THE WITNESS:  I do not.

9       Q.    Point 4, please.  Do you recall having any --

10      strike that.

11            Do you recall having any discussions with

12      Ms. Rendon concerning the issue raised in Point 4?

13      A.    I do not.

14      Q.    Do you recall having any discussions with any

15      other officers or directors or employees of MMT

16      concerning the issue raised in Point 4?

17      A.    Other than repeating what I said before,

18      contributions, whether they be cash or in kind, we were

19      sensitive and I would recall general discussions of

20      that issue for compliance reasons, but I don't recall

21      any specific conversations or with whom I might have

22      had that conversation within MMT.

23      Q.    Say that again.

24      A.    With MMT employees.  I have no such recollection

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

38

1          of any such conversations with Ms. Rendon.  I'm

2          answering that with regard to what I thought your

3          question was with regard to MMT employees.

4          Q.    Do you recall the specific MMT employees?

5          A.    I do not.

6          Q.    Do you have any understanding of how the issue

7          raised in Point 4 would have any effect on Ms. Rendon's

8          clients in the investigation?

9          A.    I do not.

10         Q.    And, lastly, I'm going to ask the same series of

11         questions with respect to Point 5.

12         A.    Certainly.

13         Q.    Do you recall having any discussions with

14         Ms. Rendon concerning the issues raised in Point 5?

15         A.    I do not.

16         Q.    Do you recall having any discussions with other

17         officers, directors or employees of MMT -- I'm sorry.

18         Strike that.

19              ATTY. BAGGER:  You keep saying other employees and

20         officers of MMT after asking about Ms. Rendon who is

21         not an officer or employee of MMT.

22              ATTY. FLEISCHER:  I struck the question and for

23         that reason.

24              ATTY. BAGGER:  Okay.

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

39

```
 1        Q.   Do you recall having any discussions with any

 2        officers or directors or employees of MMT concerning

 3        the issues raised in Point 5?

 4        A.   I do not.

 5        Q.   Do you have any understanding as to how the issue

 6        raised in Point 5 would have any impact on Ms. Rendon's

 7        clients?

 8             ATTY. BAGGER:  Objection.

 9             THE WITNESS:  I do not.

10        Q.   We're done with that document.  You don't have to

11        look at it anymore.

12        A.   Thank you.

13             ATTY. BAGGER:  Anymore than you need to.

14             ATTY. FLEISCHER:  Off the record a second.

15

16             (Recess taken.)

17

18             ATTY. FLEISCHER:  Back on the record.  Mark this.

19             (Exhibit 5, JOINT DEFENSE DOCUMENT, marked for

20             identification.)

21

22        Q.   You've just been handed what's been marked Exhibit

23        5, I believe, Mr. Berman.

24        A.   Yes.
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

45

```
1       A.   I have no, you know, current recollection of it.

2       Although, I have no reason to think it's not an

3       accurate depiction of what -- well, it looks like my

4       signature at the bottom.

5       Q.   Turn to the fourth page.

6       A.   Fourth page of the whole document?

7       Q.   Yes, and what does that appear to you to be

8       there -- strike that.

9            What is it that you note there -- strike that, as

10      well.

11      A.   I want to make sure I'm looking at the right page.

12      Q.   There are the numbers RW852 in the lower

13      right-hand corner.

14      A.   Correct.

15      Q.   Do you see time entries for 2/27/98?

16      A.   I do.

17      Q.   Can you just take a look at those, read those to

18      yourself for a moment?

19           ATTY. BAGGER:  Can you read the Bates number

20      again?

21           ATTY. FLEISCHER:  RW852.

22           ATTY. BAGGER:  Thank you.

23           THE WITNESS:  Okay.

24      Q.   Who was J. Grabmeier?
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

46

```
1       A.    One of the accounting people at MMT.

2       Q.    He was an MMT employee?

3       A.    Correct.

4       Q.    Do you recall having -- and, again, do you recall

5       having any particular, any telephone conferences with

6       Carole Schwartz Rendon?

7       A.    Well, this certainly suggests I did have them.  To

8       answer your question specifically, I don't really

9       recall having those conversations.

10      Q.    And these -- the time entries that appear on this

11      document and there are several here that reference you?

12      A.    Correct.

13      Q.    None of them refresh your recollection as to

14      conferences with Carole Schwartz Rendon?

15           ATTY. BAGGER:  To whether there were conversations

16      or the context of the conversations?

17           ATTY. FLEISCHER:  I'm not asking about the

18      contents.  Just whether or not it refreshes his

19      recollection.

20           ATTY. BAGGER:  As to whether he had conversations

21      with Carole Rendon?

22           THE WITNESS:  As I said, I previously testified I

23      think that I knew who she was.  My job was to review

24      invoices for payment.  Reading this, the only further
```

