**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **ROBERT I. HANFLING, CHAPTER 7 TRUSTEE FOR ATG, INC. AND ATG CATALYTICS L.L.C.,** | |
| **Plaintiffs,** | **C.A. No. 05-10077-RGS** |
| **vs.** | |
| **EPSTEIN BECKER & GREEN, P.C., et al.,** | |
| **Defendants.** | **August 7, 2006** |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**MOTION OF DEFENDANT EPSTEIN BECKER & GREEN, P.C.**
**TO STRIKE DEPOSITION TESTIMONY OF ALAN BRAUNSTEIN**

The Plaintiffs, Robert I. Hanfling, Chapter 7 Trustee for ATG, Inc. and ATG Catalytics, LLC (jointly, the "Plaintiffs"), by their attorneys, Jacobs Partners LLC, hereby submit this Memorandum in Opposition to the Motion of Defendant Epstein Becker & Green, P.C. (alternatively the "Defendant" or "EBG") to strike the deposition testimony of Alan Braunstein (the "Motion"). In support of their opposition to Defendant's Motion, the Plaintiffs respectfully represent as follows:

1.      On April 10, 2006, Defendant EBG took the deposition of Alan L. Braunstein, an attorney with the firm Riemer & Braunstein, LLP, which has offices in Boston, Massachusetts. It is undisputed that Mr. Braunstein serves as counsel to Stephen S. Gray (the "MMT Trustee"), Chapter 11 Trustee for, *inter alia*, Molten Metal Technology, Inc. ("MMT"). MMT's jointly administered bankruptcy cases are currently pending in the United States Bankruptcy Court for the District of Massachusetts, Eastern Division.

2.    EBG's motion for summary judgment is currently pending before the Court. Among the issues of fact in dispute in this case is whether there existed an attorney-client relationship between MMT and EBG during 1997 and 1998.  EBG denies that there was attorney-client relationship between MMT and EBG, while Plaintiffs believe there was.

3.    During Attorney Braunstein's deposition, EBG's counsel inquired of Attorney Braunstein whether he believed there was an attorney-client relationship between MMT and EBG.  After Attorney Braunstein testified that he believed there was an attorney-client relationship between MMT and EBG, EBG's counsel asked him to testify about the facts upon which he based his belief.  Attorney Braunstein then testified, at length, as to the basis for his belief that there was an attorney-client relationship between ATG and MMT. [1]

4.    EBG now seeks to strike all of the portions of Attorney Braunstein's testimony referred to by Plaintiffs in opposing EBG's pending Motion for Summary Judgment, on the grounds that the testimony is not independently admissible in evidence. *See* Motion, page 2, ¶4. EBG further asserts that Attorney Braunstein's testimony consists variously of hearsay statements, unsupported conclusions and speculative assertions. *See* Motion, page 3.

5.    However, insofar as Attorney Braunstein's testimony constitutes admissible non-expert opinion testimony based, predominantly, upon admissible evidence, there is no basis to strike the deposition testimony.

***Attorney Braunstein's Testimony Would Be Admissible at Trial.***

6.    Pursuant to Rule 701 of the Federal Rules of Evidence, Attorney Braunstein's testimony regarding his view that there was an attorney client relationship between MMT and EBG will be allowed at trial, provided that: (a) it is rationally based on his perception, (b) helpful to the determination of the fact in issue, and (c) not based on scientific, technical, or other

---

[1] Attached hereto as Exhibit A is a complete true and accurate copy of the transcript from Attorney Braunstein's deposition (hereinafter the "Braunstein Tr.").

specialized knowledge within the scope of Rule 702 of the Federal Rules of Evidence. *See* Fed. R. Evid. 701.

7.     Attorney Braunstein's testimony regarding the existence of an attorney-client relationship between MMT and EBG was rationally based upon facts perceived by him. He explained fully the basis for his belief. He testified that his belief is based upon, among other things, his review of MMT business records. *See* Braunstein Tr., pp. 38 to end.

8.     EBG asserts that Attorney Braunstein's testimony consists of "hearsay" statements. However, most of the facts upon which Attorney Braunstein based his belief are derived from records of MMT, including invoices/bills issued by EBG to MMT for payment, and records evidencing payment by MMT of EBG bills. *See* Braunstein Tr., p. 38, 52; 46-47. In addition, Attorney Braunstein based his conclusion on records related to the MMT bankruptcy case, including the Proof of Claim filed by EBG in MMT's bankruptcy case (see Braunstein Tr., p. 38), and an application to employ EBG as special counsel to MMT that was drafted but never filed with the Bankruptcy Court in MMT's bankruptcy case (*see* Braunstein Tr. pp. 39-40). Copies of many of the records reviewed and relied upon by Attorney Braunstein were produced to all parties in this action. Furthermore, copies of many of these records have been submitted to the Court by both parties in connection with the Pending Summary Judgment.

9.     Insofar as the records relied upon by Attorney Braunstein are business records of MMT, those records would satisfy the "business records" exception to the rule against hearsay. *See* Fed. R. Evid. 803(6). Furthermore, with respect to the bills submitted by EBG to MMT, and the Proof of Claim, those documents constitute admissions, excluded from the rule against hearsay. *See* Fed. R. Evid. 801(d)(2)(A).

10.     As to EBG's contention that Attorney Braunstein's testimony contains "unsupported conclusions and speculative assertions," that contention is without merit and is itself

3

unsupported.  Attorney Braunstein explained the bases for his determination that there was an attorney-client relationship between EBG and MMT.   The fact that EBG does not agree with Attorney Braunstein's conclusion does not mean that the conclusion is unsupported or speculative.

11.    Furthermore, the Court should consider that the MMT Trustee, whom Attorney Braunstein represents, is, by operation of the United States Bankruptcy Code, the person vested with the right to invoke, enforce, or waive any attorney-client relationship between MMT and its attorneys. Thus, it was well within Attorney Braunstein's professional purview to examine the facts and assess wither there was such a relationship between EBG and MMT.

12.    The fact that statements by attorney Daniel Cohn were a factor in Attorney Braunstein's determination that there was an attorney-client relationship between EBG and MMT does warrant exclusion Attorney Braunstein's deposition testimony.  Again, Attorney Braunstein made it clear that Attorney Cohn's statements were not the sole basis for his determination.   *See* Braunstein Tr., p.50

13.    While EBG will be free to challenge the weight of Attorney Braunstein's testimony, there are simply no grounds for complete exclusion of his testimony at this stage of the proceeding.

**WHEREFORE**, for the following reasons, the Plaintiffs respectfully request that the Court deny Defendants' Motion in its entirety.

## REQUEST FOR ORAL ARGUMENT

The Plaintiffs believe that oral argument may assist the Court and wish to be heard.

Dated:   Norwalk, Connecticut
         August 7, 2006

THE PLAINTIFFS,
By their attorneys,
JACOBS PARTNERS LLC

By:     _____ /s/ Robert M. Fleischer _____
        Mark R. Jacobs
        Leslie L. Lane
        Robert M. Fleischer
        Merritt View
        383 Main Avenue
        Norwalk, Connecticut 06851
        Phone: (203) 846-6622
        Fax: (203) 846-6621

        -   and-

        McCARTER & ENGISH, LLPP
        William A. Zucker
        David Himmelfarb
        225 Franklin Street
        Boston, MA 02110
        (617) 345-7000

**Certification of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 7th day of August, 2006.

By: /s/ Robert M. Fleischer ____
Robert M. Fleischer

Page 1

1                                          Volume: I
                                           Pages: 1-103
2                                          Exhibits: 1-7

3              UNITED STATES BANKRUPTCY COURT

4             NORTHERN DISTRICT OF CALIFORNIA

5

6                                    Case Nos.
     IN RE:  ATG, INC., ET AL,       01-46389 N11
7                    Debtors         02-43161 N11
                                     02-43163 N11
8      *   *   *   *   *   *   *   *   *    02-43164 N11

9
     ROBERT I. HANFLING, CHAPTER 11
10   TRUSTEE FOR ATG, INC. and ATG
     CATALYTICS LLC,
11                   Plaintiffs
                                     Adv. Pro. No.
12           vs.                     03-04806

13   EPSTEIN, BECKER & GREEN, P.C.,
     JOHN PRESTON, CHRISTOPHER
14   NAGEL, EUGENE BERMAN, ETHAN
     JACKS, QUANTUM CATALYTIC LLC,
15   ABC CORPS 1 THROUGH 5 and JOHN
     DOES 1 THROUGH 5,
16                   Defendants

17

18

19           DEPOSITION of ALAN L. BRAUNSTEIN, a
     witness called by and on behalf of the Defendant
20   Epstein, Becker & Green, P.C., taken pursuant to the
     Federal Rules of Civil Procedure, before Heidi B.
21   Stutz, Certified Shorthand Reporter No. 146599S and
     Notary Public in and for the Commonwealth of
22   Massachusetts, at the offices of Riemer &
     Braunstein, LLP, 3 Center Plaza, Boston,
23   Massachusetts, on Monday, April 10, 2006, commencing
     at 11:02 a.m.
24

ALAN L. BRAUNSTEIN
4-10-06

Page 2

```
 1  APPEARANCES:
 2     ROBERT M. FLEISCHER, ESQ.
        Morgenstern Jacobs & Blue, LLC
 3      383 Main Avenue
        Norwalk, Connecticut 06851
 4      203-846-6622
        Rfleischer@mjbllc.com
 5        on behalf of the Plaintiffs
 6     PAULA M. BAGGER, ESQ.
        Cooke, Clancy & Gruenthal, LLP
 7      265 Franklin Street
        Boston, Massachusetts 02110
 8      617-428-6800
        Pbagger@ccg-law.com
 9        on behalf of the Defendant Epstein,
          Becker & Green, P.C.
10
       PETER H. SUTTON, ESQ.
11      Riemer & Braunstein, LLP
        3 Center Plaza
12      Boston, Massachusetts 02108
        617-880-3400
13        on behalf of the Deponent
14
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2
    WITNESS:     DIRECT  CROSS  REDIRECT  RECROSS
 3
 4  ALAN L. BRAUNSTEIN  4    93
 5
    EXHIBITS:      DESCRIPTION        PAGE
 6
 7  1    Fax dated 9/25/98          14
 8  2    Confidential Agreement      15
 9  3    Initial Proposal       21
10  4    Motion to Approve Settlement
         Agreement               34
11
    5    Internal Memo dated 12/6/97   45
12
    6    Letter dated 11/10/97      56
13
    7    Plaintiffs' Supplemental
14       Answers to Defendant Nagel's
         First Set of Interrogatories  76
15
16
17
18
19
20  ***ALL EXHIBITS KEPT BY ATTORNEY BAGGER***
21
22
23
24
```

Page 4

```
 1            P R O C E E D I N G S
 2  Whereupon:
 3        ALAN L. BRAUNSTEIN,
 4  having been satisfactorily identified and duly sworn
 5  by the Notary Public, was examined and testified as
 6  follows:
 7        DIRECT EXAMINATION
 8    BY MS. BAGGER:
 9    Q.  Good morning, Mr. Braunstein.
10    A.  Good morning.
11    Q.  Thank you for being here.  My name is
12  Paula Bagger and I represent Epstein, Becker &
13  Green, P.C. which is a defendant in the action
14  Robert I. Hanfling versus Epstein, Becker & Green,
15  et al, Civil Action Number 05-10077, pending in
16  United States District Court.
17        Could you state your full name for
18  the record, please?
19    A.  Alan Louis Braunstein.
20    Q.  And you are currently counsel to the
21  Chapter 11 Trustee of the Molten Metal Technologies
22  bankruptcy?
23    A.  Technically not.  I was counsel.  Plan was
24  confirmed, so now I'm counsel to the plan
```

Page 5

```
 1  administrator.
 2    Q.  And what date was the plan confirmation?
 3    A.  I believe it was February 13th of this
 4  year, 2006.
 5    Q.  And is Stephen Gray the plan
 6  administrator?
 7    A.  He is.
 8    Q.  And was Stephen Gray the Chapter 11
 9  Trustee?
10    A.  He was.
11    Q.  Do you remember the month and year of your
12  appointment as Chapter 11 Trustee?
13        MR. SUTTON:  Objection.  He's not
14  the Trustee.
15    Q.  I'm sorry, as counsel to the Chapter 11
16  Trustee.
17    A.  August, 1998.
18    Q.  And do you recall approximately the date
19  of Mr. Gray's appointment as Chapter 11 Trustee?
20    A.  The way it works is that what happened is
21  the Court enters the order appointing the Trustee.
22  Then the U.S. Trustee makes his choice or her
23  choice.  Actually, at that time, it was his choice,
24  Chris Marshall was the Trustee.  And then the
```

Mycourtreporter@comcast.net

O'CONNOR POLLARD REPORTING, INC.
508-528-2950 * MA: 800-528-2951

Fax:  508-528-3927

ALAN L. BRAUNSTEIN
4-10-06

Page 6

1  Trustee files a document with the court. So it's a
2  process that sometimes is a week to ten days. So
3  the actual date would be the Trustee was appointed
4  on this date, Steve Gray was appointed as Trustee by
5  the U.S. Trustee, and then the court affirmed that
6  appointment. That I believe took place over the
7  last week in August of 1998. I don't remember the
8  exact date. The date that we've been using for
9  purposes of our pleadings are on or about August
10 24thth.
11     Q.  And how much, how long a period of time
12 elapsed between Mr. Gray's appointment becoming
13 final and you being appointed counsel to Mr. Gray,
14 approximately?
15     A.  Again, because of the way it works with
16 regard to bankruptcy, Mr. Gray called us, and
17 ostensibly with our local rules we were asked to be
18 counsel to the Trustee subject to a pleading,
19 subject to the approval of the court. Again, those
20 are three separate days. When you're asked, your
21 employment becomes nunc pro tunc without further
22 order of the court once you apply your application.
23 And when the order enters, it then dates all the way
24 back. All this was a period of I believe late

