UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT I. HANFLING, CHAPTER 7 TRUSTEE FOR ATG, INC. and ATG CATALYTICS L.L.C., <br><br> Plaintiffs, <br><br> vs. <br><br> EPSTEIN BECKER & GREEN, P.C., <br><br><br> Defendant. | C.A. No. 05-10077-RGS <br><br> Leave to File Granted on November 14, 2006 <br><br><br><br> November 15, 2006 |

## AMENDED COMPLAINT

The plaintiffs, Robert I. Hanfling (the "Trustee"), the duly appointed Chapter 7 Trustee for ATG, Inc. ("ATG") and its wholly owned subsidiaries, and ATG Catalytics L.L.C. ("ATG Catalytics", and jointly with the Trustee, the "Plaintiffs"), by their undersigned counsel, as and for their amended complaint (the "Complaint") against the defendant, Epstein Becker & Green, P.C. (the "Defendant" or "EBG"), allege and plead as follows:

1.  Plaintiffs commenced this civil proceeding pursuant to section 542 of Title 11 of the United States Code (the "Bankruptcy Code") and Federal Rule of Bankruptcy Procedure 7001(1), to recover for the benefit of Plaintiff's bankruptcy estates damages arising from the Defendant's actions and omissions in connection with the sale of certain assets of Molten Metal Technology, Inc. ("MMT") to ATG Catalytics in December, 1998.

### JURISDICTION AND VENUE

2.  This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334.

3.  Venue is proper before this Court by virtue of, and in accordance with, 28 U.S.C. § 1409(a).

## NATURE OF THIS ACTION

4.  The Plaintiffs bring this action in order to recover damages against the Defendant for negligence and breach of contract arising from a transaction wherein certain assets of MMT were sold to ATG Catalytics.

## PARTIES

5.  The Trustee is the duly appointed chapter 7 bankruptcy trustee for ATG and its wholly owned subsidiaries.

6.  ATG Catalytics is, and was at all relevant times, a wholly owned subsidiary of ATG.

7.  Upon information and belief, the defendant EBG is a professional corporation organized under the laws of the State of New York with offices and a principal place of business located at 250 Park Avenue, New York, NY.

## FACTUAL BACKGROUND

8.  On December 3, 2001 (the "Petition Date") ATG filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court").

9.  By order dated January 25, 2002, the Bankruptcy Court directed that the United States Trustee appoint a chapter 11 trustee for the Debtor.

10. On February 6, 2002, the United States Trustee appointed, subject to Bankruptcy Court approval, the Trustee to serve as the chapter 11 trustee for the Debtor.

11. On February 11, 2002, the Bankruptcy Court entered an Order Approving the Appointment of the Trustee as chapter 11 trustee for the Debtor (Case No. 01-46389).

12. On June 12, 2002, ATG Catalytics, at the direction of the Trustee, filed a voluntary petition in the Bankruptcy Court for relief under chapter 11 of the Bankruptcy Code (Case No. 02-43164).

13. On April 27, 2003, the Bankruptcy Court entered an order converting the bankruptcy cases of ATG and its wholly owned affiliates, including ATG Catalytics, to cases under chapter 7 of the Bankruptcy Code and thereafter the Trustee was appointed to serve as the chapter 7 trustee for the Debtor and each of the Debtor's wholly-owned subsidiaries, including ATG Catalytics.

**MMT and Q-CEP**

14. MMT, based in Waltham, Massachusetts, and four of its affiliates, filed petitions for relief under chapter 11 of the Bankruptcy Code on December 3, 1997. Thereafter, Stephen S. Gray was appointed Chapter 11 Trustee for MMT (the "MMT Trustee"). MMT's bankruptcy case is pending in the United States Bankruptcy Court for the District of Massachusetts, Boston Division (Case No. 97-21385 (CJK)).

15. MMT, prior to its bankruptcy case, was engaged in various business ventures, including the transportation and processing of hazardous and/or radioactive waste.

16. MMT had two primary operating business assets: one was the so-called "wet-waste" business, which related to the transportation, processing, packaging and disposal of wet waste materials. The second was its Catalytic Extraction Process business ("CEP"), which, through fixed base operations in Fall River Massachusetts and Oak Ridge, Tennessee, was used to treat commercial wastes with the goals of extracting reusable products from the waste while dramatically reducing the volume of waste that required disposal. MMT further developed the CEP system to treat radioactive resin waste generated by commercial facilities, such as nuclear power generators, through a system called Quantum Catalytic Extraction Process ("Q-CEP") that was located at MMT's Bear Creek, Tennessee facility (the "Q-CEP Facility").

