UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ROBERT I. HANFLING, Chapter 7 Trustee of the Bankruptcy Estates of ATG, Inc. and ATG Catalytics, LLC, <br><br> Plaintiff, <br><br> v. <br><br> EPSTEIN BECKER & GREEN, P.C., <br><br> Defendant. | Civil Action No. 05-10077-RGS |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR
AN AWARD OF ATTORNEYS' FEES AND EXPENSES UNDER 28 U.S.C. § 1927**

Defendant Epstein Becker & Green, P.C. ("EBG") submits this memorandum in support of its motion, brought pursuant to 28 U.S.C. § 1927, for an award of attorneys' fees and costs, payable by Jacobs Partners LLC ("Jacobs Partners"), counsel to plaintiff Robert I. Hanfling, Chapter 7 Trustee of the Bankruptcy Estates of ATG, Inc. and ATG Catalytics LLC (the "Trustee").

Jacobs Partners has unreasonably and vexatiously multiplied the proceedings in this case. The original Complaint filed in this case was fatally flawed, as Jacobs Partners would have known had it merely reviewed documents in its client's possession and conducted any meaningful pre-filing investigation.  After the problems with its claims was made abundantly clear, Jacobs Partners interrupted an established summary judgment briefing schedule to amend the original Complaint, without, however, curing its fundamental flaws.  When the Court awarded EBG summary judgment on the Amended Complaint, Jacobs Partners filed a motion for reconsideration that lacked any basis in the summary judgment record or governing Massachusetts law.  As a sanction for this unreasonable and vexatious multiplication of the proceedings, EBG requests that it be granted an

award of its attorneys' fees and costs incurred (1) in briefing and arguing the merits of the unnecessary Amended Complaint and (2) in opposing the frivolous motion for reconsideration.

## PROCEDURAL BACKGROUND

The Complaint in this action was originally filed on December 2, 2003 as an adversary proceeding in what was then the Chapter 11 bankruptcy case of ATG, Inc. (later converted to Chapter 7). The adversary proceeding was filed on the last possible day before the statute of limitations ran pursuant to 11 U.S.C. § 108(a); it was one of the 54 adversary proceedings that Jacobs Partners filed on the Trustee's behalf that day.

Jacobs Partners did not adequately investigate the Trustee's legal malpractice claim against EBG before filing the Complaint. The truth about many of the incorrectly pleaded basic facts was available, had Jacobs Partners simply reviewed the documents in the Trustee's possession and made inquiry with former ATG employees before it was filed. An accurate grasp of these facts, including in particular those with respect to the basic structure of the underlying corporate transaction and ATG's reasons for pursuing it, was essential to an understanding of the parties' motivations and actions and issues of causation.

After the Complaint was filed, the case was almost immediately delayed for over one year as the parties briefed and argued the withdrawal of the reference of this non-core proceeding to the bankruptcy court and then a transfer of this matter from the Northern District of California to the District of Massachusetts. Despite this delay, Jacobs Partners apparently did no further work to assess the factual accuracy of the Complaint. When the case finally arrived in the District of Massachusetts and a scheduling order entered, Jacobs Partners immediately put EBG on notice that it had not yet even reviewed the Trustee's own documents to identify documents relevant to this

claim. Had the Trustee and his counsel reviewed documents in the Trustee's own possession, they would have discovered that this malpractice claim against EBG was destined to fail.

Nor did the Trustee or Jacobs Partners apparently conduct any investigation among the former employees of ATG in order to assess the claims made in the Complaint. In August 2005, Jacobs Partners reported to EBG that William Hewitt, the former ATG employee with the greatest personal knowledge of the events underlying this action, had died. Although no explanation has been provided for this misrepresentation, it could not have been the result of any factual investigation among ATG's former employees. The very first former ATG employee whom EBG contacted to investigate ATG's participation in the underlying acquisition (including such causation-related issues as what ATG knew about MMT's technology and why it wished to acquire it), in March 2006, immediately and without prompting remarked that Mr. Hewitt was the individual with knowledge regarding these issues and then confirmed that he was alive.

