UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ROBERT I. HANFLING, CHAPTER 11 TRUSTEE FOR ATG, INC. AND ATG CATALYTICS L.L.C.**<br><br>         **Plaintiff,**<br><br>    vs.<br><br>**EPSTEIN BECKER & GREEN, P.C.,** et al.,<br><br>         **Defendant(s)** | C.A. No. 05-10077-RGS |

## DECLARATION OF ROBERT M. FLEISCHER

I, Robert M. Fleischer, having been duly sworn, deposes and states as follows:

    1.  I am a member in good standing of the Bar of the State of Connecticut and am admitted, *pro hace vice*, to this Court in this action.

    2.  I submit this declaration in support of Jacobs Partners LLC's ("JPLLC") opposition to the motion of defendant Epstein Becker & Green, P.C. ("EBG") for sanctions pursuant to 28 U.S.C. 1927.

    3.  Attached hereto as Exhibit "A" is a true and accurate copy of the official transcript of the hearing conducted in the above-captioned case on November 21, 2006 in connection with the defendant's motion for summary judgment.

    4.  Attached hereto as Exhibit "B" is a copy of an affidavit of service that JPLCC received in August of 2005 in connection with its effort to effect service of a summons and complaint on William Hewitt.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 15th day of February, 2007 at Norwalk, Connecticut.

    __s/Robert M. Fleischer_____
    Robert M. Fleischer

**Certification of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on this 15th day of February, 2007.

By: /s/ Robert M. Fleischer _____
    Robert M. Fleischer

11-21-06sj-F

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF MASSACHUSETTS
 2

 3     * * * * * * * * * * * * * * *
       *ROBERT J. HANFLING,         *
 4     CHAPTER 7 TRUSTEE            *
                Plaintiff           *    CIVIL ACTION
 5              vs.                 *    No. 05-10077-RGS
                                    *
 6     *EPSTEIN BECKER & GREEN, ET AL *
                Defendants          *
 7     * * * * * * * * * * * * * * *

 8

 9

10          BEFORE THE HONORABLE RICHARD G. STEARNS
                 UNITED STATES DISTRICT JUDGE
11                 SUMMARY JUDGMENT MOTION
                     November 21, 2006
12

13     APPEARANCES:

14         JACOBS PARTNERS, LLC, (By Robert M. Fleischer,
       Esq.) 383 Main Avenue, Norwalk,, Connecticut  06851, on
15     behalf of Plaintiff

16         COOKE, CLANCY & GRUENTHAL, LLP, (By Paula M.
       Bagger, Esq.) 265 Franklin Street, Boston, Massachusetts
17     02110, on behalf of Defendants

18

19

20
                                  Courtroom No. 21
21                                1 Courthouse Way
                                  Boston, Massachusetts 02109
22

23          JAMES P. GIBBONS, RPR/RMR
                Official Court Reporter
24           1 Courthouse Way, Suite 7205
              Boston, Massachusetts  02210
25                  (617) 428-0402
```

2

```
 1                P R O C E E D I N G S

 2         THE CLERK:  This is Robert Hanfling versus
```

```
                              11-21-06sj-F
     3      Epstein Becker & Green, Civil Action No. 05-10077.
     4               If counsel would each identify themselves for the
     5      record.
     6               MR. FLEISCHER: Good afternoon, your Honor.
     7      Robert Fleischer of Jacobs Partners for the plaintiff,
     8      Robert Hanfling, Chapter 7 Trustee for ATG.
     9               MS. BAGGER: Paula Bagger, Cooke, Clancy &
    10      Gruenthal, for the defendant, Epstein Becker & Green, P.C.
    11               I have with me here today Robert DeRight who is
    12      listed counsel for Epstein Becker & Green.
    13               THE COURT: All right.
    14               The cases are before the Court, as you know, on the
    15      motion for summary judgment brought on behalf of Epstein
    16      Becker & Green, who I will refer to as "EBG."
    17               The facts are, obviously, complex, but I think I
    18      have a pretty good grip on all that has proceeded today's
    19      hearing.
    20               And here, as I tried to piece together what the
    21      summary judgment motion involves, the issue seems to me to
    22      be the following:
    23               In amending the complaint, there's been, it seems
    24      to me, not a subtle but an important shift in the trustee's
    25      position. As I understood the original complaint against
```

                                                                       3