Eugene Berman 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

47

1    refreshment of my recollection would be there were also

2    scheduling issues as far as when these people were to

3    be made available and when they were, you know, being

4    either subpoenaed to testify and I do -- I would

5    certainly think at least that's what the substance of

6    these entries might suggest.

7    Q.    So you do recall that you spoke with her directly

8    about scheduling the testimony of the individuals that

9    she represented?

10   A.    My recollection is most clearly that it was on

11   budgetary concerns, but I do have a general

12   recollection, and this somewhat refreshes it, that I

13   would have logically additionally spoke about

14   scheduling, availability and when these -- we had a

15   very small company at that point and getting these

16   people kind of pulled out of the office and tied up was

17   one of the concerns that I was also addressing, yes.

18   Q.    With respect to the budget, was there a set budget

19   for each of the firms involved or was there a

20   litigation budget?

21   A.    At some juncture there was a set budget that was

22   approved by the creditor's committee.  That's the only

23   strong recollection that I have.  Prior to that, prior

24   to let's say the Chapter 11 proceedings being

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert Hanfling v. Epstein, Becker & Green, et. al.

**Transcript of the Testimony of:**

# Michael Tuteur

# April 13, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**



Cindy Berglund   1-18970

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

16

1          ATTY. COOKE:  If it is, I'm not going to have a

2     problem with it.  But you are asking him now about

3     conversations he had with people in 1999.

4          ATTY. FLEISCHER:  Well, let's understand what the

5     litigation is about here.  It's about representation of

6     Allied Technology Group that took place in late 1998

7     and into 1999.

8          ATTY. COOKE:  No.  The liability phase goes to

9     what happened with respect to what Epstein, Becker and

10    Green knew prior to the closing on December 1, 1998.

11    We have a court order.  I might even have it with me.

12         ATTY. FLEISCHER:  Let's go off the record.

13

14         (Discussion held off record.)

15

16         ATTY. FLEISCHER:  Back on the record.

17    Q.    Are you -- do you have any understanding of

18    whether or not Epstein, Becker and Green was party to a

19    joint defense agreement in connection with the MMT

20    investigations?

21    A.    I don't know whether they were or not.

22    Q.    You don't know.  Do you have any reason to believe

23    they may have been?

24         ATTY. COOKE:  Objection.

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

17

1           THE WITNESS:  I have no reason to believe that

2      they were.

3      Q.    That's essentially what I'm asking.

4      A.    Slightly different.

5      Q.    Do you recall specifically when you first started

6      speaking with -- strike the question.

7           When did you first start to get involved in the

8      MMT matter?

9           ATTY. COOKE:  Objection.  What do you mean by the

10     "MMT matter"?

11          ATTY. FLEISCHER:  The investigations.  The matters

12     that Ms. Rendon had been working on?

13          ATTY. COOKE:  Objection to the form of the

14     question.  No foundation.

15          THE WITNESS:  I don't believe that I ever actually

16     got involved with the investigations.  Ms. Rendon left

17     Epstein Becker and asked me whether I would, in the

18     event that the investigations continued, serve as local

19     counsel to her, you know, if she needed to come to

20     Boston or needed something done with the various

21     agencies.  My recollection is she took the file.  She

22     intended to continue to keep those clients if, but only

23     if, the investigation, in fact, continued.

24          My recollection is that it had pretty much run its

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

18

1    course by the time that she left.  So she asked me

2    whether I would do that and I agreed that I would do

3    that, but my recollection is that, in fact, I never

4    needed to do that.

5    Q.   Thank you.  That's what I was looking for.

6         Do you know who Rhonda Walker was?

7    A.   I know her only as an employee of MMT.

8    Q.   Are you familiar at all with the issues between

9    her and MMT?