Page 7

1  August to mid-September of 1998.
2      Q.  At the point that you started acting as
3  counsel to Mr. Gray what was the status of efforts
4  to sell assets of Molten Metal Technology?
5      A.  The Trustee was soliciting offers and in
6  doing so consulted with the debtor's counsel and the
7  creditors' committee, as well as I believe the
8  Blackstone Group. There were number of parties that
9  were involved during the, what we call the debtor in
10 possession period before the appointment of a
11 Trustee. And during that time period the parties
12 had solicited various offers for some of the assets
13 of the debtor. I don't know specifically, but that
14 was the posture that things were in. Blackstone was
15 hired for that purpose. The creditors' committee on
16 its own, we were informed, were looking at the ways
17 to sell Bay City to a liquidator, those sort of
18 things. So the Trustee investigated those avenues
19 that had been explored previously by the predecessor
20 professionals in the case and then set out on what
21 he thought was the most appropriate course going
22 forward.
23     Q.  Did the Blackstone Group's appointment end
24 when you became the -- excuse me, when Mr. Gray

Page 8

1  became the Trustee?
2      A.  The Blackstone Group, as with all
3  debtor-in-possession professionals, ends upon the
4  appointment of a Trustee. The Trustee did not
5  ratify any of those appointments.
6      Q.  Did the recovery group assume some of the
7  work that Blackstone Group had been doing during the
8  debtor-in-possession period?
9      A.  No, not to my knowledge.
10     Q.  Once the Trustee period started what steps
11 did the Trustee take to get the message out to the
12 marketplace about the assets of Molten Metal
13 Technology?
14     A.  I don't know specifically what steps the
15 Trustee took.
16     Q.  Do you have a general sense of how Mr.
17 Gray handled that, handled that work?
18     A.  I do.
19     Q.  And could you describe that?
20     A.  There was already a set number of people
21 who were interested in these various businesses.
22 The committee had already explored the avenues of
23 the residual market such as liquidators and the
24 Trustee would have, presumably did make it known

Page 9

1  through whatever channels that a Trustee makes known
2  that these assets were available for sale as a going
3  concern or if avenues had already been exhausted, as
4  it was with Bay City, then as a liquidation.
5      Q.  If I used the term "wet waste assets" of
6  Molten Metal Technology, would that have a meaning
7  for you?
8      A.  Yes, it would.
9      Q.  Okay. And at the point at which Mr. Gray
10 became involved and you became involved do you
11 remember what firms had evinced an interest in the
12 wet waste assets of Molten Metal Technology?
13     A.  Yes. NUKEM Technology, I believe it's
14 NUKEM in capitals, N-U-K-E-M, Framotome, I believe
15 that's spelled F-R-A-M-O-T-O-M-E, and ATG. There
16 may have been others. Those are the only three that
17 I was aware of as to the wet waste assets.
18     Q.  And if I used the term "CEP assets" of
19 Molten Metal Technology, would that phrase have a
20 meaning for you?
21     A.  Yes, it would.
22     Q.  If I used the term "Q-CEP assets" of
23 Molten Metal Technology, would that have a meaning?
24     A.  Yes, it would.

3 (Pages 6 to 9)

ALAN L. BRAUNSTEIN
4-10-06

Page 10

1    Q.    And in the sense that Molten Metal
2  Technology during the Trustee period used it, were
3  Q-CEP and CEP referring to different sets of assets
4  or the same?
5    A.    Well, just the CEP is a process and there
6  was a CEP process that may have been utilized in
7  connection with Bay City because that was what was
8  envisioned, although Bay City never operated.  So
9  when we referred to Q-CEP we talked about the
10  operations in Oak Ridge, Tennessee and the, I
11  wouldn't say operations, but the administrative
12  aspect of it in Fall River, Massachusetts.
13    Q.    And if I were talking about the Bear Creek
14  Road facility in Oak Ridge, Tennessee, would it be
15  most appropriate to refer to that as one of the
16  Q-CEP assets?
17    A.    Yes.
18    Q.    At the point in time that Mr. Gray took
19  over the position as Trustee and you became his
20  counsel who, if anyone, had shown interest in the
21  Q-CEP assets of Molten Metal Technology?
22    A.    John Preston, Christopher Nagel, and what
23  they would do is we would have several meetings with
24  parties that presumably they had solicited.  In

Page 11

1  other words, I would come to a meeting with Mr.
2  Preston and/or Mr. Nagel would be there along with
3  this investor.  The only one I remember definitely
4  meeting with -- there were more than one -- was
5  Clean Harbors, only because I'm familiar with the
6  name.  So we met with Preston and the Clean Harbors
7  people together.
8    Q.    Okay.  And do I understand you to say that
9  the purpose of that meeting was a suggestion that
10  Preston, Nagel and Clean Harbors might together --
11    A.    That's correct.  Yes, that's how and with
12  the preceding meeting.  I believe Clean Harbors was
13  the last meeting that we had.  And we had at least
14  one, if not two other meetings that preceded that.
15    Q.    And did you, did you attend the meeting
16  with Clean Harbors --
17    A.    I did.
18    Q.    -- Preston and Nagel?
19    A.    I did.
20    Q.    And was Clean Harbors interested in
21  perhaps, or at least in investigating acquiring the
22  Q-CEP assets together with Preston and Nagel?
23    A.    They were there to meet, didn't go to that
24  level as -- they were there to get information.

Page 12

1  There was no --
2    Q.    But they weren't interested in the wet
3  waste assets --
4    A.    To my knowledge --
5    Q.    -- this was all on the Q-CEP?
6    A.    To my knowledge, I was believe it was only
7  on the Q-CEP.
8    Q.    I will try and be shorter and if you will
9  try and slow down a little, the court reporter is
10  having trouble.
11        (Discussion off the record.)
12    Q.    How did you become aware that ATG was
13  interested in purchasing the wet waste assets of
14  Molten Metal Technology?
15    A.    I became aware only with ATG sometime, I
16  believe, in the middle of November, 1998.
17    Q.    What happened in the middle of November of
18  1998 that caused you to become aware?
19    A.    At that time Framotome had advanced an
20  offer for wet waste, but it had been the Trustee's
21  position that he wanted to have a wet waste and
22  Q-CEP sale together because he did not want to be
23  left with the shutdown costs in connection with the
24  Q-CEP operations.

Page 13

1    Q.    Okay.  And so the question is how you
2  became aware of ATG at that time?
3    A.    What happened is that ability -- let me --
4  what happened is Mr. Preston and Mr. Nagel had kept
5  telling the Trustee that this had value and that
6  there would be someone that would be able to be
7  interested in this process and trying to convince
8  the Trustee of its value.  And the Trustee wanting,
9  because of the attendant potential liabilities with
10  shutdown, wanted to see if he could combine a wet
11  waste Q-CEP sale together with the CEP buyer,
12  obviously to absorb the environmental and not have
13  to have the estate be burdened with shutdown costs.
14  And ATG came forward with Preston and Nagel.  In
15  other words, I am not aware outside of a letter from
16  ATG interested in the wet waste at some point in
17  time of dealing with, personally with ATG until such
18  time as ATG, Preston, Nagel were all one.  And this
19  was after we had submitted the offer the purchase
20  wet waste by Framotome.  But in that offer to
21  purchase there was a right of the Trustee to
22  withdraw that offer if he got an offer for both
23  combined.
24    Q.    So --

4 (Pages 10 to 13)

ALAN L. BRAUNSTEIN
4-10-06

Page 14

1      MS. BAGGER:  Actually, Peter, do you
2   have the document that I sent out?
3      MR. SUTTON:  I think that's it.  I
4   left it on your --
5      MS. BAGGER:  I'm sorry.
6      Q.  Let me put in front of you, Mr.
7   Braunstein, a document that I guess we'll mark as
8   Exhibit 1 in this deposition.
9      (Deposition Exhibit No. 1
10         marked for identification.)
11     Q.  Showing you what has been marked as
12  Exhibit 1 in this deposition, have you ever seen
13  that document before?
14         (Document handed to the witness.)
15     A.  I may have, but it's unlikely that I did
16  in September of 1998.
17     Q.  Is there anyone from, on the cover page of
18  the fax, is there anyone from Riemer & Braunstein
19  listed on the cover page?
20     A.  Dan Black.
21     Q.  And who's Dan Black?
22     A.  Dan Black was at that time a junior
23  partner who was working on the Molten Metal case.
24         MR. SUTTON:  He's no longer with the

Page 15

1   firm.
2      Q.  Do you know where Mr. Black is now?
3      A.  He's now at Mintz, Levin.
4      Q.  When you said it was unlikely that you saw
5   it, is there a reason just generally in terms of
6   your work why it would be unlikely?
7      A.  Sure.  At that time period where I was
8   becoming involved only when it became a party that
9   was ready to really sit down and meet with us and
10  talk with us in a ready to go forward, and I was
11  working on other matters in connection with that.
12  And Mr. Black was working on basically farming out
13  any presumably confidentiality agreements or
14  anything in connection with soliciting bids on
15  behalf of Mr. Gray.
16         MS. BAGGER:  Mark that as Exhibit 2,
17  if we can.
18         (Deposition Exhibit No. 2
19            marked for identification.)
20     Q.  I'm going to show you what's been marked
21  as Exhibit 2 in this deposition.
22         (Document handed to the witness.)
23     Q.  Can you identify that document?
24     A.  It says "Confidentiality Agreement."

Page 16

1      Q.  And do you recognize the document?
2      A.  I recognize the document.  I don't know if
3   I've ever seen the document before.
4      Q.  Do you recognize the form of document,
5   let's ask it that way?
6      A.  Yes, I recognize the form of document.
7      Q.  And what is it?
8      A.  It's a confidentiality agreement.
9      Q.  Does it appear to have been sent out in
10  connection with the negotiation of sale of assets in
11  the Molten Metal bankruptcy?
12     A.  Well, again, typically as these arise in
13  every bankruptcy, before one can get information
14  regarding an asset for sale that may have
15  proprietary information, a confidentiality agreement
16  is almost always required to be signed.
17     Q.  Okay.  Would you have any way of
18  estimating how many such agreements the Trustee
19  would have sent out in connection with the sale of
20  assets?
21     A.  None.
22     Q.  You have no way -- it's a very bad
23  question -- not no confidentiality agreements.
24     A.  I'm unaware of who it went to or how many

Page 17

1   were sent out.
2      Q.  Okay.  Do you have any way of estimating
3   how many entities would have submitted an initial
4   offer for the purchase of MMT assets?
5      A.  My understanding is --
6         MR. SUTTON:  Wait a second.  That's
7   a very broad question.  You're asking him all of
8   MMT's assets?
9         MS. BAGGER:  At this point, yes.
10     A.  My answer -- again, why don't you go over
11  the question again, repeat the question?
12         MS. BAGGER:  Could you read the
13  question back?
14         (The previous question was read
15            back by the reporter.)
16     A.  Answer, no.
17     Q.  Do you have any way of estimating how many
18  would have submitted an initial offer for the wet
19  waste assets of MMT?
20     A.  No, except the ones that Stephen would
21  have had me meet with.
22     Q.  And who were the entities or potential
23  purchasers of wet waste assets that Mr. Gray had you
24  meet with?

5 (Pages 14 to 17)

ALAN L. BRAUNSTEIN
4-10-06

Page 18

1    A.  Initially it was just Framotome.
2    Q.  And what was the, do you remember the
3  general time period of that?
4    A.  Yeah.  I believe that was in October.  It
5  was the only party that had submitted an offer that
6  was acceptable to the Trustee.  So I believe that
7  was late October, early November.
8    Q.  After October were there any others that
9  Mr. Gray had you meet with, any other potential
10  acquirers of the wet waste?
11    A.  Right, after we -- again, after October,
12  it was after we had served notice of Framotome, yes,
13  it was NUKEM and ATG and Quantum.  What I'm going to
14  say, Preston and Nagel.  In other words, it was ATG
15  with Preston and Nagel and we were, basically it was
16  named Quantum, I believe, Quantum Catalytics.
17  Additionally with NUKEM, the negotiations were with
18  NUKEM and an entity called Duratech.
19    Q.  Okay.
20    A.  So even though we had talked with NUKEM
21  individually, again, the Trustee wanted to sell both
22  and NUKEM partnered with Duratech.
23    Q.  So just to make sure I understand, after
24  the Framotome offer, there was a joint offer of

Page 19

1  NUKEM and Duratech and a joint offer of ATG and
2  Quantum Catalytic?
3    A.  Yes.  I think what happened was NUKEM made
4  its offer, Trustee said I got this Framotome, you
5  really want to get it, I'm selling the Q-CEP with
6  it.
7    Q.  Based on the fact that you don't believe
8  you saw Exhibit 1 in the September time period, can
9  you infer that that offer was found unacceptable?
10    A.  I can make that, yes.
11    Q.  When you met with ATG -- did you say that
12  was in November?
13    A.  In November, yes.
14    Q.  When you met with ATG in November with
15  whom did you meet?
16    A.  I met with Rick Mikels.
17    Q.  Anyone else?
18    A.  And other parties that I had not met for
19  the first time.
20    Q.  Do you know who any of the others were?
21    A.  Some of the parties that were in the room
22  at the time I believe was either John Preston or
23  Chris Nagel or both, I believe there were one or two
24  representatives from ATG -- again, you're talking

Page 20

1  about the first meeting?
2    Q.  Yes.
3    A.  The first meeting was here in this office.
4  But I do remember Rick Mikels is really the only
5  one, because he's the only one I was dealing with at
6  the time.  The others were peripheral to me.
7    Q.  Rick Mikels is an attorney at Mintz Levin?
8    A.  At Mintz Levin, that's correct.
9    Q.  Who did he represent in this meeting?
10    A.  He was representing the purchaser that
11  turned out to be really Quantum.  I don't know -- by
12  the way, there may have been other attorneys there,
13  but...
14    Q.  When you say "representing the purchaser,"
15  the purchaser of what?
16    A.  Well, again, what we were doing at that
17  time was negotiating a combined deal as a
18  counteroffer to Framotome.  And the document which
19  was the form of the counterproposal, if you will,
20  was what was filed with the court.  So again, I'm
21  not specifically familiar with what went on
22  specifically there.  I know it went until 3:00 a.m.
23  and I really don't have much of a memory in terms of
24  what went on because it started in the afternoon and

Page 21

1  we ended up with a document that was submitted to
2  the court and then later had to be revised.  But
3  again, I remember the meeting, but I remember
4  focusing primarily with Mr. Mikels and there were a
5  lot of other people there.  Again, I really just
6  don't remember who was there because there were a
7  series of other meetings up until the court hearing
8  and people were, again, coming in and out.  I do
9  remember people who ultimately, if you asked me who
10  was at one of the three meetings, I can identify
11  those names, but I don't know who was at each
12  specific meeting because meetings went from place to
13  place.
14    Q.  Okay.  And just focusing for the moment on
15  this first meeting --
16    A.  Yes.
17    MS. BAGGER:  Mark this as Exhibit 3.
18    (Deposition Exhibit No. 3
19    marked for identification.)
20    Q.  You have in front of you a lengthy
21  document that has been marked as Exhibit 3 in this
22  deposition.  Can you identify that document?
23    A.  I can.
24    Q.  Can you tell me what it is?