17. At various times between 1993 and MMT's bankruptcy filing, MMT issued public statements that indicated, directly or by implication, that MMT's technologies, including Q-CEP, were operational and commercially viable.

18. Upon information and belief, and contrary to MMT's public statements, although MMT invested significant resources into development of the CEP and Q-CEP technologies, MMT was never able to make those technologies effective, safe or profitable.

19. Upon information and belief, at the time of MMT's bankruptcy filing, the CEP/Q-CEP technologies were, in fact, highly flawed and unsafe to operate. The full extent of the problems associated with the CEP/Q-CEP technologies were not generally known to the public.

**Federal Investigations of MMT**

20. In September of 1993, MMT signed an agreement with the United States Department of Energy ("DOE") to participate in the DOE's Planned Research and Development Announcement program ("PRDA"). Under the PRDA, the DOE would fund research and development of technologies geared towards treatment and recycling of a variety of DOE wastes.

21. Upon information and belief, between 1993 and 1997, the DOE paid millions of dollars to MMT to fund MMT's technologies in accordance with contracts entered into between DOE and MMT pursuant to the PRDA.

22. Beginning in or about May of 1997, various federal government entities began investigating MMT in connection with the contracts awarded to MMT pursuant to the PRDA. These investigations included a joint investigation by the DOE Office of Inspector General, and the Federal Bureau of Investigation ("FBI"). The FBI was performing its investigation of MMT in conjunction with the Department of Justice Campaign Finance Task Force. In addition, the United States House of Representatives, House Commerce Committee, was also involved in the investigations of MMT, and was conducting its own hearings. The various federal investigations of MMT are referred to

hereinafter, collectively, as the "Federal Investigations." The Federal Investigations included a grand jury investigation.

23. In connection with the Federal Investigations, MMT was represented by the law firm Latham & Watkins ("L&W"). On May 19, 1997, L&W entered into a written confidentiality and joint defense agreement (the "Joint Defense Agreement") with MMT, MMT's co-counsel (Bingham, Dana & Gould LLP), three of MMT's officers and directors and their respective counsel (the firms of Hale & Dorr, LLP, Vinson & Elkins LLP, and Duncan & Allen). As part of the Joint Defense Agreement, the parties to that agreement agreed to exchange with and disclose to each other various confidential defense materials, while preserving and protecting, as against those who were not parties to the Joint Defense Agreement, the confidentiality of such materials and any applicable privilege or protection. The Joint Defense Agreement permitted disclosure of defense materials to only a very small universe of persons, comprised of (a) employees of any counsel who are assisting in the representation of such counsel's client; and (b) experts or consultants working on behalf of or under direction of any counsel to the Joint Defense Agreement.

24. In connection with the Federal Investigations, government investigators sought to interview various MMT employees. In addition, several MMT employees were subpoenaed to testify in grand jury proceedings, and at hearings being conducted by the House Commerce Committee. The government informed MMT that separate counsel would be necessary for the employees, that L&W would not be allowed to appear on their behalf and that the government would litigate the matter to conclusion, if necessary.

25. In light of the government's demands, in August of 1997, MMT retained EBG to represent the MMT employees in connection with the Federal Investigations. EBG represented 24 separate MMT employees in connection with the Federal Investigations, including Christopher Nagel ("Nagel"), who at that time was an officer and director of MMT. Upon information and belief, each of the MMT employees' retention of EBG was at the insistence and recommendation of MMT, and MMT agreed

to pay EBG for all legal fees incurred by MMT and/or MMT employees in connection with EBG's representation of MMT and/or MMT employees.

26. The EBG attorney primarily responsible for the representation of MMT employees was Carole Schwartz Rendon ("Rendon").

27. Neither EBG, Rendon, nor the individual MMT employees represented by EBG in connection with the MMT investigation had signed the Joint Defense Agreement. However, EBG and Rendon actively participated in the Joint Defense Agreement by participating in joint defense communications and conferences, and by sharing confidential written communications expressly subject to the Joint Defense Agreement and the attorney-client and attorney-work product privileges. By their active participation in the Joint Defense Agreement, Rendon and EBG became *de facto* parties to the Joint Defense Agreement.