Phase I document production and deposition discovery during March and April 2005 laid bare the errors in the Trustee's original Complaint. In early May 2006, EBG notified the Trustee, by a letter to Jacobs Partners, that it believed that Rule 11 required withdrawing the Complaint as not supported by the facts as they had developed in discovery. Jacobs Partners responded, acknowledging the factual inaccuracies of the original Complaint and promising to amend it. The proposed Amended Complaint did not appear until late June 2006 (and only *after* EBG had filed a motion for summary judgment on the original Complaint). The allegations of the proposed Amended Complaint did not cure the deficiencies of the original Complaint, and EBG opposed amendment on grounds of futility. The Court allowed amendment of the Complaint because the motion for leave was timely filed, explicitly noting that EBG's futility arguments would be addressed within the context of EBG's pending motion for summary judgment.

At oral argument on the motion for summary judgment (subsequently renewed as EBG's motion for summary judgment on the Amended Complaint), the Court ruled from the bench that the claims failed for lack of any proof of the causation of damages. After final judgment entered, Jacobs Partners filed a motion for reconsideration arguing, in the alternative, that the Court had erred in allocating to the Trustee the burden of proof on causation and that the Trustee retained a newly articulated claim for disgorgement which did not require proof of causation. The motion for reconsideration was likewise denied.

## **ARGUMENT**

Section 1927 of Title 28 of the United States Code provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses and attorney's fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Behavior is considered "vexatious," for purposes of Section 1927, "when it is harassing or annoying, regardless of whether it was intended to be so." *Cruz v. Savage,* 896 F.2d 626, 632 (1st Cir. 1990). The standard is objective; a showing of subjective bad faith is unnecessary.

> The attorney need not intend to harass or annoy by his conduct of be guilty of conscious impropriety to be sanctioned. It is enough that an attorney acts in disregard of whether his conduct constitutes harassment or vexation, thus displaying a 'serious and studied disregard for the orderly process of justice.'

*Id.* (internal citations omitted).

The Trustee's litigation conduct, as planned and executed by Jacobs Partners, meets this standard. Jacobs Partners filed the Trustee's original claims against EBG in haste and thereafter failed to rethink their merit, even as an increasing fund of information called them into doubt. Failure to abandon a "doomed," meritless claim can result in sanctions. *E.g., Gorman v. Coogan,* 2004 WL 2713095, *20-*21 (D. Me. 2004)(a "litigant's obligations with respect to the contents of

4

these papers are not measured solely as of the time they are filed . . . but include reaffirming to the court and advocating positions contained in those pleadings and motions after learning that they cease to have any merit"). Jacobs Partners should have investigated facts about ATG and the asset purchase transaction before it filed the Trustee's Complaint. It should have examined the documents in the Trustee's possession and interviewed former ATG employees in order to learn the structure of the transaction and the reasons why ATG entered into it. As discovery progressed, it should have considered the facts as they developed with respect to EBG and its legal work on behalf of certain MMT employees. When EBG's summary judgment motion appeared meritorious, it ought not to have amended the Complaint unless it could articulate a theory that did not fail for exactly the same reason – notably, a fatal lack of causation. And when the Court ruled from the bench, awarding EBG summary judgment, it ought not to have sought reconsideration unless the arguments it would advance were based on the governing Massachusetts law.

Although this action was ill-considered from the outset, the point at which it became affirmatively harassing was when Jacobs Partners sought to amend the Complaint to assert a new claim that had no greater chance of success than had the original, abandoned claim. The harassment continued when Jacobs Partners pursued reconsideration of a clear ruling with respect to the amended claims' lack of viability. As sanctions, EBG is entitled to the attorneys' fees and costs it incurred in responding to the Amended Complaint and opposing the motion for reconsideration.

I.  **THE AMENDED COMPLAINT CURED NONE OF THE DEFICIENCES OF THE ORIGINAL COMPLAINT.**

Jacobs Partners amended the original Complaint because its deficiencies were glaring after discovery into liability issues was completed. However, even after amendment, the most glaring errors in the original Complaint – demonstrating an absence of causation of damages – remained:

(1) a willful ignorance about ATG's knowledge, goals and strategies with respect to the CEP technology and MMT asset purchase transaction; (2) a complete misapprehension of the structure and purpose of that transaction; and (3) a fundamental failure to grasp an attorneys' duties of confidentiality to a client.[1]

> **A.    The Trustee And His Counsel Remained Willfully Ignorant About The Knowledge With Which ATG Entered The Asset Purchase Transaction.**

It is the underlying premise of the original and Amended Complaints that EBG possessed material information with respect to the viability of the CEP technology that ATG and Quantum Catalytics were jointly purchasing and that EBG failed to disclose this information to ATG. Principles of causation suggest that this argument would fail if ATG already knew the information that EBG allegedly failed to disclose. The Trustee and his counsel, Jacobs Partners, failed completely to make inquiries of ATG's own former employees about their knowledge of the MMT assets and their motivations for entering into the asset purchase transaction. This includes their mystifying failure to locate and interview William Hewitt, the ATG executive who had primary