```
     1      EBG, the trustee made the argument that EBG was under a duty
     2      to disclose confidences that it had learned in the course of
     3      its representation of Molten Metals, and had those
     4      confidences been disclosed, I suppose the theory is that ATG
     5      might have reconsidered its purchase of the assets.
     6               I think perhaps the trustee has recognized that
     7      that argument in a sense puts EBG into yet another violation
```
Page 2

11-21-06sj-F

8  of its duty to avoid conflicts; that is, what the trustee is
9  arguing is that EBG should have violated its duty to the
10 prior client, again assuming the fact of representation, by
11 disclosing confidences it had learned in the course of
12 representing Molten Metals or employees of Molten Metals.
13         As I understand the amended complaint, the argument
14 that the trustee now makes is that EBG's wrongdoing was in
15 failing to disclose the fact that there was a conflict that
16 resulted from prior representation.
17         Let's assume that there was a conflict. It seems
18 to me pretty apparent that there was on the part of EBG.
19 And, further, I think we can assume that the trustee is
20 correct that the conflict existed and there was a duty on
21 EBG to disclose the prior representation and EBG did not.
22         The issue I have is I do not understand how you
23 articulate damages as a result, or what the theory of
24 damages could possibly be, particularly in light of the
25 Hewitt affidavit; that even assuming that the conflict had

4

1  been disclosed, assuming that EBG had been willing to
2  violate its confidences -- or its confidential relationship
3  with the previous client and had told everything that they
4  are alleged, or the firm is alleged to have known because of
5  the representation -- why would we see any different result,
6  Mr. Fleischer? What are the damages?
7          MR. FLEISCHER: There are a couple of points
8  about the damages and the causation.
9          First of all, if I may address the Hewitt
10 affidavit, and I don't want to belabor the points too much
11 that have been raised in my pleadings and which your Honor

11-21-06sj-F

12  has obviously read.

13  But I think that the Hewitt affidavit itself raises
14  more questions than it does answers. It sets forth a number
15  of assumptions that he and actually ATG were making when
16  they made the decision in November of 1998 whether or not to
17  go forward with the acquisition of these MMT assets.

18  These assumptions were expressly set forth in
19  Mr. Hewitt's memorandum, indicating that those assumptions
20  had some significance to the company, one of those
21  assumptions being that the technology was "close to
22  profitability." Another assumption being that most of the
23  costs and investment had been made in the system, and
24  that -- he used the term of "tweaking," I believe, and
25  further training was all that would be required to bring the

5

1   system to profitability or to operational status.
2   Those assumptions, in fact, were incorrect.
3   THE COURT: Well, doesn't he say in paragraph
4   10 that they recognized that there was a risk and even
5   recognized the possibility that they may have to replace the
6   technology altogether?
7   MR. FLEISCHER: Certainly they did recognize
8   that there was some risk, but any decision to purchase -- to
9   make a major acquisition is a balancing analysis. You're
10  weighing the risks against the possible benefits.
11  And what we're saying is that you can't assume that
12  the analysis would not have -- the balance would have been
13  shifted had some of those assumptions that the company was
14  obviously relying on been different than they were.
15  They may have said, well, you know, if we're going
16  to face $14 million worth of exposure here on this

11-21-06sj-F

17  acquisition that's only going to cost us $4 million, it
18  probably doesn't make sense to our shareholders. We're
19  talking about a public corporation here.
20          Another thing that your Honor should recognize is
21  that Mr. Hewitt did not have final decision-making
22  authority. He does not speak for ATG. Frank Chiu is the
23  person that ultimately will have to come in here and testify
24  as to what the effect of that decision has been.
25          I would like to address another aspect of

6

1  causation, and this is a point of contention in the briefs
2  as well.
3          The effect of the disclosure will ultimately, in
4  our view, be determined by an expert that we're going to