10        ATTY. COOKE:  Objection.

11        THE WITNESS:  Only that there were -- I'm now

12   testifying about knowledge that I learned much later,

13   but that I came to understand that Ms. Walker had a

14   dispute with MMT.

15   Q.   Did you ever come to understand how it was

16   resolved?

17   A.   I have no idea.

18        ATTY. FLEISCHER:  I'll mark a document, please.

19        (Exhibit 1, 11/3/06 PACKAGE OF DOCUMENTS, marked

20        for identification.)

21

22   Q.   The document that we're marking is one of those

23   documents that is labeled as confidential.  It will be

24   Exhibit 1.  Just to let you know, the document was

Michael Tuteur 4-13-2006
Robert Hanfling v. Epstein, Becker & Green, et. al.

38

1      discussions about the possibility of representation.

2      Hence, I believed that there was already confidential

3      information that had been provided to me and so

4      accordingly we had to examine the question about

5      whether that preliminary pre-representation status

6      affected Epstein Becker's potential representation of

7      ATG.  So that's what I meant by that.

8      Q.    And there is in, I believe it was Exhibit 2 -- is

9      that Exhibit 2?

10     A.    Yes.

11     Q.    Maybe Exhibit 1.  In Exhibit 1, there was a

12     reference to joint defense communication.

13        Was Epstein, Becker and Green a party to any joint

14     defense agreement with respect to the MMT shareholder

15     litigation prior to December 1, 1998?

16        ATTY. FLEISCHER:  Objection.  Foundation.

17        THE WITNESS:  I am unaware of -- I do not believe

18     Epstein Becker was a party to a joint defense agreement

19     during the Molten Metal shareholder litigation before

20     December 1, 1998.

21     Q.    When you referred to confidential information that

22     had been provided in these preliminary discussions

23     about the possibility, were you referring to the

24     documents that were provided to you by Ms. Rendon that

# O'BRIEN&LEVINE

### Court Reporting Services



**YOUR BOSTON CONNECTION...WORLDWIDE**

# Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

**Transcript of the Testimony of:**

# Jarvis Kellogg

# April 18, 2006

www.court-reporting.com
mail@court-reporting.com

**195 State Street**
**Boston, MA 02109**
**(617) 399-0130  888.825.DEPO(3376)**



Cindy Berglund   18973

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

22

1       A.    No.

2       Q.    And in 2000?

3       A.    No.

4       Q.    Were you -- are you aware of -- did you become

5       aware prior to December 1st of 1998 that MMT had been

6       involved in a securities class action litigation?

7       A.    No.

8       Q.    Did you ever become aware that MMT was involved in

9       a securities class action litigation?

10      A.    Yes.

11      Q.    To the best of your recollection, when did you

12      first become aware of that?

13      A.    I can't recall, but I believe it was sometime in

14      the -- in January or February of 1999.

15      Q.    Do you know who Carole Schwartz Rendon is?

16      A.    I do.

17      Q.    Do you personally know her?

18      A.    I do.

19      Q.    When did you first meet Carole Schwartz Rendon?

20      A.    I honestly don't recall.  I interviewed her as a

21      part of the possibility that she would join us as a

22      lawyer and I don't remember the dates on that.  I don't

23      remember the years, but that's when I first met her.

24      Q.    Would that have been prior to 1998?

Jarvis Kellogg 4-18-2006
Robert I. Hanfling v. Epstein, Becker & Green, P.C., et al.

23

```
1       A.   I think it probably was.  It would have been, yes.
2       Q.   Did you work with her at Epstein Becker?
3       A.   No.
4       Q.   Did you work at the same office where she worked?
5       A.   You mean the same -- did she work at the Boston
6       office?
7       Q.   Yes.
8       A.   Yes.
9       Q.   Did you become aware that she had represented
10      various individuals in connection with certain
11      investigations, federal government investigations of
12      Molten Metal Technology, Inc.?
13      A.   I would say yes, but my awareness is very dim.  In
14      other words, I don't have any -- I seem to recall that
15      she was involved in some way or another, but I have no
16      memory of what it was about.
17      Q.   Do you recall when you may have first became
18      aware?
19      A.   I believe it was -- I believe it was at the time
20      that John Preston became a client of the firm.
21      Q.   When was that?
22      A.   I think that was in January or maybe February of
23      1999.
24      Q.   Did you have any discussions with Mr. Preston
```