6 (Pages 18 to 21)

ALAN L. BRAUNSTEIN
4-10-06

Page 22

1    A.   I believe it was the initial proposal that
2  was negotiated either before, during or after that
3  meeting I referred to in November where, again, the
4  only one I specifically remember being there was
5  Rick Mikels.
6    Q.   And I guess you, I think you previewed my
7  next question.  Do you know whether this was the
8  product of that meeting?
9    A.   It's honestly difficult for me to say
10  because I think there were three iditerations.
11  Because we had that meeting, then we went into
12  court, the court then had us meet, I believe it was
13  immediately thereafter.  I remember two dates,
14  November 6 and November 13th, and I don't remember
15  which one precipitated the court saying come back
16  the next day and revise this because it's not in
17  acceptable form with the local rules and a host of
18  other things.  Then we went through a series of --
19  again, these were like marathon meetings going from
20  place to place.  So I believe this is the first of
21  the documents that were negotiated -- submitted and
22  I don't know if it, again, preceded the meeting or
23  was after the meeting.  I know it went through two,
24  perhaps three iditerations.

Page 23

1    Q.   If I were to represent to you that the
2  deadline for counteroffers to the Framotome offer
3  was November 6th, 1998, would that help you place
4  this meeting or this document?
5    A.   It may or may not, only because, again, I
6  don't know if this was submitted before of them --
7  if I saw our name somewhere on this, it would make
8  it much easier for it.  I don't know if they just
9  submitted this and then they met with us right after
10  to negotiate what ultimately became the offer or
11  whether this was a product of our negotiation at the
12  11th hour to submit this together in a form that
13  would be acceptable to the Trustee.
14    Q.   I take it from your previous answer that
15  you don't recall what individuals, if any, were at
16  that first meeting on behalf of ATG, is that
17  correct?
18    A.   There were a number of people there.  The
19  only one I remember was Rick Mikels and Dan Black,
20  my partner at the time.  Those are the only two
21  people I can tell you were definitely at that
22  meeting.
23    Q.   If you aggregate the meetings --
24    A.   Sure.

Page 24

1    Q.   -- held between that first meeting and up
2  to when the court entered the sale order, do you
3  recall meeting with any identifiable individuals
4  representing ATG?
5    A.   Again, I can tell you the individuals.  I
6  can't say whether they were representing in a legal
7  capacity with ATG.  I can tell you the people who
8  were there that I perceived --
9    Q.   Attending on behalf of.
10    A.   -- were on behalf of.  Whether they -- in
11  what capacity, I just don't know.
12    Q.   Okay.
13    A.   But there was Kevin Walsh at one of the
14  meetings from Mintz.
15    Q.   Are you giving me a list of people who
16  were there on behalf of ATG or just who were there
17  at all?
18    A.   Who were there and not on behalf of the
19  Trustee.
20    Q.   Okay.
21    A.   And not on behalf of any other party but
22  the bidder.  Ethan Jacks, Christopher Nagel, Eugene
23  Berman, John Preston, Bill Hewitt.
24    Q.   Hewitt?

Page 25

1    A.   Hewitt.  I believe it's H-E-W-I-T-T.  He I
2  knew definitely was affiliated with ATG.  The others
3  I gave you were former Molten officers, and Nagel
4  was both an officer and director.  Excuse me,
5  Preston was only a director, not an officer.  And
6  there were, I believe, Frank Chin.  He was an Asian
7  American person on behalf of ATG.  And I'm quite
8  certain there was another woman, I believe his
9  spouse, but I'm not, that I'm not certain.  But --
10    MR. FLEISCHER:  May I interject for
11  just a moment?  Could the name you are thinking of
12  actually be Chiu?
13    THE WITNESS:  Yes, I would stand to
14  be corrected, Frank Chiu.
15    MR. FLEISCHER:  And the other person
16  would have been Doreen Chiu?
17    THE WITNESS:  Wouldn't know her
18  first name, wouldn't know her last name, but I was
19  told that they were husband and wife.
20    Q.   Okay.  Anyone else?
21    A.   Yes.  Again, throughout the negotiation
22  process, I don't know when, but at one point I was
23  introduced to Jarvis Kellogg.
24    Q.   Okay.  I'm just going to recap the list

7 (Pages 22 to 25)

ALAN L. BRAUNSTEIN
4-10-06

Page 26

1   and then ask you if there's anyone else.
2       A.   Rick Mikels, obviously.
3       Q.   The list as I have it includes Rick
4   Mikels, Kevin Walsh, Ethan Jacks, Christopher Nagel,
5   Eugene Berman, John Preston, Bill Hewitt, Frank
6   Chiu, his wife, and Jarvis Kellogg.
7       A.   Yes.
8       Q.   Are there any other names that --
9       A.   From the beginning, from November
10  through the end of the sale process those were the
11  people who were there. And I believe, again,
12  because someone was referring to Mr. Chiu's wife, I
13  believe he was there and may have been at the
14  hearing. Again, I don't know who was where when. I
15  do know in some locations who was where, for
16  example, at Mintz, Levin.
17      Q.   Okay. Did you ever, do you remember
18  whether you ever talked to Jarvis Kellogg outside of
19  large meetings of the acquiring group? Did you have
20  reason to have telephone communications or other
21  meetings with Mr. Kellogg?
22      A.   No, I don't believe so.
23      Q.   Do you know whether you had any reason to
24  have one-on-one communications with Mr. Hewitt?

Page 27

1       A.   I'm quite certain I did not have.
2       Q.   And same question for either Mr. or Mrs.
3   Chiu?
4       A.   No, I don't believe I spoke directly with
5   any of them.
6       Q.   Okay. Is it your practice to take pencil
7   notes of meetings of this sort?
8       A.   Well, normally if you have one or other
9   attorneys that are with you, one of the attorneys
10  does. So it's a practice if I'm the only attorney
11  that's in the room, that I would take notes or,
12  again, work on a document, if you will. Because
13  most of this was document sensitive. So I would
14  just write there. But generally someone would be
15  doing that is generally our firm's policy.
16      Q.   And do you know who took notes of any of
17  these meetings that you have been testifying to
18  during this November period?
19      A.   I don't know who would have taken notes.
20      Q.   Okay. Should there be notes in Riemer &
21  Braunstein's closed files of any of these meetings?
22      A.   I don't believe so.
23      Q.   And why would that be?
24      A.   Because at that time certainly I was not

Page 28

1   taking notes. Mr. Black was there and may have.
2   But again, we were working on a document. So it
3   would have been drafts of the document that we were
4   working on in connection with the sale.
5       Q.   You said that ATG and Quantum Catalytic
6   originally came to your attention as a joint bidder
7   or a potential joint acquirer of the wet waste and
8   Q-CEP assets, is that correct?
9       A.   That's correct.
10      Q.   Do you remember the general outline of the
11  initial offer that they came in with?
12      A.   I believe -- and again, it would be
13  reflected in here -- but the general offer was a
14  purchase of wet waste and Q-CEP and also included in
15  that were other assets located at the M4 mixed waste
16  facility, because that housed a number of the assets
17  that were used in both operations.
18      Q.   Is the M4 center sometimes referred to as
19  the tech center in documents?
20      A.   That's correct.
21      Q.   Do you recall how in the initial offer to
22  purchase the wet waste assets and the Q-CEP assets
23  were allocated between Quantum Catalytics and ATG?
24      A.   I do not.

Page 29

1       Q.   Was there real estate involved?
2       A.   There was.
3       Q.   Can you describe to me the real estate
4   that was involved in the transaction?
5       A.   The real estate was in Oak Ridge where the
6   Q-CEP operations were. Q-CEP owned the real estate
7   that was sold in connection with the sale.
8       Q.   That's the Bear Creek Road?
9       A.   Bear Creek facility.
10      Q.   Was there also Barnwell, South Carolina
11  real estate?
12      A.   There was Barnwell, South Carolina, a plot
13  of land where the ingots were buried.
14      Q.   Do you recall whether there were any
15  particular issues that arose with respect to the
16  issue of the acquisition of the assets?
17      A.   There were issues with regard to the sale
18  process and also with respect to the closing and
19  post-closing. So I can go through a litany of what
20  those issues were.
21      Q.   What issues arose during the negotiation
22  process?
23      A.   The negotiation process was simply, again,
24  the negotiation between the parties and the

8 (Pages 26 to 29)

ALAN L. BRAUNSTEIN
4-10-06

Page 30

1  particular issues relating to what we call the
2  financial assurance.
3      Q.  When you say "between the parties," do you
4  mean between the Trustee and the joint bidder?
5      A.  Well, the Trustee and the joint bidder and
6  the necessity to ensure that we, the Trustee, able
7  to get the cash value of what we call the letter of
8  credit on these bonds that were posted for financial
9  assurance and it was in compliance with what the
10  state of Tennessee wanted with regard to any
11  acquirer.  So we had to make sure that the acquirer
12  was one that would be able to post the financial
13  assurance with the Trustee and we would negotiate,
14  again, part of the negotiation process for also the
15  cash collateral behind the letter of credit coming
16  back into the estate.  And there were just general
17  issues in connection with that because of the
18  necessity to show the Trustee that it had the
19  wherewithal to convince the state of Tennessee that
20  it could get that financial assurance.
21      Q.  Any other issues that come to mind as
22  major issues in the negotiation of the --
23      A.  Just -- no major issues that I'm aware of.
24  Just the negotiation, which was a major negotiation

Page 31

1  process, if you will.
2      Q.  You said that there were issues that arose
3  with respect to the closing?  Are those different
4  ones that come to mind?
5      A.  That's correct.
6      Q.  Could you describe those for me?
7      A.  In general terms, because I didn't attend
8  the closing, the entire closing, I think it was a
9  two-day process, and there was a problem with --
10  again, this is what I remember -- Quantum coming up
11  with the money to purchase what it was going to do,
12  because I believe there was some sort of agreement
13  between Quantum and ATG.  All I know is that when it
14  came time to the closing, we had problems in
15  connection with how we were going to close this
16  because there wasn't enough money to close.  And
17  there were means in which to effectuate that
18  resolution that were implemented with the Trustee
19  and with the lender.  They were all resolved.
20      Q.  What generally were the means that were
21  implemented?
22      A.  I'm sorry?
23      Q.  What generally were the means that were
24  implemented?

Page 32

1      A.  There was an agreement reached, at least
2  from our side, our side, where we collateralized the
3  differential amount they couldn't come up with at
4  the closing with the accounts receivable.  So when
5  the receivables would be collected, that would go
6  and reduce that balance.  That's in addition to the
7  installment obligations.  And were there also
8  various escrows established.
9      Q.  Were there any objections from third
10  parties that had to be addressed prior to the entry
11  of the bankruptcy sale?
12      A.  To my knowledge, no, because we involved
13  the State of Tennessee Attorney General's office in
14  the process, invited them to attend and, further,
15  invited them to meet with each of the two bidders.
16  At that time it was just NUKEM, Duratech and ATG/
17  Quantum.  So we engaged them in the process since
18  they were the ones that had to really essentially
19  approve it since it was a regulated business.
20      Q.  And did the State of Tennessee make any
21  demands with respect to the structure of the deal?
22      A.  Only with regard to the financial
23  assurance and that the companies that would be
24  purchasing it were able to meet the regulation

Page 33

1  demands regarding the material.  In other words, be
2  able to access what we call nuclear guards, security
3  guards, those kinds of things.
4      Q.  And to your knowledge, did that, did those
5  concerns on behalf of the State of Tennessee affect
6  the manner in which the transaction was structured?
7      A.  The manner in which any transaction would
8  be structured.
9      Q.  In which this one, the ATG/Quantum one was
10  structured.
11      A.  Yes.  The reason why I was doing the
12  answer, they also with regard to NUKEM, they each
13  met with each one to become satisfied.
14      Q.  And do you recall -- well, with respect to
15  NUKEM/Duratech, do you recall whether anything
16  needed to be changed in that deal or what needed to
17  be done to that bid in order to satisfy the State of
18  Tennessee?
19      A.  I don't specifically know since I wasn't
20  the one doing the satisfying.  I knew that they
21  ultimately met with each party and became satisfied
22  with whatever arrangements they particularly made.
23      Q.  Okay.  Same question, if I asked you that
24  question with respect to ATG/Quantum, you also

9 (Pages 30 to 33)

ALAN L. BRAUNSTEIN
4-10-06

Page 34

1  wouldn't have any personal knowledge as to what was
2  done?
3      A.  I wouldn't have personal knowledge, except
4  that there was a resolution.
5      Q.  Would Mr. Black have knowledge of that, do
6  you know?
7      A.  No.  It was, again, it was just
8  satisfying, each entity was satisfying the State of
9  Tennessee on its own.
10      Q.  And the Trustee was happy as long as the
11  State of Tennessee was happy?
12      A.  That's correct, yes.
13      Q.  Essentially in terms of --
14      A.  Essentially, yes.  We essentially
15  predicated a sale that, with Tennessee in the
16  courtroom, that they would be okay with.
17      MS. BAGGER:  Ask you to mark that.
18      (Deposition Exhibit No. 4
19      marked for identification.)
20      Q.  I'm going to show you what's been marked
21  as Exhibit 4.
22      (Document handed to witness.)
23      A.  Thank you.
24      Q.  Do you recognize Exhibit 4?