28. EBG's role in the Federal Investigations went beyond representing the MMT Employees and participating in the Joint Defense Agreement. EBG provided legal counseling and representation directly to MMT in connection with the Federal Investigations, such that there was a *de facto* attorney client relationship directly between MMT and EBG.

29. After MMT filed its chapter 11 bankruptcy petition in December of 1997, MMT, then a debtor in possession, desired to obtain authority from the bankruptcy court in MMT's case to employ EBG as counsel in connection with the federal investigations. A draft application to employ EBG, to be filed with the bankruptcy court, was prepared on or about December 6, 1997. However, because EBG refused to waive its pre-bankruptcy petition claim against MMT for unpaid legal fees incurred in connection with the Federal Investigations, MMT could not pursue the application. MMT nonetheless desired to have EBG continue to represent MMT and the MMT employees. Consequently, MMT agreed to pay EBG for legal services rendered to MMT and the MMT employees during the chapter 11 proceeding by characterizing the payments as

"employee expense reimbursements," thereby side-stepping the requirements of sections 327 and 330 of the Bankruptcy Code.

**The McConchie Letter**

30.     On or about March 25, 1998, Nagel received a letter (the "McConchie Letter") from the law firm of Dwyer & Collora, LLP concerning Garnet Earl McConchie, the former Vice President of MMT's Chemicals Business. The McConchie Letter set forth at length the flaws in the CEP and Q-CEP technologies and the malfeasance and misfeasance of certain individuals, including Nagel, in connection with MMT's recruitment of Mr. McConchie.

31.     On or about April 20, 1998, Nagel sent a copy of the McConchie Letter to Rendon, and Rendon read the McConchie Letter. Rendon subsequently conferred with Nagel and Eugene Berman ("Berman"), MMT's vice president of governmental and external affairs about the McConchie matter.

32.     Upon information and belief, the dispute between McConchie and Nagel and Haney was resolved in an out of court settlement.

**Shareholder Class Action Litigation**

33.     During 1997, a series of five lawsuits were commenced by various shareholders of MMT against MMT and certain officers and directors. Subsequently in 1997, the five lawsuits were consolidated into a single class action lawsuit titled *In re Molten Metal Technology, Inc. Securities Litigation*, which was pending in the United States District Court for the District of Massachusetts (Case No. 97-10325-MLW) (the "MMT Litigation").

34.     Among the individual officers and directors of MMT named as individual defendants in the MMT Litigation were Nagel and John Preston ("Preston"), a former director of MMT.

35.     The plaintiffs in the MMT Litigation alleged numerous violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Specifically, the plaintiffs alleged that the defendants made numerous false and misleading public

statements about MMT and its technologies. Many of the public statements in issue in the MMT Litigation related to public statements regarding the capabilities of MMT's technology, including CEP and Q-CEP.

36. The plaintiffs' consolidated complaint in the MMT Litigation outlined specific serious problems with the CEP/Q-CEP facilities, and alleged that, notwithstanding public statements made by MMT to the contrary, the CEP/Q-CEP systems were not capable of commercial, profitable, operation.

37. On or before November 3, 1998, EBG began to represent Nagel in the MMT Litigation, and began to participate in a joint defense agreement with other defendants and their respective counsel in the MMT Litigation.

38. Upon information and belief, the MMT Litigation was resolved in an out of court settlement.

**EBG Proof of Claim Against MMT**

39. On or about March 19, 1998, EBG filed a proof of claim (the "Proof of Claim") in MMT's bankruptcy case, pursuant to which EBG asserted a claim against MMT's bankruptcy estate in the amount of $34,607.04 for unpaid legal services, which EBG rendered to MMT prior to the commencement of MMT's chapter 11 bankruptcy proceeding.

**ATG'S Purchase of Bear Creek CEP/Q-CEP Business**

40. Subsequent to his appointment as MMT's Trustee, the MMT Trustee undertook to sell off the operational assets of MMT, including the Wet Waste business, and the CEP/Q-CEP operations located at Bear Creek Road in Oak Ridge, Tennessee, and in Fall River, Massachusetts.