---

[1]    Jacobs Partners also conducted itself unreasonably and vexatiously when it advanced unsupported, almost fanciful allegations about the conduct of EBG, which were contradicted by facts in its own possession and the depositions conducted during Phase I discovery. For instance, the Trustee alleged in its original and Amended Complaints that EBG had represented MMT and not just certain of its employees. When he made this allegation, the Trustee possessed (i) copies of written indemnification agreements between MMT and certain employees, pursuant to which it had agreed to pay the employees' legal bills incurred in connection with the FBI/DOE investigation of MMT and (ii) copies of written retention agreements that EBG had entered with MMT employees thereafter. During discovery, the Trustee also learned (through depositions of the EBG lawyer who represented the MMT employees, Carole Rendon, and MMT's in-house counsel, Ethan Jacks and Eugene Berman) that EBG had represented certain MMT employees but never MMT itself.

The Trustee thereupon attempted to marshal other "evidence" in support of the claim that EBG had really represented MMT itself, including speculation by counsel to the MMT Trustee, Alan Bruanstein (a man with no first-hand knowledge of the matter) that MMT had forced a former employee named Rhonda Walker, as a condition of settlement of a Title VII complaint, to accept EBG's legal services. The Trustee withheld from the Court Ms. Walker's written settlement agreement and related correspondence, which disproved his accusation. The Trustee also argued that EBG had been party to a joint defense in connection with the federal investigations, while withholding the joint defense agreement among counsel to that investigation (EBG was not a party to it) and an immense volume of "joint defense communications," not copied to or shared with EBG, which tended to demonstrate that EBG was not part of the joint defense group.

responsibility for the asset purchase transaction (and who was EBG's primary point of contact with ATG).  Second, and yet more fundamentally, the Trustee and his counsel ignored evidence *from the Trustee's own files* establishing ATG's deep awareness of the shortcomings of CEP technology and the drawbacks of (including environmental liabilities posed by) the Bear Creek Road facility.  This evidence includes the following documents, produced by the Trustee in this litigation but otherwise ignored by him:

- In a September 1998 memorandum, an ATG employee recommended that ATG bid for MMT's wet waste business line only.  With respect to the Q-CEP assets, the author wrote:

> Q-CEP is the core molten metal process at a facility in Oak Ridge that is focused on process nuclear utility resins up to 10-20 R/hr.  Although Q-CEP may represent a significant value, *I recommend against acquiring this business line based upon the magnitude of the potential risks to ATG.* . . .  [The] Mixed Waste Business Line . . . is based upon a Q-CEP type technology that is applied to mixed wastes . . . .  I do not recommend pursuing the MMT Mixed Waste Business Line.  *I believe that the operating costs associated with this business line as well as the inherent uncertainties associated with the overall long-term viability and robustness of the MMT technology in general would present untenable management and financial challenges to ATG.*

(Emphasis supplied)

- On September 25, 1998, ATG's William Hewitt submitted a bid for the wet waste assets only.  Knowing the preference of the MMT Trustee for a transaction that bundled the CEP and wet waste assets, he included a second, alternative bid that also covered certain CEP assets "contingent upon ATG being held harmless for the ultimate cleanup of the Q-CEP facility."

- On November 30, 1998, Mr. Hewitt memorialized the thought processes that had led ATG to submit a bid that included the CEP assets.  Because the CEP business line had been in "a loss position historically," ATG entered the deal (1) recognizing that it was necessary to purchase CEP assets in order to acquire the desired wet waste assets and (2) with a firm back-up plan in the event that turnaround was not possible.  *See* Hewitt Aff. Ex. A.

Even without the testimony of William Hewitt, the documents in the Trustee's own possession provided crystal clear evidence that ATG was not fooled -- either by Quantum Catalytics or EBG -- into purchasing the CEP assets. A business decision was made, and a risk was taken with full knowledge. Mr. Hewitt's testimony only confirmed information previously available to the Trustee:

> It was known to ATG at the time of the transaction that the CEP technology had not operated reliably. As explained above, ATG approached the acquisition of the MMT CEP assets with a back-up plan due to the risk it perceived with the CEP process. If CEP had operated as promised by Quantum Catalytics (which ATG was skeptical of), it would have been an upside. If it did not, ATG's plan was to remove the CEP processors from the facility and replace that process with a process that had already been internally proven to treat resins.