5  have to bring in to opine as to what the natural flow of
6  consequences would have been had Epstein Becker & Green made
7  the appropriate disclosure.
8          Based upon our discussion with transactional
9  attorneys that we've spoken to about this matter, we believe
10 that that would have resulted in a disclosure of information
11 that ultimately would have led the company to realize that
12 there was a serious problem here and reconsider its
13 decision, perhaps, you know, going in an entirely different
14 direction --
15          THE COURT: I thought you said in the original
16 complaint, and as I understand the amended complaint, the
17 failure on the part of EBG was the failure to disclose the
18 fact that a conflict existed.
19          MR. FLEISCHER: That's correct, your Honor.
20          THE COURT: And had they disclosed that fact,

11-21-06sj-F

21  let's assume the logical consequence, which would be what,
22  that --
23              MR. FLEISCHER: The logical sequence --
24              THE COURT: -- ATG would have found different
25  counsel?

7

1               MR. FLEISCHER: I think that from what I
2   understand, again in talking with people, you know,
3   attorneys in conflicts -- I'm sorry, attorneys involved in
4   transactional matters of this kind, particularly in
5   bankruptcies, is that the disclosure of the conflict itself
6   would have revealed a lot of information that, you know, a
7   further analysis, further investigation, that would have led
8   to the disclosure -- to the discovery of some significant
9   problems with the assets.
10              And your Honor should keep in mind the time table
11  here. There was a very short-pressed time period from the
12  time ATG came in and between the closing. You recall
13  that -- I believe the first bid was submitted November 13,
14  1998. Closing occurred on December 1, 1998, upon an
15  approval order that entered December -- I'm sorry.
16  November 24.
17              So I think that given the hurried speed of these
18  transactions, had new counsel come in, it's very likely that
19  there would have been a lot more information to discover.
20  There was so much that hadn't been done.
21              THE COURT: You mean by of way of due
22  diligence. You're not now arguing --
23              MR. FLEISCHER: It's not necessarily due
24  diligence.
25              It's what would have been disclosed had the

1   conflict been disclosed.

2           THE COURT: But how could ethically EBG --
3   let's assume that they did have a duty to say, We have a
4   conflict. How could they then disclose confidences that
5   they had learned because of the conflict, because of the
6   prior representation?

7           MR. FLEISCHER: Right.

8           I think that the amount of material, the limited
9   material, that would have to be disclosed to explain the
10  conflict to ATG would have raised a red flag, and I think,
11  again, this is going to be a matter for an expert to testify
12  to --

13          THE COURT: Well, you tell me about it, but
14  where in the record do I find this expert?

15          MR. FLEISCHER: Okay.

16          Your Honor, we have not disclosed the expert yet,
17  and this is a point that Epstein Becker makes in the brief.

18          We have a bifurcated discovery schedule here. The
19  schedule specifically contemplates that expert disclosure
20  will occur in Phase II. Phase II does not come until after
21  your Honor rules on this motion. And, again, this was a
22  two-phased discovery that EBG pushed very hard for. You
23  know, for them to now complain that there is no expert
24  discovery when they insisted on having expert discovery
25  pushed into Phase II, is really not a fair point to make.

9

1           You know, our intention is to bring an expert who
2   will provide testimony as to what the natural consequences

11-21-06sj-F

3  would have been had the disclosure been made, and we would
4  then go from there, you know, in terms of the damage
5  analysis. But I believe we're entitled to designate that
6  expert in Phase II, assuming that your Honor let's this case
7  go to that stage.
8           THE COURT: But your theory of damages is that
9  an expert will testify that had the conflict been disclosed,
10 there would have been at least inquiry notice given to ATG,
11 that they would have then more diligently pursued
12 information about the acquisition and the prior business of
13 MMT, and in the course of that they would have discovered
14 that, I presume, that Nagle and Preston were some dubious