Page 35

1      A.  I do.
2      Q.  Can you tell me what it is?
3      A.  It's the motion and attached to the motion
4  is the stipulation of settlement between the Trustee
5  of Molten Metals and the Trustee of ATG, meaning the
6  Trustee in bankruptcy.
7      Q.  And this was submitted to the bankruptcy
8  court and it was allowed?
9      A.  That's correct.
10      Q.  And was a similar document submitted to
11  the bankruptcy court in the Northern District of
12  California, do you know?
13      MR. FLEISCHER:  Why don't I just
14  respond to that since I'm counsel representing the
15  Trustee?  The answer to the question is yes, because
16  I submitted it to, as counsel to Robert Hanfling.
17  The court approved that document.  It's a matter of
18  public record.
19      Q.  And were you involved in the negotiation
20  of this document?
21      A.  I was.
22      Q.  And did you work with Mr. Fleischer on
23  this document?
24      A.  I did.

Page 36

1      Q.  Want to --
2      A.  I think it would be on the settlement
3  agreement itself.
4      Q.  And did someone else in the office most
5  likely prepare the motion to allow?
6      A.  I prepared the motion, but I believe what
7  we do is, again, we get the settlement agreement, we
8  prepare the motion and circulate it.  I don't know
9  if we got comments on that or solicited comments on
10  that beforehand, but yes as to the settlement
11  agreement, most definitely.
12      Q.  Understood.
13          I'd like to call your attention to
14  paragraph 10.
15      MR. FLEISCHER:  Are you referring to
16  the --
17      Q.  Paragraph 10 of the settlement agreement,
18  I'm sorry.
19      MS. BAGGER:  Thank you.
20      Q.  Has Mr. Gray provided any express written
21  waivers of any attorney/client privileges since the
22  entry of this agreement?
23      A.  I don't know.
24      Q.  In any event, he hasn't asked you to work

Page 37

1  with him on any such thing?
2      A.  That he would have been asking Mr. Sutton
3  regarding those matters.
4      Q.  What facts cause you to believe that there
5  is an attorney/client privilege or there was an
6  attorney/client privilege between MMT and EBG?
7      A.  I'm not understanding the question.
8      Q.  This is about the company that you negotiated
9  with counsel for Mr. Hanfling, correct?
10      A.  Uh-huh.
11      Q.  And in this document Mr. Gray is agreeing
12  to waive attorney/client privilege as necessary and
13  appropriate, including, but not limited to, the
14  attorney/client privilege between MMT and EBG.
15  Correct?
16      A.  Yeah.  Are you asking me what case --
17      Q.  My question to you is what causes you to
18  believe that there existed an attorney/client
19  relationship and/or privilege between MMT and EBG?
20      A.  If your question is here as it's written
21  in the sentence, I don't think it says definitively
22  there is or is not an attorney/client privilege, and
23  I'm just confused in terms of if you're talking
24  about in law what right does a trustee have to waive

10 (Pages 34 to 37)

ALAN L. BRAUNSTEIN
4-10-06

Page 38

1   an attorney/client privilege.
2       Q.   I'm asking a very different question.  Do
3   you believe that there was, do you have any reason
4   to believe that there was an attorney/client
5   relationship at any time between Molten Metal
6   Technology and Epstein, Becker & Green?
7       A.   I do believe there was.
8       Q.   And what facts cause you to believe that?
9       A.   One, Epstein Becker filed a proof of claim
10  in the bankruptcy case.
11          MR. SUTTON:  Which bankruptcy case?
12          THE WITNESS:  In the bankruptcy case
13  of Molten Metals.  I presume when I use "bankruptcy
14  case" in the future it will mean the Molten Metal
15  case.
16      Q.   And that was a proof of claim for
17  attorneys' fees?
18      A.   That's correct.
19      Q.   Is there anything else that causes you to
20  believe there was an attorney/client relationship?
21      A.   Yes.  Epstein Becker bills were sent to
22  Ethan Jacks.  I believe they said "work product" on
23  it and the bills weren't redacted.
24          MR. SUTTON:  Excuse me.  You said

Page 39

1   you believe they said "work product"?
2       A.   Or privilege, or something, that buzz word
3   that led me to make that observation that there was
4   some attorney/client privilege that existed between
5   the two.
6       Q.   Do you have a recollection sitting here
7   today what they said?
8       A.   On the cover letter or what they may have
9   said --
10      Q.   Well, you said work product --
11      A.   Confidential, privileged, work product.
12  Again, I don't remember exactly the buzz word.  But
13  when I looked at it I said it's not -- if I were
14  representing the company, that's the kind of bill
15  that I would send to the company or to the company's
16  general counsel or to the assistant general counsel,
17  Gene Berman.  So I mean the bills and the cover
18  letters themselves, as well.
19      Q.   Anything else that you rely upon for the
20  conclusion?
21      A.   Yes.  Specifically I had a meeting with
22  Dan Cohn after I reviewed some records at his
23  office, including a draft application to employ
24  Epstein Becker as special counsel.  And I inquired

Page 40

1   about, from Mr. Cohn, I believe this was in the year
2   2000, what happened with regard to that.  And he
3   informed me that Epstein Becker -- it was not filed
4   with the court and I asked him why.  And he informed
5   me that Epstein Becker would not go forward unless
6   their -- would not waive, would not go forward and
7   waive its claim in the bankruptcy case.
8       Q.   Would not go forward to do what, did he
9   say?
10      A.   Would not represent the debtor as special
11  counsel or represent interests of the debtor as its
12  special counsel, I believe representing certain
13  individuals.
14      Q.   So you remember that they were
15  representing -- I guess what is your memory of what
16  the draft --
17      A.   Well, the conversation --
18      Q.   No, no.  Let me finish the question.
19          What is your memory of what, first
20  of all, of what the draft application to employ
21  indicated that Epstein Becker was going to do?
22      A.   I don't remember.
23      Q.   Okay.  What is your memory about who --
24  this is Dan Cohn?

Page 41

1       A.   Dan Cohn.
2       Q.   -- who Dan Cohn said that Epstein Becker
3   was refusing to continue to represent unless their
4   proof of claim was met?
5       A.   Well, it came up as a question regarding
6   why Bingham -- because there was also one regarding
7   Bingham, and Bingham, they said they were employing
8   Epstein because Bingham refused or would not go
9   forward on the same grounds, it would not waive its
10  claim.
11      Q.   Mr. Cohn --
12      A.   Was counsel to the debtor.
13      Q.   Let me ask you a question.
14          It's your recollection that Mr. Cohn
15  said that they were going to retain Epstein, Becker
16  & Green to replace Bingham, Dana & Gould?
17      A.   That was my understanding of what was
18  said, yes.
19          Let me correct the word "replace."
20  Because it's bankruptcy court, Bingham Dana would
21  not agree to be counsel.  They weren't counsel in
22  the bankruptcy, they weren't approved in the
23  bankruptcy because they did not submit an
24  application.

ALAN L. BRAUNSTEIN
4-10-06

Page 42

1    Q.  Do you remember when this conversation
2  took place?
3    A.  I believe in the spring of 2000.
4    Q.  Okay.
5    A.  And my, I just want to make sure I answer
6  the question.
7    Q.  I want to make sure -- yes.  My question
8  was what causes you to believe that there was an
9  attorney/client relationship between EBG and MMT.
10  And I guess let me just, in spring of 2000 was MMT
11  retaining counsel?
12    A.  No.  At that time that's when I found a
13  number of documents in Mr. Cohn's files, including
14  what we've called the McConchie letter.
15    Q.  I just want to take a step back.  When you
16  said this was in the spring of 2000 that there was a
17  question whether or not Epstein, Becker & Green was
18  going to replace Bingham, Dana & Gould --
19    A.  No, I'm sorry.  During the spring of
20  2000 --
21    Q.  Yes.
22    A.  -- I went through certain records,
23  additional records at Cohn & Kelakos and I found
24  records that I had never seen before.  This was

Page 43

1  among them.  And I asked Mr. Cohn a question.  It
2  was not the focus of what I was there to look at.
3  It just was in the documents that Mr. Cohn --
4  basically drafts of documents.  And I saw that and I
5  asked him that along with a hundred other questions
6  on other matters.
7    Q.  Okay.  So in the spring of 2000 you're
8  talking to Dan Cohn about a draft application to
9  employ that was dated when?
10    A.  I don't know.
11    Q.  Was it dated from the, before or after the
12  bankruptcy?
13    A.  My belief in when this was all being done
14  was at the beginning of the case, so it would have
15  been December of '98 -- '97 or January, '98.  That's
16  the time frame that I remember as the vintage of
17  when it was from.
18    Q.  During the debtor-in-possession period of
19  the bankruptcy?
20    A.  Because in 2000 Dan Cohn had no powers in
21  this case.  Obviously it wouldn't have been
22  applicable.
23    Q.  And what was it that Mr. Cohn said to you
24  in the spring of 2000 about this draft application

Page 44

1  to employ?
2    A.  That they intended to employ Epstein
3  Becker in the case.
4    Q.  They had intended to employ them?
5    A.  They had intended to, that's correct.
6    Q.  And that they had intended to employ
7  Epsetin, Becker & Green as counsel to the debtor in
8  possession?
9    A.  Again, didn't get into specifics.  It was
10  special counsel and that was it.  It was not, at
11  that time there was not anything that was of concern
12  to me.  I asked that question more of curiosity than
13  anything else.
14    Q.  Do you know whether it was to represent
15  employees of the debtor in possession?
16    A.  I don't remember.
17    Q.  Or the debtor in possession itself?
18    A.  I don't remember.  All I know, again,
19  special counsel to the debtor is what I remember.
20    Q.  Did you take a copy of that document?
21    A.  I did.
22    Q.  And was that one of the documents that was
23  produced this morning?
24    A.  I would not know.

Page 45

1        MS. BAGGER:  I presume -- off the
2  record.
3        (Discussion off the record.)
4        (Recess 12:00-12:04 p.m.)
5        MS. BAGGER:  Mark this as the next
6  numbered exhibit.
7        (Deposition Exhibit No. 5
8        marked for identification.)
9    Q.  I'm putting in front of you a document
10  that's been marked as Exhibit 5 in this deposition.
11        (Document handed to witness.)
12    Q.  Do you recognize that document?
13    A.  I do.
14    Q.  Is this the document that we were
15  discussing a moment before?
16    A.  It was.
17    Q.  This is a document that you took a copy of
18  from the files of Cohn & Kelakos during the spring
19  of 2000?
20    A.  Again, from files of Cohn & Kelakos.  I
21  said I believe it's the spring of 2000.  It's my
22  memory.  It could be corrected.
23    Q.  Is this a document that you rely upon for
24  the conclusion that there was an attorney/client

12 (Pages 42 to 45)

ALAN L. BRAUNSTEIN
4-10-06

Page 46

1  relationship between Epstein, Becker & Green and
2  Molten Metal Technology?
3      A.  No.
4      Q.  Was this the document that you were
5  referring to when you were listing for me the
6  reasons why you thought there was an attorney/client
7  relationship between --
8      A.  Yes, it was.
9      Q.  But this document itself doesn't lead you
10  to this conclusion?
11      A.  No.
12      Q.  Was it, rather, your conversation with Dan
13  Cohn that led you to the conclusion?
14      A.  It was that and the fact that afterwards,
15  to have seen this and then to have seen that the
16  debtor then ended up, nonetheless, paying Epstein,
17  Becker & Green post petition to do exactly what I
18  presume it was intended to do in connection with
19  this application.
20      Q.  I'm sorry, I'm afraid you're going to have
21  to understand, how do those two factors together,
22  what is their significance to you?
23      A.  The significance is that Epstein, Becker &
24  Green nonetheless represented the debtor or various

Page 47

1  individuals and was paid by the debtor.  In fact, I
2  believe there was another letter I saw from Carole
3  Schwartz Rendon to Gene Berman demanding payment
4  post petition during the bankruptcy when they hadn't
5  been retained and she was demanding money from the
6  debtor and the debtor was in fact paying that money.
7      Q.  When you give that answer, is there
8  something about this case, this matter arising in
9  the context of a bankruptcy that is significant?
10      A.  Yes.
11      Q.  Could you explain?
12      A.  In order to get paid in a bankruptcy case
13  you have to be specifically retained.
14          MR. SUTTON:  Employed.
15      A.  Employed, I stand corrected.
16          MR. SUTTON:  By whom?  Explain.
17      A.  You have to be employed, authorized to be
18  employed, one, by the debtor or Trustee or
19  committee, and that retention has to be approved by
20  the bankruptcy court.  And in doing that, and in
21  doing that you're required to make very definitive
22  financial disclosures.
23      Q.  "You," meaning the law firm?
24      A.  The applicant is supposed to make --

Page 48

1      Q.  Let me ask the question.  When you say
2  "the applicant," you mean the law firm?
3      A.  The law firm.
4      Q.  And what financial disclosures is the
5  applicant law firm --
6      A.  Not just financial -- I'm sorry.
7      Q.  Your previous answer was financial
8  disclosures.  What financial disclosures is the law
9  firm applicant required to make?
10      A.  Financial disclosures would be in terms
11  of, one, what you're owed, two, the past history of
12  payments that you received, from what sources.
13      Q.  Okay.
14      A.  And other relevant disclosures if there
15  are such that are non financial.  In other words,
16  your connections with the debtor, its officers, its
17  employees, as specified in the bankruptcy rules and
18  local rules and the First Circuit decisions.
19      Q.  Okay.  And if a law firm does not --
20  strike that.
21          If a law firm representing the
22  debtor does not get itself employed with the
23  imprimatur of the bankruptcy court, what result
24  follows from that?