41. During 1998, Preston and Nagel were interested in jointly acquiring certain assets of MMT from the MMT Trustee. Preston and Nagel created Quantum Catalytic LLC ("Quantum"), an entity through which Preston and Nagel intended to acquire assets of MMT.

42.     In or about September 1998, ATG learned that the MMT Trustee was looking to sell off MMT assets. Also around this time, ATG learned that Nagel and Preston were interested in acquiring certain MMT assets.   Upon information and belief, ATG learned, first from the MMT Trustee, and later from Preston and Nagel, that there might be a benefit to ATG to work with Preston and Nagel on a joint bid to acquire various assets from MMT.

43.      ATG retained EBG to represent ATG in negotiations with Preston and Nagel on a joint bid for assets of MMT, and in negotiations with the MMT Trustee.

44.     Preston, Nagel and Quantum were represented by the firm Mintz Levin Cohn Ferris Glovsky and Popeo, PC ("Mintz Levin") in negotiations with ATG and the MMT Trustee in connection with a joint bid with ATG to acquire MMT assets.

45.     During the negotiations between ATG and Preston, Nagel and Quantum, Preston and Nagel informed and assured ATG that technical issues with the CEP process had been worked out. Consequently, although ATG realized that MMT had lost money on the CEP/Q-CEP business, ATG negotiated a transaction with Quantum to jointly bid on assets of MMT.  ATG's decision to go forward and negotiate a joint bid with Quantum and the MMT Trustee was based upon its understanding and beliefs that:

   a) MMT's CEP/Q-CEP business had been run in an extremely inefficient manner by MMT and the MMT Trustee;
   b) the CEP/Q-CEP process was on the verge of profitability, with a high upside potential;
   c) MMT had already made most of the investments in CEP/Q-CEP required to achieve higher waste processing rates, and that the existing constraints were largely a function of completing on-going process tweaking and focusing trained personnel on the job at hand.
   d) MMT's CEP/Q-CEP business was in a strong position in a strong market area; and
   e) the CEP/Q-CEP business was close to profitability.

46.     On November 6, 1998, ATG and Quantum submitted a joint bid for substantially all of the assets of MMT, including the Wet Waste and CEP/Q-CEP assets. Thereafter, on November 13, 1998, ATG and Quantum submitted a revised bid (the "ATG/Quantum Bid") to the MMT Trustee for the MMT assets. Thereafter, the MMT Trustee determined that the ATG/Quantum Bid was the highest and best offer for the assets covered in the ATG/Quantum Bid.

47.     On November 24, 1998, the Bankruptcy Court in MMT's bankruptcy case conducted a hearing on, *inter alia*, the MMT Trustee's request for authority to sell MMT Assets pursuant to the ATG/Quantum Bid. Jarvis Kellogg, an attorney then employed with EBG, represented ATG at the November 24, 1998 hearing.

48.     On November 25, 1998, the Bankruptcy Court (Kenner, U.S.B.J.) in MMT's bankruptcy case, entered an order approving the sale of the Wet Waste and CEP/Q-CEP assets to ATG and Quantum in accordance with the terms of the ATG/Quantum Bid, subject to certain amendments. On December 1, 1998, the MMT Trustee, Quantum and ATG Catalytics entered into a letter agreement (the "Letter Agreement") pursuant to which the MMT Trustee agreed to sell, and ATG Nuclear Services, LLC ("Nuclear Services"), ATG Catalytics and Quantum each agreed to purchase, certain assets of MMT. Specifically, ATG Nuclear Services was to acquire MMT's Wet Waste business assets, and ATG Catalytics was to acquire all of MMT's CEP/Q-CEP business assets excluding certain CEP related assets that Quantum was acquiring.

49.     The monetary terms of the sale for the CEP/Q-CEP assets, subject to various adjustments, included an immediate cash payment to MMT of $100,000.00 and minimum annual installment payments for five years thereafter of at least $800,000.00 each, commencing on the one-year anniversary of the sale closing date. In addition, ATG agreed to pay, and guarantee the payment of ATG Catalytics' payment obligations.

Further, ATG assumed various liabilities, including certain environmental liabilities related to the CEP/Q-CEP facilities.