Hewitt Aff. ¶ 15(b). *See also id.* ¶ 10 ("Despite assurances by Drs. Preston and Nagel that the technical issues with the CEP process had been worked out, ATG considered the CEP process to pose a risk."). If Jacobs Partners had sought out knowledgeable witnesses and reviewed the Trustee's own documents, it would have understood that it could not prove causation of damages.

### B. Jacobs Partners Repeatedly Misstated Basic, Material Facts About the Asset Purchase Transaction.

Jacobs Partners put together the original Complaint in this matter without any real understanding of the structure of the asset purchase transaction that was its subject or the interests of the various parties thereto. While this conduct alone was negligent and perhaps sanctionable, the failure to have corrected serious misapprehensions about the transaction over two years later, after full discovery into this subject and correction by EBG, is baffling. A proper understanding of the MMT asset purchase transaction clarifies the utter improbability of the theory behind the proposed Amended Complaint. Faced with the evidence that EBG marshaled that ATG was well aware of historical problems with the CEP technology, the Trustee advanced the argument that ATG had relied to its detriment upon representations by Christopher Nagel and John Preston of Quantum

Catalytics that problems with the CEP technology had been fixed and that it would work in the future. *See, e.g.,* Amended Complaint ¶ 45.

The Trustee's conflict of interest claim, asserted in its Amended Complaint, was premised on the suggestion that EBG had an obligation to tell ATG information that would have made clear to ATG that Nagel and Preston were lying.[2] The theory relies upon the assumption that Quantum Catalytics *benefited* from misrepresenting the viability of the CEP assets, as would be the case, for instance, if Quantum Catalytics were selling the CEP assets. But it was not. The fact (ignored by the Trustee) was that ATG Catalytics, the firm that purchased the CEP assets, was jointly owned by ATG, Inc. and Quantum Catalytics.[3] Anything ATG Catalytics was purchasing, Quantum Catalytics was purchasing as well. Moreover, Quantum Catalytics was also purchasing additional CEP assets, by itself, alongside of ATG Catalytics, and Quantum Catalytics and ATG Catalytics had agreed to be *jointly and severally liable for the purchase price of all of the CEP assets*. There simply was not, on the facts the Trustee and his Counsel failed to investigate, any evidence pointing towards an incentive for Nagel and Preston to lie to ATG about the CEP assets.[4]

---

[2]   This argument morphed once again, at oral argument, into the allegation that EBG should have disclosed its alleged conflicts of interest, from the disclosure of which ATG would have inferred that Nagel and Preston were lying.

[3]   The Trustee and his Counsel alleged on multiple occasions (including in the original Complaint and the Amended Complaint) – incorrectly -- that ATG Catalytics – one of the companies for which the Trustee served as Chapter 7 Trustee – was a wholly-owned subsidiary of ATG, Inc. This was wrong and the Trustee should have known it: ATG Catalytics had two members, ATG, Inc. and Quantum Catalytics.

[4]   Indeed, when ATG Catalytics failed to make its second payment for the CEP assets, due on December 1, 2000, the MMT Trustee first sued Quantum Catalytics, alone, for payment. *Gray, Chapter 11 Trustee of Molten Metal Technology, Inc. v. Quantum Catalytics LLC,* Adversary Proceeding No. 01-1205-CJK (Bankr. D. Mass.). This lawsuit put Quantum Catalytics out of business. Only after this case settled did the MMT Trustee pursue ATG Catalytics, in state court in Tennessee.

### C. Jacobs Partners Failed From The First To Grasp The Rules Of Confidentiality That Guide An Attorneys' Actions.

Finally, both the initial Complaint and the Amended Complaint also shared as a premise the assumption that, if EBG had learned information about CEP technology from a prior representation of MMT employees, it had an obligation later to pass that information on to ATG. This is incorrect. Even if EBG had had a conflict of interest,[5] the ethical rules preserve confidential information learned in the course of representing one client from disclosure in the event of a subsequent representation of a different client. Rule 1.6(a) of the Massachusetts Rules of Professional Conduct provides that "[a] lawyer shall not reveal confidential information relating to representation of a client unless the client consents after consultation . . . ." This broad prohibition "applies not merely to matters communicated in confidence by the client but also to virtually all information relating to the representation, whatever its source." Rule 1.6 comment 5. Issues of causation hobbled this case from the start because the Trustee's fundamental complaint was that EBG had not divulged client confidences, something it was not free to do in any event.