15 standing within the prior? Is that the theory?
16          MR. FLEISCHER: That is basically --
17          THE COURT: There's a lot of "ifs" out there
18 in that chain.
19          MR. FLEISCHER: I think that's a correct
20 characterization of it, your Honor.
21          THE COURT: Ms. Bagger.
22          MS. BAGGER: Thank you.
23     I think the three main points to be made about
24 causation, and I think the Court, in fact, has touched upon
25 each already.

                                                          10

1           The first is the state of the record at this point.
2           We've heard about Frank Chiu who is going to come
3  in at trial and testify, but there is no affidavit or
4  deposition testimony from Frank Chiu.
5           We've heard about a transactional attorney who's
6  going to come in at trial and testify, but there is no
7  affidavit or information from any damage -- a causation

11-21-06sj-F

8   damages expert in this case.
9          There was no Rule 56 affidavit filed with the
10  summary judgment. If, indeed, the plaintiff had considered
11  it somehow unfair or out of order for us to have filed this
12  summary judgment motion at this point, they certainly had
13  the opportunity to call that to the Court's attention prior
14  to today.
15          I think the second point is exactly what the Court
16  said, that even if there were a conflict in this case, the
17  ethical rules limit what Epstein Becker could have done to
18  call an undisclosed conflict to the attention of the
19  plaintiff, and certainly they could not have disclosed any
20  of the prior confidences or communications that were
21  received from prior clients, Christopher Nagel in
22  particular.
23          I think where Mr. Hewitt's affidavit is most
24  powerfully effective is the only inferences I think that the
25  Court can draw that a simple notification to ATG of a

11

1   potential conflict could have been was either, number one,
2   the idea that perhaps this technology did not work as well
3   as it might; and, two, the suggestion that maybe Mr. Nagel
4   and Quantum Catalytics shouldn't be believed, everything
5   that they say shouldn't have been believed on its face.
6          Mr. Hewitt is crystal clear in his affidavit on
7   both points, that he knew walking in -- he knew he didn't
8   want to buy initially the assets walking in. None of this
9   was a mystery to Mr. Hewitt.
10         The entire history of the ATG side of this
11  transaction, as set forth not only in the Hewitt affidavit

11-21-06sj-F

12  but also in the deposition -- the affidavit and limited
13  deposition testimony from Jarvis Kellogg, who was the
14  corporate lawyer at Epstein Becker & Green, made that clear.
15      When Mr. Hewitt showed up at Epstein Becker's
16  doorstep, he knew he wanted to buy the wet waste assets of
17  Molten Metal Technology. He talked to the trustee. He'd
18  done his diligence. He was told by the MMT trustee that
19  they wanted a package deal, that he'd have to find somebody
20  who wanted to buy the CEP assets so they could sell them
21  together; and the MMT trustee said there's a company called
22  Quantum Catalytics who wants to buy that CEP assets, why
23  don't you guys get together. And they went in and they made
24  a joint bid initially.
25      ATG was going to buy the wet waste assets, because

12

1   that's what they wanted. CEP was going to be purchased by
2   Quantum Catalytics because that's what it wanted.
3       There is a suggestion in the case that Chris Nagel
4   and Quantum Catalytics are somehow suckering ATG into buying
5   this technology, and that's not what the undisputed record
6   of this case shows.
7       What it shows is they made a joint bid. The State
8   of Tennessee said we're not going to let Quantum Catalytics
9   take title to a nuclear facility down in Oak Ridge,
10  Tennessee. We want a company with more of a track record.
11      ATG realized that was going to have to be ATG. It
12  formed a company called ATG Catalytics.
13      ATG Catalytics was owned jointly by Quantum
14  Catalytics and ATG to purchase those CEP assets.
15      Again, if Quantum Catalytics and Chris Nagel were
16  involved in some kind of deal to foist bad assets off on

11-21-06sj-F

17  ATG, it doesn't comport with the record because they were
18  joint purchasers of these assets; and the acquisition was
19  set up so that the purchase price for these CEP assets was
20  $800,000 a year over five years, jointly and severally