Page 49

1      A.  If it doesn't get employed?
2      Q.  Right.
3      A.  One, to the extent it received any fees,
4  that would be subject to disgorgement or recovery
5  under Section 549 of the Bankruptcy Code.
6      Q.  A law firm that represents employees of a
7  debtor in possession who are entitled to
8  indemnification by the company I presume would, or
9  do I understand you telling me should also file an
10  application for employment?
11      A.  A law firm that would represent the
12  employees for which the debtor has any obligation to
13  pay or subrogation in my view would have to seek
14  employment to the bankruptcy court.
15      Q.  And if it does not do so, what result
16  follows if it does not do so?
17          MR. SUTTON:  I think we're getting a
18  little far afield here.  He's not being deposed as
19  an expert.  He's being deposed as a fact witness.
20  I've let you go on a little bit, but he's not here
21  to answer questions about the Bankruptcy Act and
22  hypotheticals.  If you want to customize the
23  question as to this case, that's fine.
24          MS. BAGGER:  Okay.  Fair enough.

13 (Pages 46 to 49)

ALAN L. BRAUNSTEIN
4-10-06

Page 50

1    Q.   I believe you testified a moment ago that
2    it was not, in fact, the memo that's been marked as
3    Exhibit 5 that caused you to believe that there was
4    an attorney/client relationship between Epstein,
5    Becker & Green and Molten Metal Technology, but,
6    rather, an oral conversation that you had with Mr.
7    Cohn, is that correct?
8    A.   There were -- again, that was one of the
9    indicia, not that per say, obviously, but --
10    Q.   But the conversation you had with Mr. Cohn
11    was a factor in your conclusion that there was an
12    attorney/client relationship --
13    A.   It was one of the factors --
14    Q.   -- there was an attorney/client
15    relationship between Epstein Becker and Molten
16    Metal, correct?
17    A.   That's correct.
18    Q.   And you told me that Mr. Cohn told you
19    that Epstein, Becker & Green had continued billing
20    the debtor in possession without filing an
21    application to employ, correct?
22    A.   No, I didn't tell you that Mr. Cohn told
23    me that.
24    Q.   Okay.  What did Mr. Cohn tell you, since

Page 51

1    Mr. Cohn -- take a step back.  Was there anything
2    that Mr. Cohn told you during this conversation in
3    which you saw Exhibit 5 that led you to believe that
4    there was an attorney/client relationship between --
5    that was a factor in causing you to believe that
6    there was an attorney/client relationship between
7    Epstein, Becker & Green and Molten Metal Technology?
8    A.   Only a factor.
9    Q.   What was it that he said?
10    A.   That he intended to employ Epstein Becker
11    because Bingham was not going to be special counsel,
12    and that Epstein would not agree to that application
13    you see there if it had to waive its claim.
14    Q.   Do you know what work Bingham was doing
15    for Molten Metal Technology during the
16    debtor-in-possession period?
17    A.   No, Bingham did not represent the debtor
18    during the debtor-in-possession period.
19    Q.   And that's --
20    A.   This is prior to --
21    Q.   And that's your understanding from Mr.
22    Cohn?
23    A.   That's, again, Bingham was not employed,
24    retained or otherwise in the bankruptcy case by any

Page 52

1    party.
2    Q.   And what's your, how do you know that?
3    A.   Because Bingham, the docket and Bingham
4    for a fact did not.  The docket would reflect who
5    was employed and Bingham was not employed.  I did
6    check the docket specifically at the beginning of
7    the case as to who had been employed by each of the
8    professionals during the debtor-in-possession
9    period.
10    Q.   So your review of the docket is what you
11    rely upon?
12    A.   Yes.
13    Q.   Okay.  Did Mr. Cohn tell you what he
14    intended to employ Epstein Becker to do?
15    A.   No.
16    Q.   Do you know, other than your review of
17    bills rendered, do you have any information about
18    any work that Epstein Becker did during the
19    debtor-in-possession period?
20    A.   The bills would speak for itself during
21    that period.
22    Q.   And did you examine the bills to see what
23    Epstein Becker did?
24    A.   I did.

Page 53

1    Q.   And what did your review of the bills tell
2    you Epstein Becker did?
3    A.   That Epstein Becker was communicating with
4    certain employees of the debtor and the debtor
5    regarding various matters that were purported to be
6    in connection with various investigations.
7    Q.   And do you have any information about
8    whose interests Epstein, Becker & Green was
9    representing in those investigations?
10    A.   I believe the debtor's interests.
11    Q.   And upon what do you base that conclusion?
12    A.   Because at that point in time my
13    understanding from review of other records in the
14    case that the investigation at that time was
15    focusing in on what we call the invoice issue and
16    the Q2 and Q3 1996 misstated earnings, and that at
17    least one of the key employees who in files we found
18    stated that she had the smoking gun regarding the
19    invoice issue was one of the persons listed on the
20    time records.
21    Q.   What's that person's name?
22    A.   Rhonda Walker, and was the same person
23    who, if I remember correctly, was being currently
24    investigated by the Trustee with regard to the

14 (Pages 50 to 53)

ALAN L. BRAUNSTEIN
4-10-06

Page 54

1   information that she had -- when I mean currently,
2   at the time I made this conclusion and learned about
3   this. And I believe I had seen a document from
4   Rhonda Walker's attorney stating that as part of the
5   settlement agreement with Molten Metal in her,
6   quote, severance or leaving she was required to
7   retain Carole Schwartz Rendon and Epstein, Becker &
8   Green and, if I remember correctly, that lawyer's
9   letter raised an issue in connection with that
10  representation as being a conflict.
11      Q.   Did you take a copy of that letter?
12      A.   I don't know if I took a copy of that
13  letter.
14      Q.   Where would that letter --
15          MR. SUTTON: That letter is in the
16  documents.
17          MS. BAGGER: I think it might make
18  sense, we might just need to bring the whole ATG,
19  that whole folder that that document came out of.
20  We can go off the record.
21          (Discussion off the record.)
22      Q.   Before we broke, Mr. Braunstein, I should
23  say during our break I noticed that you were taking
24  the opportunity to read Exhibit 5. Who does Exhibit

Page 55

1   5 say Epstein, Becker & Green is going to represent
2   if employed?
3       A.   Certain employees to be obtained from
4   Carole -- well, actually, "employees" is defined, so
5   although it says "for authority to employ employees'
6   counsel in connection with government
7   investigation." So whatever -- again, the document
8   speaks for itself, but that's what it states.
9       Q.   Who does the first sentence of the cover
10  memo say that Cohn & Kelakos is contemplating
11  representing Epstein, Becker & Green to represent?
12      A.   "Enclosed is a draft of Epstein's
13  application to be employed on behalf of the MMT and
14  LP employees involved in the investigation."
15      Q.   Do you have any knowledge of what the
16  investigation is?
17      A.   What's being referred to here?
18      Q.   Yes.
19      A.   I don't know what specific investigation
20  it's referring to.
21      Q.   Did Mr. Cohn tell you in your conversation
22  with him what investigation this document referred
23  to?
24      A.   No.

Page 56

1       Q.   Do you know who represented Molten Metal
2   Technology in the investigation as that term is --
3       A.   Again, I don't know.
4       Q.   -- as that term is used in the memo?
5       A.   Well, again, on the memo, presumably
6   Latham & Watkins, because Latham & Watkins is
7   mentioned in there.
8       Q.   You said that Mr. Cohn discussed Epstein,
9   Becker & Green being retained as special counsel
10  because Bingham Dana was not going to be. I may
11  have asked this before and forgive me if I did, but
12  did Mr. Cohn indicate in what capacity he had
13  contemplated retaining Bingham Dana?
14      A.   No.
15      Q.   Was it in connection with the
16  investigation as that term is used in Exhibit 5?
17      A.   Again, only the word "special counsel" was
18  used, both instances.
19          MS. BAGGER: Let's mark this as
20  Exhibit, I think it's 6.
21          (Deposition Exhibit No. 6
22          marked for identification.)
23      Q.   I'm showing you a document that's been
24  marked as Exhibit 6 in this deposition, Mr.

Page 57

1   Braunstein.
2          (Document handed to witness.)
3       Q.   Do you recognize this document?
4       A.   I don't have any specific recollection of
5   this document.
6       Q.   Is this a document that you retrieved from
7   the Cohn & Kelakos files in 2000?
8       A.   No.
9       Q.   Have you ever seen this document before?
10      A.   I am not sure if I have seen this document
11  before.
12      Q.   Is this the document to which you were
13  referring in your prior answer when you talked about
14  a conflict of interest in connection with
15  representation of Rhonda Walker?
16      A.   No. I wasn't referring to a particular
17  document. I said I believed that I had seen or
18  recollected that there was a document and it wasn't
19  a document or documents that related to that.
20      Q.   When you say "related to that," can you
21  tell me precisely what you mean?
22      A.   During the Rhonda Walker investigation by
23  this firm --
24      Q.   Which firm?

15 (Pages 54 to 57)

ALAN L. BRAUNSTEIN
4-10-06

Page 58

1      A.   By Riemer & Braunstein, there were a
2   number of documents that I had seen, as well as
3   other attorneys working on the matter, and therefore
4   that may have come up at one point in time.
5      Q.   Okay.  What had come up at one point in
6   time?
7      A.   That at one point in time there may have
8   been in connection with Rhonda Walker or James
9   Andrews, as both received what we call preferential
10  payments, that may have come up.  So I'm not
11  referring to -- I'll review this document right now.
12     Q.   Yes, take a moment to read the document.
13     A.   Again, I do not remember seeing this
14  document.
15     Q.   Okay.  In your previous answer you said
16  something about James Andrews and an investigation
17  of preferential payments.  You didn't mean to
18  suggest that James Andrews had received a
19  preferential payment?
20     A.   Yes.
21     Q.   Did you mean to suggest that?
22     A.   Yes.
23     Q.   James Andrews was paid by Molten Metal
24  Technologies?

Page 59

1      A.   My understanding is that in connection
2   with the severance settlement with Rhonda Walker she
3   directed where the monies would be paid.  So it may
4   not have been a preferential transfer, it may have
5   been a fraudulent conveyance to James Andrews.  But
6   she received monies from Molten and allocated where
7   they would go.  Molten made the payment.  So, in
8   reviewing this again, I would say a fraudulent
9   conveyance is what we sued James Andrews for.
10     Q.   But James Andrews would have received
11  money on behalf of Rhonda Walker --
12     A.   That's correct.
13     Q.   -- as her attorney?
14     A.   That's correct.
15     Q.   You're not suggesting that payment was
16  made to the attorney for legal services?
17     A.   No, definitely not.
18     Q.   Okay.  And what was the potential conflict
19  of interest that you may have seen in the documents?
20     A.   Either may have seen or discussed with the
21  attorneys bringing these actions.
22     Q.   "These actions" being?
23     A.   Again, the fraudulent conveyance or any
24  other actions that involved Rhonda Walker.

Page 60

1      Q.   And I --
2      A.   That may have been where I drew the
3   inference, if you will.
4      Q.   And I'm just asking you to describe to me
5   precisely what the conflict of interest that you may
6   have seen implicated in the documents was.
7      A.   That Carole Schwartz Rendon of Epstein
8   Becker may not independently been able to represent
9   Rhonda Walker because of a potential conflict of
10  interest.
11     Q.   And what was the conflict?
12     A.   Carole Schwartz Rendon was representing
13  Molten or one of the other entities.  Rhonda Walker
14  was a former M4 employee.  And there were claims
15  with M4 against Molten.
16     Q.   M4 was another affiliated debtor, correct?
17     A.   Affiliated, yes, that's correct.
18     Q.   Okay.  And so was the conflict that she
19  was representing employees of M4 and employees of
20  Molten Metal?
21     A.   My understanding is that she was
22  representing various employees of several of the
23  entities or employees who had interests in several
24  of the entities.

Page 61

1      Q.   And why was that a conflict?
2      A.   Why would that be a conflict?
3      Q.   Yes.
4      A.   Because the interests of the entities that
5   Ms. Rendon was trying to protect in my view, based
6   on my review of the records and the various
7   communications and the various documents in the
8   files where Ethan Jacks is directing the debtor to
9   pay her and the communications between her and Ethan
10  Jacks leading me to conclude that she had a host of
11  information regarding the true nature of these
12  investigations.
13     Q.   Okay.
14     A.   And to me in that mind, that poses some
15  sort of potential conflict.  Again, I'm not making
16  any conclusion whatsoever.
17     Q.   I guess I just want to take a step back.
18  You started your answer by saying, I asked you why
19  representing employees of M4 and employees of MMT at
20  the same time was a conflict.  And you started your
21  answer by saying that the interests of the entities
22  Rendon was trying to protect were, and how would
23  that sentence be finished?
24     A.   Were essentially the officers and

16 (Pages 58 to 61)

ALAN L. BRAUNSTEIN
4-10-06

Page 62

1    directors of M4, MMT.
2        Q.    And so it was a conflict to be
3    representing the employees when she was in fact
4    seeking to protect the officers and directors, is
5    that what you're saying?
6        A.    No. I'm saying, you're asking me what are
7    the totality of all this add up to, what are the
8    indicia. I'm giving you a number of what the
9    indicia are. I'm not raising any --
10       Q.    I'm really not trying to grow this at this
11   point. In fact, I'm trying to shrink it in to in
12   the fall of 1997, winter of 1997, at the time at
13   which Exhibits 5 and 6 were generated, did Carole
14   Schwartz Rendon and Epstein, Becker & Green have a
15   conflict of interest?
16           MR. SUTTON: Well, that's not a fair
17   question, because again, you're asking him for a
18   legal conclusion. And you're going out of context.
19   What he has said was in 2000 and 2001 when he became
20   aware of this information and had more information
21   regarding what he calls the mass conspiracy theory,
22   then everything started fitting into place. Whether
23   going back into 1997, which was in somebody else's
24   mind --

Page 63

1           MS. BAGGER: Mr. Sutton, all
2    deference, I'd rather question the witness. You've
3    stated an objection on the record, but I don't think
4    that anything else at this point is helpful.
5           MR. SUTTON: Would you please get
6    your hand out of my face?
7           MS. BAGGER: My hand is five feet
8    away from your face, Mr. Sutton.
9           What was my last question that was
10   objected to? I will seek to rephrase it.
11          (The previous question was read
12          back by the reporter.)
13       Q.    In your discussion -- let me take a step
14   back.
15          We've been discussing the bases for
16   your suggestion that there was an attorney/client
17   relationship between Epstein, Becker & Green and
18   Molten Metal Technology, correct?
19       A.    That's correct.
20       Q.    And was I incorrect in hearing you say
21   that one of the factors was learning that there was
22   a conflict of interest that Carole Schwartz Rendon
23   had in the last quarter of 1997, that this was one
24   of the things?