50. On December 1, 1998, the parties closed on the sale and ATG Catalytics acquired ownership of MMT's CEP/Q-CEP business assets (except those assets acquired by Quantum). ATG was represented by EBG at the closing.

51. In accordance with certain federal and state regulations, ATG purchased financial assurance in the form of an insurance policy (the "Financial Assurance Policy") from Indian Harbor Insurance Company ("Indian Harbor"), to cover closure and/or post-closure expenses associated with various ATG hazardous waste properties, including the CEP/Q-CEP facility in Oak Ridge, Tennessee. The Financial Assurance Policy guaranteed payment of closure costs and/or post-closure costs associated with the shut down of the CEP/Q-CEP facility. The Financial Assurance Policy included a provision requiring ATG to reimburse Indian Harbor for any amounts paid by Indian Harbor under the Financial Assurance Policy for closure and/or post-closure expenses. The Financial Assurance Policy contained a $4.8 million sub-limit for the CEP/Q-CEP facility in Oak Ridge, Tennessee.

**Failure of the CEP/Q-CEP Business**

52. Upon its acquisition of the CEP/Q-CEP business assets from MMT and the MMT Trustee, ATG undertook to operate the CEP/Q-CEP business. However, ATG ran into immediate, severe problems with the CEP/Q-CEP facility, which prevented continuous, reliable operation of the CEP/Q-CEP system.

53. The problems with the CEP/Q-CEP technology alleged by McConchie in the McConchie Letter, alleged by the shareholders in the MMT Litigation, and alleged by the government in the Federal Investigations, were true.

54. On or about December 9, 1999, the one-year anniversary following the closing of the sale, the first annual installment of $800,000 relative to the CEP/Q-CEP assets was paid to MMT from collateral held by the MMT Trustee pursuant to the Letter Agreement.

55. By the end of 2000, ATG was forced to shut down its operation of the CEP/Q-CEP business that it had acquired from MMT due to significant, insurmountable problems. ATG then defaulted on its remaining payment obligations to MMT under the Letter Agreement.

56. On or about January 15, 2004, the State of Tennessee demanded forfeiture of the full sub-limit of the Financial Assurance Policy applicable to the CEP/Q-CEP facility in Oak Ridge, Tennessee. On or about February 24, 2004, Indian Harbor paid the State of Tennessee $4.8 million, the full sub-limit applicable to the CEP/Q-CEP facility, on account of the state's demand of forfeiture of the Closure Assurance Policy. Thereafter, Indian Harbor filed a proof of claim in ATG's bankruptcy case asserting, *inter alia*, a $4.8 million unsecured claim arising from ATG's obligation to reimburse Indian Harbor.

57. The assumptions upon which ATG decided to move forward with a joint bid with Quantum to acquire the CEP/Q-CEP assets, outlined in Paragraph 45 above, were incorrect, insofar as:

   a) MMT and the MMT Trustee had operated, or attempted to operate, the CEP/Q-CEP facility in as efficient a manner as possible, given the constraints and limitations on the CEP/Q-CEP facility's operational capabilities;

   b) MMT's CEP/Q-CEP process was not on the verge of profitability, and did not have any upside potential whatsoever;

   c) No amount of additional investment in the CEP/Q-CEP facility by ATG would attain profitable operation of the facility. Further, existing constraints on the system's processing capabilities were the result of serious system design defects, and were not largely a function of completing on-going process tweaking and focusing trained personnel on the job at hand;

   d) Given the serious operational constraints on the system, MMT's CEP/Q-CEP business was in a weak position in the market; and

   e) The CEP/Q-CEP business was not close to being, and never could be, profitable.

58. As a result of the transaction, ATG, *inter alia*, incurred approximately a $4.1 million liability to the MMT Trustee. Furthermore, ATG was required to pay, and did pay, approximately $296,000 to secure transfer of the required Closure/Post-Closure Bond/Insurance to ATG. ATG also incurred liability of not less than $4.6 million pertaining to environmental contamination of the real property in Oak Ridge Tennessee where the Q-CEP facility is located.

**EBG's Failure To Adequately Disclose Conflicts and Obtain Conflict Waivers**

59. Upon information and belief, EBG, after it had begun to represent ATG in connection with ATG's joint bid to acquire assets from MMT, conducted and completed an internal conflict of interest check.