## II. THE MOTION FOR RECONSIDERATION FOUND NO SUPPORT IN EITHER THE RECORD OR GOVERNING MASSACAHUSETTS LAW.

After the Court entered summary judgment in EBG's favor from the bench, the Trustee moved for reconsideration. Its initial argument was that the Court had not considered an argument – running squarely against settled Massachusetts authority – that the burden of proof in a legal malpractice case should switch to the lawyer to prove that its conduct did *not* cause any damages. The Trustee suggested in its motion that the Court had failed to consider the issue below, although

---

[5] EBG did not have a conflict of interest. Because the case was resolved on the causation issue, EBG did not have the opportunity to address the breaches of duty alleged by the Trustee at the summary judgment argument on November 21, 2006. The facts of the case are complex, and EBG was forced to argue the conflict of interest allegations in a reply brief based on a record initially developed with other allegations in view, given plaintiffs' late assertion of new theories.

there was no explanation why he thought so, insofar as the sole subject of discussion at oral argument was causation and whether or not the Trustee had carried his burden of proof.[6] In any event, while this argument was foreclosed by the governing Massachusetts law, *see, e.g., McEvoy v. Robinson & Cole LLP*, 61 Mass. App. Ct. 1110, 2004 WL 1292042 (2004); *Clark v. Rowe*, 428 Mass. 339, 345 (1998); 2 J. MALLEN & J. SMITH, LEGAL MALPRACTICE § 14.2, what tipped the argument decisively from the merely unsuccessful to the frivolous was the unassailable fact that EBG was the only party in this case to offer *any* proof of causation. William Hewitt's unrebutted affidavit ensured that, no matter where the burden of proof might lie, EBG would prevail on the causation issue.

The Trustee's second argument on its motion for reconsideration was that, if it were successful in proving that EBG had committed an ethical breach (conflict of interest), then it could require EBG to disgorge all fees that the Trustee had paid, without proof of causation of damages. This theory of recovery is foreclosed by the governing Massachusetts law, which does not recognize a remedy of disgorgement of legal fees, without any evidence of causation of damages, in an attorney malpractice action such as this one. The issue was squarely faced by the Massachusetts Appeals Court in *McElroy v. Robinson & Cole, LLP*, 61 Mass. App. Ct. 1110, 2004 WL 1292042 (2004)[7]:

> McElroy also argues that, even without evidence of causation, a jury should have been allowed to determine whether [defendant's] breach of fiduciary duty required disgorgement of all legal fees owed to the offending law firm. We disagree. McElroy points to no Massachusetts case that provides for per se forfeiture of fees from an attorney in such circumstances, nor are we aware of any.

---

6   The burden of proof had been briefed by both parties. *See* Pl. Opp. at 16 and EBG Reply at 3.

7   The Trustee failed to bring this case, which is directly on point, to the Court's attention, as required by Massachusetts Rule of Professional Conduct 3.3(a)(3).

2004 WL 129042, *3.  Under Massachusetts law, ethical violations that do not result in damage to a client are matters for the Board of Bar Overseers and not recovery in tort.  Even if EBG had violated the ethical rules concerning conflicts of interest, there would have been no cause of action available to the Trustee in the absence of damages.

## CONCLUSION

For all of the foregoing reasons, EBG requests that the Court award it sanctions for Jacobs Partners' unreasonable and vexatious multiplication of the proceedings in this matter.  Specifically, EBG requests that it be awarded its attorneys' fees and costs incurred in briefing and arguing in response to the Amended Complaint and in responding to its motion for reconsideration.  EBG will, at the Court's request, submit proof of the attorneys' fees and costs it incurred in this manner.

EPSTEIN BECKER & GREEN, P.C.

\_\_\_/s/ Paula M. Bagger_____
Marjorie Sommer Cooke (BBO#097800)
Paula M. Bagger (BBO#547703)
COOKE, CLANCY & GRUENTHAL, LLP
265 Franklin Street
Boston, MA  02110
(617) 428-6800

Dated: February 1, 2007

## CERTIFICATE OF SERVICE

I, Paula M. Bagger, hereby certify that service upon plaintiffs' counsel was effected through the Court's CM/ECF system this 1st day of February 2007.

\_\_\_\_/s/ Paula M. Bagger_____
Paula M. Bagger