21  liable, the Quantum Catalytics folks and ATG Catalytic.
22      There is no support in the record, first of all,
23  for the idea that Quantum Catalytics was coming in to
24  defraud or mislead or lie to Bill Hewitt, ATG.
25      But, even so, Mr. Hewitt says in his affidavit --

13

1   he suggests that he knew that perhaps Chris Nagel, as the
2   inventor of this technology, might have been a little
3   optimistic, and he says, It was known to ATG at the time of
4   the transaction this CEP technology had not operated
5   reliably. As explained above, ATG approached the
6   acquisition with a backup plan due to a risk it perceived
7   with the CEP process. If CEP had operated as promised by
8   Quantum Catalytics, which ATG was skeptical of, there would
9   have been an upside. If it did not, ATG's plan was to
10  remove this CEP process from the facility and replace that
11  process with a process that had already been internally
12  proven to treat rosins.
13      Now, I think the suggestion that we should wait to
14  see what an expert is going to say that somehow explains how
15  the mere disclosure of a prior representation of Christopher
16  Nagel by Epstein Becker & Green is going to put into dispute
17  that clear language from Mr. Hewitt, I think is far too
18  speculative at this point, and that each of these causation
19  arguments, number one, the fact that EBG had an ethical
20  obligation not to disclose the information that we're

11-21-06sj-F

21  essentially being sued because we did not disclose; B,
22  failure of the record in terms of affidavit support for the
23  theory we're hearing today; and, C, the strength of
24  Mr. Hewitt's affidavit, which is unrebutted in the summary
25  judgment record, suggests that summary judgment should enter

14

1   for Epstein Becker.
2              THE COURT:  Let's take a five-minute recess.
3              THE CLERK:  All rise.
4          (Recess.)
5              THE CLERK:  Court is in session.
6          You may be seated.
7              THE COURT:  I'm sorry for the interruption.  I
8   wanted to take another look at the record in the case.
9              As counsel are aware, summary judgment involves a
10  standard with respect to the nonmoving party, but there is a
11  burden, where the record is otherwise presented to the Court
12  as complete, to contest facts that otherwise are
13  uncontested, and in doing so, a party has to do more than
14  simply rely on speculation or allegation.  There has to be
15  enough evidence -- again, seen in the light most favorable
16  to a nonmoving party -- that would warrant a jury, again
17  seeing it in that favorable light, in returning a verdict
18  for the party that is not the moving party at summary
19  judgment.
20             On this record there simply is insufficient
21  evidence before the Court that any kind of damage could be
22  shown, given the nature of the amended complaint and the
23  allegations it makes.
24             The duty that is now identified by the Trustee is
25  the duty to disclose the fact of prior representation, and

15

1   then the assumption is, and it is a speculative one, that
2   had that conflict been disclosed, more diligent inquiry
3   would have been undertaken; and in the course of that
4   inquiry, facts would have been discovered that would have
5   then led ATG to reconsider the purchase of the assets that,
6   in fact, were purchased.
7           This is simply not supported.  In fact, it is, to
8   my mind, directly contradicted by the Hewitt affidavit.  It
9   may be that Mr. Chiu has a different view of what would have
10  happened, but I see nothing, and that is what I was looking
11  for.  There is no affidavit from Mr. Chiu or reference to
12  testimony or to what Mr. Chiu's position in fact would have
13  been with respect to this conflict issue.
14          I recognize that discovery was bifurcated and the
15  expert stage has not occurred yet, but plaintiff had some
16  obligation to recognize the absolute deficit in the case or
17  in the record before the Court, and that's why Rule 56(f)
18  would have been the appropriate vehicle for the plaintiff to
19  resort to to supplement the record that is before the Court.
20          Again, looking at the record in the case, for the
21  reasons that the Court has stated, I have no choice but to
22  allow the motion for summary judgment, and the record will
23  so indicate.
24          Thank you, counsel.
25          MR. FLEISCHER:  Thank you, your Honor.

16

1           MS. BAGGER:  Thank you, your Honor.
2           THE CLERK:  All rise.