Page 64

1        A.    No.
2        Q.    Okay.
3           MR. SUTTON: Actually, that's not
4    quite accurate. He said potential conflict.
5           MS. BAGGER: Okay.
6        Q.    Was one of the -- I'm going to just go
7    right back. I want you to tell me the reasons that
8    you think that Epstein, Becker & Green represented
9    Molten Metal Technology or had an attorney/client
10   relationship with Molten Metal Technology.
11          MR. SUTTON: That's been asked and
12   answered.
13       Q.    Do you have anything to add to what you've
14   told us previously? And if it helps you to recap in
15   deciding whether you have anything to add, I think
16   I'd like you to do that.
17       A.    Yes. Epstein Becker was in possession of,
18   based on review of the bills, and in communication
19   with all of the parties -- not to say all, a number
20   of parties that were ultimately sued by the Trustee
21   in bankruptcy for a number of improprieties. Prior
22   to this time Molten's employees, the same officers
23   and directors, were being sued in connection with a
24   shareholder suit that was merely a tip of the

Page 65

1    iceberg. People like Ethan Jacks in particular, who
2    the shareholders missed in their suit, but the
3    Trustee didn't, received millions of dollars and
4    additional payments from Molten such that if the Q2
5    and 3 invoice issue came to light in the normal
6    course, then Mr. Jacks especially and all of the
7    others at that point in time faced great exposure.
8           And it is my belief, and this has
9    been espoused to the court, that the nondisclosure,
10   which the court already has adjudicated in
11   connection with the Latham & Watkins decision on
12   disclosure, was tantamount to the reason why Molten
13   became 20 million dollars insolvent in nine months
14   of a bankruptcy proceeding.
15          And the nature of the communications
16   and the bills and the communications I'm talking
17   about from Rendon to Jacks, to Berman and the
18   responsive one saying we need to pay EBG,
19   contributed to the excessive losses in the case.
20   And that by representing Rhonda Walker, knowing and
21   having familiarization with the peripheral
22   documentation that does not relate in any way to
23   what Rhonda Walker was going to testify to, and not
24   even considering the fact that each of these Molten

17 (Pages 62 to 65)

ALAN L. BRAUNSTEIN
4-10-06

Page 66

1    entities are five separate entities and may have
2    claims against one another, evidenced for me that
3    the scope of the employment went far beyond
4    representing mere employees at an investigation.
5        Q.   Is that your, do you have anything to add
6    to that answer?
7        A.   Yes, one other.  And from the bills that I
8    have seen and from all of the other correspondence
9    that the representation of Christopher Nagel went
10   excessively beyond the scope of any investigation,
11   and yet the bills were being sent to Molten Metal
12   for payment of Christopher Nagel obligations.
13       Q.   Anything else?
14       A.   That's it.
15       Q.   What work done for Christopher Nagel went
16   excessively beyond the scope of the investigation?
17       A.   I believe there was a time entry that I
18   saw in one of the bills saying, meeting with or
19   conversation with Christopher Nagel regarding
20   McConchie.  And to my knowledge, nothing in any
21   investigation, governmental investigation obviously
22   I'm referring to, involved or implicated McConchie.
23       Q.   Do you recall what the time entry said was
24   done?

Page 67

1        A.   I don't.
2        Q.   Would it matter to you what the time entry
3    said was done?
4        A.   Again, would it matter to me in terms of
5    what?
6        Q.   Would it affect the conclusion that you're
7    drawing?
8        A.   It may, depending on the nature of what it
9    is.  But I don't see -- again, because I'm drawing
10   it from a totality of eight years of investigation
11   in the case, that's how I see it, if you will.
12       Q.   Do you recall how many time entries were
13   devoted to the McConchie letter?
14       A.   Again, I don't know if it's -- you mention
15   McConchie letter.  I said McConchie.
16       Q.   I didn't mean to make a distinction.  Do
17   you recall how many time entries were devoted to
18   McConchie?
19       A.   I saw one at least.  I'm not sure if there
20   are more than one, but I saw one.
21       Q.   And what about that time entry or entries
22   causes you to conclude that it suggests that
23   Epstein, Becker & Green was representing Molten
24   Metal and not Christopher Nagel?

Page 68

1        A.   Can you repeat the question?
2        Q.   What about the time entry supports the
3    conclusion that Epstein, Becker & Green was
4    representing Molten Metal Technology, the debtor in
5    possession, and not Christopher Nagel, an
6    individual?
7        A.   Nothing.
8        Q.   So that particular, that particular
9    portion doesn't lead you to believe that there was
10   an attorney/client relationship between Epstein,
11   Becker & Green and Molten Metal Technology?
12       A.   Yes, correct.
13       Q.   What was the Q2/Q3 invoice issue?
14       A.   In a nutshell, because I'm not the
15   forensic accountants in here, but essentially the
16   earnings for those two quarters, 1996, needed to be
17   restated.  And I'll give you the, again, nutshell
18   layperson's statement that M4 or Molten Metal
19   Technology was booking revenues from M4 improperly
20   and/or illegally under PRDA regulations -- PRDA is
21   capital P-R-D-A, and I couldn't explain to you what
22   they are except they are under governmental
23   regulations.
24       Q.   Are you aware of any facts that would

Page 69

1    suggest that Carole Schwartz Rendon knew anything
2    about the Q2/Q3 invoice issue?
3        A.   Based on the fact that she represented
4    Rhonda Walker who did know intimately about the
5    invoice issue and had been questioned several times
6    about that, I draw that inference.
7        Q.   Was the Q2/Q3 invoice issue an issue in
8    the shareholder litigation?
9        A.   To my knowledge, it was not specifically,
10   or even generally.  I don't know.
11       Q.   But as I understand it, it was the subject
12   of the Trustee's suit against the insiders?
13       A.   Right.  Not specifically in terms of that,
14   but it was one of the counts in there regarding the
15   actions against the officers and directors by the
16   Trustee.
17       Q.   Other than the Q2/Q3 invoice information
18   which you infer Carole Rendon may have learned from
19   Rhonda Walker, what other information do you believe
20   -- let me -- what other information do you believe
21   that Carole Rendon may have acquired?
22       A.   Again, I was saying not from, from her
23   representation of Rhonda Walker.  There are
24   communications noted in the time records of her with

18 (Pages 66 to 69)

ALAN L. BRAUNSTEIN
4-10-06

Page 70

1  other attorneys who specifically were involved or
2  knew about the M4 issue, M4 invoice issue.
3      Q.   Let me follow up on that and then I'll
4  repose my question.
5      A.   Okay, sure.
6      Q.   Do you have any basis, do you have any
7  knowledge as to what the content of the
8  conversations in the bills between Carole Rendon and
9  those lawyers were?
10     A.   No.
11     Q.   Okay.  Other than Carole Rendon's, the
12 allegation that Carole Rendon knew about the Q2/Q3
13 invoice issue, is there any other information that
14 you believe Carole Rendon had that suggests to you
15 that there was a broader scope to the
16 representation?
17     A.   I think that with each of the various
18 employees, each one had, from here it looks like
19 they represented potentially 20 employees, so I
20 believe Jean Baulch also had information, and I
21 think that she was one of the Epstein Becker, but
22 they had a number of people and I don't know which
23 ones knew or not of the M4.  I know Rhonda Walker
24 did.

Page 71

1      Q.   And through, I guess the question is
2  through the representation of Rhonda Walker or any
3  of the other 20-some employees is there any other
4  information that you believe or that you have reason
5  to believe Carole Rendon gained the supports the
6  conclusion that you have drawn that the scope of her
7  representation was broader than just that of the
8  employees?
9      A.   Again, just from the time records.  That's
10 it.
11     Q.   Has the Trustee made documents available
12 to Mr. Hanfling prior to today?
13     A.   In connection with the settlement there
14 were documents that were exchanged.
15     Q.   And what kind of documents were those?
16     A.   I don't know specifically because they
17 dealt with the negotiation between the parties, that
18 ATG didn't have certain documents in its file that
19 we had showing, for example, the escrow agreements,
20 some of the sale closing documents, and also ATG
21 presumably had some of the documents that were
22 necessary in connection with an SEG litigation that
23 we were pursuing.  So I don't know specifically what
24 was exchanged or not exchanged in connection with

Page 72

1  that.
2      Q.   Okay.  Did the Trustee make available to
3  Mr. Hanfling a quantity of documents from, that
4  originated in the files of Bingham Dana?
5      A.   To my knowledge, no, but that I would not
6  necessarily know or not know.  I don't know where
7  certain things may have come from if they were
8  informally exchanged.
9      Q.   Leaving aside documents with respect to
10 the escrow and the financial arrangements of the
11 settlement between Mr. Gray and Mr. Hanfling, were
12 documents, have documents before today been made
13 available to Mr. Hanfling to assist in the
14 prosecution of this litigation, the litigation in
15 which we're having this deposition today?
16     A.   In connection with our settlement or what
17 -- there may have been documents that may have been
18 requested by -- again, when I say documents such as
19 proof of claims that Epstein may have filed, I don't
20 know and don't recollect exactly what was asked for
21 and what was given.
22     Q.   Okay.  In paragraph 10 of the settlement
23 agreement that we were looking at just a moment ago,
24 in addition to the waiver of -- I'm sorry, I'm not

Page 73

1  looking at 10.  I meant to look at 9.  Number 9
2  recites that the parties agree to cooperate with
3  each other in connection with each party's ongoing
4  litigation and efforts to recover assets for the
5  bankruptcy estates from third parties and to
6  preserve records that may be relevant in that
7  regard.  In furtherance of Mr. Gray's obligations
8  under that paragraph have documents before today
9  been transmitted from Mr. Gray's custody to Mr.
10 Hanfling?
11     A.   I don't believe since this time period
12 that there have been any documents, but I'd stand
13 corrected by, if there were.  But I don't believe
14 so.  I know there were, again, documents while we
15 were going through the negotiations in connection
16 with that, but that I can't remember.
17     Q.   Were any documents provided to Mr.
18 Hanfling to assist in the prosecution of this
19 litigation prior to the execution of this settlement
20 agreement?
21     A.   There may have been like the proof of
22 claim or something that were public records that may
23 have been provided.  Again, I would defer to Mr.
24 Hanfling.  I just don't remember.

19 (Pages 70 to 73)

ALAN L. BRAUNSTEIN
4-10-06

Page 74

1    MR. FLEISCHER:  Documents were
2  provided prior to that agreement and I want to say
3  that was in 2003. Every document that we have
4  received copies have been provided to you along with
5  our discovery. There's nothing outside of those
6  documents that have been provided to you that have
7  been provided to that time period.
8    MS. BAGGER:  Let me just follow up
9  with you with one question and then we'll get back.
10  The documents that were on the CD that were the PDF
11  files which were pretty obviously from Bingham Dana,
12  did those come from Mr. Gray?
13    MR. FLEISCHER:  I don't recall
14  documents coming from Bingham and Dana. I'm not
15  sure what the source of that disk was. It might
16  have -- and I'm not sure of the timing of that one.
17  I didn't recall that documents came from Bingham and
18  Dana.
19    MS. BAGGER:  We can pursue it off
20  the record.
21    MR. FLEISCHER:  Okay.
22    MR. SUTTON:  Well, I have a
23  question. You have documents purporting to be
24  records of Molten Metal Technology on a disk?

Page 75

1    MS. BAGGER:  We can do this on, do
2  you want to do this on the record?
3    MR. SUTTON:  Off the record.
4    MS. BAGGER:  Off the record is fine.
5    (Discussion off the record.)
6    Q.  Are you familiar with a litigation that
7  was commenced by Mr. Gray against ATG down in state
8  court in Tennessee?
9    A.  I was.
10    Q.  And that case was later removed to the
11  federal court in Tennessee?
12    A.  Again, the documents speak for itself. We
13  employed special counsel to do that.
14    Q.  Do you know whether documents were
15  produced by either party in that litigation?
16    A.  I don't know. I did not handle it. We
17  employed special counsel, I believe Greenbaum Dole.
18  And though we had communications with them, I could
19  not remember what were or were not produced. But my
20  understanding is we didn't get too far in that
21  because ATG filed for bankruptcy.
22    Q.  And the follow-up question was whether you
23  -- if there were any document productions or
24  depositions in that case, are they in your

Page 76

1  possession at this point?
2    A.  If they were, they would have been, I
3  presume, given to you because we would have had
4  their file if they sent it to us. I don't believe
5  that we received any documents. We received copies
6  of pleadings, that I believe we received.
7    MS. BAGGER:  Mark this as the next
8  and potentially last exhibit.
9    (Deposition Exhibit No. 7
10    marked for identification.)
11    Q.  Put in front of you a document that was
12  marked as Exhibit 7 in this litigation.
13    (Document handed to witness.)
14    Q.  Do you know if you've ever seen this
15  document before?
16    A.  I've not seen this document.
17    Q.  You'd agree with me that it appears to be
18  the, Mr. Hanfling's supplemental interrogatory
19  answers in this case?
20    A.  Right. Document would speak for itself.
21    Q.  Okay. I'd like to call your attention to
22  the supplemental answer to interrogatory number 1.
23    A.  What page is that on?
24    Q.  That starts at page 2.