60. During its conflict check, EBG attorneys learned that EBG had represented MMT officers and employees, including Nagel, in connection with the Federal Investigations and the Shareholder Litigation.

61. As a result of its prior representation of MMT and MMT employees and officers, including Nagel, and as a result of its pecuniary interest in MMT and its bankruptcy estate, EBG had a conflict of interest with respect to its representation of ATG in connection with ATG's joint bid and purchase of MMT assets.

62. EBG did not, prior to commencing its representation of ATG in connection with ATG's joint bid to acquire assets from MMT, or after commencing its representation of ATG, disclose, or adequately disclose, its prior representations of MMT and MMT employees to ATG. Nor did EBG disclose that it held a pecuniary interest in MMT's bankruptcy estate, as reflected in EBG's Proof of Claim.

63. EBG did not obtain any written conflict waivers from ATG or MMT

before it commenced its representation of ATG in connection with its joint bid to acquire MMT assets.

## COUNT I
## NEGLIGENCE and BREACH OF CONTRACT (MALPRACTICE)

64. The Plaintiffs incorporate herein the allegations set forth in all of the above paragraphs in their entirety as if set forth fully herein.

65. EBG, as counsel to ATG, had a duty to fully and fairly disclose its conflicts, or potential conflicts, of interest to ATG prior to undertaking to represent ATG in connection with ATG's purchase of assets from MMT.

66. EBG breached its duty to ATG when it failed, prior to undertaking its representation of ATG in connection with ATG's joint bid and purchase of MMT assets, to adequately disclose to ATG that:

(a) EBG had participated in a joint defense agreement in connection with the Federal Investigations and in the MMT Litigation;

(b) EBG had provided direct legal representation to MMT in the Federal Investigations;

(c) EBG was representing Nagel in the MMT Litigation;

(d) among the issues raised in both the Federal Investigations and the MMT Litigation were whether there were serious problems with MMT's CEP/Q-CEP technology;

(e) among the issues raised in the Federal Investigations and the MMT Litigation, were the honesty and credibility of MMT officers and directors, including Preston and Nagel;

(f) McConchie had outlined, in the McConchie Letter, his specific claims regarding serious defects with MMT's CEP/Q-CEP technology and related assets;

    (g)    McConchie alleged, in the McConchie Letter, matters going to the honesty and credibility of, among others, Nagel; and

    (h)    EBG possessed a pecuniary interest in MMT's bankruptcy estate, as evidenced by its Proof of Claim.

67.    EBG further breached its duty to ATG when, upon learning of EBG's potential conflict of interest, it failed to perform a thorough and adequate conflict analysis.

68.    EBG knew, or should have known, that full and fair disclosure of the circumstances pertaining to its conflicts, or potential conflicts of interest, including the matters alleged in the preceding paragraph, would likely have altered ATG's determination to go forward with a joint bid and purchase of MMT assets.

69.    As a direct and proximate cause of EBG's failure to adequately disclose its conflicts of interest, and potential conflicts of interest to ATG, ATG suffered damages, in an amount to be determined at trial, but not less than $10,000,000.00.

**WHEREFORE,** the Plaintiffs request that judgment be entered in its favor and against the Defendant as follows:

    i.    damages, in an amount to be determined at trial, but not less than $10,000,000.00;

    ii.    costs, including attorneys' fees, to the extent permitted by law, and expenses incurred by the Plaintiffs in the commencement and prosecution of this Complaint from its initial analysis to preparation through trial and any subsequent appeal ("Costs");

    iii.    interest, at a per annum rate deemed by this Court to be appropriate, from the Petition Date until such amount ordered by this Court, together with all interest and Costs, is paid in full to the estate; and

    iv.    such other and further relief as is just and proper.

Dated:   Norwalk, Connecticut
         November 15, 2006

                                      THE PLAINTIFFS,
                                      By their attorneys,
                                      JACOBS PARTNERS LLC

                            By: / s/ Robert M. Fleischer_____
                                Mark R. Jacobs
                                Leslie L. Lane
                                Robert M. Fleischer
                                Merritt View
                                383 Main Avenue
                                Norwalk, Connecticut 06851
                                Phone: (203) 846-6622
                                Fax: (203) 846-6621

**Certification of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 15th day of November, 2006.

By: /s/ Robert M. Fleischer
Robert M. Fleischer

-17-