```
                        11-21-06sj-F
3           Court is in recess.
4           (Proceedings adjourned.)
5
6                   C E R T I F I C A T E
7
8
9
10          I, James P. Gibbons, Official Court Reporter for
11   the United States District Court for the District of
12   Massachusetts, do hereby certify that the foregoing pages
13   are a true and accurate transcription of my shorthand notes
14   taken in the aforementioned matter to the best of my skill
15   and ability.
16
17
18
19
                    JAMES P. GIBBONS, CSR, RPR, RMR
20                       Official Court Reporter
                       1 Courthouse Way, Suite 7205
21                    Boston, Massachusetts 02210
                             (617) 428-0402
22
23
24
25
```

# AFFIDAVIT OF SERVICE

**State of California**        **County of**                **District Court**

Case Number: C05-01141 BZ

Plaintiff:
Robert I. Hanfling, Chapter 7 Turstee for ATG, Inc.
vs.
Defendant:
Doreen Chiu, Frank Chiu, George Doubleday, David Chan, Edward Vinccour, Rio Chao, David R. Sebastian, James E. Thomas, Dennis Williamson, Eric C. Su, Fred Feizollahi, and William Hewitt

For:
    Jacobs Partners L.L.C.

Received by Front Range Legal Process Service on the 12th day of July, 2005 at 1:32 pm to be served on **WILLIAM HEWITT- 16310 Wild Plum Road, Morrison, CO 80465**. I, _Charles Schmidt_, being duly sworn, depose and say that on the _16th_ day of _July_, 20_05_ at _10:00_ .m., executed service by delivering a true copy of the Summons in a Civil Case; District Court Civil (CV) Case Cover Sheet For Initial Pleadings Of Complaint, Counterclaim, Cross-Claim or Third Party Complaint; Complaint & Demand for Jury Trial; Order Setting Initial CAse Management Conference; ECF Registration Information Handout; Dispute Resolution Procedures in the Northern District of California; Certification Purrsuant to ADR LR 4-2(b)(1) Re Amount of Damages; Consent to Proceed Before a United Stated Magistrate Judge in accordance with state statutes in the manner marked below:

( ) INDIVIDUAL SERVICE: Served the within-named person.

( ) SUBSTITUTE SERVICE: By serving _____ as _____.

( ) POSTED SERVICE: After attempting service on __/__ at ____ and on __/__ at ____ to a conspicuous place on the property described herein.

(✓) NON SERVICE: For the reason detailed in the Comments below.

Military Status: ( ) Yes or ( ) No   If yes, what branch? _____

Marital Status: ( ) Married or ( ) Single   Name of Spouse _____

COMMENTS: _per neighbor Mr Hewitt passed away 2 yrs ago. Spouse sold house and moved._

Subscribed and Sworn to before me on the _3rd_ day
of _Aug_, _2005_ by the affiant who is
personally known to me.

_Margie Wolfe_
NOTARY PUBLIC

PROCESS SERVER # _N/A_
Appointed in accordance
with State Statutes

Front Range Legal Process Service
826 Roma Valley Dr.
Fort Collins, CO 80525
(888) 387-3783

Our Job Serial Number: 2005002174

I certify that I have no interest in the above action, am of legal age and have proper authority in the jurisdiction in which this service was made.