Page 77

1    A.  Okay.
2    Q.  And I just want to ask you a couple of
3  questions about it, if you want to look over the
4  answer.
5    A.  Just the supplemental answer itself?
6    Q.  Yeah.
7    A.  Okay.
8    (Discussion off the record.)
9    A.  Okay. I may have to read it again to
10  answer a specific question, but I'm familiar.
11    Q.  You've at least looked it over and
12  familiarized yourself with it?
13    A.  I have.
14    Q.  Had you read that answer before today?
15    A.  No.
16    Q.  Was the answer provided to you in draft
17  form before the interrogatories were submitted?
18    A.  No.
19    Q.  First sentence, if I can draw your
20  attention to the first sentence where it says,"
21  Prior to the commencement of this action plaintiffs'
22  counsel were contacted by counsel for Stephen S.
23  Gray, specifically Alan L. Braunstein." I've
24  paraphrased a little bit, but is that a fair reading

20 (Pages 74 to 77)

ALAN L. BRAUNSTEIN
4-10-06

Page 78

1  of the first two sentences?
2      A.   Except the matters alleged in the
3  complaint, it was regarding the whole host of
4  matters that did not involve and did not begin with
5  matters alleged in the complaint.
6      Q.   What caused you to contact Mr. Hanfling's
7  counsel?
8      A.   There were two matters.  One, we had a
9  proof of claim that was filed by ATG in the
10  bankruptcy case arising from what ATG was alleged as
11  a certain environmental derivative claim, if you
12  will, that was being claims against Molten's estate.
13  They filed a two million dollar administrative
14  claim.  And additionally, obviously, we filed the
15  complaint there and everything was stayed by virtue
16  of ATG's filing.  Additionally, ATG had records that
17  special counsel thought would be necessary in
18  connection with -- when I mean special counsel for
19  Stephen Gray, the Trustee, in connection with the
20  SEG litigation.
21      Q.   Drawing your attention to the, I guess
22  it's the middle of the paragraph, maybe the fourth,
23  perhaps the fifth.  "Mr. Braunstein informed
24  plaintiffs' counsel about the McConchie letter

Page 79

1  referred to in the complaint and in prior discovery
2  responses."  What do you recall telling Mr.
3  Hanfling's counsel about the McConchie letter?
4      A.   Well, during the stage of the negotiations
5  and the discussions actually in connection with that
6  the McConchie letter came up in context.  I don't
7  know in what context it came up.  And during that
8  time, at that point when it came up, if I remember
9  correctly, Mr. Hanfling had no idea what this
10  McConchie letter was or anything about that.  And
11  there were questions that were asked and so we
12  provided responses to those questions.  So really it
13  really became a Molten Metal Trustee call that
14  turned into what I believe formed the basis of the
15  litigation.  In other words, I did not call him
16  saying you had a claim.  This had to do with a long
17  series of conversations with myself and special
18  counsel on the phone with ATG.
19      Q.   Do you recall any of the questions that
20  were asked by ATG about the McConchie letter?
21      A.   I believe certain questions like when,
22  where, how and why, and who had copies of it.  And I
23  think what happened is that we, when we mentioned
24  that we believed law firms had it, I believe that's

Page 80

1  when we first mentioned Epstein, Becker & Green and
2  that's when I think the light bulb went on with
3  them, because we believed that Nagel's counsel had a
4  copy of it and that's how it came out.  But there
5  was no -- the phone call was not made to induce them
6  to bring litigation.  We didn't know that they
7  didn't know about McConchie and Epstein Becker.
8      Q.   But your recollection is that you told Mr.
9  Hanfling that you believed that Epstein Becker had a
10  copy of this letter?
11      A.   We believed, at that time we named all the
12  people that we believed had a copy of that letter
13  and we said Nagel and Nagel's counsel is Epstein
14  Becker.  I think that's how it went.
15      Q.   And what was your, what was the basis for
16  believing that Epstein Becker had a copy of the
17  letter?
18      A.   Three reasons.  One, Christopher Nagel is
19  one of the parties that's alleged to have induced
20  McConchie into this.  Two, during this time period
21  of the settlement with regard to, during this time
22  period of the negotiations I believe that Mike
23  Dutore (phonetic) was representing Christopher Nagel
24  and John Preston in the trustees litigation, and

Page 81

1  ultimately, and there was some coalescence, if you
2  will, between the representation and their guidance
3  of Preston and Nagel because Bingham had been
4  representing all of the officers and directors and
5  Molten and there was a conflict waived -- I mean
6  conflict raised and I think Dutore came in and
7  represented Nagel and Preston in the follow-up of
8  that shareholder litigation.
9          I don't know, I'm, again, with
10  regard to that, this is why I mentioned that I
11  thought Nagel's attorney would have it, because at
12  that time period in the shareholder litigation we
13  found out, unbeknownst to us and not disclosed to
14  anyone, that the shareholder litigation, which made
15  no reference to McConchie, was carving out $350,000
16  to pay Earl McConchie.
17          That's what caused a lot of this to
18  blow up.  Why is McConchie getting money?  Why is he
19  getting it from the shareholder litigation?  Why is
20  he carving it out?  That's when we found and thought
21  there was something subversive in connection with
22  the whole shareholder litigation process and the
23  fact being why would you carve out that money?  And
24  it was really an end run around relief from the

21 (Pages 78 to 81)

ALAN L. BRAUNSTEIN
4-10-06

Page 82

1  automatic stay to get him the money.
2      Q.  Besides the fact that Nagel was the
3  recipient of the letter and that Epstein Becker came
4  in to represent Christopher Nagel in the shareholder
5  litigation after Bingham was conflicted out, was
6  there anything else that led you to believe that
7  Epstein Becker might have a problem because of a
8  conflict?
9      A.  Because also remember, they had were
10 representing presently, I believe, Nagel in the
11 Trustee's litigation.  Trustee had sued Nagel, among
12 others, at that time.  And there were the bills that
13 showed an entry, at least one I remember, in the
14 same entry with the name Nagel and McConchie at
15 about the time period, I think within a month or so
16 of when the McConchie letter was, had been drafted
17 and was kept from everyone.
18     Q.  When you say that the McConchie letter was
19 kept from everyone, can you explain what you mean?
20     A.  The McConchie letter came to light
21 inadvertently, if you will, when I had been informed
22 by Cohn's office that there were certain records in
23 storage that had not been given to us at the
24 beginning of the case, that they were, quote,

Page 83

1  internal files.  And at that time Molten's records
2  were all in -- either missing, gone, stolen or
3  whatever the case may be.  The records were in a
4  state of incompleteness.  So when I found out that
5  there were some additional records that I hadn't
6  seen, even though they were, quote, internal files,
7  and because Cohn had agreed to waive the
8  attorney/client privilege with respect to the lender
9  early on, I wanted to see what was there.  And
10 that's when I found the McConchie letter and also
11 some other things such as the Epstein Becker.  The
12 Epstein Becker really didn't mean much or anything
13 to me at that time.  It was the McConchie letter
14 which suddenly was the, quote, smoking gun in our
15 proceedings.
16     Q.  And so when you say that the McConchie
17 letter had been hid, are you suggesting it had been
18 hid by Molten Metal officers?  Who did the hiding I
19 guess is what I'm asking?
20     A.  Maybe it was the wrong word to say it was
21 hidden from us.  I can't characterize what it was.
22 It was never disclosed, never provided to us.  We
23 didn't know of its existence.  And what was more
24 troubling is that McConchie filed a proof of claim

Page 84

1  in the case, but that letter wasn't attached.  So
2  then to see that letter all of a sudden come out and
3  the allegations in the letter which all proved to be
4  true after the fact based on what our experts tell
5  us, obviously that was something that ultimately
6  resulted in all of the recoveries that we generated
7  in the case in order to take this out of
8  administrative insolvency.
9      Q.  Did you retain a testifying expert in your
10 action against the insiders on the subject of the
11 McConchie allegations?
12     A.  I didn't do that litigation.
13     Q.  Did your firm --
14     A.  Our firm did not do that litigation.
15     Q.  Who did that litigation?
16     A.  The firm of Greene & Hoffman.
17     Q.  To your knowledge, did Greene & Hoffman
18 retain a testifying expert on the subject of the
19 McConchie allegations?
20     A.  It didn't go to trial, so I don't know if
21 there was an expert that was, that they had
22 retained.  I don't know.  I don't believe there was
23 one because we would have retained him in the
24 bankruptcy court.  We did not retain any expert for

Page 85

1  that purpose.  But again, it was all settlement and
2  it was in a settlement posture from the very
3  beginning of the case.
4      Q.  I want to ask you to turn to page 3 of
5  Exhibit 7 that's in front of you.  And I want to ask
6  you about the paragraph that starts at the bottom of
7  the page and then goes over on to page 4.
8  Specifically I want to ask you about the first
9  sentence.  "Gray's counsel further informed the
10 plaintiffs' counsel that shortly before ATG became
11 involved in negotiations in the letter with the
12 individual Defendants and Gray to purchase the Q-CEP assets the
13 individual Defendants had solicited several other
14 parties to purchase MMT assets including the Q-CEP
15 assets together with the individual Defendants."
16 What's the -- is that what you told Hanfling?
17     A.  In my prior testimony?
18     Q.  When you spoke to Mr. Hanfling did you
19 tell him that?
20     A.  Honestly, I can't remember what I told him
21 or didn't tell him.  But if he had asked and I had
22 answered, that probably would be, I would have told
23 him the same thing that I testified to earlier
24 regarding the purchase process and who I met with

22 (Pages 82 to 85)

ALAN L. BRAUNSTEIN
4-10-06

Page 86

1  and what I went through.
2         MR. FLEISCHER:  Counsel, just one
3  point.  There's a defined term in there.  You should
4  probably just establish with the witness if he
5  understands that defined term.  I don't believe he
6  would necessarily know that unless he saw the prior
7  response.  This is a supplemental response.
8         MS. BAGGER:  I assume you mean
9  "individual Defendants."
10        MR. FLEISCHER:  Yeah, I think you
11  should put on the record whether or not he knows who
12  we're talking about here.
13        Q.  I can represent to you that the individual
14  Defendants are John Preston, Christopher Nagel,
15  Eugene Berman and Ethan Jacks.
16        A.  Then it would only be John Preston and
17  Christopher Nagel.
18        Q.  And who are the or who were the, I should
19  say, several other parties?
20        A.  The ones I testified to earlier.  It would
21  have been, again, Clean Harbors and others, one or
22  two others that I met with with Preston present and
23  I believe Nagel, but definitely Preston.  I don't
24  remember the names.  And I certainly did not give

Page 87

1  them the names because I didn't remember it then, as
2  well.
3         Q.  I just want to read you the next two
4  sentences.  "However, the individual Defendants were
5  not able to conclude an agreement with any of these
6  parties.  According to Gray's counsel, the
7  individual Defendants then brought in ATG to
8  co-purchase the MMT assets with the individual
9  Defendants."  Is that what you told Mr. Hanfling's
10  counsel?
11        A.  That I do not remember.  I may have made a
12  presumption, but I don't remember.
13        Q.  Sitting here today do you have any
14  information as to whether the individual Defendants
15  brought in ATG to co-purchase the MMT assets?
16        A.  Not personal, not firsthand personal
17  knowledge as to that.
18        Q.  Do you have any non-firsthand or hearsay
19  knowledge about that?
20        A.  Hearsay knowledge only.
21        Q.  Can you tell me that?
22        A.  I believe that that information, if I had
23  communicated that, would have been from someone at
24  the Trustee's office, Stephen Gray's office.

Page 88

1         Q.  And do you know whether you said that or
2  not?
3         A.  Well, if he said I said it, then I
4  presumably made that statement.  I certainly drew
5  that conclusion.  And whether I had talked to the
6  Trustee beforehand to get that information, to
7  specify that, that's probably what I would have
8  done.
9         Q.  The next sentence, "According to Gray's
10  counsel, the individual Defendants could not
11  conclude a transaction to acquire MMT assets without
12  a third party."  Is that what you told Mr. Hanfling?
13        A.  No.  To be specific, Preston and Nagel at
14  the meeting, and really Preston in a meeting with
15  Stephen Gray, at least one of the meetings, there
16  was a statement that Preston was trying to come up
17  with the money from other parties.  I also know that
18  personally because we had sued Preston and Quantum,
19  as well, and his responses during that time would be
20  consistent with what was here.
21        Q.  I'm sorry, I don't understand the last
22  part.
23        A.  In other words, we sued Quantum.  We sued
24  Preston.  During that time period the financial

Page 89

1  wherewithal of both was discovered.  And Preston,
2  consistent with Preston back then, they needed
3  investors.  They did not have their own capital with
4  which to purchase anything of consequence near what
5  the Trustee was asking for.
6         Q.  To make sure I understand you, when you
7  were later in litigation with John Preston --
8         A.  Correct.
9         Q.  -- you learned that back in 1988 he would
10  not have had the financial wherewithal?
11        A.  Well, also because of the people that he
12  was bringing to us it came out in the meetings, I
13  don't know who said it, that he needed to find
14  investors.  He and Nagel believed in the technology,
15  but needed to find investors in order to purchase at
16  the price point that the Trustee was seeking.
17        Q.  Did Nagel and Preston tell you in these
18  meetings that they believed in the technology?
19        A.  Again, the reason why I can't -- Nagel, I
20  don't remember Nagel ever really speaking.  I
21  remember him being in various places.  Preston was
22  the one who would be talking.
23        Q.  Did Preston say that he believed in the
24  technology?

23 (Pages 86 to 89)

ALAN L. BRAUNSTEIN
4-10-06

Page 90

1    A.  Yes.
2    Q.  The next sentence says, "Therefore, it was
3  essential that the individual Defendants find a
4  third party willing to co-purchase the MMT assets
5  with the individual Defendants."  Is that what you
6  told Mr. Hanfling?
7    A.  No.
8    Q.  Is that true?
9    A.  I don't think it says the "Trustee's
10  counsel."  I don't know what their intent was or
11  anything of that nature.
12    Q.  Okay.  The next sentence says, "The
13  transaction with ATG was concluded on an expedited
14  basis."  Did you tell Mr. Hanfling that or Mr.
15  Hanfling's counsel, I should say?
16    A.  The court records would show that.  I
17  wouldn't have told them that.  Filing was done on an
18  expedited basis.
19    Q.  From your vantage point as Trustee's
20  counsel, do you believe that the transaction
21  occurred on an unusually rapid basis?
22    A.  I'm trying to determine whether it was
23  induced by the court or not, if there were certain
24  deadlines of things expiring.  I would rely on what

Page 91

1  we said in our pleadings to the court, because that
2  would be the freshest of recollections.  I believe
3  everything was filed on an expedited basis because I
4  think the court imposed deadlines or the State
5  imposed deadlines.
6    Q.  I guess the question, the question I'm
7  meaning to ask you is based on your experience doing
8  work of this kind, did the timetable on which the
9  acquisition of these assets occurred strike you as
10  noteworthy?
11    A.  No.  Again, I've done hundreds if not
12  thousands of these transactions and it varies.  So
13  again, the only timing constraints would have been
14  put in the pleadings in terms of that and rely upon
15  that.  I just don't remember, honestly.  I do
16  remember having to stay up until 3:00 in the morning
17  and then having to go another morning on this.
18  There were certain deadlines that were imposed and I
19  don't know which those were and whether it was also
20  a constraint of the lenders or if it was the
21  purchasers.  I don't know who.  I did know it was
22  done on a very expedited basis, but well within the
23  parameters of what the Bankruptcy Code provides and
24  the local rules provide, which grants the court for

Page 92

1  cause to expedite the process.  So I don't know
2  which, from which end it was coming from in terms of
3  why it was expedited.
4    Q.  And the last sentence, "The circumstances
5  and timing of ATG's involvement reasonably infers
6  that the individual Defendants had solicited ATG and
7  not vice versa."  Was that an inference that you
8  drew and shared with Mr. Hanfling's counsel?
9    A.  I did not make that statement and --
10         MR. FLEISCHER:  I'll point out that
11  that --
12         MS. BAGGER:  I would like --
13         MR. FLEISCHER:  It's not a quote.
14         MS. BAGGER:  I'm just asking him the
15  question and I'd like him to be able to answer it.
16    Q.  Are you finished?
17    A.  I didn't make the statement.  Is that the
18  answer to the question or do you want me to -- what
19  was the question?  I'm sorry.
20         MS. BAGGER:  Why don't you read back
21  the question and the answer?  I just hadn't been
22  sure if he was finished, so let's get the question
23  and answer back and then we'll know.
24         (The previous question was read

Page 93

1         back by the reporter.)
2    A.  No, I did not share that with Mr.
3  Hanfling's counsel.
4         MS. BAGGER:  Fine.  I have no
5  further questions.
6         MR. FLEISCHER:  I just want to be a
7  couple minutes because you covered almost everything
8  that I --
9         THE WITNESS:  Do I need any of
10  these?
11         MR. FLEISCHER:  No.
12         CROSS EXAMINATION
13  BY MR. FLEISCHER:
14    Q.  Mr. Braunstein, the negotiations with ATG
15  and the Quantum folks resulted in a letter agreement
16  of November 13, 1998, do you recall that?
17    A.  I think in my testimony I said there was a
18  November 6th and then I remember a November 13th.
19    Q.  Okay.  Do you recall who was involved in
20  the negotiation of that agreement on each side of
21  the transaction?
22    A.  Again, with the parties present, as time
23  grew closer, more and more people became involved.
24  Because I would know them after having been

24 (Pages 90 to 93)

ALAN L. BRAUNSTEIN
4-10-06

Page 94

1  introduced to them earlier on in connection with
2  that. I don't know exactly when and who I met with
3  at each particular time frame.
4      Q.  Do you recall who represented Quantum in
5  that negotiation?
6      A.  Well, in the November 13th -- and what
7  happened, just so that you know, what happened, we
8  had met both with Quantum and NUKEM. After
9  November, I'm presuming November 6th was the first,
10 we had meetings after with each of the parties. And
11 we had a meeting with NUKEM at Stephen Gray's
12 office, then a meeting like at midnight at Mintz,
13 Levin in a big conference room with a number of
14 people. And again, all I know is I came to know who
15 the people were, some I knew, Ethan Jacks, Nagel,
16 Preston, those guys I knew. But I came, there were
17 more people that I would subsequently come to know
18 in connection with that. And I know throughout
19 there, at that meeting at Mintz, Levin there was a
20 more vocal responsiveness by other of the parties.
21 So there wasn't one person focusing on the
22 negotiations. The first time at our office it was
23 clearly Rick Mikels. He was virtually one voice at
24 that point. After that time period it was a whole

Page 95

1  host of other people.
2      Q.  Once Epstein Becker came in with Jarvis
3  Kellogg were you dealing with two sets of attorneys
4  on the other side of the transaction to get the deal
5  done? In other words, were you dealing with Epstein
6  Becker for ATG and another set of lawyers
7  representing the individual Defendants that we've
8  talked about before and Quantum?
9      A.  My understanding, as I remember it, Rick
10 Mikels was doing the bankruptcy aspect of it and
11 then after that virtually it was just Jarvis
12 Kellogg, except when it came time afterwards to
13 allocate among the tech center assets. I think Rick
14 got back involved with that along with Jarvis.
15     Q.  And then there was an agreement that was
16 entered in December 1, 1998. Do you recall that
17 agreement?
18     A.  That's correct. That's the, I think that
19 was when the sale took place, the closing.
20     Q.  Again, do you recall the attorneys who
21 represented the purchasers, all of the purchasers in
22 that transaction?
23         MS. BAGGER: Objection. Just
24 foundation.

Page 96

1      A.  The transaction was at Epstein Becker with
2  a number of Epstein Becker lawyers. The only one I
3  remember was Jarvis Kellogg.
4      Q.  And was Jarvis representing all of the
5  buyers or was it just certain portions of the --
6         MS. BAGGER: Objection, foundation.
7      A.  I can't, I certainly couldn't tell at that
8  point. Again, there were other people from my
9  office, two other people involved in the closing
10 from my office. I was there and brought over mainly
11 because there became a problem at the closing where
12 there wasn't enough money, how do we fix this. So
13 my intervention was coming in to figure out how to
14 do this. I was not, I think it was like a 13-hour
15 closing and I was there maybe for -- well, I was
16 there for quite some time in negotiating this
17 resolution.
18     Q.  When did you first become aware, and I'm
19 asking this relative to the December 1, 1998
20 agreement to sell the assets to ATG and Quantum,
21 when did you first become aware that Epstein, Becker
22 & Green had been involved in representing MMT or MMT
23 individuals?
24         MS. BAGGER: Objection to the form

Page 97

1  of the question.
2         MR. FLEISCHER: I'm asking when he
3  became aware.
4         MS. BAGGER: I'm just objecting to
5  the form of the question.
6      A.  It would have been, I believe it was
7  November of 1999.
8      Q.  Subsequent to the transaction?
9      A.  Right, yes.
10     Q.  At the time of the transaction did anyone
11 from Epstein Becker approach you about a conflict
12 waiver from MMT or the Trustee to handle that
13 transaction?
14     A.  No. And I was unaware that Epstein Becker
15 had any involvement.
16     Q.  And exactly how was it that you came to
17 be, precisely how you became aware that Epstein
18 Becker had represented MMT employees or MMT?
19         MS. BAGGER: Objection to the form
20 of the question.
21     A.  There were two things in particular that I
22 remember, because I was curious as to how much money
23 was being spent by MMT on lawyers. And they had two
24 charts. I remember these two charts very

25 (Pages 94 to 97)

ALAN L. BRAUNSTEIN
4-10-06

Page 98

1  particularly. And one said, by Ethan Jacks, saying
2  hey, we're going to go into bankruptcy, we'd better
3  pay these people ahead of time and there were a
4  number of people on that list. And there was
5  another chart that I remember another firm had had
6  that I had seen. Again, I'm only, my photographic
7  memory shows me the one of Ethan Jacks or from Gene
8  Berman, and Epstein was on that.
9            But more significantly, the reason
10  why I found out was that Epstein Becker had received
11  monies post bankruptcy and we had done a, first
12  debtor had done its preference analysis, and we
13  looked on that and there was nothing that showed any
14  payments and I don't think the schedule showed any
15  payments. So I remember this particularly, because
16  we found out that the debtor had made unauthorized
17  post-petition payments. And it was validated a
18  number of years later with Bill Graham stating to
19  the court that, oh, yeah, they did and they did it
20  without our authority.
21            And so Epstein Becker had received
22  payments from the debtor post petition and we
23  brought an action on that 549. And at that point I
24  started reviewing bills. But it was only in

Page 99

1  connection with the litigation with Epstein Becker.
2       Q.  How was the 549 action resolved?
3       A.  We settled that.
4       Q.  Do you recall how much it settled for?
5       A.  I think it was like probably 65 percent of
6  what the payments were.
7       Q.  Do you have an understanding as to what
8  exposure MMT from a corporate perspective would have
9  faced in connection with the FBI/DOE investigation
10  that was occurring, I think, I believe it was in
11  1997-1998 time frame?
12            MS. BAGGER:  Objection, foundation.
13       A.  Exposure from a shareholder level, vast.
14  Exposure from a bankruptcy level, Trustee
15  immediately appointed. Which would have been before
16  the loan of 20 million was advanced and before they
17  incurred the 20 million dollars of administrative
18  debt.
19       Q.  Did Jarvis Kellogg ever mention to you
20  that Epstein Becker was performing a conflict check
21  in connection with its involvement with this
22  transaction?
23       A.  No, no.
24       Q.  With respect to the McConchie letter that

Page 100

1  we've referred to before, did I understand that you
2  only found that document in one file?
3       A.  That's correct.
4       Q.  Which file was that again?
5       A.  It was files that Cohn & Kelakos had not
6  given us at the beginning of the case or allowed us
7  to go through -- not allowed us to go through,
8  turned over to us at the beginning of the case.
9  When I mean turned over, we went over to his office
10  and looked at certain records and they sent us
11  certain records.
12            And what happened was I got a call,
13  again, I'm believing it was in the spring of 2000
14  from Michael Khoury or David Madoff who said, by the
15  way, there's other documents which we have in
16  storage, they're all internal documents, but since
17  the lender waived the attorney/client privilege,
18  we're telling you that they're here and if you want
19  to look at them.
20       Q.  Do you recall which specific sub file it
21  may have been in?
22       A.  No.  I went to Cohn & Kelakos and they had
23  boxes. There were no sub files. It was just
24  documents. Most of it were draft pleadings. That

Page 101

1  was 90 percent of it.
2       Q.  I just wanted to touch on a couple of
3  issues. Just pardon me for a moment.
4            I also wanted to clarify one other
5  area of your testimony. In response to Ms. Bagger's
6  questions before you had indicated that EBG was in
7  communications with certain employees of the debtor
8  and the debtor about certain investigations. Do you
9  recall that testimony?
10       A.  Yeah.
11       Q.  Okay. I'm curious to understand, you made
12  a distinction, you said certain employees of the
13  debtor and the debtor, and I wonder if you can
14  articulate the distinction between employees of the
15  debtor and the debtor. Was that, were those
16  different communications?
17            MS. BAGGER:  Object to the form of
18  the question.
19       A.  Yeah. It appeared that most of the time
20  entries from my perspective were all communications
21  with parties that were for the, either the debtor
22  directly or for these officers and directors. You'd
23  see counsel to Gene Berman, also Gene Berman,
24  counsel to Ethan Jacks, counsel to Bill Haney, who

26 (Pages 98 to 101)

ALAN L. BRAUNSTEIN
4-10-06

Page 102

1  was a white collar attorney, counsel to Latham &
2  Watkins.  So in other words, there's a, the time
3  entries show more of communications not with the
4  client, but mostly with the debtor or the other
5  parties that were protecting the officers and
6  directors, either individually or Latham & Watkins,
7  which was there to ostensibly protect the debtor,
8  but you can draw the inference from the judge's
9  decision.
10          MR. FLEISCHER:  I think that's it
11 for me.  I'm not going to go into anything further.
12          MS. BAGGER:  I'm concluded, as well.
13          (Whereupon, the deposition in the
14          above-entitled matter was concluded
15          at 1:53 p.m.)
16
17
18
19
20
21
22
23
24

Page 103

1  COMMONWEALTH OF MASSACHUSETTS
2  COUNTY OF SUFFOLK
3
4
5          I, HEIDI B. STUTZ, Certified Shorthand
   Reporter No. 146599S and Notary Public duly
6  commissioned and qualified in and for the
   Commonwealth of Massachusetts, do hereby certify
7  that the witness whose testimony is hereinbefore set
   forth, came before me on April 10, 2006, who was by
8  me duly sworn to testify to the truth and nothing
   but the truth of his/her knowledge touching and
9  concerning the matters in controversy in this case;
   that he/she was thereupon examined upon his/her
10 oath, and his/her examination reduced to typewriting
   under my direction; and that the transcript is a
11 true record of the testimony given by the witness to
   the best of my knowledge, skill and ability.
12
          I further certify that I am neither
13 attorney nor counsel for, nor related to or employed
   by any of the parties to the action in which this
14 deposition is taken; and further that I am not a
   relative or employee of any attorney or counsel
15 employed by the parties hereto or financially
   interested in the action.
16
          IN WITNESS WHEREOF, I have hereunto set
17 my hand this 13th day of April, 2006.
18
19
20
21
22          HEIDI B. STUTZ
23
24

O'CONNOR POLLARD REPORTING, INC.
508-528-2950 * MA: 800-528-2951
Mycourtreporter@comcast.net
Fax:  508-528-3927